IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHELDON G. ADELSON, | )<br>)<br>) |
| Plaintiff, | ) Civil Action No.<br>) |
| v. | ) **04-cv-10356-RCL**<br>) |
| MOSHE HANANEL, | )<br>) |
| Defendant. | )<br>) |

**AFFIDAVIT OF MOSHE HANANEL IN SUPPORT OF MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND FOR FORUM NON CONVENIENS, OR TO STAY PROCEEDUNGS**

I, Moshe Hananel, depose and say:

1. I am the Defendant in the above action. I state the following facts of my own personal knowledge, except where stated to be on information and belief, and, as to such facts, I believe them to be true.

**Personal Information**

2. I am 50 years old. I have been a citizen and resident of Israel my whole life. I have never resided in the United States.

3. I have been ill with diabetes since 1995, and high blood pressure and kidney pathology since December 2001 and February 2002 respectively. Since Dec. 31, 2002 I have been legally blind. I require assistance when I travel, and specialized computer and other equipment to assist in reviewing documents and communicating in writing. For these reasons I find it difficult to travel abroad.

4. Although I speak English, my native language is Hebrew.

5. In Israeli courts, both English and Hebrew are official languages. I would find it relatively difficult to participate in proceedings in the United States rather than Israel for this reason, as I would be required to hire different machinery and assistance.

**My Contacts With The United States - General**

6. I do not own any interest in any business in the United States and I have never been employed or paid taxes in the United States. I do not own any real estate in the United States. From 1980 until 1995 when I started working for IPI, I visited the United States for social reasons and in connection with my family's Israeli business of arranging tours to Israel for Americans. My family sold control of the business in 1998 and the remaining interests in 2000.

7. I have visited Massachusetts to participate in panel discussions concerning Israel and the Middle East at the John F. Kennedy School of Government of Harvard University in 1993 and 1995.

**My Contacts With Adelson In Israel and the United States**

8. I was first introduced to Sheldon Adelson ("Adelson") in the mid-1980's and met him formally in 1988 during Adelson's first visit to Israel. Since that first meeting, when I escorted him around Israel, the overwhelming majority of our meetings have been in Israel rather than in the United States, and the overwhelming majority of our telephone conversations (which occurred almost daily during my employment by IPI, 1995-2000) and other communications have occurred while I was in Israel.

9. Our meetings before August 1995 were usually social, and occasionally concerned our mutual interests in the travel business or in casinos in the Middle East.

10. From 1994 to April 2000, I visited the United States approximately thirteen times, for a total stay of approximately 50 days (i.e., an average stay of less than four days).

- 3 -

Only about five of these visits were to Massachusetts, with a total length of stay of less than two weeks. My contacts with Adelson are described below.

11.     From April 2000 through the present, a period of more than four years, I have not visited the United States even once.

**Adelson's Contacts With Israel**

12.     I am aware of many visits by Adelson to Israel since his first visit in 1988. He had and retains extremely close links with Israel, including a penthouse residence at 10 Paamoni St. in Tel Aviv (where he stays during his visits to Israel and the region), an apartment at 10 David Yalin St., Tel Aviv (both properties registered in his wife's name), a movie theater in Haifa, a bank account at a Tel Aviv branch of Bank Hapoalim (and previously at other Israeli banks), personal legal counsel Yakov Neeman, Dr. Klagsbald, and Hagai Halevi, all Israeli lawyers with offices in Israel, and a C.P.A. Gad Somech of Somech Haikin. Adelson's wife Miriam and their children are Israeli citizens, and Miriam's family is primarily located in Israel. Adelson has personal investments worth at least several million dollars in Israeli businesses, and the movie theater and his residence are also worth several million dollars. Adelson has conducted business while in Israel regularly over the last ten years, and has been in Israel approximately 400 days over that time. In the last 48 months (March 2000 - March 2004) he has made more than a dozen visits. Adelson's September 29, 2002 Affidavit, filed in the first Israeli litigation between us, Exh. 1 hereto, states in paragraph 41:

> There are businesses in Israel which I manage outside of the Israeli branch of Interface, such as investments in real estate and in movie theatres in Israel.

