IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED
CLERKS OFFICE

2004 OCT -7 P 4: 20

U.S. DISTRICT COURT
DISTRICT OF MASS.

|  |  |
|---|---|
| SHELDON G. ADELSON, | ) |
| Plaintiff, | ) Civil Action No.: |
| v. | ) 04-cv-10357-RCL |
| MOSHE HANANEL, | ) |
| Defendant. | ) |

## MOTION OF HANANEL FOR LEAVE TO SUPPLEMENT RECORD AND RULE 7.1 CERTIFICATION

### Local Rule 7.1 Certification of Motion

In a telephone conversation between the undersigned and Albert P. Zabin, Esq. on Oct. 6, 2004, Mr. Zabin agreed not to oppose this motion for leave to supplement and Mr. Hamilton agreed not to oppose a motion by Adelson for leave to supplement to deal with the Adelson Affidavit dated Sept. 7, 2004 attached to Hananel's motion, if Adelson deemed it necessary.

### Motion for Leave

Defendant Moshe Hananel ("Hananel") respectfully moves the Court for leave to supplement the record on Hananel's pending motions to dismiss for lack of personal jurisdiction and for forum non conveniens, and his alternative motion to stay proceedings, by supplementing the record with a true copy, attached as Exh. 1 hereto, of an Affidavit of Plaintiff Sheldon G. Adelson ("Adelson") filed in Israel in Labor Case 9015/02 on behalf of the plaintiff in that case, which states on page 14 that it Adelson appeared in Israel on September 7, 2004 to sign it. Hananel offers this supplement to the record as evidence unknown to him at the time of his last

- 2 -

filings of Adelson's recent presence in Israel for the purpose of conducting pending litigation with Hananel in Israel, an issue on which Adelson has sought to cast doubt.

WHEREFORE, the Court should grant leave and consider the evidence of a recent presence in Israel by Adelson for the purpose of conducting pending litigation with Hananel there.

Dated: October 7, 2004

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail -hand on 10/7/04.

MotLvSuppRec.-31216-1

MOSHE HANANEL
By His Attorneys

James A. G. Hamilton (MA Bar # 218760)
PERKINS, SMITH & COHEN, LLP
One Beacon Street
Boston, MA  02108
617.854.4000

1

## Affidavit

I, the undersigned, Sheldon G. Adelson, U.S. passport No. 101668547, after having been cautioned to tell the truth, failing which I shall be liable for the penalties prescribed by law, do hereby declare as follows:

1. My name is Sheldon G. Adelson. I am making this affidavit solely on behalf of the Plaintiff in labor case 9015/02 (hereinafter: "Interface"), of which I am the sole controlling shareholder, after having been authorized thereby to do so.

### Chapter I – Factual Background to the Relationship Between Interface and Hananel

2. Interface is a private company organized in the United States which has a registered branch in Israel. I am a citizen and resident of the United States and the sole controlling shareholder of Interface.

3. Since on or about the beginning of 1994, Interface (at first - a related company called Interface Group Massachusetts, Inc., and since 1996 Interface itself) has maintained a branch in Israel, the objective of which was to identify investments in the hi-tech industry in Israel. The Israeli branch of Interface was established with the view of capitalizing on Interface's relationships within the hi-tech industry and to enable Mr. Farbstein – my brother-in-law and the first manager of Interface's Israeli branch – to take advantage of the business experience he acquired in the United States.

4. The Defendant (hereinafter: "Hananel") and I first met in 1988. Hananel was a manager at HaGalil Tours Ltd. (hereinafter: "HaGalil Tours"), an Israeli company which was owned by Hananel's wife's family and himself. HaGalil Tours provided tourism services to a company under my control which was affiliated with Interface. Subsequently, when I visited Israel, Hananel would meet me occasionally, and that is how we became acquainted.

5. Over the years, the acquaintance between myself and Hananel turned into a personal friendship marked by a relationship of trust.

6. Toward the end of 1995, as Mr. Farbstein notified Interface of his intention of retiring from Interface, it became clear that Interface would need a new manager for its Israeli branch. Hananel proposed himself for this position. In light of my acquaintance with Hananel and the relationship of trust between us,

2

Interface agreed to entrust the responsibility for managing its Israeli branch to Hananel.

