Labor Case 7704/03
Hananel v. Interface
Opening date: December 17, 2003

Type of matter: 932

EXHIBIT
"A"

**At the District Labor Court**
**of Tel Aviv Jaffa**

In the matter of:     **Moshe Hananel, I.D. 52750726**
of 21 Ha'Ella St., Mevaseret Zion
Represented by Haim Zadok & Co., Attorneys-at-law
Whose address for service of process is:
20 Lincoln St., Tel Aviv 67134
Tel. 03-6254000; Fax 03-6254040

**The Plaintiff**

Versus

1.     **Interface Partners International Limited**
Foreign Company No. 56-001401-1
of 3A Jabotinsky St., Ramat Gan

2.     **Sheldon G. Adelson**
Holder of U.S. passport No. 101668547
of 10 Pa'amoni St., Tel Aviv

Both represented by Danziger, Klagsbald, Rosen & Co.
Whose address for service of process is:
Gibor Sport Bldg., 28 Bezalel St., Ramat Gan
Tel. 03-6110700; Fax 03-6110707

**The Defendants**

Type of claim: Declaratory

# Complaint

1.  ## Subject Matter of the Complaint

    This Complaint concerns the Defendants' undertaking to give the Plaintiff
    stock options in a casino venture in the Macau region of the People's Republic
    of China, in view of the Plaintiff's involvement in the initiation of the project,
    while he worked for the Defendants. The Defendants have denied their
    undertaking. Hence this Complaint is filed for a declaratory remedy in
    recognition of the right.

2.  ## The Parties to the Complaint

    2.1.    The Plaintiff is a private businessman who served as the General
            Manager of the First Defendant [sic].

The First Defendant is a private U.S. company that is registered in Israel and maintains a branch in Israel. The First Defendant is controlled by the Second Defendant.

The Second Defendant is the American businessman Sheldon Adelson (hereinafter: "**Adelson**"), who controls 100% of the First Defendant's shares. The Israeli branch of the First Defendant serves as Adelson's Israeli arm in Israel, and through it Adelson manages all of his diverse businesses in Israel. Adelson's businesses are mainly in the field of tourism, hotels and casino management in Las Vegas, and Adelson controls a group of companies in Las Vegas and around the world such as:

2.2.1.   Las Vegas Sands, Inc.

2.2.2.   Venetion [sic] Casino Resort

2.2.3.   Grand Canal Shops in Las Vegas

2.2.4.   The Sands Macau

2.2.5.   Interface Partners International LTD

3.   **The Background to the Complaint**

3.1.   The Plaintiff started working as Adelson's most senior representative in Israel, his right-hand man and confidant in October-November 1995. Within this position, the Plaintiff was also employed by the First Defendant as General Manager, and this entity paid his salary.

3.2.   The Plaintiff is a tourism man of international repute in the various fields of tourism – hotelkeeping, transportation, tourism operations, tourism marketing, etc.

3.3.   The Plaintiff and Adelson maintained close personal and business ties even before the Plaintiff started working for the First Defendant.

3.4.   Employment relations existed between the Plaintiff and the Defendants from October-November 1995.

3.5.   Although the Plaintiff received his salary from the First Defendant, he was Adelson's senior representative in Israel and his right-hand man, in both personal and business matters. His work also included the rendition of services to Adelson. The Plaintiff therefore acted as both Adelson's employee and the company's employee.

3.6.   On May 10, 2000 the Plaintiff was terminated by the First Defendant. Proceedings are pending between the parties with respect to the employment relations (Labor Cases 6245/01 and 9015/02).

3.7.   This Complaint concerns the Plaintiff's right to options and shares in the Macau casino venture. This cause of action has matured only now,

Macau Casino Venture (sired of the Plaintiff's initiative, for which he is entitled to the remedies claimed herein), the existence of which the Defendants concealed and thereafter denied, is taking form.

4. **The Macau Casino Venture**

    4.1.    In early 1999, when the Plaintiff worked for the Defendants, the Plaintiff met with an Israeli entrepreneur who told him of a tourism venture in the region of Macau, located in Cotai, between the islands of Coloane and Taipe in the People's Republic of China (hereinafter: "**Macau**").

