EXHIBIT "D"

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHELDON G. ADELSON,<br><br>        Plaintiff,<br><br>v.<br><br>MOSHE HANANEL,<br><br>        Defendant. | Docket No. 04CV10357RCL |

## AFFIDAVIT OF PAUL G. ROBERTS

Paul G. Roberts, upon his oath affirms and says:

1. I am Paul G. Roberts. I am Vice President and General Counsel to The Interface Group ("Interface") which has its principal office at 300 First Avenue, Needham, MA. I held that position throughout the time period relevant to the matters before this Court.

2. Sheldon Adelson ("Adelson"), plaintiff the above referenced matter, is the majority shareholder of Interface.

3. In addition to my position as counsel to Interface I am also counsel to Adelson as well as his other ventures including the Las Vegas Sands, Inc. and the Venetian Hotel and Casino.

4. I have also served at all relevant times as U.S. Counsel to Interface Partners International, Ltd ("IPI"). IPI is a Delaware corporation with offices in Needham, MA, Nevada and Israel. In that role I handle all legal matters except for those that require foreign counsel. As to those matters I select counsel and supervise and coordinate their work and review their bills.

foreign counsel. As to those matters I select counsel and supervise and coordinate their work and review their bills.

5. I make this affidavit upon my personal knowledge of the events described herein. In addition, I have reviewed company business records and documents maintained in the ordinary course and I have interviewed appropriate employees relative to the records.

6. In my capacity as counsel to IPI, I met with Moshe Hananel ("Hananel") at 300 First Avenue in Needham, MA on December 5, 1995. The meeting began in the afternoon following an appointment which Hananel told me he had at the Leahy Clinic in nearby Burlington, Massachusetts.

7. This was not a social meeting. A specific purpose of the meeting was to discuss the terms of Hananel's anticipated employment by IPI. As of December 5, 1995 Hananel had not gone on the IPI payroll or been formally hired. Prior to that date he had offered himself to fill the vacant managers position and in anticipation of becoming an IPI employee performed certain limited services for IPI as both an accommodation and to demonstrate his value and ability. Prior to this meeting Adelson had told me the terms he wished to offer to Hananel for employment with IPI and directed me to discuss and finalize the employment terms with Hananel when he was in the Needham offices.

8. During the meeting, which took place on the third floor of 300 First Avenue, Hananel told me his understanding of the general terms that had been discussed between him and Adelson and, after some discussion, we settled on the following:

a) Hananel would transition out of his current employment at Galilee Tours and become a fulltime IPI employee on January 1, 1996.

b) He would devote all of his time to IPI except for occasional consultation with Galilee.

c) Hananel would be responsible to identify recruit and hire business analysts and portfolio managers to assist him and IPI to search out and identify investment opportunities in Israel in the high technology sector and present them to IPI and its legal and financial advisors.

d) Beginning January 1, 1996 Hananel would be paid an annual salary of $100,000 by IPI. He would also be eligible to receive 12% of the net profits received by IPI from high tech investments in Israel which were found and recommended by Hananel and made by IPI as a result of Hananel's efforts. I specifically explained to him that he would only receive a share of investment profits that were realized (i.e. received) by IPI during the term of his employment.

9. After Hananel had agreed to those terms, I asked Hananel if he wanted me to put these terms in writing. I told him I had been authorized to prepare a written employment contract for him if it was the custom in Israel or simply if he wished. He said it wasn't necessary because of his close relationship with Adelson. Adelson then arrived in the office, having just returned from a trip to New York. I reported to Adelson the results of our meeting and, at his request, I repeated the terms I had agreed upon with Hananel so there would be no misunderstanding. Hananel said he agreed. On behalf of IPI, Adelson said that he agreed.

Then Adelson, Hananel and I shook hands. To the best of my recollection, Hananel and Adelson left the building together to meet Adelson's wife who, like Hananel, was Israeli and was friends with Hananel.

10. At no time did Hananel ever seek to vary the terms of the agreement nor were they ever varied by IPI. He was paid a salary by IPI, but there were never any profits in which he was entitled to share.

11. In April 2000, IPI terminated Hananel's employment on account of his failure to perform the functions initially set out for him as part of his employment terms. It was later determined that Hananel did virtually nothing for IPI, but spent most of his time on other business. In addition, he misappropriated funds and abused IPI's trust.

12. Two years later, when IPI and Hananel were still attempting to negotiate his severance, if any, Hananel began to make demands against Adelson for compensation to which Hananel was not entitled. On July 30, 2002, I wrote to Hananel's counsel from Needham and on September 23 Mr. Hananel responded to me in Needham. In my letter to him I specifically made reference to the possibility of litigation in the United States. Copies of those letters are attached hereto as Exhibit "A".

13. The fact is that there is no substance whatsoever to Hananel's claims. In particular his claim that he directed Adelson to Macau in 1999 [handwritten correction] and that led to the successful application for a gambling license is patently absurd.

