UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHELDON G. ADELSON,<br><br>    Plaintiff,<br><br>v.<br><br>MOSHE HANANEL,<br><br>    Defendant. | Docket No. 04CV10357RCL |

## SECOND SUPPLEMENTARY BRIEF IN OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

I.   **Introduction and Background**

Pursuant to the court's order of January 21, 2005 the parties have engaged in discovery focusing on the issue of personal jurisdiction. The deposition and other documentary evidence that are appendices to this brief conclusively demonstrate that the employment agreement central to the dispute between Adelson and Hananel, and which is the subject of this action for declaratory judgment, was negotiated and made in Massachusetts. The contract was made on December 5, 1995 in the Needham, Massachusetts office of IPI. Hananel's contention to the contrary, as shown by the documents, his testimony and his affidavits, is patently false.

At this point in the litigation, the options for the court are three in number. The court may decide the issue of jurisdiction using the submitted affidavits, deposition transcripts and documents using the "Prima Facie Standard of Proof." It may hold a hearing and decide the issue using the Preponderance of Evidence Standard; or it may defer deciding the jurisdictional issues until the trial on the merits. Fed.R.Civ.P 12(d). Because the court had indicated (without

BOS\129354.1

so ruling) that it would consider the issue after the parties have finished the limited discovery, this brief is written on the assumption the court will use it to assist it in evaluating the testimony and documentary evidence that discovery has revealed. Unless the court chooses to decide the issue on the papers (using the prima facie standard of proof) it will have to examine the credibility of the evidence either before trial or as part of the trial on the merits. This brief and its attachments will aid the court in this work.

**II.    Argument**

Adelson, with his first affidavit and with the affidavit of Paul Roberts, has established sufficient evidence to sustain easily a finding that this court has personal jurisdiction over Hananel, based on the fact that the employment contract, by which Hananel claims twelve (12%) percent of the casino in Macau, was negotiated and concluded in Massachusetts. Recognizing that this is the key factual issue, because finding business investments constituted his responsibilities with IPI, Hananel has created a fantastic tale[1]

Hananel has attacked in his brief, the sworn statements of Sheldon Adelson and IPI general counsel, Paul Roberts, by asserting that none of Hananel's visits to Massachusetts "had anything to do with the terms of his IPI employment." He also asserted, as the basis for his contention that this court lacks personal jurisdiction, that the terms of Hananel's employment as Israel Branch Manager of IPI had been negotiated and established in Israel before Hananel's December 1995 visit to Massachusetts. (Hananel's first affidavit ¶¶14, 15; Appendix A) (Hananel's memorandum in support of his motion to dismiss, page three.) Hananel conceded that he did visit Massachusetts in December 1995, "but only after he had been working for IPI

---

[1]    My work for Adelson and IPI from October 1995 until April, 2000 was to identify, evaluate and make investments in businesses in Israel and other countries, but never in the United States. (Hananel first affidavit, ¶16, Attached as Appendix A)

2

for almost two months." He asserted, "Hananel informed Adelson, while they were both in Israel, of casino opportunities in Macau and supplied him with relevant documents." (Hananel's memorandum pages 5-9.) Embellishing this assertion Hananel has asserted in affidavits and in his deposition (Hananel's deposition, pg. 142-146, attached as <u>Appendix B</u>) that he told Mr. Adelson that there were casino opportunities coming up in Macau and that Mr. Adelson never heard of Macau. "He told me what is Macau? It could be for him an object, it could be a name of a place, it could be a dress and it could be a brand name." I told him, "Sheldon, I need your concentration, and I almost begged, because I was already convinced at that time that Macau is presenting a huge opportunity." (Hananel deposition pg. 142: 18-27). It is on the basis of this supposed conversation that Hananel claims he is entitled to twelve (12%) percent of Adelson's interest because of an alleged option agreement.

