IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SHELDON G. ADELSON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | |
| v. | ) | **04-cv-10357-RCL** |
| | ) | |
| MOSHE HANANEL, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF HANANEL IN SUPPORT OF RENEWED MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Defendant Moshe Hananel ("Hananel") provides this Memorandum in support of his renewed motion, following Court-ordered discovery, for dismissal for lack of personal jurisdiction. Hananel will seek leave to reply specifically to the Second Supplementary Brief Adelson filed April 29, 2005.

Discovery, particularly admissions in interrogatory answers and deposition, by plaintiff Sheldon G. Adelson ("Adelson") and documents produced by Adelson, now permits the Court to decide that Adelson has failed to offer a *prima facie* case of jurisdiction.

### PROCEDURAL BACKGROUND

Three previously-filed (2001, 2002, and 2003), ongoing proceedings in Israel between them concerning the same subject matter as the present action preceded Adelson's filing of this action in February, 2004 against Hananel, a resident of Israel. Hananel moved to dismiss for lack of personal jurisdiction and on forum non conveniens grounds, and for a stay in favor of the Israeli proceedings, in June, 2004. The Court has denied the stay motion without a hearing, and has denied the other motions without prejudice to their renewal following limited discovery. The

parties dispute whether Adelson complied with his discovery obligations, and that dispute is

anticipated to be the subject of Local Rule 37.1 conference and possible motion practice. On

April 29, 2005, Adelson served a Second Supplementary Brief ("2d Supp. Brief") in opposition

to the jurisdictional motion to dismiss. Hananel files this Memorandum in support of his

Renewed Motion to dismiss.[1]

## FACTS

As discussed in the first section of Argument, below, the determinative facts are those

properly shown by the plaintiff, ignoring conclusory statements, plus uncontradicted facts put

forward by a defendant. Discovery has focused the issues to a single contact with

Massachusetts, the alleged Dec. 5, 1995 meeting in Needham. Hananel therefore sets forth the

following facts, in each case citing to a record statement by Adelson, documents or an

uncontradicted statement by Hananel. The headings reflect Constitutional requirements for

jurisdiction presented in the Argument sections of this Memorandum: relatedness, purposeful

availment, and the Gestalt factors.

### A.    ADELSON LIMITS HIS JURISDICTIONAL CLAIM TO THE ALLEGED NEEDHAM MEETING.

1.    Adelson concedes that jurisdiction depends on a single contact, Hananel's alleged

---

[1]    In previous briefing and evidentiary submissions, Hananel has provided a
Memorandum in Support of his motion to dismiss for lack of personal jurisdiction (Dkt. # 7), a
Memorandum in Support of his motion to dismiss for forum non conveniens (Dkt. # 9), and a
(First) Hananel Affidavit in support of both motions (Dkt. # 12). Adelson has provided an
Opposition (Dkt. # 14), a Roberts Affidavit (Dkt. # 16), and an Adelson Affidavit (Dkt. # 17).
Hananel filed a Reply Memorandum (Dkt. # 29) and Second Hananel Affidavit (part of Dkt. #
21). Adelson then filed a Plaintiff's Response and Zabin Affidavit (Dkt. # 30). Hananel then
filed a motion for leave to supplement (Dkt. # 31; motion allowed Nov. 26, 2004) (showing
Adelson's appearance in Israel to execute an affidavit in the Israeli proceeding). Hananel has filed
a Supplementary Memorandum of Hananel In Support Of Motion To Dismiss For Forum Non
Conveniens (Dkt. # 40).

meeting in Needham, Massachusetts on December 5, 1995. Int. Ans. 1.[2]

## B.    WHETHER THE NEEDHAM MEETING WAS PURPOSEFUL AVAILMENT BY HANANEL.

### 1.    Whether The Meeting Was "Random Or Fortuitous."

2.    Hananel's trip to the United States on Dec. 4-5, 1995 resulted only from his desire to obtain superior medical advice concerning his diabetic condition. (First) Hananel Aff. ¶ 18 at 4-5. Had the Joslin Clinic been located in another state, or had Hananel decided to attend another famous clinic, he would not have visited Massachusetts.

3.    Adelson agreed that Hananel's visit to Massachusetts was not in any way at Adelson's request; after Hananel announced that he was coming to the clinic, Hananel asked Adelson for a contact at the clinic, and Adelson had helped set up the appointment. Adelson Deposition Transcript, Exh. 1 hereto, page 353: lines15-24. Adelson recalls no other conversation with Hananel on the subject of the purpose of the visit. *Id.*

### 2.    Whether Hananel Came For A Business Purpose.

4.    The current affidavit of Adelson lawyer and employee Paul G. Roberts, App. E to Adelson's 2d Supp. Brief ("2d Roberts Aff.), reciting new allegations concerning the evening of Dec. 4 when Hananel arrived from Israel and stayed the night at Adelson's house, nevertheless confirms (¶ 8) that no prior request or invitation had been made for Roberts or anyone else to talk to Hananel about business or a contract.

