UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHELDON G. ADELSON,<br><br>    Plaintiff,<br><br>v.<br><br>MOSHE HANANEL,<br><br>    Defendant. | Docket No. 04CV10357RCL |

## REPLY BRIEF OF THE PLAINTIFF TO HANANEL'S MEMORANDUM IN SUPPORT OF HIS "RENEWED" MOTION TO DISMISS

The essential thrust of the Defendant's argument is that the meeting of December 5, 1995, didn't happen, and if it did, it was only incidental to the Defendant's presence in Massachusetts, and if it was not only incidental, nothing was decided other than to "confirm" what the parties had already negotiated and to which they had previously agreed, in Israel. Like many statements that Hananel has made, his statement that Adelson's jurisdictional claim is limited "to the alleged Needham meeting" is untrue. Hananel argues that his stay in Massachusetts resulted only from his desire to obtain medical care at the Joslin Clinic and not the result of the Plaintiff's request. These assertions are completely irrelevant. What is relevant is that he did meet with IPI general counsel, Paul Roberts, to negotiate an employment agreement and to discuss an issue involving the misuse of the name of Hananel's company, Galilee Tours, by an Illinois travel agency. These activities constituted the transaction of business. It is no accident that Hananel not only cites no authority for their relevance, but relies on cases that are so clearly distinguishable that they are as irrelevant as are Hananel's Argument.

The quotation Hananel extracts from *Burger King Corp. v. Rudzewicz et al*, 471 U.S. 462 (1985) is inapplicable to the present case. It is not solely the existence of the contract that confers jurisdiction on this court. The facts that the parties got to "Yes" in Massachusetts and that Hananel was required to and did communicate and take direction almost daily from Adelson, acting as the chief officer of IPI (Hananel Affidavit, filed in this court, June 14, 2004. ¶8, Exhibit A) are clearly sufficient to meet the constitutional standard for the exercise of personal jurisdiction. One of the key facts that the Supreme Court relied on to find that Florida could exercise personal jurisdiction over Rudzewicz and his partner was that Burger King exercise extensive control and direction over the conduct of their Michigan franchise.

> Eschewing the option of operating an independent local enterprise, Rudzewicz deliberately "[reached] out beyond" Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization. (cite omitted). Upon approval, he entered into a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida. In light of Rudzewicz' voluntary acceptance of the long-term and exacting regulation of his business from Burger King's Miami headquarters, the "quality and nature" of his relationship to the company in Florida can in no sense be viewed as "random," "fortuitous," or "attenuated. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479-480 (1985).

Hananel sought Adelson (Defendant's Exh. 1, p. 164:12-16) the manager position of IPI and had many telephone conversations Adelson concerning his wish for the job (Exh. 1, P. 164:19:24). He was willing to accept very close control from Adelson. *Burger King* supports the assertion of jurisdiction in this case.

The other cases that Hananel cites, *Philips Exeter Academy v. Howard Philips Fund*, 196 F.3d 284 (1st Cir. 1999) and Sawtelle v. Farrel, 70 F.3d 1381 (1st Cir. 1995) are distinguishable. In *Philips* a Florida testator left money to a fund, which was to give 5% of the annual net income to the school. The school sued because the fund allegedly had failed to send all the money due to the school. The only contact the fund had with New Hampshire was a single visit years before

2

the claim arose by a representative for the purpose of persuading the school to take a discounted lump sum in lieu of the annual payments. The parties did not arrive at an agreement. *Sawtelle* was a legal malpractice suit against a Florida lawyer for malpractice committed in Florida. The only contacts with Massachusetts were a letter and a telephone call in which the defendant's colleague urged the plaintiff to accept a settlement. In neither case was the contact with the putative forum state the *sine qua non* of the claim, and in each case the contact was marginal and of no consequence. In the case at bar, the visit to Massachusetts resulted in the employment contract out of which the plaintiff's claim admittedly arose.[1]

