IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHELDON G. ADELSON, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. |
| ) | |
| v. ) | 04-cv-10357-RCL |
| ) | |
| MOSHE HANANEL, ) | |
| ) | |
| Defendant. ) | |

**REPLY MEMORANDUM OF HANANEL TO ADELSON'S SECOND SUPPLEMENTARY BRIEF IN OPPOSITION TO HANANEL'S MOTION TO DISMISS**

Defendant Moshe Hananel ("Hananel") provides this Reply Memorandum and the Fourth Affidavit of Hananel in reply to Adelson's Second Supplementary Brief filed April 29, 2005 ("2d Supp. Brief"). Hananel states that Adelson's 2d Supp. Brief consists almost entirely of invective concerning Hananel's credibility, and the 26 exhibits are generally mischaracterized in the text. The 2d Supp. Brief also contains statements directly contradicted by the documentary record. It thus constitutes an effort to replace the central inquiry before the Court, which is whether Adelson has met his burden to show purposeful contacts by Hananel with Massachusetts, with a failed attack on credibility using mismatched documents. Hananel has requested leave to file this Reply and his Fourth Affidavit to show how Adelson's invective is wrong and irrelevant.

**I.     ADELSON'S "ARGUMENT" IS IRRELEVANT.**

The section of the 2d Supp. Brief entitled "Argument," pages 2-4, contains no legal argument or case citations. It recognizes Hananel's affidavit testimony that his employment contract with Adelson, including both Hananel's position as branch manager in Israel of

Interface and Adelson's agreement to compensate him for any initiatives including casino opportunities brought to him by Hananel, was made between them in Israel before Hananel's medical visit to the Joslin Clinic in December 1995, and was performed in Israel and elsewhere outside the United States. This section contains no citations to the record rebutting Hananel's testimony. A review of the remaining fifteen pages and exhibits, ignoring conclusory rhetoric, shows that Adelson has no rebuttal.

## II.  ADELSON'S CLAIMS AS TO THE DECEMBER 5, 1995 VISIT ARE INCONSISTENT WITH THE RECORD.

Adelson's 2d Supp. Brief, beginning on page 1, and throughout (particularly in general summary sections such as pages 2 and 16), directly misstates its own citations by claiming that the employment agreement was "negotiated and made" in Massachusetts. The Supplemental Affidavit of Paul Roberts, Exh. E to the 2d Supp. Brief ("Supp. Aff. Roberts"), containing his brand-new memories of a Dec. 4 encounter with Hananel, nevertheless alleges only (¶ 8) that the alleged meeting was to "discuss" the employment, a statement entirely consistent with the agreement having been negotiated and made in Israel before December. Roberts also refers to his prior Affidavit, which, as earlier briefing has pointed out, also uses the verb "discuss," never uses the words "negotiate" or "made," and consistently refers to Adelson and Hananel having reached a prior agreement and of Hananel having performed work for IPI in Israel prior to December. Affidavit of Paul G. Roberts, filed July 15, 2004 ("Roberts Aff.") ¶¶ 7-8. Adelson himself admitted in discovery, Int. Ans. 1 (Exh. 3 to Hananel Mem. Supp. Renewed Mot., at 1), that he had told Roberts the terms "prior to this meeting." Adelson had also emphatically testified that he never gave Roberts any authority to make any business decisions for him. Hananel Mem. Supp. Renewed Mot. at 5 (citing deposition testimony); *see also* paragraphs 7, 8,

and 14 of Adelson's July 3, 2004 Affidavit in the Israeli proceeding (Second Hananel Aff. Exh. 6), where he states that the employment was by "Interface (through myself)" and paragraph 26, where Adelson states "*I made it crystal clear that I – and only I – was authorized to approve the employment of [IPI employees] and the terms of their employment.*" The Supplemental Affidavit of Adelson, Exh. T to his 2d Supp. Brief ("Supp. Aff. Adelson"), does not even mention events in Massachusetts at any time. Moreover, the complete absence from the record of any documents concerning the alleged meeting detracts substantially from any claim by Adelson that it was important to the contract with Hananel.

