UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
-----------------------------------)
SHELDON G. ADELSON,                )
                                   )
              Plaintiff,           )
                                   )        Civil Action No. 04-cv-10357-RCL
v.                                 )
                                   )
MOSHE HANANEL,                     )
                                   )
              Defendant.           )
-----------------------------------)
```

REPORT AND RECOMMENDATION
ON DEFENDANT'S RENEWED MOTION TO DISMISS
FOR LACK OF PERSONAL JURISDICTION (Docket #45)

SOROKIN, M.J.

Defendant has filed a renewed motion to dismiss for lack of personal jurisdiction.

(Docket #45). In response to an Order of Reference, (Docket #50), I recommend that this Motion

be ALLOWED IN PART and DENIED IN PART.

PROCEDURAL HISTORY AND
RULINGS ON NON-DISPOSITIVE MOTIONS

On February 23, 2004, Sheldon Adelson (hereinafter "plaintiff" or "Adelson") filed his

complaint. Subsequently, Moshe Hananel (hereinafter "defendant" or "Hananel") filed a series

of motions challenging the complaint, specifically a Motion to Dismiss for Lack of Personal

Jurisdiction, a Motion to Dismiss on Grounds of Forum Non Conveniens, a Motion to Stay and a

Motion to Enjoin Plaintiff from pursuing a Parallel Cause of Action in Israel. The Court denied

the Motion to Stay and the Motion to Enjoin. Regarding the motion challenging jurisdiction, the

Court denied the Motion without prejudice to its renewal following jurisdictional discovery. Electronic Order dated January 11, 2005. The Court denied without prejudice the Forum Non Conveniens Motion, allowing its renewal after resolution of the jurisdiction question. Electronic Order dated January 19, 2005. After the conclusion of the reciprocal jurisdictional discovery, defendant filed a Renewed Motion to Dismiss for Lack of Personal Jurisdiction (Docket #45). The Court referred this matter for a Report and Recommendation ( Docket # 50).

After briefing, oral argument was held on July 20th, 2005. The question of jurisdiction focused upon a December 5th, 1995 meeting in Needham, Massachusetts as well as communication thereafter between the plaintiff and the defendant. To clarify these issues, I ordered the parties to submit supplemental affidavits by August 5, 2005 detailing: (1) communications between the plaintiff and the defendant, (2) defendant's travels to Massachusetts for or involving IPI business and (3) a description of IPI's office in Needham on December 5, 1995. Order dated July 22, 2005 (Docket #60). Plaintiff's response included an affidavit from Stephen O'Connor, the Chief Financial Officer of IPI (Docket #62). This affidavit explained that during defendant's employment: defendant submitted regular budgets to O'Connor in Needham, defendant made periodic requests for funds to O'Connor (because IPI did not generate its own funds), O'Connor disbursed funds regularly to defendant in Israel and that the disbursed funds came from either IPI's bank accounts in Massachusetts or plaintiff's personal bank accounts which were administered out of the Needham office. This affidavit drew a Motion to Strike (as beyond the scope of my Order and beyond the scope of plaintiff's interrogatory answer) (Docket #65) or alternatively a Motion for leave to Supplement (Docket #66). I deferred ruling on the Motion to Strike, allowed defendant leave to supplement the record in response to the O'Connor

affidavit and directed plaintiff to explain whether the Court could consider the O'Connor information in light of plaintiff's interrogatory answer in which it did not identify this type of evidence as a basis for jurisdiction.[1]   Order dated August 18, 2005 (Docket #69).   In essence, the answer focused on the December 5th, 1995 meeting and made reference generally to communications between the plaintiff and defendant.

The O'Connor affidavit is beyond the scope of plaintiff's interrogatory answer.  As defendant points out, considering it raises a fairness concern because it was first filed after the period for reciprocal discovery closed and it renders plaintiff's interrogatory answer incomplete under Local Rule 26.5(c)(8).  Notwithstanding these arguments, which do have some merit, I will consider the information.  First, the information is, plainly, highly material to the question before the Court.   Excluding such evidence would disregard the fundamental principles governing civil litigation set forth in Fed. R. Civ. P. 1.  Second, defendant has had the opportunity to supplement the record in response to the O'Connor affidavit, thereby mitigating the unfairness of considering the information.  Third, the facts described in the O'Connor affidavit are within the knowledge of the defendant, as O'Connor describes communication between the defendant and various employees in Needham.  To the extent the parties dispute the facts, under the applicable legal standard I must accept the non-movant plaintiff's version of the facts in any event. Boit v. Gar-

---

[1] Defendant's Interrogatory #1 asks for plaintiff to "[s]tate the basis according to Local Rule 26.5(C)(8) for your contention that personal jurisdiction over Hananel exists in this action." Memorandum of Hananel in Support of Renewed Motion to Dismiss For Lack of Personal Jurisdiction Exhibit 3 at 1 [Plaintiff's Answers to Defendant's First Set of Interrogatories Concerning Jurisdiction] (Docket #46) (hereinafter "Def. Mtn. To Dismiss").  Plaintiff's response need not be quoted in full, as it tracks the language of the affidavit of Paul Roberts, paragraphs six through nine, almost exactly. Id. at 1-3.  Notably missing from plaintiff's response was any mention of the ongoing financial oversight of and communication with defendant by the IPI employees in Needham.

