IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

———————————————————————
)
SHELDON G. ADELSON,                          )
                                             )
Plaintiff,                                   )          Civil Action No.
                                             )
v.                                           )          **04-cv-10357-RCL**
                                             )
MOSHE HANANEL,                               )
                                             )
Defendant.                                   )
———————————————————————)

**OBJECTIONS OF HANANEL TO PROPOSED FINDINGS AND
RECOMMENDATIONS OF MAGISTRATE JUDGE  ON MOTION TO DISMISS
FOR LACK OF PERSONAL JURISDICTION**

Defendant Moshe Hananel ("Hananel"), pursuant to Fed. R. Civ. P. 72, files the

following objections to the Report and Recommendation on Defendant's Renewed Motion To

Dismiss For Lack Of Personal Jurisdiction dated October 31, 2005 from Magistrate Judge

Sorokin ("Report"), and requests the Court to grant Hananel's Motion to Dismiss.  In summary,

the Report omits many relevant facts put forward by Hananel and not contradicted by Adelson,

and admissions by Adelson, which, if considered, would show that the contacts relied on by

Adelson are insufficient to create personal jurisdiction and that the exercise of jurisdiction would

be unreasonable.  *See Mass. School of Law at Andover v. American Bar Assn.*, 142 F.3d 26, 34

(1st Cir. 1998) (uncontradicted facts from defendant accepted).  Hananel relies on the entire

record, and draws the Court's attention to specific uncontradicted facts which show that

dismissal is the correct outcome.

## I.     OBJECTIONS TO PROCEDURAL HISTORY (REPORT AT 1-3)

The Report states on p. 1 that Hananel filed a Motion to Enjoin Plaintiff From Pursuing a

Parallel Cause of Action in Israel.  Adelson, not Hananel, filed this motion, which Hananel

opposed and the Court, Lindsay, J., denied.[1]  The motion papers, particularly Hananel's

opposition to Adelson's Motion to Enjoin, are relevant to Hananel's Motion to Dismiss, and are

part of the record that the Court should consider in granting the Motion to Dismiss.[2]

Hananel objects to the Report's consideration of the O'Connor affidavit (at 3-4).  The

Report fully notes  (at 3 n.1) that the alleged information in the O'Connor affidavit was

"[n]otably missing from plaintiff's [February 2005 interrogatory response."  The Report

concludes that "fairness" requires consideration of the O'Connor affidavit, but takes insufficient

account of (a) the harm to Hananel from the belated disclosure, as Hananel's financial ability to

renew discovery as the Report suggests was limited, (b) the other grounds in Hananel's Motion

to Strike (Docket # 65) (which also sought to strike much of the Roberts Supp. Aff.), (c) the

automatic-exclusion remedy provided by Fed. R. Civ. P. 37(c)(1) (*see* Reply Memorandum of

Hananel (Order of August 22, 2005), Docket # 72), (d) Adelson's failure to amend or seek leave

to supplement his interrogatory answer, and (e) the effect of this Court's discovery order, which

was intended to narrow the issues, not to permit Adelson to belatedly broaden them.  Hananel's

Motion to Strike should be allowed.

In any case, the Report should have recognized that Adelson's belated reference to the

O'Connor information was not, as it concluded, only explainable by "oversight" of Adelson's

counsel (Report at 4 n.2).  No claim of "oversight" or "late discovery" has been made by

Adelson, and "a later appreciation of the significance of the information" is an insufficient

excuse.  The belatedness is fully explainable by Adelson's full understanding that the O'Connor

---

[1]     This Objection is significant because Adelson's Motion to Enjoin further demonstrates his admitted goal (Hananel Memorandum in Support of Renewed Motion to Dismiss, Docket # 46, Exh. 1, Adelson Depo. 88: 14-22, 231: 15-20) of causing Hananel to exhaust his limited resources in fighting the present action, which Adelson admits is duplicative of the prior pending action in Israel, in addition to the Israeli actions.

[2]     Hananel informs the Court that in early October 2005 he filed a motion in Israel to enjoin Adelson from continuing this litigation against him, based on the prior pending actions in Israel.

information had no jurisdictional significance, as shown by his failure to claim it in three years of Israeli proceedings and sixteen months of U.S. proceedings, and his avowed intent to exhaust Hananel financially in this duplicate proceeding, a goal fostered by trickling out and mischaracterizing allegations and documents to which he has always possessed.[3]

## II.     OBJECTIONS TO STANDARDS APPLIED AND RECOMMENDED FINDINGS OF FACT (REPORT AT 4-13).

### A.     OBJECTIONS TO LEGAL STANDARDS APPLIED TO FACTUAL SUBMISSIONS OF THE PARTIES (REPORT AT 4, 14).

The Report at 4 and 14 sets forth the standard by which it considered the factual submissions of the parties.  Both  statements are incomplete, and the three significant omissions render the proposed factfinding and recommended conclusions objectionable.

First, the Report's standard omits the fundamental requirement to consider "facts put forward by defendants, to the extent they are uncontradicted." *Mass. School of Law at Andover v. American Bar Assn.*, 142 F.3d 26, 34 (1st Cir. 1998); *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 51 (1st Cir. 2002);  *see Ticketmaster-N.Y. v. Alioto*, 26 F.3d 201, 203 (1st Cir. 1994) ("we draw the facts from the pleadings and the parties' [plaintiff's and defendant's] supplementary filings, including affidavits"); *id.* at 206 ("if [defendant] can establish that allowing the suit to go forward would be inconsistent with 'fair play and substantial justice'"); *Lyle Richards Int'l, Inc. v. Ashworth, Inc.*, 132 F.3d 111, 113 (1st Cir. 1997) (unopposed affidavit by defendant that plaintiff had proposed the contract supports dismissal); *Rodriguez v. Fullerton Tires Corp.*, 115 F.3d 81, 84 (1st Cir. 1997) (dismissal based

---

The Israeli court has not decided that motion yet.
[3]     Roberts, for example, suddenly remembered (in a second affidavit, Docket # 44, Exh. E) first an alleged meeting on Dec. 4, 1995, then (in a third affidavit, Docket # 63) an undated telephone call.

in part on "the declarations attached to [defendant's] motion").  While the Report has indeed

recognized a number of uncontradicted facts supplied by Hananel, it has omitted others, and the

proper standard of decision requires their inclusion in the findings.

The Report, while recognizing (at 4) that "mere general conclusory assertions" may not

be used, also omits a prohibition against unreasonable inferences:  "In so doing [crediting facts

supported by the plaintiff], however, 'we do not credit conclusory allegations or draw farfetched

inferences.'"  *Sawtelle v. Farrell*, 70 F.3d 1381, 1385 (1st Cir. 1995) (emphasis added).  Here,

the Report occasionally accepts conclusory statements by Adelson or relies on unwarranted

inferences.

