UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

SHELDON G. ADELSON,
           Plaintiff,

v.

MOSHE HANANEL,
           Defendant.

Docket No. 04CV10357RCL

### PLAINTIFF'S RESPONSE TO THE DEFENDANT'S OBJECTIONS THE MAGISTRATES REPORT AND RECOMMENDATIONS

This memorandum will not seek to pick up every pellet from the Defendant's scatter gun attack on the very careful and meticulously accurate recommendations and report of the Magistrate. It will address the objections by the categories in which the various points of the Defendant can be conveniently and logically grouped.

### Argument

The procedural objections of the Defendant to the decision of the Magistrate to consider the O'Connor and Robert late filed exhibits are insubstantial because the Magistrate acted well within his discretion and gave the Defendant full opportunity to respond and engage in additional discovery which were opportunities the Defendant did not take. The Defendant was not prejudiced.[1]

---

[1] It should be noted that in his answer to interrogatory #1, asking for the basis of the plaintiff's claim that Massachusetts had personal jurisdiction, Mr. Adelson, describing the December 5, 1995 meeting stated, "Mr. Hananel and I discussed and agreed that part of his job would be to stay in close contact with me to discuss business matters and take direction from me." Hananel stated in an affidavit filed in Israel that he and Adelson spoke nearly everyday concerning IPI business matters. Hananel was
                                                                                                                        (Continued…)

The Magistrate had asked the litigants to provide additional documentation concerning the meeting at which the contract of employment of the Defendant Hananel was formed. In the course of the search for additional documents, Plaintiff's employees of the IPI office in Needham discovered the additional documents at issue. The important documents that were found were communications and other documents that were sent from and to O'Connor, the Chief Financial Officer of IPI and other Adelson affiliated business entities. The other documents of importance were the hand written notes of Mr. Roberts, Corporate Counsel of IPI of a meeting that he attended in Marlboro, Massachusetts with the Defendant. That meeting was with representatives of Digital Equipment Company's subsidiary. The purpose of the meeting was to negotiate a business relationship between a company in which IPI had a substantial financial interest and Digital Equipment subsidiary. Hananel's responsibility was to oversee and protect IPI's interest.

The O'Connor documents support the Magistrate's finding of personal jurisdiction, contrary to Hananel's absurd assertion that they were not disclosed earlier because they were totally irrelevant to the jurisdictional issue. They are highly relevant in that they show that the agreement resulted in and contemplated close control and a relationship between Hananel and IPI's home office in Massachusetts.

1.  **Hananel's Argument That The Magistrate Impermissibly Failed To Consider And Give Weight To So Called Uncontradicted Facts Is Untrue Because The Court Did Consider All The Uncontradicted Facts, The Fact That Hananel Claimed Uncontradicted Was Very Much In Dispute And Some Of The Facts That Hananel Asserts Were Uncontradicted In Material To The Jurisdictional Issues.**

---

(Continued...)

then trying to persuade an Israeli court that Adelson exercise pervasive control over the IPI branch office and Hananel.

A. **Hananel's Employment With IPI Contemplated And Was Characterized by the Exercise of Close Control Over Hananel and the IPI Branch In Israel And Personal Contacts With Massachusetts For Business Meetings**

The essence of Hananel's argument that Magistrate Judge Sorokin erred is that no agreement was consummated on December 5, 1996 and that Hananel had no activities in Massachusetts significantly related to his employment. Hananel's assertions of what the Magistrate's report does not contain, and his assertions of factual matters are consistently misleading and follow the pattern of disingenuousness that has characterized his representations to the Court. These have been laid out for the court in the plaintiff's Second Supplementary Brief filed with this Court on or about April 29, 2005. The Court may find it useful to review this brief, because Hananel makes the assertion in his objections to Magistrate Judge Sorokin's Report and Recommendations that "Here, Hananel conducted no business activities in Massachusetts (emphasis supplied) for which he sought the protection of Massachusetts Law." (Hananel objections, p.20) Compare this statement to the following statement made twice in an affidavit that Hananel filed in the Israeli Court:

