## Affidavit

I, the undersigned, Moshe Hananel, bearer of I.D. No. 52750726, of 21 HaElla St., Mevaseret Zion, after having been cautioned to tell the truth, failing which I shall be liable for the penalties prescribed by law, do hereby declare in writing as follows:

a.  I am the Defendant in Labor Case 9015/02 at the District Labor Court in Tel Aviv Jaffa, and am making this affidavit in lieu of direct testimony.

b.  The facts specified herein are known to me personally, unless stated otherwise.

c.  All of the legal arguments in my affidavit are pursuant to legal advice that was rendered to me.

## Foreword

This complaint is an extremely severe example of bad faith, abuse of process and extreme abuse of an employee by an employer. The unfounded claim of Interface Partners International Limited (hereinafter: "**Interface**") which is the subject of this affidavit (hereinafter: the "**Complaint**"), as well as the unfounded complaint which has been filed against me in the United States by Mr. Sheldon Adelson (hereinafter: "**Adelson**"), holder of 100% of Interface's shares, were born as a counter-reaction to my claims against Interface and Adelson. Interface and Adelson's sole purpose is to harass me, vex me, cause me heavy legal expenses and wear me down by various vain proceedings, and all in order to cause me to retract my claims.

Interface has made no attempt to ask me about even a single one of its hundreds of unfounded claims against me. **Furthermore**, the Complaint and the affidavits in lieu of direct testimony on behalf of Interface are interlaced throughout with lies, falsehoods and distorted facts. Interface and the affiants on its behalf, headed by Adelson, will go to any lengths, including: (a) prohibited coordination of testimonies between the affiants; (b) inadmissible hearsay; (c) rebutting[1] general and vague claims, while drawing false and groundless conclusions without any factual or legal basis; (d) intentional concealment of documents which could rebut the claims against me and establish my claims; (e) breach of attorney-client privilege; (f) infringement of privacy, *inter alia*, by using various investigation and detective firms, **and all, as an end that justifies the means.**

Interface filed the Complaint **more than two and a half years** after the date of termination of my employment with Interface and Adelson, **and more than one year** after the claim was filed by me against Interface and Adelson in Labor Case 6245/01. Interface and Adelson saw that I was standing firm in my claims, and decided to file a claim of their own against me, as an act of retaliation.

In addition, in 2004 Adelson filed another claim against me **in the United States**, for the sum of ten million dollars. This was done as a tactical move designed to intimidate me, cause me to incur the huge expenses of conducting an expensive proceeding in the United States and, above all, to thwart my claims at the competent court in Israel.

---

[1] Translator's note: This might be a typographical error. In this context, "rebutting" in Hebrew [הפרכה] differs from "carelessly raising" [הפרחה] by only one letter, and the two words are homophones.

This practice of 'doing business through litigation' is a "known method" of Adelson's in the management of his businesses and struggles, and is designed to wear the opponent down and defeat him by the huge gap between his financial means and the financial means of those attempting to enforce their rights and his undertakings on him.

A copy of the gaming control minutes is attached hereto as **Annex D1**.

Thus is Adelson described also in an important Las Vegas newspaper, which has been quoted around the world several times:

> "He has been described by the Las Vegas Journal as'[2] perhaps the most vilified man in Nevada".

The European *Evening Times* also states:

> "He is in ongoing litigation with the United States Equal Employment opportunity Commission over issues dating back to 1999".
> .
> "He has been repeatedly characterized as difficult to work with and 'terrorizing those who get in his way".

A copy of the articles is attached hereto as **Annexes D2**.

After the filing of an Answer on my behalf and the performance of a mutual discovery and review of documents proceeding, various claims which had been included in the original Complaint that was filed, did not appear in the affidavits in lieu of direct testimony on Interface's behalf. Thus, for instance, many amounts that were claimed from me for reimbursement of foreign travel expenses did not appear, without any explanation on Interface's part. This fact, above all, testifies how unfounded Interface's claim is, throughout.

## **Factual Background**

1.  I am a businessman and, *inter alia*, a tourism man of international repute in the various tourism industries. In the months of October and November 1995 I started, **at Adelson's request,** to work as Adelson's most senior representative in Israel and served as his right-hand man and confidant. In the context of this position, I was also employed as the General Manager of the Plaintiff, Interface, which also paid my salary.

2.  Interface is a private U.S. company which is registered in Israel and carries on a branch and operations in Israel.

3.  Adelson is a Jewish-American businessman and casino mogul who, in the relevant period, held 100% of Interface's shares. The Israeli branch of Interface serves as Adelson's Israeli arm in Israel, and through it Adelson carries on many businesses in Israel. It should be noted that Adelson is one of the richest persons in the world (ranking 60th on the World's 400 Richest

---

[2] Translator's note: Sic.

People list [sic] published by "Forbes" magazine, with an estimated net worth of approximately \$3 billion).

4.   The tight relations (both personally and business-wise) between Adelson and myself started even before the commencement of my work as aforesaid. Thus, for instance, as part of these relations, Adelson undertook to give me rights in a venture that comprises a hotel, convention center and casino that we had jointly initiated, and which was scheduled to be built in Israel and/or in Jordan (hereinafter: the "**Tourism Venture**").

5.   In various periods of my employment with Interface and Adelson, Interface employed, besides myself, two secretaries (to cover a work day which often lasted more than 12 hours per day), another two senior employees – Mr. Dan Raviv (hereinafter: "**Raviv**") and Oded Efrat (hereinafter: "**Efrat**"), a driver and various consultants.

6.   The employment relations between myself and Interface and between myself and Adelson commenced in the month of October November 1995 [sic]. Although I received my salary from Interface, in practice I worked also for Adelson and at his demand also for his various companies. Thus, I was his senior representative in Israel and his right-hand man, handled issues for him that were not related to Israel, and all in both the personal and the business realms.

7.   The terms and conditions of my employment, as agreed between myself and Adelson included, *inter alia*, a monthly salary, coverage of expenses, and options in ventures and/or investments of Adelson (either directly or via corporations under his control) and/or of Interface in Israel and/or outside of Israel, in which I was involved (*inter alia*, as employee, promoter, assistant, consultant, etc.). The mechanism that was determined for the grant of the options was that I would be entitled to receive 12% of the holdings/rights of Interface or of Adelson or of any other company controlled by Adelson, in such ventures and/or investments in which I was entitled to the options. I should emphasize that my right to the options referred to ventures and/or investments in which my involvement as aforesaid was during the term of my employment, regardless of whether such ventures and/or investments were realized during the term of my employment or after termination thereof.

My last salary from Interface was in the sum of NIS 34,250. A copy of an employer's notice to the income tax authorities on my salary (Form 161) is attached hereto as **Annex D3**. A copy of the "settlement of accounts" document prepared by Interface's CPA on May 7, 2000, which specifies my salary, is attached hereto as **Annex D4**.

In addition to the salary, Interface paid my expenses. These expenses were fully grossed-up by Interface and did not appear in my pay slip. The expenses were as follows: car expenses; newspaper subscriptions; telephone lines at my home; a cellular telephone and a full-time driver.

