of HaGalil Tours, followed immediately by a profile of Interface, is attached hereto as **Annex D41**.

27.11   Adelson and Interface and/or others on their behalf benefited from and utilized the fact that I also worked for HaGalil Tours. Adelson and his people in the U.S.A worked exclusively with HaGalil Tours in every matter connected with visits to Israel. In addition, Adelson and his people made use of the name and reputation of "HaGalil Tours". They frequently asked to use my contacts with various bodies throughout the world which had been acquired in the context of my position at HaGalil Tours, to promote their interests and businesses. Thus, for example: (a) Interface and the companies in which Interface and/or Adelson had holdings enjoyed significant discounts on flight tickets and hotels by virtue of my working for HaGalil Tours. **I estimate that the value of the above discounts totals tens of thousands of dollars**. (Thus, for example, Phyllis Gottlieb and Edo Schoenberg of IMD Soft enjoyed a discount at Sofitel Hotel in Tokyo, thus, for example, Raviv and Efrat enjoyed a discount at a Sheraton hotel in New York). A copy of documents testifying to the above discounts are attached hereto as **Annex D42**; (b) At the request of Adelson's security detail and pilots, (who also knew my telephone numbers at the HaGalil Tours offices), I helped in solving problems that arose in connection with landings and various payments in Jordan and also in connection with hotel bookings in Israel. Thus, for example, I helped Adelson in HaGalil Tours' capacity as a representative of the airline Royal Jordanian in Israel, when he was in Jordan and there was a need for landing rights and payment of fees for his private plane; (c) At Adelson's request, I organized a meeting for him with the Head of Domestic and Foreign Security in Jordan, by virtue of the contacts that I had with Jordanian figures in the context of my work at HaGalil Tours as aforesaid. A copy of a document testifying to my extensive contacts with Jordanian figures is attached hereto as **Annex D43**; (d) As specified above and below, when a group or VIP was to visit Israel or Jordan and was connected to Adelson and/or his people, Adelson and his people utilized the fact that I also worked for HaGalil Tours and demanded my personal involvement in the organization of the visit; (d) In view of my vast international experience and my involvement, in the context of my work at HaGalil Tours, in the tourism industry, Adelson required the marketing department of the Venetian Hotel to consult with me on the travel agents to whom it would be worthwhile to allocate rooms at the Venetian Hotel. A copy of documents dealing with this matter are attached hereto as **Annex D44**; (e) I helped Adelson (by virtue of my status at HaGalil Tours) to obtain approximately 20 tickets for the festival at Verona, Italy, a short time before the festival commenced, when all of the tickets had already been sold out; (f) In the context of his contacts with the authorities in Israel, Adelson used the fact that I worked at HaGalil Tours and even utilized my reputation in the field of tourism. Thus, for example, in the context of the contacts with the Israel Lands Administration and the Ministry of Tourism, regarding the allocation of land for the Tourism Venture. See, for example, Annex

D30 above; (g) Through my contacts with various entities in the world in the context of my work at HaGalil Tours, many business opportunities were revealed to Adelson abroad. Thus, for example, Adelson held contacts and examined the possibility of establishing a casino in Cyprus and utilized my contacts with one of the richest families in Cyprus to promote the matter. Thus, for example, Adelson contacted, through me, a member of the Irish parliament who owned a travel agency, in order to look into establishing a casino in Ireland. During the meetings held in connection with the above ventures, the subject of HaGalil Tours and my involvement in HaGalil Tours was raised, sometimes by Adelson himself.

27.12   The law firm Herzog, Fox, Neeman & Co. gave personal legal advice to Adelson and Interface, *inter alia* through the attorneys Yaakov Neeman and Ehud Sol. The above firm's attorneys who also represented Adelson and Interface were well aware that I worked both at HaGalil Tours and at Interface, since they handled both my personal matters and matters of HaGalil Tours on an ongoing basis. Thus, for example, the above law firm handled the merger of HaGalil Tours with the Clal Group, as can be seen from the document that was attached by Interface to Schory's affidavit, in breach of privilege.

The law firm Herzog, Fox, Neeman & Co. represented Adelson and Interface in negotiations conducted with me over approximately one year after the date on which my employment with Interface and Adelson was terminated, throughout all of which negotiations, they never dared to raise the groundless claim whereby Adelson and Interface were not aware that I also worked at HaGalil Tours.

Adv. Yaakov Neeman himself consulted with me in respect of a number of business matters and investments in the tourism industry, since he was aware of my vast experience and involvement in the field of tourism in the context of my work at HaGalil Tours.

27.13   Miriam Adelson was also aware that I worked at HaGalil Tours. Miriam Adelson had a drug rehabilitation clinic. At Miriam Adelson's request, I employed 4 rehabilitated hard drug users at HaGalil Tours. I personally took care of them, and monitored their work. In addition, Miriam Adelson and the manager of her clinic requested that in the context of my work at HaGalil Tours, I donate daytrips to former drug users at the clinic and to the staff, which I did several times. Thus, at Miriam Adelson's request, and in accordance with my instructions, HaGalil Tours was involved in the organization of a cornerstone laying ceremony for Miriam Adelson's drug rehabilitation clinic at Poriah Hospital. I recall that according to my direction, HaGalil Tours donated a bus to bring guests and journalists to the said cornerstone laying ceremony. In addition, I recall that according to my direction, HaGalil Tours donated a bus and guide (at least twice) for the patients and staff at Miriam Adelson's drug rehabilitation clinic in Tel Aviv. Miriam Adelson even approached me in relation to a tour that took place in Jerusalem. During the said tour, a need arose to organize a

lunch. I ordered the meal through HaGalil Tours and thus the affair came to a close.

27.14 HaGalil Tours was also responsible for the organization of the wedding of Yasmin Oxhorn–Lukatz, Miriam Adelson's daughter (hereinafter: "**Yasmin**"). The organization of the wedding was done in coordination with Adelson personally through meetings and telephone conversations held between us. At Adelson's request, in the context of my work at HaGalil Tours, I was personally involved both in the planning and the execution of the above wedding, while all of the details of the wedding, the handling of the guests who came from abroad, their arrival in Israel, their stay in Israel and the tours organized for them in Israel, were under HaGalil Tours' responsibility and my supervision.

Yasmin and her husband, Oren Lukatz, consulted with me a number of times on various matters in the field of tourism. Oren Lukatz, who was an attorney, checked with me the possibility of rendering legal services to HaGalil Tours.

At Miriam Adelson's request, also Sivan Oxhorn Adelson, Miriam Adelson's other daughter, met with me in Paris, France, during a combined business trip for Interface and HaGalil Tours. Sivan dined with myself and HaGalil Tours employees at the said meeting and thereafter, Adelson and his wife received a report in respect of their daughter.

Adelson's family members (his sister and brothers) used the services of HaGalil Tours on their visits to Israel. I recall that Adelson's sister had special demands and that she approached me in connection therewith.

27.15 Friends of Adelson and his wife, both in Israel and abroad, were well aware of my work at HaGalil Tours and even utilized this to such an extent that it almost became a nuisance. I recall that Professor Uriel Reichman of the Interdisciplinary Center in Herzliya requested my personal involvement in the context of my work at HaGalil Tours in connection with the Interdisciplinary Center's trip to Jordan. In addition, Miriam Adelson's friend, Dr. Eli Gruner, approached me following Miriam Adelson's recommendation, in order that I help him book flights abroad through HaGalil Tours. Thus, I also helped Nurit Arad at Adelson's request and she received a discount from HaGalil Tours with my authorization. Also Nurit Arad's daughter, Yael Arad, the well-known Olympic Judoka, was twice a central guest at a travel agencies' conference of Super Charter HaGalil Tours in my presence and even told Miriam Adelson of experiences there. Other friends of the Adelson family were also referred to me as aforesaid.

27.16 In the context of my and Adelson's meetings with politicians such as, for example, Mr. Roni Milo (Mayor of Tel Aviv at the time), with Mr. Amram Mitzna (Mayor of Haifa at the time), with Mr. Ehud Olmert (Mayor of Jerusalem at the time), with Mr. Shimon Peres and with Mr. Ariel Sharon (Minister of Infrastructure at the time), the subject of my

work at HaGalil Tours, including my contacts with Arab countries in the context of my work at HaGalil Tours, was raised for discussion, sometimes by Adelson himself.

