UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

SHELDON G. ADELSON,

          Plaintiff,

v.

MOSHE HANANEL,

          Defendant.

Docket No. 04CV10357RCL

## PLAINTIFF'S BRIEF IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

### Statement of Facts

The Defendant, Moshe Hananel, became an employee of one of the Plaintiff's companies, IPI, as the manager of the IPI's Israeli branch. According to Hananel, part of his work was to "identify, evaluate and make investments in businesses in Israel and other countries, but never in the United States." Hananel's first Affidavit, ¶ 16. His salary was $100,000. Hananel deposition, page 73. In addition, he claims that Adelson promised him a 12% option of any investment Adelson made that Hananel found for him.[1] In his deposition, Mr. Hananel describes the conversation at which he alleged that Mr. Adelson promised him a twelve (12%) percent option for any investment that he made, as a result of Hananel's find. In response to the question, "Tell me everything you can remember that Mr. Adelson said to you on the subject of options at that meeting" in reply, Mr. Hananel gave a long rambling answer but taking in the light most favorable to him, he said that Adelson made the following offer: Hananel would get

---

[1] In the first demand Hananel made for this claim his attorney alleged an 8% option.

what Adelson's brother-in-law, who was the prior manager, in addition to the $100,000 with a one difference that was favorable to Hananel.  The difference would be that, while Hananel would get a 12% option of any investment that Adelson made as a result of Hananel finding the opportunity, Hananel would not have to invest at the same time that Adelson made his investment.  Hananel could invest later, so that he would see if the company "is viable," so that Hananel would not be taking any risk.  He gave an example that he claimed Adelson gave him.  If Adelson invested one million dollars, and as a result, had fifty-one (51%) percent of the company, Hananel would be entitled to 12% of Adelson's 51%, and if before Hananel chooses to invest the 12% Adelson were to buy another half million dollars of the shares, Hananel would have the right to invest in and obtain 12% of one and one half million dollars.  Hananel could "choose later on," and see if the investment were a good one,  so he would not "taking the risk."  Adelson supposedly said, "I will invest a million dollars and the company go bankrupt, you don't have to pay me this when the company go Mechulah."[2]  Hananel claimed that what Adelson meant was, "You can invest one year after its going.  Ten years is not discussed, but one year was discussed, was given by him as an example to tell me what a good deal his is offering me."  Hananel deposition, 83:1 - 84:6.  In response to the question what did he have to do to qualify for an option, he answered, "Any investment that would be done because of the Israeli body (company) and myself."  Hananel deposition, 84:25-26.  By initiation, he meant every project that "I bring in, idea that would create a project and so on."  From that conversation, Hananel seems to believe that he is entitled to a finder's fee of 12% of any investment that Adelson makes, as a result of "an idea that will create a project and so on." Hananel deposition, 85:8-9.  Using a hypothetical example, Hananel said his understanding was

---

[2]    Yiddish for "bankrupt."

that "I plant the idea . . . and he went with me or he went because of me to Iceland. That was the first reason that he went with me during the time I raised a project. Five years later you know till the project materializes in business...yes." Hananel deposition, 89: 14 - 24. Hananel also claims that he was entitled to 12% if others in the IPI Israel organization "initiated that is gave Adelson the idea of an investment that he later made." He said essentially that if Adelson made an investment based on Hananel's recommendation, Hananel was entitled also to 12% by paying 12% of what Adelson invested, even years later and even if the investment greatly increased in value.

He claims that in 1999 he had a conversation with Adelson in which Hananel begged him to listen, because Hananel was convinced that at the time Macau would present a huge opportunity for him. Mr. Adelson supposedly said, "What is Macau?" Hananel commented in his testimony, "It could be for him object, it could mean a name of place, it could be address, it could be a brand name." Hananel claims that he brought a business plan to Mr. Adelson's attention along with a map. Adelson supposedly asked Hananel how you get to Macau. Hananel deposition, 142:17 – 145:12. Hananel also claims that while Mr. Adelson was in Hong Kong, they had a phone call and Hananel begged him to go to Macau and that later Adelson called him and told him that he did visit Macau. This allegedly occurred in 1999. Hananel thus claims that in that year (August of 1999) "I was the only reason for Adelson to visit Macau. I had to explain to him about Macau, because he knew nothing about Macau." Hananel claimed that among the valuable information he gave Adelson relating to Macau was the "investment guidance through Zhuhai, China and a document, "Zhuhai – The Green Home." See Exhibit 40, deposition Hananel, **Attachment B**. In contrast to Hananel's uncorroborated story, the actual facts are that Adelson clearly knew of the existence of Macau. Adelson admittedly was the highly successful

3

operator of Venetian Sands Casino Resort since 1995, His Chief Operating Officer, William P. Weidner, has sworn in his Affidavit (**Attachment D**) that he was well aware of the gambling industry in Macau and thoroughly familiar with the situations there, well before 1995.

