## UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

Docket No.: 04CV-1035RCL

SHELDON G. ADELSON,

        Plaintiff,

v.

MOSHE HANANEL,

        Defendant.

## OPPOSITION OF THE PLAINTIFF, SHELDON ADELSON, TO THE MOTION OF THE DEFENDANT TO DISMISS FOR *FORUM NON CONVENIENS* AND BRIEF IN SUPPORT OF THE PLAINTIFF'S MOTION FOR SANCTIONS FOR THE DEFENDANT'S FRAUD ON THE COURT.

The plaintiff respectfully calls to the Court's attention the statement of facts in his

opposition to the defendant's rejected motion to dismiss for lack of personal jurisdiction.

Additional facts will be set out in the legal arguments to which they are most relevant.

       **1.    The Defendant's Claim That His Physical Condition Because of Disability Compels The Court To Dismiss This Case for *forum non conveniens* Is Based Entirely On Hananel's Perjury.**

From the very first Hananel has claimed that his diabetes related blindness is a ground for

dismissal. He has made that claim in connection with the motion to dismiss for lack of personal

jurisdiction and for *forum non conveniens*. In his first affidavit, ¶ 3, he stated "Since December

31, 2002 I have been legally blind. I require assistance when I travel and a specialized computer

and other equipment to assist in reviewing documents and communicating in writing." In his

second affidavit, Page, 19, he swore, "I spend much of my time at home using the vision

Technology, Inc. equipment and computer installed there as I live, function and work primarily

in my house." In his deposition (Exh. A), Hananel testified,

> I got Neuropathy. I got Nephropathy, I got Retinopathy, I got diabetic foot syndrome...

> Hananel dep. 10:8--10

> I tell about Retinopathy, but I am legally blind which is, the disease is
> Retinopathy and the result and you know what is considered to be here, 100%
> disabled. Hananel dep. 10:28—11:3

> I take per day more than 40 pills. I, unfortunately, I cannot see the pill and
> identify the difference, but if you would like, my wife can show, you there is a
> special day tablet that she put there with small boxes, and I know that the top box
> with all the pills inside can be 10 pills, is for the morning.... Hananel dep. 10:12-
> 17

Hananel has used this testimony to support his arguments in this court, in his

Memorandum In Support of His Renewed Motion and in previous memoranda. He has used it in

an opposition to plaintiff's request for an evidentiary hearing on jurisdiction and his

memorandum in support of his motion to dismiss for lack of personal jurisdiction in which he

asserted that the court should dismiss the case "based on the overwhelming inconvenience of the

Massachusetts forum on the absence of readers, machines and travel assistants he needs, which

are available to him and *[sic]* Israel and not easily provided in the U.S." Hananel Reply

Memorandum, August 4, 2004. At his deposition, he appeared to be as blind and lame (notice

the black glasses and aluminum cane), as he claimed (Exh. B). In his most recent memorandum,

p.9, he reminds the Court that M.J. Sorokin accepted these statements as true.

Hananel's claims of disabling blindness are lies. Exhibit C, consisting of surreptitious

movies on DVD's of Hananel taken as recently as December, 2005, still photographs made from

the movies and an authenticating affidavit from the photographer show this purportedly disabled

blind victim of the plaintiff, is walking without a cane or assistance on the street,  using a cell

2

phone without difficulty, guiding an elderly woman across a busy street, and reading in a book store, some times *without* glasses. Hananel has attempted, almost successfully, to perpetrate a fraud on this court. This repeated perjury is ground enough, not only to deny his motion to dismiss, but to enter a default against him.[1]

## 2.    It Is Not Only Legally Immaterial That Israel May Be A Convenient Forum, But It is Untrue.

*A. It Is Recognized Doctrine That More Than One Lawsuit Involving The Same Issues May Progress In Different Fora, and The Choice Of Forum Of The Plaintiff Is Entitled To The Greatest Weight.*

The issue for the Court that Hananel's motion raises is not whether Israel is a more convenient forum for the parties and witnesses (it is not), but whether the Federal District Court in Massachusetts is so inconvenient that it is unfair to require Hananel to defend here. A defendant has the burden- and a heavy burden it is, *Nowak v. Tak How Invs., Ltd.,* supra.,at 719 (1st Cir. 1996) (There is a "strong presumption in favor of a plaintiff's forum choice, [against which] the defendant must bear the burden of proving . . . that considerations of convenience and judicial efficiency strongly favor litigating the claim in the alternative forum.") of demonstrating that a case should be dismissed or stayed because of *forum non conveniens.*; In *Nowak,* the Court of Appeals for the First Circuit quoted the Supreme Court's decision in *Koster v. Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 524, 91 L. Ed. 1067, 67 S. Ct. 828 (1947), for the proposition that plaintiff should not be deprived of the advantages of his own jurisdiction except upon a clear showing of facts which either "(1) establish such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiffs convenience, which may be shown to be slight or nonexistent, or (2) make trial in the chosen forum inappropriate because of

---

[1] This mendacious claim of blindness, while the most egregious of his falsehoods, is only one reason to find that he has perpetrated a fraud on the court. See *infra.* P. 11.

considerations affecting the court's own administrative or legal problems." *Nowak*, supra. at 720;
see also *Iragorri v. Int'l Elevator, Inc.*, 203 F.3d 8, 15 (1st Cir. 2000).

