**At the District Labor Court**
**of Tel Aviv Jaffa**

**Labor 6245/01**

[Stamp]
District Labor Court
of Tel Aviv Jaffa
September 9, 2002
## Filed

In the matter of:    **Moshe Hananel**, I.D. No. 52750726

Represented by Haim Zadok & Co., Law Offices
Whose address for service of process is:
20 Lincoln St., Tel Aviv 67134
Telephone: 03-6254000; Facsimile: 03-6254040

**The Plaintiff**

- AGAINST -

1.    **Interface Partners International Limited**
2.    **Sheldon G. Adelson**

Both represented by Danziger, Klagsbald, Rosen & Co.
Whose address for service of process is:
Gibor Sport Bldg., 28 Bezalel St., Ramat Gan
Telephone: 03-6110700; Facsimile: 03-6110707

**The Defendants**

# Notice of the Filing of an Affidavit in Lieu of Direct Examination

Pursuant to the Honorable Court's decision of June 17, 2002, an affidavit in lieu of direct examination is hereby filed on behalf of the Plaintiff.

(-)

_____
Eyal Rosovsky, Adv.
Counsel for the Plaintiff

This day, September 9, 2002

f:\100xx\10070-001\hannanel-affidavit-trans

## Affidavit

I, the undersigned, Moshe Hananel, bearer of I.D. No. 52750726 of 21 Ha'ella St., Mevaseret Zion, after having been cautioned to declare the truth, failing which I shall be liable for the penalties prescribed by law, do hereby declare in writing as follows:

## Introduction

1.    I am the Plaintiff in Labor 6245/01 at the District Labor Court in Tel Aviv Jaffa, and I am making this affidavit as an affidavit in lieu of direct examination.

2.    The facts specified in this my affidavit are known to me personally, unless otherwise stated.

3.    The Complaint concerns withheld wages, breaches of contract, breaches of undertakings and damages caused to me by the Defendants.

4.    I am a private businessman. I acted as the General Manager of the First Defendant (hereinafter: "**Interface**") for approximately four and a half years, and was terminated thereby on May 10, 2000.

5.    Interface is a private U.S. company which is registered in Israel and maintains a branch in Israel.

6.    The Second Defendant is the American businessman Sheldon Adelson (hereinafter: "**Adelson**"), who controls 100% of Interface's shares. The Israeli branch of Interface serves as the Israeli arm of Adelson in Israel, and through it Adelson manages all of his multifarious businesses in Israel.

## Working for the Defendants

7.    In the months of October and November 1995, I began, at Adelson's request, to work as Adelson's most senior representative in Israel, and served as his right-hand man and confidant. Within this position, I was employed by Interface as General Manager, and this entity paid my salary.

8.    The intimate ties between myself and Adelson commenced even before I started working for Interface. Within the framework of these ties, Adelson undertook to give me shares in a venture comprising a hotel, a conference center and a casino which we had initiated together, and which is scheduled to be established in Israel and/or in Jordan (hereinafter: the "**Tourist Venture**"). In this Complaint, I am not claiming the rights due to me in the Tourist Venture.

9.    In the first months of my employment with Interface, I received no pay slips, but an agreement was made with me that the remuneration for

my work would be paid to me later, by checks, as was indeed done – in part. Later, I began receiving my salary by pay slips.

10.     Employment relations existed between myself and the Defendants from November 1995. As specified below, although I received my salary from Interface, I was in practice Adelson's senior representative in Israel and right-hand man, in both the personal and the business realms. My work included also the rendering of services to Adelson. I was employed by both Adelson and Interface.

11.     In addition to my monthly salary and expenses, the Defendants undertook to give me stock options with an indefinite term in two companies (the "**Options**") and in other ventures, alongside the general undertaking that I would receive options in any venture which the Defendants would establish at my initiative, with my assistance or with my participation.

## The Termination

12.     In April 2000, before the Passover holiday, Adelson visited Israel and notified me of his intention of terminating me. Prior to the expiration of the employment relationship between myself and the Defendants, I sent Adelson a letter in which I reduced to writing my demands within the framework of the expected termination of the employment relations. A copy of the letter (which is not dated) is attached as **Exhibit "P1"**.

