| | |
|---|---|
| **The District Labor Court** <br> **In Tel Aviv Jaffa** | Labor Case 9015/02 <br> Before the Honorable Justice <br> Efrat Lakser |

In the matter of: **Interface Partners International Limited**
Represented by Danziger, Klagsbald, Rosen & Co.
of 28 Bezalel St., Gibor Sport Bldg. (24th floor),
Ramat Gan 52521
Tel: 03-6110700; Fax: 03-6110707

**The Plaintiff;**

Versus

**Moshe Hananel**
Represented by Shalev, Holdstein, Galor[1]
of 3 Daniel Frisch St., Tel Aviv 64731
Tel: 03-6910330; Fax: 03-6919533

**The Defendant;**

# Affidavits in Lieu of Direct Testimony on Behalf of the Defendant

---

[1] Translator's note: Full list of attorneys names omitted from translation.

## Affidavit

I, the undersigned, Hoggatt Elhadad, bearer of I.D. No. 6903052-6, of 41 Foch Street, Paris, France, after having been cautioned to tell the truth, failing which I will be liable for the penalties prescribed by law, do hereby declare in writing as follows:

1. In 94-95 I worked for approximately one year at HaGalil Tours Ltd. (hereinafter: "**HaGalil Tours**").

2. During said period I was aware that Mr. Moshe Hananel (hereinafter: "**Hananel**") was involved in and worked at Interface Partners International Limited (hereinafter: "**Interface**"). This was known to me based on the following facts:

   2.1 I recall that in those days, Hananel spoke with me and told me about Adelson offering that he work for him; about Hananel's deliberations as to whether to accept the offer; and about his ultimate decision to accept the offer;

   2.2 I recall that in those days, Mr. Sheldon Adelson (hereinafter: "**Adelson**") visited HaGalil Tours' offices on Shalom Aleichem Street in Tel Aviv;

   2.3 I recall that Dan Raviv also told me that following a dispute between Adelson and his brother-in-law, he, Dan Raviv and Hananel began working with Adelson in managing Adelson's company (Interface) in Israel.

   I was acquainted with Dan Raviv from the field of productions. During said period Dan Raviv was engaged with various productions[2] and in the context of said activity, produced promotional videos for municipalities or local councils.

3. I knew Adelson himself in the context of my position at HaGalil Tours. In the context of my acquaintance with Adelson, I was also invited to social and family events of his. I was even invited by Adelson to Boston (U.S.A) in order to meet him and see his offices and I also participated in the wedding of the daughter of Miriam (his wife) in Caesarea. I am aware that Hananel actively participated in the organization of the said wedding on behalf of HaGalil Tours.

4. It is not plausible to me that Adelson was not aware of the fact that in addition to Hananel's work at Interface, he also worked at HaGalil Tours, since in my conversations with Adelson I mentioned Hananel from time to time in connection with his activity and status at HaGalil Tours and I called Hananel "my boss" in Mr. Adelson's presence and I was also witness to Adelson and his people calling HaGalil Tours in order to speak with Hananel.

(-)

---

[2] Translator's note: Literally 'deposits' [הפקדות], but probably a typographical error, and should be productions [הפקות].

Hoggatt Elhadad

## Affidavit

I, the undersigned, Majili Wahabah, bearer of I.D. No. 0050793751, of Beit Jan, after having been cautioned to tell the truth, failing which I will be liable for the penalties prescribed by law, do hereby declare in writing as follows:

1. In 1996-1998 I worked at the Ministry of Infrastructures as an Adviser on Arab Countries Affairs to the Prime Minister and the then-Minister of Infrastructures, Mr. Ariel Sharon.

2. In 1997, a meeting was held at the Ministry of Infrastructures in Jerusalem to which I was also invited, between Mr. Sheldon Adelson (hereinafter: "**Adelson**") and Mr. Ariel Sharon, in the presence of Mr. Moshe Hananel (hereinafter: "**Hananel**"). During the said meeting I made the acquaintance of Adelson who introduced Hananel to me as his representative in Israel and as manager of the company HaGalil Tours.

    Adelson, at his own initiative, mentioned during the said meeting his wish to establish a casino on the Israeli-Jordanian border, in the Naharayim region, or alternatively on the border of Eilat and Aqaba. In addition, at Mr. Ariel Sharon's request, it was agreed during the said meeting that a meeting would be scheduled between Hananel and myself in Jordan with the objective of utilizing Hananel's contacts in Jordan, *inter alia*, in view of HaGalil Tours' being Royal Jordanian's representative in Israel.

    Hananel and I indeed met in Jordan a number of times and in the context of the said meetings Hananel introduced me to a number of key figures in the Jordanian Government. I recall that in Jordan they called Hananel "Mr. Galilee".

3. I also recall a joint trip on Mr. Sheldon Adelson's private plane, with him, Mr. Raviv and Moshe Hananel, in order to promote, *inter alia*, the matter of the casino in Jordan. One of the meetings was also with the president of Royal Jordanian in which, *inter alia*, he spoke generally with his representative in Israel, Mr. Hananel, about the state of Royal Jordanian's business in Israel.

4. Later, between 2001-2002, my relations with Adelson and Hananel continued in the context of my position as Director General of the Ministry for Regional Cooperation.

5. In our joint meetings, in Israel and in Jordan, Moshe Hananel never concealed his involvement in HaGalil Tours and as representative of Royal Jordanian, on the contrary.

