occupations as shall be specified below. In the context of his work at Interface, Raviv gave instructions to Interface employees, held and participated in meetings, held telephone conversations, and made use of Interface money, including Interface's petty cash.

I recall that for a certain period, Raviv received a new Toyota car from Interface, which was registered on Interface's name and purchased especially for him. I recall that in a significant part of the time, Raviv's daughter, who was a student and studied in Jerusalem, used the car that Raviv had received and Raviv himself used a motorbike that was in his possession.

Raviv would give me instructions and send me on journeys and errands for the Adelson family. Thus, for example, I recall that I drove several times to a dry-cleaning store, to the tailor, and to service the personal cars of Adelson and his wife. In addition, I made journeys for Raviv and his wife and also for Adelson's wife when she was in Israel. I recall, for example, that I drove Raviv's wife to a wedding at Ramat Rachel near Jerusalem.

I recall a great many instances in which Raviv gave instructions to Interface's secretaries, including dictating letters and requesting that they coordinate meetings for him. In addition, I saw conversations that Raviv held with Oded Efrat (hereinafter: **"Efrat"**) and Hananel and various meetings on Interface matters. I recall that Raviv coordinated meetings at the Interface offices, some with Hananel or Efrat and some without them. For this purpose, Raviv would also use Adelson's office at the Interface offices.

Upon Hananel's arrival together with me at the Interface offices in the morning hours, we were witness to the fact that in the absolute majority of cases, Raviv would leave Interface's offices in order to handle his occupations immediately after finishing his daily telephone conversation with Adelson. Raviv himself told me that he worked at the Broadcasting Authority, in which context he was a producer on Nissim Mishal's interview program on television. I am aware that in addition thereto, Raviv was often a guest anchor on the program *Hakol Diburim* on Reshet Bet[4]. Whilst at the Interface offices, Raviv would also deal in matters that were not connected with Interface. Thus, for example, whilst at Interface, he dealt with matters connected with film productions (for example promotional videos for companies, municipalities and public bodies) under the name "Take One". I recall that in the context of his said occupation in film production, Raviv would leave material at the Interface offices bearing the name "Take One", which included letterheads, scripts and a checkbook. I recall that Raviv would sometimes pay bills with the said checkbook.

In addition, as far as I am aware, Raviv worked for David Appel (hereinafter: **"Appel"**) on the Greek Island matter. Appel's offices were located about two stories above the Interface offices (on the 31st floor) in the building on Yahalom St. [sic] in Ramat Gan. I was friendly with the drivers who worked at the Appel offices and sometimes spent time at the Appel offices in a room that was designated for the drivers. Since I was the only driver at Interface, I sometimes sat at the Appel offices with the drivers who worked there, had

---

[4] Translator's note: Freely translatable as 'Radio Two'.

coffee with them and chatted with them. Whilst at the Appel offices I saw Raviv visit there a number of times. I understood from the conversations that I heard at the Appel offices that Raviv also worked for Appel on the Greek Island matter. Raviv himself also brought pictures to the Interface offices that had been taken on a trip he had made on a private plane to the Greek Island, which depicted political figures in shorts, Raviv and his female friend. I also recall a heated argument between Adelson, Raviv and Hananel during which Hananel expressed his objection to Adelson's connections with Appel and to Adelson participating in Appel's party to which Raviv wanted to take Adelson. I recall that Hananel thought that he had convinced Adelson not to participate in the party, but on the following day it transpired that Raviv had ultimately succeeded in persuading Adelson to join him in the said party.

Raviv is lying in his affidavit with respect to Hananel's presence at the Interface offices. Raviv cannot testify to Hananel's presence at the Interface offices since Raviv himself, due to his many occupations, often only spent a little time at Interface's offices.

7. Throughout the years of my work as Hananel's driver I did not see Hananel organize trips to Jordan or to Yemen (apart from one trip to Yemen for the Rabbinical delegation) at Interface.

8. I recall instances in which Hananel stayed overnight at a hotel in Tel Aviv because he finished working late, and I waited for him on the following morning at HaGalil Tours' offices (on Shalom Aleichem St. in Tel Aviv) which were in the vicinity of the hotel district in Tel Aviv. A number of times I was present at HaGalil Tours' offices when Adelson himself called HaGalil Tours' offices looking for Hananel, and I personally told him that Hananel was at a hotel (and this despite my limited knowledge of the English language). I talked with Adelson more than once when I was in Hananel's car and there were times when I myself told Adelson that Hananel was at HaGalil Tours' offices.

9. I remember that Adelson visited HaGalil Tours' offices.

10. I recall that Adelson himself participated in some of the visits of the groups of American members of Congress to Israel. I accompanied Hananel and therefore both Adelson and I saw Hananel handle the organization of the said visits. I recall that Adelson insisted that Hananel personally handle the said visits as well as the visits and events of his family (for example, the wedding of Yasmin, the daughter of Dr. Miriam Adelson and [sic] Adelson's wife) or partners. *Inter alia*, Hananel took care of all the logistics, hotels, transportation and so forth.

11. I recall that Hananel would tell Adelson at length about his legal struggle against Clal.

12. I recall that during Adelson's latter visits in Israel, before my dismissal, Adelson did not visit the Interface offices. I recall that in those times Hananel and I would arrive at the Interface offices in the morning hours and Hananel would hold meetings without Adelson's presence. Thereafter, when Adelson

would call from his house at 10 Paamoni St. in Tel Aviv and request that Hananel come to his house, I would drive Hananel to him. I well recall that during Adelson's visits to Israel, Hananel was forced, at the demand of Adelson himself, to stay with Adelson (at Adelson's home or at meetings outside his home) every day until the late hours of the night (even after midnight).

