concealing the mere fact of the existence of the parallel proceedings that are conducted before the Honorable Court from the District Court in Boston.

Thus, from the Docket describing the milestones in connection with the claim filed by Adelson against me in the United States, it appears that Adelson had declared to the Court in the United States that no other legal proceedings related to the proceeding filed by him were conducted **in other courts**.

A copy of the Docket is attached hereto as **Annex D14**.

Thus, the complaint that was filed in the United States – in which Adelson relates, *inter alia*, the arguments pending in the Complaint which is the subject of this affidavit, his relationship with me in connection with my work in Israel for Adelson and for Interface, including the engagement in the employment agreement, the termination of the employment relationship, my claims against Adelson and Interface in connection with my employment as aforesaid and the termination thereof, my claims in connection with the Macau venture – does not as much as mention that all such issues are pending before the Honorable Court by virtue of its singular jurisdiction, in three cases that are conducted herein (the two claims filed by me were consolidated, as aforesaid, into a single case).

A copy of the complaint that was filed in the United States is attached hereto as **Annex D15**.

If this were not enough, as part of the attempt to wear me down, on November 2, 2004 I learned that Adelson, as part of his global struggle against me, had filed a motion **in the United States** to prevent me from realizing my rights as an employee in Israel. The motion was filed under the heading of "Motion to Enjoin the Defendant from Pursuing a Parallel Cause of Action in Israel".

The purpose of this motion (as absurd and inconceivable as it may be) is to deny me my basic right as a worker in Israel from enforcing my rights vis-à-vis my employers in Israel at the court having the singular jurisdiction to hear such issues – namely the District Labor Court in Israel.

A copy of the said motion is attached hereto as **Annex D16**.

15. I took the pains to review the factual chain of events to the Honorable Court, in an attempt to illustrate to the Honorable Court that I have fallen victim to a strategic move designed to eliminate my ability to litigate before the Court, a main link of which strategy is the Complaint which is the subject of this affidavit. This Complaint is disgraceful and aggravating, utterly groundless, the sole concern of which is to defame me and push me out of court, and this because I "dared" to sue Interface and Adelson in court for that to which I am entitled by contract and law.

16. **Interface and Adelson are dragging me into complex legal proceedings. They are thus causing me to incur heavy expenses of hundreds of thousands of Shekels, and preventing me from engaging in other matters, even if I do ultimately win my claims against them. Also if Interface**

**decides not to conduct the Complaint against me, and even if the witnesses on Interface's behalf, headed by Adelson, avoid appearing at the evidence hearing at the Honorable Court, as was the case in the claim of Mr. Moshe Melnik (a former Interface employee) (hereinafter: "Melnik"), in any event, I have suffered and will suffer great damage, some of which is irreversible.**

## Response to the Claims made in the Complaint and in the Affidavits on Interface's behalf

### My employment with Interface and Adelson

17. **I never proposed myself to Adelson for any position with him or with Interface. It was Adelson, who was in urgent and desperate need of a person to manage Interface and his personal businesses in Israel, who turned to me and offered me to work for him and for Interface.** The claim made in the Complaint and in Adelson's affidavit whereby I proposed myself to Adelson for the position of manager of Interface's Israeli branch – **is false.**

18. During the month of September 1995, Farbstein, who was then Interface's General Manager, finished working for Interface following a dispute that had broken out between him and Adelson approximately two months earlier. Adelson who is, as aforesaid, the controlling shareholder of Interface, wanted to prevent the managerial vacuum that was created in Interface. Therefore, he urgently needed a new manager to replace Farbstein. Following a previous acquaintance between Adelson and myself and the relationship of trust that existed between us, Adelson approached me and offered me to work as his most senior representative in Israel, as his right-hand man and confidant, in the framework of which position I would serve, *inter alia*, as Interface's General Manager. This was **despite the fact that Adelson knew that I was working for HaGalil Tours and held a key position therein.**

    Ultimately, after much imploration on the part of Adelson who, as aforesaid, urgently needed a new manager for Interface, I accepted his proposal. It should be noted that already in the months of August-September 1995, an agreement was reached with me and with Raviv on the terms and conditions of our employment with Interface, while Adelson presented to me the terms of Raviv's employment and asked for my opinion.

    In the months of October November 1995, I started, **at Adelson's request**, to work for Interface and Adelson. Already in September 1995, I held several meetings with Farbstein as part of the transfer of his duties to me.

19. The claim made in the Complaint and in Adelson's affidavit to the effect that I started working only on January 1, 1996 – **is false.** As aforesaid, I started working for Interface and Adelson already in late 1995.

    Thus, for instance, as part of my work as aforesaid, I was appointed as a director in the company Auto Depot, in Interface's capacity as a shareholder of such company. During the months of November-December 1995, I participated in several meetings of Auto Depot's Board of Directors, as a

11

director, and in some of them I even held the office of Chairman of the Board. It should be noted that at the first board meeting in which I participated, which was held on November 7, 1995, it was Adelson who introduced me to the board members as Farbstein's successor and as Interface's manager.

A copy of the Auto Depot minutes of November 7 and 14, 1995 and of December 14, 1995, that were located by me, are attached hereto as **Annex D17**.

Thus, for instance, as Adelson admitted in the U.S. Complaint, already in 1995 I was granted signatory rights as Interface's General Manager in Interface's bank accounts, and signed several checks in sums of hundreds of thousands of Shekels as Interface's authorized signatory.

In the Memorandum of Law (a document on Adelson's behalf that was filed in the U.S. Complaint), it is stated on p. 2, last paragraph:

> "At first Hananel took the role of a temporary caretaker for IPI (Roberts paragraph 7) and was given authority to write checks. He wrote very few."

A copy of the Memorandum of Law and of the affidavit of Paul G. Roberts (hereinafter: "**Roberts**"), is attached hereto as **Annex D18**.

