In addition, my secretaries at Interface (including Schory during the period of her employment) handled payments in Israel up to a certain amount, with Interface's petty cash, salaries and my personal expenses.

A copy of sample correspondence between Schory, Interface's secretary, and Zamir's office, is attached hereto as **Annex D72**.

70. The claim made in the Complaint and in Zamir's affidavit, whereby I did not submit foreign travel reports – **is false**. This is particularly true in view of the fact that insofar as I did not submit a travel report for any reason, I was asked by Zamir himself and/or by another on his behalf to do so, which I did.

A copy of correspondence illustrating such work procedure is attached hereto as **Annex D73**.

I generally submitted travel reports by the specification on credit card statements, and sometimes also in a separate report.

A copy of a sample travel report that was submitted by me separately, is attached hereto as **Annex D74**.

I would approve every charge and expense made with Interface funds, and also specified the nature of the charges made due to expenses incurred overseas. Interface and/or Interface's bookkeeping received all of Interface's credit card statements, accompanied by my comments thereon. As aforesaid, insofar as an expense was incurred for companies in which Interface had holdings, I mentioned the same on the printouts and ordered Interface's bookkeeping to charge such companies for the amounts charged to Interface's credit card, as was indeed done in practice. I did the same with regard to my private expenses. On the credit card printouts, I ordered the sums which had been charged to Interface due to private expenses of mine, to be offset against my salary, and Interface would offset the said expenses against my salary.

A copy of several printouts of Interface's credit cards, bearing my approvals and comments as aforesaid and/or memos of Interface's bookkeeping, are attached hereto as **Annex D75**.

See also, on this matter, my letters of July 5, 1998 and of September 11, 1998 (Annex C to Zamir's affidavit), which attests [sic] to the method of reporting on the face of the said printouts. Zamir's claim whereby he did not receive a copy of the letter of September 11, 1998 is utterly groundless. Every letter that was prepared by me was typed by Interface's secretaries and sent by them. Therefore, also this letter of September 11, 1998 was necessarily and clearly sent to Zamir. Furthermore, Zamir, in his capacity as Interface's bookkeeper, had to know what was decided with regard to the credit charges which were the subject of my said letter. Therefore, even if according to Zamir's denied version he did not receive a copy of the letter, then he should have been updated by Interface's U.S. offices on how to treat the expenses set forth in the letter.

A copy of the said letters is attached hereto as **Annex D76**.

71. I did not save the original invoices for the expenses incurred overseas and did not submit them to Interface. This was because, to the best of my knowledge and from my experience at HaGalil Tours, it was not possible to offset the V.A.T. in such invoices vis-à-vis the tax authorities. In addition, the origin of the charge is visible in the credit card printout, and therefore there was not need therefor.

    In 1997, while I worked for Interface, a dispute arose between Zamir and myself on the need to submit original invoices **for expenses incurred overseas** and on the manner of specification of the nature of charges for overseas travel and expenses overseas. Following the dispute that arose we turned to the CPA of Interface's bookkeeping, CPA Prof. Yoram Eden, and asked for his opinion. Prof. Eden confirmed what I had said, and determined that there was indeed no need to submit original invoices. Following Prof. Eden's opinion, Zamir did not ask me again to submit original invoices for foreign expenses, and the method of reporting remained as it was. In addition, to the best of my knowledge, Interface's CPA (Somekh Chaikin) and the tax authorities did not rule out this method of reporting.

    To emphasize, according to accounting advise I received as aforesaid and to the best of my knowledge, the submission of original invoices for expenses incurred overseas is not conducive to classifying the nature of the expenses as business or personal. All of the expenses incurred via Interface's credit card on trips abroad made by myself and others as aforesaid (including those mentioned in the Complaint and in Interface's affidavits in lieu of direct testimony) were open for all to see, are recorded and the origin thereof is clearly and openly specified in the credit card statements. They are therefore traceable even today, approximately eight years after the expenses were incurred. This fact testifies even more that no attempt was made on my part to conceal the said expenses, not to mention that in any event, the non-attachment of the original invoices does not render such expenses personal.

72. The claim that is asserted for the first time in Zamir's affidavit that I did not routinely submit invoices in respect of my expenses in Israel – **is false**. This claim, beyond being a **prohibited extension of the range of litigable issues, lacks any grasp on reality**. Parenthetically, it should be stated that the letter attached as Annex A to Zamir's affidavit does not deal with the issue of Interface's expenses in Israel at all, but rather only with the issue of expenses abroad.

73. During the term of my employment with Interface, Interface and/or Adelson did not raise any claim or reservation (that remained unresolved) on the subject of expenses incurred by me by charging Interface's credit card, expenses that were undisguised, known and reported in an ongoing and detailed manner. Also after termination of my employment, no attempt was made to check with me even one of the myriad claims raised against me in this Complaint.

    On the day on which I finished working for Interface and Adelson in practice, a bookkeeper from Zamir's office approached me and requested to check **only** a sum of $418 incurred on a trip taken by Efrat and myself to Japan.

A copy of the communication dated May 8, 2000 is attached hereto as **Annex D77**.

This fact too testifies that there is no basis to the claims against me in connection with the expenses in the context of my trips abroad, since, as aforesaid, no contact was made with me in an attempt to check the expenses mentioned in the Complaint or in the affidavits in lieu of direct testimony on Interface's behalf.