13.     Adelson's extensive contacts with Israel through the litigation he has conducted against me there are detailed below.

## My Contacts With Adelson Concerning IPI Employment

14.     In August, 1995, while Adelson was in Israel, I learned from Adelson that he was having a dispute with his brother-in-law, the Israeli branch manager of Adelson's wholly-owned company Interface Partners, Inc. ("IPI"). The brother-in-law resigned, and Adelson was urgently looking for a manager. In discussions with Adelson in September and October 1995, while both of us were in Israel, we orally agreed that IPI would employ me as Israeli branch manager.

15.     I began my employment in October, 1995. Among my other duties, in that month I accompanied Adelson on a trip from Israel to Jordan to discuss an investment in that country. On the 7th of November 1995 Adelson elected me chairman of the board of directors of the Israeli company Auto Depot (and I attended at least three meetings before my December 1995 trip to the United States), which he owned through IPI, and announced publicly that I was the Israeli branch manager of IPI. Adelson granted me signature rights on all IPI accounts in October 1995 and on Auto Depot bank accounts in November 1995. I participated with him and on his behalf in negotiations with the Israel Land Authority regarding a project in Eilat, Israel, on November 1, 1995.

16.     My work for Adelson and IPI from October 1995 until April, 2000 was to identify, evaluate and make investments in businesses in Israel and other countries, but never in the United States. My only office for IPI was IPI's office in Tel Aviv. I never had an office in the United States.

17.     At all times from 1995 to the present IPI had registered to do business in Israel, IPI paid taxes in Israel, my salary was paid in Israel, and I paid taxes in Israel.

18.     <u>After</u> Adelson and I had agreed to all employment terms in September and October 1995, and <u>after</u> I had started work for IPI in October, I visited Massachusetts in early

- 4 -

December 1995. The primary purpose for my visit was to seek medical advice (a second opinion) about my diabetes from the Joslin Clinic in Boston. I participated in discussions at Harvard, as stated previously. I did meet with Adelson and some other employees of his during that visit. <u>It is not true that the terms of my employment were decided during that visit</u>, as they had previously been decided and agreed to in Israel, and I had already begun to work for Adelson and IPI before December, 1995.

**Contacts With Adelson Concerning The Macau Claim**

19.     During the period from 1995 to April 2000, Adelson also employed me to identify and work on casino projects in Israel, Jordan, Italy, Rhodes (Greece), Bulgaria, Ireland, and elsewhere.

20.     In 1999, I initiated a project for a casino and a hotel in Macau, China as a potential investment by Adelson. I told Adelson of this opportunity (including telling him where Macau was located) while we both were in Israel, and as a result he traveled to Macau from Israel (via Taiwan and Hong Kong) in August, 1999 (and returned to Israel). I provided him with business plans I had prepared in Israel. Although these plans were for other opportunities, they were appropriate for convincing the Chinese authorities that a casino license should be granted to Adelson. I also provided to him the official Foreign Investment Guide to China, and other material about the region. He made a second trip from Israel to Macau (and Hong Kong) for five days and back to Israel in March, 2000.

21.     Upon his return from his first visit to Macau, Adelson told me, "If I were younger I would invest in China, but now I am ready to invest only in places under the American or Israeli flag." Adelson's later conduct, described below, indicated to me that he was attempting to

mislead me about his interest in the Macau project I had initiated. A few days after his second visit to Macau (March 2000), Adelson notified me of my termination from employment by IPI.

22.    Adelson successfully concealed his subsequent activity in Macau from me for nearly two years. I learned through the international press of Adelson's Macau activity and wrote Adelson a letter on Feb. 21, 2002 reminding him to inform the Chinese authorities of my stock option in the project.