7. The agreement between Interface (through myself) and Hananel – which was not reduced to writing – was that Hananel would act as the manager of Interface's Israeli branch. Within this framework, Hananel would be responsible – with the assistance of professionals whom he would retain with Interface's prior approval – for identifying business opportunities for Interface in the hi-tech market in Israel, investigating such opportunities, preparing recommendations for Interface, carrying out Interface's decisions with regard to the proposed investments and supervising the investments made or to be made (hereinafter: the "Agreement"). As aforesaid, the Agreement between Interface (through myself) and Hananel was an oral agreement.

8. Within this framework, it was agreed that as of January 1, 1996, Hananel would work full time for Interface, in consideration for which he would receive, starting January 1, 1996, an annual salary of US $100,000 (US $8,333 per month). Hananel said that he would start a "phasing-in" period of sorts shortly before January 1, 1996, but it was agreed that Hananel would only be remunerated from January 1, 1996. In addition, Interface (through myself) undertook to pay Hananel 12% of the net profit (profits less losses) which Interface might generate from the realization of investments in Israeli hi-tech companies initiated and caused to happen by Hananel, while he acted as the manager of Interface's Israeli branch, provided that he was still employed with Interface at the time of realization.

9. Hananel stated to me – as part of our agreement on the terms of his employment – that he would separate himself completely from HaGalil Tours, with the exception of occasional consultation, which in no case would compromise his <u>full time</u> employment with Interface.

10. Hananel was the senior (in fact, the only) manager of Interface in Israel. Toward mid 1996, Adv. Oded Efrat joined Interface's office.

11. Only in retrospect did Interface (and I) learn that Hananel abused the trust Interface placed in him as the manager of Interface's Israeli branch. Hananel did not fulfill the duties he was supposed to fulfill. The second half of the 1990s was the most flourishing period of Israeli hi-tech. As aforesaid, Hananel was supposed to identify attractive investments for Interface in the field of hi-tech. However – as Interface (and I) only subsequently learned, as specified in the affidavits of Ms. Miri Schory and Mr. Dan Raviv, Hananel invested most of his time and efforts (in violation of the Agreement between Interface and himself) in the management of HaGalil Tours and in his internal struggles with his partners there. Furthermore, as Interface (and I) only subsequently learned, as specified in the affidavits of Ms. Miri Schory and Mr. Dan Raviv, Hananel used

3

the resources which Interface placed at his disposal and his ability to "load" his expenses and the expenses of his private affairs on Interface in order to finance his expenses and the expenses of his private affairs (for example - within the framework of HaGalil Tours).

12. The years since Hananel's appointment as the manager of Interface's Israeli branch were very busy years for me, in which I constructed my largest project yet – the Venetian Hotel in Las Vegas. For that reason, I was unable to dedicate much attention in that period of time to Interface's branch in Israel. I relied on Hananel and trusted him and he abused the trust I placed in him. Also the geographic distance and time difference between Israel and the United States hampered my ability to monitor the office.

13. In the period leading up to early 2000 I despaired of Hananel and of his inability or unwillingness to perform his duty of identifying hi-tech investments for Interface in Israel. In the more than four years in which Hananel acted as the manager of Interface's Israeli branch – which were the golden years of Israeli hi-tech – Interface invested in only two companies. Hananel would forward to our offices in the United States raw information which he received from companies in Israel, without any analysis or investigation report. Our attempts to convince Hananel to hire the appropriate manpower to identify and evaluate investments – were unfruitful. Interface therefore decided to terminate Hananel.

14. Accordingly, in April 2000 Interface (through myself) gave Hananel notice of termination.

15. At the time of Hananel's termination I was not yet aware (nor was Interface aware) of Hananel's abuse of the trust placed in him. I believed that Hananel was a lazy and unproductive manager. It did not occur to me that throughout those years he actually continued working for HaGalil Tours and misappropriated Interface's funds.

## Chapter II – Refund of the salaries and related payments which were paid to Hananel while he worked for HaGalil Tours

16. As aforesaid, according to the Agreement between Hananel and Interface, from January 1, 1996 Hananel was supposed to work full time for Interface and to stop working for HaGalil Tours (with the exception of occasional consultancy).