    4.2.    The Plaintiff took an interest in the venture and in the field of gambling in the Far East, and learned that only one casino operated in the Macau district. The Plaintiff further learned that inhabitants of China and tourists from neighboring countries were flocking to the casino in Macau, that gambling was highly successful in China, and that the Chinese authorities were open to operating and expanding the field of gambling, only in the region of Macau.

    4.3.    After studying the subject, the Plaintiff approached Adelson, and suggested to him that the company owned by him look into the subject and the worthwhileness of investing in the tourism venture in Macau. The Plaintiff also gave Adelson official publications by the Chinese government on the establishment of projects and foreign investments in the Macau region, which the Plaintiff had arranged to obtain in order to examine the worthwhileness of such investment in the Macau region. A copy of the brochures forwarded by the Plaintiff to Adelson is attached hereto as **Exhibit "A"**.

    4.4.    The Plaintiff forwarded the business plan he was given by the Israeli entrepreneur as aforesaid, in Section 4.1, for the establishment of a tourism project in Macau, to Adelson. Sheldon Adelson claimed that the venture was of no interest and expressed reservations with respect thereto.

    4.5.    Nevertheless, the Plaintiff presented to Adelson Macau's location, historical and legal uniqueness, the condition of tourism therein and in nearby Hong Kong, and the possibilities embedded therein, including the possibility of building a casino.

    4.6.    Thereafter, the Plaintiff pleaded with Adelson to visit Macau too, on Adelson's upcoming trip to Hong Kong and Taiwan in August 1999, in which he was scheduled to meet local gamblers in order to invite them to the casino hotel in Las Vegas, so that he could gain a first-hand impression of the business opportunities there.

    4.7.    The Plaintiff advised Adelson to present himself to the locals as a leader in the field of conference organization, and to use (as was done in Israel too) the strategy of presenting the casino to the authorities as a

magnet for attracting foreign tourism, for the construction of a leisure and entertainment center, for the organization of conferences and as a catalyst for regional development. To this end, the Plaintiff equipped Adelson with written material in English which the Plaintiff had prepared, and which was used by him within his duties in the First Defendant for his activities vis-à-vis decision makers with respect to the casino in Israel and in Jordan. The Plaintiff believed that this strategy could lend the added value of tourism and conferences to the Macau venture, promote the Chinese authorities' approval of the construction of another casino in the region, and thus give the Defendants an edge over other proposals.

4.8.   Only as a result of the aforesaid, did Adelson decide to visit Macau during his planned visit to Hong Kong and Taiwan in August 1999, on which he was accompanied by another worker of the First Defendant, Mr. Dan Raviv, who was subordinate to the Plaintiff.

4.9.   The Plaintiff talked to Adelson during his visit to Hong Kong and Macau and received a report from him on the visit, both during the course thereof and thereafter. After the visit Adelson told the Plaintiff that he had found China to be very interesting, but that due to his age and his readiness to invest "only where the American or the Israeli flags were flying", he did not intend to act to realize the initiative.

4.10.   After the said trip to Macau, the Plaintiff assumed that Adelson had indeed abandoned the initiative, as he had told the Plaintiff. Since that trip, the Plaintiff had no connection with the project. In retrospect it transpired that Adelson visited Macau again for several days in late March 2000; upon his arrival in Israel immediately thereafter, in his private jet in early April 2000, Adelson gave the Plaintiff notice of termination.

4.11.   As specified below, the Plaintiff learned in retrospect that Adelson did ultimately choose to embark on the tourism venture that included a casino in the Macau region according to the strategy conceived by the Plaintiff. It further transpired, in retrospect, that the fact that the Plaintiff had drawn Adelson's attention to the business opportunity in Macau at an early stage, the strategy of approaching the Chinese authorities and the manner of presentation of the venture by the Defendants according to the Plaintiff's advise (including his advise of presenting the project as including also conference tourism) as aforesaid, all gave the Defendants an edge and an advantage over competing entrepreneurs in the gambling field, who were too late in discovering the business opportunity in Macau.

## 5.   The Option Undertaking

5.1.   Within the employment relationship between the Plaintiff and the Defendants, the Plaintiff was promised options in ventures initiated during the course of his work.

5.2.  The mechanism determined for the grant of options was that the Plaintiff would be entitled to 12% of the shares held by the First Defendant, or by Adelson, or by another company controlled by Adelson, against payment of 12% of the sum invested by Adelson or the First Defendant or another company owned by Adelson in those ventures for which the option was granted.