14. I am personally familiar with the circumstances that drew Adelson to become interested in Macau Hananel did not direct Adelson to Macau. In the ordinary course of business LVSI, Inc. maintains detailed records of Adelson's travel. Those logs show that

4

BOS\106346.1

between August 25, 1999 to September 3, 1999 Adelson traveled to Mumbai, India, Bangkok, Thailand, Taipei Taiwan, and Hong Kong ( although the airplane landed in Macau for purely aviation related reasons, the records show Adelson went directly to Hong Kong) to meet with customers of the Venetian for the purpose of promoting the business of the Venetian.

15. The records and logs show a second marketing trip which included Macau among many other destinations during the months of February and March 2000. The marketing destinations were: Panama City Panama, Santiago Chile, Buenos Aires Argentina, Rio de Janeiro, Brazil, San Paulo Brazil, Foz Do Iguaçu, Argentina, Yuma Arizona, Madrid Spain, Nice France, Genoa Italy, Rome Italy, Venice Italy, Macau, Taipei Taiwan, Manila Philippines, and Singapore. At no time during either of these trips were there any meetings with any of the Macau authorities or any other party concerning applying for a casino license.

16. I have read Hananel's affidavit in which he avers that there is a connection between Adelson's trip to Macau and Hananel's termination by IPI in April 2000, upon Adelson's return, and that this is all connected to Adelson's plans for Macau. This is a complete fabrication.

17. It is a fact that it was not until September 2001 that the government of Macau first created a Tender Commission, announced that interested parties could bid and make proposals for gambling licenses in Macao, and then issued Procedures of November 1, 2001. (Exhibit "B")

18. It was not until after the Commissions' creation that an LVSI/Venetian file was opened on this project and billings from outside corporate counsel indicate time entries beginning in October 2001, as the first time lawyers were ever consulted concerning a Macau venture.

19. Simply put, there was nothing Hananel could have provided concerning a casino in Macau prior to his termination in April 2000 because prior to the fall of 2001 there were no casino or license opportunities for foreign companies.

20. On October 16, 2001 the Venetian first communicated with the Macau Tender Commission in response to a public invitation to bid. In addition to the Venetian, Donald Trump, MGM Mirage, Steve Wynn and a variety of other U.S. and foreign operators submitted offers and competed for one of the three licenses being offered. It was a long, difficult and highly competitive process which did not conclude until the Summer of 2002. Moshe Hananel had nothing to do with this process and provided no value. Furthermore, IPI, Hananel's only relevant employer, had no connection whatsoever to the process.

21. The trial of this matter will involve critical testimony from individuals who participated in this process and have knowledge of the parties. In addition to Adelson there are perhaps 12 other executives, lawyers and accountants who had key roles and have knowledge concerning Hananel's employment or the genesis and history of the Macau casino matter. All will testify to the absence of any input by Hananel. These witnesses include myself, David Friedman, William Weidner, Fred Kinmonth, Richard Lewis, Leonard Adelson, Jan Lochtenberg, Stephen O'Connor, Irwin Chafetz, Theodore Cutler, Bradley Stone, Robert Goldstein and Harry Miltenburger. All are residents of either Massachusetts, New York or Nevada. There are no witnesses in Israel other than Mr. Hananel. There are also witnesses from Macau who will be asked to testify voluntarily. I assume that they would be more favorably disposed to testifying in Boston than in the dangerous and unstable Middle East.

22. Attached to this Affidavit as Exhibit "C" is a press release issued by a public relations agency on behalf of Hananel. I know from my own inquiry that this release caused

articles to appear in Nevada and Macau print publications as well as internet publications I have accessed from my office in Needham.

23. In my role as Counsel to IPI, I have monitored the litigation in Israel. Hananel is wrong to state that the Israel litigation involving Macau is well along. In fact Adelson has only just responded, and only after the Court decided that it had jurisdiction over him personally because he controls a company with an office in Israel. I am informed that this type of complicated case can take more than four years to reach a conclusion in the crowded Israeli courts. The appeal process is also many times longer than that in the First Circuit Court of Appeals.

24. In Hananel's affidavit he makes much of a Settlement agreement that was sent to him. The agreement was just that – a proposed settlement. Hananel's Affidavit which quotes release language to buttress his specious case has nothing to do with the facts. As counsel involved in settlement negotiations I expect that such negotiations are inadmissible.

25. I also wish to comment on Mr. Hananel's claim that he cannot travel because of his disabilities. In January 2004, Hananel traveled to Hong Kong and Macau where he delivered the press release attached hereto as well as requested assistance of various authorities in Macau and Hon Kong. He also sought legal counsel in Macau. I also know from the records of process servers employed to serve summonses to Hananel in Israel that he was often out of the house and at one point several months ago was unavailable because he was traveling in France.

26. As counsel to Adelson I am personally aware of his domicile and residences and businesses. Adelson is a Las Vegas, Nevada domiciliary. He is a Massachusetts native and owns a home on Dudley Road in Newton which he and his family occupy when in Massachusetts. He is the majority shareholder and Chairman of the Board of the Interface. He maintains an office in the executive suite at 300 First Avenue, Needham, Massachusetts.

27. I know of my own personal knowledge that Adelson is not an Israeli citizen and neither owns nor rents a residence in Israel. Company travel logs show that Adelson was in Israel twice in the last twelve months: once for the Chanukah/New Year holiday as well as the last week in August.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 13th DAY OF JULY, 2004.

_____
Paul G. Roberts