This testimony along with virtually everything else that Hananel has testified to that has any relevance at all to the issue of jurisdiction is at best a fable. The testimony when and where the contract was formed is of course critical to the issue of jurisdiction. The testimony that Hananel has given, concerning his rights to twelve (12%) percent of any enterprise that he "found" for Adelson, as well as the conversation that he alleges took place in which he illuminated Adelson's supposed total ignorance concerning Macau are critical, not only for the merits of Hananel's claim, but for the issue of personal jurisdiction. If these conversations did not take place then Hananel has no basis for arguing that Massachusetts had no connection with his alleged contractual rights, which are the subject matter of this case.

Hananel's testimony, affidavits and pleadings filed both in this court and in the Israel court demonstrate that his case is based on intentional falsehoods that not only are worthy of no belief but which by themselves constitute admissions of a consciousness that he has no case.

*Sheehan v. Goriansky,* 317 Mass. 310, 16 (1944) (Intentional false testimony an admission of liability). They are so egregious that they constitute a fraud on the Court that merits, as a sanction, a default judgment, or, at the very least, a denial of the defendant's motion to dismiss.

### III. Hananel has Attempted to Perpetrate a Fraud on The Court by Concocting a Web of Intentional Falsehoods to Deprive This Court from Asserting Jurisdiction and to Gain an Unjust Victory.

"A 'fraud on the court' occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." *Aoude v. Mobil Oil Corporation,* 892 F.2nd 1115 (1st Cir. 1989). In *Aoude,* the Plaintiff based his case on a concocted back-dated bogus purchase agreement with a third person. The agreement formed the centerpiece of Aoude's complaint. By his own admission, he did not ask his attorney to amend the Complaint to retract the lie. (892 F.2d at 1117.) The Court of Appeals affirmed a dismissal of the case. It held that the telling of this lie and embodying it in a phony purchase agreement was a fraud on the court.

"When a fraud on the court is shown through clear and convincing evidence to have been committed in an ongoing case, the trial judge has the inherent power to take action in response to the fraudulent conduct. The judge has broad discretion to fashion a judicial response warranted by the fraudulent conduct." *Rockdale Management Co., Inc. v. Shawmut Bank, N.A.,* 418 Mass. 596, 598 (1994) (complaint dismissed). Examined in the light of these cases, Hananel's fraud is clear.

### A. The December 5 Meeting in Needham Massachusetts.

Hananel claims that although he was in Needham on December 5, 1995, no business relating to his coming to work for IPI was ever discussed. He testified that he came to the United States for a medical examination and treatment at the Joslin Clinic and that he left the clinic at about 4:30 to 5:00 (Hananel deposition 98:19, attached as <u>Appendix C</u>). He claims that he saw the doctor at about 4:00, and then after he paid the final bill, the driver took him to Needham (Hananel deposition 98:19-99:21). Thus, he attempts to persuade the court that there was no time for a business meeting. He claims he did not talk to Paul Roberts on December 5, although he did talk to him at a function at Adelson's home held on December 4, 1995. (Hananel deposition 101:25, attached as <u>Appendix D</u>). Paul Roberts' detailed affidavit contradicts him. (Roberts' affidavit, attached as <u>Appendix E</u>). Most significantly, Mr. Roberts quite specifically remembers that there were two issues that he and Hananel needed to discuss. One of which was an IPI employment agreement and the other involved the use by a Chicago travel firm of the name, Galilee Tours, the use of which created problems for GWV Travel, a division of Adelson's Interface Group, which sold trips to Israel under the name Galilee Tours (the name of Hananel's travel agency).

Lica Brill, a former employee of IPI, directly contradicts Hananel's testimony by her Affidavit. (Brill's affidavit, attached as <u>Appendix F</u>.) She remembers, with a good deal of detail, that she met him in the early to mid afternoon, shortly after she returned from lunch and that much to her surprise he had brought her some perfume. (Brill affidavit, Paragraph 3c).