5.    Adelson concedes that no documents exist concerning  (a) communications between himself and Roberts concerning Hananel for the second half of 1995, or (b) communications between Roberts and Hananel in the same period. Adelson Doc. Resp., Exh. 2,

---

[2]    Hananel continues to deny discussing the terms of his employment contract with anyone on Dec. 5, and will supply additional documentary proof supporting his version of events when

- 3 -

nos. 18, 19.

6.    Adelson, asked for the complete schedule of himself <u>and Roberts</u> beginning at 6 p.m. Dec. 4, failed to mention a single event that night, much less a memory of the presence of Hananel.  Adelson's Int. Ans. 8 of February 14, 2005, Exh. 3.

7.    Further confirming that Adelson had no business purpose in mind for Hananel's trip from Israel, Adelson admitted that he did not pay for Hananel's trip in any way and added that if he had been asked, <u>he would have refused</u>.  Exh. 1, 352:13-16; *see also* Adelson's Doc. Resp. no. 12, Exh. 2.

8.    Even if Roberts' alleged solicitation of a meeting had occurred, neither he nor Adelson identify any communication that could not have been accomplished by mail, or telephone conference, or meeting with Adelson in Israel during one of his multiple visits in late 1995 (see below).

### 3.    Whether The Alleged Meeting Was Instrumental Or Causative.

9.    On February 14, 2005, Adelson signed interrogatories admitting that he had "*reach[ed] an understanding sometime in or around November 1995*" that Hananel would replace Adelson's brother-in-law as "*manager of IPI in Israel.*"  Int. Ans. 2, Exh. 3.

10.    Adelson has further admitted in his deposition (Exh. 1) that the agreement was neither negotiated or made in Massachusetts, but only "confirmed," requiring the inference that it had been fully negotiated and entered into before December 1995.

> –At 164:12-24 Adelson stated that he first discussed Hananel's contract in "*October or November*" and does not deny that it was in Israel.

> –At 165:2-5 Adelson admitted that he talked with Hananel "*almost every day*" in the October–November 1995 period.

---

he seeks leave to reply to Adelson's Supplemental Brief.

–At 353:6-8 Adelson restates that he saw the alleged Roberts conversation as only "*to confirm the deal.*"

–At 353:9-11 Adelson stated that no controversy over terms was involved.

–At 132:25 - 134:6 Adelson testified that Roberts had never been authorized to make any business decisions or business judgments for him.

11.    Adelson has admitted that the employment agreement was made between Hananel and himself, not Roberts; in his Sept. 7, 2004 affidavit in the Israeli proceedings he did not mention any role in making the agreement by Roberts, or any contacts between Hananel and Massachusetts. Deposition Exhibit ("DX") 5, Exh. 4 hereto, ¶¶ 6-7. Adelson insists instead that the agreement was made "*through myself.*" *See id.* ¶¶ 7, 8, 14. Adelson further states in ¶ 26 "*I made it crystal clear that I – and only I – was authorized to approve the employment of Workers [for IPI] and the terms of their employment.*"

12.    Admissions and undisputed evidence show that Adelson and Hananel engaged in business-related meetings, at which Hananel performed business-related services at Adelson's request, in Israel for months before December 1995. Adelson has admitted being in Israel in the late summer and fall of 1995 and being in Hananel's presence and/or using his services, including his agreed position as IPI branch manager in Israel with substantial financial and official authority, on the following occasions:

August 16-23, AIPAC/Congressional Mission to Israel. Exh. 1, 183:20 - 184:1.

October 6 - Adelson instructs his "team in Las Vegas" to request information concerning investment in a new facility in Eilat, Israel from Hananel, "a tremendous source for assisting us." DX 17, Exh. 5, p. 1. Adelson does not deny the statement in the letter that Adelson told the author of DX 17, Heller, to contact Hananel. Exh. 1, 242:7-9.

October 24 - Adelson's documents show that Hananel assisted him in obtaining an invitation to attend the economic summit in Amman, Jordan in October 1995. DX 27, Exh. 6.

October 28-30, economic summit in Amman, Jordan. Exh. 1, 177:19 - 178: 7. DX 27, Exh. 6, shows that Adelson had not been invited, and that his secretary wrote to the Jordanian Minister of Trade and Industry requesting an invitation, suggesting Adelson's "future business interests in Jordan" and that Adelson used Hananel to transmit the letter from Israel (on Interface Group stationery). Adelson purported to scoff at the "ridiculous" idea that he would condescend to ask a "king" [sic] for anything, but was forced to admit that his personal secretary had signed the request. Exh. 1, 283:15-18 (sarcasm); 285:19 - 286:10 (signature and letterhead).