*Workgroup Technology Corp. v. MGM Grand Hotel, LLC*, 246 F. Supp. 2d 402 (D. Mass. 2003) is equally irrelevant. That case was an action for breach of a contract for a convention to be held in the defendant's Nevada Hotel. The parties negotiated the contract only by telephone and letters. The parties executed the contract in their respective states. No representative of the hotel was ever in Massachusetts in connection with the contract, and the plaintiff never exercised any control over the hotel's performance. Hananel came to Massachusetts. It is true that one purpose of this visit was to have an appointment at the Joslin clinic. He apparently had no treatment. However, he voluntarily came to the Commonwealth and transacted business here. He entered into a contract that required a continual, active relationship with the Plaintiff and IPI. He did not inadvertently wander over the world into Massachusetts. His visit to Massachusetts brought him the benefits of a contract with a Massachusetts corporation that paid him, under the contract, a handsome salary of $100,000 and gave him the opportunity to benefit from certain

---

[1] Hananel has alleged that he "was promised options in ventures initiated during the course of his work." (Hananel Complaint #2, ¶5.1) (filed with Plaintiff's original opposition to the motion to dismiss) Adelson consistently has stated that the agreement included a provision that Hananel would receive 12% of the net profits realized during Hananel's employment from any successful investment in an Israel "hi-tech" venture that Hananel initiated, subject to conditions, including one that Hananel had to be employed when the investment was made. (Exh. 3, answer #2) This is the dispute that lies at the heart of the litigation, and it arises from the contract of employment made in Massachusetts.

3

investments that his entrepreneurship (not his imagination) might have created. The meeting was hardly random or a chance happening.

### THE MEETING OF DECEMBER 5, 1995 DID BEAR A SUFFICIENT CAUSAL CONNECTION TO THE FORMATION OF HANANEL'S EMPLOYMENT CONTRACT ON WHICH TO BASE A RULING THAT THE COURT HAS PERSONAL JURISDICTION OVER THE DEFENDANT.

Hananel argues that the "deal" had been completed before the December 5, 1995 meeting. He argues that if the meeting took place, it was merely to confirm an agreement already made in Israel. To support this contention, Hananel points to his work with another company in which Adelson had an interest, Auto Depot Ltd., and purports to quote portions of Adelson's deposition testimony. Hananel seriously distorts and misquotes the evidence on which he relies.

Hananel asserts that Adelson admitted that "the agreement was neither negotiated or made in Massachusetts, but only 'confirmed...'" Hananel then represents that Adelson admitted to having discussed "Hananel's contract" in '*October or November*' and does not deny that it was in Israel. These statements egregiously distort the record. They never discussed the "contract" in October or November. Mr. Adelson's testimony:

Page 164

```
12   Q. (by Mr. Hamilton) What was—what was the first
13   time that you and Mr. Hananel discussed IPI, if you
14   remember? (emphasis supplied)
15   A. We discussed IPI when he offered himself to take
16   the place of my brother in law
```

As for Hananel's implication that Adelson conceded that the discussions were held in Israel, the transcript destroys that implication.

4

Page 164

19    Q. Where was that?
20.    A. Over the phone mostly from Boston, and I could
21    check my schedule. I was only in Israel before the
22    subject date once in that period.

Hananel also makes the argument that Adelson admitted in his deposition that "the agreement was neither negotiated or made in Massachusetts, but only confirmed...." (Brief p. 4) Nowhere in the deposition will the court find such an admission--quite the contrary.

Pages 352-353

24    Q. What were those conversations?
25    A. I asked Paul to confirm—I don't like

Page 353

1    negotiating with friends. It's a difficult thing to do,
2    because you could get into confrontational issues that
3    might show one side or a bad side of either person.
4        And so I don't like to negotiate with friends,
5    and I never do. And so I asked Paul Roberts to—to
6    confirm the deal with Moshe that I had in mind, and
7    that he was coming in and this was the time to confirm the deal.

Mr. Adelson's testimony about his very short presence at the December 5 negotiation also shows clearly that he never admitted that the agreement was negotiated in Israel and only "confirmed" in Needham. He testified that when he arrived he asked if they had reached an agreement. Both Mr. Roberts and Mr. Hananel confirmed that they did. (Adelson dep. 355:8-12)[2]

Hananel tries to boot strap his contention that his agreement to manage IPI was made before December 5 by arguing that he was given a role in Auto Depot. That can avail him, not at

---

[2]     The affidavits of Messrs Adelson and Roberts, filed with the Plaintiff's first opposition to the motion to dismiss are attached for the easy reference of the Court.