Thus, even though the very existence of the alleged Roberts-Hananel meeting is disputed, Adelson has not created a record sufficient to carry a prima facie burden of proof.[1]

Adelson's 2d Supp. Brief discloses additional contradictions showing the weakness and lack of credibility of Adelson's version of the events of Dec. 5, 1995. Contrary to the claim in the 2d Supp. Brief at 5, the Brill affidavit does not state that she remembers the time of her encounter with Hananel; she only states that it is her "best memory that we would not have met much later than 3:00 p.m." This vague statement cannot be evidence contradicting Hananel's testimony that he arrived in Needham quite late in the afternoon, supported by a document showing that the Joslin doctors drew blood from him at 2:43 p.m., the undisputed necessity for a summary meeting with the doctors and paying for his visit, and Adelson's testimony that it would have taken an hour to get from Joslin to Needham in traffic. 4th Hananel Aff. ¶ 4 and Exh. 3; Adelson Dep. 352: 17-20 (Exh. 1 to Hananel Mem. Supp. Renewed Mot.).

Roberts' attempt to add detail to the alleged meeting by referring to a trademark issue is

---

[1] Hananel's Mem. Supp. Renewed Mot. at 3-8 shows that, even if the meeting occurred and included negotiations or the making of a contract, it was not sufficient to create jurisdiction as a matter of law.

- 3 -

undercut by his admission that Hananel told him that he could not be party to such discussions because of Hananel's employment by Adelson. Supp. Aff. Roberts ¶ 9. Thus Roberts admits that no business was done in Massachusetts on this issue and that it would be resolved in Israel.

### III.   ADELSON'S CLAIMS AS TO THE DATES OF MELNIK'S EMPLOYMENT ARE INCONSISTENT WITH THE RECORD.

Adelson's brief again repeats an effort to distort the relationship between the commencement of Hananel's employment and the firing of Moshe Melnik from IPI in 1995. While Hananel wrote, as part of the financial severance statement to Melnik (2d Supp. Brief Exh. H) that Interface Group employed Melnik through December 25, 1995, it is undisputed that Melnik was fired by Hananel (pursuant to Adelson's orders and pursuant to the authority Adelson had given Hananel) in September, 1995. *See* Adelson's Response to Defendant's Reply Memorandum (Aug. 19, 2004), Exh. A (Declaration of Hananel in Israeli proceeding between Melnik and Interface, ¶ 9: *"Mr. Adelson decided that the plaintiff [Melnik] did not have a place at the defendant [Interface]. I informed the plaintiff of that, clearly, in September 1995."* Adelson's own 2d Supp. Brief Exh. M dated Nov. 7, 1995 (Auto Depot board minutes) confirms (¶ 6) that Melnik had been let go by then and his Exh. N, pages 1 and 2, dated Nov. 15, 1995 (cited by him on page 8) confirms that Melnik had been fired before December. This is not the only occasion where Adelson claims support for one proposition in a document while forgetting that the document rebuts an earlier or later proposition.

### IV.   ADELSON'S CLAIMS AS TO GALILEE TOURS LETTERHEAD AND BUSINESS CARDS ARE INCONSISTENT WITH THE RECORD.

Although Hananel wrote Adelson on Dec. 3, 1995, using Galilee Tours letterhead, Adelson fails to dispute, and thereby establishes, that Adelson recognized Hananel's use of the

Galilee Tours office as a place to communicate with Hananel on IPI and other Adelson business long before December. *See* Hananel Mem. Supp. Renewed Mot. Exhs. 5, 6, 12, 14 (Interface business communications addressed to Hananel's Galilee Tours office in Oct. - Nov. 1995). Although Hananel did request business cards in writing on Dec. 10, 1995, this request does not rebut the uncontradicted evidence that Adelson and Interface employed Hananel before then.