Tec Products, Inc., 967 F.2d 671, 675 (1st Cir. 1992).  Fourth, defendant has not requested leave

for supplemental jurisdictional discovery, no doubt in light of his knowledge of the

communications, if any, he had with employees in Needham.  Finally, in the end the

jurisdictional question will be settled by the Court at trial.  Id.[2]  Accordingly, I DENY

Defendant's Motion to Strike (Docket #65) and ALLOW Defendant's Motion for Leave to

Supplement the Record (Docket #66) as set forth in my August 17, 2005 Order on the Motion to

Strike (Docket #67).

RECOMMENDED FINDINGS OF FACT

The facts are drawn from the documents and affidavits submitted by the parties.  In

reviewing the factual submissions, I have viewed the facts in the light most favorable to the

plaintiff.  Boit, 967 F.2d at 675.  Thus, when the parties dispute a fact, I have accepted plaintiff's

version of the fact provided plaintiff submitted specific facts rather than mere general conclusory

assertions.  Ticketmaster-N.Y., Inc. v. Alioto, 26 F.3d 201, 203 (1st Cir. 1994).

1. The Parties and Relevant Entities

This suit concerns activities during the time period from 1995 until at least 2000.

Plaintiff is a citizen of the United States and a domiciliary of Nevada. Affidavit of Sheldon

---

[2]  I do note one additional point.  The O'Connor affidavit sets forth information obviously relevant and material under the Supreme Court's decision in Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985).  No reason appears on the face of the record for plaintiff to have omitted this evidence, other than oversight.  While Hananel's Motion to Strike Affidavits of Roberts and O'Connor (Docket #65) and Reply Memorandum (Docket #72) characterize the information contained in the new affidavits as untimely, unresponsive to the Court's order, harmful and "false," he has not presented evidence that Adelson intended to "hide the ball" on jurisdiction nor any reason for Adelson to attempt to do so.  Accordingly, I view the timing of the affidavit as reflecting merely a later discovery of the information by counsel or a later appreciation of the significance of the information rather than any sort of improper attempt to mislead the defendant or gain some tactical advantage by improper gamesmanship.

Adelson ¶ 2 (Docket #17) (hereinafter "Pl. Aff."). He maintains a residence in Massachusetts. Id.

He has, or has available to him through his Israeli citizen wife, a residence in Israel titled in the

name of his wife. Def. Mtn. to Dismiss Exhibit 1 at 36:8-9 (Docket #46). Plaintiff is also a very

wealthy international businessman with substantial holdings in the United States, Israel and other

countries around the world making him a reputed billionaire. Id., 308:11-12. His holdings

include several casinos and a company named The Interface Group. Pl. Aff. ¶ 2. The Interface

Group has an office in Needham, Massachusetts, Id. ¶ 3; plaintiff had an office within the

Interface Group's office suite in Needham, as did several other persons. Id. ¶ 2.

Plaintiff also owns IPI, a Delaware corporation. Complaint ¶ 11 (Docket #1). Plaintiff

established IPI for the purpose of making business investments in Israel. Id. Plaintiff is the only

shareholder of IPI. Pl. Aff. ¶ 3. It has offices in Needham, Nevada and Israel. Id. IPI's name

appears (and did appear during the relevant time) on the lobby directory in the Needham Office

building though not on the door to the Interface Group offices.[3] Affidavit of Paul Roberts in

Response to the Order for Further Affidavits on Motion to Dismiss ¶ 15 & Exhibit F (Docket

#63) (hereinafter "Aff. Roberts in Resp. To Court's Order").

All legal matters for IPI are handled by or directed by Paul Roberts, Esquire. Affidavit of

Paul Roberts ¶ 4 (Docket #16) (hereinafter "Aff. Roberts"). Roberts serves as counsel for the

Interface Group and IPI, with an office in the suite of offices in Needham maintained by the

Interface Group. Id. ¶ 1. IPI's Chief Financial Officer is Steven O'Connor; he serves as CFO for

---

[3] Disputing this point, defendant avers that "no IPI office existed in Needham in the fall of 1995 or thereafter" and that there was no business signage for IPI. Fifth Affidavit of Moshe Hananel in Support of Motion to Dismiss for Lack of Personal Jurisdiction and Forum Non Conveniens ¶ 15 (Docket#64) (hereinafter "Def. 5th Aff.").

various other entities owned or controlled by the plaintiff. Affidavit of Stephen O'Connor in Response to the Order for Further Affidavits on Motion to Dismiss ¶ 1 (Docket#62) (hereinafter "Aff. O'Connor"). O'Connor's office is within the Interface Group offices in Needham. Id. Apparently IPI's office is just at the Interface Group office with no separate employees or demarcation. Aff. Roberts in Resp. To Court's Order ¶ 15.