Finally, the Report nowhere acknowledges the requirement that the facts a plaintiff needs

to support a prima facie case must be "properly supported."  *Pike v. Clinton Fishpacking, Inc.*,

143 F. Supp. 2d 162, 165-166 (D. Mass. 2001)(Lindsay, J.), quoting from *United Electrical*

*Radio and Machine Workers of America v. 163 Pleasant Street Corp.*, 987 F.2d 39, 44 (1st Cir.

1993).  Here, the Report includes some findings that are not found in Adelson's affidavits or

documents, and some findings that Adelson himself has denied under oath.

Application of the complete standard provides a body of undisputed facts showing that

Adelson has failed to meet his burden of showing a prima facie case, as well as undisputed facts

showing that jurisdiction would be inconsistent with fair play and substantial justice.  The overall

effect of the Report's failures to consider uncontradicted facts and to reject unwarranted

inferences and unsupported allegations is so great that the Court should not follow the

recommendation and should dismiss the action.

**B.   OBJECTIONS TO RECOMMENDED FINDINGS OF FACT (REPORT 4-13).**

**1.   THE PARTIES AND RELATED ENTITIES.**

**Description of Adelson (Report at 4-5).**  The Report omits that Adelson has, in Israel, in addition to a residence, an office, attorneys, and accountants, and is a party to prior litigations with Hananel concerning the contract which is the subject of the present action.  1st Hananel Aff., Docket # 12, 74, ¶ 12; 4th Hananel Aff., Docket # 56, ¶ 6 & Exh. 5.  He also  conducts much of his business, which is international, while traveling on his private jet around the world. 5th Hananel Aff., Docket #64, ¶ 2.

**IPI (Report at 5).**  The Report correctly notes that Adelson established IPI for the "purpose of making business investments in Israel;" this was in fact its <u>sole</u> purpose according to Adelson. 5th Hananel Aff., Docket #64, Exh. 2, Adelson Depo. 133: 17-18.  The Report fails to recognize the uncontradicted facts that IPI's <u>only</u> operating office was in Israel, where it was registered to do business, paid taxes, and conceded that it and Hananel's contract were <u>subject to Israeli law.</u>  1st Hananel Aff., Docket # 12, 74, Exh. 1 (Adelson 2002 Aff. in Israel), ¶ 18: *"I instructed Interface to treat Hananel as required by the law."*  Moreover, Adelson forbade Hananel from doing any business in the United States.  5th Hananel Aff., Docket #64, ¶ 8. Although the Report lists three IPI offices–"Needham, Nevada, and Israel"– Adelson's Complaint, ¶ 11, lists only the Israel office and it is an uncontradicted fact that the only office with paid employees was Israel, as the Report notes at page 6.

**Name on the door.**  The Report departs from the standard by relying on unsupported evidence and a conclusory assertion that IPI's name appeared on an office in Needham in December 1995.  In fact, Roberts' (third) Affidavit, Docket # 63, ¶ 15 only asserts this "to the best of his recollection" and supplies a photograph taken in 2005, but he inadvertently also

supplies documentary evidence (Exh. A thereto) showing that at least one of the photographed names (IMDSoft) he purports to recall was of an entity <u>not in existence</u> in 1995.[4] The departure from the standard is not trivial; the Report uses it to support a recommendation that Hananel voluntarily did business with IPI on Dec. 5, 1995, when the absence of any signage helps confirm that his visit to Needham had no business purpose.

**Roberts' duties for IPI.** While the Report at 5 repeats Roberts' claim to handle "all legal matters for IPI" it fails to include the uncontradicted testimony of Adelson that Roberts had no role in any hiring or business decisions. 5th Hananel Aff. (Docket # 64) ¶ 16 & Exh. 1, quoting from Adelson deposition. This omission is important because it shows that no genuine business purpose existed for the alleged meeting with Roberts, and that the alleged meeting could not have been "instrumental in" or a "but for" factor, in his employment contract. The Court should also take into account the uncontradicted fact that Adelson has failed to provide any note, fax, diary, or summary of the meeting, an ordinary expectation from legal counsel (and in contrast to Roberts' notes of the Andover meeting).

**Date of Adelson's offer of employment to Hananel.** The Report at 6, after noting Hananel's lack of any financial connection to the United States, states that "the parties disagree over the timing, but at some point in 1995, plaintiff hired defendant to serve as the General Manager of IPI's operations in Israel." This does not fully state the uncontradicted facts, which show that Adelson offered Hananel employment in Israel in October 1995, and Hananel accepted the offer and began his employment then. 1st Hananel Aff., Docket # 12, 74, ¶¶ 14-16; 4th Hananel Aff., Docket # 56, ¶¶ 3, 5 & Exhs. 2, 4. Even Adelson's proffer does not support the Report's conclusion of a disagreement over the timing. The Report's footnote 4 at the end of the quoted sentence incorrectly states that "Plaintiff states that defendant was <u>offered</u> employment

---

[4]        This (and the inconsistency of other newer companies) was brought to the Court's

by IPI on December 5th, 1995, to commence on January 1, 1996," citing to Roberts Aff. ¶ 8

Docket #16 (emphasis added).  That Roberts paragraph, however, does not say that Hananel was

"offered employment" on Dec. 5, but is instead entirely consistent with the uncontradicted fact

stated by Hananel, also referred to in this footnote, that Adelson offered employment to Hananel

in October, 1995, and that Hananel accepted it by beginning his employment then.  1st Hananel

Aff. Docket #12, ¶¶ 14-15.  *See also* Adelson's Interrogatory Answer No. 2, attached to Hananel

Memorandum Docket # 46 as Exh. 3, page 4 ("*we did reach an understanding sometime in or*

*around November 1995. . . .*").  Hananel documented the pre-December formation of his

contract, and his performance as IPI manager, with numerous documents produced by Adelson

in discovery including directors' meeting minutes, calendars, and one in Adelson's handwriting

ordering that Hananel be given authority over checking accounts in Israel.  Hananel

Memorandum in Support of Renewed Motion to Dismiss, Docket # 46, Exhs. 5-14 (Exh. 11 is in

Adelson's handwriting).  Adelson has contradicted none of these documents or activities, but has

merely stated a conclusory allegation lacking specific facts that Hananel was "helping" him at

this time–a conclusory allegation that the Report at 7 objectionably adopts.  Changing the

Report's characterization of the Roberts affidavit, and applying the rule that uncontradicted facts

supplied by a defendant are to be taken as true, requires the finding that Hananel was offered,

and entered, employment in October, 1995, and, consequently, that his Needham visit was not

purposeful availment.  Indeed, the Report's entire Recommendation pivots on these omissions,

and should be changed.