> *Throughout the years of my work for Interface and Adelson, I was required to take, as part of my work for Interface and Adelson, many (dozens of) trips to various countries around the world. At times, I traveled also with Interface employees (Raviv, Efrat, Harry Kromanchero, Tom White), and at times I traveled with employees of the companies in which Interface had holdings (Phyllis Gottlieb, Edo Schoenberg, Alon Haike, etc.). Adelson himself, and sometimes also members of his immediate family, also took part in a large part of the said trips (more than twenty trips). Thus, for instance, Adelson and I were at ... (k) United States – for meetings with Adelson in New York, Boston and Chicago. Contrary to the statements made in the Complaint, these were not meetings on personal matters*". (¶¶8, 65 Affidavit of November 7, 2004, filed in Israeli Labor Court Attached to this Memorandum) (emphasis supplied)

Uncontradicted is the fact that one of the meetings in Massachusetts was an important meeting with Hewlett-Packard and one of its subsidiaries. Hananel seeks to minimize the

BOS\140864.1

importance of this meeting by asserting it was to discuss an important deal abroad. Even were that true, it would not serve to attenuate the fact that Hananel's job with IPI required him to attend and participate in this negotiating meeting in Massachusetts. All the Hewlett-Packard (including its subsidiary's, Agilent) participants were based in Massachusetts, and the purpose of the meeting was to try to negotiate a strategic alliance with iMD, a matter of great importance to IPI. The meeting was important enough for Paul Roberts, corporate counsel of IPI to attend with Hananel. Among the participants was Harry Comanchero, the sales manager for U.S. sales of iMD.[2] The subject of the negotiations was clearly not limited to foreign matters as Hananel—without any support—carelessly asserts.

Hananel asserts that among the facts that the Magistrate did not weigh that were supposedly uncontradicted are that IPI's operating office was in Israel and Hananel was not to develop prospects in the United States. He is incorrect and in any event the fact that Hananel was not to develop contacts in the United States is simply off the point. The Needham, Massachusetts office was IPI's principal place of business and its headquarters. It exercised, the Magistrate found, financial control from the Massachusetts office over its Israeli branch. Money transferred to Israel to fund the operations of the branch office in Israel came from Massachusetts financial institutions. Hananel was the general manager of IPI's Israel branch. There was ample documentary evidence supporting Mr. O'Connor's affidavit (to which Hananel objected, but chose not to explore with additional discovery or challenge with contrary evidence) that established these facts.

Hananel further argued that the Israel branch office of IPI was the only office with a paid employee. IPI's home office was in Needham, O'Connor was paid for his work as a CFO of IPI

---

[2] Roberts affidavit of August 5, 2005 ¶¶ 10-14

and the Needham office exercised tight control particularly over finances of the IPI branch. Even if there were no employees paid for their work for IPI, that, were it true, is totally irrelevant. What was relevant was that Hananel was subject to the closest supervision and control in financial and other matters by officers acting for IPI.[3] There is no question that the IPI office in Israel under Mr. Hananel was simply a branch office of IPI.

      B.    **The Plaintiff Has Established, Certainly Sufficiently To Meet The Prima Facie Standard of Proof, That The Employment Contract Was Formed At A Meeting In Needham, Massachusetts On December 5, 2005. Hananel's Claim That The Magistrate Ignored Uncontradicted Evidence Is Belied By The Record.**

---

[3]    O'Connor Affidavit of August 4, 2005, ¶¶9-12 "As noted, IPI maintained such control over Mr. Hananel that he would be required to request funds for normal operating expenses and investments, often on a month by month basis or for specific expenses. An example of this practice is attached as **Exhibit 2** showing a request for Mr. Adelson's approval for the transfer of $1,000,000.00 for an investment by IPI.

    1.    The money for IPI funding came from Mr. Adelson's personal accounts maintained or administered in Massachusetts, or from the IPI bank accounts in Massachusetts.
    2.    IPI's Needham based stewardship of Mr. Hananel included such relatively mundane matters as the calculation of a 401(k) replacement benefit for an employee of a company in which IPI had invested. (**Exhibit 3**).
    3.    Hananel was supposed to report to us on a regular basis on how monies were spent as well as the activities in which IPI had become involved. I have attached in **Exhibit 4** copies of such communications. These documents are only a sample of these communications.
    4.    Our involvement in financial and accounting matters required that I or a member of my staff often dealt directly with the Israeli accountants on accounting matters.
    5.    We also required that IPI in Israel follow certain protocols and procedures in its bookkeeping. See **Exhibit 5** for an example."