In view of the unqualified relationship of trust that prevailed between Adelson and myself, the terms and conditions of my employment were never put to

writing, and the employment agreement between Interface and Adelson and myself was based on oral agreements and on the accepted usage in Interface and the terms and conditions of the employment of senior employees in positions similar to that occupied by me. I should note that other Interface employees were also employed without having the terms and conditions of their employment fixed in a written contract.

8.   In the framework of my employment with Interface and Adelson, I invested my best energy and of my time for Interface and Adelson's benefit, as my said position required and as I was asked by Adelson, and even gave this position preference over my other occupations (of which Adelson and Interface were well aware both before the commencement and during the course of my employment). The fields of my responsibility in the framework of my work were unlimited, and I acted for Interface and Adelson to develop various ventures and promote the intricate interests of Interface and Adelson in Israel and around the world. As Interface's General Manager, I was responsible for Interface's investments in and outside of Israel, and for the identification of new investments in a variety of fields.

Furthermore, as part of my duties and all through the years of my work for Interface and Adelson, I was required to take many trips to different countries. A large part of these trips were attended also by Adelson himself and sometimes even by his (immediate) family members. *Inter alia*, Adelson and I spent time, together, in the U.S., Ireland, the U.K., France, Turkey, Greece, Cyprus, Jordan, Hungary, Italy, the Czech Republic, Bulgaria and the Palestinian Authority, to some of which destinations we traveled together. It should be noted that also during the trips in which Adelson did not participate, I maintained daily and current telephone contact with him.

9.   **To emphasize, I never undertook to dissociate myself from HaGalil Tours Ltd. (hereinafter: "HaGalil Tours"), and never undertook to dedicate 100% of my time to Interface and Adelson. On the contrary, Interface and Adelson who, as aforesaid, controls Interface, were well aware, throughout the entire relevant period of time, that I was working for both them and HaGalil Tours.**

For approximately four and a half years I served my employers, Interface and Adelson, faithfully, while all the while maintaining the most tight, almost intimate, connections with Adelson. Throughout the period of my employment with Interface and Adelson, I won praise from Adelson and greatly assisted him in promoting his personal and business interests in and outside of Israel. As aforesaid, I was Adelson's right-hand man and confidant. The relationship of trust between myself and Adelson was so fierce, that Adelson gave me a power of attorney and appointed me as a signatory in approximately ten personal bank accounts in Israel, from which moneys were remitted to members of Adelson's family, and in a special bank account (together with Adv. Yaakov Neeman) from which donations were remitted to various associations in Israel. In this context, I was responsible for millions of dollars of Adelson's money, and was involved in his most secret affairs. Obviously, against the background of such relations of trust and affinity, we did not feel – Adelson and I – the need to have each other sign a formal employment

contract. The oral agreements we had reached were, in our eyes, as valid as a contract written in stone.

10. After approximately four and a half years of intensive work for Interface and Adelson, Adelson informed me, in April 2000, several days before the Passover holiday, during his visit to Israel, that he had come to the decision to cease Interface's operations in Israel, and that he intended to terminate me and the entire Interface staff. On May 10, 2000, the employment relations between myself and Interface and between myself and Adelson were terminated, at the initiative of Interface and Adelson as aforesaid.

11. Towards the end of the employment relations between myself and Interface and Adelson, I sent Adelson a letter, at his request, in which I put to writing the relevant issues as part of the expected termination of the employment relations, as was agreed between us before the commencement of my employment.

A copy of the letter (which is undated) is attached hereto as **Annex D5**.

On May 1, 2000 Adelson replied to my letter. In his answer, Adelson agreed to most of my demands, as was agreed between us before the commencement of my employment.

A copy of Adelson's letter of May 1, 2000 is attached hereto as **Annex D6**. A letter of reply from me to Adelson of May 2, 2000 is attached hereto as **Annex D7**.

After my termination, disputes arose between myself and Adelson regarding various rights that are due to me in various tourism ventures, while the rest of the rights that are due to me were not in dispute at all.

I conducted lengthy contacts with Interface and Adelson in an attempt to resolve the disputes between us. The contacts between me and Interface and Adelson included conversations with Adelson, with Adelson's wife and with his counsel in Israel. As specified above, the contacts lasted a long time, approximately one year, probably in view of Interface and Adelson's intention of stalling the matter.

I continued attempting to resolve the disputes by way of a compromise. In the last proposal I received in April 2001 from Adelson's counsel, Adv. Yaakov Neeman, I was offered to make do with monetary compensation in cash (as my successor, Raviv, and predecessor, Mr. David Farbstein (hereinafter: **"Farbstein"**), had received moneys in the U.S.), for my claims (as seen by Interface and Adelson). This, subject to my waiver not only of my rights in the Tourism Venture, but also of the options and my rights in any other venture in Israel or overseas.

**Thus, a draft agreement that was presented to me read as follows:**

"Hananel has alleged certain claims against IPI and Adelson in relation to the terms of the termination of his

> employment... and in connection with casino license(s)
> obtained or to be obtained by IPI and/or any IPI party
> and/or Adelson and/or any Adelson party in Israel, Jordan
> or any other country".

A copy of the said draft settlement agreement is attached hereto as **Annex D8**.

At this stage Interface, Adelson and their representatives even threatened me,
in conversations that they held with me, that if I did not agree to waive the
options and the rights in the Tourism Venture or in any other venture in Israel
or overseas, not only would they not pay me what was due to me as part of the
salary, they would also damage my reputation and institute various legal
proceedings against me, aimed at defaming me and ruining my reputation,
under the guise of a legal action.

In a final attempt to avoid the need to claim my rights in court, my counsel
sent Interface and Adelson the draft complaint, via their counsel, and
suggested that this lead to a settlement solution.

A copy of the August 9, 2001 letter is attached hereto as **Annex D9**.

In response to my notice, Interface and Adelson threatened me that if I dared
to sue them in court (and would not accept the settlement proposal they had
made me), they would perform a check at Interface, and would attempt to find
various causes of action against me. So it was said, in plain words, in the letter
of Adv. Yaakov Neeman, on behalf of Interface and Adelson, to my counsel:

> **"In view of the aforesaid, my client would be forced, if
> your client insists on bringing his draft complaint
> (either that attached to his letter or an "improved
> version") before the court, to present to the appropriate
> instances the full and real picture regarding the
> relationship with your client...**
>
> **I held a telephone conversation with my client today,
> and he has informed me that at the end of the summer
> vacation, namely in September 2001, he will send to
> Israel one of the Company's financial managers from
> overseas, in order to closely monitor all of the financial
> activities performed by your client. Upon the
> completion of this report we will notify you of our
> client's monetary claims due to the unauthorized acts
> performed by your client..."**

A copy of the letter dated August 19, 2001 is attached hereto as **Annex D10**.

Already at this point, one can see that Interface's complaint against me is
nothing but an act of retaliation for my complaint against it and against
Adelson, retaliation which was intended from the outset to serve as a means of
deterrence against me, in view of the filing of my complaint against Interface
and Adelson.