In all of Adelson's many shared conversations together with me with Tourism Ministers in Israel: with Mr. Moshe Katzav, Mr. Uzi Baram and Mr. Amnon Lipkin-Shahak, Adelson raised the subject of my working at HaGalil Tours and the central role that I played in bringing tourists to Israel, at his own initiative. In those conversations, Adelson also stated that the Tourism Venture would also step up the attraction of tourists to Eilat through HaGalil Tours too. Also in meetings in Jordan, where HaGalil Tours was one of the central factors in bringing tourists to Jordan, Adelson raised this matter.

27.17 In various publications in the press, some of which were in English and were forwarded to Adelson, it was explicitly stated that I worked at and was involved in HaGalil Tours. I particularly recall an instance in which the King of Jordan, at my request, helped airlift a cardiac patient to Israel. An article thereon was published in the *Jerusalem Post*, which article related my involvement in the matter in the context of my being a director at HaGalil Tours.

A copy of some of the above publications which were forwarded to Adelson are attached hereto as **Annex D45**.

In a letter addressed to me from the late King Hussein, following the foregoing event (and which hints to another event in which Adelson was involved) my role as manager of HaGalil Tours was explicitly stated. This letter was sent to Adelson and the contents thereof explained to him.

A copy of the late King Hussein's letter is attached hereto as **Annex D46**.

27.18 In contacts that Adelson and I conducted with entities abroad, particularly in Jordan, the subject of my involvement in HaGalil Tours came up. I particularly recall that in our meetings with the Jordanian Minister of Tourism, with the Jordanian Foreign Minister, with General Dahabi, former Commander of the Jordanian Air Force, the President of Royal Jordanian, with the Jordanian Ambassador in Israel and with the Israeli Ambassador in Jordan, this topic was raised. The Jordanians would even call me "Mr. Galilee", also in Adelson's presence.

27.19 Moreover, during four and a half years of employment, Interface and/or Adelson never raised any claim that I was not investing sufficient time in my work for them, or that I was too involved in HaGalil Tours, or that I was not supposed to work at HaGalil Tours at all.

28.    As for GWV, this is a subsidiary of Interface in the U.S.A which acted as a representative of HaGalil Tours in the U.S.A. In the context of the representation, GWV heads – who were part of the Interface mechanism in the U.S.A., were in contact with me by virtue of my activity at HaGalil Tours.

Roberts' claim that I told him that I did not work at HaGalil Tours **is false**. Likewise, the claims in the affidavits of Laurence Henry Marder (hereinafter: "**Marder**"), Irwin Chafetz (hereinafter: "**Chafetz**") and Harry Theodore Cutler (hereinafter: "**Cutler**") in their affidavits [sic] (Sections 4, 4 and 3 respectively) that they were aware that I had terminated my employment at HaGalil Tours upon commencing my employment at Interface; that in any event from said date neither they nor GWV had any contact with me in relation to HaGalil Tours; and that their contacts with HaGalil Tours were made through Emmanuel Shacham and/or HaGalil Tours' departments in Jerusalem and Tel Aviv – are **false** claims.

It is not for nothing that Chafetz and Cutler, who are Adelson's partners and who participated together with him in many claims (both as plaintiffs and as defendants) and appeared as witnesses on his behalf in many trials both in Israel and abroad, and even in Adelson's family affairs, have no qualms about asserting false claims against me.

The one and only reason that I asked GWV personnel to abstain, insofar as possible, from involving me in essentially financial affairs between GWV and HaGalil Tours, was that in my capacity as an employee of both Interface and HaGalil Tours, I did not want to find myself in a situation of a conflict of interests. Accordingly, I did not handle any matter connected with the financial affairs between GWV and HaGalil Tours.

As specified below, I was sometimes asked by GWV personnel, who approached me since they were aware that I worked at HaGalil Tours, to help them organize various events and also solve logistical problems that arose, and I did indeed do so insofar as possible and insofar as I found that such help would not place me in a conflict of interests situation.

28.1    **Marder** – Thus, for example, I recall that during May 1999, Marder approached me and requested that I help him solve an urgent problem that had arisen due to a shortage of business class seats for a number of members of Congress who were supposed to come to Israel as part of a group of approximately forty members of Congress and their escorts from the U.S.A. Marder, who was aware that I worked at HaGalil Tours, searched for me at the HaGalil Tours branch in Jerusalem, at the HaGalil Tours branch in Tel Aviv and by cellular phone but was unable to reach me. Ultimately, he left me a message at Interface's offices and although uncustomary in the U.S.A, left his home telephone number due to the urgency of the matter. Subsequently, when we managed to talk, he requested that I utilize my connections at the airline and ask that they move the business class curtain this one time so that members of Congress who could not be seated in business class would not be offended.

A copy of the notice of the message which Marder left me is attached hereto as **Annex D47**.

Marder also came to Yasmin's wedding, which had been organized by HaGalil Tours, accompanied the guests who had come to the said wedding and coordinated, together with me, the arrival and departure of the said guests. Marder spoke with me regarding operative matters in respect of the said wedding a great many times.

Therefore, Marder's claim to the effect that he knew that since I had started working for Interface I stopped working for HaGalil Tours and that neither he nor GWV had any contact with me regarding HaGalil Tours – **is false**.

28.2.  **Cutler** – GWV used the name "HaGalil Tours" as a brand name in all matters pertaining to tours in Israel. I recall talking to Cutler about the fact that GWV was examining the possibility of changing the said brand to Our preaches Legacy [sic]. Cutler said it was the idea of one of GWV's new managers, Michael Shaw (hereinafter: **"Michael"**).

I also learned that during Michael's only visit to Israel in 1996, he met with a friend of his from Gordon Tours and gave him a copy of our program "round tour". Michael attempted a move which would result in GWV ceasing to work [with – missing] HaGalil Tours and moving over to working with Gordon Tours. I contacted Cutler and informed him of Michael's intentions. Following my communication, Cutler instructed Michael to cease his contacts with Gordon Tours, and to work exclusively with HaGalil Tours.

28.3.  I recall that Cutler and his wife personally participated in the U.S. Congressional tours as part of the AIPAC delegations (at least once or twice a year), at Yasmin's wedding events and at the wedding of the GWV partner Chafetz's son. Thus, for instance, on one of the visits of an AIPAC mission to Israel, a visit that was organized by HaGalil Tours and which Cutler too had joined, Cutler, who knew that I worked also for HaGalil Tours, turned to me and complained that the HaGalil Tours hostesses who served the mission members during their stay in Israel were too old, and that he would have liked young hostesses. I disagreed with him, and said that I saw a great advantage in the hostesses being older, because they were more experienced and professional.

Therefore, also Cutler's claim in Section 3 of his affidavit, to the effect that he knew that since I had started working for Interface I stopped working for HaGalil Tours and that neither he nor GWV had any contact with me regarding HaGalil Tours – **is false**.

Also Cutler's claim in Section 3 of his affidavit, whereby he maintained contact with Mr. Emmanuel Shacham throughout the period of my work at Interface is false, for the simple reason that due

to a heart attack, Mr. Emmanuel Shacham only worked for HaGalil Tours for several months.

28.4. **Chafetz** – Thus, for example, I recall that Chafetz too participated in the Congress members' visits to Israel. Chafetz saw me in activities that took place as part of the said visits, my involvement in the organization of the visits, and even turned to me to resolve various problems.

I remember handling Chafetz's son's wedding in Israel on behalf of HaGalil Tours. I was involved in everything related to the organization of the said wedding as part of my work at HaGalil Tours. Approximately one hundred guests were invited to the said wedding, the majority of whom were VIPs from overseas. I was present at all of the said wedding events as part of my position, as aforesaid, and not merely as one of the guests.

The said wedding was complicated logistically, its organization involved much work and much coordination was required. This was so, *inter alia*, in light of the large number of special requests by the guests and by Chafetz and his wife. Most of Chafetz's and the guests' requests were addressed directly to me, and I instructed HaGalil Tours' employees to handle them, and even handled part of the requests myself.

The said wedding took place at the Hilton hotel in Tel Aviv. As aforesaid, many guests arrived from overseas for the said wedding, but each one of the guests arrived and left independently. HaGalil Tours reserved all of the hotel rooms for all the guests. HaGalil Tours scheduled a separate transfer for each one of the guests, in accordance with his arrival from overseas, and thereafter HaGalil Tours arranged to connect that guest with the other guests and with the joint program for the said wedding.