In December of 1999, four months after the alleged conversation between Hananel and Adelson, when Adelson was in Hong Kong, Macau reverted from Portuguese control and became special administrative region of the Peoples Republic of China. It was not until August 30, 2001 that the government in Macau established a tender commission, which was responsible for the process of conducting a public tender for the awarding of three gaming licenses/concessions. The tender commission was established a full four months after Adelson discharged Hananel. In October, Adelson's public company, Las Vegas Sands, Inc., operator and owner of the Venetian Hotel and Casino of Las Vegas, Nevada, the Venetian, submitted an expression of interest to the Tender Commission. This was developed by Venetian employees under Mr. Weidner's direction. No document that Hananel claims that he prepared or gave Mr. Adelson was ever seen by any employee or executive working on the Tender. The reality, as the plaintiff has documented for this court in prior briefs, is that Adelson was well aware of Macau. In fact in a trade journal a story about Adelson and Macau appeared on the same page. Adelson's affidavit (**Attachment C**) previously filed shows that he saw both articles, which antedated the alleged conversation in which Adelson supposedly exposed himself as a geography nitwit.

According to Hananel, the information he gave Adelson made it possible for him to make contacts in Macau that gave him an inside track that other applicants could not have. That is a claim that is supported by no one and by nothing but contradicted by the affidavits of Eric Ho and William P. Weidner. The business plan that Hananel claims he gave Adelson in 1999 could

not have been used. There was no official to whom to show it. The Venetian, as it turned out, could not meet the minimum financial criteria that the Macau Tender Commission required. Weidner Affidavit, ¶ 6. The Venetian then entered into an arrangement with the China Development Industrial Bank to create a joint venture under the name of the Asian-American Entertainment Corporation (AAEC), for purposes of participating in a tender. Thus, neither The Venetian nor the Las Vegas Sands, the Adelson Companies, were bidders.

On February 7, 2002, the Macau Tender Commission made its decision and suggestions for the award of Concessions. Three concessions were granted. Not only was the Asian-American Entertainment Corporation, Ltd. *not* one of the three winners, it didn't even make sixth place. The Venetian's subsequent negotiations with Galaxy (one of the successful applicants) to form some sort of a partnership relationship stalled and then died. Eventually, The Venetian made a deal with Galaxy, under which the Galaxy granted it a sub-concession to operate a casino within the framework of the concession that Galaxy obtain from the Government of Macau. The government did not have anything to do with those negotiations, it merely approved them, according to its rules. Hananel had nothing to do with any of the negotiations failed or otherwise.

The affidavit of Mr. Eric Ho, **Attachment E**. The former Secretary General of the Tender Commission provides the Court with a good summary of the background to the awarding of concessions for gambling casinos in Macau. He points out that the monopoly of Stanley Ho (no relation) was due to end in 2001, not in 2004, as Hananel seemed to believe. It was widely known that the Ho (STDM) Contract would not be renewed in 2001. The initial advisory committee to the Macau government actually made contact and inquiries through their advisor, Arthur Anderson, among the major Vegas hotel owners to see if they would be interest in

5

coming to Macau. As Weidner's Affidavit makes clear, he was very much aware of developments in the Macau gambling industry. Mr. Ho's Affidavit affirmatively establishes that neither Mr. Adelson, nor anyone in his behalf contacted the Tender Commission or submitted anything to the Commission, except as part of the AAEC bid. Ho Affidavit, ¶ 17. Moreover, Mr. Ho states there was nothing that Adelson could have done in 1999 that would have helped him obtain a license or even a sub-concession. No knowledge that he may have had of Zhuhai would have been at all useful. See Ho Affidavit, ¶ 18.