Hananel's suggestion that litigation here would raise the likelihood of inconsistent
verdicts is without merit. Assuming that Israeli courts have jurisdiction over Adelson,[2] it is clear
that the Federal Court has concurrent jurisdiction. It is well settled that it is permissible and
appropriate for two parallel lawsuits be litigated in different courts. The first to render judgment
binds the other.

> . However, the fundamental corollary to concurrent jurisdiction
> must ordinarily be respected: parallel proceedings on the same in
> personam claim should ordinarily be allowed to proceed
> simultaneously, at least until a judgment is reached in one which
> can be plead as res judicata in the other. " *Laker Airways Ltd. v.
> Sabena, et al.,* 731 F.2d 909, 926, 927 (D.C.C.T. 1984).

The First Circuit cited *Laker* with approval in Hans A. Quaak v. Klynveld Peat Marwick

Goerdeler Bedrijfsrevisoren, 361 F.3d11 (1st Cir., 2004). Judge Selya began with the premise that

there is a rebuttable presumption against stopping either side of the parallel prosecutions.

Hananel's argument that there is a danger of inconsistent judgments unless his motion to dismiss

is granted is groundless.

> *B. Hananel's Contention That There Are Dozens of Witnesses and
> Thousands of Documents In Israel Is Errant Nonsense. Not Only Has Hananel
> Never Disclosed Any Israeli Witnesses In This Case, But He Has Refused To
> Name Any During His Deposition.*

---

[2] The ruling that the Israeli Labor Court has international jurisdiction over Adelson is
provisional and may well be reversed after an evidentiary hearing. Also, Hananel will have to
prove that he was employed personally by Adelson and not just IPI to maintain jurisdiction in
the Israeli labor courts over Adelson. The process could result as a dismissal as to Adelson and
no resolution of the Macao issue.

4

The absurdity of this claim is apparent just from Hananel's story. He and Adelson agree that the employment contract was oral. Adelson contends that the contract was sealed with a handshake after Hananel had final negotiations with IPI's counsel, Paul Roberts, in Massachusetts. Thus, the only witnesses, other than Hananel, are in Massachusetts. Hananel claims Adelson hired him in Israel in a private conversation [3]at which Adelson offered him "the option" deal. If Hananel is correct, there were no witnesses other than the parties. Hananel Dep.73:1—80:16. By Hananel's own account, there could be no witnesses to the alleged conversation in which he told Adelson what and where Macau was and told him of the great opportunities for a casino there was. Hananel's sworn testimony:

> Mr. Levi, *[sic]* Esq. (colloquy omitted)  Do you remember when you had this conversation with Him?
> Mr. Hananel: Sure
> Q: O.K., When?
> A: He came to the office, it was in hundreds of things. I was finishing another conversation about Macau with the gentleman as I described before and I was trying to get his attention to Macau. I told Sheldon I wasn't to speak with you about Macau. He told me what it is Macau? It could be for him object, it could mean a name of place, it could be address, it could be a brand name. I told him Sheldon, I need your concentration and I almost begged because I was already convinced at that time that Macau it's presenting a huge opportunity. As a mercy to my begging he tell me o.k., *we kicked everybody from the office and I brought the business plan that I had with a map.* Hananel dep. 143:4—21 (emphasis supplied)

During his deposition, Hananel, refused to name any witnesses. How could he? He had testified that the alleged conversations on which his case must rest were private. The deposition of Mr. Hananel is remarkable in many ways, not the least of which was the creation of a non-

---

[3]  Q: Would you, so no one heard this conversation except you and Mr. Adelson?

A: That's right. (Hananel dep. 73:6—8)

existent privilege – the litigation privilege (see Hananel deposition p. 31, line 15). [4] Hananel consistently refused to disclose the identity, even indirectly, of persons he claimed were witnesses to the facts of the Macau Casino claim. Nevertheless, Hananel has claimed in support of his motion to dismiss based upon the doctrine of Forum Non-Conveniens that the witnesses are located in Israel and not in the United States.

It hardly requires any discussion at all to point out that the Rules of Civil Procedure (see Fed.R.Civ.P 26(a)(1)(A)) require that a party disclose the names, addresses and telephone numbers of potential witnesses, and the subject matter of their expected testimony. The rules also require disclosure of persons who have knowledge that is relevant to the issues of the case. There is no Massachusetts privilege that permits a party to withhold the identity of persons who have knowledge of facts relevant to the litigation. Two broad and well-established principles of law virtually require the court to draw the inference that Hananel has no witnesses who will support his position or that such witnesses as may exist would testify adversely to his claims concerning the Macau Casino. Even if the Court were to give any weight at all to the names of alleged witnesses in Hananel's brief and affidavit, there is no indication of what subjects their testimony would address. (One of the witnesses he claims is only available in Israel is Adelson's wife, who lives with him in the United States.) Some, according to Hananel, have already given affidavits in the 2001 case. The 2001 case is not the Macau case. There is nothing in those affidavits that mention the Macau claim.