13.     On May 1, 2000 Adelson answered my letter. In his letter of reply, Adelson agreed to most of my demands, including my demand for shares in the casino. A copy of Adelson's letter is attached as **Exhibit "P2"**. A copy of my reply to Adelson of May 2, 2000 is attached as **Exhibit "P3"**.

14.     On May 10, 2000 I was terminated by Interface.

15.     Following my termination, I addressed Interface and asked to be paid the sums of money due to me within the employment relationship and due to my work for the Defendants. Adelson admitted to me that my claims for these sums were justified, and even re-confirmed my right to the Options (and to the best of my belief this constitutes a "litigant's admission"), but at this stage he conditioned the payment on my waiver of the shares which Adelson had undertaken to give me in the aforementioned Tourist Venture. Adelson made this demand, even though his undertaking to give me shares in the Tourist Venture was made without any connection with my work at Interface. In fact, the undertaking regarding the shares in the Tourist Venture was made to me before I started working at Interface, and regardless of the employment relationship between myself and Interface.

16.     I held lengthy contacts with the Defendants with the intention of avoiding a legal action, in which I asked to receive what I was due,

while Interface and Adelson were tying the aforesaid with a waiver on my part of my rights in the Tourist Venture.

17.      Within the contacts, which were held orally and in writing, Adelson's attorney, Adv. Chinn, sent me a letter dated July 27, 2000, in which I was asked to reduce to writing a settlement proposal regarding the terms of my retirement and my rights in Interface's investments and in the Tourist Venture. The letter is attached as **Exhibit "P4"**. My letter of reply to Adv. Chinn dated July 27, 2000 is attached as **Exhibit "P5"**. Since these contacts yielded no progress, I sent a letter to Adv. Chinn through counsel on my behalf on October 29, 2000. A copy of the letter is attached as **Exhibit "P6"**.

18.      I continued making attempts to resolve the disputes by way of a settlement, and in April 2001 Adelson sent me a draft settlement agreement, a copy of which is attached as **Exhibit "P7"**. Within this framework, I was offered to receive a sum of money in cash (as my successor, Mr. Raviv, and my predecessor, Mr. Farbstein, received moneys in the United States). I was made this offer through Adelson's counsel, Adv. Neeman.

19.      The contacts between myself and the Defendants included conversations with Adelson, with Adelson's wife and with his counsel in Israel. As specified above, the contacts lasted for a long time, approximately one year, probably due to the Defendants' intention of delaying the matter. In the last offer, which was delivered to me by Adelson's counsel, Adv. Yaacov Neeman, I was offered to make do with compensation for my monetary claims (as viewed by the Defendants), subject to my waiver not only of my rights in the Tourist Venture, but also of the Options and of my rights in any other venture in Israel or overseas.

20.      At this point the Defendants and their representatives even threatened me, in conversations which they held with me, that if I did not agree to waive the Options and the rights in the Venture, not only would they not pay me what I was due as part of my salary, but they would also damage my reputation and institute various legal proceedings against me, aimed at defaming me under the guise of a legal action.

21.      In a final attempt to avoid the need to claim my rights in court, my counsel sent the Defendants the draft complaint, through their counsel, and suggested that this lead to a settlement solution. A copy of the letter is attached as **Exhibit "P8"**.

22.      In response to my counsel's letter, the Defendants' counsel, Adv. Neeman, made additional hollow threats against me. A copy of his letter is attached as **Exhibit "P9"**. A letter of reply on behalf of my counsel is attached as **Exhibit "P10"**.

**The Terms of Employment and the Undertaking to Give Advance Notice**

4

23.    The terms of my employment with Interface were based on the terms of employment of my predecessor, Mr. Farbstein, into whose "shoes" Adelson and I agreed that I would in fact "step", with slight modifications. The terms were as follows:

23.1.    My last salary from Interface was NIS 34,250. An employer's notice to the income tax authorities regarding my salary is attached to this Complaint as **Exhibit "P11"**. A "settlement of accounts" paper prepared by Interface's CPA on May 7, 2000, which specifies my salary, is attached as **Exhibit "P12"**.