(-)<br>
Majili Wahabah

Case 1:04-cv-10357-RCL    Document 128    Filed 01/31/2006    Page 5 of 20

2

I the undersigned, *Halit Megiddo*, Adv. of <u>the Knesset</u> do hereby confirm that on *October 27, 2004* appeared before me Mr. Majili Wahabah, whom I identified by an I.D. card and who, after I cautioned him to tell the truth, failing which he would be liable for the penalties prescribed by law, confirmed the veracity of his foregoing statement and signed it in my presence.

(-)
Halit Megiddo, Adv.

### Affidavit

I, the undersigned, Dan Tichon, former Speaker of the Israeli Knesset, bearer of I.D. No. 6732481, of 5 Hanamer St., Malcha, Jerusalem, after having been cautioned to tell the truth, failing which I will be liable for the penalties prescribed by law, do hereby declare in writing as follows:

1. I became acquainted with Mr. Sheldon Adelson (hereinafter: "**Mr. Adelson**") more than a dozen years ago and I regard him as a friend.

2. In the context of the acquaintance between us, I met with Mr. Adelson and with the woman who subsequently became his wife, Miriam Oxhorn-Adelson, a great many times at social, public and personal events.

3. I recall, in the context of our close relationship that in the early 1990s Mr. Adelson wanted to hold one of his wedding event at the Knesset building, (the Chagall Hall). I advised him not to hold the said event at the Knesset but he did not heed my advice.

4. I recall that in 1995, after elections were held for the Knesset and for Prime Minister, which former Prime Minister Mr. Benjamin Netanyahu won, a problem arose at the entrance to the Likud's victory event at Binyanei HaUma in Jerusalem. Mr. Adelson, who was invited to the said event, requested my assistance since he not allowed in. Mr. Adelson was unsuccessful in reaching Mr. Benjamin Netanyahu who had invited him and therefore contacted me and requested my assistance. I was aware of Mr. Adelson's substantial and crucial contribution to Mr. Benjamin Netanyahu's election and was happy to help him. I handled Mr. Adelson and his wife's entrance permit for the event and also handled the matter of seats for Mr. Adelson and his wife (next to my wife).

5. Mr. Adelson visited my chambers at the Knesset several times. I was invited to Mr. Adelson's home at 10 Paamoni St. in Tel Aviv a number of times and attended several family events there. Mr. Adelson and his wife were invited to, and were also present at a private party held in my honor at Danny Rejwan's family house in Jerusalem on my being elected as Speaker of the Knesset and on the occasion of my wife's birthday.

6. We dined together a number of times at restaurants in Tel Aviv-Jaffa and in Jerusalem with his wife and my wife. At the majority of the dinners, Mr. Moshe Hananel and his wife also participated.

7. At Mr. Adelson's request, my wife and I participated in a great number of events held at the Knesset and in various locations in Jerusalem, which were held on the occasion of the visit of American members of Congress (mainly Republicans) in Israel. In a number of instances I recall that after being contacted by Mr. Adelson, I helped coordinate events that were held at the Knesset.

8. I recall an event held at Mr. Moshe Hananel's house in Mevasseret Zion at which Mr. Adelson, who spoke with me the entire evening, was present.

9. Over the years, on his visits to Israel, Mr. Adelson and I met and spoke a great many times on various and varied topics which interested Mr. Adelson such as a casino in Israel, a casino on the Israeli-Jordanian border, the subject of privatization in Israel, the company Africa-Israel, Bank Leumi, professional unions in Israel and in the U.S.A, Mr. Adelson's wife's drug clinic and problems at the Ministry of Health in Israel.

10. Throughout the years, I was happy to be of service to Mr. Adelson when he needed advice or an opinion on matters that occupied him.

11. On August 29, 1999 (at which time I did not hold any public position), I held a press conference at Beit Agron in Jerusalem. I was interested in the press conference being recorded and invited a recording company for this purpose. To my surprise, less than one hour before the press conference began, it transpired that the recording company that I had invited was demanding an undertaking by a "company" for payment of the cost of recording the press conference. The recording company refused to accept an undertaking for payment from a private person and would not even agree to payment in advance in cash or by check or credit card (not even as collateral).

As aforesaid, my attempts to solve the problem by myself were in vain. Due to the shortage of time I was forced to approach an external entity for assistance. I turned to my friend Mr. Moshe Hananel whom I knew worked for Mr. Adelson at Interface and requested his urgent help in solving the problem. I did so, *inter alia*, since I estimated that in view of my relations with Mr. Adelson, helping me in the urgent circumstances that had arisen would not create a problem. Mr. Moshe Hananel expressed his consent to help me by giving an undertaking for payment and I agreed with Mr. Moshe Hananel that upon arrival of the tape and the invoice we would settle the matter and I would arrange to remit to Interface the payment due thereto. I would like to mention that to date, I have not received the tape or the transcript.

12. In the event that I receive a request from any entity for payment, I will not hesitate to remit the sum, which I have been told is NIS 671, immediately.