13. I recall that Adelson had close relations with Rabbis who often visited the Interface offices. I was acquainted with some of the said Rabbis from my work at Interface, such as, for example, Rabbi Shemesh, Rabbi Tanami and Rabbi Melamed. I recall that the said Rabbis would come to Interface's offices and Adelson would give them cigars. The said Rabbis felt at home at Adelson's office and home during the period in which he would stay in Israel. I recall that I drove the said Rabbis in Adelson's private car (a Mercedes) a number of times, at his request. In addition, I recall that I drove Adelson and Hananel to Rabbi Ovadia Yossef. I also recall a visit by Rabbi Elbaz, the "Greatest Proselytizer", with Adelson.

In all of the years of my work with Hananel, to the best of my knowledge, Hananel had no relations with Rabbis and/or religious organizations other than those with which Adelson himself was in contact and other than in connection with the Rabbinical delegation to Yemen.

14. In all of the years of my work with Hananel, I drove Hananel in two cars. So long as Hananel worked at HaGalil Tours (until early 1999), I drove Hananel in a bordeaux-colored Ford Eurostar, on three sides of which was written HaGalil Tours in Hebrew (3 times) and in English (3 times) (hereinafter: the "**Car**"). Adelson saw the Car a great many times and even traveled therein several times. In addition, I drove Adelson's family members in the Car. The Car was parked right next to Adelson's private car when Adelson would come to Interface's offices. In addition, there were instances in which Adelson drove in his car with Hananel and I would drive after them in the Car. From early 1999 and up until the date of my dismissal, I drove Hananel in a white Ford Windstar without any inscription.

15. At the end of June 1998 or thereabouts, Hananel gave me the sum of $1,000 in cash. I recall that Hananel took the above sum from his wallet and counted it before me. I put the money in an envelope. Hananel asked me to go to Ms. Gila Mankevitz from the Association for the Promotion of Tourism, deliver the envelope with the $1,000 to her, and receive from her a lamp for him which weighed approximately 10 kg. I delivered the above sum to Ms. Gila Mankevitz and received one lamp from her but I did not receive a receipt. I recall that approximately ten days later, I was sent to the same place with a check that I received from Interface's secretaries.

16. The number of leave days taken by Hananel during the years 1995-2000 was negligible (and this is only for the sake of caution). I recall that I even spoke to Hananel on this matter and told him a number of times that he needed a vacation.

6

17.     I recall the work of Iris Mantzer (hereinafter: "**Mantzer**") as a secretary at
        Interface (who began working several months before my dismissal). Mantzer
        worked like any other secretary at the Interface offices and complied with the
        instructions of her supervisors as she was requested. In this context, Mantzer
        performed typing work and other clerical tasks and connected telephone calls
        intended for Hananel, Raviv, Efrat and also Adelson.

18.     Upon Hananel's and my leaving Interface's offices after our dismissal,
        personal material, pictures and a Jordanian flag belonging to Hananel were left
        at Interface's storeroom in Ramat Gan. After our dismissal as aforesaid, I
        drove, at Hananel's request, to the office of Adv. Yaakov Neeman at Asia
        House in Tel Aviv. Hananel told me that there were a number of boxes
        (approximately three-four) in which there was material for him, pictures and a
        Jordanian flag. I recall that to my surprise I received from the secretary at
        Adv. Yaakov Neeman's office merely one thin envelope, the contents of which
        I am not aware of, and received nothing else apart therefrom.

                                        (-)
                                    David Miro


I, the undersigned, Sharon Friedman, Adv. do hereby confirm that on October 27,
2004 appeared before me at my office at 3 Daniel Frisch St. in Tel Aviv Mr. David
Miro, whom I identified by an I.D. card and who, after I cautioned him to tell the
truth, failing which he would be liable for the penalties prescribed by law, confirmed
the veracity of his foregoing statement and signed it in my presence.

                                        (-)
                                Sharon Friedman, Adv.

## Affidavit

I, the undersigned, Iris Mantzer, bearer of I.D. No. 057112203, of 9 Toscanini St. in Tel Aviv, after having been cautioned to tell the truth, failing which I will be liable for the penalties prescribed by law, do hereby declare in writing as follows:

1.  I worked as a part-time secretary for Interface Partners International Limited (hereinafter: **"Interface"**) at Interface's offices in Ramat Gan, from November 12, 1999 until my termination in April 2000.

2.  I was shocked to learn of the exposure of personal information of mine by Interface, its attorneys and Interface's bookkeeper, CPA Yehuda (Dadi) Zamir. I regard with gravity the attachment of: (a) all of my pay-slips in respect of my work at Interface; (b) my pay-slip in respect of my work at an additional company; (c) a letter specifying the terms and conditions of my employment at Interface, particularly in view of the fact that I am not a party to the complaint which is the subject matter of this affidavit.

3.  I usually worked at Interface two or three times a week, from the afternoon until the evening hours.

4.  The claim that in the context of my work as aforesaid I did not deal with Interface matters is utterly untrue. During the period of my work for Interface, I dealt, just like any other secretary, with Interface's matters. I was an integral part of Interface's staff and was involved in various projects such as, for example, the casino project on the Israeli-Jordanian border and the Venetian Hotel in Las Vegas.