Thus, for instance, in October 1995, after it was agreed with me that I would start for [sic] Interface and Adelson, I convinced Adelson to join me at the Economic Convention for the Middle East that was held in Amman in Jordan, *inter alia*, in order to promote the establishment of the Tourism Venture in Jordan. I traveled to that convention, *inter alia*, also as part of my work at HaGalil Tours. In the said convention, a brochure was issued which included profiles of different companies which participated in the said convention. Adelson agreed to join at the last moment before the convention was held, and therefore Interface's profile was not included in the said brochure. During the course of the convention and in different meetings that Adelson and I held, Adelson introduced me as his business manager in Israel and as Interface's General Manager.

A copy of pictures from the said convention featuring Adelson, his wife and myself, are attached hereto as **Annex D19**.

The cover page and HaGalil Tours' profile page from the brochure of the said convention are attached hereto as **Annex D20**.

Thus, for instance, on November 1, 1995, I participated as a manager on Interface's behalf, together with Adelson and Raviv, at a meeting that was held at the Israel Lands Administration with regard to the construction of a conference center in the city of Eilat.

A copy of the minutes of the said meeting is attached hereto as **Annex D21**.

I was also introduced as Interface's General Manager and as Adelson's representative in Israel, already in 1995, during meetings that were held with

Adelson's partners in companies in which Adelson and/or Interface had holdings, Interface's bank people, Interface's insurance agent, Interface's bookkeepers, Interface's PR people, its legal counsel, and others.

20.    The claim made in Adelson's affidavit to the effect that I had told him that I would start a short running-in period before January 1, 1996, and that in any event we had agreed that I would start receiving a salary only from January 1, 1996, **is a false claim**. As aforesaid, I started working for Interface and Adelson in the months of October November 1995, and already in September 1995 held several meetings with Farbstein as part of the transfer of the office as aforesaid. In addition, I never agreed to waive the salary due to me for my work for Interface and Adelson, including in 1995.

As aforesaid, my work for Interface and Adelson was a second job, in addition to my work for HaGalil Tours. For several months, I was deliberating the best tax route for receiving my salary. At my request and, *inter alia*, with Adelson's knowledge and approval, until September 1996 I was not paid a salary and no pay slips were issued to me. I agreed, and was financially able, not to receive my salary for my work for Interface and Adelson for several months, because I had an additional source of income from my work for HaGalil Tours. In view of the relationship of trust that existed between Adelson and myself, it was agreed with me that my salary for the said period would be paid to me later, as was actually done.

A copy of my "Form 106" for 1996 is attached hereto as **Annex D22**.

21.    The claim that is implied from the Complaint and from Adelson's affidavit (*inter alia*, in Sections 3, 7, 11 and 13 of Adelson's affidavit), whereby Interface's sole objective was to identify investments in the high-tech field – **is utterly untrue**.

**Interface worked on identifying investments and utilizing business opportunities in various fields, and not necessarily in the high-tech field**. I worked for both Interface and for Adelson and his various businesses. In addition, the high-tech field was only one of the numerous and diverse fields in which Interface and Adelson engaged, before I started working and while I was working for Interface and Adelson. Following are several matters and fields in which Interface and Adelson engaged and in which I too was involved, and which testify that with Adelson's direction and knowledge, I was not instructed to focus on high-tech:

(a)    Ownership of Auto-Depot, which is not a high-tech company;

(b)    Construction of the Tourism Venture (conference center and casino) in Israel or in Jordan in one of the following locations: Eilat, the Eilat-Aqaba border, Aqaba, Bakura (the island of peace near Beit She'an) and Amman;

A copy of documents dealing with the Tourism Venture and testifying that I acted to promote the Tourism Venture as part of my work for Interface and Adelson, are attached hereto as **Annex D23**.

(c)     A possibility of buying a marble cutting and polishing factory and for bicycles in Beer Sheva (Dunhill);

(d)     Maintaining business ties with marble factories at Karera, Carmel Carpets, Polgat and Kitan (satin sheets, towels) and safes, *inter alia*, in order to buy products for the Venetian hotel in Las Vegas in the United States (hereinafter: the "**Venetian Hotel**");

(e)     Adelson was interested in buying Africa-Israel. He took part in the tender to buy Africa-Israel and was one of the two final bidders in the tender;

A copy of an article in *Property* newspaper on Adelson's interest in buying Africa-Israel is attached hereto as **Annex D24**.

(f)     Marketing of the Venetian Hotel;

A copy of documents pertaining to the Venetian Hotel are attached hereto as **Annex D25**.

(g)     An attempt to buy Bank Leumi Le'Israel Ltd;

A copy of an article in *Yediot Aharonot* newspaper of November 2, 2001 is attached hereto as **Annex D26**.

(h)     Examining the construction of a casino and conference center in Cyprus;

(i)     Considering the purchase of El Al (in the context of privatization);

(j)     Examining the purchase of the basketball team Hapoel Jerusalem;

(k)     Examining the purchase of apparel stores and obtaining franchises for fashion store brands (the Naf Naf chain, Wakiki and Boom Ltd.);

(l)     Considering the construction of a store and buying a franchise for "Warner Brothers";

(m)     Examining the purchase of a franchise for a Starbucks chain;

(n)     Examining the construction of a casino venture in Macau;

(o)     Holding of contacts vis-à-vis the City of Tel Aviv and the Ministry of Tourism regarding the purchase of the conference center at the Exhibition Gardens (in the context of privatization) and regarding the construction of a center in Park Darom in Tel Aviv;

(p)     Examining a proposal to purchase the Conference Center in Jerusalem;

(q)     Establishment of a cinema chain to compete with the Globus chain;

(r)   Review of business plans to build a movie theatre complex at Gelilot (Cinima [sic] City);

(s)   Review of a proposal by Yoram Globus to enter Globus Studios as a partner and to buy the real estate on which the studios are built in Neve Ilan;

(t)   Examining the purchase of a franchise for Imax (3D) movie theatres in Masada and/or Eilat;

(u)   Considering participation in the tender for satellite television broadcasts;

(v)   Review of various projects for the construction of hotels overseas;

(w)   Reviewing the purchase of Sport Mart, which merged with the Mega Sport chain in Israel. Adelson and I met with the owners of Sport Mart in the United States;

(x)   Examining the possibility of conducting gaming operations on an airplane;

(y)   Cooperation with Accor (hereinafter: "**Accor**"), *inter alia* with regard to the construction of a casino in Jordan and regarding the purchase of equipment from Accor for the Venetian Hotel;

(z)   Meetings with the manager of "Quartz Investments", Jean Manuel Rosen, regarding various investments and alliances;

A copy of a fax dated February 23, 1998 from Jean Manuel Rosen specifying the schedule of the meetings he had prepared for me, is attached hereto as **Annex D27**.