In practice, as part of the smear campaign and the attempt to terrorize me with false claims, Interface took **all** of the expenses incurred abroad via its credit card in the years 1997-2000 as one whole, without making any attempt to look into the source thereof, and included all of them in the Complaint against me in the context of an argument that the said expenses had been incurred by me not for Interface's purposes. Once it became clear to Interface that I have in my possession documents which serve to refute and undermine Interface's version, a substantial portion of the said sums that Interface claimed I incurred unlawfully, have disappeared from its affidavits. Just think, had Interface provided me, as was called for, with all of the documents existing in its possession and relating to the incurrence of the expenses on trips abroad and, *inter alia* the reports that I regularly and consistently submitted thereto, I would have been able to refute also the remainder of its claims, which are asserted in an indefinite and vague manner. Interface's said behavior demonstrates the extent to which the Complaint is groundless and how grave Interface's actions are.

It is emphasized that after Interface saw the few documents that I did have in my possession, there was no reference in Zamir's affidavit to a large number of sums which I was sued for in the context of Section 34 of the Complaint. Interface also refused to deliver to me my personal bookkeeping card, and only upon the Honorable Court's intervention did it condescend to deliver the same to me. It should be stated that charges and credits in respect of trips abroad appear in the above card, alongside which are stated references in respect of said trips, for which I was sued in the Complaint that is the subject matter of this affidavit.

From the aggregate it clearly emerges that Interface managed a control system regarding the expenses thereof (including my expenses) through an external bookkeeper, an in-house functionary responsible for monies – Efrat, and up-to-date and meticulous control of the relevant entities in the U.S.A., and all under the supervising eye of the leading accounting firm in Israel – Somekh Chaikin. The attempt, under these circumstances, to represent me as having treated Interface's money as his own, without any control or supervision, is a grave attempt, with no foundation or basis, which does not stand up to the test of reality.

74. If that were not enough, Adelson declares in Section 34 of his affidavit, while relying on the affidavits of Schory and Zamir (quite so, as inadmissible hearsay, similarly to a substantial portion of his testimony) that my three trips: (a) to Jordan with the delegation of the Association of Industrialists; (b) to Greece (Santorini) on a family vacation; (c) to France in order to meet with

people from Accor and others, were trips that were not for Interface's objectives, and that I made a number of payments on the above trips with Interface means of payment. As shall be specified below, these claims are false, groundless and demonstrate more than anything the extent to which the Complaint against me is unfounded:

74.1　**The trip to Jordan** – On September 8, 1999, I traveled to Jordan together with Adelson, in the context of the efforts to promote the Tourism Venture in Jordan, where we met with two Jordanian Ministers in connection with the Tourism Venture. On that same evening, I accompanied Adelson, who returned to Israel on his private plane, to the airport.

I remained that night in Jordan (at the Meridian hotel), at the request of Adelson and with his knowledge (now, absurdly, in the context of the Complaint, Interface is suing me for the payment for the above stay, see Section 34.24 of the Complaint). **In the context of the said efforts to promote the Tourism Venture**, I participated in a meeting held the following day between the King of Jordan and the delegation of the Association of Industrialists, to which I was invited even though I was not a member of the Association of Industrialists (*inter alia*, because the Association of Industrialists requested this of me, seeking to utilize my excellent connections with the Jordanian authorities and royalty). Therefore, unlike all of the above delegation members, I was not charged for the above trip, and also Interface, contrary to its claim, did not pay for me in respect of the delegation of the Association of Industrialists' trip to Jordan. Adelson was not invited to the above meeting, although he wanted to participate therein, since from the point of view of the Association of Industrialists, his presence was not wanted, since he was not Israeli. It is emphasized that I arrived in Jordan with Adelson and not with the delegation of the Association of Industrialists.

After the above meeting, I held a short personal meeting with the King of Jordan, during which I summarized for him the course of the meetings held the previous day with the two Jordanian Ministers (regarding the Tourism Venture) and I even had the King of Jordan sign a picture in which the King, Adelson and I had been photographed in the past with a picture of the Venetian Hotel. After the said meeting with the King of Jordan, which focused on the matters of Interface and Adelson, I returned to Israel on a flight, payment for which Interface is claiming from me (see Section 34.24 of the Complaint).

A copy of the picture on which I had the King of Jordan sign as aforesaid and documents in connection with the above trip are attached hereto as **Annex D78**.

**How is it possible for Adelson to now claim and lie that the aforesaid trip to Jordan was not in the context of my work for Interface and Adelson and that he was unaware thereof? Why is Interface now suing me for the expenses of the stay in Jordan and**

the return to Israel, expenses which were incurred in order to promote Interface and Adelson's business in Jordan?

74.2 **The trip to Santorini, Greece** – As I stated previously, on September 8, 1999 I traveled with Adelson to Jordan in order to meet with Ministers in the Jordanian Government. I met with the King of Jordan, as aforesaid (at Adelson's request) on September 9, 1999. I returned from the above trip in the afternoon, and on the same day I was to travel, at midnight, **at my expense**, on a private vacation with my family to Santorini, Greece on account of my own private time – the Jewish New Year holiday.