23.    Adelson's response, in part, was a letter from his and IPI's counsel Mr. Roberts to my counsel dated July 30, 2002, in which Mr. Roberts stated "neither Mr. Adelson nor IPI has received any franchise to build a casino in Macau." Exh. 2. This statement, however, conflicts sharply with Adelson's allegation in paragraph 24 of his Complaint in this Court that "after [Adelson's company] LVSI or an affiliate first obtained approval to operate a casino in Macau, Hananel began to make claims against Adelson for an interest in the Macau project." (Emphasis added.) Thus Adelson admits that my February 2002 written notification to Adelson of my Macau claim was after Adelson had obtained approval for a Macau casino. All of these events occurred while I was in Israel.

24.    I believe Adelson has always been aware that he owed me a share in the Macau project. In the course of negotiations in Israel over the terms of my severance from IDI, in April, 2001, Adelson's counsel sent me a draft Settlement and Release Agreement, a true copy of which is attached as Exhibit 3 hereto. This agreement recites my claim to interests in casino investments by Adelson in "Israel, Jordan, or any other country," and Adelson proposed to me that I release all claims "in connection with casino license(s) obtained or to be obtained by IPI and/or any IPI Party and/or Adelson and/or Adelson Party in Israel, Jordan, or any other country." Exh. 3 (emphasis added). I did not agree to this release.

- 6 -

## Three Litigations In Israel Between Adelson And Myself

25. Following my termination in April 2000, Adelson and I disputed the amount of compensation due me from my work at IPI and my rights to receive stock options in high-tech and casino projects. This dispute has resulted in proceedings in Israel concerning all of the claims and allegations Adelson raises in his U.S. Complaint.

26. Adelson and I are presently parties before the Tel Aviv District Labor Court of Israel in <u>three</u> proceedings described below (and an additional proceeding in the State Labor Court in Jerusalem, an appeal by Adelson of an evidentiary ruling in the 2001 case). There have been hundreds of documents including thousands of pages submitted to the courts in these actions. Because English is an official language of the Israeli courts, Adelson has been able to submit an affidavit in English (copy attached as Exh. 1 hereto). The vast majority of all documents have been in Hebrew. Adelson has taken positions in these Israeli proceedings that substantially contradict some allegations of his U.S. Complaint.

   a. **Hananel v. Adelson & IPI, 2001.** I filed suit against Adelson individually and IPI in the Tel Aviv District Labor Court August 19, 2001 ("the 2001 suit"). I claimed money due me pursuant to oral employment agreements with Adelson and IPI, thereby putting the terms and performance of my relationship with Adelson at issue. (Adelson's September 29, 2002 Affidavit, a true copy of which is Exh. 1 hereto, was filed in this action.) In its answer to my complaint, filed on November 18, 2001, IPI denied my claims for options and other past due compensation. Interface denied also that I served as its manager, that I was fired, and that it had an employment agreement with me. IPI took the opposite position on these issues in its 2002 suit, and, as Adelson also takes the opposite position

concerning the existence of an employment contract in the present Complaint. Adelson has <u>never alleged any meetings in Massachusetts or contacts with Massachusetts, has never mentioned the presence of a third person in any employment negotiations, and has never designated to the Israeli court any third person as a witness to such negotiations,</u> all contrary to allegations in the U.S. Complaint.

b. **IPI v. Hananel, 2002.** Adelson's company IPI then <u>chose the same Israeli court</u> to bring a countersuit against me. On November 17, 2002, IPI filed suit against me, seeking the return of allegedly misused IPI funds ("the 2002 suit"). In its Israeli suit, IPI (as always fully owned and controlled by Adelson) confirmed, as does Adelson in the present Complaint, that there <u>was</u> an employment agreement between IPI and Hananel and that Hananel was the manager of the Israeli office of IPI, and alleges meetings between Hananel and Adelson in Israel and Las Vegas, Nevada, and in other foreign countries. IPI admits joint trips by Adelson and Hananel to Jordan to assist IPI in promoting a joint Jordanian-Israeli project, although IPI does not mention that the project was a casino. <u>As in the 2001 suit IPI/Adelson never allege any meetings in or contacts with Massachusetts.</u>

c. **Hananel v. Adelson and IPI, 2003.** The following year, on December 17, 2003, I commenced another suit in the <u>same Israeli court</u> against both Adelson individually and IPI for my rights in options and stock in the Macau project ("the 2003 suit"). Adelson responded to the suit by contesting service of process, but the District Labor Court rejected his arguments in an order dated May 24, 2003 more fully described below.