4

17. As I now know from Ms. Miri Schory and Mr. Dan Raviv, Hananel acted in violation of the Agreement with him, and dedicated most of his time and energy to managing HaGalil Tours and other businesses, and invested only a very small portion of his time in Interface, all as specified in the affidavits of Ms. Miri Schory and Mr. Dan Raviv. Despite the aforesaid, Hananel drew a salary from Interface as if he worked for it full time.

18. I would like to emphasize that when I found out that Hananel worked for HaGalil Tours concurrently with his alleged "work" for Interface, I was utterly amazed. When the oral Agreement between Hananel and Interface was entered into, Hananel explicitly told me that he was tired of working for HaGalil Tours and that he would separate himself from HaGalil Tours, with the exception of occasional consultancy; as Hananel himself put it – once every few days he would pop into HaGalil Tours on his way home from Interface at the end of the work day. **Hananel's continued work for HaGalil Tours – while receiving a salary from Interface too – is an act of fraud, and I would never have agreed to it.** It would never have occurred to me to pay Hananel a full salary · ($100,000 per year), had I known that he was also working elsewhere at the same time. However, as I subsequently learned, Hananel was working for two different employers at the same time. To this I would never have agreed.

19. Hananel's conduct in this matter is entirely incomprehensible, and the claim whereby I allegedly agreed to it in advance or knew about it in real time is a blatant lie. **It is a flagrant abuse of the trust I placed in Hananel** and of the geographic distance and time difference which made it difficult to keep track of Hananel's work hours. In this context I should note that it never occurred to me that I had to spy on Hananel to verify whether he was keeping his agreement with Interface. I had full faith in Hananel.

20. As mentioned above, I am a resident of Las Vegas in the United States. The time difference between Las Vegas and Israel is 10 hours. This made it easy for me not to notice Hananel's work for HaGalil Tours. Because of the time difference, only rarely would I or my secretary call Interface's office to talk to Hananel, since the working hours in Israel (say, 9 a.m.-5 p.m.) are 11 p.m.-7 a.m. in Las Vegas. Even had I called Hananel first thing in the morning in Las Vegas (for instance, at 8:30 a.m.), I wouldn't have expected to catch Hananel at Interface's office (since by then it was 6:30 p.m. in Israel). Therefore, in order to reach Hananel, I or my secretary would generally call Hananel's home or cellular phone. On rare occasions, maybe once in several weeks, when I was told that Hananel was at HaGalil Tours after having tried to reach him, I would also call HaGalil Tours to talk to Hananel. Doing so never aroused my suspicions, since it was evening in Israel and, as aforesaid, Hananel told me that he intended dropping by at HaGalil Tours' offices occasionally, on his way home, after finishing his work day at Interface.

5

21. Another reason why I never suspected that Hananel continued working for HaGalil Tours was that every time I came to Israel on a visit, and would come to Interface's office, I would see Hananel in the office laden with work and meetings with various people. As specified in the affidavits of Ms. Miri Schory and Mr. Dan Raviv, it is now clear to me that this was a "charade" put on especially for me, so as to cause me to believe that this was the case all year long. In any event, as explained above, it never occurred to me that Hananel did not in fact come to work at Interface, but worked for HaGalil Tours.

22. Interface's attorneys informed me of Hananel's claim (in Section 5.13.2 of his Answer), whereby "Adelson knew that, as distinguished from Interface's other senior employees, Hananel neither asked for nor received a company car, since HaGalil Tours made a car available to Hananel, by virtue of the position he filled there (and Interface even paid expenses on that car). Can it seriously be claimed now that Interface was unaware that Hananel worked for HaGalil Tours too?". Without addressing all of the (irrelevant) inaccuracies dotting Hananel's said sentence, the conclusion which Hananel wishes to draw is not based on the facts. When the Agreement between Interface and Hananel was entered into, Hananel told me that as part of the arrangement for the termination of his work for HaGalil Tours, he was allowed to keep the car he had received from HaGalil Tours, and since this car was large and spacious he wanted to continue using it, and therefore asked – instead of car expenses – that Interface bear the cost of a driver for him, who would also run errands for Interface. I agreed to Hananel's said request. I was never told by Hananel (or by anyone else) that Hananel's keeping the car he received from HaGalil Tours involved Hananel's continued employment with HaGalil Tours. HaGalil Tours was a company owned by Hananel and his family, and I saw no irregularity in Hananel's keeping the car that he received from HaGalil Tours.