5.3.  The option undertaking was given orally, but was later acknowledged by the Defendants, as specified below.

5.4.  All of the employment relations between the Plaintiff and the Defendants were regulated orally. The oral regulation of the employment relationship resulted from the almost intimate relationship between the parties, as the Plaintiff was entrusted with Adelson's most confidential private affairs, and managed huge amounts of money for him, with absolute trust.

5.5.  Under these circumstances, the cause of action is comprised of two elements:

5.5.1.  The undertaking to grant options.

5.5.2.  The existence of a venture initiated during the period of employment and the maturity thereof either during the period of employment or thereafter.

5.5.3.  Under the circumstances, the said cause of action is entirely unrelated to the termination of the employment relationship and to the rights stemming from the termination thereof.

6.  **The Defendants' Demand that the Plaintiff Waive his Rights**

6.1.  After the Plaintiff's termination, disputes broke out between the parties regarding the Plaintiff's retirement conditions (including with respect to ventures that were already formed at that time).

6.2.  Within the framework of the parties' attempts to reach an arrangement, Adelson turned to the Plaintiff, through Adv. Daniel Chinn, on July 26, 2000, mentioning that to the best of his understanding, the issues that remained "open" were the Plaintiff's rights in casinos to be established with the Defendants' participation in Israel or in Jordan:

> **"Specifically, we understand the open issues to be your interest (if any) in the appreciation in net value of Interfaces portfolio and your interest (if any) in any casinos which may be built in Israel or Jordan with the participation of Interface."**

A copy of the July 26, 2000 letter is attached hereto as **Exhibit "B"**.

6.3.  The Defendants subsequently offered the Plaintiff sums of money, the meaning of which offer was that the Defendants would make the

payment in lieu of advance notice only, and that all of his other claims would be waived. The draft agreement presented to him, which was drawn by Adv. Yaakov Neeman on behalf of the Defendants, stated, *inter alia*, that –

> **"Hananel has alleged certain claims against IPI and Adelson in relation to the terms of the termination of his employment... and in connection with casino license(s) obtained or to be obtained by IPI and/or any IPI Party and/or Adelson and/or any Adelson Party in Israel, Jordan or any other country."**

A copy of the draft is attached hereto as **Exhibit "C"**.

6.4.   In this draft, the Plaintiff was already required to waive rights to casinos to be established by the Defendants or on their behalf not only in Israel or Jordan, as written earlier in Adv. Chinn's letter, but also in "any other country". This demand originated from the Defendants' knowledge (that was concealed from the Plaintiff) that they were promoting the casino project in Macau, in connection with which the Plaintiff is entitled to his rights, and constitutes at least a scintilla of evidence of a defendant's admission to the Plaintiff's claims.

6.5.   The Defendants' proposals for settling the dispute were considerably lower than what was due to the Plaintiff in accordance with the agreements. The Plaintiff therefore rejected the offers and was forced to take legal action (with regard to those rights, the maturity of which was known to the Plaintiff at that time).

6.6.   The Plaintiff subsequently learned that it was not inconceivable that the timing of his termination was determined based on the fear that he would find out that his initiative to enter into an investment in a casino in Macau was being materialized. For this reason, probably, Adv. Neeman incorporated into the draft agreement a waiver of casino rights in any country around the world. At the time, this addition seemed puzzling to the Plaintiff, who was neither aware nor informed that his initiative was being realized, and, worse, such matter was even denied, as specified below. It was a demonstration of bad faith in negotiations of the worst degree on the Defendants' part.

7.     **The Demand to Receive the Shares in the Macau Venture**

7.1.   On February 10, 2002, while perusing the business supplement of *Ha'aretz* newspaper, the Plaintiff discovered that the Macau project, which he had first initiated and brought to Adelson, was under way, and that Adelson had subsequently obtained a franchise to establish a casino in Macau. Other articles making similar mentions were later found in the foreign press. A copy of the news item from *Ha'aretz* is attached hereto as **Exhibit "D"**. Copies of other newspaper articles on the project are attached hereto as **Exhibit "E"**.

7.2.    Naturally, having known of the project at the early stage at which the Plaintiff had reported to him thereof, enabled Adelson to enter the tender at a time when other American activists in the gambling field had not yet known of the business opportunity. The Plaintiff turned to Adelson, via his attorneys, demanding to exercise the option. A copy of the letter of February 21, 2002, and a letter of amendment on the same matter of February 27, 2002, are attached hereto as **Exhibit "F"**.