This discrepancy is not a mere difference in memory. It is not simply a difference between the testimonies of two people. Unimpeachable documentation contradicts Hananel and supports the affidavits of Roberts and Brill. Nor is the factual dispute insignificant, because it is intimately tied into Hananel's assertion that he actually began working for IPI in Israel in the

autumn of 1995. Hananel testified, by affidavit, in the Israel court proceeding that he began working for IPI when Moshe Melnick, another employee, terminated his employment (Hananel deposition, exhibit, No. 45, attached as <u>Appendix G</u>). Moshe Melnick's official termination slip that *Hananel himself signed* on January 18, 1996 shows that Melnick's employment ended December 25, 1995. (Hananel deposition exhibit 51, attached as <u>Appendix H</u>).

Hananel's contemporaneous documents contradict his story decisively. On December 3, 1995, Hananel sent Mr. Adelson a fax, on the letter head, not of IPI for which Hananel allegedly had been, for the previous two months, a full time high level employee, *but of Galilee Tours*, Hananel's company, announcing that he would arrive in Boston on December 4. (Adelson deposition, exhibit 37, attached as <u>Appendix I</u>). On December 10, after the meeting with Mr. Roberts, Hananel requested IPI business cards for himself for the first time (Adelson Exhibit 29, attached as <u>Appendix J</u>). He had no explanation for why he would work for two months without getting business cards and why it was after the trip to the United States and the meeting on December 5, that he first ordered them. It is clear that on December 3, he was operating Galilee Tours, on December 5 he agreed to be the full time manager of IPI, Israel, and on December 10, he was starting his transition from one to the other.

Even more devastating to Hananel's testimony is the Settlement of Accounts that he signed after he was fired. Hananel signed on May 10, 2000 the settlement of accounts, as required under Israeli law. In it, Hananel confirmed that his tenure with IPI was four years, four months and ten days. Four years, four months and ten days from May 10, 2000 is January 1, 1996 (Hananel Exhibit 43, attached as <u>Appendix K</u>). Exhibit 44 of Hananel's deposition (attached as <u>Appendix L</u>) is the IPI official government form for termination of employment that an IPI agent signed (under the penalties of law for false statements), which confirms that

BOS\129354.1

6

Hananel's employment ran from January 1, 1996 to May 10, 2000. Hananel, before he invented the story of the 12% option, signed an official government form certifying that he had begun work on January 1, 1996, exactly "four years, four months and ten days" from the date of his signature. If he had worked for a longer period, his severance pay would have been greater. Why in the world would he have signed that document, if it were not true?

**B.   The fabled Pre- December Appointment to Chairmanship of the Board of Directors and Manager of Auto Depot Ltd.**

Hananel tried to bolster his imaginary 1995 employment with IPI by asserting that Sheldon Adelson made him manager of another Israeli company known as Auto Depot Ltd.

> "On the 7th of November 1995 Adelson elected me chairman of the board of directors of the Israeli company Auto Depot (and I attended at least three meetings before my December 1995 trip to the United States), which he owned through IPI, and announced publicly that I was the Israeli branch manager of IPI." (Hananel's First Affidavit ¶15) (Appendix A)(punctuation as in the original filed in court)[2]

In fact the minutes of that meeting show nothing of the kind (attached as Appendix M). In another display of fictitious grandiosity, contradicted by the very minutes he cites, Hananel trumpeted,

> ...He (Roberts) is either ignoring or concealing the records of my work consisting of minutes of the Board of Directors meetings of Auto Depot Ltd....for Nov. 14, 1995 where I am sitting as chairman in Adelson's absence and am speaking for IPI, including committing hundreds of thousands of Israeli shekels of IPI's money. to Auto Depot. (Hananel's First affidavit, ¶5, p.3) (Appendix A)

---

[2]   Hananel apparently forgot that in paragraph 5 of his First affidavit he stated that at the November 11, 1995 board of directors meeting ...he "sitting as chairman in Adelson's absence."