Oct. 28-30 - Adelson and Hananel meet with Minister of Tourism in Jordan at the summit. Exh. 1, 289:1-5 and DX 28, Exh. 7.

Nov. 1 - Adelson and Hananel meet (Exh. 1, 249:12-21) with the General Manager of the Israel Land Authority concerning the "establishment of a convention center in Eilat [Israel]." DX 19, Exh. 8. Adelson wanted a casino for this site, Exh. 1, 176:3-11, 248:14 - 249:11, showing that he employed Hananel for the purpose of identifying and developing casinos at least as early as October-November 1995.

Nov. 7 - Adelson and Hananel present together at Auto Depot board meeting. "Mr. Adelson explained that Mr. Hananel will contribute greatly to the company's strategic planning." DX 9, Exh. 9, ¶ 7. Adelson agrees that "it appears that I was there." Exh. 1, 204:14-16. Adelson nowhere denies that he announced publicly that Hananel was IPI branch manager in Israel. (First) Hananel Aff. ¶ 15.

Nov. 7 and 22/24 - Adelson has supplied documents showing that, prior to December 5, 1995, he gave Hananel signature rights on Auto Depot's bank accounts. See Doc. Resp. 9, Exh. 2, and DX 9, ¶ 9 and DX 10, third page, ¶ 3, Exhs. 9 & 10. He has admitted giving Hananel signature rights on IPI's checking account as well. *See* Opposition of Plaintiff filed July 15, 2004, at 2 (Hananel wrote IPI checks before December). Adelson confirmed this grant in his own handwriting on Nov. 22 or 24, 1995. DX 15, Exh. 11; , Exh. 1, 234:7 - 235:3.

Nov. 7 – Auto Depot board meeting vote to give Hananel equal authority with Adelson to bind Auto Depot to monetary obligations of over 30,000 shekels. DX 10, Exh. 10, 3d page, ¶ 3.

Nov. 7 - Adelson gives Hananel authority to act for him "*for those [board of directors] meetings that I would otherwise have participated in if I were there [in Israel].*" Exh. 1, 235:8-15.

Nov. 8 - Farbstein (Adelson's brother-in-law whom Hananel replaced as manager) of The Interface Group/Israel (Interface) seeks and gets Hananel's

> authority (as manager of IPI) to loan 305,000 shekels from IPI to Auto Depot. DX 11, Exh. 12.

> Nov. 14 - Hananel is noted as a director and chairs the Auto Depot board meeting "in the absence of Mr. Sheldon Edelson [sic]", is appointed a signatory of an investment deal, and commits an additional 486,000 shekels from IPI to Auto Depot. DX 12, Exh. 13, top of first page; ¶ 1 on page 1; ¶ 2 on page 2. Adelson admits making loans to Auto Depot, and does not deny that it was on that date, in that amount, or in that fashion, Exh. 1, 210:21-23.

> Nov. 21 - IPI office manager Davy Camp requests Hananel approval to pay bill of $4,000 to Kersni, and Hananel signs it "OK." DX 14, Exh. 14.

> Nov. 24 - Adelson sends Davy instructions (in a handwritten letter) to add Hananel as a sole signature "for any amount" on checking accounts. DX 15, Exh. 11.

> November - Adelson confirms at his deposition that he gave Hananel signature rights on Auto Depot accounts, Exh. 1, 202:23 -203:2 (and does not deny that it was in November); 222:3-5.

13.    Confirming the importance of Hananel's pre-December 1995 employment in Adelson's casino projects (see Eilat and Jordan, ¶¶ 12-13 above), Adelson has admitted meeting with Hananel on other occasions concerning the initiation and development of casinos. Exh. 1, 291:5 - 292:6. Adelson stated that during Hananel's employment he had pursued casino project ideas in Israel, Jordan, and Cyprus, and had made inquiries in Ireland and Bulgaria (with Hananel present). Exh. 1, 324:21-327:25; 336:16-21 (Cyprus).

### 4.    Whether presence in a Massachusetts court was "foreseeable" to Hananel.

14.    New documents produced in discovery by Adelson, including many attached to his 2d Supp. Brief, show that he intended Hananel to be employed with a company registered in Israel, to be paid there, and to be subject to Israeli laws. *See* 2d Supp. Brief Apps. J, K, L, M, and O. No documents show employment activities by Hananel in Massachusetts.