5

BOS\131390.1

all. Auto Depot was a separate corporate entity from IPI. The documents on which Hananel's contention depends are not authenticated and some are unsigned, and Mr. Adelson had never seen them. Their genuineness is questionable. Even were they genuine, accurately understood, and relevant, they do not support Hananel, and in fact, are not consistent with his position. Hananel's brief outrageously misstates several of the exhibits that are vital to his argument. For example, on page 6-7 of his brief, he asserts that "Nov. 8 Farbstein (Adelson's brother-in-law whom Hananel replaced as manager) of the Interface Group/Israel seeks and gets Hananel's authority (as manager of IPI) to loan 305,000 shekels from IPI to Auto Depot." The document in question—a fax cover sheet-- (Exh. 12) says something quite different. The message from Farbstein states, "The amount needs to be written, as I am acting as a rubber stamp until you set up your signature rights in *Auto Depot*" (emphasis supplied). The response from Moshe Hananel states that he "would appreciate" if Farbstein could arrange to transfer the amount to Auto Depot. The brief in addition asserts, "Nov. 14 Hananel. . .chairs the Auto Depot board meeting...and commits an additional 486,000 shekels from IPI to Auto Depot." The minutes of the meeting (Exh. 13) simply notes that Auto Depot will receive an "owners loan" and that part of that loan will come from IPI in the sum of 486,000 shekels. There is nothing in that document that even suggests that Hananel authorized a loan from IPI. Even more disingenuous is the statement on page 7 that "Adelson admits making loans to Auto Depot, and does not deny that it was on that date, in that amount, or in that fashion." Exh. 1, 210: 21-23" While Adelson stated that he did make loans to Auto Depot, he most emphatically denied that he made them in that fashion, i.e. on the basis of Hananel's decision. On the very next line of the deposition the Defendant cites, Mr. Hamilton asks if Hananel was authorized to approve such a loan "on or about November 8, 1995." Adelson's answered, "No. Hananel was not approved to make any loans to anybody on

6

my behalf." Exh. 1, 210:24—211:2. Even more egregious torturing of the record is the Defendant's assertion that "Adelson stated that during Hananel's employment he had pursued casino project ideas in Israel, Jordan, and Cyprus, and had made inquiries in Ireland and Bulgaria..." Adelson's testimony was quite the opposite. "I could tell you this. During the term of Hananel's employment, I never had any intention or any serious interest to go anywhere in the world to build another casino, period, except Israel, the one on the border in Israel..." Exh. 1, 327:14-18. It appears that the Defendant has argued the case that he wished he had, rather than the case at bar.

### THE GESTALT FACTORS SUPPORT PERSONAL JURISDICTION IN THIS COURT AND DO NOT JUSTIFY DISMISSAL ON *FORUM NON CONVENIENS* GROUNDS.

The Defendant's first argument to support his assertion that the "gestalt factors" support dismissal is that Adelson "has boasted of his cleverness in seeking to try the Macau claim in a distant forum," his enormous wealth, and his "intention to exhaust Hananel financially." (brief p. 18.) These arguments, like the previous contentions, are based largely on deliberate distortions of Mr. Adelson's deposition testimony. He never boasted of his cleverness. He merely stated the obvious—that the purpose of bringing the claim for declaratory relief in this court is to try the issue of whether Hananel ever had a contractual right to a 12% interest in Adelson's interest in the Macau casino.[3]

Adelson never declared an intention to exhaust Hananel financially. The excerpt of his deposition that the Defendant has set out in his brief is extracted from its context. The reason for the misleading extraction is that Adelson's comment occurred after several pages of repetitive questioning about IPI letterheads that had been used by a different company. Adelson

---

[3] In any event, so far as our research has revealed, a litigant's boastfulness does not appear to defeat jurisdiction.

admonished Mr. Hamilton, pointing out that it was he who was wasting his client's money.[4] The Plaintiff has been more than fair in this lawsuit, which he believes is nothing less than dishonest. He had agreed to pay for Mr. Hamilton's expenses for the deposition of Hananel in Israel, and paid Mr. Hamilton's travel expenses to Nevada for the Plaintiff's deposition.