V.   **ADELSON'S CLAIMS AS TO THE SETTLEMENT OF EMPLOYMENT ACCOUNTS ARE INCONSISTENT WITH THE RECORD.**

Adelson's 2d Supp. Brief spuriously attempts to define Hananel's employment period according to forms showing the commencement of his salary on January 1, 1996. Exh. K, Dep. Exh. 43, is a correction by Hananel (in IPI's favor) of a "settlement of accounts table" from an accounting firm for his salary. Exh. L, Dep. Exh. 44, the alleged "official government form," was prepared by an unknown person (not Hananel) after Hananel left IPI, was yet another "notice of payment," rather than an employment contract, and, <u>directly contrary to the false statement on page 7 of Adelson's 2d Supp. Brief,</u> was not signed by Hananel. Directly contrary to the false statement on page 6 of the Brief, it was not signed by "an IPI agent," as no signature appears. Hananel Dep. 245:11-25.

Notably, these Israel government forms further rebut United States jurisdiction because they confirm that Hananel's employment was paid for in Israel, showing that the Dec. 5, 1995 meeting, even if it occurred, was a non-purposeful contact not affecting the realities of a contract made and performed in Israel and elsewhere outside the United States. Adelson/Interface eventually, in 1998, paid Hananel his salary for his work in Nov.-Dec. 1995, although that payment is the subject of dispute in the Israeli case. 4th Hananel Aff. ¶ 2 and Exh. 1.

## VI. ADELSON'S CLAIMS AS TO HANANEL'S WORK FOR INTERFACE AS AUTO DEPOT DIRECTOR ARE INCONSISTENT WITH THE RECORD.

Nowhere in his 2d Supp. Brief (at 7-8) does Adelson deny the fundamental fact that he introduced Hananel as Interface's manager and as the person who would exercise Adelson's and Interface's powers over Auto Depot, including the approval of substantial loans from Interface to Auto Depot, in November, 1995. In the quote from Hananel's first affidavit (¶ 15) on page 7, Adelson's 2d Supp. Brief acknowledges that Hananel stated that, on Nov. 7, Adelson "announced publicly that I was the Israeli branch manager of IPI." Nothing in the 2d Supp. Brief or elsewhere in the record denies this fact, resulting in its establishment for purposes of the motion to dismiss. This fact alone renders the alleged December meeting non-instrumental and not a jurisdictional contact.

In response to Adelson's attack, Hananel has provided additional documentation with his Fourth Affidavit filed herewith. He sets forth entries from an office diary produced in the Israeli litigation, and attached affidavits, filed in the Israeli litigations, of three independent witnesses, all Israeli citizens and residents. These men met and communicated with him, Adelson, Interface employees, and Israeli officials during September-November 1995 while Hananel was employed by Adelson and Interface, not only for Auto Depot but for Adelson's and Interface's casino development interests. 4th Hananel Aff. ¶¶ 3, 5 and Exhs. 2, 4.

Having failed to address, much less contradict, the fundamental fact of Hananel's pre-December employment as branch manager of Interface in Israel, Adelson's 2d Supp. Brief seeks to obscure and minimize Hananel's role in Auto Depot contrary to the record. Although the 2d Supp. Brief (at 7-8) now seeks to conceal the documented fact that Hananel acted as chairman of Auto Depot's board of directors in the absence of Adelson on Nov. 14, 1995, <u>neither Adelson's affidavit or any documents in the record directly denies that Hananel so acted</u>. Adelson never