Defendant is a citizen and resident of Israel. Affidavit of Moshe Hananel in Support of Motion to Dismiss for Lack of Personal Jurisdiction and for Forum Non Conveniens, or to Stay Proceedungs [sic] ¶ 2 (Docket #12) (hereinafter "Def. 1st Aff."). He owns no businesses or real estate in the United States. Id. ¶ 6. He has never been employed in or paid taxes to the United States. Id. The parties disagree over the timing, but at some point in 1995, plaintiff hired defendant to serve as the General Manager of IPI's operations in Israel.[4] He was terminated in 2000. Complaint ¶ 19 (Docket #1). From 1994 ( i.e. prior to working for IPI) through April 2000, defendant visited the United States approximately thirteen times; five of these trips were to Massachusetts for a total period of less than two weeks. Def. 1st Aff. ¶ 10 (Docket #12) [attached as Appendix A to Second Supplementary Brief in Opposition to the Defendant's Motion to Dismiss for Lack of Personal Jurisdiction (Docket #44)]. Defendant states that during at least two trips to Massachusetts while employed by IPI, he attended business meetings in Andover regarding a possible relationship between an Israeli company owned by IPI (or in which IPI had made a substantial investment) and a subsidiary of Hewlett-Packard. Def. 5th Aff. ¶ 14 §§ (a), (c) (Docket #64). Hananel asserts that he said nothing at either meeting, that he merely observed the

---

[4] Plaintiff states that defendant was offered employment by IPI on December 5th, 1995, to commence on January 1st, 1996. Aff. Roberts ¶ 8. Defendant states that his employment with IPI began some months earlier, in the fall of 1995. Def. 1st Aff. ¶ 15 (Docket #12).

two meetings. Id.  Although defendant's native language is Hebrew, he speaks English. Def. 1st

Aff. ¶ 4 (Docket #12).  Defendant is legally blind and ill with diabetes, high blood pressure and

kidney pathology. Id. ¶ 3.

    2. The December 5th, 1995 Meeting

    Prior to the December 5th, 1995, meeting, defendant was at least helping plaintiff with

matters related to IPI.  For example, defendant stood in for plaintiff at various business meetings

involving IPI interests or investments during the fall of 1995 and plaintiff appears to have

invested defendant with some authority to sign checks on IPI's behalf during this time. See, e.g.,

Def. Mtn. to Dismiss Exhibit 3 at 5 [Plaintiff's Answers to Defendant's Interrogatories] (Docket

#46).  In addition, plaintiff and defendant discussed some or most of the general terms of

defendant's employment prior to December 5th.  Plaintiff concedes in his deposition that he

wanted Roberts (at the December 5th meeting) "to confirm the deal with Moshe that I had in

mind" and "this [December 5th] was the time to confirm the deal. . ." Def. Mtn. To Dismiss

Exhibit 1 at 353:6-8 [Transcript of Deposition of Sheldon Adelson] (Docket #46).  Defendant

contends that his employment with IPI was entered prior to December 5th, 1995.  Counsel have

represented that all pre-December 5th discussion were in English.

    Roberts states that he personally spoke with defendant by telephone prior to December

5th, 1995, and arranged to have defendant meet with him at the IPI offices in Needham. Aff.

Roberts in Resp. To Court's Order ¶ 6 (Docket #63).  As further evidence of defendant's prior

agreement to meet with Roberts, Roberts submits a note from defendant, dated November 19th,

1995, sent by facsimile on "Galilee Tours" stationary (Hananel's employer prior to IPI), not IPI

stationary, to "Bety" [sic] at "Interface Group" which reads "I will try to be in Boston the first

week of December.  Do you think a meeting in Jocelyn Clinique [sic] could be arranged?" Id. ¶ 7

& Exhibit B (Docket #63).  Roberts states that the note was faxed to Betty N. Yurcich, Adelson's

administrative assistant, and that it confirms that Hananel made advance plans to meet with

Adelson to discuss his employment with IPI. Id.  Finally, Roberts also states that he

"confirm[ed]" the scheduling of the December 5th meeting with defendant when he saw the

defendant at a social gathering at plaintiff's Massachusetts' home on the evening of December

4th, 1995. Pl. 2nd Opp. Mtn. Appendix E ¶ 8 [Suppl. Aff. Roberts] & Appendix D at 101:25

[Defendant's Deposition] 101:25 (Docket #44).  Roberts' supplemental affidavit and Exhibit B

suggest that the meeting with Roberts at least became a goal of Hananel's once he was in

Massachusetts, even if it was not a motivating factor in making the trip to Massachusetts.[5]

On or about December 4th, 1995 defendant came to Massachusetts to obtain a second

opinion at the Joslin Clinic regarding the treatment of his diabetes. Def. 1st Aff. ¶ 18 (Docket

#12).  According to Roberts, Roberts met with the defendant at IPI's office in Needham on

December 5th. Aff. Roberts ¶ 6 (Docket #16).  The purpose of the meeting, according to Roberts,

was discussing and finalizing the terms of defendant's employment with IPI. Id. ¶ 7.  Again,

according to Roberts, at the meeting he and the defendant "settled" on the terms (start date,

responsibilities, salary and benefits) and agreed to an oral, rather than written, contract. Id. ¶¶ 8-

9.  At some point during the meeting, Adelson himself arrived at IPI's office and Roberts

reported the terms of Hananel's employment to the plaintiff. Id. ¶ 9.  The plaintiff, for IPI, agreed

to the terms and all three men shook hands. Id.  Plaintiff confirms Roberts' account. Pl. Aff. ¶ 5

---

[5]  The note Hananel sent relates only to the medical purpose of his trip; it has not business
component.

8

(Docket #17).  Another employee of plaintiff's confirms defendant's presence at the office on December 5th. Second Supplementary Brief in Opposition to the Defendant's Motion to Dismiss for Lack of Personal Jurisdiction Appendix F ¶ 3 §§ (a)-(c) [Affidavit of Lica Brill] (hereinafter "Pl. 2nd Opp. Mtn.") (Docket #44).  Defendant disputes he had any discussion with Roberts regarding his employment or any other business matter on this trip to Massachusetts. Def. 1st Aff. ¶ 18 (Docket #12).