**Purpose of Hananel's Andover visit (Report at 6-7).**  While the Report correctly notes

a dispute between Hananel and Roberts over the depth of Hananel's participation in the Andover

meeting, it fails to note the uncontradicted evidence that the purpose was to discuss a potential

---

attention by Hananel's Motion to Strike (Docket # 65) ¶ 7.

deal <u>abroad</u> between the Israeli company iMD Soft and a <u>German</u> company, and that no business in Massachusetts was done (in fact the deal failed) or discussed.  5th Hananel Aff., Docket #64, ¶ 14a, 14c.  Adelson himself has confirmed that Hananel did no business for IPI in the United States. Hananel Memorandum in Support of Renewed Motion to Dismiss, Docket # 46, Exh. 4, Adelson Aff. in Israel ¶ 29 (*"from Interface's point of view there was no justification for Hananel to travel overseas. . . . [O]n occasion I invited Hananel to meet with me in the United States. These invitations were for social reasons and not for Interface's business."*)  The Roberts affidavit cannot be regarded as properly supported when it is thus contradicted by the party, Adelson, who is the plaintiff Roberts' boss, and the Report should reject it.

### 2.    THE DECEMBER 5, 1995 MEETING (REPORT 7-9).

**Hananel's employment prior to Dec. 5, 1995.**  As discussed above, the Report at 6 and here at pages 7-8 significantly understates the uncontradicted evidence (*see* pp. 6-7 above) that Adelson offered Hananel employment in Israel, Hananel accepted it in Israel, and Hananel began his employment in Israel, well before Dec. 5.[5]  The Report properly acknowledges the uncontradicted evidence that Hananel represented Adelson at "business meetings" (actually, chairing a board meeting in Israel in Adelson's absence), Adelson gave authority to sign checks on IPI's behalf (actually, six-figure sums being invested by IPI, with authority equal to Adelson's (2d Hananel Aff., Docket # 21, ¶ 5; Hananel Memorandum in Support of Renewed Motion to Dismiss, Docket # 46, Exhs. 9, 11, 14).  It fails to acknowledge that Hananel performed significant work in a leadership role in pursuing casino opportunities in Israel and

---

[5]    The understatement is encapsulated in the Report's statement at 7 that "Defendant <u>contends</u> that his employment with IPI  was entered prior to Dec. 5, 1995," because the use of the word "contends" obscures the voluminous, uncontradicted affidavit and documentary evidence supporting Hananel.  It is <u>Adelson</u> that merely "contends" that Hananel was "helping" (an unspecific, conclusory phrase proposed by Adelson and adopted in the Report (7, ¶ 2)), without supplying the specific, properly supported evidence to support his contention or to show

Jordan, all before December. 1st Hananel Aff., Docket # 12, 74, ¶15; 4th Hananel Aff., Docket # 56, ¶ 3. The Report also acknowledges the indirect admissions by Adelson, who, when examined under oath, used the word "confirm" to describe the role of the December meeting, that the agreement had been reached earlier.

The Report should also have acknowledged Adelson's failure over many years of contract litigation in the Israeli actions to mention this meeting or any other contacts between the employment contract and Massachusetts. 1st Hananel Aff., Docket # 12, 74, ¶ 27 & Exh. 1. It also should have mentioned Roberts' prevaricating language on this issue. He first stated that the meeting was to "discuss the terms" of employment, Roberts Aff., Docket # 16, ¶ 7 and only later sought to use firmer, more self-serving descriptions. Even then, the next two paragraphs of the Roberts Aff. do not disclose any changes or negotiations of any of the terms which, as Roberts admits in ¶ 7, Adelson had told him about, and in ¶ 8, Hananel had told him about. Roberts thus effectively admits that the terms had been "finalized" between Adelson and Hananel earlier. Thus there is no specific evidence that the Dec. 5 meeting added any cognizable term to the previously concluded agreement, and the Report should make this finding. Also, Adelson, in his interrogatory answer No. 2 (Hananel Memorandum in Support of Renewed Motion to Dismiss, Docket # 46, Exh. 3 at 5) fails to assert that he informed Hananel of any business purpose of the meeting. Adelson himself agreed that Hananel's visit to Massachusetts was not in any way at Adelson's request; after Hananel announced that he was coming to the clinic, Hananel asked Adelson for a contact at the clinic, and Adelson had helped set up the appointment. Hananel Memorandum in Support of Renewed Motion to Dismiss, Docket # 46, Exh. 1, Adelson Depo. 353: 15-24. Adelson recalls no other conversation with Hananel on the subject of the purpose of the visit. *Id.* The absence of any oral or written request by Adelson to Hananel, and the absence

---

any actual transition after the meeting.

of any written request or meeting notes by Roberts, the lawyer, are uncontradicted facts which preclude any inference that Hananel came to Massachusetts for the purpose of making a contract. Further confirming that neither Hananel or Adelson had any business purpose in mind for Hananel's trip from Israel, Adelson admitted that he did not pay for Hananel's trip in any way and added that if he had been asked, he would have refused. *Id.* 352:13-16; *see also* Hananel Memorandum in Support of Renewed Motion to Dismiss, Docket # 46, Exh. 2, Adelson's Doc. Resp. no. 12.

Given this acknowledged information (and there is much unacknowledged that should have been considered) there is no basis to regard Adelson's and Roberts' schooled affidavits concerning the meeting as "properly supported," "specific," and non-conclusory, as they must be. Any inference drawn in Adelson's favor on the basis of the affidavits, when so much specific, documentary, and admission evidence contradicts it, must be "far-fetched" and forbidden.

**Roberts' alleged telephone call to Hananel prior to Dec. 5.** The Report cannot properly take Roberts' affidavit allegation at face value, because the call is undated and Roberts does not say that it was prior to the meeting.[6] The Report also unfairly enhances it to favor Adelson, as Roberts expressly admits that he does not know whether or not Hananel's purpose was "primarily to seek a consultation at the Joslin Clinic for his diabetes." Roberts does not even state that there was a non-medical purpose to Hananel's visit, but only that Hananel "agreed on the telephone that we would meet together in my office while he was in Boston." Nowhere does Roberts state that he informed Hananel of any business purpose for that meeting. (The Report at

---

[6]    Hananel points out the telephone call is a complete afterthought for Roberts, as his first affidavit (July 2004, Docket # 16), Adelson's interrogatory answer (February 2005), and Roberts' second affidavit (containing recovered memory of a meeting on Dec. 4)(Adelson's Second Supplementary Brief Exh. E, Docket # 44) failed to mention it. This repeated failure of memory permits the Report, and the Court, to reject this allegation as unsupported.

7 says that Roberts "arranged" the meeting, a word Roberts does not use, and thereby implies that Roberts was telling Hananel to come, which even Roberts does not claim he did.)