Hananel suggested that he was subject to the control described in O'Connor's affidavit and supporting documents in his November 7, 2004 affidavit, ¶92.5. " ** On the contrary, I tried to reach O'Connor for two days, without success, in **order to receive his authorization to my signing a payment instruction to the tax authorities and additional entities as aforesaid. **"** (emphasis supplied) Perhaps, Hananel's knowledge of the existence of even more documentation explains the decision not to accept the Magistrate Judge's offer to permit him to engage in additional discovery.

5

BOS\140864.1

Hananel asserts that it was uncontradicted that Roberts never negotiated with him at all. The fact was very much and clearly contradicted not only by Roberts' affidavit[4] but by Mr. Adelson's testimony in his deposition, in which he stated that he had Roberts negotiate the final terms of the contract, because he did not like negotiating with friends. At the time, Hananel and he were friends, as both of them have stated in a variety of documents and affidavits filed both in the United States and Israel courts.

---

[4] In ¶¶8-10 of his affidavit of July 13, 2004 filed in support of the opposition to Hananel's motions, Atty. Roberts stated,

"Prior to this meeting Adelson had told me the terms he wished to offer to Hananel for employment with IPI and directed me to discuss and finalize the employment terms with Hananel when he was in the Needham offices.

During the meeting on the third floor of 300 First Avenue, Hananel told me his understanding of the general terms that had been discussed between him and Adelson, and after some discussion, we settled on the following:

Hananel would transition out of his current employment at Galilee Tours and become a fulltime IPI employee on January 1, 1996.

He would devote all of his time to IPI, except for occasional consultation with Galilee.

Hananel would be responsible to identify, recruit and hire business analysts and portfolio managers to assist him and IPI to search out and identify investment opportunities in Israel in the high technology sector and present them to IPI and its legal and financial advisors.

Beginning January 1, 1996, Hananel would be paid an annual salary of $100,000 by IPI. He would also be eligible to receive 12% of the net profits received by IPI from high-tech investments in Israel, which were found and recommended by Hananel and made by IPI, as a result of Hananel's efforts. I specifically explained to him that he would only receive a share of investment profits that were realized (i.e. received) by IPI during the term of his employment.

After Hananel had agreed to those terms, I asked Hananel if he wanted me to put these terms in writing. I told him I had been authorized to prepare a written employment contract for him, if it was the custom in Israel, or simply if he wished. He said it wasn't necessary, because of his close relationship with Adelson. Adelson then arrived in the office, having just returned from a trip to New York. I reported to Adelson the results of our meeting, and at his request, I repeated the terms I had agreed upon with Hananel, so there would be no misunderstanding. Hananel said he agreed. Adelson said that on behalf of IPI he agreed. . . ."

Hananel asserts that it is uncontradicted that, although admittedly he did not receive any salary until after January 1, 1996, he was paid in later months for the work he did in 1995. That statement is very much in dispute. The basis for the dispute, in addition to the affidavits filed by the Plaintiff, is documents filed in Israel with the appropriate government agencies for Hananel's unemployment compensation that showed that the term of employment began after December 31, 1995. One of these documents Mr. Hananel signed himself. Moreover, Hananel testified, by affidavit, in an Israel court proceeding that he began working for IPI after Moshe Melnick, another employee, terminated his employment. (See Hananel's Deposition Exhibit 45 attached as Exhibit G to the Second Supplementary Brief of the Plaintiff served on or about May 4, 2005 and exhibit A attached to Plaintiff's Response to Defendant, Moshe Hananel's, Reply Memorandum, served on or about August 19, 2004.) That document shows that Mr. Melnick's employment ended on December 25, 1995. Therefore, by Hananel's own testimony, he could not have begun his IPI employment until after December 25, 1995.