My counsel responded to the said letter, in a letter dated September 3, 2001, whereby, *inter alia*, I vehemently rejected all the accusations, claims and threats that were cast against me in the said letter.

A copy of the September 3, 2001 letter is attached hereto as **Annex D11**.

12. In light of Interface and Adelson's position, I had no choice but to file a complaint against them at the Tel Aviv District Labor Court, for the rights to which I am entitled and for damage that was caused to me by Interface and Adelson after my termination.

A copy of the complaint, which was designated as Labor Case 6245/01, is attached hereto as **Annex D12**.

In their answer, Interface and Adelson denied all of my claims, including my mere status as an employee of Interface and Adelson, including the jurisdiction of the Labor Court, and the fact that Adelson was represented by counsel in Israel. However, even in the answers filed on their behalf, Adelson and Interface raised no claim against my functioning as an employee and/or against the moneys that were paid to me by them as part of my work, including payment in lieu of annual vacation to which I was entitled.

A copy of Interface and Adelson's answers is attached hereto as **Annex D13**.

To emphasize, throughout the entire period of my work for Interface and Adelson, at the time of the notice of my termination and even thereafter, at the time of conclusion of my work, during the negotiations which were conducted after termination of my work vis-à-vis Adelson and thereafter vis-à-vis Adelson and Interface's counsel, and, as aforesaid, also in the answers that were filed on behalf of Adelson and Interface in Labor Case 6245/01 – **Adelson and Interface never raised any claim against my functioning as an employee and/or with regard to moneys that were paid to me by them within the framework of my employment.**

13. More than a year passed since I filed my complaint against Interface and Adelson in Labor Case 6245/01, and more than two and a half years since my termination, and the parties were already required to file affidavits in lieu of direct testimonies in the said complaint. At this point, so it would seem, Interface and Adelson realized that I was standing firm in my claims, and decided to realize the threat contained in Adv. Neeman's letter (more than two and a half years after the date of my termination), and to file a complaint of their own against me. Undoubtedly, Adelson and Interface did not fail to see the distressing fact that I had then been stricken with blindness, a fact which renders the conduct of the proceedings tremendously difficult for me.

Thus was Interface's complaint against me born – a complaint which is nothing but a heap of unfounded claims that present me as a villain, after many years in which I served my employers, Interface and Adelson, faithfully, impeccably, and without any complaint being raised against me as aforesaid.

14.   Furthermore, in early 2002, I found out that the Macau casino venture (which was born of my initiative), the existence of which was first concealed from me and thereafter denied by Interface and Adelson, was taking shape. As aforesaid, as part of the employment relations between myself and Interface and Adelson, I was promised options in ventures, the initiative for which was born during my employment. This undertaking was made orally by Interface and Adelson who, eventually, even admitted it.

Ultimately, when official notices were publicly released on behalf of Interface and Adelson, they were no longer able to deny the fact that Adelson and Interface's casino project in the Macau region was taking shape. I turned to Interface and Adelson via my counsel, demanding to realize my rights in the Macau venture. When my requests were turned down, I was forced to file another claim against Interface and against Adelson at the District Labor Court in Tel Aviv, Labor Case 7704/03 (hereinafter: the "**Macau Complaint**") (which claim was later consolidated, pursuant to the Court's decision, with Labor Case 6245/01).

On December 17, 2003, the date on which the Macau Complaint was filed, the Macau Complaint was served on Interface and Adelson's counsel. On February 3, 2004, Adelson's counsel filed a "Notice Regarding Service of the Complaint on the Second Defendant" (namely, Adelson), in which it was claimed that the law firm of Danziger, Klagsbald, Rosen & Co. was not the address for service of the Macau Complaint on Adelson. This was done in an additional attempt to evade the Israeli court's jurisdiction.

The rationale which Adelson and Interface had to deceive the Court and deny the service of the Macau Complaint on Adelson, was the artificial creation of a timeframe in which Adelson could open a new legal front against me, as part of a strategic move for the application of wrongful pressure to me, by way of dragging me into a complicated, intricate and expensive legal proceeding in the United States, while taking advantage of my disability and the immeasurable financial advantage which Adelson and Interface have over me. In order to undermine the proceedings taking place in Israel, and to apply inhuman pressure to me, as aforesaid, Adelson filed a claim against me in the United States (Boston, Massachusetts) on February 23, 2003, for the sum of **U.S. $10 million** (hereinafter: the "**U.S. Complaint**"). The U.S. Complaint involved the same matters which are pending before the Honorable Court in the Complaint and the same matters which are pending in Case 6245/01 and the Macau Complaint, which set of complaints concern issues which are, without a shadow of doubt, within the exclusive jurisdiction of the Honorable Court.

Thus, Adelson and Interface did not make do with filing the unfounded complaint which is the subject matter of this affidavit, and acted behind the back of this Honorable Court in a new, deliberate and dual move: first, an attempt to bypass the Court's jurisdiction and void the proceeding conducted herein of any content; second, an attempt to wear me down and eliminate my litigation ability by conducting intimidating, predatory and expensive proceedings at the District Court in Boston. And all the while, Adelson is

concealing the mere fact of the existence of the parallel proceedings that are conducted before the Honorable Court from the District Court in Boston.

Thus, from the Docket describing the milestones in connection with the claim filed by Adelson against me in the United States, it appears that Adelson had declared to the Court in the United States that no other legal proceedings related to the proceeding filed by him were conducted **in other courts**.

A copy of the Docket is attached hereto as **Annex D14**.

Thus, the complaint that was filed in the United States – in which Adelson relates, *inter alia*, the arguments pending in the Complaint which is the subject of this affidavit, his relationship with me in connection with my work in Israel for Adelson and for Interface, including the engagement in the employment agreement, the termination of the employment relationship, my claims against Adelson and Interface in connection with my employment as aforesaid and the termination thereof, my claims in connection with the Macau venture – does not as much as mention that all such issues are pending before the Honorable Court by virtue of its singular jurisdiction, in three cases that are conducted herein (the two claims filed by me were consolidated, as aforesaid, into a single case).

A copy of the complaint that was filed in the United States is attached hereto as **Annex D15**.

If this were not enough, as part of the attempt to wear me down, on November 2, 2004 I learned that Adelson, as part of his global struggle against me, had filed a motion **in the United States** to prevent me from realizing my rights as an employee in Israel. The motion was filed under the heading of "Motion to Enjoin the Defendant from Pursuing a Parallel Cause of Action in Israel".

The purpose of this motion (as absurd and inconceivable as it may be) is to deny me my basic right as a worker in Israel from enforcing my rights vis-à-vis my employers in Israel at the court having the singular jurisdiction to hear such issues – namely the District Labor Court in Israel.

A copy of the said motion is attached hereto as **Annex D16**.