The opening dinner for the said wedding event was organized by HaGalil Tours at Magenda, in Kerem Hateymanim in Tel Aviv. As I recall, only part of the guests who had been invited from overseas had arrived in Israel by that time and participated in the said dinner. I also recall that there were not enough rooms at Kind David hotel in Jerusalem, which put up the guests from overseas. Therefore, to Chafetz's son's chagrin, the bride's family (the Golan family) was put up in Pninat Dan hotel. This was done with my approval and in light of the fact that I had been involved in solving all the problems that had arisen as aforesaid and maintained direct contact with Chafetz.

As part of the said wedding events, HaGalil Tours organized tours that were intended for guests who were visiting Israel for the first time, and tours for those who had already visited Israel and wanted to see something new or special. As part of the said wedding events, the guests and the in-laws' families traveled to the school at Yemin Ord. A ceremony was held at the school with the participation of all of them,

in view of a contribution that was made by Chafetz. In addition, a visit was paid to the air force base in Hatzerim and trips to the Kineret, the Galilee and Masada.

I recall that Chafetz asked me to organize a "men's night" for his son (through HaGalil Tours) with strippers and call-girls. I refused and Chafetz ultimately got help from one of the drivers at HaGalil Tours.

I remember that on the closing night of the said wedding, which was held at Ilana Gur's museum in Jaffa, Chafetz very warmly thanked me and the other workers of HaGalil Tours. Chafetz also consulted with me on the issue of tips for all HaGalil Tours' workers (who had been involved in organizing the wedding) and even gave me thousands of dollars in cash to distribute as tips to the drivers and hostesses of HaGalil Tours.

Therefore, also Chafetz's claim, in Section 4 of his affidavit, to the effect that he knew that since I had started working for Interface I stopped working for HaGalil Tours and that neither he nor GWV had any contact with me regarding HaGalil Tours – **is false**.

Also Chafetz's claim in Section 4 of his affidavit, whereby he maintained contact with Mr. Emmanuel Shacham throughout the period of my work at Interface is false, for the simple reason that due to a heart attack, Mr. Emmanuel Shacham only worked for HaGalil Tours for several months.

29.   The claim made in Adelson's affidavit (*inter alia*, in Section 18 of his affidavit) whereby he would never have agreed to my working elsewhere in addition to my work for him and for Interface, or that it would never have occurred to him to pay me an annual salary of $100,000 had he known that I was working elsewhere – **is false**. One of the basic assumptions upon which the salary that Adelson and Interface had undertaken to pay me was determined, was that I was not dissociating myself from my commitments at HaGalil Tours.

Furthermore, I agreed to receive a salary for my work for Interface and Adelson which was low relative to the salary received by Farbstein (my predecessor), relative to the salary Adelson used to pay persons in managerial positions in the United States, and even lower than my conditions at HaGalil Tours, because my work for Interface and Adelson was a second job, in addition to my work, as aforesaid, at HaGalil Tours.

A copy of a memorandum dated November 29, 1993, which attests to Farbstein's salary, is attached hereto as **Annex D48**.

Contrary to Adelson's false claim (in Section 10), I was not the only senior employee at Interface. Raviv too was a senior employee at Interface. Adelson, who knew that Raviv had more than two jobs at that time (*inter alia*, at the Broadcasting Authority, at Interface and as a partner in a restaurant), approved for Raviv a salary in the same order of magnitude as I was getting (although in

a different payment technique). And this, while Raviv was absent from Interface's offices for a considerable part of the time, and was occupied with many different matters that had nothing to do with Interface's affairs.

A copy of a document attesting to the level of Raviv's salary at Interface, is attached hereto as **Annex D49**.

Furthermore, Adelson's statements as aforesaid are false, and not for nothing. Adelson attached to his affidavit in Labor Case 6245/01 a document which explicitly states that in Interface's budget, one item accounted for the salaries of Raviv (Danny) and myself (Moshe).

A copy of the said document is attached hereto as **Annex D50**.

## The scope of my work at Interface

30.    In the framework of my employment with Interface and Adelson, I invested my best energy and of my time for Interface and Adelson's benefit, as my said position required and as I was asked by Adelson, and even gave this position preference over my other occupations. Thus, for instance, in the midst of concluding the negotiations I was conducting (in reference to HaGalil Tours) with Clal, I had to go on a business trip for Interface to Japan. I therefore left my lawyer a power of attorney, so that he could continue the negotiations in my absence, when there was no way of contacting me in the critical hours as aforesaid.

The fields of my responsibility in the framework of my work were unlimited, and I acted for Interface and Adelson to develop various ventures and promote the intricate interests of Interface and Adelson in Israel and around the world. As Interface's General Manager, I was responsible for Interface's investments in and outside of Israel, and for the identification of new investments in a variety of fields.

As aforesaid, as part of my work for Interface and Adelson, I was required to take many trips to different countries. A large part of these trips were attended also by Adelson himself and sometimes even by his (immediate) family members. *Inter alia*, Adelson and I spent time together in the U.S., Ireland, the U.K., France, Jordan, Cyprus, Turkey, Bulgaria, Hungary, the Czech Republic, Italy and Rhodes, to some of which destinations we traveled together. It should be noted that Adelson was traveling to a large part of these destinations for the first time, and that also during the trips in which Adelson did not participate, I maintained daily and current telephone contact with him.

## Response to the affidavits of Raviv and Schory

31.    In the Complaint and in the affidavits of Raviv and Schory, it was claimed against me that: (a) I used Interface's resources for my private affairs or businesses (for instance, organizing trips to Jordan and Yemen while using Interface's means, name and funds, and all for the benefit of my private businesses and not for Interface's benefit); (b) I would appear at Interface's offices only seldom, for a few hours only at a time; (c) The exception to the

foregoing was when Adelson would come to Israel on visits – in which case I would come to work at Interface's offices, to create a misrepresentation to the effect that I was fulfilling the agreement between myself and Interface; (d) I invested the majority of my time and energy in managing HaGalil Tours or in my internal struggles within HaGalil Tours, and only a very small portion of my time was dedicated to Interface's affairs (according to their estimate, from August 1998 until March 1999 I invested only approximately one third or approximately 35%).

**These claims are false, distorted and perverted, and have the sole purpose of defaming me and "framing" me with a complaint which would cause me to retract my claims against Interface and Adelson.**

32.   As aforesaid, I never undertook to sever myself from my activity at HaGalil Tours and never undertook to devote 100% of my time to Interface and Adelson. On the contrary, Interface and Adelson who is, as aforesaid, the controlling shareholder of Interface, were well aware, throughout the relevant period of time, that I was working for both them and HaGalil Tours. However, the majority of my time was dedicated to Adelson and to Interface.

33.   Usually, in light of the time differences between Israel and the United States, and due to the fact that I was required to make myself available to Adelson, I would arrive at Interface's offices at around 10:00, with the work day lasting until the late hours of the night. Therefore, Interface also employed a team of secretaries to cover a work day of more than 12 hours. As part of my work as aforesaid, at the beginning and end of every work day, I would talk to Adelson for at least an hour or so. The requirements of my position with Interface and Adelson did not demand my permanent physical presence at Interface's offices throughout the working day. I worked for Interface and Adelson also when I was not physically present at Interface's offices. Many times, I continued managing Interface and Adelson's affairs also during time spent at HaGalil Tours' offices, while traveling from the offices home (at Mevaseret Zion), in many meetings that I held outside Interface's offices, on trips abroad, etc.

34.   When Adelson would visit Israel, I would usually pick him up at his home and travel with him to Interface's offices and to meetings on his affairs and on Interface's affairs. While he was in Israel, Adelson demanded that I accompany him to almost all of the social events and business meetings which he attended. Consequently, while Adelson was in Israel I worked for Interface and Adelson approximately 14-15 hours a day. In addition, I would like to note that over the years of my work for Interface, I spent more than six months, in the aggregate, with Adelson in Israel and overseas.

35.   Since I was working two jobs, as aforesaid, I received faxes and messages related to Interface's affairs at my office in HaGalil Tours, just as faxes and messages on HaGalil Tours' affairs arrived at Interface's offices.

36.   Raviv is claiming, *inter alia*, in Section 2 of his affidavit, that from the mid 1990s he was allocated a room at Interface's offices in Israel; that he used to visit Interface's offices regularly; and that he was well acquainted with

Interface's business, due to his acquaintance, ties and conversations with Adelson and with me. **These claims, as aforesaid, are false**.