## ARGUMENT

1. **Hananel's Story Is So Fanciful, Contradictory and Unsupported That It Cannot Be Sufficient To Withstand This Motion For Summary Judgment.**

While it is Hornbook law that courts should not assess credibility in dealing with motions for summary judgment (see *Azrielli v. Cohen Loan Law Offices*, 21 F.3d 512, 517 (2d Cir. 1994), it is also clearly established that when evidence is so contradictory, improbable or fanciful that it cannot be believed by a reasonable person, it may be disregarded. See *Dentin v. Hernandez*, 504 U.S. 25, 32 (1992); *Chabazz v. Pico*, 994 F.Supp. 460, 470 (S.D.N.Y. 1998); and *Jeffreys v. Rossi*, 275 F.Supp. 2d 463, 476-477 (S.D.N.Y. 2003). Hananel's Affidavits and testimony are absurd. He claims an open-ended agreement, whereby all that was required him was to "plant" an idea for an investment and that whenever an investment took place that was remotely connected to his idea, he was entitled not only to 12% of the investment, but entitled to claim his 12% after an unlimited time in which to assess whether the investment was going to be profitable. At one point, he says that the agreement was that it was a matter of stock option. Hananel deposition, page 123:13-14. In other parts of his testimony, he seems to suggest it was an unlimited option to invest. Moreover, he supposedly could make the investment years later, according to Hananel, and if the investment increased in value, he would still only have to pay in

12% of the original purchase. Without an explanation of why an entrepreneur as successful as Mr. Adelson would ever make such a disadvantageous deal, the testimony is not credible and could not be believed by any reasonable person.

The story is internally inconsistent. In his description of the conversation that he alleges he had with Mr. Adelson at which the "deal" was offered to him, he says that Mr. Adelson said he always buys 51%, because he wanted control and not by agreement but by ownership. If Mr. Adelson were to buy a business and purchase 51%, and if he gave a stock option to Hananel and Hananel exercised it, then Adelson would no longer be in control, he would have only 39% and would not meet the criterion of control that Hananel claims Adelson required. This is precisely the type of absurd testimony that a court should not and need not consider in deciding the motion for summary judgment.

> Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. The court should neither look the other way to ignore genuine issues of material fact nor strain to find material fact issues when there are none. *Smith v. General Scanning, Inc.*, 876 F.2d 1315, 1318 (7th Cir. 1989).

Summary judgment is appropriate where the party resisting judgment relies upon conclusory allegations, improbable inferences and unsupported speculation as to any essential element in the case. *Byrd v. Ronayne*, 61 F.3d. 1026, 1030 (1st Cir. 1995).

2. **Even If The Court Would Credit Hananel's Story For Purposes Of This Motion, The Motion For Summary Judgment Must Be Granted, Because Hananel Has No Evidence That His Alleged Introduction Of Adelson To Macau Was A Proximate Cause Reasonably And Proximately Grew Out Of That Introduction.**

   A.   **Nothing That Hananel Claimed He Did Could Have Helped the Venetian Obtain Either a Concession or A Sub Concession From a Successful Applicant**

The undisputed facts in the case are that in August of 1999 when the alleged introduction to Macau occurred, the Portuguese had not yet turned over Macau to the People's Republic of China. At the time that the transfer was made, no plan or decision had been made about how or

under what circumstances the gambling industry in Macau would be liberalized. There was no Tender Commission. The next important fact is that, as the Affidavit of Mr. Ho establishes, there was nothing that Mr. Adelson could have done in 1999 that would in any way have assisted him in obtaining a license or concession for a casino or for involvement in the gambling industry in Macau. When the Tender Commission invited expressions of interest, Mr. Weidner, the Chief Operating Officer of The Venetian, and his staff did not use any material, and in fact, did not see any material that Hananel allegedly provided Mr. Adelson in the preparation of the Tender. Moreover, the documents that Hananel claims to have given Adelson relating to investments in the region of Zhuhai and the province of Guangdong had nothing at all to do with Macau, with the Tender, or with the gambling industry in Macau, and, as Mr. Ho's Affidavit establishes, could have been of no assistance to Adelson. There is no evidence that Adelson ever talked to anyone in Macau who had or would have anything to do with opening the gaming industry.