There is no Massachusetts privilege that permits a party to withhold the identity of persons who have knowledge of facts relevant to the litigation. The fundamental rule is that even

---

[4]     Yesterday in thin air/I saw a rule that wasn't there. It wasn't there again today. I hope it doesn't go away. Apologies to Ogden Nash

when a party in a civil action may resist discovery on the basis of some privilege, the party may not rely on the privileged information as evidence at the trial. *G.S. Enterprises, Inc. v. Falmouth Marine, Inc.*, 410 Mass. 262 (1991).[5] This rule must apply with even greater force when a party refuses to divulge information with no legal basis at all. Consequently, Mr. Hananel must be assumed, for the purposes of this motion, to have no witnesses and cannot be heard to argue that witnesses in Israel support his contention that the United States District Court in Massachusetts is an inconvenient forum.

The second rule which supports the conclusion that the court should draw adverse inferences concerning the availability of any witnesses in Israel who Hananel would call to support his case is the rule that a party who does not consent or to produce relevant information is subject to the adverse inference that that information would be adverse to his cause. *Bishop v. Klein*, 380 Mass. 285 (1980). Where a party does not call a witness who is available to him as a witness and was in a position to give evidence on a relevant matter, the failure to call that witness permits the inference that the witness, if called, would give testimony adverse to the party. *Williamson v. Feinstein*, 311 Mass. 322 (1942). When without reasonable explanation "a party fails to call a person to whom the party is aware can bring to trial and who is friendly to or at least not hostility disposed toward the party and who can be expected to give testimony of distinct importance to the case an inference that the witness would testify adversely is justified." *Hoffman v. Houghton Chemical Corporation, et al.*, 434 Mass. 624, 640 (2001). These rules must apply with even greater force when the issue is the refusal to identify witnesses.

---

5 In diversity cases, federal courts apply the state evidentiary rules of privilege. e.g. *Kowolski v. Gagne*, 914 F.2d 299, 306-308 (1st Cir. 1990).

An alternative ground for the court to draw adverse inference against Hananel is to treat his refusal to provide the identity of the witnesses for what it was, a refusal to make legitimate discovery and draw the inference adverse to him or at least prohibit him from calling any witnesses as a sanction for a blatant and unjustified disregard of his obligations under the federal rules. See *Fed.R.Civ.P. 37*.

On the other hand, the plaintiff has made and timely supplemented the list of witnesses and the subject matters of their expected testimony that F.R.C.P. 26(a)(1)(A) requires. The witnesses listed clearly have testimony about the Macau sub-concession. None of the witnesses reside in Israel. They are all residents of the United States, Macau, and Hong Kong. The residents of Macau and Hong Kong will have to give testimony by deposition, unless they are willing to come to the United States.

There are three separate grounds that call upon this court to draw the inference that there are no witnesses who have any significant information in Israel, and it should so find in dealing with the motion of the Defendant to dismiss for Forum Non-Conveniens. Forcing the parties to try the case in Israel will not improve the inconvenience of testifying for any non-party witnesses. The convenience of the witnesses factor favors the plaintiff.

### C. The Israeli Courts Are Less Adequate Fora For This Litigation Than The U.S. Federal Courts.

It is important for the court to keep in mind that although the two Hananel suits in Israel have been consolidated, the issues in each are quite different. The first suit arises out of disputes concerning salary and other compensation that Hananel claims. IPI's counterclaim is based on allegations of improper self dealing and was not consolidated with Hananel's other claims.[6] The

---

[6] Hananel again repeats the totally false assertion that Adelson conceded Israeli law applies to this claim.

"Macau claim" is, on the other hand, based on a purported specific agreement with Adelson personally under which Hananel claims the right to an investment option in a project outside of Israel. This has nothing to do with any requirement of the Israeli labor laws. Hananel commenced the first suit in 2001 and that case has progressed.[7] He commenced the suit on the Macau claim in December 2003, only two months before the case at bar; that suit has not progressed past the filing of an answer and (along with Hananel's 2001 claim) is now – as Hananel has himself asserted in the Israel Court - effectively stayed awaiting a decision on an appeal of an interlocutory matter.[8] (Exh. D., Affidavit of Dr. Avigdor Klagsbald, Adelson's Israeli attorney) The case at bar is further along, the parties having been deposed, and the plaintiff's motion for summary judgment having been served, than is the Israeli lawsuit. But most importantly, according to Hananel's own filings, the consolidated in Israel are are effectively stayed awaiting a decision from the Appeals Court on an interlocutory matter. The parties have been waiting for more than two years and there is no end in sight. It may very well be years before those matters reach a trial, and at present, one cannot even state with certainty whether Adelson will be a party to that trial or will have been dismissed. There is no finality on even the most optimistic Israeli horizon.

Israeli procedural rules do not permit depositions and require as a general rule that witnesses appear in person. These rules make Israel a most difficult forum for Adelson, who has

---

[7] Contrary to Hananel's repeated incorrect assertion (now on page 14 of his brief), Adelson did not choose to litigate in Israel. Hananel sued Adelson and IPI, and IPI counterclaimed The repetition of that assertion does not impart accuracy..

[8] The table attached to Hananel's affidavit purporting to show all the activity in the second lawsuit (assuming it is true—a leap of faith to which Hananel should not be entitled) merely shows a flurry of procedural motions that have not advanced the case.