23.2.    In addition to my salary, Interface paid my expenses. These expenses were fully grossed-up by Interface and did not appear on my pay slip. The expenses were as follows:

23.2.1.    Car expenses (gas, license fees, insurance, parking and maintenance) – approximately NIS 5,000 per month.

23.2.2.    A subscription for the newspapers "Haaretz" and "Globes" – approximately NIS 600 per month.

23.2.3.    Two telephone lines (for a phone and for fax and Internet) – approximately NIS 2,000 per month.

23.2.4.    Cellular telephone – approximately NIS 1,000 per month.

23.2.5.    A full time driver – approximately NIS 6,500 per month.

The total amount of my expenses which Interface paid during the term of my employment therewith – NIS 15,100 per month.

23.3.    Interface's payment of my expenses constituted a part of the terms of my employment.

23.4.    When summing up my base salary and expenses, I received a monthly salary of approximately NIS 49,350 per month.

24.    In view of the relationship of unconditional trust which existed between myself and Adelson, the terms of my employment were never reduced to writing, and the employment contract between myself and the Defendants was based on oral agreements and on usage. I should

note that other Interface employees were also employed without the terms of their employment being fixed in a written contract.

25.    The relationship of trust between myself and Adelson was so strong, that Adelson gave me a power of attorney and appointed me as a signatory in approximately ten personal bank accounts, from which moneys were transferred to members of Adelson's family, and in a special bank account (together with Adv. Yaacov Neeman), from which contributions were made to various associations in Israel. The power of attorney I received from Adelson is attached as **Exhibit "P13"**. Within this framework, I was responsible for millions of dollars of Adelson's money, and was involved in his most secret affairs. Naturally, against the background of this relationship of trust and intimacy, Adelson and I felt no need to have each other sign a formal employment contract. The agreements we made verbally were, in our eyes, binding and effective as if written in stone.

26.    One of these agreements was the Defendants' undertaking to give me six months of advance notice in the event that I was terminated. The significance of the notice was that Interface would continue paying my salary (base salary + expenses) for six months after the notice of termination, regardless of whether I did or did not continue working for Interface or for Adelson.

27.    This agreement was even expressed in Section 1 of the letter which Adelson sent to me on May 1, 2000, Exhibit "P2" above.

28.    This agreement was also based on a custom which existed in Interface at the time I was employed thereby. All of the senior employees in Interface received, upon termination thereby, advance notices of several months, each according to his level of seniority with the Defendant. Also my secretary, who was terminated shortly after me, received an advance notice of 3 months.

29.    As aforesaid, on May 10, 2000 I was given a notice of termination by Interface.

30.    In contrast to the Defendants' undertaking, I was paid a salary for one month only of the advance notice period.

31.    I turned to the Defendants and asked to be paid salaries for the remaining five months. However, as specified above, Interface and Adelson – although they did not deny my rights – asked to tie my demands together with my waiver of my other rights.

32.    Consequently, Interface and Adelson still owe me a salary for five months of the advance notice period.

33.    The Defendants' debt to me for the five months is as follows:

6

33.1.   The June 2000 salary (which was due to be paid on July 1, 2000): NIS 49,350, in addition to interest and linkage, the value of which as of the date of filing of the Complaint is NIS 52,123.

33.2.   The July 2000 salary (which was due to be paid on August 1, 2000): NIS 49,350, in addition to interest and linkage, the value of which as of the date of filing of the Complaint is NIS 51,801.

33.3.   The August 2000 salary (which was due to be paid on September 1, 2000): NIS 49,350, in addition to salary-withholding compensation at the rate of one twentieth of the salary (NIS 2,467) for the first week following the due date of payment, and one tenth of the salary (NIS 4,935) for 49 weeks from the second week until the date of filing of the Complaint, i.e., NIS 241,815, and NIS 293,632 in total.