13. To the best of my understanding and knowledge, in view of my acquaintance and conversations with Mr. Adelson, it was not possible for a situation to have been created in which Mr. Adelson was not aware that Mr. Moshe Hananel continued to be employed by "HaGalil Tours" and involved in the business thereof, in addition to his occupation at Interface, during the period from late 1995 until 1998. In joint meetings that I held with Mr. Adelson and Mr. Moshe Hananel, I made reference, in Mr. Adelson's presence, to the situation at "HaGalil Tours", the situation at Royal Jordanian, the relationship with Jordan, the state of business at "HaGalil Tours" in general and in the field of incoming tourism in particular. Mr. Moshe Hananel, who is considered one of the kingpins of the tourism industry, was absolutely identified in this field with his occupation at "HaGalil Tours", and this fact was commonly known, particularly amongst those entities that engaged in the field of tourism or in the tourism relations with Jordan.

3

(-)
Dan Tichon

I, the undersigned, *Ruth Glatt*, Adv. of *74 Menachem Begin Road, T.A.*, do hereby confirm that on *October 25, 2004* appeared before me Mr. Dan Tichon, whom I identified by an I.D. card and who, after I cautioned him to tell the truth, failing which he would be liable for the penalties prescribed by law, confirmed the veracity of his foregoing statement and signed it in my presence.

(-)
Ruth Glatt, Adv.

## Affidavit

I, the undersigned, Miriam Cohen, bearer of I.D. No. 004355509, of 6 Ein Yahav St. in Ramat Gan, after having been cautioned to tell the truth, failing which I will be liable for the penalties prescribed by law, do hereby declare in writing as follows:

1. I have been dealing in the field of tourism for approximately thirty five years and my field of expertise is in the travel industry, in the field of incoming tourism.

2. I worked for approximately nine years at HaGalil Tours Ltd. (hereinafter: "**HaGalil Tours**") from 1990 until the end of 1998, and since then and up until today I act as senior academic adviser on tourism affairs at the College of Management.

3. I recall a conversation that I held with Hananel in the summer of 1995 after Mr. Sheldon Adelson (hereinafter: "**Adelson**") visited HaGalil Tours' offices on Shalom Aleichem street in Tel Aviv and met with Hananel. In the said conversation, Hananel told me that Adelson had met with him with the intention of attempting to persuade Hananel to work at Interface Partners International Limited (hereinafter: "**Interface**"). Hananel told me of his hesitations on the matter.

4. After Hananel began working at Interface in addition to his work at HaGalil Tours, he did not dedicate much time to his work at HaGalil Tours. During the said period, Hananel's visits to HaGalil Tours' offices during the week (Sundays through Thursdays) were infrequent. I recall that there were employees at HaGalil Tours who were talking amongst themselves saying such things as, for example, "Hananel has really settled in there", or "Hananel has forgotten us". Therefore, Interface's statements, including through Adelson, whereby Hananel invested the majority of his time and energy in the management of HaGalil Tours and only a small part of his time in the management of Interface, are untrue but rather quite the reverse is correct.

5. On Fridays Hananel would regularly come to HaGalil Tours' offices and even then he would meet with Interface people. Since some Fridays there was no secretary at HaGalil Tours' offices, or the secretary was busy, I would answer some of the telephone calls and if necessary, transfer them to Hananel.

   I recall that Adelson himself would call HaGalil Tours on Fridays in order to speak with Hananel, so he must have known that Hananel was at HaGalil Tours. Therefore, Adelson cannot be surprised about Hananel's work at HaGalil Tours. I would transfer Adelson's calls to Hananel (sometimes a number of calls during one day) and the conversations held between them were usually long. In addition, I recall that also during the week, it happened that Adelson called HaGalil Tours' offices looking for Hananel.

6. As a very senior employee in the field of incoming tourism at HaGalil Tours, I maintained ongoing contact with Hananel. I do not recall that Moshe Hananel

2

took any vacation during the period after the end of 95. I, like other employees at HaGalil Tours, knew that Hananel could be reached at Interface's offices and every so often I even spoke with him when he was at Interface's offices.

7. I recall that the secretaries office at HaGalil Tours worked in coordination with Interface's secretaries office. In addition, I recall that Adelson's people in the U.S.A. and Adelson himself, preferred to use the services of the secretaries office at HaGalil Tours, also on matters that were not connected with HaGalil Tours, seeing that the secretaries at HaGalil Tours were more senior and experienced than the secretaries at Interface.

8. Adelson and his people in the U.S.A. worked exclusively with HaGalil Tours in every matter connected with visits to Israel. In addition, Adelson and his people made use of the name and reputation of "HaGalil Tours". Thus, for example, Adelson's people (Michael Shaw, for instance) had HaGalil Tours business cards and made use of the name of HaGalil Tours on letterheads. I recall that in the framework of contacts that I had with American entities, I was asked more than once whether Adelson owned HaGalil Tours.

A copy of Michael Shaw's business card under the name HaGalil Tours in Israel and in the U.S.A. is attached hereto as **Annex A**.

9. When a group or important figure was to visit Israel or Jordan and was connected to Adelson and/or his people, Adelson and his people utilized the fact that Hananel also worked for HaGalil Tours and demanded his personal involvement in the organization of the visit.

10. HaGalil Tours was responsible for the entire logistical organization of the visit of the Congressional Delegation from the U.S.A. to Israel on behalf of the organization A.I.P.A.C. (hereinafter: "**AIPAC**") and in the majority of cases this was done under Hananel's management and supervision, mainly in view of the demand of Adelson and his people who utilized the fact that Hananel also worked for HaGalil Tours, and transferred various requests and demands through him to HaGalil Tours.