    In the context of my work for Interface I performed, *inter alia*: (a) current secretarial work which included, for example, coordinating meetings and placing telephone calls with various entities for Interface employees, such as Dan Raviv, Moshe Hananel, Oded Efrat, Sheldon Adelson; (b) various instructions that were given to me, *inter alia*, by Moshe Hananel, Dan Raviv, Oded Efrat and Sheldon Adelson; (c) various tasks which required proficiency in English (such as translation of material into English for Sheldon Adelson and typing correspondence in English). This was so, *inter alia*, since it was more convenient for the other secretary who worked at Interface to leave me the English-language work, since she neither typed nor was well versed in the English language; (d) handling Sheldon Adelson's personal affairs during his visits to Israel. Thus, for example, I coordinated the delivery to and collection of Sheldon Adelson's and/or his family's clothes from the tailor and from the cleaners and also a delivery of flowers to Sheldon Adelson's wife.

5.  To the best of my recollection, in the context of my work for Interface I transferred a great many telephone calls from Sheldon Adelson who requested to speak with Moshe Hananel and Dan Raviv. Sometimes, in the context of the said telephone conversations that I transferred as aforesaid, Sheldon Adelson himself would ask about my well-being.

I met Sheldon Adelson at Interface's offices a number of times on his visits to Israel, and for the first time less than one month after I started working for Interface. I recall that in the said meeting, Sheldon Adelson asked me how it would be possible to differentiate between myself and the second secretary whose name was also Iris. I recall that he suggested that in order for him to be able to differentiate between us he would call me Iris[5]. In addition, I recall an instance when Sheldon Adelson arrived at the Interface offices whilst I was present at the Interface offices and I prepared and served him coffee (it was important to him that the coffee be very hot).

Sheldon Adelson never expressed to me, and to the best of my knowledge to others, any displeasure with the fact of my employment at Interface or my performance in the context of my work at Interface.

6.   On Sheldon Adelson's visits to Israel, when he would come to Interface's offices, he would stay at the offices for a relatively short time, despite the meticulous preparations by Interface staff's for his visits.

7.   I recall that Rabbi Shemesh visited Adelson on his visit to Israel, at Interface's offices. I also recall that Adelson complained that groups of religious people were constantly coming to him with requests for donations.

8.   During the period of my employment at Interface, it was clear to me that Dan Raviv was one of Interface's senior employees. This was so also in view of the intensive relations that he had with Sheldon Adelson directly. In addition, according to Dan Raviv's instructions I coordinated trips for him abroad, booked hotels for him abroad and coordinated meetings for him regarding Interface matters, and helped him find information on the Internet.

9.   During the period of my employment at Interface Dan Raviv was almost never present at Interface's offices. Dan Raviv's office at Interface's offices was vacant for a significant part of the time that I worked. Since Dan Raviv had a computer in his office which was better than mine, I used to sit in his office and use his computer.

10.  I recall that Dan Raviv also worked during the same period for the Broadcasting Authority, on a radio program and also produced films. Dan Raviv did not want people to know that he was an Interface employee and therefore asked me not to tell people who called looking for him where he was and whether he was at Interface's offices (with the exception of a number of people to whom Dan Raviv authorized me to provide the said information). In accordance with Dan Raviv's instructions, I took messages and telephone numbers from whomever was looking for him and gave him the information.

11.  Moshe Hananel was often at Interface's offices, even past my working hours. To the best of my knowledge, the majority of Hananel's time and energy was devoted to Interface and Adelson and I have almost no recollection of Moshe Hananel dealing with personal matters. I recall that Moshe was greatly occupied with the casino project on the Israeli-Jordanian border. In this

---

[5] Translator's note: Using American pronunciation (ī□rĭs), rather than Israeli pronunciation (e□rĭs).

context I recall that Interface's plans for the casino project on the Israeli-Jordanian border had leaked and I also recall Moshe Hananel's anger in this regard. In addition, Moshe Hananel was occupied with the project for the establishment of the Venetian Hotel in Las Vegas.

12. Almost every day that I worked at Interface, at least one long telephone conversation was held between Sheldon Adelson and Moshe Hananel.

13. I do not know how Miri Schory declares that I did private work for Moshe Hananel. I have never met Miri Schory, never spoke with her, never worked with her and I have no idea why and under what authority she says this.

14. To the best of my knowledge, Moshe Hananel did not deal in the organization of trips to Jordan at all. The organization of the Rabbinical delegation to Yemen was a one-time event and a veritable public mission. I helped Moshe Hananel since I felt that we were doing something important for the State of Israel and for its relations with the Arab world. Most of the work was done from Moshe Hananel's home, due to the need for secrecy. Therefore, it was Tirtza, Moshe Hananel's wife, who mainly dealt with the organization of the said delegation. All that I helped with was by arranging to transfer various documents and faxes. The time that I dedicated to helping Moshe Hananel in this matter can be estimated at no more than two or three hours. To the best of my knowledge, Adelson was aware of the organization of the Rabbinical delegation to Yemen and even spoke about it with Moshe Hananel when he was in Israel, a short time before the delegation's departure to Yemen (approximately one week earlier).

(-)
Iris Mantzer

I, the undersigned, Sharon Friedman, Adv. do hereby confirm that on October 13, 2004 appeared before me at my office at 3 Daniel Frisch St. in Tel Aviv Ms. Iris Mantzer, whom I identified by an I.D. card and who, after I cautioned her to tell the truth, failing which she would be liable for the penalties prescribed by law, confirmed the veracity of her foregoing statement and signed it in my presence.

(-)
Sharon Friedman, Adv.