(aa)  Examining the purchase of an executive plane from Astra and the Aircraft Industries;

(bb)  Acquisition of the "Roses" casino in Rhodes;

(cc)  Acquisition and/or construction of a casino at Karlovy Vary[3] in the Czech Republic;

(dd)  Examining the construction of a conference center and casino in Dublin, Ireland;

(ee)  Examining the operations of the casino in Jericho, as well as in Turkey, Hungary and Bulgaria;

(ff)  Considering the construction of a store and the purchase of a franchise for the "Sharper Image";

---

[3] Translator's note: Original says קרלו ויוארי, namely Karlo Vyvary.

    (gg)    Examining investments in solar energy ventures;

    (hh)    Examining a proposal to buy the conference center in Haifa.

**Can it be said that these matters are from the high-tech field?**

22.    In addition, in the context of my work for Interface and Adelson, Adelson and I were in many countries throughout the world for business objectives that were not connected with the high-tech field. For example, Adelson and I were in: (a) Turkey – a tour of five casinos in Antalya; (b) Greece – to look into an offer to purchase the "The Roses" casino; (c) Italy – a visit to Murano exhibitions in Milan, workshops in Venice, a visit with architects and interior designers in Venice, photographing sites in Venice and in Milan and a visit to the quarries in Carrera. Such being in the context of my involvement in Adelson's project to establish the Venetian Hotel; (d) Hungry – a visit to the iron foundries for lighting pillars and decorations for the Venetian Hotel; (e) Ireland – to look into an offer to establish casinos and a conference center in Dublin; (f) France – meetings in connection with restaurants and fashion houses, for the casino and shopping center at the Venetian Hotel; (g) the Czech Republic – a visit to glass factories in connection with the Venetian Hotel; (h) Bulgaria – a visit with Bulgaria's Vice-President and Minister of Finance with the intention of looking into the purchase of crystals and establishing a casino; (i) Jordan – meetings with the Jordanian Minister of Water in charge of relations with Israel, with the Jordanian Minister of Tourism, with the Jordanian Prime Minister and with the King of Jordan and others. Meetings with Abu Raheb, a potential partner for the establishment of a casino in Jordan, a meeting with Omar Salah in respect of the establishment of a conference center in Amman and a Club-Med in Aqaba, a visit of the Congressional delegation to Jordan and a visit with Dr. Miriam Adelson (Adelson's wife) (hereinafter: **"Miriam Adelson"**) for the purpose of examining the possibility of establishing a drug rehabilitation clinic in Jordan; (j) Cyprus – to look into establishing a casino.

23.    Furthermore, contrary to the assertion in the Complaint and in Adelson's affidavit, I also dealt in the field of high-tech. I transferred to Adelson and his assistants in the U.S.A many business proposals in the high-tech field but the vast majority thereof were dismissed by Adelson and his assistants. In this context I recall that Adelson especially appointed a person named Tom White in order to review the proposals that were transferred by Interface as aforesaid. I even appointed Efrat as my assistant whose duties were, *inter alia*, to find investments for Interface, mainly in the high-tech field. I also hired the services of Dr. Adi Peri, a high-tech person – with the objective of helping Interface to locate high-tech companies.

Efrat and I would present before Adelson himself, also during his visits to Israel, various proposals in connection with potential investments. In many instances we also utilized Adelson's visits to Israel to schedule meetings for him with entrepreneurs.

I would state that various entities, be it venture capital funds or investment banks or target companies, did not wish to contract with Adelson due to his

unacceptable conduct in another instance where he invested in the high-tech company Pegasus. Due to Adelson's said behavior, Interface entered the "black list" of those entities that I stated above.

I would state that at Interface's offices there were approximately seven heavily-loaded binders of high-tech companies that had been reviewed for investment purposes and which had also been sent to Interface's offices in the U.S.A. Set forth below are a number of examples of proposals which were brought before Adelson for potential investment and rejected for one reason or another:

(a)     The company Geo Interactive (animation on the Internet) – situated in Givatayim. I was successful in reaching a draft agreement in which all of the commercial terms and conditions were agreed upon, which I sent to Tom White. Adelson wanted to check the matter again and again and when he reached a decision the offer was no longer relevant.

(b)     The company Exect (checking traffic on the Internet) – I reached an understanding with the company according to which Interface would invest in the company at the scope of 10%. Ultimately, the offer was rejected by Exect since they preferred not to contract with Adelson in view of the abovementioned Pegasus incident.

(c)     The company Odigo.

(d)     The company Sontronics (establishing a Pan-Arab website on the Internet) – Adelson cancelled the transaction on the date of signing of the investment agreement.

(e)     The company XTL – the biotechnology field.

(f)     The company Edusoft.

(g)     Dream Team – animation.

(h)     Jerusalem Global – various offers for investment in the high-tech field.

(i)     Versa Ware – medical instrumentation for the detection of breast cancer. The possibility of cooperation with the company Denex was examined.

(j)     Opline – an optical company.

(k)     Carta – maps software.

(l)     Mail Vision.

(m)     Lansys.

(n)     Code Ware.

(o)     Exten Net – Natan Garini and Lior Harish.

(p)  Technological incubators in the north and the south.