Contrary to Adelson's false claim as aforesaid, the above vacation in Santorini, Greece was paid for by me and from my money and was on account of my own private time and Interface is well aware of this. Needless to say that this example, one of many, only demonstrates the extent to which the Complaint filed against me lacks any basis and is designed for nothing other than to cause me to withdraw my own claims.

A copy of a printout of my personal credit card testifying to the fact that I paid for the vacation in Santorini myself and from my own money is attached hereto as **Annex D79**.

Two days before the trip to Santorini, a staff member at the hotel in Santorini requested that a written order be sent to the hotel in Santorini in order to verify the terms of the order. As aforesaid, I was in Jordan together with Adelson, and did not have ongoing telephone contact (the cellular telephone companies did not have an agreement with Jordan at that time). Therefore, it was not possible to contact me. In addition, I view of the proximity of the dates, it was not possible to wait for my return to Israel. Therefore, one of Interface's secretaries sent the details of the booking to the hotel in Santorini via fax (on Interface's letterhead) in my wife's name, without her signature and without my knowledge.

Moreover, in view of the short time that I had from the time I returned from Jordan until my flight on the same day at midnight, with my family to Santorini, I did not have time to provide Adelson (who at that time was in Israel) with a detailed update of the outcome of the meeting with the King of Jordan. Therefore, during the said vacation and on account of my own private time, I called Adelson, who was then staying in Israel, twice, and updated him regarding the meeting with the King of Jordan, and charged Interface in respect of the above telephone calls. Now, Interface is suing me for payment in respect of the above calls (see Section 34.25 of the Complaint).

**How can Adelson now claim that the charge in respect of the above telephone calls was not in the context of my work for Interface and Adelson?**

74.3 **A trip to France** – Accor is an international company that manages and owns a hotel chain of over 3,200 hotels under the brand names Sofitel, Novotel, Ibis, Motel 6 and others, throughout the world. Accor's management wanted to expand its activity in Las Vegas. Accord's management, which was acquainted with Adelson's extensive businesses in Las Vegas, approached Adelson and requested a meeting with him. Adelson who is himself a hotel owner, met with Accor's management several times since he had an interest in becoming acquainted with Accor's modus operandi.

Two of Accor's senior executives, the Deputy CEO and Director of Development, met with Adelson, flew in his private plane together with his wife and dined with him in France, Jordan and Israel. In the context of the said meetings, the Accor people offered Adelson to contract in a transaction and to cooperate with the objective of establishing a luxury hotel in Las Vegas under one of Accor's brand names. In addition, the Accor people were Interface and Adelson's competitors with regard to the Jordan casino venture. Accor's management understood that it was behind, from its perspective, in its progress with a casino venture in Jordan and was therefore interested in examining the possibility of cooperation with Interface regarding the said venture. Accor even attempted to interest Adelson in buying hotel equipment from a company owned thereby by the name of Da Vinko but Adelson rejected this outright.

Being an international businessman in the field of tourism I was in contact with various bodies throughout the world, as well as with Accor. Accor's management which, as aforesaid, was interested in promoting the matter of the hotel in Las Vegas and the matter of cooperation in Jordan, invited me to a number of meetings on the above matters with Accor's management in Paris. Adelson, who was aware of the meetings, had, as aforesaid, an interest in promoting the contacts with Accor and therefore encouraged their being held. Adelson utilized my connections with Accor for the purpose of promoting his interests. In January 2000, I traveled to Paris and held a number of meetings with Accor's management. During the above meetings, the subject of the cooperation between Interface and Adelson and Accor was discussed, both on the matter of the casino in Jordan and on the matter of the hotel in Las Vegas. In order to complete the picture I shall state that at the same opportunity, and in the context of one of the said meetings, another matter, connected with myself personally in the context of the direct connections I had with Accor, was raised between myself and Accor's personnel.

In the context of the said trip to France, with Adelson's knowledge and according to his instructions, I held a number of meetings with Pysis's management, headed by Mr. Ted Cousins whose office and residence were in Paris. At the same time, Pysis, which was IMD Soft's main competitor, finished raising funds of approximately $15 million and advanced contacts were held between the two companies for the

purpose of examining various offers, for the purchase of Pysis, the sale of IMD Soft, a merger between the two companies or the conversion of IMD Soft into a research center for Pysis. These contacts lasted for a long time in an attempt to solve various problems for the benefit of both companies. Ultimately, Pysis merged with another company in the U.S.A.

In addition, during the above trip I held a meeting with Jean Manolo, manager of "Quartz Investment" who had also met with Adelson together with me previous thereto. Jean Manolo made Adelson various offers (see Annex D27 to this affidavit). An additional meeting was held in the context of the above trip with Jean Jacques Demri, regarding the establishment of branches of the stores "Naf Naf" and "Chevignon" at the Venetian Hotel. It should be stated that during the above trip, I spoke with Adelson by telephone and reported to him on the outcome of the said meeting.

### Donations

75. The donations mentioned in the Complaint and/or in the affidavit in lieu of direct testimony on behalf of Interface, were donated from Interface's money, for business reasons and/or for the purpose of promoting various interests of Interface and/or Adelson. The claim that I appropriated Interface's money through donations and payments to bodies that I wanted to benefit - **is a false and groundless claim**. In the Complaint and/or in the affidavits in lieu of direct testimony on behalf of Interface, there is not a single piece of evidence that testifies that the donations made with Interface's monies were intended to promote my personal interests, and not without reason.