### Statements And Admissions By Adelson In Israeli Lawsuits

27.     Adelson's September 29, 2002 Affidavit in the 2001 suit (Exh. 1 hereto) and, as stated above, all of his or IPI's other papers filed in the 2001, 2002, or 2003 Israeli suits <u>lack any claim that employment agreements with me had been made in Massachusetts, lack any allegation that any meetings had taken place in Massachusetts, lack any allegation that I had contacts with Massachusetts, and, indeed, lack any mention of Massachusetts</u>.

28.     On March 30, 2004, IPI filed a Statement of Defense to my 2003 lawsuit arguing that the 2003 lawsuit <u>should be stayed because the question of my Macao claim is the subject of my prior (2001) Israeli lawsuit</u>.

### Relevant Findings By Israeli District Labor Court

29.     In her 24 May 2004 decision in the 2003 action, Judge Davidov-Mutola held that I had properly served Adelson under Israeli law by serving his Israeli attorneys, and also by serving IPI. Attached as Exh. 4 hereto is an accurate translation of relevant portions of the 24 May 2003 decision, which was originally in Hebrew.

30.     Judge Davidov-Mutola found that service on Adelson's Israeli attorneys was proper based on the following facts:

   a. The complaint in the 2003 suit "deals substantively with the same matter as the [2001 suit]" and these same attorneys had represented Adelson (and IPI) in the 2001 action. Exh. 4, ¶ 19.

   b. The complaint in the 2003 suit "evolved from the same claimed [employment] agreement and deals with the same issues." ¶ 22.

   c. A limitation by Adelson of his relationship with these attorneys, saying that their representation of him was strictly limited to the other cases, was issued for a

tendentious purpose, and consequently service on these attorneys was valid. ¶ 22.]

d.  Adelson did not substantively dispute that he was aware of the 2003 action or that he is in very close contact with these attorneys concerning the other litigation. ¶ 20.

31. She also found that <u>service on Adelson by delivering the papers to IPI in Israel</u> was proper, for the following reasons:

a.  Adelson's own prior affidavit in the 2001 action (Exh. 1 hereto), paragraph 8, showed that he had personal and direct involvement in employing me, although IPI was the formal employer. ¶ 28.

b.  Adelson had also admitted that he closely supervised and actively participated in IPI's business in Israel. Judge Davidov-Mutola rejected Adelson's argument that a holding against him would make all CEO's of multinational corporations liable to personal service through an Israeli branch, distinguishing Adelson because of his close personal involvement in the Israeli business. ¶ 28.

32. Judge Davidov-Mutola also ruled that the 2003 suit <u>should be consolidated with the 2001 suit</u> "to save judicial time and to prevent inconsistent decisions on the same issues." She stated that the 2003 suit was "another layer of" the 2001 suit. She ordered the parties to submit their positions on consolidation in thirty days, i.e., by June 23, 2004. Exh. 4, ¶ 32. She ordered Adelson to pay the Plaintiff's expenses of the motion. Exh. 4, ¶ 33.

### Disclosures Of Competing Suits

33. I promptly disclosed to the Israeli courts Adelson's filing of this Massachusetts suit. Adelson, however, did not disclose to this Court the pendency of the Israeli actions, nor did

he disclose that, in the extensive litigation in Israel, he had never mentioned any contacts with Massachusetts by me or any relationship between the employment agreement and Massachusetts.

I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct to my personal knowledge, this 4 day of June, 2004.

_____
Moshe Hananel

- 11 -

he disclose that, in the extensive litigation in Israel, he had never mentioned any contacts with Massachusetts by me or any relationship between the employment agreement and Massachusetts.

I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct to my personal knowledge, this ____ day of June, 2004.

_____
Moshe Hananel

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail-hand on 6/14/04
_____