23. Interface's attorneys have also informed me of Hananel's claim (in Section 5.13.4 of his Answer), whereby "When Hananel worked for Interface and Adelson, Adelson visited Israel several times on tours with U.S. congresspersons. These visits were organized by HaGalil Tours, under Hananel's direction. During these visits, Adelson saw Hananel supervising HaGalil Tours' work many times. Can it seriously be claimed now that Interface was unaware that Hananel worked for HaGalil Tours too?".

This claim is a good illustration of both Hananel's ability to distort the truth and of his overestimation of himself. First, I should note that the claim whereby Hananel was an employee of mine is incorrect. In any event, the claim whereby HaGalil Tours organized the Congressional tours to Israel – under Hananel's direction, no less – is an outright lie. The said tours were organized – at a frequency of approximately one per year – by the American Israel Education Foundation, an affiliate of AIPAC (the American Israel Public Affairs Committee). The flight arrangements were made by GWV International, an entity under my control. All of the other arrangements for the tours, such as the

6

tour schedule, food service and accommodation – were organized by the American Israel Education Foundation. The only component of the tours in which HaGalil Tours was involved was the provision of buses for travel inside Israel. Hananel frequently approached me with requests to be allowed to join meetings or dinners of Congressional delegations, and only rarely - with my consent - would Hananel show up on these meetings or dinners. I most certainly never saw Hananel supervise or direct anything related to the organization of the tours.

24. I was also informed by Interface's attorneys of Hananel's claim (in Section 5.13.5 of his Answer), whereby "A subsidiary of Interface in the United States, GWV, acted as a representative of HaGalil Tours in the United States. As part of this representation, GWV executives – who belong to the Interface mechanism and work from Interface's offices – maintain contact with Hananel. Can it seriously be claimed now that Interface was unaware that Hananel worked for HaGalil Tours too?". GWV, however, ceased acting as HaGalil Tours' representative in the United States in early 1996, very shortly after Hananel started working as the manager of Interface's Israeli branch. Therefore, there is clearly no weight to Hananel's said claim. I, in any event, never heard from GWV personnel that Hananel continued working opposite them as a manager or employee of HaGalil Tours.

**Chapter III – Payment of Interface monies to employees of Hananel and of HaGalil Tours**

25. As I now know from the affidavits filed along with my affidavit, within the framework of the authorities that Hananel assumed as the manager of Interface's Israeli branch, Hananel employed people who helped him in his private businesses as employees or service providers of Interface, without the approval or consent of Interface or myself and in violation of the Agreement with him. Such was the case with Ms. Orly Katav (from September 1999 until Hananel's termination), such was the case with Ms. Iris Mentzer (from November 1999 until Hananel's termination), and such was the case also with the investigation office retained by Hananel (in 1998 and 1999), all as specified in the affidavit of Mr. Dan Raviv (and also, in part, in the affidavit of Ms. Miri Schory).

26. I would like to emphasize that from Hananel's close acquaintance with me, Hananel was well aware that he had no authority to make decisions of his own on the employment of workers (or service providers on a permanent basis, like Ms. Orly Katav, hereinafter jointly: "Workers") at Interface. Hananel was supposed to make recommendations to Interface on the employment of Workers, including on the terms of their employment, and Interface (through

7

me) was supposed to approve (or disapprove) their employment. This is a long-standing managerial principle of mine, which was well known to Hananel: A manager employed by Interface (or any other company under my control) who reports directly to myself (like Hananel) is entitled and expected to find the manpower needed in his work, and even to negotiate the terms of their employment, but the approval for employing Workers and for their terms of employment must be given by me. Thus, Hananel knew that his predecessor – my brother-in-law, Mr. David Farbstein – needed my approval to employ a person to help him (Mr. Moshe Melnik) and to fix his terms of employment. This was one of the main issues in the lawsuit that Moshe Melnik filed against Interface. In the affidavit I made in that case, I made it crystal clear that I – and only I – was authorized to approve the employment of Workers and the terms of their employment. Moshe Melnik's lawsuit against Interface was filed in February 1996, while Hananel was the manager of Interface's Israeli branch, and conducted in the following years. Hananel was well versed in the case and was well aware of my position as expressed therein.