7.3.    The letter of reply from the Defendants' attorney denied the fact that the First Defendant had sought or received a franchise to establish a casino in Macau. A copy of the letter of March 14, 2002 is attached hereto as **Exhibit "G"**.

7.4.    On July 8, 2002 the Plaintiff's attorney approached the Defendants again with respect to his rights in the Macau casino venture. In the letter, the Plaintiff congratulated the Defendants for having won the tender to establish the casino, and asked to exercise the options granted to him in the venture. A copy of the letter of July 8, 2002 is attached hereto as **Exhibit "H"**.

7.5.    Adelson rejected the request, in a letter of reply from the First Defendant's VP, Adv. Paul Roberts, of July 30, 2002. Adelson also denied that he had ever won a franchise for a casino in Macau, or that he had ever conducted meetings or discussions in connection with a casino in Macau, or any other business activities in the Macau region. Adelson claimed that he had never discussed Macau with the Plaintiff. Adelson even warned in the letter, that the Plaintiff's attorneys might be sued by him in the United States, if they filed a claim on behalf of the Plaintiff with regard to the Macau venture. Reading is believing. The letter reads as follows:

> **"Responding specifically to the allegations contained in your letter, neither Mr. Adelson nor IPI has received any franchise to build a casino in Macau as you allege. More importantly, Mr. Hananel's employment with IPI was terminated on April 11, 2000 with 30 days' notice. As of the date of his termination, neither Mr. Adelson nor any employee of any affiliated company had engaged in any meetings or discussions regarding a casino in Macau, nor were they aware of the possibility of any business venture in Macau. Mr. Adelson had not mentioned Macau to Mr. Hananel nor had Mr. Hananel mentioned Macau to Mr. Adelson. It is no surprise that your letter does not specify what actions Mr. Hananel took prior to his termination that support your assertions that he developed a Macau venture or acted for the promotion of any such venture. It appears that Mr. Hananel's involvement in Macau is simply a figment of his active imagination."**

"Mr. Adelson emphatically and unequivocally denies that there is any basis for your client's claim, and any such claim will be met with the most vigorous response permitted by our legal system".

...

"In the United States, both attorneys and their clients who bring frivolous claims, such as your appears to me to be, may be held accountable by our courts. Please govern yourself accordingly."

A copy of the response is attached hereto as **Exhibit "I"**.

7.6.  The said letter from the First Defendant's VP was answered by the Plaintiff in his letter of September 23, 2002. A copy of the Plaintiff's letter is attached hereto as **Exhibit "J"**.

7.7.  The statements made in the letter stand, of course, in contrast to the dozens of visits paid by Adelson and his men to Macau, and in particular two visits (at least in one of which Adelson spent a long time in the Macau region) prior to announcing the Plaintiff's termination. They also stand in contrast to the items in the foreign press on the winning by the group known as 'Galaxy Casino', owned by Adelson together with other local investors, of the tender to establish casinos in the Macau region. Copies of news items on the Galaxy Group are attached hereto as **Exhibit "K"**. Copies of other official announcements on behalf of the Macau authorities, including a publication of the names of the winners in the tender, are attached hereto as **Exhibit "L"**.

7.8.  Only in July 2003 did the Plaintiff start receiving official news, originating from companies controlled by Adelson himself, on the involvement of Adelson and of the First Defendant in the Macau casino venture. Thus, the Plaintiff learned of a public announcement on behalf of Las Vegas Sands Inc., controlled and owned by Adelson, that operates the Las Vegas casino and hotel "The Venetian Casino Resort". According to that public announcement, the company was engaged in the establishment of the same venture of hotels and a casino in Macau, "Venetian Macao Limited". The same public announcement also referred the readers to the First Defendant (in which the Plaintiff worked) and to Dan Raviv (mentioned in Sections 4.8 and 5.3), the manager of the First Defendant's Israeli branch after the Plaintiff's termination, for inquiries on the said casino venture in Macau. Copies of the public announcement and of other announcements on behalf of the Defendants on their involvement in the establishment of the Macau casino resort are attached hereto as **Exhibit "M"**.