7

If he could persuade the court that Adelson had made him manager of another of his companies before December 5, 1995 that might appear to give some support for his claim that his employment with IPI commenced before the December 5 meeting. The Auto Depot claim is as counterfeit as the IPI claim. The minutes of the November 7, 1995 meeting list Sheldon Adelson as chairman and show no election of Mr. Hananel to that post. There is no notation that Hananel was now the manager of IPI's Israel branch. The corporate documents of Auto Depot officially filed with the appropriate agencies in Israel (attached as <u>Appendix N</u>) show that in the annual report of mid 1995 of Auto- Depot, Hananel is not listed as a manager. The company's resolution regarding the termination of appointment of Moshe Melnick and the appointment of the new manager show that as of November 15, Moshe Melnick was replaced not by Hananel, but by Adelson (<u>see</u> Appendix N). The minutes of the Auto Depot Limited meeting held on March 26, 1996 shows that Mr. Hananel was then elected chairman of the Board of Directors (attached as <u>Appendix O</u>). In the 1996 annual report filed with the Ministry of Justice (attached as <u>Appendix P</u>), Adelson, not Hananel, is listed as the manager. Hananel's assertion of his appointments to offices in Auto Depot Limited in 1995 is not true. Contemporaneous, ordinary business documents destroy this deception. Hananel's assertions made under oath in depositions and affidavits are spurious and cannot be anything other than intentional falsehoods.

C.   **The 12% Option**

If this story were true, Hananel, like The Shadow, of radio drama fame, had the magical power to cloud men's minds. This is the deal that Hananel claims that Sheldon Adelson, reputedly one of the world's most successful businessmen, risen from a poor immigrant family in Roxbury, made: If Hananel provided information to Adelson that resulted in a successful

venture, Hananel could buy into it at anytime for twelve (12%) percent[3] of what Adelson paid and get twelve (12%) percent of the value at the time of Hananel's purchase, even if made years later and even if the venture had increased in value beyond all expectations (Hananel deposition pg. 72:4 --pg. 81:19, attached as <u>Appendix Q</u>).

> [H]e told me look, you are getting 12% options but specifically he said that you have a huge advantage, I am taking the risk. That means I am investing in a company, you are sitting aside, you don't have to invest the same moment I an investing, you will invest later, so you can see if this company is viable, is interesting to invest. I am taking the risk, you are not taking the risk Moshe and then told me remember Moshe, it's a big advantage but on the other side don't think that you invest 1-2 years later, it will be the same initial amount if, and only if , I invested more. Hananel, deposition, pg. 74:9-21

What stunning deed did Hananel have to perform to earn the right to invest at any time to obtain 12% of Adelson's venture for only 12% of Adelson's cost, no matter how valuable that investment had become? Give him the "idea" of the "possibilities" to invest in the venture. (Hananel deposition p. 123:9—28, attached as <u>Appendix R</u>.) Sheldon Adelson, the owner of a Las Vegas major casino and hotel, has been recognized as one of "the greatest entrepreneurs of the last 25 years," Silver, *The Greatest Entrepreneurs Of The Last 25 Years,* John Wiley & Sons, New York (1985), p.131 ( attached as <u>Appendix S</u>.) Although Hananel's "story is not beyond the pale of possibilities, such is not normally the conduct that one would expect of" an experienced, knowledgeable and shrewd businessman. Its absurdity grows when Hananel tells his story of how he, like Moses leading the Hebrews to the promised land, led Adelson to Macau. An inherently preposterous story in itself can be taken as a lie, disbelieved and taken evidence of

---

[3]     The Court may recall from the previously filed papers opposing the motion to dismiss, that Hananel originally claimed that he had an 8% option agreement, and his Israeli lawyers sent a demand letter to Adelson asserting the right to 8% of Adelson's interest.