- 7 -

### 5.     Whether Hananel accepted any "protections and benefits" from Massachusetts.

15.     Adelson has admitted that "the place of the contract formation or negotiation have [sic] not been a subject before any Israeli court." Exh. 3, Int. Ans. 7. Adelson therefore does not contradict evidence that the contract has been treated by all parties in Israel as a contract made in Israel and subject to Israeli law (as both Hananel and Adelson through IPI have commenced earlier litigations in Israel concerning the contract), confirming that Hananel has not sought the protections or benefits of Massachusetts law.

### 6.     Whether Hananel undertook any "continuing obligation" towards Massachusetts.

16.     Adelson has provided no facts suggesting that Hananel undertook a continuing obligation towards Massachusetts, as his compensation and performance occurred in Israel (and elsewhere outside the United States). *See* ¶¶ 14-15, *supra*.

### C.     WHETHER THE MACAU CLAIM DIRECTLY RELATES TO OR ARISES OUT OF THE ALLEGED NEEDHAM MEETING.

17.     Adelson stated under oath on February 14, 2005 that he had "*never heard the word Macau before*" Hananel's termination (April 2000) and then corrected himself to say that he knew the word because he had landed there and taken the ferry to Hong Kong, "*but I had no interest, didn't know of the possibility [of a casino development there] at all, had no interest.*" Exh. 1, 328:12-19. These statements confirm that Hananel was the first person to identify the Macau casino opportunity to Adelson, in Israel, in 1999.

18.     Adelson agreed on February 14, 2005 that the flight itineraries he produced, DX 35, Exh. 15, showed flights to and from Israel with a scheduled landing in Macau. Exh. 1, 343:2-6.

19.     At his deposition, Adelson, referring to his trip from Israel to Macau and return in

- 8 -

March, 2000, claimed that he knew nothing about casinos (Exh. 1, p. 349):

> 17  *Q.  Did you talk with anyone about casinos?*
> 18      *A.  Absolutely not.  Never knew about casinos,*
> 19  *didn't know nothing about it.*

But in his present Supp. Aff., ¶ 15, he admits that during his August 1999 trip to Macau he <u>had</u> visited a casino and had spoken with at least one person about casinos, in a "VIP room" in the Lisboa Casino in Macau.  This later version is consistent with Hananel's evidence that he urged Adelson to go to Macau for that purpose.

### C.    GESTALT FACTORS.

20.    Discovery has confirmed the ease with which Adelson can conduct litigation in Israel, relative to Hananel coming to the United States.  According to Adelson's deposition testimony (Exh. 1):

> –Adelson's wife owns two residences in Israel.  36:8-9.
> –His family owns three Mercedes cars in Israel. 38:16-20.
> –He "*travels a lot.*" 61:12 - 62:11.
> –"*I do business everywhere.*" 70:24 - 71:1.
> –He has business interests of "*international scope.*" 73:15-18.
> –He anticipates going to Israel up to four times in 2005, for stays for five days or
>      more. 73:25 - 74:12.
> –He has a residence in Israel. 75:8-9.
> –He has an office in Israel. 77:22-24.
> –He has lawyers in Israel. 78:6-8.
> –He has a 30-35% investment in an Israeli software company, 78:22 - 79:3, and is
>      chairman of the board 81:8-10.

21.    Discovery has confirmed Adelson's enormous wealth relative to Hananel (Exh. 1 p. 308):

> 11  *Sir, my worth today is 15 or 16 billion United*
> 12  *States dollars.  Do you really think a company [IPI] in which*
> 13  *I invested 10 or 15 million dollars just as a lark was*
> 14  *of significance to me that I would put it on my*
> 15  *business card?  That's absolutely just not the case.*

22.    Discovery has confirmed that Adelson brought the present action against Hananel

knowing it was duplicative of the Israeli litigation, and intending it to be so (Exh. 1, p. 88):

> 14    *Q. Mr. Levy knows that I have to ask you. Do you*
> 15    *remember what the claims in the complaint are?*
> 16    *A. At this moment, at this very moment, I could not*
> 17    *recite for you chapter and verse exactly what the*
> 18    *paragraphs in the complaint are.*
> 19    *Q. And you don't remember --*
> 20    *A. **The fundamental purpose of the case is to try***
> 21    ***the issue of the Macau claim in Massachusetts. That I***
> 22    ***know.** . . .*

23.    Discovery has confirmed that Adelson intends to exhaust Hananel financially

through this duplicative litigation in the United States (Exh. 1, p. 231):

> 15    *Q. I have to mark a document, Mr. Adelson.*
> 16    *A. Mark a document.*
> 17    *(Exhibit 15 marked for identification.)*
> 18    *THE WITNESS: It's your time you're wasting*
> 19    *and it's Mr. Hananel's money you're wasting. **One day***
> 20    ***he'll run out.***

24.    Discovery has confirmed that Adelson hopes and expects to conceal the facts he

discloses in the United States from the Israeli courts (Exh. 1, p. 118):

> 13    MR. HAMILTON: The Israeli court should not
> 14    hear anything that goes on here today, is that what
> 15    you're saying?
> 16    THE WITNESS: Absolutely.