The Defendant complains that among the "burdens" of litigating the case in Massachusetts is his sight problems. Hananel testified in his deposition that he has recently traveled in Europe for pleasure, including attending concerts in Vienna. While we can all agree that listening to the Vienna Symphony Orchestra is far more pleasant than listening to lawyers try a case, it is hard to argue that the physical burden is significantly greater. Hananel has never shown, nor could he, in the light of his many travels, (see Plaintiff's first reply brief) that either his medical or financial condition are such that he could not litigate this case in this court.

The burdens of physical infirmities would be heavy for Adelson, over twenty years Hananel's senior. He is in his seventies, needs physical therapy on a daily basis and needs to use a wheel chair for mobility. (Exh.1 62:6—66:13). The physical difficulties on both of litigating this case in a less convenient forum are greater for him. While it is true that Mr. Adelson is a very wealthy man, there is no evidence in this record that Hananel cannot afford the costs of litigating this case in Massachusetts. While the relative financial ability of parties to conduct litigation in a particular venue is of some relevance, it is given only slight weight, unless one party can show that it is effectively prevented from litigating at all, if required to litigate in the subject forum *Houk v. Kimberly Clark Corporation*, 613 F. Supp. 923, 929 (W. D. Mo. 1985) (*forum non conveniens issue*).

---

[4] Mr. Hamilton's seven hour deposition focused far more on the substantive issues in the other Israeli law suits than on the personal jurisdiction issues in this case.

8

Hananel argues that the additional burdens "include the need for English translation of the thousands of Hebrew documents submitted by both parties in the Israel litigations..." This statement is errant nonsense. The documents in the Israeli litigation have nothing to do with the issues in this case, which is whether under the terms of an oral contract formed in Massachusetts Hananel is entitled to 12% of Adelson's interest in a casino in Macau and whether Hananel's claimed verbal advice to Adelson led him to a successful acquisition of an interest in the that casino. How could there by thousands of relevant documents? Hananel has not identified any documents in Hebrew that he would introduce. If there are any relevant documents, it would seem that they would be corporate documents and perhaps official documents, the originals of which would be in the custody of the gaming officials in Macau and the copies of which would be in the United States and easily brought to Massachusetts.

Hananel also argues that Israel is the venue where the "only truly effective resolution of the controversy", in part because of the Israeli witnesses and the "thousands" of documents. As pointed out in the Plaintiff's supplemental memorandum of law, Hananel not only hasn't given the names of witnesses who have relevant information concerning his claim, but he refused to give the names of witnesses he claims to have. He has no witnesses. Moreover, he, unlike Adelson, disclosed no documents upon which he would rely or which were discoverable as required by Fed. R. Civ Pro. R. 26(a)(B). Rule 37(c) provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) ... is not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any witness ... not so disclosed." Fed. R. Civ. P. 37(c)(1). The sanction of exclusion is automatic, unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless. *NutraSweet Co. v. X-L Engineering Co.*, 227 F.3d 776, 786 (7th Cir. 2000). If there are

documents that Hananel has in Israel that are relevant (which seems very doubtful), Hananel had an obligation to produce them. His failure to do so, without good excuse, should result in their exclusion.

In Massachusetts and in the United States there are several witnesses, listed in the Plaintiff's original brief opposing the motion to dismiss. Contrary to Hananel's assertion that Massachusetts has no interest in this litigation because Adelson and IPI are not domiciliaries of Massachusetts, Adelson has a home here, and IPI, although incorporated in Delaware, has its principal place of business in Needham.

Hananel also argues that a factor favoring dismissal is that English is not his native tongue. However, he never has said that his command of English is weak or that it would hamper the presentation of his case. How could he, considering the facts that he has done business in the United States, including his employment by IPI, given a deposition in this case and has lectured at the Kennedy School at Harvard, all in English, and without apparent difficulty? However, Adelson does not speak or understand Hebrew. Exh. 1, 197:23, 198:20-25. His linguistic limitations would hamper his cause in Israel. He would need translation, not only as a witness, but also as a spectator-party. The feasibility of contemporaneous translation is, at best doubtful, so he would be unable to assist counsel, as he could in this country. Hananel would not be similarly burdened. The "gestalt factors" do not favor Hananel's position, quite the contrary.