- 6 -

testified to the contrary; for example, his Int. Ans. No. 2 (Exh. 3 to Hananel's Mem. Supp. Renewed Mot.) at 5 grudgingly admits that Hananel did work for Interface with respect to Auto Depot and became a signatory on the Interface bank account before December. Nor has Adelson ever contradicted the documentary evidence, such as (a) the statement in the Nov. 7 minutes, ¶ 7, that Adelson told the board that "Mr. Hananel will contribute greatly to the company's strategic planning" (Hananel's Mem. Supp. Renewed Mot., Exh. 9); (b) the statement by Auto Depot's counsel that, on Nov. 7, Hananel was given power equal to Adelson's to bind the company to monetary obligations (*id.*, Exh. 10, third page, ¶ 3); (c) Adelson's handwritten note dated Nov. 22 or 29 putting Hananel on a bank account for "any amount" (*id.*, Exh. 11); (d) the document showing Hananel approving a transfer of 305,000 Israeli shekels as a short term loan from Interface to Auto Depot on Nov. 8 (*id.*, Exh. 12); (e) the Nov. 14, 1995 Auto Depot board minutes stating that Hananel was Chairman (in Adelson's absence) (*id.*, Exh. 13, at 1).

Moreover, Adelson's 2d Supp. Brief quotes on page 7 the Hananel affidavit concerning these activities, and <u>nowhere denies these facts</u>, further establishing them for purposes of the motion to dismiss.[2] Each of these facts by itself shows the formation of an employment contract in Israel and renders the alleged December meeting non-instrumental and not a jurisdictional contact.

The statements in the 2d Supp. Brief on page 8, arguing the absence of a reference to elections in some of the November Auto Depot minutes, and the corporate filings, and the allegations about who was "manager" of Auto Depot (a post not claimed by Hananel), do not

---

[2]   Adelson resorts to misquotation at p. 7 and n.2. Following the snide remark "apparently forgot," Adelson cites to a statement Hananel made in his second affidavit, not his first, referring to Nov. 14, not Nov. 11, and therefore an unchallenged statement. Just after the footnote reference on page 7, Adelson quotes from Hananel's second affidavit correctly (thus rebutting the misquotation in Adelson's footnote 2) but claims that it is Hananel's first affidavit and that Adelson has attached it as Exh. A, neither of which is correct.

refute Hananel's employment. Adelson's Exh. O, confirming Hananel's election on March 26, 1996, does not refute the earlier announcements reflected in the November 1995 minutes. Exhs. N and P are incorrectly described (2d Supp. Brief at 8) as naming Adelson "manager" of Auto Depot. That title is his "occupation" and his position with Auto Depot is "director" (as is the case with two other listed entities in Exh. P). (Exh. N is incorrectly described as a "mid-1995" report when it is dated Nov. 8, 1995.)

### VII.  ADELSON'S CLAIMS AS TO HIS OBLIGATION TO COMPENSATE HANANEL FOR THE MACAU OPPORTUNITY ARE INCONSISTENT WITH THE RECORD.

Adelson's discussion of the 12% contract term at pages 9-10 of Adelson's 2d Supp. Brief nowhere cites admissible evidence refuting that Adelson made Hananel's employment agreement in Israel before December 1995, or that the agreement included Hananel's investigation, initiation and development of casino opportunities in a number of countries other than the United States, or that Adelson agreed to the 12% compensation. The 2d Supp. Brief's bombastic statements and hearsay exhibits (S and T) concerning Adelson's undeniable wealth and alleged brilliance merely obscure Adelson's comprehensive failure to deny, here or elsewhere in the record, the following facts concerning the Macau claim:

> Adelson's 1999 and 2000 trips to Macau originated in and returned to Israel;
>
> Conversations with Hananel in Israel were at least a contributing factor (Hananel says the sole factor) in Adelson's learning of the opportunity and his decision to visit Macau;
>
> The flight plan documents produced by Adelson shows that he planned to visit Macau when he left Israel on both the 1999 and March 2000 occasions. Exh. 15 to Hananel's Mem. Supp. Renewed Mot., showing that they were prepared before leaving Israel and at least 5 days and 9 days respectively before arriving in Macau;
>
> While in Macau, he visited at least one casino and conversed about the industry.

- 8 -

Thus however much Adelson may be concealing about (a) his obligation to Hananel for his early access to the Macau opportunity or (b) the substantial effort Adelson put forward at Hananel's urging beginning in 1999 to obtain the lucrative gambling concession, Adelson has not and cannot deny the facts that link the Macau claim to Israel (and remove it from Massachusetts).