Less than a week after the December 5th meeting in Massachusetts, defendant requested the preparation of business cards bearing his name for his new position. Pl. 2nd Opp. Mtn. Appendix J (Docket #44). The proposed business card bore two sets of addresses and phone numbers: one for the IPI office in Israel and one for the Massachusetts office in Needham. Id. Defendant joined the payroll of IPI on January 1st, 1996. Id. Appendix L.

Under the applicable prima facie evidence standard, Boit, 967 F.2d at 675, I recommend finding that: the December 5th meeting occurred; the meeting resulted in a formal, albeit oral, agreement or execution of the terms of the employment and that thereafter defendant began his transition into the job of IPI's general manager in Israel, as distinct from filling in for or helping plaintiff out as he had in the past.  I note that the evidence regarding these facts is in serious dispute.  By making these findings I am not suggesting a conclusive resolution of these factual disputes, but rather finding that plaintiff's evidence is sufficiently specific to establish the foregoing facts under the prima facie standard.

### 3. Hananel's Employment Activities Related to Massachusetts

The parties seem to agree that during Hananel's employment by IPI, Adelson and Hananel stayed in constant communication to discuss IPI business. Aff. Roberts in Resp. To

9

Court's Order ¶ 14 (Docket #63) & Fourth Affidavit of Moshe Hananel in Support of Motion to Dismiss for Lack of Personal Jurisdiction and Forum Non Conveniens ¶ 8 (Docket #56) (hereinafter "Def. 4th Aff.")  Plaintiff asserts in his reply brief  that defendant "was willing to accept very close control from" plaintiff. Reply Brief of the Plaintiff to Defendants' Memorandum in Support of his "Renewed" Motion to Dismiss at 2 (Docket #53) (hereinafter "Pl. Reply to Def. Mtn. to Dismiss").  Plaintiff cites to defendant's first affidavit, which concedes that defendant had "almost daily" telephone calls with the plaintiff during his employment by IPI. Def. 1st Aff. ¶ 8 attached as Exhibit A to Reply to Def. Mtn. to Dismiss (Docket #53).  Adelson's location at the time of these communications remains unclear, however.  Adelson lived in Nevada during this period and traveled throughout the world regularly.  He may have and probably did speak with Hananel from many different places. Hananel claims that Adelson was rarely in Massachusetts and, importantly, Adelson has <u>never</u> said he called Hananel from Massachusetts.  Def. 5th Aff. ¶¶ 3-4 (Docket#64).  Adelson's only evidence on this point (submitted after the order for further affidavits) comes from Roberts' statement that "there were calls between Hananel and Adelson that occurred when Mr. Adelson was in Needham." Aff. Roberts in Resp. to Court's Order ¶ 5 (Docket#63).  Neither the specific content of these calls, other than their being IPI-related, nor whether Hananel had any knowledge that Adelson was in Massachusetts during the calls is established, although Roberts does state that Adelson acted in his role as CEO of IPI when he spoke with Hananel about the company. Id. ¶ 14.

Plaintiff's supplemental affidavits, however, describe specific additional relevant contacts between Hananel and IPI in Massachusetts.  IPI's Chief Financial Officer explains that

he, and IPI's treasurer, also located in Needham, "were in consistent communication with Mr. Hananel" and the latter's assistant in Israel.  Aff. O'Connor ¶ 3.  IPI's "operations and investments were consistently funded from the home office in Needham." Id. at ¶ 4.  For example, Hananel had to submit a budget each year to IPI in Needham and had to "request operating funds on either a monthly or quarterly basis." Id.  The "money for IPI funding came from Mr. Adelson's personal accounts maintained or administered in Massachusetts, or from the IPI bank accounts in Massachusetts." Id. ¶8.  If "IPI's Massachusetts account had sufficient funds" then the funds came from this account. Id. ¶ 5. When the funds came from IPI's accounts, O'Connor or a member of his staff wired the money to IPI's account in Israel. Id. Hananel "was supposed to report" to O'Connor "on a regular basis on how monies were spent." Id. ¶ 10.  O'Connor attached to his affidavit samples of various written communications reflecting the foregoing control and reporting.

Hananel responds to O'Connor's affidavit and exhibits through his own most recent affidavit, flatly stating that "[a]t no time did Stephen O'Connor or anyone else located in Massachusetts exercise any control or direction over my activities as Manager of the Israel office of IPI." Sixth Affidavit of Moshe Hananel in Support of Motion to Dismiss ¶ 2.  Hananel concedes, however, that O'Connor did perform "ministerial accounting functions," and had a role "limited to that of an accountant/bookkeeper, mainly registering bank transactions, i.e., having no direction or control over IPI's business decisions." Id. §§ (f),(h).  Hananel states that O'Connor acknowledged Hananel's sole authority to direct IPI's Israel branch within an affidavit he filed for the ongoing proceedings in Israel, wherein O'Connor stated that he told the accountant for Interface's Israel branch that he could rely on representations made by

Hananel for the Israel branch's bookkeeping (such as with regard to how expenses were classified). Id. ¶ 3.  Finally, Hananel asserts that none of the plaintiff's previous affidavits in either the present case or in pending proceedings in Israel claimed that "any activities by O'Connor were relevant to jurisdiction." Id. ¶ 10.