**Hananel's Nov. 19 fax to Yurich (7).**  The Report's characterization of this note and its effect on fact-finding is objectionable.  The Report's sentence "Roberts states that this note . . . confirms that Hananel made advance plans to meet with Adelson to discuss his employment with IPI" accepts an unwarranted conclusory statement.  The note does not supply any information about any plans for a meeting with Roberts, a trip to Needham, or any IPI business; its face shows that it was faxed to Ms. Yurich in Las Vegas (702 area code) and it appears that she wrote on it the information a physician would need (date of birth, etc.), as well as a phone number which, if in the 617 area code, has a Boston-Brookline medical area exchange (732) rather than a Needham exchange.  Contrary to the Report at 8, neither the Roberts Supp. Aff. nor the note "suggest" any "goal of Hananel's" other than a medical consultation; indeed, the Report's footnote 5 acknowledges the <u>absence</u> of a "business component" in the note.[7]  Even if Roberts and the note had resulted in a "suggest[ion]," however, that would not be the "specific" "properly supported evidence" that can be used to make a prima facie case.

Finally, the Report itself at 8-9 expressly acknowledges that the meeting with Roberts may not have been "a motivating factor in making the trip to Massachusetts" and tacitly acknowledges, by the absence of a finding, that Hananel was not informed of any business purpose for his trip from Israel to Massachusetts.  From this it should be concluded that he did not voluntarily come here for a business purpose or under circumstances that made it foreseeable that he could be haled into court.

**Evidence of Brill Affidavit.**  The Report cites the Brill Aff. as evidence that Hananel appeared at the Needham office of GWV Travel on Dec. 5.  Hananel has never disputed that he

---

[7]      The Galilee Tours letterhead is consistent with the employment agreement which

paid a call but maintained that it was for social reasons (as Adelson himself claimed in his Israeli

affidavits) and because Adelson was picking him up there.  2d Hananel Aff., Docket # 21, ¶4.

The Brill Aff. confirms the social purpose by noting that Hananel brought her a birthday present;

notably, she does not mention IPI, Roberts, or any business purpose.

   **Business cards (Report at 9).**  The business card requested by Hananel listed five

companies controlled by Adelson, and was designed to identify the services of Adelson and his

companies for marketing purposes.  The business card is not specific evidence of any purposeful

availment by Hananel of a presence in Massachusetts.

   **Payroll timing (Report at 9).**  Although the Report is correct that payroll records show

Hananel's first salary payment (made in September, 1996) to be for the period beginning January

1, 1996, it is uncontradicted that IPI later paid Hananel for his 1995 employment (although the

payment has been in active dispute in the Israeli actions for years). 4th Hananel Aff., Docket

# 56, ¶ 2.

   **Summary and conclusion (9).**  The Report's recommended findings concerning the Dec.

5 meeting are objectionable for the reasons stated above, especially the undisputed facts of

Adelson's employment of Hananel in Israel and his activities in performance before the

December 5 visit.  The Report states that Hananel "began his transition into the job" after Dec. 5

and had been "filling in or helping plaintiff out" before then, but these phrases are inconsistent

with the uncontradicted evidence, and are unwarranted inferences and based on conclusory

allegations by Adelson, who has not denied that every term of Hananel's employment was

decided upon, and performance begun, before December.

   **3.    HANANEL'S EMPLOYMENT ACTIVITIES RELATED TO MASSACHUSETTS (9-
          12).**

   The uncontradicted evidence (some of which the Report includes) shows that Hananel's

_____

recognized that Hananel would also do some work for Galilee Tours.

contacts during his employment were <u>not</u> part of an actual course of dealing in which Hananel purposely availed himself of the privilege of doing business in Massachusetts.

**Contact between Adelson and Hananel (10).**  The Report at 10 confirms that Adelson has <u>failed</u> to show that the agreed control of IPI's business by Adelson and numerous communications between them were jurisdictional contacts with Massachusetts.[8]  The Report should also note that Adelson's close control is inconsistent with his belated efforts to show that the O'Connor contacts were jurisdictional, confirming Hananel's evidence that O'Connor took direction from him and Adelson and did not give any. 6th Hananel Aff., Docket # 71, ¶¶ 4-6 & Exh. 2.

**O'Connor and funding (10-12).**   The statement from Adelson's brief quoted in the Report at 10 concerning <u>Adelson's</u> "very close control" directly <u>contradicts</u> any notion of control by O'Connor or Roberts or anyone else in Massachusetts.[9]  The Report cannot fairly draw inferences of control or direction by O'Connor in light of this prevarication.  The Report at 10 summarizes the belated[10] O'Connor testimony re communications between Hananel and Needham and correctly notes that O'Connor claims nothing more than a <u>funding</u> role for investments and operating expenses.  The Report should not adopt the conclusory assertion, at the end of this summary (page 11), that the O'Connor affidavit and documents resulted in "control."  This objectionable conclusion is fundamental in the jurisdictional context, because pure funding, without any direction or control from Needham of the investments or the operations which Hananel controlled (at Adelson's direction) <u>in Israel</u>, which is the case here,

---

[8]     Adelson initiated all the calls. 5th Hananel Aff., Docket #64, ¶ 10.

[9]     Adelson's lawyers made this assertion <u>before</u> they had any idea of asserting evidence from O'Connor.

[10]    The Report at 11-12 notes O'Connor's sworn testimony in Israel that Hananel made bookkeeping decisions in Israel, and at 12 correctly quotes Hananel's testimony that neither Adelson, IPI, or anyone else had ever put forward O'Connor's activities as jurisdictional contacts in Israel or in this action before the hearing on the motion, another uncontradicted fact which

means that Hananel did not purposely avail himself of a presence in Massachusetts, and that the location of the bank accounts was purely fortuitous. Fortuitous and non-purposeful contacts do not permit jurisdiction. Taking uncontradicted facts into account, there must be a finding that Hananel never contemplated or received any control over his activities from Massachusetts.

**Andover meeting (12).** The Report at 12 cites to Roberts' late affidavit concerning the Andover meeting, and tacitly confirms (by the absence of a finding) that there was <u>no Massachusetts business purpose</u> for Hananel's visit. The uncontradicted testimony of Hananel concerning the "business" that was conducted at Andover shows that it was Israeli business for an Israeli company (iMD Soft) examining a deal for business in Germany and Israel. 5th Hananel Aff., Docket #64, ¶ 14a, 14c. No person at that meeting had any notion of a relationship to Massachusetts,[11] and use of the Andover meeting to make a prima facie case of jurisdiction is unwarranted.