Hananel seeks to assert that the Magistrate was obligated to find that somehow Adelson has admitted by silence that the contract formation occurred in Israel. In attempting to do so, he has taken a position in this case, inconsistent with the position he successfully took in the Israeli court. Defense counsel states, "Adelson has admitted that the place of the contract formation or negotiation has not been a subject before any Israel court." From that statement, he concludes that Adelson therefore, "does not contradict evidence that the contract has been treated by all parties in Israel as a contract made in Israel and subject to Israel law." This is not only a nonsequitor-- because it is quite obvious that because an Israel court has not dealt with the subject of whether Massachusetts has personal jurisdiction over Hananel-- but the assertion that parties in Israel treated the contract as subject to Israeli law does not contradict the assertion of

7

personal jurisdiction in Massachusetts. The claim, however, that "all parties" have "treated" the contract as "a contract made in Israel" is untrue and unsupported by any evidence before Magistrate Judge Sorokin. As papers previously filed in this Court show, even before the reference to the Magistrate Judge, Adelson objected to the assertion of personal jurisdiction by the Israeli Court, but the Court found personal jurisdiction, because of the control that he and his agents exercised over the branch office in Israel. Hananel argued that the court had jurisdiction over Adelson, because he exercised pervasive control over the branch in behalf of IPI and himself.[5] Now, when it suits him, Hananel seeks to assert a contrary position—that he, not IPI, made all the decisions and exercised all meaningful control. The magistrate could have refused to consider any of these arguments on the basis of Judicial Estoppel. He did not choose to do, but he was not obligated to "weigh" them.

These examples clearly demonstrate that Hananel, again in this litigation, has made assertions that are simply untrue. His contention that the Magistrate ignored uncontroverted material evidence is clearly untrue. The evidence that Hananel claimed was not properly weighed by Judge Sorokin was either seriously disputed or clearly irrelevant. The Plaintiff also wishes to remind the court that he, before and after the reference to Judge Sorokin, had asked for an evidentiary hearing. The Plaintiff's burden was simply to provide evidence, that if credited, supports the exercise of personal jurisdiction. It is clear that the Plaintiff has provided this court and Magistrate Judge Sorokin with ample evidence that supports personal jurisdiction. Even if

---

[5] "Adelson is a Jewish-American businessman and casino mogul who, in the relevant period, held 100% of Interface's shares. The Israeli branch of Interface serves as Adelson's Israeli arm in Israel, and through it Adelson carries on many businesses in Israel." ¶ 3 Hananel affidavit of November 7, 2004, filed in the Israeli Labor Court.

the Magistrate had mentioned every one of Hananel's arguments and allegations, the Plaintiff would still have made out a prima facie case supporting the exercise of personal jurisdiction.

Thus, Hananel's factual contentions regarding the formation of the contract, and the date of hiring, particularly the entire full paragraph on page 18 and pages 6 and 7 of the objections, are based on a complete distortion of the evidence that the Plaintiff presented to this Court and to the Magistrate.

2.  **The Defendant's Arguments that Hananel Did Not Transact Business in Massachusetts Are Based On a Misreading of Relevant Precedents And Must Be Rejected.[6]**

The Defendant's argument begins with an incorrect reading of *Burger King Corporation vs. Rudzewicz* 471 U.S. 462 (1985). The Burger King case does not support Hananel's position but, on the contrary, supports that of the Plaintiff. In *Burger King,* the court found personal jurisdiction in Florida against two franchisees, citizens of Michigan, even though the contract that they made was negotiated and formed in Michigan but approved by the home office of Burger King in Florida, and that under the terms and understanding of the contract, the parties had a business relationship in which Burger King exercised very close control over the operation of the business. The parties in *Burger King* negotiated the contract in Michigan, with representatives of Burger King based in Michigan. Like the agreement in the case at bar, it contemplated that the franchisees would perform in a state other than Florida. However, unlike the case at bar, Rudzewicz and his partner never traveled to Florida to consummate or finalize

---

[6] The argument of law of Hananel in his objections to the recommendation of Magistrate Judge Sorokin is simply a rehash of the arguments that he previously made and he seriously misreads controlling precedents. The Court may wish to reread all the prior briefs, particularly the plaintiff's Second Supplementary Brief, in which the plaintiff has demonstrated that there are grounds to deny the defendant's motions because the defendant has attempted a fraud on the court, by intentionally making egregiously false assertions that were contradicted by his own affidavits and documents.