15. I took the pains to review the factual chain of events to the Honorable Court, in an attempt to illustrate to the Honorable Court that I have fallen victim to a strategic move designed to eliminate my ability to litigate before the Court, a main link of which strategy is the Complaint which is the subject of this affidavit. This Complaint is disgraceful and aggravating, utterly groundless, the sole concern of which is to defame me and push me out of court, and this because I "dared" to sue Interface and Adelson in court for that to which I am entitled by contract and law.

16. **Interface and Adelson are dragging me into complex legal proceedings. They are thus causing me to incur heavy expenses of hundreds of thousands of Shekels, and preventing me from engaging in other matters, even if I do ultimately win my claims against them. Also if Interface**

**decides not to conduct the Complaint against me, and even if the
witnesses on Interface's behalf, headed by Adelson, avoid appearing at
the evidence hearing at the Honorable Court, as was the case in the claim
of Mr. Moshe Melnik (a former Interface employee) (hereinafter:
"Melnik"), in any event, I have suffered and will suffer great damage,
some of which is irreversible.**

## Response to the Claims made in the Complaint and in the Affidavits on Interface's behalf

### My employment with Interface and Adelson

17.    **I never proposed myself to Adelson for any position with him or with
Interface. It was Adelson, who was in urgent and desperate need of a
person to manage Interface and his personal businesses in Israel, who
turned to me and offered me to work for him and for Interface**. The claim
made in the Complaint and in Adelson's affidavit whereby I proposed myself
to Adelson for the position of manager of Interface's Israeli branch – **is false**.

18.    During the month of September 1995, Farbstein, who was then Interface's
General Manager, finished working for Interface following a dispute that had
broken out between him and Adelson approximately two months earlier.
Adelson who is, as aforesaid, the controlling shareholder of Interface, wanted
to prevent the managerial vacuum that was created in Interface. Therefore, he
urgently needed a new manager to replace Farbstein. Following a previous
acquaintance between Adelson and myself and the relationship of trust that
existed between us, Adelson approached me and offered me to work as his
most senior representative in Israel, as his right-hand man and confidant, in the
framework of which position I would serve, *inter alia*, as Interface's General
Manager. This was **despite the fact that Adelson knew that I was working
for HaGalil Tours and held a key position therein**.

Ultimately, after much imploration on the part of Adelson who, as aforesaid,
urgently needed a new manager for Interface, I accepted his proposal. It
should be noted that already in the months of August-September 1995, an
agreement was reached with me and with Raviv on the terms and conditions of
our employment with Interface, while Adelson presented to me the terms of
Raviv's employment and asked for my opinion.

In the months of October November 1995, I started, **at Adelson's request**, to
work for Interface and Adelson. Already in September 1995, I held several
meetings with Farbstein as part of the transfer of his duties to me.

19.    The claim made in the Complaint and in Adelson's affidavit to the effect that I
started working only on January 1, 1996 – **is false**. As aforesaid, I started
working for Interface and Adelson already in late 1995.

Thus, for instance, as part of my work as aforesaid, I was appointed as a
director in the company Auto Depot, in Interface's capacity as a shareholder of
such company. During the months of November-December 1995, I
participated in several meetings of Auto Depot's Board of Directors, as a

director, and in some of them I even held the office of Chairman of the Board. It should be noted that at the first board meeting in which I participated, which was held on November 7, 1995, it was Adelson who introduced me to the board members as Farbstein's successor and as Interface's manager.

A copy of the Auto Depot minutes of November 7 and 14, 1995 and of December 14, 1995, that were located by me, are attached hereto as **Annex D17**.

Thus, for instance, as Adelson admitted in the U.S. Complaint, already in 1995 I was granted signatory rights as Interface's General Manager in Interface's bank accounts, and signed several checks in sums of hundreds of thousands of Shekels as Interface's authorized signatory.

In the Memorandum of Law (a document on Adelson's behalf that was filed in the U.S. Complaint), it is stated on p. 2, last paragraph:

> "At first Hananel took the role of a temporary caretaker for IPI (Roberts paragraph 7) and was given authority to write checks. He wrote very few."

A copy of the Memorandum of Law and of the affidavit of Paul G. Roberts (hereinafter: "**Roberts**"), is attached hereto as **Annex D18**.

Thus, for instance, in October 1995, after it was agreed with me that I would start for [sic] Interface and Adelson, I convinced Adelson to join me at the Economic Convention for the Middle East that was held in Amman in Jordan, *inter alia*, in order to promote the establishment of the Tourism Venture in Jordan. I traveled to that convention, *inter alia*, also as part of my work at HaGalil Tours. In the said convention, a brochure was issued which included profiles of different companies which participated in the said convention. Adelson agreed to join at the last moment before the convention was held, and therefore Interface's profile was not included in the said brochure. During the course of the convention and in different meetings that Adelson and I held, Adelson introduced me as his business manager in Israel and as Interface's General Manager.

A copy of pictures from the said convention featuring Adelson, his wife and myself, are attached hereto as **Annex D19**.

The cover page and HaGalil Tours' profile page from the brochure of the said convention are attached hereto as **Annex D20**.

Thus, for instance, on November 1, 1995, I participated as a manager on Interface's behalf, together with Adelson and Raviv, at a meeting that was held at the Israel Lands Administration with regard to the construction of a conference center in the city of Eilat.

A copy of the minutes of the said meeting is attached hereto as **Annex D21**.

I was also introduced as Interface's General Manager and as Adelson's representative in Israel, already in 1995, during meetings that were held with

Adelson's partners in companies in which Adelson and/or Interface had holdings, Interface's bank people, Interface's insurance agent, Interface's bookkeepers, Interface's PR people, its legal counsel, and others.

20. The claim made in Adelson's affidavit to the effect that I had told him that I would start a short running-in period before January 1, 1996, and that in any event we had agreed that I would start receiving a salary only from January 1, 1996, **is a false claim**. As aforesaid, I started working for Interface and Adelson in the months of October November 1995, and already in September 1995 held several meetings with Farbstein as part of the transfer of the office as aforesaid. In addition, I never agreed to waive the salary due to me for my work for Interface and Adelson, including in 1995.

As aforesaid, my work for Interface and Adelson was a second job, in addition to my work for HaGalil Tours. For several months, I was deliberating the best tax route for receiving my salary. At my request and, *inter alia*, with Adelson's knowledge and approval, until September 1996 I was not paid a salary and no pay slips were issued to me. I agreed, and was financially able, not to receive my salary for my work for Interface and Adelson for several months, because I had an additional source of income from my work for HaGalil Tours. In view of the relationship of trust that existed between Adelson and myself, it was agreed with me that my salary for the said period would be paid to me later, as was actually done.

A copy of my "Form 106" for 1996 is attached hereto as **Annex D22**.

21. The claim that is implied from the Complaint and from Adelson's affidavit (*inter alia*, in Sections 3, 7, 11 and 13 of Adelson's affidavit), whereby Interface's sole objective was to identify investments in the high-tech field – **is utterly untrue**.