**The truth is entirely different**. Raviv was not acquainted with Interface's business due to his "acquaintance, ties and conversations with Adelson and with me". **In the relevant period of time, Raviv was employed by Interface for a salary, at the time when I acted as Interface's manager**. However, Raviv wishes to keep this information out of the spotlight, because at that very time, and concurrently, Raviv was an employee of the Broadcasting Authority who was barred from working elsewhere for a salary, in addition to the Broadcasting Authority. This was also the reason why Raviv did not want, at the time, to be issued pay slips by Interface, nor wanted to receive his salary for his work for Interface in Israel, in Israel. Therefore, with Adelson's approval and knowledge, Raviv received his salary in dollars in the United States ($280,000 for fifty months).

A copy of a wire transfer form attesting due to [sic] Raviv's salary is attached hereto as **Annex D51**.

A copy of documents attesting that Raviv worked for the Broadcasting Authority are attached hereto as **Annex D52**.

As part of his work for Interface at that time, Raviv was allocated an office at Interface's offices. Raviv handled different and diverse matters related to Interface and Adelson, took part in meetings on behalf of Interface and traveled overseas at Interface's expense. Being a media person, Raviv handled all of the PR affairs of Interface, Adelson and Adelson's wife and, accordingly, was the contact person who worked vis-à-vis the PR firm of Ms. Orly Katav. As an employee of Interface at that time, Raviv used Interface's office and secretarial services, gave instructions to Interface's workers, and was listed on the contact sheet of Interface's employees. Interface paid Raviv's expenses for a telephone at his home and a cellular telephone, and for meals in Israel and overseas in the context of his work as aforesaid. Interface bought Raviv, for his work, a Toyota, and paid him car expenses, even though it was used in practice by his family and not by Raviv himself.

A copy of documents pertaining to Raviv's work for Interface as aforesaid, are attached hereto as **Annex D53**, and see also Annexes D49-D51 hereto.

37.   **The claims made in Raviv's affidavit (Chapter B of the affidavit) regarding the scope of my work, my working hours, or the time which I dedicated to my work for Interface and Adelson – are false**. Raviv cannot attest to the aforesaid because Raviv himself, even though he was a salaried employee of Interface, was not continuously present at Interface's office. Raviv was present at Interface's offices for a small part of the working hours that I dedicated to Interface and Adelson's affairs (either in or outside the office). When Raviv would arrive at Interface's office, he would generally come in at 08:00 am (after, so he told me, having had the time to do some morning sport activity and pay a home visit to Ms. Mira Shai (hereinafter: "**Mira**"), with whom Raviv had maintained – so he told me – a personal and business relationship). Just as I held daily conversations with Adelson, Raviv

too held a daily conversation with Adelson, generally between 08:00 and 09:00, after which he would go out to handle his private affairs and businesses. Sometimes, Raviv would return to the office in the afternoon for a short while. Also Raviv's time sheet at the Broadcasting Authority shows that he was usually present for eight hours a day, four times a week. On this matter, see Annex D52 hereof.

Thus, Raviv was in no position to "monitor" my working hours on Interface and Adelson's affairs, and certainly was unable to "monitor" the hours that I spent at Interface's offices.

38. Raviv, a man who has no qualms about deceiving his workplace and family, is now trying to deceive the Honorable Court while shamelessly and unhesitatingly rebutting[4] false, vague and general claims against me, without any foundation, with regard to the scope of my work, my working hours, or the time which I dedicated to my work for Interface and Adelson.

This is a man who, *inter alia*, despite the fact that he was barred from taking paid employment elsewhere parallel to his work for the Broadcasting Authority – worked for Interface; who managed, in practice, a business in the productions field under the trade name of "Take One" (a business which was formally registered in the name of "Mira Shai" – as authorized dealer); who wrote screenplays for commercials, etc., for pay; who, according to information that emerged from the press – was employed by Mr. David Apel and was even his confidant, according to a *Yediot Aharonot* article of March 16, 2001 which is attached hereto as **Annex D54**. Raviv helped Apel, *inter alia*, in planning the business plan for the Greek island; organized, for pay, interview evenings before an audience, in Holon, in which he acted as researcher, producer and interviewer; was a guest anchor on the show *Hakol Diburim*; and, so Raviv told me, was a partner in the restaurant "*Hamshoush*" in Tel Aviv.

Furthermore, in the last year of my work for Interface and Adelson, Raviv relentlessly undermined me, with the intention of stepping into my shoes.

39. Likewise, Schory's testimony is fraught with lies and inaccuracies. Schory finished working for Interface already in August 1999, so she did not in fact work the **entire** period in which I worked for Interface and Adelson. Also during the period of her employment with Interface, Schory was not present throughout the hours of my work for Interface and Adelson, at or outside of Interface's offices. Schory used to be at Interface's offices five days a week, Sundays-Thursdays, from the morning hours, and would finish working between 16:00 and 17:00 and sometimes even earlier. As I described above, my hours of work for Interface and Adelson far exceeded the hours of Schory's presence at Interface's offices, and my work was often carried out outside Interface's offices.

Also Schory, who never approached me, never asked me, and never commented to me either implicitly and/or directly on the manner and scope of

---

[4] See note 1 supra. See also the second paragraph in Section 39, in which the correct spelling is used.

my functioning, has no qualms about carelessly raising false, vague and general claims against me, without any foundation, with regard to the scope of my work, my working hours, or the time which I dedicated to my work for Interface and Adelson. On the contrary. Throughout the period of my work with Schory, she had expressed much appreciation for my actions and devotion.

40.  It is worth noting and emphasizing that on its face, Schory's testimony is clearly tendentious and untrustworthy. In my affidavit in Labor Case 6245/01 it was mentioned that the sum of NIS 10,000 which was deducted from my salary close to the date of termination of my work for Interface and Adelson, was unlawfully deducted, because Schory took the said amount. In retrospect, Schory is admitting that she received this sum in cash, but is claiming that she gave it to me. I am denying this allegation. In addition, in her affidavit, in Section 9, Schory explicitly admits that after I filed my claims against Interface and Adelson, her services were retained by Interface for the sole purpose of finding "incriminating" information against me. It is worth mentioning again that Schory was terminated, and as we can see, as part of Interface and Adelson' attempts to achieve their goal of ruining my reputation and standing, Schory's services were **re-hired**, to serve as a mercenary in Interface and Adelson' hands in the battle being waged against me. And this is after she was terminated, as aforesaid, and after I claimed that she took NIS 10,000 from Interface. How, then, is it possible to believe a person who is receiving remuneration for his testimony and has a clear interest in "incriminating" me? It is a clear case of "testimony buying".

**It is not for nothing that Schory and Raviv, Interface's two central witnesses on whose affidavits Adelson relies, in his affidavit, more than ten times, do not dare to say what is clear and manifest, namely that they knew about my work at HaGalil Tours.**

## Claims regarding the use of Interface resources and funds

41.  Following is my response to issues raised in the Complaint and in affidavits on behalf of Interface in lieu of direct testimony which, according to Interface, establish the utterly unfounded claim whereby I took advantage of the resources that Interface placed at my disposal and/or made use of Interface funds to employ workers other than for the needs of Interface and/or Adelson.

## Ms. Orly Katav's PR firm

42.  **During the term of my employment with Interface and Adelson, I did not personally retain, nor made any personal use of the services of the PR firm of Ms. Orly Katav** (hereinafter: "**Katav**"). Furthermore, insofar as HaGalil Tours made any use of the services of Katav's PR firm – HaGalil Tours itself paid Katav the full consideration for such services, without any connection to Interface.

43.  Katav's firm was retained by Interface already in 1994, even before I started working for Interface and Adelson. It was my predecessor, David Farbstein, who starting using Katav's services. Katav's services were retained by

Interface via Raviv and Farbstein for the purpose of promoting the issue of a casino in Israel and to promote the status, businesses and name of Adelson in Israel. During the period of my employment with Interface and Adelson, it was Raviv who worked opposite Katav's firm and who was Interface's contact person, by virtue of his being a media person. I should note that in my presence, Katav met with Adelson at least five times, of which we even dined together once. I know that Katav met with Adelson's wife, not in my presence, at least twice with regard to the PR services that were rendered to them by Katav's firm. Katav's services were rendered also to Adelson's wife, at Raviv's initiative, to promote a clinic of hers in Israel.