    B.    **There Were Too Many Unrelated Steps Between Adelson's Company, The Venetian (Las Vegas Sands, Inc.) Expression of Interest and Its Final Successful Negotiation For A Subconcession And Anything That Hananel Claims He Did To Be A Proximate Cause of the Subconcession.**

The Venetian, it turned out, could not qualify, because, alone, it could not meet the minimum financial criteria of the Tender Commission. Therefor, it was necessary for the Venetian to find a partner to create an entity that did meet the financial criteria of the Macau Tender Commission. Hananel apparently totally unaware of this development, provided no evidence that he did anything that assisted or lead or guided Adelson into forming a joint venture with the China Development Bank. The Venetian had to find an investor, negotiate a joint venture agreement and create the entity with his joint venturer to form the entity, known as the Asian-American Entertainment Corp., Ltd. Hananel's assistance was so valuable to Adelson that the enterprise which Adelson formed with the China Development Bank not only was not

awarded any of the concessions but didn't even finish sixth in the Tender Commissions beauty contest. Now, three steps away from the expression of interest for which Hananel allegedly gave him an inside track—an advantage that no one else had, Adelson needed to find another way to buy into the Macau gaming industry. Thereafter, The Venetian tried to negotiate with one of the successful contestants, Galaxy Enterprises, to form a business relationship in the nature of a joint venture or partnership. The negotiations broke down. Hananel has no evidence whatsoever that anything he did assisted or caused the negotiations with Galaxy to even occur. Now four steps away from the expression of interest, Adelson had nothing. Finally, The Venetian negotiated a sub-concession with Galaxy, another step that Hananel did nothing to advance.

Hananel's statement of the oral contract was that he would be entitled to an option[3] if he initiated the investment by presenting a good idea. The common meaning of initiate is to start or set in motion an unbroken process which ends in a result. Whatever Hananel claimed he did, he did not initiate a process which ended in a profitable investment. It may be that the agreement that Hananel claims he made with Adelson did not require that his services needed to be an efficient direct cause of the investment that Adelson might make, See *Buskin Associates, et al. v. Raytheon Company*, 815 F.2d 142 (1st Cir. 1987). However, even in the most relaxed standard of causation as represented by the case of *Davidson v. Robie*, 345 Mass. 333 (1963), the plaintiff must establish that the option supposedly payable with respect to any profitable investment transaction must have been the proximate result of "the idea" brought to Adelson (345 Mass. at 339). There are simply too many steps and too much time between the alleged presentation of the alleged introduction to Macau and the final sub-concession to even surmise that the sub-

---

[3] What kind of option is vague and unclear. At one point, Hananel refers to it as a stock option and at other points, just an option to invest.

9

concession was the proximate result of the idea of investing and gambling in Macau. As the First Circuit observed in *Carolitz v. Dampsen Oil Company*, 820 F.2d 529 (1st Cir. 1987), in a finder's fee case, a cause is more than simply a necessary but for condition. The finder, the Court of Appeals ruled, he must show that "the deal that was made resulted and flowed directly from the original introduction. The finder must establish a continuing connection between the finder's service and the ultimate transaction." Ibid at 31. Thus, when new introductions have intervened, new parties have entered the picture, the causal connection is broken. Here in this case, according to Hananel, the original idea was to talk with the government of Macau. Before the Venetian obtained any foothold in the market, it first submitted an expression of interest and was disqualified. The Venetian formed a joint venture with a Chinese bank and submitted a Tender to the government of Macau. It lost the bid, sought to negotiate with one of the successful contenders, Galaxy, whom Hananel did not introduce. That negotiation failed. Finally, the Venetian negotiated a subconcession with the Galaxy, without any good ideas from Hananel who did not make any introduction to Galaxy. If ever there was a broken chain of causation, it was here.

## CONCLUSION

Although a court ordinarily cannot weigh credibility when deciding a motion for summary judgment, it does not have to accept assertions that pigs can fly. Hananel's story is similar to the assertion of a man who claimed his dog could climb trees and, answering a disbeliever offered to show the tree. Hananel never even mentioned the alleged offer to give him an option, until after the newspapers reported that The Venetian obtained a subconcession. Lady Justice may be blind, but she was not born yesterday. She is not bound by absurd, incredible,

unsupported testimony. This Court should recognize Hananel's claim for what it is and dismiss the case.

Even if the Court were willing to indulge Hananel's story, it is clear that he can prove only "but for" causation, at best. He must do more. He must establish, at the least, proximate causation. There is no chain of causation here—another basis requiring the grant of the plaintiff's motion for summary judgment.

Respectfully submitted,
The Plaintiff,
SHELDON G. ADELSON,
By his Attorneys,

_____
Franklin H. Levy, B.B.O. No. 297720
Albert P. Zabin, B.B.O. No.: 538380
DUANE MORRIS LLP
470 Atlantic Avenue, Suite 500
Boston, MA  02210
(617) 289-9200

Dated:  December 30, 2005

BOS\142543.1