9

witnesses, from the United States, (only those who work for his companies can be predicted with certainty to travel to Israel) and most important, witnesses from Macau and Hong Kong, who would most likely not wish to come to either country to testify or might not even receive permission from the government of Macau or Hong Kong to testify abroad. In addition, Adelson will need to seek the aid of the forum to obtain testimony from Macau and Hong Kong based witnesses who cannot or will not give evidence voluntarily by the use of the Hague Convention For Obtaining Foreign Evidence. The Israeli system of requiring personal attendance was a major reason why the Court in *Terris-Feldmam v. Dan Hotels of Israel et al,* 1997. U.S. Dist LEXIS 2666 (S.D.N.Y. 1997) declined to grant a motion to dismiss for *forum non conveniens* and move the litigation to Israel. In *Boudreau v. Scitex Corporation Ltd.,* 1992 U.S. Dist LEXIS 9629 (D. Mass. 1992), Judge Young declined to dismiss a lawsuit for *forum non conveniens* involving an employment contract between an American citizen and an Israeli corporation. He held that the private interest factors—"relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing witnesses...all other practical problems that make trial of a case easy, expeditious and inexpensive..."—did not favor requiring the case to be tried in Israel. Likewise, in this case, the ease of obtaining and using foreign based evidence in the United States Federal courts weighs heavily against dismissal. Furthermore, Adelson's inability in the Israeli litigation to compel testimony by deposition in Macau and Hong Kong will deprive him of full and adequate defenses if the case were tried in Israel.. In Israel it will be Hananel's word against Adelson. In this District Court, it will be Hananel's word against Adelson and those witnesses who can testify by deposition concerning what actually happened in Macau. The convenience of

10

all witnesses, both in Macau and in the United States, weighs against dismissal. Hananel is

clearly able, if unwilling, to come to the United States for a trial.

The language differences also weigh against dismissal. All the parties and witnesses

speak English. Some witnesses speak Chinese, but none of the known witnesses except Hananel

speak Hebrew. He was deposed in English in which he is fluent. Adelson, as he has stated in his

previously filed affidavit, does not speak Hebrew. Hananel again repeats his misstatement that

"English is an official language of the Israeli courts" despite the fact that the plaintiff has called

attention to the Israeli statute that provides the contrary. It provides,

– Section 82 of the Order in Council for the Land of Israel, 1922, as presently in effect, provides
as follows:

> **"Official Languages**
>
> **All Ordinances, official notices and official forms of the Government and all
> official notices of local authorities and municipalities in areas to be
> prescribed by order of the Government, shall be published in Arabic and
> Hebrew. The two languages may be used, subject to any regulations to be
> made from time to time by the Government, in the Government offices and
> the Law Courts".**

Section 15(b) of the Administration of Rule and Justice Ordinance, 5718-1948, provides
that:

> **"Any provision in a law requiring the use of the English language, is null and
> void".**

No doubt Hananel hopes that somehow repetition will provide an aura of verisimilitude  The

private interest factors favor keeping the case in this Court.

> **3.    Hananel's Testimony, Affidavits And Pleadings Filed Both In
> This Court And In The Israel Court Demonstrate That His Case Is Based On
> Intentional Falsehoods That Not Only Are Worthy Of No Belief But Which
> By Themselves Constitute Admissions Of A Consciousness That He Has No
> Case. *Sheehan V. Goriansky,* 317 Mass. 310, 16 (1944) (Intentional False
> Testimony An Admission Of Liability). They Are So Egregious That They
> Constitute A Fraud On The Court That Merits, As A Sanction, A Default**

11

**Judgment, Or, At The Very Least, A Denial Of The Defendant's Motion To Dismiss.**

**A.     Hananel has Attempted to Perpetrate a Fraud on The Court by Concocting a Web of Intentional Falsehoods to Deprive This Court from Asserting Jurisdiction and to Gain an Unjust Victory**.

"A 'fraud on the court' occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." *Aoude v. Mobil Oil Corporation*, 892 F.2nd 1115 (1st Cir. 1989). In *Aoude*, the Plaintiff based his case on a concocted back-dated bogus purchase agreement with a third person. The agreement formed the centerpiece of Aoude's complaint. By his own admission, he did not ask his attorney to amend the Complaint to retract the lie. (892 F.2d at 1117.) The Court of Appeals affirmed a dismissal of the case. It held that the telling of this lie and embodying it in a phony purchase agreement was a fraud on the court.

"When a fraud on the court is shown through clear and convincing evidence to have been committed in an ongoing case, the trial judge has the inherent power to take action in response to the fraudulent conduct. The judge has broad discretion to fashion a judicial response warranted by the fraudulent conduct." *Rockdale Management Co., Inc. v. Shawmut Bank, N.A.*, 418 Mass. 596, 598 (1994) (complaint dismissed). Examined in the light of these cases, Hananel's fraud is clear. We urge the Court to watch the videos to see the extent of Hananel's prevarication when he calls himself "100% disabled".