33.4.   The September 2000 salary (which was due to be paid on October 1, 2000): NIS 49,350, in addition to salary-withholding compensation at the rate of one twentieth of the salary (NIS 2,467) for the first week following the due date of payment, and one tenth of the salary (NIS 4,935) for 45 weeks from the second week until the date of filing of the Complaint, i.e., NIS 222,075, and NIS 273,892 in total.

33.5.   The October 2000 salary (which was due to be paid on November 1, 2000): NIS 49,350, in addition to salary-withholding compensation at the rate of one twentieth of the salary (NIS 2,467) for the first week following the due date of payment, and one tenth of the salary (NIS 4,935) for 41 weeks from the second week until the date of filing of the Complaint, i.e., NIS 202,335, and NIS 254,152 in total.

33.6.   The Defendants' total debt to the Plaintiff for salaries and salary-withholding compensation, as of the date of filing of the Complaint, is NIS 925,600.

## Unlawful Setoff of Funds

34.   On the eve of my departure from Interface and the preparation of the "settlement of accounts", Interface offset two checks against my salary, while agreeing that this matter would be examined later, and that if the setoff was found to be unjustified, the funds would be returned to me. Only after I inquired into the nature of the setoffs, did I learn that they were unfounded.

35.   Thus, a check was offset against my salary that was given to a clerk at Interface, Miry Shechori. The setoff was based on the mistaken assumption that this check was given to me. This check was check #905 dated August 30, 1998 (a copy of which is attached as **Exhibit "P14"**) in the amount of NIS 10,000. This check was given to Ms. Shechori and cashed by her.

36.   Once I understood that the setoff of this amount was unjustified, I asked Interface to be paid the said amount. Interface refused and conditioned, as aforesaid, any payment upon my waiver of the Options and the rights in the Venture. Therefore, Interface owes me the amount stated in the check attached as Exhibit P14, which, when grossed-up, amounted to approximately NIS 20,000 (according to the value thereof on the date of the setoff, May 10, 2000). In addition to interest and linkage, this sum amounts, as of the date of filing of the Complaint, to NIS 21,516.

37.   In addition, the amount stated in check #844 (a copy of which is attached as **Exhibit "P15"**) in the amount of NIS 20,000, which was given to me on July 5, 1998, was offset against my salary.

38.   This setoff was performed on the basis of the assumption that this check was given to me as a loan "on account". However, this check was given to me as salary for my work in the months during which I worked without pay slips, at the beginning of the term of my employment.

39.   Once I understood that the setoff was unjustified, I asked Interface to be paid the offset amount. Interface refused and conditioned, as aforesaid, any payment to me upon my waiver of the Options and the rights in the Venture. Therefore, Interface owes me the amount stated in the check attached as Exhibit P15, which, when grossed-up, amounted to approximately NIS 40,000 (according to the value thereof on the date of the setoff, May 10, 2000). In addition to interest and linkage, this sum amounts, as of the date of filing of the Complaint, to NIS 43,033.

40.   The Defendants' total debt due to unjustified setoffs, as of the date of filing of the Complaint, is NIS 64,549.

**Injury to Reputation and Business Opportunities**

41.   In the period following my departure from Interface, Interface refused to forward to me personal mail and fax correspondence which arrived in my address at the offices of Interface.

42.   In a conversation which I held with Interface's attorney, Adv. Chinn, Adv. Chinn told me that the mail I received at the company's address was being opened by my successor, Mr. Raviv. According to Adv. Chinn, it filled around three boxes of letters and facsimiles. In my

conversations with Adv. Chinn, and in my letter (the aforementioned Exhibit "P15" [sic]), I asked to receive the letters and the facsimiles.

43.    Only six months later, a minuscule portion of the letters and faxes addressed to me personally was forwarded to me. Most of the material remains in the hands of Interface.

44.    Due to Interface's refusal to forward the letters and faxes to me, I did not receive communications which were highly important to my personal affairs. Thus, among other things, I missed an important international conference in Davos, to which I was invited personally, since the invitation was sent to the offices of Interface and Mr. Raviv from Interface refrained from forwarding it to me. Consequently, I missed business opportunities.