AIPAC determined the arrival and departure dates, and coordinated some of the meetings with the political figures. HaGalil Tours was responsible for the entire logistical organization of the visit (accommodation, meals, tours, transport and so forth). In order to illustrate the division of roles between HaGalil Tours and AIPAC it could be said that if, for example, AIPAC coordinated a meeting with a political figure, the role of HaGalil Tours was to book a place to hold the meeting, to organize refreshments, microphones and even the political figure's favorite drink and so forth.

In the context of its responsibility as aforesaid, HaGalil Tours, *inter alia*, through myself as manager in the field of incoming tourism at HaGalil Tours, organized: VIP reception and hospitality for the members of Congress at the airport in Israel, booking hotel rooms, meals, special events, meetings with various entities including political figures, a tour schedule and attractions. Thus, for example, HaGalil Tours organized: mass on the Kineret, artistic performances, shows by instrumentalists and singers, special meals (such as,

for example, a meal at the Israel Museum, a meal at the Jerusalem Theatre, a meal at Mishkenot Shananim, a meal in Ancient Jaffa, a meal with Mr. Shimon Peres at the restaurant Keren, etc).

As aforesaid, in the context of his work at HaGalil Tours, Hananel was involved and personally supervised all that was involved in the organization of the Congressional delegations' visits by HaGalil Tours. Hananel was also conceptually involved in the organization of the delegations' visits. Hananel personally checked, *inter alia*, the coordination of the arrival at and departure from the airport, the buses, hotels, menus, meals and even the gifts. Contrary, *inter alia*, to Adelson's affidavit, Hananel was present at and participated in the majority of the Congressional delegations' events. In almost any central activity carried out during the said visits, Hananel played a part in the supervision and even visited the place before the event.

Hananel would even provide Adelson, who would usually join the Congressional delegations himself once or twice a year, with an ongoing update of the details involved in the organization of the said visits. Adelson was also involved in the details involved in the organization of the said visits and he would update HaGalil Tours, through Hananel, regarding his preferences and wishes. Hananel updated the personnel of HaGalil Tours regarding Adelson's preferences and wishes and HaGalil Tours acted according to Hananel's instructions, insofar as possible, in order to satisfy Adelson. Thus, for example, I recall an instance when Adelson was interested in giving the members of Congress a gift and requested that this be arranged through HaGalil Tours. At Adelson's request Hananel instructed HaGalil Tours to purchase books by Mr. Natan Sharansky in English, the price of each book being approximately NIS 20, and said books were given as a gift to the members of Congress.

11. During the entire period that Hananel also worked at Interface and I worked at HaGalil Tours, Hananel had a red Ford Transit on which was written on both sides, in Hebrew and in English, in big letters "HaGalil Tours"

12. The claim asserted, *inter alia*, in Adelson's affidavit, according to which GWV stopped working with HaGalil Tours **is utterly incorrect and false**. Up until the last day that I worked at HaGalil Tours (end of 1998) GWV continued to work with HaGalil Tours. Although the scope of the work did indeed decrease, GWV did continue to work vis-à-vis HaGalil Tours, and to the best of my knowledge it works up until today with HaGalil Tours (HaGalil Tours-Diesenhaus) in organizing group visits to Israel, for example groups on behalf of AIPAC. The majority of the contacts and conversations held with GWV personnel were held with me in the context of my work at HaGalil Tours. In this context I shall mention that Emmanuel Shacham worked at HaGalil Tours for approximately one year only, part of which time he was absent from work due to a heart attack that he suffered. With the exception of one visit by Emmanuel Shacham to the U.S.A with GWV personnel, I do not recall that he had any contact with them. HaGalil Tours' ongoing business vis-à-vis GWV was handled through me and through Hananel as aforesaid.

4

13. HaGalil Tours was also responsible for the organization of the wedding of Yasmin Oxhorn–Lukatz, the daughter of Miriam Adelson, Adelson's wife (hereinafter: "**Yasmin**"). The organization of the wedding was done in coordination with Adelson personally through meetings and telephone conversations held with him by Hananel. At Adelson's request, Hananel was personally involved both in the planning and the execution of the said wedding, and all of the details of the wedding, the handling of the guests who came from abroad, their arrival to Israel, their stay in Israel and also the tours organized for them in Israel, were the responsibility of HaGalil Tours.

14. Larry Marder (hereinafter: "**Marder**") was in contact with me on behalf of GWV in every matter connected with AIPAC's Congressional delegations, Yasmin's wedding guests and events that were organized as aforesaid by HaGalil Tours. I clearly recall that Marder came to Yasmin's wedding, accompanied the guests that came to the said wedding, and coordinated with me and sometimes together with Hananel the departure of the said guests. I recall that Marder spoke with Hananel on matters regarding the said wedding a great many times.

Marder utilized the fact that Hananel also worked for HaGalil Tours. As aforesaid, HaGalil Tours carried out the ongoing operations involved in the organization of the said events. Any time a logistical problem arose that required a creative solution or any time that Marder's opinion was not accepted, he would approach Hananel directly and ask him to handle the matter personally. Therefore, Marder's claim whereby he was aware that since Hananel began working at Interface he stopped working for HaGalil Tours [and] neither he nor GWV had any contact with Hananel in connection with HaGalil Tours – **is false**.