## **Affidavit**

I, the undersigned, Orly Katav, bearer of I.D. No. 059190967, of 5 Moshe Sneh St. in Ra'anana, after having been cautioned to tell the truth, failing which I will be liable for the penalties prescribed by law, do hereby declare in writing as follows:

1.  I am a PR woman and was one of the owners of the PR firm "Leah Shachar Orly Katav Public Relations" (hereinafter: the "**Firm**"). The Firm was retained by Interface Partners International Limited (hereinafter: "**Interface**") in the years 1994-1995 and 1999-2000.

2.  The Firm rendered PR services and communication consulting to Interface, *inter alia*, for the promotion of the political lobby for the establishment of a casino in Israel, for the promotion of Interface's investments in Israel and abroad, including the Venetian Hotel in Las Vegas, the tourism industry, such as promoting an initiative for the establishment of a hotel at the Dead Sea or an Israeli-Jordanian tourism venture, the purchase of companies and an investment in start-up companies in the biotechnology industry (such as, for example, the company **I.M.D Soft**).

    A copy of newspaper clippings that were transferred by the Firm are attached hereto as **Annex A**.

    In addition, the Firm rendered services as aforesaid to Mr. Sheldon Adelson's (hereinafter: "**Adelson**") wife, Dr. Miriam Adelson, in connection with her clinics in Tel Aviv and Tiberias (hereinafter: the "**Clinics**").

    The Firm also rendered PR services as aforesaid to the "Auto Depot" chain, which was partially owned by Adelson in the years 1997-1999.

3.  The Firm, including myself, worked vis-à-vis the Interface personnel and in the context of rendering the PR services as aforesaid, we held work meetings and telephone conversations with the Interface personnel. At first the work was performed opposite Mr. David Farbstein who was one of Interface's managers in Israel. Later, the work was performed opposite Dan Raviv (hereinafter: "**Raviv**") who was responsible for the field of PR at Interface. Raviv would approve the implementation of various ideas, press releases and other initiatives that were implemented by the Firm. I recall that in the context of my work relations with Raviv as aforesaid, Raviv explained to me that he was limited in all matters connected with work opposite journalists due to his work at the Broadcasting Authority.

    In addition, I met Adelson, his wife and people from the Clinics several times, in the context of which meetings I spoke with them and briefed them, for the purpose of: preparations for press conferences; press conferences; meeting with media people; promoting political lobbying at the Knesset and so forth. In light of my acquaintance with Adelson, I know that he attaches great importance to his image and to the PR issue both in Israel and abroad. To the best of my recollection, Adelson retained a "lobbyists" firm and later was also in contact with another PR firm.

4.    During the period between September 1999 and April 2000 I was not retained
by Hananel, either personally or to handle his private affairs or businesses. I
recall that in view of the long-standing acquaintance and appreciation that
Hananel and others had for me, I was asked by Moshe Hananel to give a
professional opinion on reputational damage that was caused to Hananel,
although it was not ultimately given.

(-)
Orly Katav

I, the undersigned, Sharon Friedman, Adv. do hereby confirm that on October 26,
2004 appeared before me at my office at 3 Daniel Frisch St. in Tel Aviv Ms. Orly
Katav, whom I identified by an I.D. card and who, after I cautioned her to tell the
truth, failing which she would be liable for the penalties prescribed by law, confirmed
the veracity of her foregoing statement and signed it in my presence.

(-)
Sharon Friedman, Adv.

## **Affidavit**

I, the undersigned, Margalit Gordon, bearer of I.D. No. 051286946, of 11 HaMaavak St. in Givatayim, after having been cautioned to tell the truth, failing which I will be liable for the penalties prescribed by law, do hereby declare in writing as follows:

1.  I have been in the tourism industry for 22 years. I am an expert in the travel industry and a manager at the company Isram (hereinafter: **"Isram"**).

2.  In early 2000, Moshe Hananel (hereinafter: **"Hananel"**) approached me with an urgent request to handle the organization and planning of a tour of a group of tourists in Israel in the months of May-June 2000, opposite an Italian travel agency named Franco Rosso Incentive (hereinafter: **"Franco Rosso Incentive"**) which specializes in incentive tours.

3.  In the initial and tentative request that was referred to me, a quotation was required for a group for which it was necessary to book approximately two hundred and fifty rooms. Subsequent thereto, after direct contact had been made between myself and Franco Rosso Incentive, the number of rooms was reduced to fifty rooms. The said group's arrival date was set for May 14, 2000.

4.  I handled everything that was involved in the organization of the said group's tour starting in January 2000 and up until the group's actual arrival as aforesaid. In October 2000, Isram, *inter alia*, through me handled an additional Franco Rosso Incentive group which arrived in Israel at the beginning of the Intifada.

5.  Since then and up until today Isram has been working and cooperating with Franco Rosso Incentive. The travel agency Franco Rosso Incentive is amongst the most important travel agents of Isram in Israel. In the future, when the security-political situation in Israel stabilizes, we anticipate that Franco Rosso Incentive, together with Isram, will bring a great number of groups of tourists to Israel.

6.  Isram is thankful to Hananel for the successful "match" with Franco Rosso Incentive.

7.  I would further like to state that since I was connected with Franco Rosso Incentive through Hananel (January 2000) Hananel has had no involvement in any matter connected with Franco Rosso Incentive or the bringing of the said groups of tourists thereby.

8.  I reviewed the 16 pages connected with the Franco Rosso Incentive affair as described above, which were attached as part of Annex P to Ms. Miri Schory's affidavit. I estimate the amount of work time required to handle the said documents to be only one to two hours at the most.