(q)  Examining projects for the establishment of gaming sites on the Internet (for example the King Solomon Casino website, the Shakked brothers – a company from Netanya);

(r)  Elsanit - Yonatan Aderet and Israel Schreiber.

(s)  Participation in IVA meetings and examining investment offers in that context.

(t)  Maintaining contact with high-tech funds and individual investors such as Meir Laser, the Gap Foundation, the Etgar Foundation, RDT (Israel Adir), Nilvit and Tamir Fischman.

(u)  Edanit.

(v)  Examining investments in the biotechnological field together with the Weizmann Institute.

(w)  Mail vision – Ze'ev Lerner.

(x)  Telsycom – Dov Seberlob.

(y)  Comverse.

A copy of documents relating to my work for Interface and Adelson in the high-tech field are attached hereto as **Annex D28**.

In addition, with Adelson's knowledge and in coordination with him I also traveled around the world for business objectives connected with high-tech. For example, I traveled: (a) to Belgium – a high-tech exhibition in the medical field "Symposium"; (b) to France – I held a number of meetings with executives from the high-tech company Pysis (a competitor of I.M.D Soft Ltd.) (hereinafter: **"Pysis"**) for the purpose of examining various offers, to purchase Pysis, to sell IMD Soft or to merge the two companies; I also held meetings in Paris to examine issue possibilities with people from the European Stock Exchange; (c) to Barcelona – a visit to Pysis's development center; (d) to London – a meeting with investors in the high-tech field; (e) to Germany and Switzerland – a meeting with HP personnel (installation of IMD Soft's software system in a hospital); (f) to the U.S.A – a meeting with various investors in the high-tech field in New York, a meeting with Data Scope personnel in New Jersey and the HIMS Convention in Orlando; (g) trips to Japan – holding meetings for the purpose of recruiting investors for the company IMD Soft.

As aforesaid, in the context of my work for Interface and Adelson, the fields of my responsibility were unlimited and I acted for Interface and Adelson for the development of various ventures and the promotion of the ramified interests of Interface and Adelson in Israel and around the world. As General Manager of Interface I was responsible for Interface's investments in Israel and elsewhere, and for finding new investments in a variety of fields.

24. Over approximately four and a half years I served my employers, Interface and Adelson, loyally, whilst being in very close, almost intimate contact with Adelson at all times. As aforesaid, I was Adelson's right-hand man and confidant. Over the entire period of my employment with Interface and Adelson, I was praised by Adelson and I helped him a great deal in the promotion of his personal and business interests in Israel and elsewhere.

A copy of a letter dated March 16, 1998 and a letter dated May 5, 1998 testifying to the trust that Adelson had in me are attached hereto as **Annex D29**.

During Adelson's visit to Israel in April 2000 (immediately after his return from Macau) Adelson notified me (in a meeting held at a restaurant) of my dismissal and of his intention of dismissing all of Interface's current workers and closing Interface's offices. Adelson claimed to me that the reason for my dismissal stemmed from the fact that he wished to close Interface's offices in Israel since Interface's operation in Israel was not worthwhile to him. Adelson did not express dissatisfaction in respect of my performance and evidence thereof is that Adelson dismissed, with the exception of Raviv, all five of Interface's employees together with me. I did not express any objection to my dismissal but I requested that all of the rights and monies to which I and the other Interface workers were entitled be given to us. Only *post factum* did it transpire that the real reason for my dismissal was rooted in the fact that Adelson was not interested in granting me the option to 12% of Adelson's (including every corporation controlled by Adelson) share in the Macau venture (a venture which was born, as aforesaid, during the term of my employment and at my initiative), an option due to me according to the employment agreement which was entered into between myself and Interface and Adelson.

## My Employment at HaGalil Tours

25. The claim asserted in Adelson's affidavit, *inter alia*, in Section 11 of his affidavit, according to which Interface and Adelson only learned of my employment at HaGalil Tours *post factum* – **is false**. Interface and/or Adelson were aware of my intention to continue working for HaGalil Tours at the same time as working for them. They benefited from my work at HaGalil Tours and even utilized it. Furthermore, one of the reasons that Adelson was interested in employing me was my work at HaGalil Tours. This was, *inter alia*, in view of the fact that a significant part of Interface's occupations was in the field of leisure and tourism. Adelson knew that I had no experience in the high-tech field.

**I also never told Adelson or any other entity that I would stop working at [HaGalil] Tours apart from providing random consultancy**. And I shall emphasize, there was no financial logic to my agreeing to work only for Interface and Adelson, and disconnecting myself from HaGalil Tours, for conditions and a salary lower than that which I had at HaGalil Tours. Interface and Adelson were aware that in any matter connected with HaGalil Tours, insofar as would be possible for me, I aspired to transfer to a position which, in the main, would not be an operative position but rather mainly managerial

and that is indeed what I did. **However, I never undertook to disconnect myself from HaGalil Tours and I never undertook to dedicate 100 percent of my time to Interface and Adelson**. According to the employment agreement I only undertook to invest of my time for the benefit of Interface and Adelson insofar as my position required and insofar as I would be requested to do so by Interface and/or Adelson, **but this was subject to and considering my other activity**. As aforesaid, Adelson was aware that I had financial interests in and commitments to HaGalil Tours.

26. The claim asserted in the Complaint and in Adelson and Roberts' affidavits that according to the agreement between Interface and myself I undertook to work in a full-time position and exclusively for Interface and to terminate my employment at HaGalil Tours apart from random consultancy on my way home from work at Interface – **is false**. Nor is this claim consistent with the fact that as a shareholder in HaGalil Tours and as an expert with a worldwide reputation in the field of tourism I had an interest in continuing to be involved in HaGalil Tours, and HaGalil Tours had a clear interest in my being involved in its affairs.