76. In my capacity as Interface's General Manager, I was authorized to make donations from Interface's monies, as a matter of routine and without requiring any approval, unless it was an exceptional and high amount unlike the above negligible donation amounts. Although I required no approval, in any event, all of the above donations were made with Adelson's knowledge and/or at his initiative and/or with his approval.

77. I routinely donated my personal time and money to various bodies separately and with no connection to the donations made from Interface's monies. The claim asserted in the Complaint and in Adelson's affidavit that I did not make donations from my own private money but rather used Interface's monies – **is false and perverse**. As an example I shall state, for instance, the donations that I ordered made at Adelson's request. At my instruction, HaGalil Tours lent its buses, for no consideration, to the Yeshiva *Or Hadash* in Rechasim. In addition, I ordered the donation of buses and entrance tickets to sites for tours held for Miriam Adelson's drug rehabilitation clinic.

I shall not disclose, in this affidavit, the donations made personally by myself and my family, since unlike some people, my family and I prefer to make anonymous donations. In any event, it is no concern of Interface and/or Adelson.

**A dinner and ceremony on the occasion of the award of the "Jerusalem 3000" badge for the encouragement of the "Friends of Jerusalem" Fund headed by Mr. Benjamin Netanyahu (Adelson's friend)**

78. Adelson approached me and told me that he had met with representatives of *Aish HaTorah* in the U.S.A., who had convinced him to donate to that organization. *Aish HaTorah* had a branch in Las Vegas called "Young Israel" (hereinafter: the "**Aish HaTorah Branch in Las Vegas**"). The manager of the Aish HaTorah Branch in Las Vegas, Rabbi Wein, is also a member of Chabad.

    A copy of documents testifying to the connection between *Aish HaTorah* and Young Israel in Las Vegas are attached hereto as **Annex D80**.

79. Rabbi Wein knew that Adelson was a regular contributor to the Chabad organization in Las Vegas, and therefore felt uncomfortable asking Adelson to donate also to *Aish HaTorah* in Las Vegas, thus reducing, in fact, the scope of the donations to Chabad in Las Vegas.

    A copy of an article from August 2000 written by Stephen G. Dovner on this matter is attached hereto as **Annex D81**.

    Therefore, Rabbi Wein offered that Adelson donate to the *Aish HaTorah* organization in Israel, in the framework of a high-tech conference that was about to be held in Israel as specified below.

80. It should be stated that the *Aish HaTorah* organization initiates and produces international business conferences, *inter alia*, on high-tech and technology.

    A copy of documents testifying thereto are attached hereto as **Annex D82**.

    Moreover, the *Aish HaTorah* organization in the U.S.A. and in Israel, had friend and supporters with whom Adelson was interested in maintaining business and social ties. Thus, members and/or supporters of the *Aish HaTorah* organization in the U.S.A include, *inter alia*: Mozi Kant, Alexander Tessler, Merv Adelson, Kirk Douglas, Ron Meyer, Senator Joseph Biden, Mario Komo, Robert Dole, Rudi Giuliani, Jinker Patrish, George Pataki, Larry King and Bill Clinton. In Israel too, supporters of *Aish HaTorah* include, *inter alia*: Ariel Sharon, Benjamin Netanyahu, Moshe Katzav, Ehud Barak, Shimon Peres, Ehud Olmert and Dan Tichon. Accordingly, Adelson had a clear interest in donating to *Aish HaTorah*.

    A copy of the document specifying the members of the board of directors of *Aish HaTorah* and the people supporting it is attached hereto as **Annex D83**.

81. Adelson asked me to handle the matter of the said donation. After making inquiries, I learned that a dinner and ceremony on the occasion of the award of the "Jerusalem 3000" badge for the encouragement of the "Friends of Jerusalem Fund" of *Aish HaTorah* was being held, with the participation of people with whom Adelson had business and social contacts. At the dinner itself, badges of esteem of Jerusalem in the name of "Jerusalem 3000" were

awarded to Professor Alan Dershowitz, Larry King, Jeane Kirkpatrick[6] and others who shared Adelson's world-view.

A copy of a list of badge recipients and an explanation of the dinner is attached hereto as **Annex D84**.

Participation in the above dinner was for a fee, and all of the monies received were to serve as a donation to *Aish HaTorah*. According to Adelson's instruction and with his knowledge I bought a "table" at the cost of NIS 5,200 for the purpose of participating in the said dinner and donating, as aforesaid, to *Aish HaTorah*. *Inter alia*, I invited Adelson's partners in companies in Israel in which Interface had holdings, to the said dinner. After the dinner I spoke with Adelson and told him about the dinner, which was attended also by Benjamin Netanyahu and Ehud Olmert.

A copy of the invitation to the above dinner is attached hereto as **Annex D85**.

82. The claim asserted in Adelson's affidavit according to which the donation to *Aish HaTorah* stands in contradiction to his philanthropic principles since he does not customarily donate to Yeshivas or religious organizations – is groundless. Adelson has contacts and has met with many Rabbis, including Rabbi Shemesh, Rabbi Tanami, Rabbi Melamed, Rabbi Reuven Elbaz (*Or Sameach* Yeshiva) Rabbi Ovadia Yossef (Rabbi Hadad (in Las Vegas) Rabbi Lau and others. Moreover, as I specify below, in absolute contradiction to his affidavit, Adelson did customarily donate to Yeshivas and/or religious organizations.