A copy of my affidavit filed in Moshe Melnik's claim against Interface is attached hereto as **Annex A**. The Honorable Court is referred, *inter alia*, to Sections 17-18 thereof.

A copy of the judgment in Moshe Melnik's claim against Interface is attached hereto as **Annex B**.

27. Interface's attorneys informed me of Hananel's claim (in Section 5.24 of his Answer) whereby "**Ms. Katav's firm provided PR services to Interface, to Adelson and to Adelson's wife.**". While I cannot testify as to whether and to what extent Hananel used the PR firm of Ms. Katav for Interface (and I refer the Honorable Court, in this context, to the affidavits of Ms. Miri Schory and Mr. Dan Raviv), never did I personally, and most certainly my wife, ask Hananel – or any other person – to use Ms. Katav's PR firm (nor any other PR firm in Israel).

28. As for the use of Ms. Katav's PR firm for Interface – I never received a report from Hananel – or from any other person – on the service which Interface received from Orly Katav's firm, and paid for by Interface. I also never asked or authorized Hananel to use Ms. Katav's PR firm. On the contrary – I specifically told Hananel that I don't approve the use of a PR firm for Interface.

f:\100xx\10070-001\taz-sheldon-adelson-neg-hananel-trans-sofi

8

### Chapter IV – Foreign Travel

29. Hananel's job description at Interface did not call for Hananel to travel abroad. Hananel's duty was to identify investments for Interface in the field of hi-tech in Israel. Hananel also – on his own accord – tried to interest Interface in other investments – not in the hi-tech market – in Israel. At times, Hananel requested me to join him to trips to Jordan for the promotion of a joint Jordanian-Israeli project in which Interface was interested. Otherwise, from Interface's point of view, there was no justification for Hananel to travel overseas. I would like to mention that on occasion I invited Hananel to meet with me in the United States. These invitations were for social reasons and not for Interface's business

30. Despite the aforesaid, and as I subsequently learned, Hananel charged Interface for the expenses of his numerous trips overseas, in whole or in part, which, to the best of my knowledge, were not made for Interface's purposes – either trips that were made for companies in which Interface was a shareholder (for which Hananel charged Interface and not such other companies), or trips made for Hananel's private businesses. According to the affidavit of CPA Yehuda (Dadi) Zamir (hereinafter: the "Zamir affidavit"), the person in charge of bookkeeping in Interface's Israeli branch, Hananel did not submit foreign travel reports or invoices for his expenses overseas. In fact, Hananel treated Interface's funds – **and its credit card which was deposited in his hands** – as his private property.

31. I have been informed of Hananel's claim (in Section 5.30 of his Answer), whereby "**over the years in which he worked for Interface and Adelson, he was required to make numerous trips to various countries. Adelson himself took part in a large portion of the said trips. Adelson and Hananel traveled together,** *inter alia*, **to the U.S., the U.K., France, Germany, Turkey, Greece, Jordan, Hungary, Italy, the Czech Republic and Bulgaria. How can Interface claim now that Hananel's work did not require him to travel overseas, when Adelson, the controlling shareholder of Interface, participated in a considerable portion of these trips?** So long as Hananel was employed by Interface and Adelson, **Adelson asked him to accompany him on dozens of trips around the world**".