7.9.     A results report for the third quarter of 2003, as published by Las Vegas Sands Inc. on October 30, 2003, removes any doubt as to the Defendants' involvement in the Macau venture and includes, *inter alia*, also a report on the progress of the establishment of the tourism and casino project that was named "The Venetian in Macau". As we can see, also in the financial balance sheets published on behalf of Adelson and the companies under his control, the Macau project is mentioned as an inseparable part of Adelson's operations (in contrast to his sweeping and false denial in the letter attached as Exhibit "G"). A copy of the October 30, 2003 report is attached hereto as **Exhibit "N"**.

7.10.    The fact that the Plaintiff drew Adelson's attention to the business opportunity in Macau at an early stage (as well as the advise of presenting the project as including also conference tourism) gave Adelson an advantage over competing entrepreneurs in the gambling field, who had discovered the business opportunity in Macau too late. Thus, for the sake of illustration, the American tycoon Donald Trump, a major activist in the global gambling field, lost the tender, because he was late in submitting his proposal to establish the casino in Macau. Reports on this matter are attached hereto as **Exhibit "O"**.

7.11.    In other words, once official public announcements were made by the Defendants themselves, they can no longer deny the fact that the Defendants' casino project in Macau (in which the Plaintiff is entitled to stock options by virtue of his employment agreement and due to his contribution to the initiation of the project) is taking form.

8.    **Other Legal Proceedings Between the Plaintiff and the Defendants**

8.1.     Proceedings with regard to employment relations are being conducted between the parties, including a complaint filed by the Plaintiff with the Honorable Court against the Defendants which concerns, *inter alia*, the Defendants' debts to the Plaintiff for an advance notice period and damage caused by the Defendants to the Plaintiff after his termination (Labor Case 6245/01). The case is scheduled for trial in February 2004. In addition, the First Defendant filed a complaint against the Plaintiff (Labor Case 9015/02).

8.2.     The causes of action of the Complaint filed by the Plaintiff against the Defendants are rooted, as aforesaid, in the Plaintiff's termination and in the Defendants' debts to the Plaintiff which had already formed while he was working and were raised by the Plaintiff, upon his termination, in the settlement of accounts vis-à-vis his employers. In addition, a claim was made for the cause of action that referred to the Defendants' undertaking to grant the Plaintiff options in "Denex Medical Software Systems Ltd." and in "IMDSoft Ltd." (ventures which had formed prior to the termination) – companies which were active during the Plaintiff's employment with the Defendants, in the operations and management of which the Plaintiff was involved. A copy of the Complaint in Labor Case 6245/02 [sic] is attached hereto as **Exhibit "P"**. The options issue was also raised in the negotiations

with Adelson, among the other issues that were discussed, the mere existence of which and the Defendants' undertakings to the Plaintiff for which (as opposed to the manner of their realization) were never in dispute.

8.3. This claim derives from a cause of action different than that of Labor Case 6245/02 [sic]. Whereas the causes of that action were rooted, as aforesaid, in the Plaintiff's termination and in the rights that had formed during the term of his employment, this case concerns a separate contractual undertaking of the Defendants vis-à-vis the Plaintiff, as specified above, for the grant of stock options with no time limit in the Defendants' Macau casino and tourism venture, which had started already during the term of the Plaintiff's employment with the First Defendant, and in the initiation of which the Plaintiff was involved. This undertaking has no bearing on the Plaintiff's termination, it is supported by an independent and separate factual foundation to that described in Labor Case 6245/01, and the Plaintiff is seeking, with respect thereto, the declaratory remedy specified below. This cause of action matured after the termination, when the Macau casino project started taking form.

8.4. Under these circumstances, this case clearly does not concern one out of several remedies to which the Plaintiff is entitled due to the same cause of action. It is a case of different causes of action and different remedies, which the Plaintiff is entitled to claim without having to resort to a splitting of remedies.

8.5. An examination of the set of facts required to prove the Plaintiff's entitlement to the requested remedy, in order to decide the issue of the identity of the causes of action and the need for a motion to split up remedies, also leads to the conclusion that in this case, while proving the Defendants' undertaking to grant options in the Macau venture, and the realization of the venture, will grant the Plaintiff the requested remedy, such set of facts and evidence is not part of the Complaint filed with the Honorable Court (Labor Case 6245/01), and it stands in its own right and confers upon the Plaintiff an independent cause of action.