9

consciousness of the lack of merit of a case or defense. *United States v. Smith*, 680 F.2d 255, 259-260 (1st Cir. 1982). Hananel's story of the 12% option is so preposterous that it cannot be anything other than a calculated falsehood.

### D. The claim that Hananel told Adelson about potential opportunities for a casino in Macau and told him what and where Macau was.

A core fact that Hananel seeks to establish is that his conversation with Adelson in which he gave him the idea of opening a casino in Macau occurred in a conversation in Israel. Clearly, if such a conversation didn't take place in Israel or didn't take place at all, Hananel has no basis for claiming that Massachusetts has no connection with that "Agreement". Without that fact the only possible evidence of a formation of a contract was that it occurred on December 5, 1995 in Needham, Massachusetts, and any rights that Hananel has or wishes he had arise from the employment relationship that that contract created.[4]

Hananel's tale of how he brought Macau to Adelson is given in exquisite detail (all untrue), extending over three deposition pages (142-145) His affidavits filed in this Court and in Israel set out the story clearly.

> In 1999, I initiated a project for a casino and a hotel in Macau, China as a potential investment by Adelson. I told Adelson of this opportunity (including telling him where Macau was located while we both were in Israel, and as a result he traveled to Macau from Israel (via Taiwan and Hong Kong) in August, 1999 (and returned to Israel.) I provided him with business plans I had prepared in Israel. Although these plans were for other opportunities, they were appropriate for convincing the Chinese authorities that a casino license should be granted to Adelson[5]

---

[4] Thy wish was father, Harry, to that thought: Shakespeare, King Henry IV. Part II. Act iv. Sc. 5. 1.

[5] Hananel does have some difficulty in keeping his story straight. . Macau was not yet returned to China. The handover occurred December 20, 1999. How could Adelson
(Continued...)

10

The story is preposterous and is disproved by all the credible evidence. Sheldon Adelson's affidavit is concrete and specific (Affidavit of Sheldon Adelson, attached as Appendix T). It shows clearly that Adelson not only knew about Macau, but knew that it was "the Monte Carlo of the East"[6]. Moreover, Mr. Adelson states in his affidavit that he made a trip in August of 1999 to go to Hong Kong in his private plane. The plane was required to land in Macau because its engines did not meet the noise regulations enforced in Hong Kong. He landed in Macau and went to Hong Kong. Hananel's wild assertion that he had to tell Adelson how to get to Macau from Hong Kong is errant nonsense. Clearly, when Hananel invented this fiction he was unaware that Adelson landed in Macau, not Hong Kong.

Adelson, prior to 1999, regularly read the Global Gaming Almanac, issued by Bear Stearns, as well as the Trade Journal, "National Gaming and Wagering Business." He was a regular subscriber and reader of the publication "Casino Journal". Exhibit C to his affidavit is a copy of the 1997 issue which published his picture and contained an article on Hong Kong that also refers to Macau. He states in his affidavit that he read the article. This was an issue to which he paid particular attention. Macau has been known for its gambling since the Portuguese

---

(Continued...)

    have taken materials to "the Chinese authorities" in Macau in August, when the Portuguese still governed?

[6]    Macau was well known if not for any other reason that it was a name of the movie, starring Robert Mitchum and Jane Russell. The plot revolved around conflict with the owner of a gambling establishment. While the movie was apparently not much to look at, Jane Russell always was, so the name Macau must have had a fair amount of notoriety. See Movie Review attached as Appendix U.

licensed casinos around 1850.[7] The notion that the owner of a major Las Vegas casino and a travel company never heard of Macau is simply ludicrous.

Hananel testified in his deposition, page 145 that he spoke to Adelson by telephone when Adelson was in Hong Kong on this trip. That

> "When he was in Hong Kong, in Peninsula Hotel, I told him, Sheldon I really want you to go and visit Macau. He told me Moshe, I have time in the morning and noon because I have a big dinner that I am entertaining other people and really don't want to see anything of the shops, anything in Hong Kong. I am telling you I am going to Macau. I tell him ok, I am very happy. So he went not so much morning, but late morning let's say he went to Macau".