## ARGUMENT

### I.    ADELSON'S BURDEN IS TO MEET THE PRIMA FACIE STANDARD.

Hananel respectfully requests the Court to consider his previous memoranda of law on

personal jurisdiction, and submits here a more detailed application of the "prima facie" standard.

Hananel believes that an evidentiary hearing on jurisdiction, and a fortiori a delay of decision until

a trial on the merits, would be so burdensome that it would vindicate Adelson's expressed

purpose of duplicating the Israeli proceedings so as to exhaust Hananel's resources until "*one day*

- 10 -

*he'll run out*" of money. If the Court finds that Adelson may meet the prima facie standard, it should recognize that "proffered evidence is conflicting and the record is rife with contradictions" and "plaintiff's affidavits are patently incredible." *Moldflow Corp. v. Simcon, Inc.*, 296 F. Supp. 2d 34, 38 (D. Mass. 2003) (Lindsay, J.), quoting from *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 676 (1st Cir. 1992). Hananel requests an evidentiary hearing limited to jurisdiction as an alternative if the Court decides it cannot dismiss on the present record.[3]

In determining whether Adelson has made a prima facie case, the Court must consider the plaintiff's properly supported factual evidence, but without relying on conclusory statements or unreasonable inferences, and recognizing as true uncontradicted facts shown by the defendant. Determination of a prima facie case requires "draw[ing] the facts from the pleadings and the parties' supplementary filings, including affidavits, taking facts affirmatively alleged by the plaintiff as true and viewing disputed facts in the light most favorable to plaintiff." *Sawtelle v. Farrell*, 70 F.3d 1381, 1385 (1st Cir. 1995). "In so doing, however, 'we do not credit conclusory allegations or draw farfetched inferences.'" *Id*. "We then add to the mix facts put forward by defendants, to the extent they are uncontradicted." *Mass. School of Law at Andover v. American Bar Assn.*, 142 F.3d 26, 34 (1st Cir. 1998). *See also Pike v. Clinton Fishpacking, Inc.,* 143 F. Supp. 2d 162, 165-166 (D. Mass. 2001)(Lindsay, J.) (" '[T]he district court . . . accepts properly supported proffers of evidence by a plaintiff as true . . . ,' " quoting from *United Electrical Radio and Machine Workers of America v. 163 Pleasant Street Corp.*, 987 F.2d 39, 44

---

[3]    The "preponderance-of-the-evidence" or intermediate "likelihood" standards are only reluctantly to be resorted to <u>after</u> the plaintiff has <u>succeeded</u> in meeting the prima-facie standard, i.e., when a court "determines that in the circumstances of a particular case it is unfair to force an out-of-state defendant to incur the expense and burden of a trial on the merits in the local forum without first requiring <u>more of the plaintiff than a prima facie showing</u> of facts essential to *in personam* jurisdiction." *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 676 (1st Cir. 1992) (emphasis added).

(1st Cir. 1993)) (emphasis added); *Champion Exposition Servs., Inc. v. Hi-Tech Electric, LLC*,

273 F. Supp. 2d 172, 175 (D. Mass. 2003) (Lindsay, J.)("properly made assertions" required).

Adelson's submissions still include much hearsay not amounting to "evidence" and key factual

assertions in his briefing are not "properly supported" by the record, are contradicted by his own

evidence in some cases, and are merely conclusory in others.

In the present case, (a) a close examination of the few facts Adelson has stated explicitly;

(b) a rejection of statements in his briefs that are (i) merely conclusory or (ii) refuted in his own

record citations;  (c) acceptance of express admissions by Adelson in interrogatory answers,

deposition testimony, and documents he produced;  and (d) the uncontradicted facts put forward

by Hananel, constitute a body of undisputed facts showing that Hananel lacks sufficient contacts

with Massachusetts.

## II.    UNDISPUTED FACTS IN THE RECORD SHOW LACK OF MINIMUM CONTACTS.

### A.    The Alleged Needham Meeting Is Insufficient To Support Jurisdiction.

The only contact between Hananel and Massachusetts proffered by Adelson, the alleged

Needham meeting to confirm a contract, fails to impose jurisdiction. The Supreme Court has

expressly addressed this situation. It said:

> If the question is whether an individual's contract with an out-of-state
> party <u>alone</u> can automatically establish sufficient minimum contacts in the
> other party's home forum, we believe the answer clearly is that it cannot.
>
> . . . . It is these factors–prior negotiations and contemplated future
> consequences, along with the terms of the contract and the parties' actual
> course of dealing–that must be evaluated in determining whether the
> defendant purposefully established minimum contracts within the forum.