## CONCLUSION

Once again Hananel argues his case from an erroneous version of the facts. The December 5, 1995 meeting with Roberts and Adelson did happen, and the parties did not simply "confirm" an agreement previously made in Israel. The discussion that preceded the agreement

10

did not occur in Israel (Adelson was in Israel only once during the late summer-and autumn of 1995), but by telephone. Hananel has claimed in his brief that Adelson made admissions, which Hananel then uses to support his argument. The deposition testimony reveals no such omissions, when read accurately and without distortion or disregard of the contexts. As the Plaintiff has pointed out in his prior memoranda of law, the documents that relate to Hananel's employment support the Plaintiff's testimony not that of Hananel. Hananel has not rebutted this evidence, much of which he created. His failure to produce any rebutting documents, as required by Fed. R. Civ. Pro. Rule 26(a)(B) precludes him from using them at this state of the case, if they even exist.

The cases on which he relies, *Burger King, Phillips Exeter Academy,* and *Workgroup Technology* either are markedly different form the facts of this case or actually support the Plaintiff's position. The motion to dismiss should be denied if the court applies the *prima facie* standard, or if the court feels that it does not wish to decide credibility issues without listening to the witnesses, it should schedule an evidentiary hearing.

<div style="margin-left: 3em;">

Respectfully submitted,
The Plaintiff,
SHELDON G. ADELSON,
By his Attorneys,

*/s/ signature*

Franklin H. Levy, B.B.O. No. 297720
Albert P. Zabin, B.B.O. No.: 538380
DUANE MORRIS LLP
470 Atlantic Avenue, Suite 500
Boston, MA  02210
(617) 289-9200

</div>

Dated: June 1, 2005

5.   In Israeli courts, both English and Hebrew are official languages. I would find it relatively difficult to participate in proceedings in the United States rather than Israel for this reason, as I would be required to hire different machinery and assistance.

### My Contacts With The United States - General

6.   I do not own any interest in any business in the United States and I have never been employed or paid taxes in the United States. I do not own any real estate in the United States. From 1980 until 1995 when I started working for IPI, I visited the United States for social reasons and in connection with my family's Israeli business of arranging tours to Israel for Americans. My family sold control of the business in 1998 and the remaining interests in 2000.

7.   I have visited Massachusetts to participate in panel discussions concerning Israel and the Middle East at the John F. Kennedy School of Government of Harvard University in 1993 and 1995.

### My Contacts With Adelson In Israel and the United States

8.   I was first introduced to Sheldon Adelson ("Adelson") in the mid-1980's and met him formally in 1988 during Adelson's first visit to Israel. Since that first meeting, when I escorted him around Israel, the overwhelming majority of our meetings have been in Israel rather than in the United States, and the overwhelming majority of our telephone conversations (which occurred almost daily during my employment by IPI, 1995-2000) and other communications have occurred while I was in Israel.

9.   Our meetings before August 1995 were usually social, and occasionally concerned our mutual interests in the travel business or in casinos in the Middle East.

10.  From 1994 to April 2000, I visited the United States approximately thirteen times, for a total stay of approximately 50 days (i.e., an average stay of less than four days).

## CERTIFICATE OF SERVICE

I, Albert P. Zabin, hereby certify that I served a copy of the following documents on all Defendants this 1st day of June, 2005:

PLAINTIFF'S OPPOSITION TO THE DEFENDANT'S MOTION TO COMPEL FURTHER ANSWERS TO INTERROGATORIES, PRODUCTION OF DOCUMENTS AND DEPOSITION TESTIMONY;

PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS OPPOSITION TO THE DEFENDANT'S MOTION TO COMPEL FURTHER ANSWERS TO INTERROGATORIES, PRODUCTION OF DOCUMENTS AND DEPOSITION TESTIMONY; and

REPLY BRIEF OF THE PLAINTIFF TO HANANEL'S MEMORANDUM IN SUPPORT OF HIS "RENEWED" MOTION TO DISMISS.

via hand delivery to the following:

James A. G. Hamilton, Esquire
Perkins Smith & Cohen
30th Floor
One Beacon Street
Boston, MA 02108-3106

_____
Albert P. Zabin

2

BOS\131741.1