Adelson creates (in his supplemental affidavit at ¶¶ 6-10, Exh. T to his 2d Supp. Brief, and in the 2d Supp. Brief at 10-12) an elaborate barrage of claims that by the time of his 1999 visit, he knew all about Macau and its casinos. (Adelson cites Shakespeare, RKO Radio Pictures, and the Internet, but no admissible corroboration). Although Adelson now claims to have been aware of the opportunity Hananel informed him of in 1999, he has disclaimed such awareness when it suits him.[3] Roberts, for example, wrote Hananel's counsel on July 30, 2002, that "as of the date of [Hananel's] termination [April 11, 2000] neither Mr. Adelson or any employee of any affiliated company . . . were aware of any business venture in Macau." 1st Hananel Aff. Exh. 2. More importantly, as recently as Feb. 15, 2005, Adelson stated under oath that he "Never heard the word Macau before [his 1999 trip] . . . had no interest, didn't know of the possibility at all [of a casino there]." Adelson Dep., Exh. 1 to Hananel Mem. Supp. Renewed Mot., 328: 15-19. Thus until Feb. 15 of this year, and the opportunity afforded Hananel to cross-examine Adelson on his inconsistent actions and statements, Adelson's story was "no knowledge of Macau;" now, presumably triggered by the rapid approach of the Israeli trial of Adelson's

---

[3] The magazine articles Adelson attaches to his Supp. Aff. show the opposite of what he contends. The articles contain information which tends to show why Adelson did not consider the Macau opportunity before Hananel described it to him in 1999. The subhead "Gang-related problems" describes a "recent" "flare-up of gang-related crime" (B, p. 67, first column); also described is the long-time Macau casino monopoly and resistance to competition by Stanley Ho (a resident of Macau) (B, p. 82, all columns); the "anti-gambling stance of the Chinese government" in which "gambling is still officially declared as one of the six major sins" (C, p. 28, 2d column); and "disappointing" profits by newcomers (A, p. 372, 2d paragraph, and 377).

credibility, and in recognition that Hananel is likely to prove initiation of the Macau project, Adelson has turned 180 degrees and for the first time claims detailed prior knowledge.

### VIII. ADELSON'S SUGGESTIONS CONCERNING HIS PRESENCE IN ISRAEL ARE INCONSISTENT WITH THE RECORD.

Adelson's 2d Supp. Brief at 13 reviews Hananel's Israeli filings concerning Adelson's recent efforts that appear to be directed towards concealing assets in Israel and making a judgment against him harder to collect. Nowhere, however, does Adelson dispute the substantial record of Adelson's residences, businesses, employees, lawyers, visits, and other substantial contacts with Israel that render his participation in the long-established Israeli litigation practical and convenient for him (in conformance with the jurisdictional Gestalt factor of practicality and the forum non conveniens factor of burden).

### IX. ADELSON'S CLAIMS CONCERNING THE EFFECT OF HANANEL'S BLINDNESS ARE INCONSISTENT WITH THE RECORD.

At page 13 of the 2d Supp. Brief, Adelson intimates that Hananel's inconvenience in traveling is "somewhat exaggerated." Hananel, however, has not denied being able to travel for short trips with the assistance of mainly family members. He has noted the memorial visits to Holland following the death of a member of his wife's family, and to Bulgaria to receive an honor bestowed on his deceased great-uncle, and for relaxation to Ireland and Austria, in each case accompanied and enabled by one or more family members who could provide him with uncompensated support. Much more important to the Gestalt and convenience analysis, however, is the effect of Hananel's disabilities (diabetes including diabetic foot syndrome, and blindness) on his ability to litigate in a distant forum in a non-native language. Adelson does not mention, much less dispute, these difficulties, and they are therefore established for the record.