Roberts reports in his affidavit filed in response to the Court's Order, that Hananel came to Andover, Massachusetts to attend a meeting "in behalf of an Israeli company, iMD Soft, Ltd. in which IPI had a substantial investment." Aff. Roberts in Resp. To Court's Order ¶ 11 (Docket #63).  Hananel was member of iMD's board to protect IPI's interests. Id.  In late 1999, iMD officials met with officials from Agilent Technologies in Andover, Massachusetts. Id. ¶ 11.  An email submitted by Roberts demonstrates that an employee of Agilent wrote specifically to Hananel at IPI to discuss the goals of the meeting and confirm his presence. Id. Exhibit C.  Roberts attests that Hananel attended the meeting on February 8, 2000, along with others from iMD Soft. Id. ¶ 12.  Roberts submits his handwritten notes from the meeting which reflect Hananel's attendance and state that Hananel "took a very active role in that meeting." Id.

4. Israeli Litigation

In April, 2000 plaintiff terminated defendant's employment with IPI.  Several lawsuits are pending between plaintiff and defendant in Tel Aviv District Labor Court concerning severance, employment terms and what, if anything, plaintiff may owe defendant under the oral employment contract.  In 2001, Hananel sued Adelson and IPI for compensation Hananel claims he was owed under his oral employment contract.  In 2002, Adelson countersued in the same court, seeking the return of allegedly misused IPI funds.  In 2003, Hananel filed a second suit against Adelson and IPI, claiming his oral employment contract with Adelson entitled

12

Hananel to purchase twelve percent of the stock option shares in Adelson's new Macau casino venture. The Israeli court has consolidated the 2001 and 2003 cases.

    5. <u>Plaintiff's Claims</u>

The parties agree that the oral employment contract provided defendant a share of some of the profits of some IPI ventures. They dispute the details and application of this provision. At bottom this case concerns defendant's claim, under the oral employment agreement, to a twelve per cent share a casino plaintiff has developed in Macau. The Complaint asserts claims for: a declaration of the parties respective rights under defendant's oral employment contract (Count I); civil extortion (Count II); malicious interference with advantageous business relationship (Count III); and disparagement and defamation (Count IV).

DISCUSSION

"In its simplest formulation, <i>in personam</i> jurisdiction relates to the power of a court over a defendant." <u>Pritzker v. Yari</u>, 42 F.3d 53, 59 (1st Cir. 1994). "It is of two varieties, general and specific." <u>Id.</u> Plaintiff is proceeding on a specific jurisdiction theory. "Specific personal jurisdiction, by contrast, is narrower in scope and may only be relied upon 'where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts.'" <u>Id.</u> at 60 (quoting <u>United Elec. Workers v. 163 Pleasant St. Corp.</u>, 960 F.2d 1080, 1088-89 (1st Cir. 1992)).

"The proper exercise of specific <i>in personam</i> jurisdiction hinges on satisfaction of two requirements: first, that the forum in which the federal district court sits has a long-arm statute that purports to grant jurisdiction over the defendant; and second, that the exercise of jurisdiction pursuant to that statute comports with the strictures of the [Due Process Clause of

13

the] Constitution." <u>Pritzker</u>, 42 F.3d at 60; <u>see also</u> <u>Burger King</u>, 471 U.S. at 471-72 (due process constraints subject defendant to forum's jurisdiction only when he has established sufficient meaningful contacts); <u>International Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1945) (subjecting defendant to forum state's jurisdiction must "not offend 'traditional notions of fair play and substantial justice'") (citations omitted).

Plaintiff bears the burden of establishing a prima facie case authorizing personal jurisdiction. <u>U.S.S. Yachts, Inc. v. Ocean Yachts, Inc.</u>, 894 F.2d 9, 11 (1st Cir. 1990). Mere reliance on the allegations of the pleadings is not enough. <u>Chlebda v. H.E. Fortna & Brother, Inc.</u>, 609 F.2d 1022, 1024 (1st Cir. 1979). But, "[i]f the plaintiff makes a prima facie showing of jurisdiction supported by specific facts alleged in the pleadings, affidavits, and exhibits, its burden is met." <u>Ealing Corp. v. Harrods, Ltd.</u>, 790 F.2d 978, 979 (1st Cir. 1986). Under the prima facie test "a district court does not act as a factfinder; to the contrary, it ascertains only whether the facts duly proffered, fully credited, support the exercise of personal jurisdiction." <u>Alers-Rodriguez v. Fullerton Tires Corp.</u>, 115 F.3d 81, 84 (1st Cir. 1997). However, where a court determines that it may be "unfair in the circumstances" to force an out-of-state defendant to trial on the basis of a tenuous prima facie showing by the plaintiff, it may hold plaintiff to a higher standard: either proof by a preponderance of the evidence, or an "intermediate" standard between the prima facie and preponderance of the evidence standards (avoiding questions of "issue preclusion" and "law of the case"). <u>Boit</u>, 967 F.2d at 677. In this case, given the detailed and specific evidence provided by the plaintiff, I apply the prima facie evidence standard.

Because the analysis of each claim in the complaint is separate under the law, I analyze each claim separately.