### 4.    ISRAELI LITIGATION (12-13).

The Report at 12-13 correctly notes the uncontradicted facts, supplied by Hananel, that Adelson and IPI are both engaged in litigation in Israel concerning the identical subject matter of the present action, Hananel's employment contract (including the Macau claim), litigation which commenced and has proceeded before Adelson filed the present action. 1st Hananel Aff., Docket # 12, 74, ¶¶ 25-26. Other relevant uncontradicted facts are absent from the Report, however. Adelson and IPI actively chose the Israeli forum to litigate this contract. *Id.* At no time has either entity claimed in Israel that any jurisdiction over Hananel existed in the United States, or that Israel was not the proper forum for both parties to determine contract issues. (Adelson and IPI have never claimed in Israel that the contract was formed anywhere but Israel, that a third

---

compels the conclusion that the assertion is conclusory and not properly supported.
[11]    As noted at page 8, above, Adelson had forbidden Hananel from doing any United States business, and had barred Roberts from doing any business.

person (Roberts) was involved, that Massachusetts was involved in the contract and have never asserted any business activities by Hananel in the United States.).  Adelson has admitted that "the place of the contract formation or negotiation have [sic] not been a subject before any Israeli court."  Int. Ans. 7, Hananel Memorandum in Support of Renewed Motion to Dismiss, Docket # 46, Exh. 3.  Adelson therefore does not contradict evidence that the contract has been treated by all parties in Israel as a contract made in Israel and subject to Israeli law, confirming that Hananel has not sought the protections or benefits of Massachusetts law.

It is uncontradicted that Adelson forbade Hananel from doing any business in the United States. 5th Hananel Aff., Docket #64, ¶ 8; Hananel Memorandum in Support of Renewed Motion to Dismiss, Docket # 46, Exh. 4, Adelson Aff. in Israel ¶ 29.  (Adelson also forbade Roberts from doing any employment business on behalf of IPI.  5th Hananel Aff., Docket #64, ¶ 16 & Exh. 1.)  Adelson has stated under oath that the reason he filed the present action was to bring the Macau claim to the United States, and that he expects Hananel to run out of money as a result.  Hananel Memorandum in Support of Renewed Motion to Dismiss, Docket # 46, Exh. 1, Adelson Depo. 88: 14-22, 231: 15-20.

Adding the uncontradicted evidence to the Report's bald descriptions of Adelson's Israeli litigations shows that Adelson has chosen the Israeli forum, that the Macau claim which is the subject of the present action is being actively litigated there, and that he has filed the present duplicative action to harass Hananel.

## 5.    PLAINTIFF'S CLAIMS (REPORT AT 13).

The Report at 13 summarizes Adelson's claims, and should also note the uncontradicted evidence that Adelson has previously chosen and accepted the Israeli forum for all claims arising under the employment agreement with Hananel, i.e., for claims identical with his Count I.  This identity is important to the Gestalt factors discussed below.

III.    **OBJECTIONS TO RECOMMENDATIONS.**

A,    **OBJECTION TO STANDARD OF DECISION.**

At pages 13-14 the Report sets forth the standard of decision.  Notably absent from this explication is the requirement to "add to the mix facts put forward by defendants, to the extent they are uncontradicted." *Mass. School of Law at Andover v. American Bar Assn.*, 142 F.3d 26, 34 (1st Cir. 1998).  This absence is fatal to the Report's recommendation.

The Supreme Court, holding that a contract alone is insufficient to establish minimum contacts, pointed to the additional factors a plaintiff has the burden of proving.  The Report did not address substantial uncontradicted evidence on these factors but should have, because they demonstrate that Adelson has not met his burden.  The Supreme Court said:

> . . . . It is these factors–prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing–that must be evaluated in determining whether the defendant purposefully established minimum contracts within the forum.

*Burger King Corp. v, Rudzewicz*, 471 U.S. 462, 478-479 (1985).  Uncontradicted evidence shows that all of the factors listed by the *Burger King* Court militate against jurisdiction.  The "prior negotiations" took place in Israel, as Adelson admitted and Roberts does not contradict; the "contemplated future consequences"–the entire business purpose of IPI, to find investments– would occur in Israel or elsewhere outside the United States, and the only operating office and paid employees would be there; Israeli law would apply; Israeli taxes, national insurance, pension, and education funds would be paid; the "terms of the contract" were Israeli compensation and Israeli performance, with no compensation or performance contemplated in Massachusetts; and the "actual course of dealing" in IPI's investment business between Adelson and Hananel has occurred primarily in Israel but in any case outside Massachusetts.  (The

bookkeeping function of the Needham personnel was a ministerial adjunct and not a primary

business function of IPI.)

### B.    RECOMMENDATIONS AS TO COUNT I: DECLARATION OF RIGHTS UNDER THE EMPLOYMENT CONTRACT.

#### 1.    Hananel did not "transact business" in Massachusetts.[12]

The Report correctly notes that it is required to apply the Massachusetts long-arm statute,

under which Adelson has the burden of making a prima facie case that Hananel "transacted

business" in Massachusetts.  The facts before the Court show that no such case can be made.  In

every case cited by the Report at 15 and Adelson as precedent, the defendant voluntarily

approached a Massachusetts resident seeking money or services from him, her, or it on behalf of

a business.[13]  The Court of Appeals for the First Circuit has held that "purely incidental contacts"

where "no requirement in any of the agreements that performance take place in Massachusetts"

or where "plaintiff decided to conduct some administration . . . in Massachusetts" "cannot be the

basis for personal jurisdiction against [defendant] where [defendant] reasonably assumed it

would be doing business with [plaintiff] in [the foreign jurisdiction] and did in fact conduct most

of its business there."  *Lyle Richards Int'l, Inc. v. Ashworth, Inc.*, 132 F.3d 111, 113 (1st Cir.

1997) (citations omitted).  In the present case, it is undisputed that Hananel sought an

employment agreement with Adelson and his Israeli-registered company, IPI, which was not

registered to do business in Massachusetts and had no business purpose there.  Adelson and IPI's

---

[12]    Even if the construction of "transacting business" extends to the limits of due process, and the applicable standards become Constitutional standards, the absence of any precedent finding that an employee like Hananel "transact[ed] business" illuminates the absence of relatedness, purposeful availment, and fair play and substantial justice in imposing jurisdiction on him.

[13]    Sending letters of guaranty, figurines for sale, solicitation of law school tuition, sending business agreements, sending threatening letters.

decision to perform some administration in Massachusetts is insufficient. Hananel's activities never affected the income or expenses of any Massachusetts domiciliary (as Adelson, the only one affected, was a domiciliary of Nevada). His presence in Massachusetts was never voluntary for business purposes of IPI. No precedent is cited in which a thoroughly foreign-based employee like Hananel of a company registered (and taxed) in his country of residence) has been subject to personal jurisdiction in the United States because his contract for employment was discussed briefly (as Adelson contends) in the United States or because the foreign company that employs him is funded from the United States.