BOS\140864.1

the contract. In the case at bar, the Plaintiff has produced convincing evidence that, although there had been discussions between Mr. Adelson and Hananel which led to an agreement, the contract was actually formed by Mr. Hananel and Mr. Roberts on December 5, 1999 in Needham, Massachusetts. Moreover, in the case at bar, Hananel has now admitted that there were meetings in Massachusetts at were not purely social. This case is a stronger case for the exercise of personal jurisdiction than was *Burger King*.

When a Defendant's contact with a foreign state is instrumental either in the formation of the contract or its breach, a Defendant's contact with the forum is related to a cause of action arising from the contract. *Work Group Technology Corporation vs. MGM Grant Hotel LLC* 246 F. Supp. 2d 102, 113 (2003). The consummation of the employment contract with IPI's general counsel in Massachusetts is an important jurisdictional fact favoring the finding of personal jurisdiction. Moreover, the agreement clearly contemplated a close and continuing relationship between Hananel and IPI in Massachusetts, by virtue of the financial control as well as the broader policy controls that IPI exerted from its Massachusetts office. This is precisely the kind of relationship that the Supreme Court found sufficient to establish personal jurisdiction in the Burger King case. The principal of the Burger King case has sustained personal jurisdiction in a variety of other cases with fact patterns similar to the fact pattern at the case at bar. For example, in *Armstrong World Industries vs. Reinke Wholesale Supply Company* 91 U.S. Dist. Lexis 3190 (E.D. Pennsylvania 1991). The court denied the motion to dismiss for lack of personal jurisdiction over the Plaintiff's exclusive distributor in the greater Chicago area. One of the grounds of the decision was that "all financial matters between Armstrong and the Distributors, including Inter Alia payment, credit, discounts, accounting, were controlled from Lancaster." *Omni Hotel Management Corporation vs. Roundhill Development Limited* 675 F. Supp. 745

(N.H. 1987). The parties in New Hampshire, a Delaware Corporation with a principal place of business in New Hampshire, had entered into a management agreement with Roundhill Development, a Jamaican Corporation. Under the agreement, the management company was to have complete control over pricing, labor policies, lease and concession negotiations and disbursement of revenues and financial records. The management agreement also provided that the law of Jamaica will apply to it. Focusing on these duties respecting the maintenance of financial records and control and disbursement of revenues, *Id at 749*, the Judge Devine "it is beyond Cavil that at least some of the duties envisioned by the management and marketing agreements which should be performed in whole or in part by either party in New Hampshire." Thus, the agreement fell within the preview of the New Hampshire long arm statute. Judge Devine went on to hold that assertion of personal jurisdiction did not offend the due process requirements of the fourteenth amendment.

It is quite clear that the business arrangement between Hananel and IPI contemplated an ongoing relationship with (IPI's) Massachusetts office where payments were processed and records were kept. "These contacts, intended to build and maintain a relationship with a Massachusetts corporation, rendered foreseeable the possibility of being haled into a Massachusetts court ... ." *Champion Expedition Services vs. Hightech Electric LLC* 273 F. Supp. 2d 172 (D. Mass 2003).

The Defendant erroneously relies on *Lyle's Richards International Limited vs. Ashwood Inc.* 132 F. Supp 3d 111 (1st Cir.1997). Just as this court distinguished *Lyle* from the facts in *Champion Expedition Services Inc. vs. Hightech Electric LLC,* at 176-177, *Lyle* is distinguishable from the case at bar for much the same reasons. In *Lyle Richards International* the contract was formed when Ashwood executed it in California. The Defendant, unlike the