**Interface worked on identifying investments and utilizing business opportunities in various fields, and not necessarily in the high-tech field.** I worked for both Interface and for Adelson and his various businesses. In addition, the high-tech field was only one of the numerous and diverse fields in which Interface and Adelson engaged, before I started working and while I was working for Interface and Adelson. Following are several matters and fields in which Interface and Adelson engaged and in which I too was involved, and which testify that with Adelson's direction and knowledge, I was not instructed to focus on high-tech:

(a) Ownership of Auto-Depot, which is not a high-tech company;

(b) Construction of the Tourism Venture (conference center and casino) in Israel or in Jordan in one of the following locations: Eilat, the Eilat-Aqaba border, Aqaba, Bakura (the island of peace near Beit She'an) and Amman;

A copy of documents dealing with the Tourism Venture and testifying that I acted to promote the Tourism Venture as part of my work for Interface and Adelson, are attached hereto as **Annex D23**.

(c)     A possibility of buying a marble cutting and polishing factory and for bicycles in Beer Sheva (Dunhill);

(d)     Maintaining business ties with marble factories at Karera, Carmel Carpets, Polgat and Kitan (satin sheets, towels) and safes, *inter alia*, in order to buy products for the Venetian hotel in Las Vegas in the United States (hereinafter: the "**Venetian Hotel**");

(e)     Adelson was interested in buying Africa-Israel. He took part in the tender to buy Africa-Israel and was one of the two final bidders in the tender;

        A copy of an article in *Property* newspaper on Adelson's interest in buying Africa-Israel is attached hereto as **Annex D24**.

(f)     Marketing of the Venetian Hotel;

        A copy of documents pertaining to the Venetian Hotel are attached hereto as **Annex D25**.

(g)     An attempt to buy Bank Leumi Le'Israel Ltd;

        A copy of an article in *Yediot Aharonot* newspaper of November 2, 2001 is attached hereto as **Annex D26**.

(h)     Examining the construction of a casino and conference center in Cyprus;

(i)     Considering the purchase of El Al (in the context of privatization);

(j)     Examining the purchase of the basketball team Hapoel Jerusalem;

(k)     Examining the purchase of apparel stores and obtaining franchises for fashion store brands (the Naf Naf chain, Wakiki and Boom Ltd.);

(l)     Considering the construction of a store and buying a franchise for "Warner Brothers";

(m)     Examining the purchase of a franchise for a Starbucks chain;

(n)     Examining the construction of a casino venture in Macau;

(o)     Holding of contacts vis-à-vis the City of Tel Aviv and the Ministry of Tourism regarding the purchase of the conference center at the Exhibition Gardens (in the context of privatization) and regarding the construction of a center in Park Darom in Tel Aviv;

(p)     Examining a proposal to purchase the Conference Center in Jerusalem;

(q)     Establishment of a cinema chain to compete with the Globus chain;

(r)     Review of business plans to build a movie theatre complex at Gelilot (Cinima [sic] City);

(s)     Review of a proposal by Yoram Globus to enter Globus Studios as a partner and to buy the real estate on which the studios are built in Neve Ilan;

(t)     Examining the purchase of a franchise for Imax (3D) movie theatres in Masada and/or Eilat;

(u)     Considering participation in the tender for satellite television broadcasts;

(v)     Review of various projects for the construction of hotels overseas;

(w)     Reviewing the purchase of Sport Mart, which merged with the Mega Sport chain in Israel. Adelson and I met with the owners of Sport Mart in the United States;

(x)     Examining the possibility of conducting gaming operations on an airplane;

(y)     Cooperation with Accor (hereinafter: "**Accor**"), *inter alia* with regard to the construction of a casino in Jordan and regarding the purchase of equipment from Accor for the Venetian Hotel;

(z)     Meetings with the manager of "Quartz Investments", Jean Manuel Rosen, regarding various investments and alliances;

        A copy of a fax dated February 23, 1998 from Jean Manuel Rosen specifying the schedule of the meetings he had prepared for me, is attached hereto as **Annex D27**.

(aa)    Examining the purchase of an executive plane from Astra and the Aircraft Industries;

(bb)    Acquisition of the "Roses" casino in Rhodes;

(cc)    Acquisition and/or construction of a casino at Karlovy Vary[3] in the Czech Republic;

(dd)    Examining the construction of a conference center and casino in Dublin, Ireland;

(ee)    Examining the operations of the casino in Jericho, as well as in Turkey, Hungary and Bulgaria;

(ff)    Considering the construction of a store and the purchase of a franchise for the "Sharper Image";

---

[3] Translator's note: Original says קרלו ויוארי, namely Karlo Vyvary.

(gg)  Examining investments in solar energy ventures;

(hh)  Examining a proposal to buy the conference center in Haifa.

**Can it be said that these matters are from the high-tech field?**

22.  In addition, in the context of my work for Interface and Adelson, Adelson and I were in many countries throughout the world for business objectives that were not connected with the high-tech field. For example, Adelson and I were in: (a) Turkey – a tour of five casinos in Antalya; (b) Greece – to look into an offer to purchase the "The Roses" casino; (c) Italy – a visit to Murano exhibitions in Milan, workshops in Venice, a visit with architects and interior designers in Venice, photographing sites in Venice and in Milan and a visit to the quarries in Carrera. Such being in the context of my involvement in Adelson's project to establish the Venetian Hotel; (d) Hungry – a visit to the iron foundries for lighting pillars and decorations for the Venetian Hotel; (e) Ireland – to look into an offer to establish casinos and a conference center in Dublin; (f) France – meetings in connection with restaurants and fashion houses, for the casino and shopping center at the Venetian Hotel; (g) the Czech Republic – a visit to glass factories in connection with the Venetian Hotel; (h) Bulgaria – a visit with Bulgaria's Vice-President and Minister of Finance with the intention of looking into the purchase of crystals and establishing a casino; (i) Jordan – meetings with the Jordanian Minister of Water in charge of relations with Israel, with the Jordanian Minister of Tourism, with the Jordanian Prime Minister and with the King of Jordan and others. Meetings with Abu Raheb, a potential partner for the establishment of a casino in Jordan, a meeting with Omar Salah in respect of the establishment of a conference center in Amman and a Club-Med in Aqaba, a visit of the Congressional delegation to Jordan and a visit with Dr. Miriam Adelson (Adelson's wife) (hereinafter: "**Miriam Adelson**") for the purpose of examining the possibility of establishing a drug rehabilitation clinic in Jordan; (j) Cyprus – to look into establishing a casino.

23.  Furthermore, contrary to the assertion in the Complaint and in Adelson's affidavit, I also dealt in the field of high-tech. I transferred to Adelson and his assistants in the U.S.A many business proposals in the high-tech field but the vast majority thereof were dismissed by Adelson and his assistants. In this context I recall that Adelson especially appointed a person named Tom White in order to review the proposals that were transferred by Interface as aforesaid. I even appointed Efrat as my assistant whose duties were, *inter alia*, to find investments for Interface, mainly in the high-tech field. I also hired the services of Dr. Adi Peri, a high-tech person – with the objective of helping Interface to locate high-tech companies.

Efrat and I would present before Adelson himself, also during his visits to Israel, various proposals in connection with potential investments. In many instances we also utilized Adelson's visits to Israel to schedule meetings for him with entrepreneurs.