A copy of a list of telephone numbers prepared by Raviv with regard to Miriam Adelson's clinic, is attached hereto as **Annex D55**.

Adelson is lying again in Section 28 of his affidavit, where he says that he was opposed to using PR firms, since Adelson himself invested financial resources (tens of thousands of NIS a month) and time in the lobbyist Boris Krasni. Boris Krasni's job was to handle politicians, decision-makers and public-opinion-shapers in order to promote the issue of opening a casino in Israel.

For the sake of illustration only, it shall be noted that an entire wall in Adelson's personal office in Israel was covered with press photos from Israel and overseas.

44. I personally did not use Katav's services in the relevant timeframe, not even in connection with the legal struggle opposite Clal Tourism Ltd. (hereinbefore and hereinafter: "**Clal**"). In the context of the attempt to settle the legal proceeding that was conducted between myself and Clal, Clal, with my consent, approached Katav in order to explore with her the possibility of her being responsible to draft and publish an apology to me by Clal. She was approached because of the need to appoint a neutral PR person to be responsible for publishing the apology. Based on my acquaintance of many years with Katav I trusted her, as did the arbitrator in this matter and Clal's people, which is why they turned to her. In practice, the notice was never published.

#### Employment of Ms. Iris Mantzer

45. **Ms. Iris Mantzer (hereinafter: "Mantzer") engaged, throughout the entire period in which she worked for Interface, in Interface and Adelson's affairs**. The claim made in the Complaint and in Raviv and Schory's affidavits, whereby Mantzer, who was employed by me via Interface, did not deal with Interface's affairs but with my private affairs – **is false**.

46. Mantzer, as well as Ms. Schory, assisted me as she was required in other matters which I handled, even if they were not directly connected to Interface or Adelson. As specified below, Interface and Adelson were aware of other matters which I handled, which were not directly related to my work for Interface and Adelson, and never commented thereon. Thus, for instance, Mantzer helped me organize a visit by a mission of Jewish Rabbis to Yemen. I **volunteered** to organize the Rabbinical mission to Yemen as a contribution to

the community, while using my international connections with Arab countries. Adelson and Interface knew that I had volunteered for the task and, as specified below, Adelson even assisted me in this matter.

47.   Mantzer started working for Interface as a secretary after having been interviewed by my assistant, Efrat, and thereafter by me. Adelson knew of Mantzer's employment and even met her when she started working, while on a visit in Israel. Contrary to the claims made in Adelson's affidavit, I did not need his approval to employ a junior administrative worker at Interface. How, then, is this claim consistent with what is claimed in Adelson's affidavit, according to his statement (which is denied), whereby he had no time to supervise what was going on in Interface or my work? Furthermore, there is nothing in Sections 17-18 of Annex A to Adelson's affidavit on a procedure for employing junior workers for Interface. All that is said is that Adelson approved the employment of Mr. Moshe Melnik. However, as distinguished from Mantzer's employment, Mr. Moshe Melnik was designated for a senior executive office at Interface, and therefore Adelson's approval of his employment was required, as he was required, at the time, to approve Efrat's employment.

## Use of Civil Intelligence Services

48.   The services of Civil Intelligence were retained by me to conduct public opinion polls or defensive measures related to Interface and Adelson's affairs. Civil Intelligence was not retained by me personally or via Interface in order to perform any initiated detective or investigation work. As aforesaid, as part of my work for Interface and Adelson we acted to establish the casino venture in Israel or in Jordan. For the purpose of promoting the venture, Interface retained the services of Civil Intelligence, in order to examine the Israeli public's position on the issue of a casino in Israel.

A copy of a tax invoice issued by Civil Intelligence for a poll performed thereby, is attached hereto as **Annex D56**.

A copy of a fax dated April 11, 1999 from Efrat Lascot Fischer regarding the translation of the said poll is attached hereto as **Annex D57**.

49.   Various factors were involved in the issue of a casino in Israel. The competition between these factors was particularly fierce in view of the huge economic interest inherent in the venture. One of the factors involved was Mifal Hapayis, which retained the services of Meir Palevsky (a private investigator) and appointed him as the person in charge of the casino subject matter. Other persons involved were Yaacov Nimrodi of Hakhsharat Hayishuv, Ran Packer and Reuven Gavrieli. At a certain point I learned that secret plans and documents which Interface had prepared on the issue of the casino had reached Nimrodi, Ran Packer and probably also Mifal Hapayis. Moreover, Ran Packer showed me a copy of a document which had reached him, and which I had prepared. Interface retained the lobbyist Boris Krastani to promote the casino venture in Israel. Upon termination of his work, rumors arose that he was involved in the casino issue both in Eilat and in Mifal Hapayis. I was very concerned about the leaking and the suspicious noises on

the telephone lines at my home and at Interface's offices. I also suspected an involvement in the leaking by Raviv (who was probably tied, in such or another manner, to some of the foregoing entities).

In other words, the atmosphere was such that caused Interface to be in a permanent state of defense surrounding the casino issue for fear of leaking. I feared that leaking originated either from persons inside Interface or from entities competing with or hostile to Interface or its workers quoting[5] Interface's and my telephone lines, in which, as aforesaid, peculiar noises were audible.

On the atmosphere in Israel on the opening of a casino in Israel, see the newspaper article of *Yediot Aharonot* of September 21, 2001, attached hereto as **Annex D58**.

I related my said concerns to Raviv. Raviv, on his part, told me that an investigation was being conducted against him at the Broadcasting Authority and of his fear that an investigation ordered by his wife was being conducted against him on personal matters. Therefore, also at Raviv's request and in order to protect the interests of Interface and Adelson, Interface retained the services of Civil Intelligence, at my instruction, to conduct a technical check that there were no wiretaps at Interface's offices in Ramat Gan and at my home in Mevaseret Zion. This investigation yielded no results.

In this context I should note that to the best of my knowledge, monitoring activities were indeed conducted and ordered by the Broadcasting Authority against Raviv, and even mentioned in the report of the Broadcasting Authority's comptroller.

A copy of a newspaper article regarding an investigation conducted by the Broadcasting Authority with respect to Raviv is attached hereto as **Annex D59**.

## Trips to Jordan

50.  **During the term of my employment with Interface and Adelson, I personally never organized trips to Jordan.** The claims made in the Complaint and in the affidavits on behalf of Interface in lieu of direct testimony that I organized trips to Jordan, are false and lack any basis in reality. All of my trips to Jordan were made within the framework of my work for Interface and Adelson to promote business and interests of Interface and Adelson in Jordan or as part of my work for HaGalil Tours. On this matter, see Annex D65 hereto.

## Flower bouquet

51.  One of the examples cited in Schory's affidavit of an alleged use that I made of Interface's resources (even though it is not mentioned in the Complaint and constitutes a prohibited extension of the range of litigable issues) is that I paid

---

[5] Translator's note: Sic [מצוטטים]. Should be 'wiretapping' [מצותתים]. Here too, the two verbs are homophones.

"Eden Flowers" with Interface funds, by a check in the sum of NIS 550, for the delivery of flower bouquets, *inter alia*, to my home in Mevaseret Zion. Over and above this claim being petty and vexatious, it has no basis in reality and is false. From the invoice attached to Schory's affidavit as Annex K, one can see that the date on which one of the flower bouquets was delivered is my birthday. It may further be seen from the invoice that the delivery was not ordered and/or sent at my initiative and/or by me, but by "Iris" or other Interface workers. I never ordered flowers from Eden Flowers and never spoke with them. The bouquet was paid for by Interface because it was sent to me by Interface for my birthday, as Interface used to do every year. And as for the other flower deliveries, I had nothing to do with them. The reason I signed the check to "Eden Flowers" was because **I signed all of Interface's checks, because I was the only authorized signatory of Interface**. It should be emphasized that this is only one of many examples that illustrate how unfounded and vexatious Interface's claims are, and how they lack any basis.

A copy of a greeting card that was attached to a flower bouquet that was sent to me on Interface's behalf, on one of my birthdays, is attached hereto as **Annex D60**.