### B     The December 5 Meeting in Needham Massachusetts.

Hananel claims that although he was in Needham on December 5, 1995, no business relating to his coming to work for IPI was ever discussed. He testified that he came to the United

States for a medical examination and treatment at the Joslin Clinic and that he left the clinic at about 4:30 to 5:00 (Hananel deposition 98:19). He claims that he saw the doctor at about 4:00, and then after he paid the final bill, the driver took him to Needham (Hananel deposition 98:19-99:21). Thus, he attempts to persuade the court that there was no time for a business meeting. He claims he did not talk to Paul Roberts on December 5, although he did talk to him at a function at Adelson's home held on December 4, 1995. (Hananel deposition 101:25,) Paul Roberts' detailed affidavit contradicts him. (Roberts' affidavit, attached to the plaintiff's "Second Supplementary Brief In Opposition To The Defendant's Motion To Dismiss For Lack Of Personal Jurisdiction" ("Second Supplementary Brief")as Appendix E). Most significantly, Mr. Roberts quite specifically remembers that there were two issues that he and Hananel needed to discuss. One of which was an IPI employment agreement and the other involved the use by a Chicago travel firm of the name, Galilee Tours, the use of which created problems for GWV Travel, a division of Adelson's Interface Group, which sold trips to Israel under the name Galilee Tours (the name of Hananel's travel agency).

Lica Brill, a former employee of IPI, directly contradicts Hananel's testimony by her Affidavit. (Brill's affidavit, attached as Appendix F. of the "Second Supplementary Brief") She remembers, with a good deal of detail, that she met him in the early to mid afternoon, shortly after she returned from lunch and that much to her surprise he had brought her some perfume. (Brill affidavit, Paragraph 3c).

This discrepancy is not a mere difference in memory. It is not simply a difference between the testimonies of two people. Unimpeachable documentation contradicts Hananel and supports the affidavits of Roberts and Brill. Nor is the factual dispute insignificant, because it is intimately tied into Hananel's assertion that he actually began working for IPI in Israel in the

13

autumn of 1995. Hananel testified in the Israel court proceeding (by affidavit) that he began working for IPI after Moshe Melnick, another employee, terminated his employment (Hananel deposition, exhibit, No. 45, attached as Appendix G of the "Second Supplementary Brief"). Moshe Melnick's official termination slip that *Hananel himself signed* on January 18, 1996 shows that Melnick's employment ended December 25, 1995. (Hananel deposition exhibit 51, attached as Appendix H of the "Second Supplementary Brief").

Hananel's contemporaneous documents contradict his story decisively. On December 3, 1995, Hananel sent Mr. Adelson a fax, on the letter head, not of IPI for which Hananel allegedly had been, for the previous two months, a full time high level employee, *but of Galilee Tours,* Hananel's company, announcing that he would arrive in Boston on December 4. (Adelson deposition, exhibit 37, attached as Appendix I of the "Second Supplementary Brief"). On December 10, after the meeting with Mr. Roberts, Hananel requested IPI business cards for himself for the first time (Adelson Exhibit 29, attached as Appendix J of the Second Supplementary Brief). He had no explanation for why he would work for two months without getting business cards and why it was after the trip to the United States and the meeting on December 5, that he first ordered them. It is clear that on December 3, he was operating Galilee Tours, on December 5 he agreed to be the full time manager of IPI, Israel, and on December 10, he was starting his transition from one to the other.

Even more devastating to Hananel's testimony is the Settlement of Accounts that he signed after he was fired. Hananel signed on May 10, 2000 the settlement of accounts. In it, Hananel confirmed that his tenure with IPI was four years, four months and ten days. Four years, four months and ten days from May 10, 2000 is January 1, 1996 (Hananel Exhibit 43, attached as Appendix K of the Second Supplementary Brief). Exhibit 44 of Hananel's

14

deposition (attached as Appendix L of the Second Supplementary Brief) is the IPI official

government form for termination of employment that an IPI agent signed (under the penalties of

law for false statements), which confirms that Hananel's employment ran from January 1, 1996

to May 10, 2000. Hananel, before he invented the story of the 12% option, signed an official

government form certifying that he had begun work on January 1, 1996, exactly "four years, four

months and ten days" from the date of his signature. If he had worked for a longer period, his

severance pay would have been greater. Why in the world would he have signed that document,

if it were not true?

### A.  The Fabled Pre- December Appointment to Chairmanship of the Board of Directors and Manager of Auto Depot Ltd.

Hananel tried to bolster his imaginary 1995 employment with IPI by asserting that

Sheldon Adelson made him manager of another Israeli company known as Auto Depot Ltd.

> "On the 7[th] of November 1995 Adelson elected me chairman of the
> board of directors of the Israeli company Auto Depot (and I
> attended at least three meetings before my December 1995 trip to
> the United States), which he owned through IPI, and announced
> publicly that I was the Israeli branch manager of IPI." (Hananel's
> First Affidavit ¶15)  (Appendix A)(punctuation as in the original
> filed in court)[9]

In fact the minutes of that meeting show nothing of the kind (attached as Appendix M of

the Second Supplementary Brief). In another display of fictitious grandiosity, contradicted by

the very minutes he cites, Hananel trumpeted,

> ...He (Roberts) is either ignoring or concealing the records of my
> work consisting of minutes of the Board of Directors meetings of
> Auto Depot Ltd....for Nov. 14, 1995 where I am sitting as
> chairman in Adelson's absence and am speaking for IPI, including

---

[9]  Hananel apparently forgot that in paragraph 5 of his First affidavit he stated that at the
November 11, 1995 board of directors meeting ...he "sitting as chairman in Adelson's
absence."