45.    I also received communications from acquaintances and entities with whom I maintained business contacts, who complained to me for not returning faxes or letters.

46.    I estimate my damages on this count at NIS 50,000.

**The Option Commitment**

47.    Within the framework of the employment relationship between myself and the Defendants, Interface gave me, through Adelson, stock options with an indefinite term in two companies – Denex Medical Software Systems Ltd. ("**Denex**") and IMDSoft Ltd. ("**IMD**") (this was in addition to the general commitment for options in ventures to be established at my initiative or with my assistance or participation).

48.    The option commitments were given orally, within the relationship of intimate trust as specified above.

49.    An option commitment was given also to my predecessor in Interface, Mr. Farbstein. This indicates that a custom existed of giving options to the General Manager of the Defendant.

50.    In accordance with the commitment made by Interface and by Adelson personally, I am entitled to 12% of the shares of Denex and IMD, held by Interface, or by Adelson, or by another company controlled by Adelson, against payment of 12% of the amount invested in Denex and in IMD by Interface or by Adelson.

51.    These terms were expressed in Adelson's letter to me, Exhibit "P2" above.

52.    On August 7, 2002 I addressed the Defendants in writing, giving notice of my wish to exercise the Options in Denex. A copy of my letter is attached as **Exhibit "P16"**. My request was rejected in a letter from the Defendants' counsel, a copy of which is attached as **Exhibit "P17"**.

9

## The Bonus Commitment

53.    At the beginning of the term of my employment with Interface, I acted as Chairman on the Defendant's behalf of Auto Depot Ltd. (hereinafter: "**Auto Depot**"), in which Interface held approximately one half of the share capital and control. At that time, Auto Depot was on the verge of insolvency, and Interface believed that its entire investment therein had been lost.

54.    The manner in which I conducted the contacts with Interface's partner in Auto Depot resulted in that Interface received the sum of $2,050,000, which was paid thereto in two installments:

54.1.    An installment in the sum of $500,000 was paid on January 28, 1999 or thereabout.

54.2.    An installment in the sum of $1,550,000 was paid (by way of forfeiture of a bank guarantee) in February 2001 or thereabout.

55.    In consideration for the manner in which I managed and navigated this affair, Adelson and Interface promised me a bonus of 6% of the sum which I "saved" for them (namely, $123,000), to be paid to me on the date on which Interface received the second installment. Consequently, Interface owes me the sum of $123,000, the value of which is NIS, according to the representative rate on a date close to the payment of the bonus (February 15, 2001) is NIS 504,300, or NIS 523,081 as of the date of filing of the Complaint.

## The Requested Remedies

56.    The Defendants' total debt to me, as specified above, jointly and severally, as of the date of filing of the Complaint, is NIS 1,563,230, in addition to salary-withholding compensation or interest and linkage, as the case may be, until the date of actual payment.

57.    I move the Honorable Court to charge the Defendants with payment to me of the amount of the Complaint, and to issue an order declaring my right to receive 12% of the shares of Denex and IMD, held by Interface or by Adelson or by a company controlled by Adelson, against payment of 12% of the initial investment of Interface or Adelson or a company controlled by Adelson.

58.    In addition, I move the Court to charge the Defendants with payment of my out-of-pocket expenses in this proceeding, while taking note that the Second Defendant denied the Court's jurisdiction without any grounds, which denial forced me to institute many proceedings aimed at having a decision issued compelling him to file an Answer.

10

59.    I declare that my name is Moshe Hananel, that the signature hereunder is my own and that all the statements made in this my affidavit are true.


(-)
_____
Moshe Hananel


## Confirmation

I confirm that on September 9, 2002 appeared before me, Dan Sela, Adv. (License No. 30676) of 20 Lincoln St., Tel Aviv, Mr. Moshe Hananel who is known to me personally, and who, after I cautioned him to declare the truth, failing which he would be liable for the penalties prescribed by law, confirmed the veracity of his above affidavit and signed it in my presence.


(-)
_____
Dan Sela, Adv.

f:\100xx\10070-001\hannanel-affidavit-trans