15. I never told Marder, or any other entity, that Hananel did not work for or was not connected with HaGalil Tours, on the contrary. I also recall that Marder, who was present himself at a number of events in Israel, spoke with me and Hananel regarding logistical problems that had arisen with the airlines in respect of a shortage of business class seats and in respect of a transfer of luggage and also on any matter connected with the hotel accommodations. In addition, I also recall that in the context of the conversations that I held with Marder he praised Hananel's ability to solve problems and his powers of persuasion in respect of Adelson.

16. Mr. Ted Bernard Cutler (hereinafter: "**Cutler**") is considered a partner, the person with professional responsibility at GWV for Mr. Adelson. I recall that Cutler and his wife participated themselves in the tours of the American members of Congress in the context of the delegations on behalf of AIPAC (at least one or twice a year), in Yasmin's wedding events and in the wedding of the son of Irwin Chafetz, who was also a partner in GWV.

17. Every so often Cutler had complaints in respect of the service given to the American Congressional delegations that visited Israel on behalf of AIPAC. Thus, for example, I recall that Hananel told me that Cutler complained to him that the hostesses, on behalf of HaGalil Tours, serving the delegation members during their stay in Israel were too old and he would like young hostesses.

Subsequent thereto, Hananel and I met with Cutler at the King David Hotel in Jerusalem in a corner in front of the hotel dining room, and spoke with him regarding several problems that had arisen. I recall that during the said conversation Hananel explained to Cutler that he saw an advantage to the hostesses being older, since they were experienced. Ultimately, in order to please Cutler, HaGalil Tours hired the services of a hostess named Mary from the company "Kenes" with whom Cutler was acquainted.

18. GWV used the name "HaGalil Tours" as a brand name in anything relating to tours in Israel. I recall that Hananel and I talked with Cutler about the fact that GWV was looking into the possibility of changing the said brand name to "Our preaches Legacy". Cutler said that it was the idea of one of the new managers at GWV, Michael Shaw (hereinafter: "**Michael**").

In addition, Hananel and I learned that on Michael's only visit to Israel in 1996 he had met with a friend of his from Gordon Tours and had given him a copy of our program "Round Tour". Michael attempted a move that would cause GWV to cease working [with - missing] HaGalil Tours and move over to working with Gordon Tours. Hananel contacted Cutler and informed him of Michael's intentions. Following Hananel's communication, Cutler instructed Michael to cease his contacts with Gordon Tours and to work exclusively with HaGalil Tours.

In view of the aforesaid, Cutler's claim to the effect that he knew that since Hananel started working at Interface he stopped working for HaGalil Tours and that since then neither he nor GWV had any contact with Hananel regarding HaGalil Tours – **is false**.

19. Irwin Chafetz (hereinafter: "**Chafetz**"), like Cutler and Adelson, also participated in the tours of the American congress members as part of the AIPAC delegations and in Yasmin's wedding events.

20. Hananel handled the wedding of Irwin Chafetz's son in Israel on behalf of HaGalil Tours together with me. Hananel was involved in all that was involved in the organization of the said wedding in the context of his work at HaGalil Tours. Approximately one hundred guests were invited to the said wedding, most of whom were VIPs from abroad. To the best of my recollection, the said wedding was held before Yasmin's wedding. Hananel was present at all of the events of the said wedding in the context of his position as aforesaid and not only as one of the guests.

The said wedding was complicated logistically, its organization involved a lot of work and much coordination was required. This was so, *inter alia*, in view of the large number of special requests by the guests and by Chafetz and his wife. The majority of Chafetz's and the guests' requests were referred directly to Hananel and he transferred them to my care. Chafetz very rarely spoke directly with me. Chafetz turned to me directly perhaps once then, and requested that I organize a hairdryer with a diffuser[3] for Chafetz's wife (I

---

[3] Translator's note: Translation uncertain. Literally, 'hairdryer with a hat'.

6

arranged to rent the hairdryer especially for Chafetz's wife and to bring it to the hotel).

The said wedding was held at the Hilton Hotel in Tel Aviv. The place was booked by Chafetz himself. As aforesaid, in honor of the said wedding many guests arrived from abroad although each one of the guests arrived and departed separately. HaGalil Tours booked all of the hotel rooms for all of the guests. A separate transfer had to be coordinated with each guest separately, in accordance with his arrival from abroad and thereafter, such guest had to be put in touch with the rest of the guests and with the joint program in honor of the said wedding.

HaGalil Tours organized the opening meal at Magenda, in the Yemenite Quarter in Tel Aviv. As I recall, only some of the guests invited from abroad had arrived in Israel by that date and participated in the said meal. In addition, I recall that there were not enough rooms at the King David Hotel in Jerusalem where the guests from abroad stayed. Therefore, to Chafetz's son's displeasure, the bride's family (the Golan family) was put up at the Dan Pearl Hotel. This was done with the authorization of Hananel, who was involved in solving all of the problems that arose as aforesaid and was in direct contact with Chafetz.

In the context of the said wedding events, HaGalil Tours organized tours intended for guests visiting Israel for the first time and tours for those who had already visited Israel and who wanted to see new or special things. For this purpose, HaGalil Tours booked "Eshkol" cars. I recall that Gloria, Adelson's sister, was offended since she did not receive a private car and subsequent thereto we organized a private car for her.