(-)
Margalit Gordon

I, the undersigned, Sharon Friedman, Adv. do hereby confirm that on October 27, 2004 appeared before me at my office at 3 Daniel Frisch St. in Tel Aviv Ms. Margalit Gordon, whom I identified by an I.D. card and who, after I cautioned her to tell the truth, failing which she would be liable for the penalties prescribed by law, confirmed the veracity of her foregoing statement and signed it in my presence.

(-)
Sharon Friedman, Adv.

## Affidavit

I, the undersigned, Alex Grinwald, bearer of I.D. No. 067490649, of 13 HaTomer St. in Givat Shmuel, after having been cautioned to tell the truth, failing which I will be liable for the penalties prescribed by law, do hereby declare in writing as follows:

1.  I served as General Manager of HaGalil Tours Ltd. (hereinafter: **"HaGalil Tours"**) from May 1, 1997 until March 31, 1999.

2.  During the period of my employment with HaGalil Tours, Moshe Hananel (hereinafter: **"Hananel"**) acted as a member of the board of directors of HaGalil Tours and as an active co-chairman of the board. I also recall that at a certain stage Hananel resigned from his position as chairman of the board of directors of HaGalil Tours, but continued to receive a salary as an active director who advised HaGalil Tours on an ongoing basis.

3.  I recall that throughout the entire period of my employment at HaGalil Tours: (a) Hananel dedicated most of his time to his work at Interface Partners International Limited (hereinafter: **"Interface"**); (b) in a number of instances when I needed to meet with Hananel urgently, I met with him at Interface's offices; (c) Hananel could be reached at Interface's offices both during regular working hours and in late and irregular hours; (d) Mr. Sheldon Adelson visited HaGalil Tours' offices; (e) during the period of my employment, at the end of a business trip to Italy on behalf of HaGalil Tours, I joined the flight back from Milan to Tel Aviv on Mr. Sheldon Adelson's private plane. Together with me on the flight were Mr. Sheldon Adelson and his wife, Hananel, Ms. Nurit Arad and others.

4.  It is not possible that Mr. Adelson was unaware of Hananel's continued involvement with and occupation at HaGalil Tours.

(-)
Alex Grinwald

I, the undersigned, Sharon Friedman, Adv. do hereby confirm that on October 27, 2004 appeared before me at my office at 3 Daniel Frisch St. in Tel Aviv Mr. Alex Grinwald, whom I identified by an I.D. card and who, after I cautioned him to tell the truth, failing which he would be liable for the penalties prescribed by law, confirmed the veracity of his foregoing statement and signed it in my presence.

(-)
Sharon Friedman, Adv.

## Affidavit

I, the undersigned, Moshe Hananel, bearer of I.D. No. 52750726, of 21 HaElla St., Mevaseret Zion, after having been cautioned to tell the truth, failing which I shall be liable for the penalties prescribed by law, do hereby declare in writing as follows:

a.     I am the Defendant in Labor Case 9015/02 at the District Labor Court in Tel Aviv Jaffa, and am making this affidavit in lieu of direct testimony.

b.     The facts specified herein are known to me personally, unless stated otherwise.

c.     All of the legal arguments in my affidavit are pursuant to legal advice that was rendered to me.

## Foreword

This complaint is an extremely severe example of bad faith, abuse of process and extreme abuse of an employee by an employer. The unfounded claim of Interface Partners International Limited (hereinafter: "**Interface**") which is the subject of this affidavit (hereinafter: the "**Complaint**"), as well as the unfounded complaint which has been filed against me in the United States by Mr. Sheldon Adelson (hereinafter: "**Adelson**"), holder of 100% of Interface's shares, were born as a counter-reaction to my claims against Interface and Adelson. Interface and Adelson's sole purpose is to harass me, vex me, cause me heavy legal expenses and wear me down by various vain proceedings, and all in order to cause me to retract my claims.

Interface has made no attempt to ask me about even a single one of its hundreds of unfounded claims against me. **Furthermore**, the Complaint and the affidavits in lieu of direct testimony on behalf of Interface are interlaced throughout with lies, falsehoods and distorted facts. Interface and the affiants on its behalf, headed by Adelson, will go to any lengths, including: (a) prohibited coordination of testimonies between the affiants; (b) inadmissible hearsay; (c) rebutting[1] general and vague claims, while drawing false and groundless conclusions without any factual or legal basis; (d) intentional concealment of documents which could rebut the claims against me and establish my claims; (e) breach of attorney-client privilege; (f) infringement of privacy, *inter alia*, by using various investigation and detective firms, **and all, as an end that justifies the means.**

Interface filed the Complaint **more than two and a half years** after the date of termination of my employment with Interface and Adelson, **and more than one year** after the claim was filed by me against Interface and Adelson in Labor Case 6245/01. Interface and Adelson saw that I was standing firm in my claims, and decided to file a claim of their own against me, as an act of retaliation.

In addition, in 2004 Adelson filed another claim against me **in the United States**, for the sum of ten million dollars. This was done as a tactical move designed to intimidate me, cause me to incur the huge expenses of conducting an expensive proceeding in the United States and, above all, to thwart my claims at the competent court in Israel.

---

[1]  Translator's note: This might be a typographical error. In this context, "rebutting" in Hebrew [הפרכה] differs from "carelessly raising" [הפרחה] by only one letter, and the two words are homophones.