27. Interface and Adelson and any entity on their behalf were aware that I worked both for Interface and Adelson and for HaGalil Tours and never prohibited me from continuing to work at HaGalil Tours. The claim asserted in the Complaint and in Adelson's affidavit that Interface and Adelson were not aware that I was continuing to work for HaGalil Tours – is false. On the contrary, said fact was never hidden and was evident to all. Furthermore, Interface and Adelson benefited from my work at HaGalil Tours and even utilized it, *inter alia*, in view of Interface and Adelson's great involvement in the fields of tourism (see, *inter alia*, Section 21 of this affidavit on this matter).

A copy of a letter dated June 8, 1997, from the Ministry of Tourism, regarding the Tourism Venture and Adelson, addressed to me as CEO of HaGalil Tours, is attached hereto as **Annex D30**.

Adelson and Interface, *inter alia*, through Adelson who was, as aforesaid, the controlling shareholder of Interface, were well aware that over the relevant period, I worked both for them and for HaGalil Tours, *inter alia*, for the following reasons:

27.1 During the entire period that I worked at the same time both at HaGalil Tours and at Interface and I was issued with pay-slips by Interface (namely from October 1996 until December 1998), my employment was defined as **"Type 2 – part-time"** in the pay-slips that were issued by Interface. Namely, Interface reported that my employment at Interface was not sole employment. Such was also true in my "101" forms which are in Interface's possession and were reported to the tax authorities. It should be stated that Interface is evading transferring to me copies of my "101" forms despite my request. The significance of said definition which was reported, as aforesaid, by Interface's bookkeeping and CPA, is that my employment with Interface and Adelson was a second and/or additional and/or part-time post since my main employment according to my definition by the tax authorities was

at HaGalil Tours. Accordingly, tax calculations were also performed in respect of my salary at Interface.

A copy of my pay-slips in respect of the years 1996-1997 are attached hereto as **Annex D31**.

Immediately upon termination of my employment at HaGalil Tours (as of January 1999), written notice thereof was delivered to Interface's bookkeeping and the definition of the type of my employment was modified accordingly to sole employment. Accordingly, both the reports on my "101" forms and the tax calculations in respect of my salary at Interface were changed.

A copy of my pay-slips at Interface in respect of December 1998 and January 1999, which testify to the transition to sole employment, is attached hereto as **Annex D32**.

27.2    During the time that I served as General Manager of Interface, I gave an affidavit in the framework of a claim that was filed by Melnik against Interface in which I declared that I was managing HaGalil Tours. Adelson received a copy of the above affidavit that was translated for him into English, just as all of the other documents regarding the Melnik trial were translated for Adelson into English. Adelson relied on the above documents both in the claim that is the subject matter of this affidavit and in Labor Case 6245/01, and therefore, he also attached documents to his affidavit from Melnik's trial (see Annexes A, B to Adelson's affidavit).

A copy of the affidavit given by me in Melnik's trial as aforesaid is attached hereto as **Annex D33**.

27.3    In a booklet specifying Interface's business plan from July 1999, regarding the Tourism Venture, it was explicitly stated that I was President of HaGalil Tours. The above booklet was given, *inter alia*, to central governmental entities in Israel and Jordan, such as Prime Ministers, Ministers and senior personnel at the Treasury, Foreign Ministers, the Minister for Regional Cooperation in Israel, the Israeli Parliament's Economics Committee, the Israel Lands Administration, the Municipality of Eilat, the Municipality of Aqaba, the Ministry of Justice and so forth. The said booklet was also delivered to entities abroad in connection with various conference center and casino ventures.

A copy of the foregoing booklet is attached hereto as **Annex D34**.

27.4    In complete contradiction with Adelson's affidavit, in the context of my employment with Interface and Adelson, Adelson demanded to talk with me every day. Adelson would call me and talk with me on various and varied subjects, twice a day, for at least one hour each time, in the morning and in the evening, seven days a week, every day, from any place in the world and to any place in the world. Adelson knew exactly

where to reach me. Adelson knew the telephone and fax numbers at which it was possible to reach me including at my office at HaGalil Tours. Adelson would frequently phone HaGalil Tours and send me material to HaGalil Tours, whether by himself or through his personal secretary.

27.5   Interface had a contact sheet, both in Israel and in the U.S.A, specifying the telephone numbers of Interface's entire staff in Israel – which also listed a telephone number at which I could be reached at HaGalil Tours.

A copy of one of the above contact sheets is attached hereto as **Annex D35**.

The secretaries' office at HaGalil Tours worked in coordination with Interface's secretaries' office including with Ms. Miri Schory (hereinafter: **"Schory"**) who was in daily contact with the secretaries' office at HaGalil Tours for this purpose. My entire appointment calendar was managed in a manner that was visible and transparent to both Interface and HaGalil Tours. The foregoing appointment calendar included all of my meetings both in connection with my work at Interface and in connection with my work at HaGalil Tours.

A copy of part of a printout of my appointment calendar during the relevant period is attached hereto as **Annex D36**.

In addition, Adelson's people in the U.S.A and Adelson himself used the services of the secretaries' office at HaGalil Tours, also regarding matters that were not connected to HaGalil Tours. Such being in view of the fact that the secretaries at HaGalil Tours were more senior and experienced than the secretaries at Interface.

Many times, on Fridays, meetings were held with me at the HaGalil Tours offices and telephone contact was maintained with me at the HaGalil Tours offices by: Raviv, Efrat, managers of the companies in which Interface had holdings and even Interface's partners in the said companies (for example Mr. Uzi Katz of Auto Depot, Mr. Edo Schoenberg and Phyllis Gottlieb of IMD Soft). Raviv also requested that I arrange personal credit for him at HaGalil Tours for trips by members of his family and his [female] friend and I even gave authorization to give him a discount at HaGalil Tours. Raviv's sister, Dr. Liora Barash-Morgenstern, was also aware that I worked at HaGalil Tours and even approached me in the context of my work at HaGalil Tours with an offer to produce a special edition of the tourism guide for distribution to passengers of HaGalil Tours and of Royal Jordanian and the partners thereof.

A copy of Dr. Liora Barash-Morgenstern's communication is attached hereto as **Annex D37**.