83. Adelson donated to the Yeshiva *Or Hadash* in Rechasim and even visited it a number of times, two of the visits being together with me. Adelson even obtained help for *Or Hadash* from members of Congress. Adelson's claim in his affidavit that this is not a Yeshiva – **is false**. *Or Hadash* has a Yeshiva and an Ulpana is the corresponding term for a Yeshiva designed for women.

A copy of *Or Hadash*'s calendar specifying, *inter alia*, the activity therein including, *inter alia*, a Yeshiva, is attached hereto as **Annex D86**.

84. Adelson also regularly donated to the Chabad center in Las Vegas, which is even named after Adelson and his wife. Adelson's claim that this is not a Yeshiva but rather a community organization, does not even remotely change the fact that the Chabad center in Las Vegas is a religious organization for all intents and purposes.

A copy of documents testifying to the religious nature of the Chabad center and to Adelson's involvement in the Chabad center as aforesaid are attached hereto as **Annex D87**.

Thus, for example, according to an article on the director of the Chabad center in Las Vegas of November 16, 2001 it was stated (in free translation):

---

[6] Translator's note: Original says "Kirk Patrick".

> "Now, the center of Vegas Chabad is a $1.5 million building, which was donated by Sheldon Adelson, owner of the luxurious Venetian on the famous strip. This building houses the school (complete with a state-of-the-art computer lab, physical education instruction, and 120 students), a mikvah, offices and a shul. **On any given Shabbat, one finds a surprising number of men sporting black hats and long beards, and the services are spirited in a way that is reminiscent shteibls in religious enclaves like Crown Heights** (Brooklyn)."
>
> (Emphases added)

A copy of the above article is attached hereto as **Annex D88**.

### The Association for the Promotion of Tourism

85. In the context of Adelson's efforts to establish a casino in Israel, Adelson hosted, at his expense, at his hotel in Las Vegas, Mr. Moshe Katzav (the current President of Israel) who was, at the relevant time, the Minister of Tourism in Israel (together with his wife and assistant in honor of Mr. Katzav's birthday). After the said visit, Mr. Katzav's assistant, who was the secretary of the Association for the Promotion of Tourism, contacted me and requested that Adelson and Interface give a donation to the association. It should be stated that the Association for the Promotion of Tourism is a public not-for-profit organization supported by the state budget.

    As aforesaid, Adelson, who was interested in establishing a casino in Israel could not refuse a request for a donation from Katzav's assistant. Therefore, with Adelson's knowledge, Interface donated the sum of NIS 12,838 to the Association for the Promotion of Tourism. The above sum was lawfully remitted by Interface and reported accordingly.

86. It should be stated that prior to the above donation, I personally purchased, from my own money, through the association, a lamp in the sum of $1,000, which is now at my house. As stated in the receipt (attached as Annex Q to the Complaint), the $1,000 clearly stated in the receipt were paid from my private money and not from Interface's monies. Interface is well aware of this, since it itself could not locate evidence of payment in cash of the above sum. This is merely another example of the lies of Interface and the affiants on behalf thereof. Until the Complaint was filed, I was not even aware that Interface had also received a receipt in respect of a payment made by me from my personal money. Interface does not explain how accounting adjustments were made in the company's books for a sum that it did not pay.

    A copy of the above receipt dated July 15, 1998 is attached hereto as **Annex D89**.

87. In honor of Adelson's birthday, we sent him a lamp as a birthday present in Interface's name. An Interface note, which stated that the present was from Interface, Raviv and myself, was attached to the present sent to Adelson. As

59

Adelson states in his affidavit, Raviv delivered the present with the note to Adelson. As for the additional lamp mentioned in the Complaint and in Adelson's affidavit, I am not aware of its fate, and Raviv (Interface's manager who succeeded me, as stated) should be asked about it.

**Redemption of Leave Days**

88. In the context of the conclusion of the terms and conditions of my employment with Interface and Adelson, it was agreed between myself and Adelson that in any matter connected with the number of annual leave days and the right to redeem annual leave, I would be entitled to exactly the same terms and conditions to which I was entitled in the context of my employment at HaGalil Tours. The terms and conditions of my employment at HaGalil Tours determined that I was entitled to 45 leave days per year of employment and that I was entitled to redeem leave days which I did not use.

89. On the date of my dismissal, in order to prevent disputes on the matter, I agreed that redemption of leave days be calculated based on 25 days in respect of every year of employment, so that in practice, such would be calculated as if I had utilized twenty leave days per year of employment (although I never utilized such a number of leave days throughout all the years of my employment). I shall emphasize again that I agreed to the said waiver only subject to the aforesaid putting an end to the discussion on the matter of the number of redeemable leave days available to my credit. On this matter, see Annex D to O'Connor's affidavit, which confirms the above claim to be true. The above annex is a memo of a telephone conversation held between myself and O'Connor, which was prepared by O'Connor himself, on May 14, 2000, close to the termination of my employment.