32. This is a far cry from the truth. First, Hananel was never employed by me personally. Second and foremost, other than trips made to the United States in order to meet with me, three daytrips to Jordan (made on August 20 and 21, 1999 and on September 8, 1999), one daytrip to Turkey and two social trips, one to Venice (Italy) and one to Rhodes (Greece), with friends, including Hananel (not at the time mentioned in Section 21.16 of the Zamir affidavit), Hananel joined me on one foreign trip only which took place per Hananel's suggestion (and had nothing to do with Interface). This trip was made from September 2, 1997 through September 5, 1997 (72 hours) to the cities of Sofia (Bulgaria), Budapest (Hungary), Prague (the Czech Republic) and Milan

9

(Italy). Hananel convinced me that he knew people in some Eastern European cities that could duplicate Murano Venetian glass that I needed for the Venetian Hotel at a dramatically lower price. Even though, as a matter of principle, I was not in favor of using unauthentic materials for the Venetian Hotel, because of Hananel's warm recommendation and my interest in visiting those cities (where I had never been before), I agreed to consider Hananel's proposal.

33. Other than these trips, Hananel did not join me on the trips mentioned in the Complaint and in the Zamir affidavit. Since I have been traveling overseas in my private airplane since 1994, before making this affidavit I checked the flight log of my private airplane at the dates mentioned in Section 21 of the Zamir affidavit. Other than the aforementioned trip to Venice (Italy) (mentioned in section 21.3 of the Zamir affidavit) and the aforementioned trip to Budapest (Hungary) (mentioned in Section 21.6 of the Zamir affidavit), I did not stay at the places outside the United States mentioned in Section 21 of the Zamir affidavit on the dates mentioned in Section 21 of the Zamir affidavit. In other words – contrary to **Hananel's claim – he did not travel with me to those places, and Hananel's expenses in these places were made unrelated to me (or Interface).**

34. Since immediately after Interface (through me) notified Hananel of his termination many documents and files have disappeared from the office (as specified in the affidavit of Mr. Dan Raviv), almost no evidence remains to testify to the private nature of Hananel's foreign trips. An exception to this is Hananel's trips mentioned in Ms. Miri Schory's affidavit, the one to Jordan with a delegation of the Industrialists Association, the second to Greece for a family vacation and the third to France to meet with people from Accor Loisiris & Tourisme. These three trips were made other than for Interface's purposes (despite which, as specified in the Zamir affidavit, Hananel made various payments for these trips with Interface's means of payment).

35. As for expenses paid by Hananel with Interface's money on trips made by him (as he claims) for companies in which Interface was a shareholder – I would like to emphasize that Hananel should never have charged Interface for trips for such companies. If such trips were made - Hananel was supposed to get travel reimbursement from those companies. Insofar as Hananel used Interface money for trips made for other companies (which he shouldn't have done), it was Hananel's responsibility – as the manager of Interface's Israeli branch – to ensure that such sums were reimbursed by the said companies. As I now know, Hananel did not do so, thus breaching his duty of acting with care and reasonableness with Interface's money, which was deposited in his hands in trust.

10

## Chapter V – Contributions and Payments to Friends and Related Entities

36. As I now know from documents found at Interface (as specified in the Zamir affidavit), another way in which Hananel misappropriated Interface's money was by making payments and contributions to entities which Hananel wanted to benefit. Hananel did not make the contributions or the payments from his own money but from that of Interface, without any authorization or approval.

37. I would like to emphasize – although it is self-evident – that Hananel was the manager of Interface's Israeli branch. Hananel did not own Interface's Israeli branch. If Hananel wanted to benefit a cause – he should have done so with his own money and not with mine (or Interface's). I engage in extensive philanthropic activities, the particulars of which are irrelevant. I do not act arbitrarily or impulsively with respect to the entities to which I (or Interface) make donations. My philanthropic policy is pre-determined, based on the causes which I deem fit to benefit above others. Furthermore, this policy is determined by my wife and myself together. Due to tax considerations, donations are made from the United States.

38. To my amazement, as I subsequently learned, Hananel used to make donations and payments from Interface to various entities and institutions, as he deemed fit (also, at times, on the basis of motives that were not entirely pure). Hananel should never have made any donations with Interface's money, without my knowledge or consent, regardless of the worthiness he attributes to those entities or institutions he donated to. In my affidavit below I will only refer to most severe cases in which Hananel made donations or payments from Interface's money.