8.6. More on this issue may be found in M. Keshet's book, <u>Procedural Rights and Procedure in Civil Law</u>, 5762-2002, on p. 530:

> **"One of the tests is whether the plaintiff derives one or more legal rights from the same transaction. If, for instance, a single accident causes the plaintiff both bodily injuries and damage to property, then he is entitled to sue for damages for bodily injuries in one claim, and for damage to property in another claim, since two separate rights had been prejudiced. In this case, it was ruled that two separate causes of action were created, each of which may be pursued in a separate claim..."**

The Plaintiff's work for the Defendants and their undertakings to him confer upon the Plaintiff different rights, which he is entitled to enforce and which he is entitled to claim in this Honorable Court.

8.7.   Even if we were to say that the claim derives from the same employment contract, in view of Adelson's recurrent and categorical denials as to his involvement in the venture and the realization thereof, the Plaintiff could not have known (until recently, as specified above), that his right to receive the options in the venture had indeed matured, and in any case he could not have claimed it in the same action which he filed with the Honorable Court. In this state of affairs, the rule requiring that a motion be filed for the splitting of remedies, is inapplicable. On this matter, it was ruled in the judgment in C.A. 830/86 <u>S.A.R. Daphna Industries (Registered Partnership) v. S.A.R. Seret Alachson Ltd. (in Voluntary Dissolution)</u>, PDI 42 (4) 805, which concerns the filing of an additional claim for different breaches of a series of contracts, as follows:

> "Remedies for a single cause of action that was formed before the claim is filed must all be included by the plaintiff in the complaint. Regulations 44 and 45 (of the Civil Procedure Regulations, 5744-1984 - the undersigned) refer to the splitting of remedies for a single cause of action. It is certainly the case that a motion for a remedy of damages due to the breaches that occurred prior to the date of filing of the first claim, should have been included by the plaintiff in the same claim, unless a splitting of remedies was granted to him therefor pursuant to Regulation 45... <u>But this is not the case with respect to a breach claimed to have occurred after the first claim was filed, a breach which constitutes, as aforesaid, a new cause of action for which the appellant is entitled to sue, and no permission is required to split up remedies for this purpose.</u>
>
> ...
>
> The trial judge further believed that since the appellant learned of the new breach while the first claim was pending before the Magistrates Court, the appellant should have moved for a remedy for the new breach within the first claim, via a motion to appropriately amend the said claim. <u>Had such a motion indeed been filed, it is quite possible that the Magistrates Judge would have dismissed it, since entirely different evidence than that required for the declarations sought in that claim would have been required for the proof thereof, which could have encumbered the hearing. Would the appellant have been barred from filing a new claim for the new</u>

> must be negative, since the new breach sired, as
> aforesaid, a new cause of action, and if this was the
> case, the appellant should not be held accountable for
> not having filed such a motion with the Magistrates
> Court to amend the first claim." [Emphases added - the
> undersigned]

These statements may well have been made directly for our case.

8.8.     As we can see, the Plaintiff's right to options, as aforesaid, in the casino venture located in the Macau region of the People's Republic of China, as the Defendants, his former employers, had undertaken to grant him, is a right which the Plaintiff is entitled to sue without need for a motion to split up his remedies.

## 9.     The Requested Remedies

In light of all of the aforesaid, the Honorable Court is hereby moved to:

9.1.     Declare that the Plaintiff is entitled to receive 12% of the shares to the Macau venture, owned by the First Defendant, or Adelson, or a company controlled by Adelson, against payment of 12% of the investments made by the First Defendant, Adelson or a company controlled by Adelson, in the venture.

9.2.     Allow the Plaintiff to split his remedies, so that if need be he will be able to claim the monetary value of the shares in the Macau venture from the Defendants.

9.3.     Charge the Defendants with payment of the Plaintiff's expenses, including the legal fees of his attorneys and V.A.T. thereon.

## 10.     Conclusion

10.1.     This Court has the territorial and the subject matter jurisdiction to hear the claim.

10.2.     The Honorable Court is therefore moved to summon the Defendants and to rule against them as aforesaid.


(-)                    (-)
_____         _____
Eyal Rosowsky, Adv.      Ravit Lahmani, Adv.
**Haim Zadok & Co., Attorneys-at-law**
Counsel for the Plaintiff


Tel Aviv, December 17, 2003