Clearly this little conversation never happened, and it was Hananel's mendacious, but clumsy, attempt to place the location of the agreement that never was to someplace other than Massachusetts. There was of course no need for Sheldon Adelson to have made that call since he landed in Macau and didn't need Hananel to tell him how to get to where he already was.

Hananel's story concerning when and how he began working for IPI is simply not true from beginning to end. The documents, some of which Hananel himself signed, the rest of which are business or official documents made and kept routinely, clearly show that Hananel did not have an employment agreement before December 5, 1995 and did not start work until January 1, 1996. The facts are clear that Hananel's whole story that he introduced Adelson to Macau and its casino opportunities is preposterous, unsupported by anything other than Hananel's say so and at variance with the very clear and documented statements in Mr. Adelson's affidavit.

---

[7] www.lonelyplanet.com/destinations/ north_east_asia/**macau/history**.htm

### E. Hananel's Statement In Support Of His Motion To Dismiss For Forum Non-Conveniens: His Claims That Adelson Has Extensive Contacts, Business, and Property in Israel

Hananel has stated in his affidavit that while he has no contacts in Massachusetts, Adelson has substantial contacts and property in Israel. (Hananel's "Second Affidavit", ¶¶ 20, 21; Appendix V) However, in an appeal from a denial from the National Labor Court in Jerusalem (Appendix W) from an order denying him an attachment, Hananel filed a pleading asserting that since that complaint was filed, Adelson has "kept his distance from Israel", that since the complaint was filed he has had no operations in Israel, that the reduction of Adelson's "business has greatly increased over the last few months since the complaint was filed," and that IPI has essentially no assets in Israel. He filed substantially the same affidavit in the District Labor Court of Tel Aviv and Jaffa (attached as Appendix X). Clearly, those statements cannot be squared with the affidavit filed in this court that asserts that Adelson has extensive business interests and property in Israel. Hananel may not have the most acute sense of reality but he certainly has a keen sense for convenience.

#### 1. Hananel's claims of his inability to travel.

In support of his Motion to dismiss for *Forum Non-Coveniens*, Hananel has appealed to the sympathy of the court claiming that because of his visual impairments and poor health travel is exceedingly burdensome to him. Within recent years he has traveled to the Far East (Hananel deposition, pg. 21, attached as Appendix Y). He has gone twice to Holland. He traveled to Bulgaria. He was in Ireland two summers ago. He has traveled to France. He has traveled to Austria to attend concerts there. It would appear that Mr. Hananel for matters of convenience has somewhat exaggerated his inability to travel.

#### 2. The Defendant's refusal to divulge the names of witnesses whom he claims had knowledge relevant to the case was without foundation, with no privilege to support it, and the court should draw the

> **inference that either there are no witnesses in Israel who have relevant information concerning the Hananel's claims or that any such witnesses would give testimony adversely to Hananel's claim.**

The deposition of Mr. Hananel is remarkable in many ways, not the least of which was his counsel's creation of a non-existent privilege -- the "litigation privilege.[8]" (Hananel deposition p. 31: 15, attached as <u>Appendix Z</u>). Hananel consistently refused to disclose the identity, even indirectly, of persons he claimed were witnesses to the facts of the Macau Casino claim. Hananel has claimed in support of his motion to dismiss based upon the doctrine of Forum Non-Conveniens that the witnesses are located in Israel and Macau and not in the United States.