*Burger King Corp. v, Rudzewicz*, 471 U.S. 462, 478-479 (1985)(emphasis in original). *See also*

*Phillips Exeter Acad. v. Howard Phillips Fund*, 196 F.3d 284, 290 (1st Cir. 1999) ("The mere fact

that a defendant willingly entered into a tendered relationship does not carry the day"); *Sawtelle, supra,* 70 F.3d at 1392) ("the mere existence [of a contractual relationship, in that case an attorney-client relationship], unaccompanied by other sufficient contacts with the forum, does not confer personal jurisdiction over the non-resident in the forum state; more is required").

In the present case, Adelson asserts not even the contract itself but only its formation in Massachusetts. By Adelson's express admission, all of the factors listed by the *Burger King* Court militate against jurisdiction. The "prior negotiations" took place in Israel (¶¶ 9-11 *supra*); the "contemplated future consequences" would be in Israel, not Massachusetts (¶¶ 12-13 *supra*); the "terms of the contract" applied to Israeli compensation and Israeli performance, with no compensation or performance contemplated in Massachusetts (¶¶ 14-15 *supra*); and the "actual course of dealing" between Adelson and Hananel has occurred primarily in Israel but in any case outside Massachusetts (¶¶ 14-15 *supra*). As discovery has forced Adelson to admit that he has no admissible evidence of any other relevant contact, even giving the disputed Needham meeting its full measure of deference does not enable Adelson to meet his burden, and dismissal is warranted under *Burger King* alone.

## B.    Application Of Recognized Standards.

As noted in previous briefing by both parties, Adelson asks for specific jurisdiction over Hananel, giving him the burden of showing that three Constitutional requirements are met:

> First, an inquiring court must ask whether the claim that undergirds the litigation directly relates to or arises out of the defendant's contacts with the forum. Second, the court must ask whether those contacts constitute purposeful availment of the benefits and protections afforded by the forum's laws. Third, if the proponent's case clears the first two hurdles, the court then must analyze the overall reasonableness of an exercise of jurisdiction in light of a variety of pertinent factors that touch upon the fundamental fairness of an exercise of jurisdiction.

*Phillips*, *supra,* 196 F.3d at 288; *Moldflow Corp., supra,* 296 F. Supp. 2d at 40-41. In the

- 13 -

present case, Adelson most clearly fails to meet the purposeful availment standard, and Hananel addresses it first.

### C.    Undisputed Facts Show Lack Of Purposeful Availment.

The Supreme Court has repeatedly used the "purposeful availment" test to ensure "that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts . . . or of the unilateral activity of another party or third person." *Burger King*, *supra,* 471 U.S. at 475 (1985). "The function of the purposeful availment requirement is to assure that personal jurisdiction is not premised solely upon a defendant's 'random, isolated or fortuitous' contacts with the forum state." *Sawtelle v. Farrell,* 70 F.3d 1381, 1391 (1st Cir. 1995). "This prong is only satisfied when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on these contacts." *Workgroup Technology Corp. v. MGM Grand Hotel, LLC*, 246 F. Supp. 2d 102, 114 (D. Mass. 2003), citing to *Phillips, supra,* 196 F.3d at 292. Adelson must show that Hananel's contacts with Massachusetts "represent a purposeful availment of the privilege of conducting activities in [the forum], thereby invoking the benefits and protections of [its] laws and making the defendant's involuntary presence before the state's courts foreseeable." *Phillips, supra,* 196 F.3d at 292. "The two focal points are voluntariness and foreseeability." *Workgroup, supra,* 246 F. Supp. 2d at 114. "The cornerstones upon which the concept of purposeful availment rests are voluntariness and foreseeability." *Sawtelle, supra,* 70 F.3d at 1391.

### 1.    Voluntariness does not exist.

Here it is undisputed that the only purpose of Hananel's 1995 trip was to seek medical advice from the Joslin Clinic on his diabetes. Even the latest Roberts and Adelson Affidavits,

- 14 -

although they add detail, previously unremembered by either of them as recently as Feb. 14, 2005, about Hananel's visit, effectively admit that there was no prior communication with Hananel about any business purpose for the visit. ¶¶ 3-5 *supra.* Adelson, who agrees that he helped Hananel set up the Joslin appointment, admits that he made no payments towards Hananel's trip. ¶¶ 3, 7 *supra.* Thus Hananel had no voluntary business purpose for (a) the alleged interaction at the Israel Bonds dinner at Adelson's house on Dec. 4, even if it occurred, or (b) traveling west to Needham after his medical workup on Dec. 5, to meet Adelson (who had landed in his private jet at Hanscom Field) to go to dinner, even if the alleged discussion of his employment agreement had occurred.[4]

A contact is not voluntary if it is solely the result of "the unilateral actions of another party or a third person." *Burger King,* 471 U.S. at 475. Here, the alleged Roberts meeting in Needham was solely the result of (alleged) unilateral actions by Roberts, who, if credited, approached Hananel at Adelson's house during a charity function on Dec. 4 to arrange the alleged meeting for the next day. Thus, even if they are credited, Roberts' actions were unilateral and do not show any voluntariness by Hananel.