Adelson does not mention Hananel's blindness, and for good reason. Adelson's attorney, during the lengthy deposition of Hananel in Israel, was a direct witness to Hananel's inability to read documents except with the help of sophisticated machinery and family members. The enormous expense of replacing this machinery and unpaid service in the course of a proceeding in Massachusetts is undeniable. Moreover, Adelson tacitly confirms to this Court the importance of the thousands of documents in Hebrew that both sides have produced in the Israeli litigation, by attaching many to the present brief. Finally, the efforts of the 2d Supp. Brief to complicate and multiply the issues emphasize the relative convenience of Israel as a forum because there, Adelson and other witnesses whose native language is English are allowed to testify in English, while the reverse is not true for this Court.

### X.     ADELSON'S CONTENTIONS CONCERNING HANANEL'S REFUSAL TO IDENTIFY WITNESSES PRIOR TO ISRAEL COURT DEADLINES ARE INCONSISTENT WITH THE RECORD.

Adelson's 2d Supp. Brief at 14-15 makes a misguided attack on Hananel's refusal to name certain witnesses at his deposition. The attack is misguided first, because Hananel was exercising his rights under Israeli procedure to exchange witness names with Adelson according to the Israeli court's pre-trial schedule, and second, because the attack provides no support for the conclusion that no or few Israeli witnesses are involved. Indeed, Adelson nowhere denies, and the record shows, that a substantial number of witnesses relevant to the Macau claim are in Israel, and others are in Macau or elsewhere outside the United States. All documents produced by both sides concerning Hananel's employment show that it was agreed to and performed outside the United States, mostly in Israel. Adelson's numerous appendices to his own 2d Supp. Brief list many Israelis including Interface and Auto Depot employees, lawyers, and business contacts.

The Court should also note that Adelson has not followed any of the rules appropriate to an argument that he has been unfairly deprived of relevant discovery (such as Fed. R. Civ. P. 37). This failure presumably also reflects Adelson's current knowledge that subsequent production in Israel according to that court's schedule has, as Hananel stated in his deposition, produced names.

## XI.   ADELSON'S CASE CITATIONS ARE INAPPOSITE.

A review of the few cases Adelson cites in the 2d Supp. Brief shows that they add nothing to Adelson's jurisdictional or convenience arguments, and, indeed, should be applied against him. In *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1117 (1st Cir. 1989), a forgery at the heart of the merits of the case resulted in dismissal. No forgeries by Hananel are suggested here; indeed, Adelson, through his witness Roberts, has submitted a forged document to this Court on a jurisdictional issue, proffering a copy of a letter printed on a letterhead showing a principal address in Massachusetts, different from the original letterhead showing a principal address in Israel, presumably to conceal the close relationship between the Macau claim and Israel. Hananel Reply Mem. In Supp. of Mot. To Dismiss (Aug. 4, 2004) 13 n. 15 and 2d Hananel Aff. ¶ 7. Hananel brought this forgery to the Court's attention and Adelson has neither disputed the forgery or withdrawn the document. Thus the *Aoude* case is applicable to reject Adelson's conduct, not Hananel's. The same analysis applies to *Rockdale Management Co., Inc. v. Shawmut Bank, N.A.*, 418 Mass. 596, 597-598 (1994), where the president of the plaintiff forged a letter from a third party to create damages. In each case the courts took note of substantial additional evidence before condemning the claimant's behavior.

## XII. ADELSON'S SUMMARY IS INCONSISTENT WITH THE RECORD.

The summaries and conclusion on pages 15-18 of the 2d Supp. Brief repeat the misstatements of the record and further overheat the rhetoric contained in the preceding pages. Each statement in these pages that the writings contradict Hananel is wrong, as has been shown in preceding sections of this memorandum.

Dated: June 22, 2005

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail - hand on _____

SuppHananelReJur-31216-1

MOSHE HANANEL,
By His Attorneys,

_____
James A. G. Hamilton (MA Bar # 218760)
PERKINS, SMITH & COHEN, LLP
One Beacon Street
Boston, MA  02108
617.854.4000

- 13 -