I.      Count I: Declaration of Rights Under the Employment Contract

      A.      Hananel Transacted Business in Massachusetts.

Plaintiff relies on the Massachusetts long-arm statute to establish jurisdiction, which reads that "[a] court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's (a) transacting any business in this commonwealth; . . ." M. G. L. c. 223A § 3(a).[6]  The most incidental of purposeful contacts will satisfy the broadly construed transacting business requirement of section 3(a). See Bond Leather Co., Inc. v. Q.T. Shoe Mfg. Co., Inc., 764 F.2d 928, 931 (1st Cir. 1985) (defendant transacted business under Section 3(a) by sending letters of guaranty into Massachusetts); see, e.g., Cambridge Literary Properties, Ltd. v. W. Goebel Porzellanfabrik G.m.b.H & Co., 295 F.3d 59 (1st Cir. 2002) (shipping figurines into Massachusetts constitutes transacting business); Hahn v. Vermont Law School, 698 F.2d 48 (1st Cir. 1983) (sending law school application information and acceptance letter into Massachusetts); Ealing Corp. v. Harrods, Ltd., 790 F.2d 978 (1st Cir. 1986) (making phone calls and sending telex draft of business agreement into Massachusetts); Nova Biomedical Corp. V. Moller, 629 F.2d 190 (1st Cir. 1980) (sending letters threatening patent litigation).

Hananel's contacts with Massachusetts were more than incidental, both in entering into the contract and in functioning as an IPI employee.  The specific affidavit evidence submitted

---

[6] Massachusetts courts construe section 3(a)'s "transacting business" test as extending jurisdiction to the outermost limit permitted by the Due Process Clause. Cambridge Literary Properties, Ltd. v. W. Goebel Porzellanfabrik G.m.b.H & Co., 295 F.3d 59, 63 (1st Cir. 2002). "[W]hen a state's long-arm statute is coextensive with the outer limits of due process, the court's attention properly turns to the . . . federal constitutional standards." Sawtelle v.Farrell, 70 F.3d 1381, 1388 (1st Cir. 1995).  Thus, any question as to whether Hananel "transacted business" in Massachusetts can also be addressed by the due process means discussed infra at 17.

by the plaintiff, which I fully credit as I must under the applicable law, establishes that Hananel formalized and entered into, albeit orally, his contractual employment relationship with IPI at its office in Needham, Massachusetts on December 5th, 1995.  Although some or many of the terms of his employment were discussed between Hananel and Adelson prior to December 5th, Hananel's discussion and finalization of his employment terms with Paul Roberts, Esq. was nonetheless a further negotiation of the contract.  Hananel's presence in Massachusetts was not merely to shake hands upon an otherwise fully premeditated agreement; even the discussion of whether the contract would be oral or written was itself a term of the contract negotiated in Massachusetts.  Furthermore, assuming, *arguendo,* that all contract terms had been finalized prior to Hananel's arrival in Needham (i.e., that <u>no</u> negotiation of the terms occurred in Massachusetts), the fact that the handshake cementing the bargain occurred in Needham was sufficient to constitute transacting business under the long-arm statute, so long as the cause of action derives from the contract itself. <u>See</u> <u>Carlson Corp. v. University of Vermont</u>, 380 Mass. 102, 105-06 (1980).[7]

There is also ample evidence that after consummating the contract Hananel transacted considerable business in Massachusetts as an employee of IPI.  Per his duties for IPI, Hananel came to Andover, Massachusetts at least once by invitation and for the purpose of participating in a business meeting with an Israeli company in which IPI had invested.  Even without consideration of the O'Connor Affidavit, all of the foregoing evidence suffices to establish that

---

[7] In <u>Carlson</u>, the defendant was found to have transacted business in Massachusetts by signing a written contract at a ceremony in Boston, even though the contract called for the construction of a building in Vermont. While <u>Carlson</u> involved some other Massachusetts based activity so does the case here. 380 Mass. at 105-06.

Hananel transacted business in Massachusetts, in satisfaction of the Massachusetts long-arm statute.

Furthermore, during the course of his employment managing IPI's operations in Israel, Hananel maintained regular communication with IPI's Chief Financial Officer and Treasurer both of whom worked at the Needham office. He received money from IPI's Massachusetts account into IPI's Israeli account. Even though Adelson, wherever he was, exercised the decision making authority, Hananel was transacting business with the employees in Needham by submitting requests, budgets and expenditure reports to them and obtaining funds for IPI's Israeli branch from them. A defendant need not be physically present in Massachusetts in order to have transacted business here. Workgroup Tech. Corp. v. MGM Grand Hotel, LLC., 246 F. Supp. 2d 102, 109-10 (D. Mass. 2003). Provided that they engendered the cause of action, the sending of business communications, written or verbal, into Massachusetts is sufficient to constitute transacting business. See, e.g., Hahn, Bond, Nova Biomedical, and Ealing, supra. Thus, Hananel transacted business in Massachusetts.

 B.   Due Process Analysis

The Fourteenth Amendment's concern for fundamental fairness is expressed by the requirement that there be "minimum contacts" between the defendant and the forum state sufficient to establish specific jurisdiction. The test is in three parts.

 1. Claim Must Arise out of or Relate to Forum Contacts

"First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities." United Electrical, Radio and Machine Workers of America v. 163 Pleasant St. Corp., 960 F.2d 1080, 1089 (1st Cir. 1992). "[T]he relatedness test is,

relatively speaking, a flexible, relaxed standard." Pritzker, 42 F.3d at 61.  However, "[t]he

relatedness requirement is not met merely because a plaintiff's cause of action arose out of the

general relationship between the parties; rather, the action must arise out of the specific

contacts between the defendant and the forum state." Sawtelle, 70 F.3d at 1389.