The statement on pages 15-16 that Hananel "entered into" the contract in Massachusetts is not a phrase ever used by Adelson or Roberts, who, as shown in the summary of their testimony at p. 9 above, prevaricated about the "entry" into the contract, admitting regularly that they were discussing terms previously determined (and failing to state "specific facts" sufficient to support a finding that any negotiation occurred in Massachusetts). Indeed, the Report tacitly admits that "entered into" is not what happened, because it also uses the word "formalized." The Report at 16 ambiguously states that "some or many" terms were discussed before Dec. 5 (unfortunately not acknowledging the uncontradicted testimony of Hananel that <u>all</u> were discussed in Israel before then), and suggests that on Dec. 5 there was "nonetheless a further negotiation of the contract." The Report, however, like Adelson, <u>never suggests a single substantive term that was "negotiated" in Massachusetts</u>, tacitly acknowledging the <u>absence</u> of specific evidence that any such Massachusetts-negotiated term existed. Roberts' testimony that he asked Hananel if Hananel wanted a writing cannot fairly be called a negotiation of a substantive term of a contract. Moreover, it is uncontradicted that Hananel and Adelson had previously conducted themselves according to the contract in Israel without insisting on a writing, showing that he and Adelson had agreed that an oral contract was sufficient.

No testimony says that the alleged handshake "cement[ed]" the contract, or that the contract did not exist independent of the handshake. Even if the alleged handshake is considered, the *Carlson* case does not make Hananel's handshake a jurisdictional contact. In *Carlson* a Massachusetts plaintiff agreed to construct a building for a Vermont defendant, and the Vermont defendant agreed to pay for it, and came to Massachusetts to sign the contract (which was negotiated in letters between them). 308 Mass. 103-107, 107 ("the defendant's contacts . . . had substantial commercial consequence in this state"). To apply the *Carlson* holding to the present case, Hananel would have had to agree to make substantial payments to or receive substantial services from a Massachusetts resident, something neither he (nor any foreign branch employee of this kind) ever did.

At page 17 the Report again goes too far in finding that "submitting requests, budgets, and expenditure reports" and "obtaining funds for IPI's Israeli branch" from persons in Massachusetts was a transaction of business by Hananel. All of the budgets, expenditures, and investments were for business in Israel, not Massachusetts. Most foreign employees of multinational corporations may submit budgets, and their branches may receive operating and investment funds, but none expect to be subject to personal jurisdiction in the place they send their budgets or funding needs. *See Lyle Richards*, *supra,* 132 F.3d at 113 (decision to administer foreign performance does not create jurisdiction). The *Workgroup Technologies* case cited in the Report at 17, like the other citations on this page repeated from the previous one, involved a defendant seeking payment to itself (or in other cases services) from a Massachusetts resident. Hananel was paid (and taxed on) his salary and expenses from the Israel branch of IPI (which paid Israeli taxes and benefits on the salary). Neither IPI nor Hananel was subject to the laws of Massachusetts in this regard. It cannot be concluded that Hananel transacted business in Massachusetts, and the plaintiff's prima facie case fails.

2.     **Due Process Analysis**

1.     **Claim must arise out of or Relate to Forum Contacts (Report at 17).**

The Report at 16-17 recognizes that contact with Massachusetts by Hananel in a contract case must be "instrumental" in the formation of a contract, such that the contract would not have been formed "but for" the contact. The Report states that Hananel performed, in Massachusetts, the "literal act of forming the contract itself." This conclusion, however, as has been seen, ignores the uncontradicted evidence that Hananel and Adelson reached an oral employment agreement in Israel and they both began to perform it before December 5. At no time have Roberts or Adelson stated that the December 5 meeting was necessary to the formation of the contract; indeed, Adelson has stated the contrary, insisting that he never gave Roberts authority to act for him. The authority cited in the Report in fact confirms the non-necessity of the meeting; in *Workgroup Technologies* the court, at 112, relies on "telephone calls, faxes and e-mails to [plaintiff] in Massachusetts" which were "crucial to the formation of the contract in dispute." The calls, faxes, and e-mails are described at 107-108, and include written negotiations, a final contract, and executions. No <u>other</u> facts leading to the formation of the contract existed; obviously these were crucial. The contrast with the present case is stark: uncontradicted evidence of prior activities in Israel, including oral agreements, performance by both parties, the announcement of Hananel's position by Adelson, and the granting of authority over bank accounts, all occurred in Israel. Any inference which elevates the alleged Dec. 5 meeting to being "crucial," "instrumental," or "but-for," is far-fetched and must be rejected. (The Report does not acknowledge the uncontradicted facts that Adelson engaged in three–now two after consolidation–contract litigations in Israel, all arising out of this contract, without once claiming any formation, arising out of, or any other contact with Massachusetts. This failure by Adelson is uncontradicted evidence that he himself for many years regarded the Massachusetts

visit as non-instrumental and the Israel contacts as sufficient.)  Adelson has failed to make a

prima facie case that his contract claim arose out of or related to the Dec. 5 meeting.

The same is true for the Andover meeting and the O'Connor communications.  Had

Hewlett-Packard, the parent of the German company with which iMD Soft was negotiating,

summoned the parties to Europe or another State, the same business of negotiation could have

been done; that it was in Massachusetts was not crucial, instrumental, or "but-for" to the gist of

the matter.  Indeed, the Massachusetts presence was purely fortuitous and no person says

otherwise, i.e., that Massachusetts had an essential relationship to the deal consideration.  The

exercise of jurisdiction over a person whose contact with the forum consists of attending a

meeting to discuss a deal having no relation to the forum is unreasonable.  Such a holding would

threaten international commerce by contradicting the legitimate expectations of thousands of

employees of foreign branches of multinational firms that they may attend conventions and

headquarters meetings without subjecting themselves to U.S. jurisdiction.

As to the O'Connor communications, on page 16 the Report suggests that there was

"control" from Massachusetts.  As has been discussed, no evidence of "control" from

Massachusetts has been presented, and uncontradicted facts show all control to be from

elsewhere.

## 2.    Purposeful Availment (Report at 19).

The Supreme Court has explained that contacts cannot meet the purposeful availment

standard if they are "random, fortuitous, or attenuated."  *Burger King*, 471 U.S. at 475.  One test

the First Circuit has used "to identify deliberate, as distinguished from fortuitous, contacts with

the forum" is the "transacting business" test, which is "importantly informed by ascertaining

whether the nonresident party <u>initiated or solicited</u> the business transaction in Massachusetts."

*Lyle Richards Int'l, Inc. v. Ashworth, Inc.*, 132 F.3d 111, 112-113 (1st Cir. 1997) (emphasis

added).  Here, it is undisputed that, even if a business transaction occurred in Massachusetts on Dec. 5, 1995, discussion was initiated and the employment was solicited <u>in Israel</u> during the months preceding December.