Defendant here, never visited Massachusetts during the course of the contract negotiations. Here, the Defendant formed the contract in Massachusetts. Moreover, in *Lyle Richards,* the Plaintiff never was subject to the kind of control to which Hananel was subject as the manager of IPI's branch office.[7] In *Lyle Richards,* the evidence did not bring it within the scope of *Burger King,* because there was no control as pervasive as in the case at bar or as in *Burger King,* and it is therefore, very different from the case at bar. Ashwood was an independent purchasing agent for footwear manufacturing companies in Taiwan; in this case Hananel was an employee of IPI and was the manager of a branch office. Moreover, in the case at bar, Hananel has admitted and, in the Israeli litigation, asserted that he made trips to Boston for business purposes and that he was in telephone contact with Mr. Adelson in connection with IPI business on an almost daily basis. He produces nothing to destroy or even attenuate the prima facie strength of the affidavits (including his own) and documents that demonstrate the degree of financial control the IPI exercised over him. The report of Magistrate Judge Sorokin is without error of law. It is soundly reasoned and it is based on a correct understanding of applicable precedence.

3. **Hananel's Accusation That The Plaintiff Has Brought This Action To Harass Him Is False, As Demonstrated By The Fact That Adelson Has Offered And Has Paid Mr. Hamilton's Travel And Lodging Expenses For Out Of State Depositions Of The Parties**

Finally, Hananel counsel in his objections states that Adelson has "filed the present duplicative action to harass Hananel." *Objections page 15.* To support this rather serious charge of unethical conduct he relies on a misstatement of testimony given by Adelson in his deposition

---

[7] "Usually, in light of the time differences between Israel and the United States, and due to the fact that I was required to make myself available to Adelson, I would arrive at Interface's offices at around 10:00, with the work day lasting until the late hours of the night. Therefore, Interface also employed a team of secretaries to cover a work day of more than 12 hours. As part of my work as aforesaid, at the beginning and end of every work day, I would talk to Adelson for at least an hour or so." ¶33, Hananel Affidavit supra.

BOS\140864.1

so gross that there is only one word to describe it. He asserts "Adelson has stated under oath that the reason he filed the present action was to bring the case to the United States and that he expects Hananel to run out of money as a result." Adelson did say he wanted to try that claim in the United States court, he never said that he expected Hananel to run out of money as the result of doing so. What he did was to admonish Mr. Hamilton for wasting time with long winded irrelevant questions and observing that if Mr. Hamilton kept it up his client would run out of money.[8] The court need not take our word for it. The deposition has been filed with Hananel's own Memorandum in Support of his Renewed Motion to Dismiss.

## Conclusion

The objections to the Magistrate's report are not well taken. They are based on a consistent misreading of the evidence, assertions that facts are uncontradicted when in fact they are very much in dispute, or which in fact the Plaintiff has been able to establish to the defendant's detriment by documents that Hananel signed. The Defendant's argument of law misreads the cases cited in the objections. Therefore, the objections to the Magistrates report and recommendations should be overruled, and the case should proceed in the normal course to resolution.

---

[8] The Court will recall that the plaintiff offered to and did pay for Hananel's lawyer's air fare and expenses for the defendant's deposition in Israel and the plaintiff's deposition in Nevada, when the plaintiff because of illness was unable to travel to Massachusetts.

Respectfully submitted,
The Plaintiff,
SHELDON G. ADELSON,
By his Attorneys,

/s/ Albert P. Zabin
Franklin H. Levy, B.B.O. No. 297720
Albert P. Zabin, B.B.O. No.: 538380
DUANE MORRIS LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210
(617) 289-9200

Dated: November 23, 2005

## RULE 7.1 CERTIFICATE

I certify I have communicated with Mr. Hamilton, and he has authorized me to represent to the Court that he does not object to my filing a response to his objection to the recommendation of Judge Magistrate Sorokin.

_____
Albert P. Zabin

## CERTIFICATE OF SERVICE

I, Albert P. Zabin, hereby certify that I served a copy of the foregoing on all Defendants this 23rd day of November, 2005, via first class mail, postage prepaid to the following:

James A. G. Hamilton, Esquire
Perkins Smith & Cohen
30th Floor
One Beacon Street
Boston, MA 02108-3106

Albert P. Zabin, B.B.O. No.: 538380

BOS\140864.1