I would state that various entities, be it venture capital funds or investment banks or target companies, did not wish to contract with Adelson due to his

unacceptable conduct in another instance where he invested in the high-tech company Pegasus. Due to Adelson's said behavior, Interface entered the "black list" of those entities that I stated above.

I would state that at Interface's offices there were approximately seven heavily-loaded binders of high-tech companies that had been reviewed for investment purposes and which had also been sent to Interface's offices in the U.S.A. Set forth below are a number of examples of proposals which were brought before Adelson for potential investment and rejected for one reason or another:

(a)     The company Geo Interactive (animation on the Internet) – situated in Givatayim. I was successful in reaching a draft agreement in which all of the commercial terms and conditions were agreed upon, which I sent to Tom White. Adelson wanted to check the matter again and again and when he reached a decision the offer was no longer relevant.

(b)     The company Exect (checking traffic on the Internet) – I reached an understanding with the company according to which Interface would invest in the company at the scope of 10%. Ultimately, the offer was rejected by Exect since they preferred not to contract with Adelson in view of the abovementioned Pegasus incident.

(c)     The company Odigo.

(d)     The company Sontronics (establishing a Pan-Arab website on the Internet) – Adelson cancelled the transaction on the date of signing of the investment agreement.

(e)     The company XTL – the biotechnology field.

(f)     The company Edusoft.

(g)     Dream Team – animation.

(h)     Jerusalem Global – various offers for investment in the high-tech field.

(i)     Versa Ware – medical instrumentation for the detection of breast cancer. The possibility of cooperation with the company Denex was examined.

(j)     Opline – an optical company.

(k)     Carta – maps software.

(l)     Mail Vision.

(m)     Lansys.

(n)     Code Ware.

(o)     Exten Net – Natan Garini and Lior Harish.

(p)     Technological incubators in the north and the south.

(q)     Examining projects for the establishment of gaming sites on the Internet (for example the King Solomon Casino website, the Shakked brothers – a company from Netanya);

(r)     Elsanit - Yonatan Aderet and Israel Schreiber.

(s)     Participation in IVA meetings and examining investment offers in that context.

(t)     Maintaining contact with high-tech funds and individual investors such as Meir Laser, the Gap Foundation, the Etgar Foundation, RDT (Israel Adir), Nilvit and Tamir Fischman.

(u)     Edanit.

(v)     Examining investments in the biotechnological field together with the Weizmann Institute.

(w)     Mail vision – Ze'ev Lerner.

(x)     Telsycom – Dov Seberlob.

(y)     Comverse.

A copy of documents relating to my work for Interface and Adelson in the high-tech field are attached hereto as **Annex D28**.

In addition, with Adelson's knowledge and in coordination with him I also traveled around the world for business objectives connected with high-tech. For example, I traveled: (a) to Belgium – a high-tech exhibition in the medical field "Symposium"; (b) to France – I held a number of meetings with executives from the high-tech company Pysis (a competitor of I.M.D Soft Ltd.) (hereinafter: "**Pysis**") for the purpose of examining various offers, to purchase Pysis, to sell IMD Soft or to merge the two companies; I also held meetings in Paris to examine issue possibilities with people from the European Stock Exchange; (c) to Barcelona – a visit to Pysis's development center; (d) to London – a meeting with investors in the high-tech field; (e) to Germany and Switzerland – a meeting with HP personnel (installation of IMD Soft's software system in a hospital); (f) to the U.S.A – a meeting with various investors in the high-tech field in New York, a meeting with Data Scope personnel in New Jersey and the HIMS Convention in Orlando; (g) trips to Japan – holding meetings for the purpose of recruiting investors for the company IMD Soft.

As aforesaid, in the context of my work for Interface and Adelson, the fields of my responsibility were unlimited and I acted for Interface and Adelson for the development of various ventures and the promotion of the ramified interests of Interface and Adelson in Israel and around the world. As General Manager of Interface I was responsible for Interface's investments in Israel and elsewhere, and for finding new investments in a variety of fields.

24.    Over approximately four and a half years I served my employers, Interface and Adelson, loyally, whilst being in very close, almost intimate contact with Adelson at all times. As aforesaid, I was Adelson's right-hand man and confidant. Over the entire period of my employment with Interface and Adelson, I was praised by Adelson and I helped him a great deal in the promotion of his personal and business interests in Israel and elsewhere.

A copy of a letter dated March 16, 1998 and a letter dated May 5, 1998 testifying to the trust that Adelson had in me are attached hereto as **Annex D29**.

During Adelson's visit to Israel in April 2000 (immediately after his return from Macau) Adelson notified me (in a meeting held at a restaurant) of my dismissal and of his intention of dismissing all of Interface's current workers and closing Interface's offices. Adelson claimed to me that the reason for my dismissal stemmed from the fact that he wished to close Interface's offices in Israel since Interface's operation in Israel was not worthwhile to him. Adelson did not express dissatisfaction in respect of my performance and evidence thereof is that Adelson dismissed, with the exception of Raviv, all five of Interface's employees together with me. I did not express any objection to my dismissal but I requested that all of the rights and monies to which I and the other Interface workers were entitled be given to us. Only *post factum* did it transpire that the real reason for my dismissal was rooted in the fact that Adelson was not interested in granting me the option to 12% of Adelson's (including every corporation controlled by Adelson) share in the Macau venture (a venture which was born, as aforesaid, during the term of my employment and at my initiative), an option due to me according to the employment agreement which was entered into between myself and Interface and Adelson.

## My Employment at HaGalil Tours

25.    The claim asserted in Adelson's affidavit, *inter alia*, in Section 11 of his affidavit, according to which Interface and Adelson only learned of my employment at HaGalil Tours *post factum* – **is false**. Interface and/or Adelson were aware of my intention to continue working for HaGalil Tours at the same time as working for them. They benefited from my work at HaGalil Tours and even utilized it. Furthermore, one of the reasons that Adelson was interested in employing me was my work at HaGalil Tours. This was, *inter alia*, in view of the fact that a significant part of Interface's occupations was in the field of leisure and tourism. Adelson knew that I had no experience in the high-tech field.

**I also never told Adelson or any other entity that I would stop working at [HaGalil] Tours apart from providing random consultancy.** And I shall emphasize, there was no financial logic to my agreeing to work only for Interface and Adelson, and disconnecting myself from HaGalil Tours, for conditions and a salary lower than that which I had at HaGalil Tours. Interface and Adelson were aware that in any matter connected with HaGalil Tours, insofar as would be possible for me, I aspired to transfer to a position which, in the main, would not be an operative position but rather mainly managerial

and that is indeed what I did. **However, I never undertook to disconnect myself from HaGalil Tours and I never undertook to dedicate 100 percent of my time to Interface and Adelson**. According to the employment agreement I only undertook to invest of my time for the benefit of Interface and Adelson insofar as my position required and insofar as I would be requested to do so by Interface and/or Adelson, **but this was subject to and considering my other activity**. As aforesaid, Adelson was aware that I had financial interests in and commitments to HaGalil Tours.