## Spanish ballet

52.    Another example cited in the Complaint and in the affidavits of Adelson, Schory and Mr. Dady Zamir (hereinafter: "**Zamir**") of an alleged use that I made of Interface's resources (even though it is not mentioned in the Complaint and constitutes a prohibited extension of the range of litigable issues) is that I paid the Friends of Rabin Medical Center (hereinafter: "**FRMC**") for the "Spanish Ballet" performance, which I attended together with another person, using a NIS 1,000 check drawn on Interface funds. **This claim too, similarly to all the other claims, is unfounded and false**. I did not attend the "Spanish Ballet" performance or any other dance performance. Interface donated NIS 1,000 to FRMC for business reasons. A special machine, that was developed by one of Interface's subsidiaries, IMD Soft, had been installed at the intensive care department of the Rabin Medical Center, as an experiment, pending the adoption of a decision on whether to buy it. Adelson and I visited the Rabin Medical Center twice in order to convince the Rabin Medical Center to buy the said machine. The machine was not donated to the Rabin Medical Center for business reasons – so as not to create a precedent for other hospitals. Therefore, in order to encourage the purchase of the said machine, Interface donated NIS 1,000 to FRMC.

The said donation was effected by buying tickets for the "Spanish Ballet" performance. In practice, I did not attend the said performance, *inter alia* because I am not a fan of dance shows. The claim that the standard letter that was issued by FRMC regarding a payment demand (Annex SS to the Zamir affidavit) attests that I was present at the said performance is, at the very least, puzzling. This letter is a standard circular that was sent to me as the General Manager of Interface, to Interface's office address. There is nothing in the said letter to attest, either directly or indirectly, that I attended the said performance. When Adelson's wife (who was once a physician at Ichilov hospital) learned of the contribution to FRMC, she asked Adelson to stop

donating to FRMC because it put her in an uncomfortable situation. Ultimately, Adelson and I agreed that no further donations would be given over and above those already given to FRMC, so as not to compromise the relationship between Adelson and his wife.

## Franco Rosso Incentive

53.    Adelson frequently used my international connections with various entities and persons around the world for his private businesses and/or affairs. Thus, for instance, Adelson wanted to obtain approximately 20 tickets for the festival at Verona, Italy, shortly before the festival opened, when all of the tickets had already been sold out. I put Adelson in touch with Mr. Emmanuel Segara of the travel agency Franco Rosso Incentive (hereinafter: "**Emmanuel**"), an Italian travel agent whom I knew in the context of my international connections in the tourism industry. Emmanuel, immediately and without hesitation, agreed to help Adelson, and managed to get him what he wanted, against all odds, and even arranged for accommodation for Adelson in Verona proper. It should be emphasized that due to the excellent connections between Emmanuel and myself, he did not charge Adelson for the services rendered by him, even though the matter involved great efforts on his part and financial expenditure.

54.    Some time thereafter, while I was working for Interface and Adelson, Emmanuel approached me and asked for my urgent assistance. Emmanuel had convinced a large Italian company to organize an incentive tour to Israel. In order to "close" a deal with the said company, Emmanuel needed a quotation from an Israeli travel agent. Emmanuel did not know any travel agents in Israel besides HaGalil Tours. In view of the distress in which he found himself, he turned to me even though he knew that I no longer worked for HaGalil Tours. In light of the assistance he had extended to Adelson in the past and the connections between us, I could not turn him down. Emmanuel was concerned that another Italian travel agent would manage to "take over" the deal and would choose another destination over Israel. I therefore agreed to help him, until he found an Israeli travel agent who would handle the matter on a permanent and ongoing basis. **I did not charge him therefor**. My assistance to Emmanuel was expressed in my giving him several general data, so as to enable him to continue negotiating with the said Italian company. Ultimately, I connected Emmanuel with the Israeli travel agency Isram via Ms. Margalit Gordon, and since then that agency has handled the matter.

A copy of Emmanuel's letter that was sent to me and confirms the aforesaid, is attached hereto as **Annex D61**.

## Trip to Yemen

55.    The Prime Minister of Yemen in the relevant period, who knew me from his previous offices as the Foreign Minister of Yemen and as the Yemenite Ambassador to the United Nations, approached me in order to open the gates of Yemen to visits by Yemenite-Israelis, thus changing Yemen's shaky image in the United States and enabling a meeting between the President of the United States and the President of Yemen, while using my political

connections in the United States, in Arab countries and in Israel. I gladly agreed and regarded it truly as a mission. I was also involved in the tourism breakthrough with Egypt, Jordan, Morocco, Qatar, Indonesia and in a certain sense also with Syria. When it appeared that a window of opportunity had opened for a breakthrough also with Yemen, and having been approached as aforesaid, my wife and I volunteered to organize a back-to-the-roots trip to Yemen for a mission of Jewish-Yemenite Rabbis (hereinafter: the "**Rabbis' Mission to Yemen**").

A copy of a letter from Rabbi Ovadia Yossef to the President of Yemen and the statements of the President of the United States at the time, Bill Clinton, to the President of Yemen, which attest to the importance of the organization of the Rabbis' mission, are attached hereto as **Annex D62**.

Adelson and Interface knew that I had volunteered to organize the Rabbis' Mission to Yemen and even assisted me therein. Approximately one week before the date of the trip to Yemen, Adelson visited Israel and was aware of the goings on in connection with the Rabbis' Mission to Yemen. I even forwarded a copy of an article in English on the Rabbis' Mission to Yemen to Adelson.

A copy of the *Jerusalem Post* article on the Rabbis' Mission to Yemen is attached hereto as **Annex D63**.

It would not be superfluous to note that **organizing the Rabbis' Mission to Yemen was, from my point of view, a mission and of course I received no consideration therefor**. Moreover, I personally financed the trip for four elderly Rabbis who lacked the financial means to pay for the trip. The trip was important and many, including the Israeli media, regarded it (also without Yemen officially recognizing Israel) as an historical step.

56.    Organizing the Rabbis' Mission to Yemen involved complex logistic planning and the handling of bureaucracy. Since I spent most of my time working for Interface and Adelson, my wife Tirtza assisted me greatly in organizing the trip. Furthermore, since I spent most of my time at Interface's offices, I needed at times, in urgent cases, to use Interface's fax and telephone for this task, and sometimes Interface's secretaries.

For security reasons, the Yemenite travel agent was unaware that the mission was coming from Israel, and therefore the correspondence and telephone calls with the travel agency in Yemen were performed via the U.S.A. and England. Adelson knew of, and even helped me in the organization of the Rabbis' Mission to Yemen. Thus, for instance, Adelson's personal secretary sent letters to Yemen herself on Interface U.S.A. letterhead, and placed conference calls with Yemen for me via the U.S.A. Furthermore, during the actual visit to Yemen I spoke with Adelson and related experiences from the visit to him. In addition, Adelson's personal secretary connected telephone calls between the people from the Rabbis' Mission to Yemen and Israel.

57.    I took days off my work at Interface for the said trip to Yemen, which vacation days were reported and deducted as required. See Annex D4 hereto.

**Legal proceedings against HaGalil Tours shareholders**

58.   As aforesaid, I was a shareholder and officer of HaGalil Tours. Clal also had
      holdings in HaGalil Tours. Due to disputes which had arisen between Clal and
      myself, I wanted to institute legal action against Clal. However, prior to
      instituting such legal action, I consulted with Adelson in his capacity as my
      employer, in view of the tight relations that existed between us as aforesaid,
      and shared my vacillations with him. Contrary to Miriam Adelson's opinion,
      Adelson's opinion was that I should insist on my rights and conduct a legal
      struggle with Clal. Furthermore, Adelson told me that he would gladly give
      me any assistance I needed to manage the legal struggle. In other words,
      Adelson not only did not object, but even supported me in the legal struggle
      against Clal and even offered his help. Adelson encouraged me to start a
      struggle against Clal even though he knew and even told me that the struggle
      could cost me time, financial resources and energy. I never tried to hide the
      legal struggle I was conducting against Clal, on the contrary. I updated
      Adelson occasionally of new developments in the matter and even consulted
      with him on the matter every now and again. **Interface and Adelson knew of
      the conduct of the legal struggle opposite Clal, which was even published
      in the media. They were aware of the great resources that I invested
      during that struggle, and never expressed any reservation with regard
      thereto**. On the contrary, I received, on that matter, Adelson's full support and
      encouragement. Thus, for instance, my wife and I celebrated, also with
      Adelson and his wife, my winning a central stage of the struggle against Clal,
      at a restaurant in Tel Aviv.