> committing hundreds of thousands of Israeli shekels of IPI's
> money. to Auto Depot. (Hananel's First affidavit, ¶5, p.3)
> (Appendix A)

The Auto Depot claim is as counterfeit as the IPI claim. The minutes of the November 7,
1995 meeting list Sheldon Adelson as chairman and show no election of Mr. Hananel to that
post. There is no notation that Hananel was now the manager of IPI's Israel branch. The
corporate documents of Auto Depot officially filed with the appropriate agencies in Israel
(attached as Appendix N of the Second Supplementary Brief) show that in the annual report of
mid 1995 of Auto- Depot, Hananel is not listed as a manager. The company's resolution
regarding the termination of appointment of Moshe Melnick and the appointment of the new
manager show that as of November 15, Moshe Melnick was replaced not by Hananel, but by
Adelson (see Appendix N supra.). The minutes of the Auto Depot Limited meeting held on
March 26, 1996 shows that Mr. Hananel was then elected chairman of the Board of Directors
(attached as Appendix O of the Second Supplementary Brief). In the 1996 annual report filed
with the Registrar of Companies (attached as Appendix P of the Second Supplementary Brief),
Adelson, not Hananel, is listed as the manager. Hananel's assertion of his appointments to
offices in Auto Depot Limited in 1995 is not true. Contemporaneous, ordinary business
documents destroy this deception. Hananel's assertions made under oath in depositions and
affidavits are spurious and cannot be anything other than intentional falsehoods.

## B.    The 12% Option

If this story were true, Hananel, like The Shadow, of radio drama fame, had the magical
power to cloud men's minds. This is the deal that Hananel claims that Sheldon Adelson,
reputedly one of the world's most successful businessmen, risen from a poor immigrant family in
Roxbury, made: If Hananel provided information to Adelson that resulted in a successful

16

venture, Hananel could buy into it at anytime for twelve (12%) percent[10] of what Adelson paid

and get twelve (12%) percent of the value at the time of Hananel's purchase, even if made years

later and even if the venture had increased in value beyond all expectations (Hananel deposition

pg. 72:4 --pg. 81:19,).

> [H]e told me look, you are getting 12% options but specifically he
> said that you have a huge advantage, I am taking the risk. That
> means I am investing in a company, you are sitting aside, you
> don't have to invest the same moment I an investing, you will
> invest later, so you can see if this company is viable, is interesting
> to invest. I am taking the risk, you are not taking the risk Moshe
> and then told me remember Moshe, it's a big advantage but on the
> other side don't think that you invest 1-2 years later, it will be the
> same initial amount if, and only if , I invested more. Hananel,
> deposition, 74:9-21

What stunning deed did Hananel have to perform to earn the right to invest at any time to

obtain 12% of Adelson's venture for only 12% of Adelson's cost, no matter how valuable that

investment had become?  Give him the "idea" of the "possibilities" to invest in the venture.

(Hananel deposition p. 123:9—28, attached as Appendix R.)  Sheldon Adelson, the owner of a

Las Vegas major casino and hotel, has been recognized as one of "the greatest entrepreneurs of

the last 25 years," Silver, *The Greatest Entrepreneurs Of The Last 25 Years,* John Wiley &

Sons, New York (1985), p.131 ( attached as Appendix S of the Second Supplementary Brief.)

Although Hananel's "story is not beyond the pale of possibilities, such is not normally the

conduct that one would expect of" an experienced, knowledgeable and shrewd businessman.  Its

absurdity grows when Hananel tells his story of how he, like Moses leading the Hebrews to the

promised land, led Adelson to Macau.  An inherently preposterous story in itself can be taken as

---

[10]     The Court may recall from the previously filed papers opposing the motion to dismiss,
that Hananel originally claimed that he had an 8% option agreement, and his Israeli
lawyers sent a demand letter to Adelson asserting the right to 8% of Adelson's interest.

a lie, disbelieved and taken evidence of consciousness of the lack of merit of a case or defense. *United States v. Smith,* 680 F.2d 255, 259-260 (1st Cir. 1982). Hananel's story of the 12% option is so preposterous that it cannot be anything other than a calculated falsehood.

### C.    The claim that Hananel told Adelson about potential opportunities for a casino in Macau and told him what and where Macau was.

A core fact that Hananel seeks to establish is that his conversation with Adelson in which he gave him the idea of opening a casino in Macau occurred in a conversation in Israel. Clearly, if such a conversation didn't take place in Israel or didn't take place at all, Hananel has no basis for claiming that Massachusetts has no connection with that "Agreement". Without that fact the only possible evidence of a formation of a contract was that it occurred on December 5, 1995 in Needham, Massachusetts, and any rights that Hananel has or wishes he had arise from the employment relationship that that contract created.[11].

Hananel's tale of how he brought Macau to Adelson is given in exquisite detail (all untrue), extending over three deposition pages (142-145) His affidavits filed in this Court and pleadings in Israel set out the story clearly.