In the context of the said wedding events, the guests and the bride and groom's families visited the school in Yemin Ord. A ceremony was held at the school with the participation of all of the above, in view of a donation made by Chafetz. In addition, a visit was made to the air force base in Hatzerim, as well as trips to the Kineret, the Galilee and Masada.

I recall that on the concluding night of the said wedding, that was held at the Ilana Gur Museum in Jaffa, Chafetz thanked Hananel and the rest of the HaGalil Tours employees, with great warmth. In addition, Chafetz consulted with Hananel on the matter of tips for all of the HaGalil Tours employees: drivers, hostesses and so forth. I recall that Chafetz wanted to give me a tip and Hananel, who discerned my embarrassment, told him that it was not accepted. Therefore, also Chafetz's claim to the effect that he knew that since Hananel started working at Interface he stopped working for HaGalil Tours, and that since then neither he nor GWV had any contact with Hananel in respect of HaGalil Tours – **is not true**.

21. I recall that Adelson was involved in donations to the *Or Hadash* Yeshiva in Rechasim, the representative of which was Rabbi Shemesh. Adelson promised to donate to the *Or Hadash* Yeshiva a vacation for the teachers and staff members during the "period between the semesters". Rabbi Shemesh was proud of Adelson's donation to the *Or Hadash* Yeshiva.

7

I am aware of this since the people of *Or Hadash* Yeshiva wanted a hotel with a swimming pool with separate swimming for men and women. In the context of my work at HaGalil Tours, I was asked to find a suitable hotel for them and I recall that the task was difficult due to the hotels being so crowded during that period of time and since the people of *Or Hadash* Yeshiva refused to stay at The Center (*HaMerkaz*) Hotel, an ultra-orthodox hotel, which was Rabbi Porush's hotel. Ultimately, they were put up in fifty rooms at the Renaissance Hotel in Jerusalem.

Invoices were issued to Interface for the said hotel accommodation and I remember that the cost was expensive.

One year later, Rabbi Shemesh approached me again and requested that I organize a vacation for the people of the *Or Hadash* Yeshiva once again. I told him that that would be possible if I received authorization therefor. Upon receipt of authorization as aforesaid, HaGalil Tours organized the vacation this time too. On the same vacation, I recall that the people of *Or Hadash* arrived at the hotel by a bus that Hananel had donated on behalf of HaGalil Tours, to the chagrin of the bookkeeper at HaGalil Tours.

22. Adelson's wife, Dr. Miriam Adelson (hereinafter: "**Miriam Adelson**") was also aware of Hananel's work at HaGalil Tours. Thus, at Miriam Adelson's request, and in accordance with Hananel's instructions, HaGalil Tours was involved in the organization of the cornerstone laying ceremony for the drug rehabilitation clinic, owned by Miriam Adelson, at Poriah Hospital. I recall that Hananel, on behalf of HaGalil Tours, donated a bus to bring guests and journalists to the said cornerstone laying ceremony. I further recall that also Ms. Orly Katav was involved in the preparations for the said ceremony. In addition, I recall that Hananel, in coordination with Miriam Adelson, donated a bus and a guide on behalf of HaGalil Tours (at least twice) for the drug rehabilitation patients at Miriam Adelson's clinic in Tel Aviv. Miriam Adelson also maintained direct contact with Hananel and myself in relation to a tour that took place in Jerusalem. During the said tour, the need arose to organize a lunch. Hananel ordered the meal through HaGalil Tours and thus the affair came to a close.

(-)
Miriam Cohen

I, the undersigned, Sharon Friedman, Adv. do hereby confirm that on October 27, 2004 appeared before me at my office at 3 Daniel Frisch St. in Tel Aviv Ms. Miriam Cohen, whom I identified by an I.D. card and who, after I cautioned her to tell the truth, failing which she would be liable for the penalties prescribed by law, confirmed the veracity of her foregoing statement and signed it in my presence.

(-)
Sharon Friedman, Adv.

## Affidavit

I, the undersigned, Galit Kerner, bearer of I.D. No. 28710663, of 9 Laskov St. in Rehovot, after having been cautioned to tell the truth, failing which I will be liable for the penalties prescribed by law, do hereby declare in writing as follows:

1. I worked at HaGalil Tours Ltd. (hereinafter: "**HaGalil Tours**") at offices on Shalom Aleichem St. in Tel Aviv, and thereafter on Ben Yehuda St. in Tel Aviv, from May 1996 until September 1998. I acted as senior secretary at HaGalil Tours, in which context I was secretary to Mr. Moshe Hananel (hereinafter: "**Hananel**"). Thereafter, I also engaged in the field of incoming tourism.

2. Since the conclusion of my employment at HaGalil Tours and up until now I have had no contact with Hananel.

3. Insofar as I recall, during the period in which I worked at HaGalil Tours, Hananel divided his time between his work at HaGalil Tours and that at Interface Partners International Limited (hereinafter: "**Interface**"). Insofar as I recall, Hananel stayed at Interface's offices for days on end until the late evening hours without coming to HaGalil Tours' offices at all. Insofar as I recall, I scheduled board of directors' meetings for Hananel at Autodepot [sic] and I.M.D. Soft (companies affiliated with Interface), which often began in the evening hours.