2

This practice of 'doing business through litigation' is a "known method" of Adelson's in the management of his businesses and struggles, and is designed to wear the opponent down and defeat him by the huge gap between his financial means and the financial means of those attempting to enforce their rights and his undertakings on him.

A copy of the gaming control minutes is attached hereto as **Annex D1**.

Thus is Adelson described also in an important Las Vegas newspaper, which has been quoted around the world several times:

> "He has been described by the Las Vegas Journal as'[2] perhaps the most vilified man in Nevada".

The European *Evening Times* also states:

> "He is in ongoing litigation with the United States Equal Employment opportunity Commission over issues dating back to 1999".

> "He has been repeatedly characterized as difficult to work with and 'terrorizing those who get in his way".

A copy of the articles is attached hereto as **Annexes D2**.

After the filing of an Answer on my behalf and the performance of a mutual discovery and review of documents proceeding, various claims which had been included in the original Complaint that was filed, did not appear in the affidavits in lieu of direct testimony on Interface's behalf. Thus, for instance, many amounts that were claimed from me for reimbursement of foreign travel expenses did not appear, without any explanation on Interface's part. This fact, above all, testifies how unfounded Interface's claim is, throughout.

## Factual Background

1.      I am a businessman and, *inter alia*, a tourism man of international repute in the various tourism industries. In the months of October and November 1995 I started, **at Adelson's request,** to work as Adelson's most senior representative in Israel and served as his right-hand man and confidant. In the context of this position, I was also employed as the General Manager of the Plaintiff, Interface, which also paid my salary.

2.      Interface is a private U.S. company which is registered in Israel and carries on a branch and operations in Israel.

3.      Adelson is a Jewish-American businessman and casino mogul who, in the relevant period, held 100% of Interface's shares. The Israeli branch of Interface serves as Adelson's Israeli arm in Israel, and through it Adelson carries on many businesses in Israel. It should be noted that Adelson is one of the richest persons in the world (ranking 60th on the World's 400 Richest

---

[2] Translator's note: Sic.

People list [sic] published by "Forbes" magazine, with an estimated net worth of approximately \$3 billion).

4.    The tight relations (both personally and business-wise) between Adelson and myself started even before the commencement of my work as aforesaid. Thus, for instance, as part of these relations, Adelson undertook to give me rights in a venture that comprises a hotel, convention center and casino that we had jointly initiated, and which was scheduled to be built in Israel and/or in Jordan (hereinafter: the "**Tourism Venture**").

5.    In various periods of my employment with Interface and Adelson, Interface employed, besides myself, two secretaries (to cover a work day which often lasted more than 12 hours per day), another two senior employees – Mr. Dan Raviv (hereinafter: "**Raviv**") and Oded Efrat (hereinafter: "**Efrat**"), a driver and various consultants.

6.    The employment relations between myself and Interface and between myself and Adelson commenced in the month of October November 1995 [sic]. Although I received my salary from Interface, in practice I worked also for Adelson and at his demand also for his various companies. Thus, I was his senior representative in Israel and his right-hand man, handled issues for him that were not related to Israel, and all in both the personal and the business realms.

7.    The terms and conditions of my employment, as agreed between myself and Adelson included, *inter alia*, a monthly salary, coverage of expenses, and options in ventures and/or investments of Adelson (either directly or via corporations under his control) and/or of Interface in Israel and/or outside of Israel, in which I was involved (*inter alia*, as employee, promoter, assistant, consultant, etc.). The mechanism that was determined for the grant of the options was that I would be entitled to receive 12% of the holdings/rights of Interface or of Adelson or of any other company controlled by Adelson, in such ventures and/or investments in which I was entitled to the options. I should emphasize that my right to the options referred to ventures and/or investments in which my involvement as aforesaid was during the term of my employment, regardless of whether such ventures and/or investments were realized during the term of my employment or after termination thereof.

My last salary from Interface was in the sum of NIS 34,250. A copy of an employer's notice to the income tax authorities on my salary (Form 161) is attached hereto as **Annex D3**. A copy of the "settlement of accounts" document prepared by Interface's CPA on May 7, 2000, which specifies my salary, is attached hereto as **Annex D4**.

In addition to the salary, Interface paid my expenses. These expenses were fully grossed-up by Interface and did not appear in my pay slip. The expenses were as follows: car expenses; newspaper subscriptions; telephone lines at my home; a cellular telephone and a full-time driver.

In view of the unqualified relationship of trust that prevailed between Adelson and myself, the terms and conditions of my employment were never put to

4

writing, and the employment agreement between Interface and Adelson and
myself was based on oral agreements and on the accepted usage in Interface
and the terms and conditions of the employment of senior employees in
positions similar to that occupied by me. I should note that other Interface
employees were also employed without having the terms and conditions of
their employment fixed in a written contract.

8.    In the framework of my employment with Interface and Adelson, I invested
my best energy and of my time for Interface and Adelson's benefit, as my said
position required and as I was asked by Adelson, and even gave this position
preference over my other occupations (of which Adelson and Interface were
well aware both before the commencement and during the course of my
employment). The fields of my responsibility in the framework of my work
were unlimited, and I acted for Interface and Adelson to develop various
ventures and promote the intricate interests of Interface and Adelson in Israel
and around the world. As Interface's General Manager, I was responsible for
Interface's investments in and outside of Israel, and for the identification of
new investments in a variety of fields.