**In other words, Adelson, all of Interface's employees, and all of the
entities that were connected to Interface in one way or another,
without exception, were aware that I worked both for Interface
and for HaGalil Tours**.

27.6    Adelson was aware that unlike Interface's other senior employees, I
        neither requested nor received a company car, so long as I worked at
        HaGalil Tours, since HaGalil Tours provided me with a car and driver.
        Interface paid expenses in respect of said car, from May 1997 and until
        the termination of my employment at HaGalil Tours at the end of 1998.
        Adelson's affidavit, according to which I told him that the car I
        received from Interface was part of the agreement for the termination
        of my employment **is false and untenable**. As aforesaid, I never told
        Adelson that I was terminating my employment at HaGalil Tours. The
        claim that I wanted to continue using the car provided to me by
        HaGalil Tours since it was fancy is unfounded. Adelson himself
        traveled with me many times in the above car and could not have failed
        to see that the car that HaGalil Tours provided me with was not a
        luxury car but rather a commercial car; a red Ford Transit on which
        was written on both sides, in Hebrew and in English, in big letters
        "HaGalil Tours". I agreed to waive receipt of a company car from
        Interface only because in the context of my employment at HaGalil
        Tours and so long as I worked at HaGalil Tours, I received a company
        car and a full-time driver from HaGalil Tours. There was logic to the
        above arrangement since the expenses of my car and driver were
        divided between my two employers, Interface and HaGalil Tours. If,
        for example, I had received the car from HaGalil Tours in the context
        of termination of my employment at HaGalil Tours, I would have
        demanded receipt of a company car from Interface and would have
        given the car that I received from HaGalil Tours to a member of my
        family, exactly as Raviv used to do with the car that was provided to
        him by Interface.

        A copy of a letter dated May 13, 1998, which puts into writing the
        agreement between Interface and HaGalil Tours regarding Interface's
        participation in the expenses of the car and driver for me is attached
        hereto as **Annex D38**.

        A copy of a number of tax invoices issued by HaGalil Tours to
        Interface in respect of participation in car and driver expenses are
        attached hereto as **Annex D39**.

27.7    Interface would send Mr. Adelson activity reports, from time to time,
        in which my actions and activities were reported to him, and in said
        circumstances Interface and Adelson were well aware, at all times, of
        what I was doing in the context of my position, and at what scope.

27.8    When a group or important figure was to visit Israel or Jordan and was
        connected to Adelson and/or his people, Adelson and his people
        utilized the fact that I also worked for HaGalil Tours and demanded
        my personal involvement in the organization of the visit.

The A.I.P.A.C organization (hereinafter: "**AIPAC**") through the company GWV (hereinafter: "**GWV**" – in respect of which I shall specify below) was a customer of HaGalil Tours. AIPAC hired the services of HaGalil Tours through GWV for the purpose of organizing visits of the members of the American Congress to Israel. Adelson's claim, in Section 23 of his affidavit, according to which HaGalil Tours did not organize the above visits, and dealt solely with the supply of buses for the tour in Israel – **is false**. AIPAC determined the arrival and departure dates, and coordinated some of the meetings with the political figures, whereas HaGalil Tours was responsible for the entire logistical organization of the visits, which included: (a) booking hotel rooms; (b) meals and choosing the menus; (c) coordinating entries to sites; (d) organizing tours and tourist events such as a cruise and shows; (e) payments to suppliers; (f) hostess services at the hotels; (g) handling personal matters of the members of Congress; (g) VIP reception and hospitality for the members of Congress at the airport in Israel; (h) special events; (i) occasionally, meetings with various entities including political figures.

Thus, for example, HaGalil Tours organized: mass on the Kineret, artistic performances, shows by instrumentalists and singers, special meals (such as, for example, a meal at the Israel Museum, a meal at the Jerusalem Theatre, a meal at Mishkenot Shananim, a meal in Ancient Jaffa, a meal with Mr. Shimon Peres at the restaurant Keren, etc.).

In order to illustrate the division of roles between HaGalil Tours and AIPAC it could be said that if, for example, AIPAC coordinated a meeting with a political figure, the role of HaGalil Tours was to book a place to hold the meeting, to organize refreshments, microphones and even the political figure's favorite drink and so forth.

In the context of my work at HaGalil Tours, I was involved and personally supervised all that was involved in the organization of the Congressional delegations' visits by HaGalil Tours. I was also conceptually involved in the organization of the delegations' visits. I personally checked, *inter alia*, the coordination of the arrival at and departure from the airport, the buses, hotels, menus, meals and even the gifts. Contrary, *inter alia*, to Adelson's affidavit, I was present at and participated in the majority of the Congressional delegations' events. In almost any central activity carried out during the said visits, I played a part in the supervision and even visited the place before the event. In this context I shall add and state that I never asked Adelson to involve me in the events of the members of Congress. On the contrary, it was Adelson who requested that I participate in the said events and even requested that I entertain the members of Congress at my home, which I did.

A copy of pictures taken during visits of members of Congress in which I appear are attached hereto as **Annex D40**.

24

I would provide Adelson, who would usually join the Congressional delegations himself once or twice a year, with an ongoing update of the details involved in the organization of the above visits. Adelson saw me many times whilst I was supervising HaGalil Tours' work during the above visits and he was even involved in the details of the organization of the above visits. Adelson would update HaGalil Tours through me regarding his preferences and wishes. I updated the people at HaGalil Tours regarding Adelson's preferences and wishes and HaGalil Tours acted according to my instructions, insofar as possible, in order to satisfy Adelson. Thus, for example, I recall an instance when Adelson was interested in giving the members of Congress a gift and requested that this be arranged through HaGalil Tours. At Adelson's request I instructed HaGalil Tours to purchase books by Mr. Natan Sharansky in English, the price of each book being approximately NIS 20, and said books were given as a gift to the members of Congress.

In addition, I particularly recall the words of thanks of the Mayor of Las Vegas, another important figure, who toured Israel separately with her daughter, with Adelson's financing, for the organization of the tour by HaGalil Tours, under my supervision.