90. Adelson's claim in his affidavit according to which Interface's policy was to give two weeks leave per year over the first five years of employment and three weeks leave per year thereafter, and that leave days could not be accrued and redeemed – is false and lacks any grasp on reality. Adelson attaches as Annex A to his affidavit, the affidavit given on his behalf in the matter of a former employee of Interface, Melnik, as evidence of the above claim. Adelson does not bother to mention, and not without good reason, that in practice, his affidavit was dismissed and did not serve as evidence. Adelson also does not bother to mention that the Honorable Court determined, in absolute contradiction to Mr. Adelson's affidavit, that Melnik, who filled a less senior position than mine at Interface, was entitled to 30 leave days per year of employment and that he was entitled to redeem all of the leave days that had accrued to his credit. What is more, Efrat, who is an employee junior to me, received redemption of accrued leave according to a calculation of 22 leave days per year of employment.

    A copy of a transcript of the hearing and of the judgment in Melnik's case are attached hereto as **Annex D90**.

91. Moreover, according to legal advice that I received, the asserted policy is contrary to the provisions of the law in Israel which calls for the provision of fourteen leave days per year over the first four years of employment and in the

60

fifth year, sixteen days. Moreover, according to Section 13 of the Annual Leave Law, 5711-1951, an employee's right to redeem the leave days that have accrued to his credit upon termination of his employment is a right conferred upon him by law and cannot be denied.

92. Set forth below is the chain of events relating to the redemption of annual leave days:

   92.1 After the notice of termination was delivered to me, I requested that I and the terminated Interface employees be paid all of the rights due to us, including redemption of annual leave days in respect of leave days not utilized.

   92.2 **On May 7, 2000** (a Sunday) at 12:00, Efrat and I met with Zamir at Zamir's office, and discussed, *inter alia*, the matter of redemption of annual leave days of Interface employees. Raviv appeared at Zamir's office at around 13:00 and was surprised to see Efrat and me. At Zamir's request, we adjourned the meeting and Efrat and I returned to Zamir's office later for the continuation of the meeting at around 15:00, after Raviv had finished his affairs at Zamir's office.

   Contrary to Zamir's affidavit, during the entire term of my employment with Interface and Adelson, Zamir used to work opposite Efrat and not opposite myself, and was in continuous contact with Interface's financial management in the U.S.A. Zamir's claim that he was aware of the cessation of my employment but was not aware that I had been dismissed, is groundless. Zamir was aware that I had been dismissed just as he was aware that the rest of Interface's employees had been dismissed. In any event, even if according to Zamir he was not aware that I had been dismissed from my employment but rather only that my employment at Interface had been ceased (although this has no relevance in relation to the question of my right to redemption of leave days), in the circumstances and as I shall specify below, authorization was in any event received also from the authorized entities in Interface's financial management in the U.S.A. to pay what was due to me in respect of redemption of leave days.

   After the meeting with Zamir as aforesaid on May 7, 2000 and on the same day, Zamir faxed Chris, O'Connor's assistant in the U.S.A., a final settlement of accounts table which included, *inter alia*, the sums due to me and to the rest of Interface's employees in respect of redemption of annual leave, based on the data in his possession (hereinafter: the "**Settlement of Accounts Table**"). Chris transferred the Settlement of Accounts Table to O'Connor. See Annex BBB to Zamir's affidavit on this matter.

   Only thereafter, at 21:30 at night, on the same day (May 7, 2000) did Zamir fax me the Settlement of Accounts Table.

   A copy of the fax dated May 7, 2000 is attached hereto as **Annex D91**.

92.3   The following day, on **May 8, 2000** (Monday), in the morning, I called Interface's offices from home and requested that the secretary prepare a letter in which I give notice of the conclusion of my office at IMD Soft.

A copy of the letter dated May 8, 2000 is attached hereto as **Annex D92**.

Pursuant thereto, on the Settlement of Accounts Table (which also determined that my right to redeem leave days is based on a calculation of 25 leave days per year) I amended (to my detriment) the number of leave days that I was entitled to redeem – I deducted nine days that I utilized as leave days during the period close to the date of termination of my employment and sent Zamir the amended Settlement of Accounts Table from home.

Later and on the same day, Zamir spoke with me on the telephone and notified me that he had talked about the matter of redemption of the leave days with O'Connor and had sent the Settlement of Accounts Table to O'Connor's assistant. Thereafter, at 17:05 he sent me, at Interface's offices, an amended Settlement of Accounts Table following my comments as aforesaid (101 days for redemption instead of 110 days) and requested my approval for the data that appeared in the amended Settlement of Accounts Table. I approved the amended Settlement of Accounts Table immediately and on the very same day, and updated Efrat thereof. See Annex AAA to Zamir's affidavit on this matter.

A copy of the amended Settlement of Accounts Table which was sent by Zamir at 17:05 is attached hereto as **Annex D93**.

Thereafter, Zamir faxed me a payment instruction intended for the International Bank at which Interface's bank account is managed (hereinafter: the "**Payment Instruction**"). The Payment Instruction instructed that payment of the sums set forth in the amended Settlement of Accounts Table be made to me and to the rest of the Interface employees who had been dismissed. Zamir requested my signature on the Payment Instruction due to my being Interface's signatory.