39. As regards the donation to the Yeshiva "Esh Hatora" (the details of which appear in section 23 of the Zamir affidavit), I have a particular dislike for that organization. I do not believe in their extreme and misleading fundraising techniques. Two of my friends told me that their children, who studied at "Esh Hatora", had been "brainwashed". Representatives of the Yeshiva "Esh Hatora" tried to approach me several times for donations, and I always refused to meet with them or to donate to them. Donating to "Esh Hatora" is totally against my philanthropic principles. In this context I should note that as a general policy, I do not donate to Yeshivas. I believe that so long as religious donors donate only to religious causes, secular businesspeople like myself should focus on non-religious organizations. Therefore, I consciously and deliberately do not donate to Yeshivas.

40. I have read Hananel's groundless claim (in Section 5.37 of his Answer), whereby "the donation to the Yeshiva *Esh Hatora* was made at Adelson's initiative. Adelson met with representatives of the Yeshiva *Esh Hatora*, who convinced him to donate to the Yeshiva. Adelson donated to other

11

Yeshivas too". As aforesaid, this claim is untrue, certainly with respect to the Yeshiva "Esh Hatora", to which I would never have agreed to donate.

41. Interface's attorneys told me that Hananel alleged (following a court decision ordering him to detail his claims regarding my alleged donations to yeshivas) that the yeshivas I donated to are Yeshiva Or Samech of Kiriat Rechasim and the Chabad Center in Las Vegas. This allegation is totally baseless and demonstrates Hananel's lack of credibility.

42. As for the Yeshiva Or Samech of Kiriat Rechasim - I have never heard of this place. I think Hananel is trying to mislead the court by confusing that yeshiva with Or Chadash. Or Chadash provides a home for hundreds of underprivileged girls (there was 300 when I first met them many years ago and now I believe it's about 600). These girls are not only underprivileged; they are taken as orphans, "olim", and are sometimes battered children, generally girls in need. In addition, Or Chadash has a school for handicapped and severely handicapped children from infants on up. **In no way, shape or form is Or Chadash a yeshiva.**

43. Regarding the Chabad Center in Las Vegas - The Chabad Center is a Jewish community outreach program with over 2,500 chapters around the world. **In no way, shape or form is the Chabad Center a yeshiva.** One basic activity of theirs is to run a school for children. 70% of the student body in their school is not even orthodox, but rather secular. The curriculum in a typical yeshiva, as a Rabbi explained to me, would be 100% religious studies. The Jewish day school that the Chabad Center runs has probably 50% or less of subjects related to Judaism, which is not much more than the Hebrew school to which my boys go to. I attach to my affidavit as **Annex C** a letter from the Director of the Chabad Center in Las Vegas, Rabbi Shea Harlig, stating that the Chabad Center is **not a Yeshiva.**

44. As regards the payment to the Association for the Promotion of Tourism (the details of which appear in section 24 of the Zamir affidavit), this payment is an excellent illustration of the extent of Hananel's insolence and outrageous behavior. As specified in section 24 of the Zamir affidavit and in the documents attached thereto, Hananel paid NIS 12,838 to the Association for the Promotion of Tourism and received, in return, three lamps ("Menorah") by the artist Salvador Dali. Needless to say, this payment was made without Interface's (or my) knowledge or approval. One lamp Hananel took for himself (I saw it in his house); a second lamp he gave to me for my birthday as a gift from him and (as he told me) from Dan Raviv. I was very moved by this gift – an impressive and beautiful work of art – and heartily thanked Hananel for it, which I estimated cost him a lot of money. **Hananel's** *chutzpah* **is simply indescribable – he took Interface's money, which he was entrusted with managing, used it to donate to an association – which, as I now know, he was one of its managers – and gave me the gift he got in return, while**

12

presenting it to me as a gift from him for my birthday. What a *chutzpah*. The third lamp– has vanished.

45. For the removal of any doubt – the donation to the Association for the Promotion of Tourism was made without my knowledge or consent. Hananel's claim (in Section 5.38 of his Answer) whereby "**the donation to the Association for the Promotion of Tourism served Interface and Adelson's interests**" was brought to my attention. In the circumstances described above, this claim is shameless. In any event, Interface never authorized Hananel to make donations with Interface's money in accordance with what he deemed would promote my or Interface's interests.

46. As for the payment for recording the press conference of the (former) MK Dan Tichon (the details of which appear in section 25 the Zamir affidavit) – I was not aware of this payment, and I certainly did not approve it.