It hardly requires any discussion at all to point out that the Rules of Civil Procedure, *Fed.R.Civ.P* 26(a), requires that a party disclose the names, addresses and telephone numbers of potential witnesses and persons who have knowledge that is relevant to the issues of the case. There is no Massachusetts privilege that permits a party to withhold the identity of persons who have knowledge of facts relevant to the litigation. Two broad and well-established principles of law virtually require the court to draw the inference that Hananel has no witnesses who will support his position or that such witnesses as may exist would testify adversely to his claims concerning the Macau Casino. The fundamental rule is that even when a party in a civil action may resist discovery on the basis of some privilege, the party may not rely on the privileged information as evidence at the trial. *G.S. Enterprises, Inc. v. Falmouth Marine, Inc.*, 410 Mass. 262 (1991).[9] This rule must apply with even greater force when a party refuses to divulge

---

[8] Yesterday in thin air/I saw a rule that wasn't there. It wasn't there again today. I hope it doesn't go away. Apologies to Ogden Nash

[9] In diversity cases, federal courts apply the state evidentiary rules of privilege. e.g. *Kowolski v. Gagne*, 914 F.2d 299, 306-308 (1st Cir. 1990).

BOS\129354.1

information with no legal basis at all. Consequently, Mr. Hananel must be assumed, for the purposes of this motion, to have no witnesses and cannot be heard to argue that witnesses in Israel support his contention that the United States District Court in Massachusetts is an inconvenient forum.

The second rule which supports the conclusion that the court should draw adverse inferences concerning the availability of any witnesses in Israel whom Hananel would call to support his case is the rule that a party who does not consent to produce relevant information is subject to the adverse inference that that information would be adverse to his cause. *Bishop v. Klein*, 380 Mass. 285 (1980). Where a party does not call a witness who is available to him as a witness and was in a position to give evidence on a relevant matter, the failure to call that witness permits the inference that the witness, if called, would give testimony adverse to the party. *Williamson v. Feinstein*, 311 Mass. 322 (1942). When without reasonable explanation "a party fails to call a person of whom the party is aware, whom he can bring to trial and who is friendly to or at least not hostily disposed toward the party and who can be expected to give testimony of distinct importance to the case an inference that the witness would testify adversely is justified." *Hoffman v. Houghton Chemical Corporation, et al.*, 434 Mass. 624, 640 (2001). These rules must apply with even greater force when the issue is the refusal to identify witnesses.

An alternative ground for the court to draw an adverse inference against Hananel is to treat his refusal to provide the identity of the witnesses for what it was, a refusal to make legitimate discovery and draw the inference adverse to him as a sanction for a blatant and unjustified disregard of his obligations under the federal rules. *Fed.R.Civ.P. 37*.

> 3. **Hananel's Multiple And Intentional Falsehoods And Refusal To Fulfill His Discovery Obligations Should Lead This Court, Not Only To Disbelieve All His Testimony, But Should Be Taken As Implied Admissions Of A Consciousness That He Has No Case.**

15

The testimony is so egregiously false that the court would be more than justified in denying Hananel's motion to dismiss as punishment for a fraud on the court. The Defendant's falsehoods have been exposed, not just by contradictory, and we submit, persuasive evidence by other persons, but by documents that the Defendant himself signed and by other official documents submitted under the certification of truth to agencies of the Israeli government. Hananel has given no explanation for the difference between what he has sworn to in testimony and in affidavits and the documentary evidence. He has no explanation for the contradictions in his own testimony. His testimony that Adelson promised to give him a twelve (12%) percent cut of any business opportunity that turned out well, regardless of when Hananel chooses to exercise that "option" is so preposterous that it could not possibly be true. It is well settled that intentionally false testimony can be considered to indicate a consciousness that the witnesses' case is without merit. *Sheeham v. Gorinsky*, 317 Mass. 310, 316 (1944). It is well settled that where a party deliberately lies in furtherance of a scheme he or she has practiced a fraud on the court.