### 2.    Foreseeability does not exist.

Even if Hananel's presence at the alleged meeting were deemed voluntary for a business purpose, jurisdiction is untenable because Adelson fails to carry his burden to show that Hananel "benefited from [that] contact[] in a way that made jurisdiction foreseeable." *Philips, supra,* 196 F.3d at 292. It is undisputed that all of Hananel's benefits from his employment contract with

---

[4]    Even if a court were inclined to draw an inference from the alleged meeting that Hananel had a business purpose, such an inference should be rejected as "farfetched" in light of the undisputed availability of alternatives to the meeting, such as Adelson's frequent visits to Israel at that time, the telephone, and facsimile. *See Sawtelle, supra,* 70 F.3d at 1386.

Adelson, such as salary and other promises of investment rewards, occurred in Israel or otherwise outside the United States. ¶¶ 9, 12-14 *supra.* None of those benefits flowed from any relationship between Hananel and Massachusetts.

The First Circuit, following the Supreme Court's lead, has linked foreseeability with the establishment of a "continuing obligation" in the forum state. "The enforcement of personal jurisdiction over a non-resident defendant is foreseeable when that defendant has established a continuing obligation between itself and the forum state." *Sawtelle, supra,* 70 F.3d at 1393, citing *inter alia Burger King*, 471 U.S. at 476. Here, it is undisputed that Hananel's employment agreement included no obligations for continuing contact with Massachusetts. Adelson's numerous documents in his present brief alone confirm that the payments, obligations, and performances by both parties were continuously established in Israel and subject to Israeli law. ¶¶ 12-14 *supra.*

### 3. The alleged Needham meeting was not purposeful availment but random or fortuitous.

The Supreme Court has explained that contacts cannot meet the purposeful availment standard if they are "random, fortuitous, or attenuated." *Burger King*, 471 U.S. at 475. One test the First Circuit has used "to identify deliberate, as distinguished from fortuitous, contacts with the forum" is the "transacting business" test, which is "importantly informed by ascertaining whether the nonresident party initiated or solicited the business transaction in Massachusetts." *Lyle Richards Int'l, Inc. v. Ashworth, Inc.*, 132 F.3d 111, 112-113 (1st Cir. 1997). Here, it is undisputed that, even if a business transaction occurred in Massachusetts on Dec. 5, 1995, discussion was initiated and the employment was solicited in Israel during the months preceding December. ¶¶ 10-12, *supra.*

### B.    Adelson's Claim Does Not "Directly Relate To Or Arise Out Of" Hananel's Contact With Massachusetts. Relatedness

To make a prima facie case for jurisdiction, a plaintiff must show that his cause of action directly arose out of the specific contacts between the defendant and the forum state. *Sawtelle, supra,* 70 F.3d at 1389. Relatedness derives from "causation." *See Interface Group–Mass. v. Rosen,* 256 F. Supp. 2d 103, 107 (D. Mass. 2003) ("focus on causation in determining relatedness") (citing *Ticketmaster-N.Y. v. Alioto*, 26 F.3d 201, 207 (1st Cir. 1994). Another way of phrasing the relatedness requirement is whether a contact was "instrumental" in the cause of action. *See Philips, supra,* 196 F.3d at 289 (plaintiff's burden to show "the defendant's contacts with the forum were instrumental either in the formation of the contract or its breach").

In the present case, the alleged Needham meeting was not the cause of, or instrumental in, the contractual relationship between Adelson and Hananel that gave rise to the Macau claim which is the subject of Adelson's complaint. Even if it is accepted that confirmation occurred at the alleged Needham meeting, no prior or subsequent contacts with Massachusetts existed–all were with Israel–and all of the causative or instrumental contacts took place between Adelson and Hananel in Israel in October-November 1995. ¶¶ 9-12, *supra.* Adelson is at great pains to downplay any role by Roberts in employment contracts and to exalt his own role; it is undisputed that Adelson played his part of employer and contracting party in Israel before December 1995. ¶¶ 10-11, *supra.*

### C.    The Gestalt factors show that the exercise of jurisdiction would be unfair.

If a plaintiff (unlike Adelson in the present case) has made a prima facie showing of