Count I of the complaint requests a judgment declaring the parties' rights and

obligations under Hananel's employment contract with IPI, which was formalized and entered

into in Massachusetts and which subjected Hananel to substantial control and ongoing

connection to Massachusetts in the performance of this contract.  The First Circuit Court of

Appeals has clearly stated that:

> Although the Massachusetts courts have not defined the scope of the "arising
> from" requirement of the long-arm statute, we have no doubt that it has been
> satisfied when the cause of action is for an alleged breach of contract and the
> business transacted was *instrumental in the formation of the contract*.
> Hahn v. Vermont Law School, 698 F.2d 48, 51 (1st Cir. 1983) (emphasis added).

This rubric has since expanded in scope, allowing that a contract claim arises from a

defendant's activities in Massachusetts if the activity was "instrumental either in the formation

of the contract *or in its breach*." Phillips Exeter Academy v. Howard Phillips Fund, Inc., 196

F.3d 284, 289 (1st Cir. 1999) (emphasis added).  A still more recent approach has stated that

courts must look at whether the contract in dispute would have "come to exist 'but for'" the

defendant's contact with Massachusetts. Workgroup Tech. Corp., 246 F. Supp. 2d at 112

(citing Tatro v. Manor Care, Inc., 416 Mass. 763, 771-72 (1994)).  Hananel's employment

contract with IPI was formalized and entered into during his December 5th, 1995 trip to

Massachusetts.  Nothing could be more instrumental in the formation of a contract than the

literal act of forming the contract itself. Furthermore, pursuant to his employment Hananel engaged in regular business activity with Massachusetts over the course of his tenure as described by O'Connor and in the meeting to which he came in Andover. Therefore, Adelson's claim requesting a declaration of the parties' rights under the employment contract clearly "arises from" Hananel's activities in Massachusetts.

2. Purposeful Availment

Adelson must also show that Hananel's contacts with Massachusetts represented a "purposeful availment of the privilege of conducting activities in [Massachusetts], thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's court foreseeable." United Elec. Workers, 960 F.2d at 1089. The two cornerstones of purposeful availment are "voluntariness and foreseeability." Nowak v. Tak How Investments, Ltd., 94 F.3d 708, 716 (1st Cir. 1996). The first prong is easily satisfied; Hananel sought and obtained employment with IPI of his own volition, and while in Massachusetts negotiated and executed his employment contract.

Due process also "require[s] that individuals have 'fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign." Burger King 471 U.S. at 472 (quoting Shaffer v. Heitner, 433 U.S. 186, 218 (1977)). Evaluating foreseeabilty requires that the court examine the structure of the relationship between the parties. In particular, "with respect to interstate contractual obligations, [the Supreme Court] ha[s] emphasized that parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." Burger King, 471 U.S. at 473 (quoting Travelers Health Assn.

19

v. Virginia, 339 U.S. 643, 647 (1950)).

From the outset, the evidence herein establishes the foreseeability of Hananel being subject to litigation in Massachusetts over his employment. He formalized his employment relationship in Massachusetts with IPI's lawyer in Needham. He acknowledged his ongoing relationship with Massachusetts on his business card. He submitted his budgets to and obtained monies to fund IPI from officers of IPI located in Needham. He traveled from Israel to Massachusetts at least once to attend an IPI meeting in Andover. Hananel's involuntary presence before a court in Massachusetts in a dispute over his employment relationship was foreseeable in light of these facts, as well as Hananel's role as the highest ranking employee in Israel of a company (1) owned by a United States citizen; (2) funded from company bank accounts in Massachusetts and Adelson's personal bank accounts administered by employees in Massachusetts; and (3) with key officers located in Massachusetts. In short, Hananel "reach[ed] out" voluntarily to enter into an employment contract which, by design, "create[d] continuing relationships and obligations" between himself and persons in Massachusetts. Travelers Health, 339 U.S. at 647. Thus, Hananel purposefully availed himself of Massachusetts law.

    3. Gestalt Factors

With Adelson having satisfied the first two elements of the due process inquiry, we must turn to the third, which requires that "the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable." United Elec.Workers, 960 F.2d at 1089. The Gestalt factors include "(1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the

judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies." <u>United Elec. Workers,</u> 960 F.2d at 1088. "These [G]estalt factors are designed to put into sharper perspective the reasonableness and fundamental fairness of exercising jurisdiction in particular situations." <u>Pritzker</u>, 42 F.3d at 64. The Gestalt factors "are not ends in themselves, but they are, collectively, a means of assisting courts in achieving substantial justice. *In very close cases, they may* tip the constitutional balance." <u>Ticketmaster</u>, 26 F.3d at 209 (emphasis added).

Regarding the burden, Hananel must "demonstrate some kind of special or unusual burden." <u>Pritzker</u>, 42 F.3d at 64. While Hananel's residence and employment in Israel might suffice to invoke this factor in some circumstances, the facts of this case suggest otherwise. All of Hananel's discussions with Adelson, including the negotiation of his employment contract and his depositions took place in English. In the course of his employment for IPI he traveled to Massachusetts for a business meeting at least once and maintained regular communication with Massachusetts based employees supervising or monitoring the businesses finances in Israel. And, importantly, he agreed to work for an American company as the chief overseas employee. Requiring him to come to the United States to litigate over the terms of his employment imposes no special burden for an executive such as Hananel.