The Report cites the requirement that Adelson show that Hananel's contacts were "purposeful availment of the  privilege of conducting activities in [Massachusetts], thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's court foreseeable."  Report at 19, citing *United Elec. Workers*, 960 F.2d at 1089.  Here, Hananel conducted no business activities in Massachusetts (or indeed anywhere else) for which he sought the protection of Massachusetts law.  His employment was with an Israeli business entity, subject to Israeli laws (as Adelson has admitted in the litigations), which governed Hananel's and IPI's taxes, salary payments, and every other attribute of an employment contract.  His Andover visit had nothing to do with invoking Massachusetts law, benefits, or protections for himself.  The O'Connor communications were for the purpose of instructing the transmission of funds approved by Adelson for expenditures and investments in Israel and elsewhere, and none of the expenditures or investments were subject to benefits or protections under Massachusetts law.  Any inference would be farfetched; as before, Adelson himself has recognized this during years of litigation in Israel where he has never sought the application of any law other than Israeli law.

The Report at 19 addresses "voluntariness" and finds that the Dec. 5 visit was voluntary. The Report states that "Hananel sought and obtained employment with IPI of his own volition, and while in Massachusetts negotiated and executed his employment contract."  This statement tends to <u>conflate</u> the undisputed voluntariness of the entering of employment (i.e., the phrase before the comma in the Report) with the <u>involuntariness</u> of the alleged Dec. 5 Roberts meeting. As described above (page 9) no witness for Adelson has stated that Hananel volunteered to come

to Massachusetts for the purpose of forming a contract, or even that he was informed of such a purpose at any time before leaving Israel and arriving in Boston; it is undisputed that his purpose was medical.  The Report cannot conclude that the alleged Dec. 5 meeting was voluntary in this sense.

The Report at 20 again lists the contacts, concluding that they render Hananel's presence before a Massachusetts court foreseeable.  But no case authority holds that an employee of a foreign branch, every attribute of whose employment contract is governed by Israeli law, as admitted by Adelson in the Israeli litigation must foresee being haled into a Massachusetts court. The Report at 20 again summarizes its argument, but ignores the uncontradicted facts that (1) Hananel is an employee of a company, established and registered in Israel by a United States citizen for the purpose of doing business in Israel and not in the United States (indeed it has no paid U.S. employees, no operations, and no investments in the U.S.); (2) that any funding of operations and investments in Israel and elsewhere was according to control and direction from outside Massachusetts; and (3) that the "officers" of IPI, Roberts, O'Connor, and the Treasurer, were explicitly excluded by Adelson from making any business decisions.

### 3.    Factors Of Reasonableness.

*Ticketmaster, supra,* holds that a minimal showing of relatedness and purposeful availment can be "trump[ed]" by a strong showing of unreasonableness under the Gestalt factors. 26 F.3d at 210.  The Report objectionably omits substantial evidence and downplays the factors. A full analysis shows that all factors weigh against the exercise of jurisdiction in Massachusetts.

### a.    *The Report understates Hananel's burden of appearing.*

The Report at 21 does not directly address the burden of distance, which, *Ticketmaster* notes, has been called "always a primary concern" by the Supreme Court.  26 F.3d at 210, quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980).  *Ticketmaster*

held that haling a defendant from California was so burdensome as to have this factor weigh

"heavily in the jurisdictional balance" and listed cases involving Japanese, Filipino, Swedish,

and British defendants, among others. 26 F.3d at 210. In reasoning particularly apposite to the

present case, the Court of Appeals said:

> One reason that the factor of inconvenience to the defendant weighs heavily in
> the jurisdictional balance is that it provides a <u>mechanism through which courts
> may guard against harassment</u>. It is firmly settled that a "plaintiff may not, by
> choice of an inconvenient forum, 'vex,' 'harass,' or 'oppress' the defendant by
> inflicting upon him expense or trouble not necessary to his own right to
> pursue his remedy." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508 (1947)
> (citations omitted). And although vexatious suits are more frequently
> dismissed under the doctrine of *forum non conveniens*, we believe that the
> reasonableness analysis required by the third prong of the due process inquiry
> must be in service to the same ends.

26 F.3d at 211 (emphasis added). Here, not only is distance from Israel extremely burdensome,

but Adelson is actively "pursu[ing] his remedy in the prior-filed pending actions in Israel.

The Report at 21 fails to recognize an important special and unusual burden in the

uncontradicted facts. While addressing Hananel's relative proficiency in English, the Report

ignores the (uncontradicted) enormous burden of translating the tens of thousands of Hebrew

documents which both parties–Hananel and Adelson–have already submitted to the Israeli court

in the contract actions there over the years. 1st Hananel Aff., Docket # 12, 74, ¶ 26. The burden

of translating thousands of documents for a U.S. court contrasts with the absence of any such

burden in the <u>bilingual</u> Israeli courts.

The Report also misses the point of the special and unusual burden caused by Hananel's

blindness and physical restrictions imposed by his diabetes, an unstable medical condition.

Hananel has traveled abroad under these restrictions for short vacations, family reasons and to

attend musical concerts (the principal aesthetic pleasure of a blind person), but on none of these

occasions has he been put to the tasks of absorbing and responding in writing to multitudinous

documents, so essential to the conduct of litigation, tasks which he cannot perform without both

mechanical and personal help of readers. 1st Hananel Aff., Docket # 12, 74, ¶ 3.  It is uncontradicted that the extraordinary costs of such help (which he has received from family members in the Israeli litigations) would be a "special or unusual burden" here.  The Report cannot fairly equate a concert, a memorial service, or a short visit with and to friends with the conduct of litigation for days, weeks, and months in a distant forum.

The Report's citation to *Pritzker* masks the reasoning of that case, in which the court recognized, in considering what will amount to a "special or unusual burden," that "most of the cases that have been dismissed on grounds of unreasonableness [of the burden of appearing] are cases in which the defendant's center of gravity, be it place of residence or place of business, was located  at an appreciable distance from the forum" 42 F.3d at 64 citing *Pleasant St. I*.  In the present case, not only is Hananel's only residence and place of business in Israel, thousands of miles away, but Adelson has a residence in Israel, travels in his private plane, and both he and IPI have places of business there.   (The *Pritzker* court, 42 F.3d at 64 also refers to *Burger King*, which found substantial, continuous, controlling "economic activity" in the distant forum, in contrast to the present case, in which neither Hananel, IPI, or Adelson had relevant economic activity in Massachusetts.)

When the uncontradicted burdens of distance, translation and physical disabilities are considered, the Gestalt factor weighs heavily against jurisdiction.