26.   The claim asserted in the Complaint and in Adelson and Roberts' affidavits that according to the agreement between Interface and myself I undertook to work in a full-time position and exclusively for Interface and to terminate my employment at HaGalil Tours apart from random consultancy on my way home from work at Interface – **is false**. Nor is this claim consistent with the fact that as a shareholder in HaGalil Tours and as an expert with a worldwide reputation in the field of tourism I had an interest in continuing to be involved in HaGalil Tours, and HaGalil Tours had a clear interest in my being involved in its affairs.

27.   Interface and Adelson and any entity on their behalf were aware that I worked both for Interface and Adelson and for HaGalil Tours and never prohibited me from continuing to work at HaGalil Tours. The claim asserted in the Complaint and in Adelson's affidavit that Interface and Adelson were not aware that I was continuing to work for HaGalil Tours – is false. On the contrary, said fact was never hidden and was evident to all. Furthermore, Interface and Adelson benefited from my work at HaGalil Tours and even utilized it, *inter alia*, in view of Interface and Adelson's great involvement in the fields of tourism (see, *inter alia*, Section 21 of this affidavit on this matter).

A copy of a letter dated June 8, 1997, from the Ministry of Tourism, regarding the Tourism Venture and Adelson, addressed to me as CEO of HaGalil Tours, is attached hereto as **Annex D30**.

Adelson and Interface, *inter alia*, through Adelson who was, as aforesaid, the controlling shareholder of Interface, were well aware that over the relevant period, I worked both for them and for HaGalil Tours, *inter alia*, for the following reasons:

27.1   During the entire period that I worked at the same time both at HaGalil Tours and at Interface and I was issued with pay-slips by Interface (namely from October 1996 until December 1998), my employment was defined as "**Type 2 – part-time**" in the pay-slips that were issued by Interface. Namely, Interface reported that my employment at Interface was not sole employment. Such was also true in my "101" forms which are in Interface's possession and were reported to the tax authorities. It should be stated that Interface is evading transferring to me copies of my "101" forms despite my request. The significance of said definition which was reported, as aforesaid, by Interface's bookkeeping and CPA, is that my employment with Interface and Adelson was a second and/or additional and/or part-time post since my main employment according to my definition by the tax authorities was

at HaGalil Tours. Accordingly, tax calculations were also performed in respect of my salary at Interface.

A copy of my pay-slips in respect of the years 1996-1997 are attached hereto as **Annex D31**.

Immediately upon termination of my employment at HaGalil Tours (as of January 1999), written notice thereof was delivered to Interface's bookkeeping and the definition of the type of my employment was modified accordingly to sole employment. Accordingly, both the reports on my "101" forms and the tax calculations in respect of my salary at Interface were changed.

A copy of my pay-slips at Interface in respect of December 1998 and January 1999, which testify to the transition to sole employment, is attached hereto as **Annex D32**.

27.2    During the time that I served as General Manager of Interface, I gave an affidavit in the framework of a claim that was filed by Melnik against Interface in which I declared that I was managing HaGalil Tours. Adelson received a copy of the above affidavit that was translated for him into English, just as all of the other documents regarding the Melnik trial were translated for Adelson into English. Adelson relied on the above documents both in the claim that is the subject matter of this affidavit and in Labor Case 6245/01, and therefore, he also attached documents to his affidavit from Melnik's trial (see Annexes A, B to Adelson's affidavit).

A copy of the affidavit given by me in Melnik's trial as aforesaid is attached hereto as **Annex D33**.

27.3    In a booklet specifying Interface's business plan from July 1999, regarding the Tourism Venture, it was explicitly stated that I was President of HaGalil Tours. The above booklet was given, *inter alia*, to central governmental entities in Israel and Jordan, such as Prime Ministers, Ministers and senior personnel at the Treasury, Foreign Ministers, the Minister for Regional Cooperation in Israel, the Israeli Parliament's Economics Committee, the Israel Lands Administration, the Municipality of Eilat, the Municipality of Aqaba, the Ministry of Justice and so forth. The said booklet was also delivered to entities abroad in connection with various conference center and casino ventures.

A copy of the foregoing booklet is attached hereto as **Annex D34**.

27.4    In complete contradiction with Adelson's affidavit, in the context of my employment with Interface and Adelson, Adelson demanded to talk with me every day. Adelson would call me and talk with me on various and varied subjects, twice a day, for at least one hour each time, in the morning and in the evening, seven days a week, every day, from any place in the world and to any place in the world. Adelson knew exactly

where to reach me. Adelson knew the telephone and fax numbers at which it was possible to reach me including at my office at HaGalil Tours. Adelson would frequently phone HaGalil Tours and send me material to HaGalil Tours, whether by himself or through his personal secretary.

27.5    Interface had a contact sheet, both in Israel and in the U.S.A, specifying the telephone numbers of Interface's entire staff in Israel – which also listed a telephone number at which I could be reached at HaGalil Tours.

A copy of one of the above contact sheets is attached hereto as **Annex D35**.

The secretaries' office at HaGalil Tours worked in coordination with Interface's secretaries' office including with Ms. Miri Schory (hereinafter: "**Schory**") who was in daily contact with the secretaries' office at HaGalil Tours for this purpose. My entire appointment calendar was managed in a manner that was visible and transparent to both Interface and HaGalil Tours. The foregoing appointment calendar included all of my meetings both in connection with my work at Interface and in connection with my work at HaGalil Tours.

A copy of part of a printout of my appointment calendar during the relevant period is attached hereto as **Annex D36**.

In addition, Adelson's people in the U.S.A and Adelson himself used the services of the secretaries' office at HaGalil Tours, also regarding matters that were not connected to HaGalil Tours. Such being in view of the fact that the secretaries at HaGalil Tours were more senior and experienced than the secretaries at Interface.

Many times, on Fridays, meetings were held with me at the HaGalil Tours offices and telephone contact was maintained with me at the HaGalil Tours offices by: Raviv, Efrat, managers of the companies in which Interface had holdings and even Interface's partners in the said companies (for example Mr. Uzi Katz of Auto Depot, Mr. Edo Schoenberg and Phyllis Gottlieb of IMD Soft). Raviv also requested that I arrange personal credit for him at HaGalil Tours for trips by members of his family and his [female] friend and I even gave authorization to give him a discount at HaGalil Tours. Raviv's sister, Dr. Liora Barash-Morgenstern, was also aware that I worked at HaGalil Tours and even approached me in the context of my work at HaGalil Tours with an offer to produce a special edition of the tourism guide for distribution to passengers of HaGalil Tours and of Royal Jordanian and the partners thereof.

A copy of Dr. Liora Barash-Morgenstern's communication is attached hereto as **Annex D37**.

**In other words, Adelson, all of Interface's employees, and all of the
entities that were connected to Interface in one way or another,
without exception, were aware that I worked both for Interface
and for HaGalil Tours**.