59.   The claim made in the Complaint and in Schory's affidavit that I ordered
      Schory to block Interface's fax machine by using such machine as a
      photocopier, in order to avid receiving faxes pertaining to the legal struggle
      opposite Clal – **is untrue**, nor is it consistent with common sense, particularly
      in light of the fact that documents could easily have been sent to me in any
      other way (by messenger, post, etc.). In addition, to the best of my knowledge
      using a fax machine to make photocopies does not "block" the fax receipt
      function, because the fax has an independent memory which is supposed to
      save the faxes received. Moreover, the legal struggle opposite Clal was
      managed by counsel for the parties. Therefore, all of the correspondence and
      contacts were conducted mainly between the lawyers, and there was no
      importance to my directly receiving, or not receiving, any correspondence on
      behalf of Clal or its counsel.

**Recording of the press conference of the former Speaker of the Knesset, Mr. Dan
Tichon (hereinafter: "Mr. Tichon")**

60.   In August 1999 I was contacted by Mr. Tichon who asked me for urgent
      assistance. He told me that the recording company he had ordered to record a
      press conference he was about to hold about one hour later had refused to
      perform the recording, unless it was provided with a written undertaking by a
      limited company. The said recording company did not agree to any other
      payment alternative.

I agreed to help Mr. Tichon, *inter alia* in light of the tight relations between Adelson and Mr. Tichon and in light of my acquaintance with Mr. Tichon. Mr. Tichon and I agreed that upon receipt of the tape and the invoice, Mr. Tichon would settle the matter and arrange to remit to Interface the payment that was due thereto.

A copy of pictures from Adelson's wedding and from Mr. Benjamin Netanyahu's election victory event, in which Adelson and Mr. Tichon appear together, are attached hereto as **Annex D64**, and see also Annex D55 hereto.

### Adelson, contrary to his affidavit, was aware of all of my activities in Interface and for him, as well as of my activities on other matters

61. Adelson supervised all of Interface's affairs and his other affairs that were handled by me on an ongoing basis, even though he spent much time on the project of building the Venetian Hotel in Las Vegas. Thus, for instance, Adelson would hold long conversations with me on a daily basis, for approximately an hour at a time, twice a day from anywhere in the world to anywhere in the world, throughout the entire period of my employment. Adelson would call me in the morning hours (the conversation would generally end at 11:00), and once again in the late hours of the night, sometimes even at midnight, and talk to me for a long time, without any consideration for the late hour. Adelson also spoke with Raviv on a daily basis. Adelson used to visit Israel frequently. On his visits, Adelson personally supervised, *inter alia*, the goings on at Interface and my work for him and for Interface. I spent many hours with Adelson on joint trips overseas, in the framework of my work for him and for Interface. During the years of my work at Interface, I spent, in the aggregate, more than six months with Adelson in Israel and overseas.

62. Adelson is claiming in his affidavit, *inter alia*, that: (a) Interface and Adelson learned only in retrospect and as specified from [sic] the affidavits of Zamir, Raviv and Schory, of the claims against me (that are mentioned above); (b) In the years of my appointment as Interface's General Manager, were [sic] years in which he was very busy building a large project – a hotel in Las Vegas (the Venetian Hotel). For this reason, and in view of the geographic distance and the time difference between Israel and the United States, Adelson was unable to dedicate much attention to Interface or to supervise my actions in the relevant period; (c) I abused the trust he placed in me.

Over and above the fact of the claims against me (as mentioned above in the affidavits of Adelson, Zamir, Raviv and Schory) being utterly groundless, Adelson's claims whereby he was unable to dedicate much attention to Interface or supervise my actions in the relevant period, and that I abused the trust he placed in me – have no basis in reality and attest that Adelson is lying in his affidavit. This is true particularly in light of the daily contact and long conversations that were held between Adelson and myself and between Adelson and Raviv.

63. For approximately four and a half years I served my employers, Interface and Adelson, faithfully, while all the while maintaining the most tight, almost

intimate, connections with Adelson. Throughout the period of my employment with Interface and Adelson, I won praise from Adelson and greatly assisted him in promoting his personal and business interests in Israel. As aforesaid, I was Adelson's right-hand man and confidant. The relationship of trust between Adelson and myself was so fierce, that Adelson gave me a power of attorney and appointed me as a signatory in approximately ten personal bank accounts in Israel, from which moneys were remitted to members of Adelson's family, and in a special bank account (together with Adv. Yaakov Neeman) from which donations were remitted to various associations in Israel. In this context, I was responsible for millions of dollars of Adelson's money, and was involved in his most secret affairs.

64.  Adelson knew exactly where to reach me. Adelson knew the telephone and fax numbers where I could be reached, including at my office in HaGalil Tours. Adelson frequently used to call HaGalil Tours and send me material to HaGalil Tours, either himself or via his personal secretary. As aforesaid, Adelson used to call my home, also on Saturdays and holidays and also at irregular hours (around midnight).

## Overseas travel

65.  The claim made in Section 31 of the Complaint, whereby "Hananel's job description did not call for Hananel to travel abroad. Hananel's duty was to identify investments for Interface (mainly in the field of high-tech) **in Israel**. Hananel was invited on occasion by Interface to meet with Adelson in Las Vegas in the United States. At times, Hananel was asked to join Adelson's trips to Jordan in order to assist Interface in the promotion of a joint Jordanian-Israeli project. Over and above the aforesaid – from Interface's point of view, there was no justification for Hananel to travel overseas" – **is false**.

Adelson and Interface are telling a bald-faced lie. Throughout the years of my work for Interface and Adelson, I was required to take, as part of my work for Interface and Adelson, many (dozens of) trips to various countries around the world. At times, I traveled also with Interface employees (Raviv, Efrat, Harry Kromanchero, Tom White), and at times I traveled with employees of the companies in which Interface had holdings (Phyllis Gottlieb, Edo Schoenberg, Alon Haike, etc.). Adelson himself, and sometimes also members of his immediate family, also took part in a large part of the said trips (more than twenty trips). Thus, for instance, Adelson and I were at: (a) Turkey – on a tour of five casinos in Antalya; (b) Greece – to consider a proposal to buy the "Roses" casino in Rhodes; (c) Italy – visiting Murano exhibitions in Milan, workshops in Venice, visiting with architects and interior designers, photographing sites in Venice and visiting the quarries in Carrera. This was done in the context of my involvement in Adelson's project to construct the Venetian Hotel; (d) Hungary – visiting iron foundries for lampposts and ornaments for the Venetian Hotel; (e) Ireland – to examine a proposal to build casinos and a conference center in Dublin; (f) France – for meetings in connection with restaurants and houses of fashion for the casino and shopping center at the Venetian Hotel; (g) The Czech Republic – visiting glass factories in connection with the Venetian Hotel; (h) Bulgaria – visiting with the Bulgarian Vice President and Minister of Finance in order to examine a

purchase of crystals and the construction of a casino; (i) Jordan – on a visit of the Congressional delegation to Jordan, visiting with the Jordanian Water Minister in charge of the ties with Israel, with the Jordanian Minister of Tourism, with the Jordanian Prime Minister and with the King of Jordan and others. Meetings with Abu Rahev, a potential partner for the construction of a casino in Jordan and a meeting with Omar Salah regarding the construction of a conference center in Amman, and a Club Med in Aqaba. A copy of documents pertaining to my trips to Jordan are attached hereto as **Annex D65**; (j) Cyrus – examining the construction of a casino; (k) United States – for meetings with Adelson in New York, Boston and Chicago. Contrary to the statements made in the Complaint, these were not meetings on personal matters. I also met with Adelson in Las Vegas on personal matters of Adelson's, at his request.

As aforesaid, and in addition to the above, the high-tech field was one of the many and diverse fields in which I engaged in the context of my work for Interface and Adelson. With the knowledge of Adelson, who did not trust entrepreneurs, and in coordination with him, I traveled around the world also for high-tech-related business purposes. Thus, for example, I traveled to: (a) Belgium – for a high-tech exhibition; (b) France – where I held several meetings with executives of Pysis (a competitor of IMD Soft) to review various proposals to buy Pysis, to sell IMD Soft and to merge the two companies; (c) Barcelona – visiting Pysis's development center; (d) London – to meet with investors in the high-tech field; (e) Germany – to meet with HP people; (f) United States – to meet with various investors in the high-tech field in New York, with Data Scope people in New Jersey and for the HIMS convention in Orlando; (g) Japan – to recruit investors for IMD Soft.