> In 1999, I initiated a project for a casino and a hotel in Macau, China as a potential investment by Adelson. I told Adelson of this opportunity (including telling him where Macau was located while we both were in Israel, and as a result he traveled to Macau from Israel (via Taiwan and Hong Kong) in August, 1999 (and returned to Israel.) I provided him with business plans I had prepared in Israel. Although these plans were for other opportunities, they were appropriate for convincing the Chinese authorities that a casino license should be granted to Adelson[12]

---

[11]    Thy wish was father, Harry, to that thought: Shakespeare, King Henry IV. Part II. Act iv. Sc. 5. 1.

[12]    Hananel does have some difficulty in keeping his story straight. . Macau was not yet returned to China. The handover occurred December 20, 1999. How could Adelson
                                                                                        (Continued…)

The story is preposterous and is disproved by all the credible evidence. Sheldon

Adelson's affidavit is concrete and specific (Affidavit of Sheldon Adelson, attached as Appendix

T). It shows clearly that Adelson not only knew about Macau, but knew that it was "the Monte

Carlo of the East"[13]. Moreover, Mr. Adelson states in his affidavit that he made a trip in August

of 1999 to go to Hong Kong in his private plane. The plane was required to land in Macau

because its engines did not meet the noise regulations enforced in Hong Kong. He landed in

Macau and went to Hong Kong. Hananel's wild assertion that he had to tell Adelson how to get

to Macau from Hong Kong is errant nonsense. Clearly, when Hananel invented this fiction he

was unaware that Adelson landed in Macau, not Hong Kong.

Adelson, prior to 1999, regularly read the Global Gaming Almanac, issued by Bear

Stearns, as well as the Trade Journal, "National Gaming and Wagering Business." He was a

regular subscriber and reader of the publication "Casino Journal". Exhibit C to his affidavit is a

copy of the 1997 issue which published his picture and contained an article on Hong Kong that

also refers to Macau. He states in his affidavit that he read the article. This was an issue to

which he paid particular attention. Macau has been known for its gambling since the Portuguese

(Continued...)

have taken materials to "the Chinese authorities" in Macau in August, when the
Portuguese still governed? The answer is that he did not. (Eric Ho, affidavit)

[13]    Macau was well known if not for any other reason that it was a name of the movie,
starring Robert Mitchum and Jane Russell. The plot revolved around conflict with the
owner of a gambling establishment. While the movie was apparently not much to look
at, Jane Russell always was, so the name Macau must have had a fair amount of
notoriety. See Movie Review attached as Appendix U of the Second Supplementary
Brief.

licensed casinos around 1850.[14] The notion that the owner of a major Las Vegas casino and a travel company never heard of Macau is simply ludicrous.

Hananel's story concerning when and how he began working for IPI is simply not true from beginning to end. The documents, some of which Hananel himself signed, the rest of which are business or official documents made and kept routinely, clearly show that Hananel did not have an employment agreement before December 5, 1995 and did not start work until January 1, 1996.[15] The facts are clear that Hananel's whole story that he introduced Adelson to Macau and its casino opportunities is preposterous, unsupported by anything other than Hananel's say so and at variance with the very clear and documented statements in Mr. Adelson's affidavit.

### D.     Hananel's Statement In Support Of His Motion To Dismiss For Forum Non-Conveniens: His Claims That Adelson Has Extensive Contacts, Business, and Property in Israel

Hananel has stated in his affidavit that while he has no contacts in Massachusetts, Adelson has substantial contacts and property in Israel. (Hananel's "Second Affidavit", ¶¶ 20, 21; Appendix V of the Second Supplementary Brief) However, in an appeal from a denial from the National Labor Court in Jerusalem (Appendix W of the Second Supplementary Brief) from an order denying him an attachment, Hananel filed a pleading asserting that since that complaint was filed, Adelson has "kept his distance from Israel", that since the complaint was filed he has had no operations in Israel, that the reduction of Adelson's "business has greatly increased over the last few months since the complaint was filed," and that IPI has essentially no assets in Israel. He filed substantially the same affidavit in the District Labor Court of Tel Aviv and Jaffa

---

[14]     www.lonelyplanet.com/destinations/ north_east_asia/**macau/history**.htm

[15]  Hananel's pay slips all show that he started work on January 1, 1996 (See Hananel deposition)

(attached as Appendix X of the Second Supplementary Brief). Clearly, those statements cannot be squared with the affidavit filed in this court that asserts that Adelson has extensive business interests and property in Israel. Hananel may not have the most acute sense of reality but he certainly has a keen sense for convenience.

There is no Massachusetts privilege that permits a party to withhold the identity of persons who have knowledge of facts relevant to the litigation. Two broad and well-established principles of law virtually require the court to draw the inference that Hananel has no witnesses who will support his position or that such witnesses as may exist would testify adversely to his claims concerning the Macau Casino. The fundamental rule is that even when a party in a civil action may resist discovery on the basis of some privilege, the party may not rely on the privileged information as evidence at the trial. *G.S. Enterprises, Inc. v. Falmouth Marine, Inc.*, 410 Mass. 262 (1991).[16] This rule must apply with even greater force when a party refuses to divulge information with no legal basis at all. Consequently, Mr. Hananel must be assumed, for the purposes of this motion, to have no witnesses and cannot be heard to argue that witnesses in Israel support his contention that the United States District Court in Massachusetts is an inconvenient forum.