4. I was in charge of managing Hananel's schedule. Insofar as I am aware and recall, all of Hananel's meetings that were scheduled by Interface's secretaries were coordinated opposite the appointment calendar that I maintained at HaGalil Tours. Insofar as I recall, many meetings in which Hananel participated were scheduled outside of Interface's offices. In addition, meetings were scheduled for Autodepot's board of directors, that I coordinated and were held almost every week.

   Miri Schory (hereinafter: "**Schory**") who was a secretary at Interface's offices, worked opposite me on an ongoing basis. My coordination of Hananel's meetings and trips in Israel and abroad was performed mainly opposite Schory but also opposite other secretaries at Interface.

5. Faxes for Hananel connected with his work at Interface were sent and received at HaGalil Tours' offices. I recall that faxes addressed to him personally were received. I recall that many faxes were received from Interface's offices in Israel and in the U.S.A and many faxes were also sent on behalf of Moshe Hananel to the said Interface offices. I also recall faxes that were received or sent from Autodepot, and from the law firm Herzog, Fox, Neeman. I filed the said documents in binders under the titles "Fax In" and "Fax Out". In addition, there were Interface and Autodepot binders at HaGalil Tours' offices. To the best of my recollection, these (either all or some of them) were sent to the archives.

In addition, I recall that I transferred material for Hananel to Interface's offices when he was at Interface's offices and I transferred material to him that had been sent for him from Interface when he was at HaGalil Tours' offices.

6. Insofar as I am aware and recall, all of Hananel's business trips abroad were coordinated by HaGalil Tours, *inter alia*, through me. For every one of Hananel's trips abroad that was coordinated by me I prepared a timetable and a contact sheet which was also delivered to Interface's offices. Thus, during Hananel's stay abroad it was possible to know where he was and how to reach him.

7. When Hananel was at HaGalil Tours' offices, many telephone conversations were held between him and Interface personnel and many messages were also delivered to me for him from Interface personnel. Said conversations were held, *inter alia*, with the personal secretary of Sheldon Adelson (hereinafter: "**Adelson**"), Betty Yurcich, with Adelson himself, with Dr. Miriam Adelson (Adelson's wife), with Larry Marder, with Autodepot personnel and with I.M.D. Soft personnel. In addition, Schory herself spoke with Hananel a great many times when he was at HaGalil Tours' offices.

Adelson regularly called HaGalil Tours' offices, often himself directly without going through his secretary, mainly on Friday mornings (nighttime in Las Vegas in the U.S.A.) and during his stay in Israel in order to speak with Hananel.

I recall that Dr. Miriam Adelson called HaGalil Tours' offices and also spoke with Hananel a number of times during her visits in Israel.

I recall contact lists of Interface in Hebrew and in English which included the telephone numbers of Adelson, Dan Raviv (hereinafter: "**Raviv**") and Hananel. In respect of Hananel, his telephone numbers at HaGalil Tours' offices were also listed.

8. Insofar as I recall and am aware, Hananel would come to HaGalil Tours' offices most Fridays. During the period of my employment at HaGalil Tours, Raviv very often came to HaGalil Tours' offices in order to meet with Hananel. Edo Schoenberg and Phyllis Gottlieb of I.M.D. Soft would also come to HaGalil Tours' offices in order to meet with Hananel.

9. I recall that close to the start of my employment at HaGalil Tours, Hananel took me to Interface's offices in order to introduce me to the office staff in order to try and improve the joint work. In addition, I visited Interface's offices a few more times.

10. Insofar as I recall, Hananel had a car in his possession, on which the name "HaGalil Tours" was clearly and conspicuously imprinted in Hebrew and in English. Insofar as I recall, the said car was in his possession throughout the entire period of my employment at HaGalil Tours.

11. I clearly recall that at least one work meeting was held, in 1997, in the lobby of the Dan Caesarea Hotel, shortly before the wedding of Yasmin, Dr. Miriam

Adelson's daughter, with Larry Marder (hereinafter: "**Marder**") and HaGalil Tours staff. The said meeting was attended, *inter alia*, by Miriam Cohen, Hananel and myself (at that time I also worked in the field of incoming tourism). At the same meeting we coordinated rooms and suites, meals, transportation from the hotel to the antiquities area in which the Chuppah took place, transfers to the airport and so forth.

Still on the subject of Yasmin's wedding – I recall that I was involved in booking and coordinating meals at the Israel Museum, the Ilana Gur Museum in Jaffa, and at a Yemenite restaurant in the Yemenite Quarter; I recall that I stayed at the King David Hotel in Jerusalem when I accompanied the group of guests since I also acted as the group's hostess and escort; I recall that Hananel was involved in the details connected with handling the guests and various coordination activities and was also present at most of the meals.

12. In respect of the visits of the Congressional delegations from the U.S.A. in Israel on behalf of the AIPAC organization, I recall that Adelson was involved in the details of the organization of the said visits and as far as I know, he would update HaGalil Tours through Hananel regarding his preferences and wishes.

(-)
Galit Kerner

I, the undersigned, Dov Kerner, Adv. do hereby confirm that on October 27, 2004 appeared before me Ms. Galit Kerner, with whom I am personally acquainted and who, after I cautioned her to tell the truth, failing which she would be liable for the penalties prescribed by law, confirmed the veracity of her foregoing statement and signed it in my presence.

(-)
Dov Kerner, Adv.