Furthermore, as part of my duties and all through the years of my work for
Interface and Adelson, I was required to take many trips to different countries.
A large part of these trips were attended also by Adelson himself and
sometimes even by his (immediate) family members. *Inter alia*, Adelson and I
spent time, together, in the U.S., Ireland, the U.K., France, Turkey, Greece,
Cyprus, Jordan, Hungary, Italy, the Czech Republic, Bulgaria and the
Palestinian Authority, to some of which destinations we traveled together. It
should be noted that also during the trips in which Adelson did not participate,
I maintained daily and current telephone contact with him.

9.    **To emphasize, I never undertook to dissociate myself from HaGalil Tours
Ltd. (hereinafter: "HaGalil Tours"), and never undertook to dedicate
100% of my time to Interface and Adelson. On the contrary, Interface
and Adelson who, as aforesaid, controls Interface, were well aware,
throughout the entire relevant period of time, that I was working for both
them and HaGalil Tours.**

For approximately four and a half years I served my employers, Interface and
Adelson, faithfully, while all the while maintaining the most tight, almost
intimate, connections with Adelson. Throughout the period of my employment
with Interface and Adelson, I won praise from Adelson and greatly assisted
him in promoting his personal and business interests in and outside of Israel.
As aforesaid, I was Adelson's right-hand man and confidant. The relationship
of trust between myself and Adelson was so fierce, that Adelson gave me a
power of attorney and appointed me as a signatory in approximately ten
personal bank accounts in Israel, from which moneys were remitted to
members of Adelson's family, and in a special bank account (together with
Adv. Yaakov Neeman) from which donations were remitted to various
associations in Israel. In this context, I was responsible for millions of dollars
of Adelson's money, and was involved in his most secret affairs. Obviously,
against the background of such relations of trust and affinity, we did not feel –
Adelson and I – the need to have each other sign a formal employment

5

contract. The oral agreements we had reached were, in our eyes, as valid as a contract written in stone.

10.    After approximately four and a half years of intensive work for Interface and Adelson, Adelson informed me, in April 2000, several days before the Passover holiday, during his visit to Israel, that he had come to the decision to cease Interface's operations in Israel, and that he intended to terminate me and the entire Interface staff. On May 10, 2000, the employment relations between myself and Interface and between myself and Adelson were terminated, at the initiative of Interface and Adelson as aforesaid.

11.    Towards the end of the employment relations between myself and Interface and Adelson, I sent Adelson a letter, at his request, in which I put to writing the relevant issues as part of the expected termination of the employment relations, as was agreed between us before the commencement of my employment.

A copy of the letter (which is undated) is attached hereto as **Annex D5**.

On May 1, 2000 Adelson replied to my letter. In his answer, Adelson agreed to most of my demands, as was agreed between us before the commencement of my employment.

A copy of Adelson's letter of May 1, 2000 is attached hereto as **Annex D6**. A letter of reply from me to Adelson of May 2, 2000 is attached hereto as **Annex D7**.

After my termination, disputes arose between myself and Adelson regarding various rights that are due to me in various tourism ventures, while the rest of the rights that are due to me were not in dispute at all.

I conducted lengthy contacts with Interface and Adelson in an attempt to resolve the disputes between us. The contacts between me and Interface and Adelson included conversations with Adelson, with Adelson's wife and with his counsel in Israel. As specified above, the contacts lasted a long time, approximately one year, probably in view of Interface and Adelson's intention of stalling the matter.

I continued attempting to resolve the disputes by way of a compromise. In the last proposal I received in April 2001 from Adelson's counsel, Adv. Yaakov Neeman, I was offered to make do with monetary compensation in cash (as my successor, Raviv, and predecessor, Mr. David Farbstein (hereinafter: **"Farbstein"**), had received moneys in the U.S.), for my claims (as seen by Interface and Adelson). This, subject to my waiver not only of my rights in the Tourism Venture, but also of the options and my rights in any other venture in Israel or overseas.

**Thus, a draft agreement that was presented to me read as follows:**

> "Hananel has alleged certain claims against IPI and Adelson in relation to the terms of the termination of his

6

> employment… and in connection with casino license(s) obtained or to be obtained by IPI and/or any IPI party and/or Adelson and/or any Adelson party in Israel, Jordan or any other country".

A copy of the said draft settlement agreement is attached hereto as **Annex D8**.

At this stage Interface, Adelson and their representatives even threatened me, in conversations that they held with me, that if I did not agree to waive the options and the rights in the Tourism Venture or in any other venture in Israel or overseas, not only would they not pay me what was due to me as part of the salary, they would also damage my reputation and institute various legal proceedings against me, aimed at defaming me and ruining my reputation, under the guise of a legal action.

In a final attempt to avoid the need to claim my rights in court, my counsel sent Interface and Adelson the draft complaint, via their counsel, and suggested that this lead to a settlement solution.

A copy of the August 9, 2001 letter is attached hereto as **Annex D9**.

In response to my notice, Interface and Adelson threatened me that if I dared to sue them in court (and would not accept the settlement proposal they had made me), they would perform a check at Interface, and would attempt to find various causes of action against me. So it was said, in plain words, in the letter of Adv. Yaakov Neeman, on behalf of Interface and Adelson, to my counsel:

> **"In view of the aforesaid, my client would be forced, if your client insists on bringing his draft complaint (either that attached to his letter or an "improved version") before the court, to present to the appropriate instances the full and real picture regarding the relationship with your client…**
>
> **I held a telephone conversation with my client today, and he has informed me that at the end of the summer vacation, namely in September 2001, he will send to Israel one of the Company's financial managers from overseas, in order to closely monitor all of the financial activities performed by your client. Upon the completion of this report we will notify you of our client's monetary claims due to the unauthorized acts performed by your client…"**

A copy of the letter dated August 19, 2001 is attached hereto as **Annex D10**.