27.9    As aforesaid, in coordination with Adelson, the payments up to September 1996 in respect of my employment were delayed and I was not even issued pay-slips until October 1996. This being, *inter alia*, due to my deliberating the tax considerations of the manner in which my salary should be paid in respect of my work for Interface and Adelson. Adelson and Interface expressed no surprise in this regard since they were aware that I also worked at the same time at HaGalil Tours and received a salary from HaGalil Tours. Had Interface been my sole source of income, would it have been conceivable, from a financial point of view, not to receive a salary over such a long period of time?

27.10    As aforesaid, in the context of the Middle East Economic Conference held in October 1995 in Amman, a conference guide was issued which included profiles of various companies that participated in the said conference (see Annex D20 hereto). Adelson received a copy of the said guide featuring a profile of HaGalil Tours and my picture, with a caption stating that I was a managing director at HaGalil Tours. In conferences held in subsequent years, in the guides of the Cairo and Qatar conferences, a profile of Interface was featured alongside a profile of HaGalil Tours (in two opposite pages), in which guides I also appeared in the profile of HaGalil Tours. In the profile of HaGalil Tours, my position in the context of my work at HaGalil Tours was explicitly stated. And I shall emphasize, Adelson received a copy of the said guides.

A copy of the title page of the guide for the 1997 Middle East Economic Conference in Qatar and the double page featuring a profile

of HaGalil Tours, followed immediately by a profile of Interface, is attached hereto as **Annex D41**.

27.11 Adelson and Interface and/or others on their behalf benefited from and utilized the fact that I also worked for HaGalil Tours. Adelson and his people in the U.S.A worked exclusively with HaGalil Tours in every matter connected with visits to Israel. In addition, Adelson and his people made use of the name and reputation of "HaGalil Tours". They frequently asked to use my contacts with various bodies throughout the world which had been acquired in the context of my position at HaGalil Tours, to promote their interests and businesses. Thus, for example: (a) Interface and the companies in which Interface and/or Adelson had holdings enjoyed significant discounts on flight tickets and hotels by virtue of my working for HaGalil Tours. **I estimate that the value of the above discounts totals tens of thousands of dollars**. (Thus, for example, Phyllis Gottlieb and Edo Schoenberg of IMD Soft enjoyed a discount at Sofitel Hotel in Tokyo, thus, for example, Raviv and Efrat enjoyed a discount at a Sheraton hotel in New York). A copy of documents testifying to the above discounts are attached hereto as **Annex D42**; (b) At the request of Adelson's security detail and pilots, (who also knew my telephone numbers at the HaGalil Tours offices), I helped in solving problems that arose in connection with landings and various payments in Jordan and also in connection with hotel bookings in Israel. Thus, for example, I helped Adelson in HaGalil Tours' capacity as a representative of the airline Royal Jordanian in Israel, when he was in Jordan and there was a need for landing rights and payment of fees for his private plane; (c) At Adelson's request, I organized a meeting for him with the Head of Domestic and Foreign Security in Jordan, by virtue of the contacts that I had with Jordanian figures in the context of my work at HaGalil Tours as aforesaid. A copy of a document testifying to my extensive contacts with Jordanian figures is attached hereto as **Annex D43**; (d) As specified above and below, when a group or VIP was to visit Israel or Jordan and was connected to Adelson and/or his people, Adelson and his people utilized the fact that I also worked for HaGalil Tours and demanded my personal involvement in the organization of the visit; (d) In view of my vast international experience and my involvement, in the context of my work at HaGalil Tours, in the tourism industry, Adelson required the marketing department of the Venetian Hotel to consult with me on the travel agents to whom it would be worthwhile to allocate rooms at the Venetian Hotel. A copy of documents dealing with this matter are attached hereto as **Annex D44**; (e) I helped Adelson (by virtue of my status at HaGalil Tours) to obtain approximately 20 tickets for the festival at Verona, Italy, a short time before the festival commenced, when all of the tickets had already been sold out; (f) In the context of his contacts with the authorities in Israel, Adelson used the fact that I worked at HaGalil Tours and even utilized my reputation in the field of tourism. Thus, for example, in the context of the contacts with the Israel Lands Administration and the Ministry of Tourism, regarding the allocation of land for the Tourism Venture. See, for example, Annex

D30 above; (g) Through my contacts with various entities in the world in the context of my work at HaGalil Tours, many business opportunities were revealed to Adelson abroad. Thus, for example, Adelson held contacts and examined the possibility of establishing a casino in Cyprus and utilized my contacts with one of the richest families in Cyprus to promote the matter. Thus, for example, Adelson contacted, through me, a member of the Irish parliament who owned a travel agency, in order to look into establishing a casino in Ireland. During the meetings held in connection with the above ventures, the subject of HaGalil Tours and my involvement in HaGalil Tours was raised, sometimes by Adelson himself.

27.12 The law firm Herzog, Fox, Neeman & Co. gave personal legal advice to Adelson and Interface, *inter alia* through the attorneys Yaakov Neeman and Ehud Sol. The above firm's attorneys who also represented Adelson and Interface were well aware that I worked both at HaGalil Tours and at Interface, since they handled both my personal matters and matters of HaGalil Tours on an ongoing basis. Thus, for example, the above law firm handled the merger of HaGalil Tours with the Clal Group, as can be seen from the document that was attached by Interface to Schory's affidavit, in breach of privilege.

The law firm Herzog, Fox, Neeman & Co. represented Adelson and Interface in negotiations conducted with me over approximately one year after the date on which my employment with Interface and Adelson was terminated, throughout all of which negotiations, they never dared to raise the groundless claim whereby Adelson and Interface were not aware that I also worked at HaGalil Tours.

Adv. Yaakov Neeman himself consulted with me in respect of a number of business matters and investments in the tourism industry, since he was aware of my vast experience and involvement in the field of tourism in the context of my work at HaGalil Tours.