Following Zamir's request, I called O'Connor at around 18:00. During the conversation I notified O'Connor that: (a) Zamir was requesting that I sign the Payment Instruction; (b) today (May 8, 2000) I was ceasing in practice to work for Interface and Adelson, since May 9, 2000 was Remembrance Day and May 10, 2000 was Independence Day. Accordingly, it was agreed that I would change the date of the Payment Instruction to May 11, 2000. During the conversation O'Connor also asked me when the payment would be remitted in practice, and I replied that I estimated that due to Remembrance Day and Independence Day falling on May 9 and 10, 2000, it was possible that the money would be remitted only on May 14, 2000 (a Sunday).

Immediately after the telephone conversation with O'Connor, I called Efrat and thereafter Zamir, and updated them in respect of the conversation that I had held with O'Connor. In addition, I sent Zamir a copy of the Payment Instruction form with the date modified to May 11, 2000.

A copy of the Payment Instruction form is attached hereto as **Annex D94**.

92.4 On May 9 and 10, 2000 (Remembrance Day and Independence Day) in the afternoon, I tried, **without success**, to speak with O'Connor in order to inform him that Interface had no other signatory apart from myself who could instruct the Bank to remit the tax payments in respect of Interface's employees' salary.

92.5 On **May 11, 2000** (a Thursday), in the morning, Zamir called me at home, worried, and requested that I immediately sign a payment instruction for Interface ordering the bank to remit monies to the relevant tax authorities and to additional entities in respect of Interface's employees' salary, since as aforesaid, I was the sole signatory at Interface. I agreed to look into the matter and requested that he send me the relevant data at home.

A copy of the documents specifying the data in respect of the payments to be remitted to the relevant tax authorities and additional entities, which were issued on May 11, 2000, by Zamir or another on his behalf, are attached hereto as **Annex D95**.

On the same day (May 11, 2000) at 22:30 at night (Israel time) after the payment instruction ordering remittance of the monies to Interface's employees had already been sent – O'Connor sent me fax at home following my attempts to reach him two days earlier, which were unsuccessful. In the above fax, O'Connor explained that **unfortunately** he had not been in the office and notified me that he would call me the following day (Friday, May 12, 2000) in order to talk with me since **he was not currently at the office**.

A copy of the fax dated May 11, 2000 is attached hereto as **Annex D96**.

Contrary to O'Connor's affidavit, O'Connor did not attempt to reach me (nor were any messages left for me on O'Connor's behalf on my cellular phone answering machine). On the contrary, I tried to reach O'Connor for two days, without success, in order to receive his authorization to my signing a payment instruction to the tax authorities and additional entities as aforesaid. In addition, I wanted to inform O'Connor that it was necessary to ensure that there would be monies in Interface's account for the above payments which were due by the 15th of the month, since as far as I was aware, after the remittance of the monies in respect of the salaries, which included redemption of leave days, to Interface's employees, an insufficient amount would remain

for the above payments. This also emerges from the conversation memo prepared by O'Connor himself, on May 14, 2000:

> Moshe reports that this payment will put the account in a negative position. Ralph A. Cadman will address."

It should be stated that in O'Connor's fax, there is no mention of O'Connor's claim whereby he had tried to reach me for several days, on the contrary, as aforesaid, he apologized for not having been at the office on those days. O'Connor had all of the possible telephone numbers at which I could be reached, including my cellular and home phone numbers. Therefore, O'Connor's claim that he tried to reach me for a number of days without success is groundless.

92.6   The following day, **on May 12, 2000** (Friday), I replied to O'Connor's communication via fax and requested that we speak on Sunday (May 14, 2000), see Annex C to O'Connor's affidavit.

On May 14, 2000 (Sunday) the said telephone conversation was held between O'Connor and me, and contrary to O'Connor's affidavit, also during the above conversation, O'Connor did not dispute my entitlement to redemption of leave or the sum that I received in respect of redemption of leave, nor expressed any surprise that the payment instruction had been filled already on May 11, 2004 since he was aware of this and authorized it as aforesaid. In addition, O'Connor notified me that Raviv had been appointed as signatory on behalf of Interface in my place and that therefore there was no need for me to sign the payment instruction to the tax authorities.

93.   It should be stated that close to the date of termination of my employment, Efrat, who had a legal education, advised me to make memos of all of the conversations and meetings that I held with Interface personnel in order to prevent misunderstandings at a later stage and that is indeed what I did, insofar as possible, and I even updated him and shared the foregoing events with him. Raviv is lying in his affidavit when he claims that the payment instruction form does not exist at Interface's offices. The payment instruction form is found both at Interface's offices and at Interface's bookkeeping's offices.

A copy of a memo that I prepared, describing the conversations and the meetings that I held with Interface personnel a number of days prior to the termination of my employment, *inter alia*, regarding the redemption of leave days accrued to my credit is attached hereto as **Annex D97**.

94.   It is emphasized that also after termination of my employment for Interface and Adelson and even while contacts were held between the parties in connection with the monetary demands raised by myself, Interface and/or Adelson never raised any claim in connection with the payment in respect of redemption of leave that was made to me. This fact too demonstrates the extent to which the claim in respect of my entitlement to redemption of leave

95. Parenthetically, it should be stated that the claim that emerges from the affidavits of Schory and Raviv, according to which I took tens of leave days – is a groundless claim. As specified above, Schory and/or Raviv had no ability to monitor my working hours and/or working days for Interface and Adelson. In any event, in the context of the final settlement of accounts that I made with Interface and Adelson, we took into account, for the sake of caution, 100 leave days that I had supposedly utilized, although I did not utilize such a number of leave days, such being, as aforesaid, in order to end my employment without dispute. Therefore, insofar as I utilized leave days, they were taken into account in calculating the payment due to me in respect of redemption of the leave.