47. As regards the payment for the performance of the "Spanish Ballet" (the details of which appear in section 28 of the Zamir affidavit) – I was not aware of this payment, and I certainly did not approve it.


### Chapter VI – Unlawful Redemption of Vacation Days

48. Interface's employment policy as regards vacation days for full time employees is **two weeks of vacation per year in the first five years of employment;** three weeks of vacation per year in the next five years of employment; and four weeks of vacation per year thereafter (part time employees, which are very rare in Interface, or in any other company under my control, are not entitled to paid vacation at all). In addition, Interface does not approve the accumulation of vacation days, except with a special approval given in advance for a particular worker (which was not asked for, and consequently not given, in Hananel's case). Even though the number of vacation days due to Hananel was not discussed when the Agreement between Interface (through myself) and Hananel was entered into, Hananel was well aware of Interface's policy. In any event, this policy was expressed also in Interface's position in Moshe Melnik's case, mentioned above, and in the affidavit given by me in that case (the Honorable Court is referred to Section 38 of my affidavit in Moshe Melnik's claim, **Annex A**).

49. As aforesaid, when the Agreement between Interface (through myself) and Hananel was entered into, the issue of the number of vacation days due to Hananel was not discussed. Accordingly, in accordance with legal advice I received, Hananel (assuming that he worked for Interface full time) was entitled

13

to vacation days in accordance with Interface's employment policy and Israeli law (between which there is, according to legal advice I received, no difference which is relevant to our case, the first five years of employment).

50. As I learnt from Mr. Steve O'Connor and the Zamir affidavit, after his termination, Hananel drew NIS 157,207.45 as vacation redemption. This withdrawal was not approved by Interface and is inconsistent with what was due to Hananel. When I learned that Hananel ordered the bank to pay himself his last salary, which included the vacation redemption payment, I saw it as a wrongful act and it made me very angry.

51. In any event, as specified in the affidavits of Ms. Miri Schory and Mr. Dan Raviv, during his years of "work" for Interface, Hananel took many days off, at a scope which -- according to legal advice I received -- certainly denies him the right to any vacation redemption payment. It should be kept in mind that Hananel was the manager of Interface's Israeli branch, and his hours of attendance at work were not monitored in any way. Hananel was supposed to make a record of the vacation days he took but -- as described in the Zamir affidavit -- he did not do so, even though he did indeed take many days off. In these circumstances, in my opinion, he is entitled to no vacation redemption payment at all.

52. I would also like to mention that it seems inconceivable to me that Hananel would be entitled to two full time work benefits, from Interface and from HaGalil Tours. Hananel could not have worked full time for two different companies and therefore he is not entitled to receive full time benefits from each company, such as two vacation periods. No self-respecting management of any company would give an employee benefits of full time employment if they didn't believe the employee was working full time for their company.

## Chapter VII – Conclusion

53. As specified in my affidavit, Hananel's case is an extreme illustration of an abuse of trust placed in an employee by an employer. Hananel abused both the trust placed in him by Interface and the objective difficulties in monitoring his work. Hananel deceived Interface (and me) – first and foremost by continuing to work, full time, also at another place of work while drawing a salary from Interface – and pocketed large amounts of money which he must return to Interface. I move the Honorable Court to order Hananel to return the moneys which he took unlawfully.

F:\DOxx\10070-001\tzz-sheldon-adelson-neg-hananel-trans-sofi

14

I declare that my name is Sheldon G. Adelson, that the signature hereinbelow is my own and that the content of this my affidavit is the truth.

_____
Sheldon G. Adelson

### Certification

In accordance with Section 15 of the Evidence Ordinance [New Version], 5731-1971, I, the undersigned, Amir Shraga, Adv., of 28 Bezalel St., Ramat Gan, certify that on September 7, 2004 appeared before me Mr. Sheldon G. Adelson, who is known to me personally, and who, after having cautioned him to declare the truth, failing which he would be liable for the penalties prescribed by law, signed this affidavit in my presence.

_____
Amir Shraga, Adv.
License No. 23944

F:\100xx\10070-001\az-sheldon-adelson-neg-hananal-trans-sofi