The case at bar is at least as egregious an example of fraud on the court as is the *Aoude* case. In this case, Hananel's effort to keep the case out of this court's jurisdiction is based not only on one lie, but on several. The most blatant of the lies goes to the very heart of the jurisdictional issue that is when and where his employment agreement was formed. To undercut Attorney Paul Roberts' testimony that the contract was formed in Needham, Massachusetts in the late afternoon of December 5, 1995, Hananel swore that he was at the Joslin Clinic all day. Lica Brill, in her affidavit, states clearly that she remembers seeing him in Needham in the mid to early afternoon. That is the least of the evidence revealing Hananel's duplicitous scheme. Hananel claimed that as early as September or October of 1995, Adelson had already hired him

as the manager of another corporation in Israel, Auto Depot, and elected him Chairman the Board of Directors. The corporate records contemporaneous with the events described in them show clearly that Hananel was never elected to the Board of Directors until March of 1996 and was not the manager of Auto Depot. The documents show that the manager was, in fact, Sheldon Adelson. Hananel conceded that his position with IPI commenced after a gentlemen by the name of Moshe Melnick left IPI. Hananel signed one of the documents which shows that Mr. Melnick left at the end of December, 1995. More devastating and absolutely conclusive proof that Hananel lied about when he commenced his work running IPI is the employment document that he signed that was filed with the Israeli government in which he stated that he worked for four (4) years, five (5) months and ten (10) days before the date of the document, which was May 10, 2000. Simple arithmetic demonstrates that in his own hand, Hananel certified that he began work January 1, 1996 not in the fall of 1995. This evidence reveals that Hananel's testimony is nothing less than a scheme to obtain judicial aide for his effort to hijack twelve (12%) percent of Mr. Adelson's investment in the Macau Casino. Hananel's conduct deserves nothing less than a denial of his motion or granting judgment to Mr. Adelson by default.

## IV.   Conclusion

Moshe Hananel was engaged to manage the Israel branch of IPI. The contract of employment was oral, according to both parties. The parties came to an agreement at their meeting in Needham, Massachusetts at the offices of IPI on December 5, 1995. Hananel worked at IPI until May 10th of 2004. He thought he saw an opportunity to become rich by claiming that he was instrumental in Mr. Adelson's group obtaining a license in Macau to build and operate a casino. He conceived of an elaborate, but clumsy, plan to build a case on an allegation that he had been given by Adelson (for no apparent reason) an unbelievably openhanded offer to obtain twelve (12%) percent of any enterprise or business opportunity which he introduced or even

suggested to Mr. Adelson. This twelve (12%) percent was twelve (12%) percent on the date that Hananel exercised his "option", and he only had to pay twelve (12%) percent of what Adelson had originally paid. His story of the 12% offer and how he supposedly introduced Adelson to Macau's existence is both fantastic and shocking. Independent witnesses, documentation supporting Mr. Adelson's affidavit, official and contemporaneous business documents (some on file with the Israeli government), and finally, a document signed by Hananel himself expose the scheme for what it was—a bold faced fraud. The court, to protect the integrity of the judicial system and maintain the confidence of the public that American courts can still be relied on to provide justice and truth, should deny Hananel's motion to dismiss, or more appropriately, enter a default declaratory judgment in behalf of Mr. Adelson.

    Respectfully submitted,
    The Plaintiff,
    SHELDON G. ADELSON,
    By his Attorneys,

    */s/ Albert P. Zabin*
    Franklin H. Levy, B.B.O. No. 297720
    Albert P. Zabin, B.B.O. No.: 538380
    DUANE MORRIS LLP
    470 Atlantic Avenue, Suite 500
    Boston, MA 02210
    (617) 289-9200

Dated: April 29, 2005

## CERTIFICATE OF SERVICE

    I, Albert P. Zabin, hereby certify that I served a copy of the foregoing on all Defendants this 29th day of April, 2005, via hand delivery to the following:

James A. G. Hamilton, Esquire
Perkins Smith & Cohen
30th Floor
One Beacon Street
Boston, MA 02108-3106

                                                                     Albert P. Zabin

BOS\129354.1