- 17 -

relatedness and purposeful availment a court must then consider five additional factors before exercising personal jurisdiction. The five factors are: (1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all sovereigns in promoting substantive social policies. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985). The purpose of the five Gestalt factors is to aid the court in achieving substantial justice, particularly where the minimum contacts question is very close. *Ticketmaster-NY, Inc. v. Alioto*, *supra,* 26 F.3d at 209; *Sawtelle, supra,* 70 F.3d at 1394. *See also Champion Exposition Servs., Inc. v. Hi-Tech Electric, LLC*, *supra,* 172 F. Supp. 2d at 178 (primary purpose of gestalt factor to prevent harassing litigation). Here, where Adelson has boasted of (a) his cleverness in seeking to try the Macau claim in a distant forum despite the prior engagement of the parties in litigating the claim in Israel, (b) his enormous wealth, and (c) his intention to exhaust Hananel financially, the prevention of harassing litigation is particularly important. ¶¶ 21-23, *supra.*

Turning to the Gestalt factors, first, it is undisputed that Hananel has never had any business or property in Massachusetts and no contacts for many years. (First) Hananel Aff. ¶¶ 6, 11. He is legally blind, not in good health, and English is not his native language. *Id.* ¶¶ 2-5. He is engaged in three suits in Israel, one of which (the 2002 suit) was instigated by Adelson's company IPI and another of which (the 2003 suit) is a full litigation of the Macau claim. *Id.* ¶ 26. The onerous additional burdens which Hananel faces for an appearance in the United States would include the need for English translation of the thousands of Hebrew documents submitted by both parties in the Israel litigations, as well as the need, arising from his blindness, to employ paid assistants for necessary services now being performed by his wife and school-age son in

- 18 -

Israel.  Thus, Hananel faces an unusual  duplicative, onerous and costly burden of trying his
Macau claim in both Israel and Massachusetts.

      The second factor inquires into the forum state's interest in adjudicating the dispute.
Adelson is not a domiciliary of Massachusetts, nor is IPI; moreover, the Macau business
opportunity is extremely remote from Massachusetts and the outcome of the investment there
will have no effect here.  Israel, by contrast has a very strong interest in a suit between its citizen
and Adelson, who, having diverse business interests (and a residence) in Israel,  affirmatively
asserts the right to make all employment decisions and contract terms with Israeli citizens.

      The third factor considers Adelson's interest in obtaining convenient and effective relief.
Adelson cannot argue that Massachusetts is more convenient to him because he has residences,
an office, substantial business interests, and lawyers in Israel and travels there regularly, often
and for long periods.  ¶ 20 *supra.*  Adelson cannot claim that Israel will not provide effective
relief, because he himself chose the Israeli forum for an action and counterclaims in his
employment dispute with Hananel (the 2002 suit), and is actively involved as a defendant in the
2001 and 2003 Israeli suits (now consolidated) concerning the Macau claim.  He will have to
appear in Israel in these suits already.

      The fourth factor focuses on the judicial system's interest in obtaining the most effective
resolution of the controversy.  Because pending, first-filed litigation of the same issues between
the same parties is proceeding in Israel, relying in part on Israeli witnesses and in great measure
on thousands of documents submitted by both parties in Hebrew, the only truly effective
resolution of the controversy will be in Israel, not Massachusetts.  Adelson's own presence in
Israel and availability for trial there is foreordained by his continuous and systematic contacts
and his own choice to conduct litigation against Hananel there.  Dismissing the present complaint

in favor of the pending action in Israel, where <u>both</u> Adelson and Hananel have purposefully and foreseeably availed themselves of the benefits of the forum, will provide the most efficient and effective resolution of this controversy.

The fifth factor weighs in favor of Israel, as the common interests of the United States and Israel in social policies such as the avoidance of duplicative litigation and the possibility of conflicting judgments are favored by dismissal of this action in favor of the ongoing proceedings in Israel.

Finally, Adelson's Complaint should be dismissed under *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508-509 (1947) as an attempt to vex, harass and annoy Hananel. Adelson has never attempted to distinguish the prior ongoing Israeli proceeding concerning the Macau claim from the action in this Court, and now, in his deposition, has admitted that he has been following a conscious strategy of duplication, using his vast wealth to exhaust Hananel financially. ¶¶ 21-24, *supra.* As the Israeli court stated on July 21, 2004, it consolidated the 2003 Macau claim with the earlier contract action "with the aim of avoiding a situation in which two judges will reach different rulings on similar issues." This Court may confidently do the same.

WHEREFORE, the Court should allow Hananel's Motion to Dismiss for lack of personal jurisdiction.

Dated: May 17, 2005

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail - hand on 5/17/05 .

SuppHananelReJur-31216-1

MOSHE HANANEL
By His Attorneys,

James A. G. Hamilton (MA Bar # 218760)
PERKINS, SMITH & COHEN, LLP
One Beacon Street
Boston, MA  02108
617.854.4000

- 20 -