In addition, under this factor, Hananel points out that he is now a legally blind diabetic. While the court is sympathetic to Hananel's medical condition, the fact remains that his condition does not preclude him from traveling internationally. Plaintiff has asserted that defendant has traveled internationally with some frequency, not only for memorial services (which perhaps fall into a more serious category than civil litigation) but also to attend a

concert in Austria. Pl. 2nd Opp. Mtn. at 13 (Docket #44).  Defendant does not deny these

assertions about his ability to travel in his response, Def. Mtn. to Dismiss at 18 (Docket #46),

and concedes he traveled to: Bulgaria to receive an honor recognizing a deceased relative;

Ireland for vacation; and Austria for vacation.  Def.'s Reply (Docket # 55)..

     With respect to the second Gestalt factor, "[t]he purpose of the inquiry is not to

*compare* the forum's interest to that of some other jurisdiction, but to determine the extent to

which the forum *has* an interest." Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d

138, 151 (1st Cir. 1995). (emphasis in original).  While neither a Massachusetts citizen nor a

Massachusetts corporation are parties to this litigation,  "Massachusetts has an interest not only

in providing a forum for its residents, but also in enforcing business transactions consummated

within its boundaries."  Carlson, 380 Mass. at 108.  Several facts heighten Massachusetts'

interest: two or three of IPI's executive officers work in Massachusetts; IPI's corporate funds

are held in Massachusetts, at least until disbursed to Israel; and IPI's corporate funds are

managed or monitored from Massachusetts.  In short, Massachusetts has an interest in the

litigation.

     Third, the plaintiff's interest in obtaining convenient and effective relief weighs in favor

of finding jurisdiction.  The assessment that a plaintiff could as easily litigate its case elsewhere

or perhaps obtain fuller relief in another jurisdiction gives too little weight to a plaintiff's

choice of forum. Foster-Miller, 46 F.3d at 151.  The plaintiff must be accorded "a degree of

deference in respect to the issue of its own convenience." Ticketmaster, 26 F.3d at 211.

     The fourth factor –  the judicial system's interest in obtaining resolution to the

controversy in the most efficacious manner –  counsels against relegating a suit to several

different jurisdictions. <u>Pritzker</u>, 42 F.3d at 64. While this factor weighs against plaintiff in this case because of the earlier filed suits pending in Israel, it is insufficient to tip the constitutional balance on the facts of this case, especially when other more targeted approaches, if appropriate under the applicable law, such as abstention or forum non convenience, could directly address the potential problem of conflicting judgments or bifurcation of a dispute among two jurisdictions without preventing plaintiff from invoking a constitutional exercise of the Court's jurisdiction.

And finally, with respect to substantive social polices, Massachusetts has an interest in redressing harms inflicted on businesses operating here (or the non-citizen owner of the business when the harm arises out of the business' activities within Massachusetts). <u>See</u> <u>Nowak</u>, 94 F.3d at 719. While this factor is of lesser importance in this case (in which neither Adelson nor IPI are citizens of Massachusetts), nonetheless the Massachusetts presence described above gives Massachusetts a meaningful interest in redressing the alleged harms.

Accordingly, I recommend that the Court has personal jurisdiction over the defendant with respect to Count I of the Complaint.

II.    The Remaining Claims

The parties focused their memoranda on whether plaintiff established specific jurisdiction for Count I only, however, "[q]uestions of specific jurisdiction are always tied to the particular claims asserted," thus the complaint's tort and contract claims require separate analysis. <u>Phillips Exeter Academy v. Howard Phillips Fund, Inc.</u>, 196 F.3d 284, 289 (1st Cir. 1999).

In Count II Adelson alleges that Hananel has "harassed and threatened Adelson"

looking for a "payoff" so as to drop a claim for 12% of the ventures developed by Adelson in Macau. Complaint ¶¶ 25-30. In Count III Adelson alleges Malicious Interference with Advantageous Business Relationship, specifically Adelson's business in Macau. <u>Id.</u>, ¶¶ 21-30, 38-42. In Count IV, Adelson alleges disparagement and defamation. <u>Id.</u>, ¶¶ 21-30, 44-46. All three of these claims arise out of allegedly improper activity engaged in by Hananel. Plaintiff has not established, or even advanced a prima facie showing, that any of the allegedly improper activity occurred in Massachusetts. Nor has plaintiff established, or even advanced a prima facie showing, that Hananel directed at Massachusetts any of his allegedly improper activity. Rather plaintiff points to press releases issued in Israel, statements made in Israel and communications with the authorities in Macau all of which appear directed, not at Massachusetts, but Macau. The casino project in Macau is owned by another of Adelson's companies, Las Vegas Sands, Inc., headquartered in Nevada. If Hananel committed these torts, he did not commit any part of them in Massachusetts. Nor did he direct them at Massachusetts or a citizen of Massachusetts. Accordingly, I recommend that the Court allow the Motion to Dismiss as to Counts II, III and IV of the Complaint.

CONCLUSION

WHEREFORE, I recommend that the Court DENY the Motion to Dismiss for Lack of

Personal Jurisdiction (Docket #45) as to Count I and ALLOW the Motion as to Counts II, III

and IV of the Complaint.[8]

/s/ Leo T. Sorokin
LEO T. SOROKIN
UNITED STATES MAGISTRATE JUDGE

Date: October 31, 2005.

---

[8] Any party objecting to the proposed findings and recommendations of this Report and Recommendation must file a written objection thereto within 10 days of receipt of this Report and Recommendation.  The written objections must identify with specificity the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections. See Fed. R. Civ. P. 72. The parties are further advised that the United States Court of Appeals for the First Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review.