## b.    *Interest of Massachusetts.*

The First Circuit Court of Appeals, in *Ticketmaster*, has warned that the interest of the forum is "much diminished" if plaintiff

> in fact filed suit primarily to retaliate against [defendant's] role [as lawyer for a claimant] in the California litigation rather than to right an independent wrong–and as previously mentioned there are some clues in the record that could lead to such a conclusion–the Commonwealth [of Massachusetts'] interest would be much diminished.

26 F.3d at 211.  Here, Adelson's contract claim is not independent but purely duplicative of

litigation in Israel, and he has testified that he sought to duplicate the Macau claim here and

expects to exhaust Hananel financially, suggesting the kind of retaliation that would substantially

diminish any interest Massachusetts would have.

The Report at 22  clearly acknowledges that "neither a Massachusetts citizen nor a

Massachusetts corporation are parties to this litigation."  The cited *Carlson* case, 380 Mass. at

207, shows that more than a passing connection is required.  The *Carlson* court expressed

interest in <u>both</u> "providing a forum for its residents" (as the plaintiff was a company centered in

Massachusetts) and in "enforcing business transactions consummated within its boundaries."

*Carlson* does not stand for the proposition that the consummation of a business transaction alone

fulfills this Gestalt factor.  The Report cannot fairly fill the gap by a reference to the IPI officers

in Needham.  Uncontradicted evidence shows that they were not "key" to the business in any

sense, as all business was in Israel, and all decisions were made by Hananel and Adelson (who in

fact forbade the Needham personnel from making any business decisions).  None of these

personnel were paid any salary by IPI.  Nor can the mere existence of bank accounts provide an

"interest" for Massachusetts, as these accounts bear no relation to the claim at issue, and could be

added to or paid out with affecting any person or entity in Massachusetts.

### c.    *Adelson's interest in obtaining relief.*

The third factor considers Adelson's interest in obtaining convenient and effective relief.

Adelson cannot argue that Massachusetts is more <u>convenient</u> to him, because he has residences,

an office, substantial business interests, and lawyers in Israel and travels there regularly, often

and for long periods.  Adelson cannot claim that Israel will not provide effective relief, because

he himself chose the Israeli forum for an action and counterclaims in his employment dispute

with Hananel (the 2002 suit), and is actively involved as a defendant in the 2001 and 2003 Israeli suits (now consolidated) concerning the Macau claim. He will have to appear in Israel in these suits already. The Court should conclude, like the *Ticketmaster* court, that "the plaintiff's <u>actual</u> convenience seems to be at best a makeweight in this situation." 26 F.3d at 211(emphasis in original).

The Report states that Adelson's choice of Massachusetts as a forum is to be given weight. This statement, however, ignores that, before Massachusetts, Adelson chose <u>Israel</u> as a forum for filing his own contract claim against Hananel and for defending Hananel's contract claims, without suggesting any grounds for a Massachusetts forum. The Report's discussion of *Pritzker* is incomplete here, as well, as the court regarded it as highly significant that the individual plaintiff would "face an enormous inconvenience that might result from forcing [him] to sue elsewhere–theoretically, in every jurisdiction in which a [defendant] is located–<u>despite ongoing litigation in a forum-based court</u>." 42 F.3d at 64.   In the present case, Adelson enjoyed, and had made no effort to change for years, his position as both defendant and claimant in the ongoing Israeli litigations. This Court should recognize that Adelson is acting radically against a rational view of his convenience by creating additional duplicate litigation, and must infer that Adelson has an ulterior motive to harass Hananel. Adelson is entitled to no deference, but should instead be dissuaded from belated forum-shopping.

### d. *Interest of judicial system.*

The fourth factor focuses on the judicial system's interest in obtaining the most effective resolution of the controversy. Because pending, first-filed litigation of the same issues between the same parties is proceeding in Israel, relying in part on Israeli witnesses and in great measure on thousands of documents submitted by both parties in Hebrew, while others are in English, and oral testimony can be given in English and Hebrew without the necessity of translation, the only

truly effective resolution of the controversy will be in Israel, not Massachusetts.  Adelson's own

presence in Israel and availability for trial there is foreordained by his continuous and systematic

contacts and his own choice to conduct litigation against Hananel there.  Dismissing the present

complaint in favor of the pending action in Israel, where both Adelson and Hananel have

purposefully and foreseeably availed themselves of the benefits of the forum, will provide the

most efficient and  effective resolution of this controversy.

      The Report appears to recognize at 22-23 that the interest of the judicial system is

completely one-sided against jurisdiction, as it is uncontroverted that the Israeli litigation

between the same parties on the same claims is well advanced and raises a clear possibility of

conflicting judgment.  When the Report at 23 says this factor is "insufficient to tip the

constitutional balance on the facts of this case, especially when other more targeted approaches,

if appropriate under the applicable law, such as abstention, or forum non convenience, could

directly address the potential problem of conflicting judgments . . .", however, it goes too far. As

the First Circuit Court of Appeals stated in the passage from *Ticketmaster* quoted above, the

application of reasonableness factors is not to be suspended merely because the defendant has a

strong argument for *forum non conveniens* dismissal.  26 F.3d at 211 (quoted *supra* at 24).  The

facts on this factor are one-sided in favor of no jurisdiction.  As the other reasonableness factors

also favor dismissal, the balance should not be measured here but on consideration of all of them.

### e.    *Substantive social policies.*

      The Report at 23 suggests harm to Massachusetts where none exists.  There is no

"business operating here" to receive harm–IPI has no paid employees in Massachusetts, no

investment projects, and no tax payments; all are in Israel.  There are no "business activities in

Massachusetts" from which harm to Adelson could arise; all such activities are and have been in

Israel.  Indeed, the Report at 23 acknowledges again that no Massachusetts citizen or corporation

is a party.  Hananel's activities–the alleged Dec. 5 meeting, the bookkeeping communications, the Andover visit–were completely meaningless as far as Massachusetts social policies are concerned, and in any case are so minimal that no impact on this state can be imagined.  The absence of any significant social policy interest requires this Gestalt factor to be weighed against jurisdiction.

## II.  THE REMAINING CLAIMS.

Hananel does not object to the Report's recommendation as to the remaining claims.

### Conclusion

WHEREFORE, the Court should allow Hananel's Motion to Strike and his Motion to Dismiss for lack of personal jurisdiction.

Dated: November 10, 2005                               MOSHE HANANEL
                                                       By His Attorneys,


                                                        _/s/James A.G. Hamilton_____

                                                       James A. G. Hamilton (MA Bar # 218760)
                                                       PERKINS, SMITH & COHEN, LLP
                                                       One Beacon Street
                                                       Boston, MA  02108
                                                       617.854.4000

ObjPropFindRecc-31216-1