27.6    Adelson was aware that unlike Interface's other senior employees, I
neither requested nor received a company car, so long as I worked at
HaGalil Tours, since HaGalil Tours provided me with a car and driver.
Interface paid expenses in respect of said car, from May 1997 and until
the termination of my employment at HaGalil Tours at the end of 1998.
Adelson's affidavit, according to which I told him that the car I
received from Interface was part of the agreement for the termination
of my employment **is false and untenable**. As aforesaid, I never told
Adelson that I was terminating my employment at HaGalil Tours. The
claim that I wanted to continue using the car provided to me by
HaGalil Tours since it was fancy is unfounded. Adelson himself
traveled with me many times in the above car and could not have failed
to see that the car that HaGalil Tours provided me with was not a
luxury car but rather a commercial car; a red Ford Transit on which
was written on both sides, in Hebrew and in English, in big letters
"HaGalil Tours". I agreed to waive receipt of a company car from
Interface only because in the context of my employment at HaGalil
Tours and so long as I worked at HaGalil Tours, I received a company
car and a full-time driver from HaGalil Tours. There was logic to the
above arrangement since the expenses of my car and driver were
divided between my two employers, Interface and HaGalil Tours. If,
for example, I had received the car from HaGalil Tours in the context
of termination of my employment at HaGalil Tours, I would have
demanded receipt of a company car from Interface and would have
given the car that I received from HaGalil Tours to a member of my
family, exactly as Raviv used to do with the car that was provided to
him by Interface.

A copy of a letter dated May 13, 1998, which puts into writing the
agreement between Interface and HaGalil Tours regarding Interface's
participation in the expenses of the car and driver for me is attached
hereto as **Annex D38**.

A copy of a number of tax invoices issued by HaGalil Tours to
Interface in respect of participation in car and driver expenses are
attached hereto as **Annex D39**.

27.7    Interface would send Mr. Adelson activity reports, from time to time,
in which my actions and activities were reported to him, and in said
circumstances Interface and Adelson were well aware, at all times, of
what I was doing in the context of my position, and at what scope.

27.8    When a group or important figure was to visit Israel or Jordan and was
connected to Adelson and/or his people, Adelson and his people
utilized the fact that I also worked for HaGalil Tours and demanded
my personal involvement in the organization of the visit.

The A.I.P.A.C organization (hereinafter: "**AIPAC**") through the company GWV (hereinafter: "**GWV**" – in respect of which I shall specify below) was a customer of HaGalil Tours. AIPAC hired the services of HaGalil Tours through GWV for the purpose of organizing visits of the members of the American Congress to Israel. Adelson's claim, in Section 23 of his affidavit, according to which HaGalil Tours did not organize the above visits, and dealt solely with the supply of buses for the tour in Israel – **is false**. AIPAC determined the arrival and departure dates, and coordinated some of the meetings with the political figures, whereas HaGalil Tours was responsible for the entire logistical organization of the visits, which included: (a) booking hotel rooms; (b) meals and choosing the menus; (c) coordinating entries to sites; (d) organizing tours and tourist events such as a cruise and shows; (e) payments to suppliers; (f) hostess services at the hotels; (g) handling personal matters of the members of Congress; (g) VIP reception and hospitality for the members of Congress at the airport in Israel; (h) special events; (i) occasionally, meetings with various entities including political figures.

Thus, for example, HaGalil Tours organized: mass on the Kineret, artistic performances, shows by instrumentalists and singers, special meals (such as, for example, a meal at the Israel Museum, a meal at the Jerusalem Theatre, a meal at Mishkenot Shananim, a meal in Ancient Jaffa, a meal with Mr. Shimon Peres at the restaurant Keren, etc.).

In order to illustrate the division of roles between HaGalil Tours and AIPAC it could be said that if, for example, AIPAC coordinated a meeting with a political figure, the role of HaGalil Tours was to book a place to hold the meeting, to organize refreshments, microphones and even the political figure's favorite drink and so forth.

In the context of my work at HaGalil Tours, I was involved and personally supervised all that was involved in the organization of the Congressional delegations' visits by HaGalil Tours. I was also conceptually involved in the organization of the delegations' visits. I personally checked, *inter alia*, the coordination of the arrival at and departure from the airport, the buses, hotels, menus, meals and even the gifts. Contrary, *inter alia*, to Adelson's affidavit, I was present at and participated in the majority of the Congressional delegations' events. In almost any central activity carried out during the said visits, I played a part in the supervision and even visited the place before the event. In this context I shall add and state that I never asked Adelson to involve me in the events of the members of Congress. On the contrary, it was Adelson who requested that I participate in the said events and even requested that I entertain the members of Congress at my home, which I did.

A copy of pictures taken during visits of members of Congress in which I appear are attached hereto as **Annex D40**.

I would provide Adelson, who would usually join the Congressional delegations himself once or twice a year, with an ongoing update of the details involved in the organization of the above visits. Adelson saw me many times whilst I was supervising HaGalil Tours' work during the above visits and he was even involved in the details of the organization of the above visits. Adelson would update HaGalil Tours through me regarding his preferences and wishes. I updated the people at HaGalil Tours regarding Adelson's preferences and wishes and HaGalil Tours acted according to my instructions, insofar as possible, in order to satisfy Adelson. Thus, for example, I recall an instance when Adelson was interested in giving the members of Congress a gift and requested that this be arranged through HaGalil Tours. At Adelson's request I instructed HaGalil Tours to purchase books by Mr. Natan Sharansky in English, the price of each book being approximately NIS 20, and said books were given as a gift to the members of Congress.

In addition, I particularly recall the words of thanks of the Mayor of Las Vegas, another important figure, who toured Israel separately with her daughter, with Adelson's financing, for the organization of the tour by HaGalil Tours, under my supervision.

27.9  As aforesaid, in coordination with Adelson, the payments up to September 1996 in respect of my employment were delayed and I was not even issued pay-slips until October 1996. This being, *inter alia*, due to my deliberating the tax considerations of the manner in which my salary should be paid in respect of my work for Interface and Adelson. Adelson and Interface expressed no surprise in this regard since they were aware that I also worked at the same time at HaGalil Tours and received a salary from HaGalil Tours. Had Interface been my sole source of income, would it have been conceivable, from a financial point of view, not to receive a salary over such a long period of time?

27.10  As aforesaid, in the context of the Middle East Economic Conference held in October 1995 in Amman, a conference guide was issued which included profiles of various companies that participated in the said conference (see Annex D20 hereto). Adelson received a copy of the said guide featuring a profile of HaGalil Tours and my picture, with a caption stating that I was a managing director at HaGalil Tours. In conferences held in subsequent years, in the guides of the Cairo and Qatar conferences, a profile of Interface was featured alongside a profile of HaGalil Tours (in two opposite pages), in which guides I also appeared in the profile of HaGalil Tours. In the profile of HaGalil Tours, my position in the context of my work at HaGalil Tours was explicitly stated. And I shall emphasize, Adelson received a copy of the said guides.

A copy of the title page of the guide for the 1997 Middle East Economic Conference in Qatar and the double page featuring a profile