A copy of documents in connection with my overseas trips as aforesaid, in the context of my work for Interface and Adelson, are attached hereto as **Annex D66**.

66. It should be noted that also during my overseas travel without Adelson, I maintained continuous and daily telephone contact with him. Before every trip I made abroad, a contact sheet was prepared with the telephone numbers and places where I could be reached, which was forwarded to Adelson and to his personal secretary.

A copy of a sample telephone list for my trip to Paris and London between November 11 and 17, 1999, is attached hereto as **Annex D67**.

How can Interface and Adelson now claim that my work did not require me to travel overseas, when the controlling shareholder of Interface, Adelson, participated in a considerable part of these trips, and when members of his immediate family and workers of Interface and of companies in which Interface had holdings, participated in some of them? So long as I was employed by Interface and Adelson, Adelson asked me to accompany him on many trips around the world. Now, after my termination, Interface is claiming that there was no justification for my traveling abroad. The absurdity is self-evident and the lie is clear.

67.    **It should be emphasized that I did not take the moneys mentioned in Section 34 of the Complaint and/or in the affidavits on behalf of Interface in lieu of direct testimony, including in connection with overseas travel. I did not make use of Interface funds for trips and expenses overseas other than in the context of my work for Interface and Adelson. This was because in the few cases in which expenses were incurred other than in the context of my work for Interface and Adelson, I gave an instruction to deduct the said expenses from the salary that was paid to me by Interface, and this was indeed done. When Interface paid moneys that were paid by me via Interface's credit card for overseas travel – it was for my expenses and/or expenses of other Interface employees and/or of affiliated companies, as part of the work for Interface and Adelson.**

68.    Insofar as Interface was charged various amounts for expenses of companies in which Interface had holdings, for whose affairs I traveled abroad, I instructed that such amounts be charged to the companies, as was indeed done. The reason that Interface's credit card was used for the expenses of companies in which Interface had holdings as aforesaid, resulted from the categorical refusal of Adelson himself to approve the issuance of a separate credit card for each one of the said companies.

A copy of several credit card statements of Interface, on which I ordered that IMD Soft be charged for various expenses incurred on a foreign trip for IMD Soft, are attached hereto as **Annex D68**.

To emphasize, Zamir, Interface's bookkeeper, serves also as the bookkeeper of IMD Soft and had personal knowledge, by virtue of his duties as aforesaid, of both the charges and the payments as aforesaid.

In addition, in cases in which there was no need to pay by credit card, for instance, for airline tickets and hotels overseas which were reserved by HaGalil Tours, I gave an instruction to charge the said companies directly.

A copy of sample invoices are attached hereto as **Annex D69**.

69.    In addition, Interface used to offset personal expenses of mine against my salary, as may be seen, for instance, in my personal bookkeeping card and pay slip from October 1999, in which the sum of NIS 7,930 and the sum of NIS 3,994 were offset against my salary for expenses.

A copy of my said pay slip and personal bookkeeping card are attached hereto as **Annex D70**.

In addition, in order to ensure full transparency and a type of control over the operations at Interface, I did not handle Interface's financial affairs, but appointed Efrat to handle the same. It was Efrat who maintained regular contact with Interface's Director of Finance in the United States, Steve O'Connor (hereinafter: "**O'Connor**") and with Zamir.

A copy of sample correspondence between Efrat and Interface's financial management in the United States is attached hereto as **Annex D71**.

In addition, my secretaries at Interface (including Schory during the period of her employment) handled payments in Israel up to a certain amount, with Interface's petty cash, salaries and my personal expenses.

A copy of sample correspondence between Schory, Interface's secretary, and Zamir's office, is attached hereto as **Annex D72**.

70.     The claim made in the Complaint and in Zamir's affidavit, whereby I did not submit foreign travel reports – **is false**. This is particularly true in view of the fact that insofar as I did not submit a travel report for any reason, I was asked by Zamir himself and/or by another on his behalf to do so, which I did.

A copy of correspondence illustrating such work procedure is attached hereto as **Annex D73**.

I generally submitted travel reports by the specification on credit card statements, and sometimes also in a separate report.

A copy of a sample travel report that was submitted by me separately, is attached hereto as **Annex D74**.

I would approve every charge and expense made with Interface funds, and also specified the nature of the charges made due to expenses incurred overseas. Interface and/or Interface's bookkeeping received all of Interface's credit card statements, accompanied by my comments thereon. As aforesaid, insofar as an expense was incurred for companies in which Interface had holdings, I mentioned the same on the printouts and ordered Interface's bookkeeping to charge such companies for the amounts charged to Interface's credit card, as was indeed done in practice. I did the same with regard to my private expenses. On the credit card printouts, I ordered the sums which had been charged to Interface due to private expenses of mine, to be offset against my salary, and Interface would offset the said expenses against my salary.

A copy of several printouts of Interface's credit cards, bearing my approvals and comments as aforesaid and/or memos of Interface's bookkeeping, are attached hereto as **Annex D75**.

See also, on this matter, my letters of July 5, 1998 and of September 11, 1998 (Annex C to Zamir's affidavit), which attests [sic] to the method of reporting on the face of the said printouts. Zamir's claim whereby he did not receive a copy of the letter of September 11, 1998 is utterly groundless. Every letter that was prepared by me was typed by Interface's secretaries and sent by them. Therefore, also this letter of September 11, 1998 was necessarily and clearly sent to Zamir. Furthermore, Zamir, in his capacity as Interface's bookkeeper, had to know what was decided with regard to the credit charges which were the subject of my said letter. Therefore, even if according to Zamir's denied version he did not receive a copy of the letter, then he should have been updated by Interface's U.S. offices on how to treat the expenses set forth in the letter.

A copy of the said letters is attached hereto as **Annex D76**.

71.     I did not save the original invoices for the expenses incurred overseas and did not submit them to Interface. This was because, to the best of my knowledge and from my experience at HaGalil Tours, it was not possible to offset the V.A.T. in such invoices vis-à-vis the tax authorities. In addition, the origin of the charge is visible in the credit card printout, and therefore there was not need therefor.

In 1997, while I worked for Interface, a dispute arose between Zamir and myself on the need to submit original invoices **for expenses incurred overseas** and on the manner of specification of the nature of charges for overseas travel and expenses overseas. Following the dispute that arose we turned to the CPA of Interface's bookkeeping, CPA Prof. Yoram Eden, and asked for his opinion. Prof. Eden confirmed what I had said, and determined that there was indeed no need to submit original invoices. Following Prof. Eden's opinion, Zamir did not ask me again to submit original invoices for foreign expenses, and the method of reporting remained as it was. In addition, to the best of my knowledge, Interface's CPA (Somekh Chaikin) and the tax authorities did not rule out this method of reporting.

To emphasize, according to accounting advise I received as aforesaid and to the best of my knowledge, the submission of original invoices for expenses incurred overseas is not conducive to classifying the nature of the expenses as business or personal. All of the expenses incurred via Interface's credit card on trips abroad made by myself and others as aforesaid (including those mentioned in the Complaint and in Interface's affidavits in lieu of direct testimony) were open for all to see, are recorded and the origin thereof is clearly and openly specified in the credit card statements. They are therefore traceable even today, approximately eight years after the expenses were incurred. This fact testifies even more that no attempt was made on my part to conceal the said expenses, not to mention that in any event, the non-attachment of the original invoices does not render such expenses personal.

72.     The claim that is asserted for the first time in Zamir's affidavit that I did not routinely submit invoices in respect of my expenses in Israel – **is false**. This claim, beyond being a **prohibited extension of the range of litigable issues, lacks any grasp on reality**. Parenthetically, it should be stated that the letter attached as Annex A to Zamir's affidavit does not deal with the issue of Interface's expenses in Israel at all, but rather only with the issue of expenses abroad.

73.     During the term of my employment with Interface, Interface and/or Adelson did not raise any claim or reservation (that remained unresolved) on the subject of expenses incurred by me by charging Interface's credit card, expenses that were undisguised, known and reported in an ongoing and detailed manner. Also after termination of my employment, no attempt was made to check with me even one of the myriad claims raised against me in this Complaint.

On the day on which I finished working for Interface and Adelson in practice, a bookkeeper from Zamir's office approached me and requested to check **only** a sum of $418 incurred on a trip taken by Efrat and myself to Japan.