### 3   Hananel's Multiple And Intentional Falsehoods And Refusal To Fulfill His Discovery Obligations Should Lead This Court, Not Only To Disbelieve All His Testimony, But Should Be Taken As Implied Admissions Of A Consciousness That He Has No Case.

The testimony is so egregiously false that the court would be more than justified in denying Hananel's motion to dismiss as punishment for a fraud on the court. The Defendant's falsehoods have been exposed, not just by contradictory, and we submit, persuasive evidence by

---

[16]     In diversity cases, federal courts apply the state evidentiary rules of privilege. e.g. *Kowolski v. Gagne*, 914 F.2d 299, 306-308 (1st Cir. 1990).

other persons, but by documents that the Defendant himself signed and by other official documents submitted under the certification of truth to agencies of the Israeli government. Hananel has given no explanation for the difference between what he has sworn to in testimony and in affidavits and the documentary evidence. He has no explanation for the contradictions in his own testimony. His testimony that Adelson promised to give him a twelve (12%) percent cut of any business opportunity that turned out well, regardless of when Hananel chooses to exercise that "option" is so preposterous that it could not possibly be true. It is well settled that intentionally false testimony can be considered to indicate a consciousness that the witnesses' case is without merit. *Sheeham v. Gorinsky*, 317 Mass. 310, 316 (1944). It is well settled that where a party deliberately lies in furtherance of a scheme he or she has practiced a fraud on the court.

The case at bar is at least as egregious an example of fraud on the court as is the *Aoude* case. In this case, Hananel's effort to keep the case out of this court's jurisdiction is based not only on one lie, but on several. The most blatant of the lies goes to the very heart of the jurisdictional issue that is when and where his employment agreement was formed. To undercut Attorney Paul Roberts' testimony that the contract was formed in Needham, Massachusetts in the late afternoon of December 5, 1995, Hananel swore that he was at the Joslin Clinic all day. Lica Brill, in her affidavit, states clearly that she remembers seeing him in Needham in the mid to early afternoon. That is the least of the evidence revealing Hananel's duplicitous scheme. Hananel claimed that as early as September or October of 1995, Adelson had already hired him as the manager of another corporation in Israel, Auto Depot, and elected him Chairman the Board of Directors. The corporate records contemporaneous with the events described in them show clearly that Hananel was never elected to the Board of Directors until March of 1996 and

22

was not the manager of Auto Depot. The documents show that the chairman was, in fact, Sheldon Adelson. Hananel conceded that his position with IPI commenced after a gentlemen by the name of Moshe Melnick left IPI. Hananel signed one of the documents which shows that Mr. Melnick left at the end of December, 1995. More devastating and absolutely conclusive proof that Hananel lied about when he commenced his work running IPI is the employment document that he signed that was filed with the Israeli government in which he stated that he worked for four (4) years, five (5) months and ten (10) days before the date of the document, which was May 10, 2000. Simple arithmetic demonstrates that in his own hand, Hananel certified that he began work January 1, 1996 not in the fall of 1995. His signed pay slips support this arithmetical conclusion. This evidence reveals that Hananel's testimony is nothing less than a scheme to obtain judicial aide for his effort to steal twelve (12%) percent of Mr. Adelson's investment in the Macau Casino. Hananel's conduct deserves nothing less than a denial of his motion or granting judgment to Mr. Adelson by default.

## 3        Conclusion

The weight of both private and public factors favor allowing this case to proceed in this court. It is clear that Hananel has no witnesses who are residents of Israel. He apparently has no witnesses at all, according to his testimony of the key conversations that he claims form the basis of his case. The case in this court is further along than is the case involving the Macau claim in Israel. The Macau claim is quite distinct from the body of disputes in Israel, even though it is included in those disputes. The disposition of the Macau claim here is unlikely to have any significant impact on the other disputes, which arise from different facts and transactions.

Hananel's claim that he is 100% disabled because of his "blindness" and lameness is an out and out lie. Its repetition in affidavits, briefs and sworn testimony cries out for sanctions. If this court allows this litigant to escape sanctions for this perjury, it will carry a burden of shame.

BOS\142643.1

The false testimony about his disability is by no means Hananel's only intentional departure from the truth—only the most egregious. Documents, some of which, Hananel signed demonstrate that his attempts to defeat jurisdiction of this court were based on false statements about when his employment with IPI began. Independent witnesses, documentation supporting Mr. Adelson's affidavit, official and contemporaneous business documents (some on file with the Israeli government), and finally, a document signed by Hananel himself expose the scheme for what it was—a bold faced fraud. The court, to protect the integrity of the judicial system and maintain the confidence of the public that American courts can still be relied on to provide justice and truth, should deny Hananel's motion to dismiss for forum non conveniens, or more appropriately, enter a default declaratory judgment in behalf of Mr. Adelson.

Respectfully submitted,
The Plaintiff,
SHELDON G. ADELSON,
By his Attorneys,

Franklin H. Levy, B.B.O. No. 297720
Albert P. Zabin, B.B.O. No.: 538380
DUANE MORRIS LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210
(617) 289-9200

December 30, 2005

24