### Affidavit

I, the undersigned, David Miro, bearer of I.D. No. 059272476, of 645/16 Keren Hayesod St. in Beit Shemesh, after having been cautioned to tell the truth, failing which I will be liable for the penalties prescribed by law, do hereby declare in writing as follows:

1. In the context of my work at HaGalil Tours Ltd. (hereinafter: "**HaGalil Tours**") I acted as the driver of Mr. Moshe Hananel (hereinafter: "**Hananel**") who, at a certain stage, started working also at Interface Partners International Limited (hereinafter: "**Interface**"). As Hananel's driver I would perform transportation and courier services for Interface. I am aware that Interface paid HaGalil Tours for the said services. At a certain stage, in early 1999, after Hananel had left HaGalil Tours, I moved over to work at Interface as an Interface employee and continued to carry out the same tasks until my dismissal from Interface in 2000.

2. Being Hananel's driver as aforesaid, I would arrive together with him at Interface's offices in Ramat Gan every day apart from isolated instances. I worked five days a week (from Sunday to Thursday). To the best of my knowledge Hananel also worked on Fridays on a regular basis, and sometimes even on Saturdays. On most mornings, I would drive Hananel to Interface's offices. We would usually depart from Hananel's home in Mevasseret Zion between 9:00-9:30 in the morning, and usually, we would only return to his house at around ten o'clock at night. There were, for example, no few instances when I would have to take the car in which I drove Hananel out of the parking garage and wait for Hananel to finish his work since the parking garage closed at 22:00 at night. I recall that also on the actual journeys, to and from Interface's offices and also to meetings outside Interface's offices, Hananel would work and handle affairs of Interface and Sheldon Adelson (hereinafter: "**Adelson**").

   I recall that daily telephone conversations were held between Adelson and Hananel and between Adelson and Raviv. I also recall that when Adelson would call Hananel, usually in the morning hours, they would hold the conversation between them from the car and I would have to wait in the car (next to Interface's offices) together with Hananel until the end of the conversation since there was no cellular telephone reception in the elevator or the parking garage. I recall that a short time before my dismissal and termination of my employment at Interface, the length of the daily conversations held between Adelson and Hananel became slightly shorter.

3. Other than during Hananel's trips abroad as part of his work at Interface, during work hours, most of the time Hananel and I would be at Interface's offices. Hananel and I were usually the last to leave Interface's offices, even after the cleaners had finished their work. Sometimes we would leave the office in the late evening hours, after Hananel had finished holding a long telephone conversation with Adelson. Sometimes Hananel would hold the long telephone conversations with Adelson on the journey back home. In addition, I drove Hananel to meetings on Interface and Adelson's affairs.

Thus, for example, I recall that I drove Hananel to the Auto Depot stores (in Lev Hamifratz, Haifa, Beer Sheva and Ramat Gan), to the offices of I.M.D. Soft in Kiryat Atidim in Ramat Gan, to the offices of Denex in Ora, to high-tech companies in Herzliya, in north Tel Aviv and so forth.

Being Hananel's driver I saw that for a significant part of the time, Hananel dealt, *inter alia*, with the affairs of Auto Depot, Bank Leumi, a casino and also spoke thereon with Adelson during his journeys as aforesaid. Contrary to the assertions made, *inter alia*, by Adelson, Hananel did not only deal with high-tech issues.

4. I recall that Hananel's schedule was given to Interface's secretaries, to HaGalil Tours' secretaries and also to me and was open for all to see. The said schedule included all of Hananel's meetings both in connection with his work at Interface and in connection with his work at HaGalil Tours.

5. I recall that Miri Schory (hereinafter: "**Schory**"), who was a secretary at Interface, finished her work at Interface between 16:00 and 17:00 at the latest. Schory would often finish her work even earlier, on various pretexts. I do not recall a single instance when Schory stayed at Interface's offices after Hananel and I had left the Interface offices at the end of a working day. Schory usually left the Interface offices approximately three to four hours before us. I remember Schory's presence at the Interface offices since when I was at the Interface offices I usually sat opposite Schory.

As aforesaid, Hananel presence and also my own at the Interface offices was daily, apart from a few instances or when Hananel was abroad. Therefore, the statement in Schory's affidavit in connection with Hananel's presence at the Interface offices **is false**. I well recall that Schory herself would complain to me that she was forced to stay too late without receiving any remuneration therefor. I recall that Schory would request that I help her organize various board meetings, mainly for Autodepot and I.M.D. Soft since she usually did not stay until their end and sometimes would not stay for the said meetings at all.

Also when Hananel and I were on visits and meetings outside Interface's offices, most of Hananel's work was connected to Interface. Hananel's work at HaGalil Tours was little and negligible compared with the work at Interface. Unlike Dan Raviv (hereinafter: "**Raviv**") and Schory, I saw Hananel from the moment he left home until he returned home, with the exception of the days that Hananel released me at night to return home by bus so that he could stay and continue to work (after which Hananel would either stay the night in Tel Aviv or return home later). Therefore, the statements made in the affidavits of Raviv and Schory in respect of Hananel's presence at the Interface offices and/or in all matters pertaining to the time that Hananel invested in his work for Interface and Adelson, is not at all true.

6. As aforesaid, during working hours I spent most of the time at the Interface offices and was therefore witness to Raviv's presence and actions at the Interface offices. Raviv worked at Interface for Interface and Adelson in addition to his work at the Broadcasting Authority and to his many