Already at this point, one can see that Interface's complaint against me is nothing but an act of retaliation for my complaint against it and against Adelson, retaliation which was intended from the outset to serve as a means of deterrence against me, in view of the filing of my complaint against Interface and Adelson.

My counsel responded to the said letter, in a letter dated September 3, 2001, whereby, *inter alia*, I vehemently rejected all the accusations, claims and threats that were cast against me in the said letter.

A copy of the September 3, 2001 letter is attached hereto as **Annex D11**.

12. In light of Interface and Adelson's position, I had no choice but to file a complaint against them at the Tel Aviv District Labor Court, for the rights to which I am entitled and for damage that was caused to me by Interface and Adelson after my termination.

A copy of the complaint, which was designated as Labor Case 6245/01, is attached hereto as **Annex D12**.

In their answer, Interface and Adelson denied all of my claims, including my mere status as an employee of Interface and Adelson, including the jurisdiction of the Labor Court, and the fact that Adelson was represented by counsel in Israel. However, even in the answers filed on their behalf, Adelson and Interface raised no claim against my functioning as an employee and/or against the moneys that were paid to me by them as part of my work, including payment in lieu of annual vacation to which I was entitled.

A copy of Interface and Adelson's answers is attached hereto as **Annex D13**.

To emphasize, throughout the entire period of my work for Interface and Adelson, at the time of the notice of my termination and even thereafter, at the time of conclusion of my work, during the negotiations which were conducted after termination of my work vis-à-vis Adelson and thereafter vis-à-vis Adelson and Interface's counsel, and, as aforesaid, also in the answers that were filed on behalf of Adelson and Interface in Labor Case 6245/01 – **Adelson and Interface never raised any claim against my functioning as an employee and/or with regard to moneys that were paid to me by them within the framework of my employment.**

13. More than a year passed since I filed my complaint against Interface and Adelson in Labor Case 6245/01, and more than two and a half years since my termination, and the parties were already required to file affidavits in lieu of direct testimonies in the said complaint. At this point, so it would seem, Interface and Adelson realized that I was standing firm in my claims, and decided to realize the threat contained in Adv. Neeman's letter (more than two and a half years after the date of my termination), and to file a complaint of their own against me. Undoubtedly, Adelson and Interface did not fail to see the distressing fact that I had then been stricken with blindness, a fact which renders the conduct of the proceedings tremendously difficult for me.

Thus was Interface's complaint against me born – a complaint which is nothing but a heap of unfounded claims that present me as a villain, after many years in which I served my employers, Interface and Adelson, faithfully, impeccably, and without any complaint being raised against me as aforesaid.

14. Furthermore, in early 2002, I found out that the Macau casino venture (which was born of my initiative), the existence of which was first concealed from me and thereafter denied by Interface and Adelson, was taking shape. As aforesaid, as part of the employment relations between myself and Interface and Adelson, I was promised options in ventures, the initiative for which was born during my employment. This undertaking was made orally by Interface and Adelson who, eventually, even admitted it.

Ultimately, when official notices were publicly released on behalf of Interface and Adelson, they were no longer able to deny the fact that Adelson and Interface's casino project in the Macau region was taking shape. I turned to Interface and Adelson via my counsel, demanding to realize my rights in the Macau venture. When my requests were turned down, I was forced to file another claim against Interface and against Adelson at the District Labor Court in Tel Aviv, Labor Case 7704/03 (hereinafter: the "**Macau Complaint**") (which claim was later consolidated, pursuant to the Court's decision, with Labor Case 6245/01).

On December 17, 2003, the date on which the Macau Complaint was filed, the Macau Complaint was served on Interface and Adelson's counsel. On February 3, 2004, Adelson's counsel filed a "Notice Regarding Service of the Complaint on the Second Defendant" (namely, Adelson), in which it was claimed that the law firm of Danziger, Klagsbald, Rosen & Co. was not the address for service of the Macau Complaint on Adelson. This was done in an additional attempt to evade the Israeli court's jurisdiction.

The rationale which Adelson and Interface had to deceive the Court and deny the service of the Macau Complaint on Adelson, was the artificial creation of a timeframe in which Adelson could open a new legal front against me, as part of a strategic move for the application of wrongful pressure to me, by way of dragging me into a complicated, intricate and expensive legal proceeding in the United States, while taking advantage of my disability and the immeasurable financial advantage which Adelson and Interface have over me. In order to undermine the proceedings taking place in Israel, and to apply inhuman pressure to me, as aforesaid, Adelson filed a claim against me in the United States (Boston, Massachusetts) on February 23, 2003, for the sum of **U.S. $10 million** (hereinafter: the "**U.S. Complaint**"). The U.S. Complaint involved the same matters which are pending before the Honorable Court in the Complaint and the same matters which are pending in Case 6245/01 and the Macau Complaint, which set of complaints concern issues which are, without a shadow of doubt, within the exclusive jurisdiction of the Honorable Court.

Thus, Adelson and Interface did not make do with filing the unfounded complaint which is the subject matter of this affidavit, and acted behind the back of this Honorable Court in a new, deliberate and dual move: first, an attempt to bypass the Court's jurisdiction and void the proceeding conducted herein of any content; second, an attempt to wear me down and eliminate my litigation ability by conducting intimidating, predatory and expensive proceedings at the District Court in Boston. And all the while, Adelson is