27.13 Miriam Adelson was also aware that I worked at HaGalil Tours. Miriam Adelson had a drug rehabilitation clinic. At Miriam Adelson's request, I employed 4 rehabilitated hard drug users at HaGalil Tours. I personally took care of them, and monitored their work. In addition, Miriam Adelson and the manager of her clinic requested that in the context of my work at HaGalil Tours, I donate daytrips to former drug users at the clinic and to the staff, which I did several times. Thus, at Miriam Adelson's request, and in accordance with my instructions, HaGalil Tours was involved in the organization of a cornerstone laying ceremony for Miriam Adelson's drug rehabilitation clinic at Poriah Hospital. I recall that according to my direction, HaGalil Tours donated a bus to bring guests and journalists to the said cornerstone laying ceremony. In addition, I recall that according to my direction, HaGalil Tours donated a bus and guide (at least twice) for the patients and staff at Miriam Adelson's drug rehabilitation clinic in Tel Aviv. Miriam Adelson even approached me in relation to a tour that took place in Jerusalem. During the said tour, a need arose to organize a

lunch. I ordered the meal through HaGalil Tours and thus the affair came to a close.

27.14 HaGalil Tours was also responsible for the organization of the wedding of Yasmin Oxhorn–Lukatz, Miriam Adelson's daughter (hereinafter: "**Yasmin**"). The organization of the wedding was done in coordination with Adelson personally through meetings and telephone conversations held between us. At Adelson's request, in the context of my work at HaGalil Tours, I was personally involved both in the planning and the execution of the above wedding, while all of the details of the wedding, the handling of the guests who came from abroad, their arrival in Israel, their stay in Israel and the tours organized for them in Israel, were under HaGalil Tours' responsibility and my supervision.

Yasmin and her husband, Oren Lukatz, consulted with me a number of times on various matters in the field of tourism. Oren Lukatz, who was an attorney, checked with me the possibility of rendering legal services to HaGalil Tours.

At Miriam Adelson's request, also Sivan Oxhorn Adelson, Miriam Adelson's other daughter, met with me in Paris, France, during a combined business trip for Interface and HaGalil Tours. Sivan dined with myself and HaGalil Tours employees at the said meeting and thereafter, Adelson and his wife received a report in respect of their daughter.

Adelson's family members (his sister and brothers) used the services of HaGalil Tours on their visits to Israel. I recall that Adelson's sister had special demands and that she approached me in connection therewith.

27.15 Friends of Adelson and his wife, both in Israel and abroad, were well aware of my work at HaGalil Tours and even utilized this to such an extent that it almost became a nuisance. I recall that Professor Uriel Reichman of the Interdisciplinary Center in Herzliya requested my personal involvement in the context of my work at HaGalil Tours in connection with the Interdisciplinary Center's trip to Jordan. In addition, Miriam Adelson's friend, Dr. Eli Gruner, approached me following Miriam Adelson's recommendation, in order that I help him book flights abroad through HaGalil Tours. Thus, I also helped Nurit Arad at Adelson's request and she received a discount from HaGalil Tours with my authorization. Also Nurit Arad's daughter, Yael Arad, the well-known Olympic Judoka, was twice a central guest at a travel agencies' conference of Super Charter HaGalil Tours in my presence and even told Miriam Adelson of experiences there. Other friends of the Adelson family were also referred to me as aforesaid.

27.16 In the context of my and Adelson's meetings with politicians such as, for example, Mr. Roni Milo (Mayor of Tel Aviv at the time), with Mr. Amram Mitzna (Mayor of Haifa at the time), with Mr. Ehud Olmert (Mayor of Jerusalem at the time), with Mr. Shimon Peres and with Mr. Ariel Sharon (Minister of Infrastructure at the time), the subject of my

work at HaGalil Tours, including my contacts with Arab countries in the context of my work at HaGalil Tours, was raised for discussion, sometimes by Adelson himself.

In all of Adelson's many shared conversations together with me with Tourism Ministers in Israel: with Mr. Moshe Katzav, Mr. Uzi Baram and Mr. Amnon Lipkin-Shahak, Adelson raised the subject of my working at HaGalil Tours and the central role that I played in bringing tourists to Israel, at his own initiative. In those conversations, Adelson also stated that the Tourism Venture would also step up the attraction of tourists to Eilat through HaGalil Tours too. Also in meetings in Jordan, where HaGalil Tours was one of the central factors in bringing tourists to Jordan, Adelson raised this matter.

27.17 In various publications in the press, some of which were in English and were forwarded to Adelson, it was explicitly stated that I worked at and was involved in HaGalil Tours. I particularly recall an instance in which the King of Jordan, at my request, helped airlift a cardiac patient to Israel. An article thereon was published in the *Jerusalem Post*, which article related my involvement in the matter in the context of my being a director at HaGalil Tours.

A copy of some of the above publications which were forwarded to Adelson are attached hereto as **Annex D45**.

In a letter addressed to me from the late King Hussein, following the foregoing event (and which hints to another event in which Adelson was involved) my role as manager of HaGalil Tours was explicitly stated. This letter was sent to Adelson and the contents thereof explained to him.

A copy of the late King Hussein's letter is attached hereto as **Annex D46**.

27.18 In contacts that Adelson and I conducted with entities abroad, particularly in Jordan, the subject of my involvement in HaGalil Tours came up. I particularly recall that in our meetings with the Jordanian Minister of Tourism, with the Jordanian Foreign Minister, with General Dahabi, former Commander of the Jordanian Air Force, the President of Royal Jordanian, with the Jordanian Ambassador in Israel and with the Israeli Ambassador in Jordan, this topic was raised. The Jordanians would even call me "Mr. Galilee", also in Adelson's presence.

27.19 Moreover, during four and a half years of employment, Interface and/or Adelson never raised any claim that I was not investing sufficient time in my work for them, or that I was too involved in HaGalil Tours, or that I was not supposed to work at HaGalil Tours at all.