96. Moreover, according to legal advice that I received, upon termination of my employment **I was entitled to redemption of leave days in respect of those leave days that I did not utilize, as other Interface employees were entitled to and even received**. Therefore, there is no basis for Adelson's vague claim whereby, according to legal advice that he received, I am not entitled to redeem leave days that accrued to my credit since I took "a lot of leave".

## Claims Regarding Theft of Documents

97. **I did not take Interface's documents on leaving and I did not delete or request Interface's documents be copied from Interface computers.** In this context I shall state that during the period commencing on the date on which I received notice of my dismissal and up until the date on which I ceased working, Raviv did not appear at Interface's offices at all. In addition, throughout April 2000, Adelson together with his attorneys from the U.S.A. were at Interface's offices for the purpose of preparing Adelson's testimony in a trial that was being held between his children and Adelson himself.

98. As aforesaid, in the context of my employment with Interface and Adelson, I invested my best energy and of my time for the benefit of Interface and Adelson. Such was, insofar as my position demanded and I even gave this position preference over my other occupations. As a consequence thereof, I spent the majority of my time at the Interface offices. The various entities that were in contact with me knew that most of the time I could be reached at Interface's offices. Accordingly, they often called me and sent me material to the Interface's offices. Moreover, as a consequence of my spending the majority of my time at the Interface offices, documents that were private and/or connected to matters that I handled and were not necessarily connected to my work with Interface and Adelson, were found at the Interface offices, just as documents connected with Interface were found at the HaGalil Tours offices. Some of the documents were saved on Interface's computers and others were filed in my personal files or in Interface's current files.

Upon finishing my work for Interface and Adelson, I wrote to Interface's counsel, Daniel Chinn (hereinafter: "**Adv. Chinn**") of the law firm Herzog, Fox, Neeman & Co. and requested that the said documents be transferred to

my possession. Nevertheless, during the period subsequent to my leaving Interface, Interface refused to transfer to me personal post and fax transmissions which had reached my address at the Interface offices.

A copy of my communications from July 18 and 27, 2000 are attached hereto as **Annex D98**.

99. In a conversation that I held with Interface's counsel, Adv. Chinn, Adv. Chinn told me that the post that reached me at the company's address was being opened by my successor, Raviv. According to Adv. Chinn, said correspondence and documents that belonged to me were packed in approximately three loaded boxes. My requests to receive the said boxes were not answered and ultimately, only approximately half a year later, was a minute portion of the said personal documents transferred to me.

100. It is emphasized that following Interface's refusal to transfer the documents to me, very important communications from various entities did not reach me and as a consequence thereof, I was unable to respond to or even know of the said communications. Thus, *inter alia*, I missed an important international conference in Davos, to which I was personally invited, due to the invitation being sent to the Interface offices and Raviv not transferring it to me. Thus, for example, it transpired, *post factum*, that various entities had tried to locate me and approached me by delivering documents to Interface, communications which, due to Interface's acts and omissions, were not answered, which caused me damage and a loss of business opportunities.

101. Even worse, in Raviv's affidavit dated October 16, 2002 which was filed in Labor Case 6245/01, Raviv declared, *inter alia*, that "he did not open any mail which stated that it was addressed to Hananel if it did not mention also Interface's name."... and that he sent "all of Hananel's documents and belongings to Adv. Daniel Chinn of the law firm of Herzog, Fox, Neeman & Co., Interface's counsel, to be forwarded by him to Hananel... I ordered that Hananel's documents be sent to his house by taxicab, as was indeed done... Interface retains no letters or facsimiles addressed to Hananel personally". Thus, also in Schory's affidavit dated November 7, 2002 in Labor Case 6245/01, Schory declared that "I sent the documents and belongings, at the direction of Mr. Dan Raviv, to the office of Adv. Chinn, to be forwarded by him to Hananel".

A copy of the above affidavits is attached hereto as **Annex D99**.

In practice it transpired that Raviv and Schory, contrary to their affidavits, hid private documents of mine that were in Interface's possession. Only in the framework of a review of documents proceeding in the Complaint that is the subject matter of this affidavit, and from reviewing Schory's affidavit, did it transpire to me that Interface had private documents of mine which were revealed to the eyes of the entire public upon the filing of Schory's affidavit as aforesaid, and all in blatant breach of attorney-client privilege between myself and my counsel and an invasion of my privacy, by acts which genuinely border on being criminal. It is clarified that I reserve the right to file additional

66

and separate motions with the Honorable Court based on the aforesaid and to initiate additional and separate legal proceedings in respect of the said acts.


(-)
Moshe Hananel


I, the undersigned, Sharon Friedman, Adv. do hereby confirm that on November 7, 2004, appeared before me Mr. Moshe Hananel, with whom I am personally acquainted and who, after I cautioned him to tell the truth, failing which he would be liable for the penalties prescribed by law, confirmed the veracity of his foregoing statement and signed it in my presence.


(-)
Sharon Friedman, Adv.