IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ ) | | |
| SHELDON G. ADELSON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | |
| v. | ) | **04-cv-10357-RCL** |
| | ) | |
| MOSHE HANANEL, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ ) | | |

**SUPPLEMENTARY MEMORANDUM OF HANANEL CONCERNING
CONSOLIDATED ISRAELI ACTION**

The Israeli court conclusively determined that the 2001 and 2003 actions are consolidated for all purposes, and neither party appealed the July 2004 consolidation order. This single case is the one that Adelson's present suit duplicates. Adelson himself acknowledged, as long ago as 2002, that Hananel's 2001 Complaint[1] encompassed Adelson's contractual promise of options on <u>all</u> projects Hananel presented to Adelson, of which the Macau opportunity is only one example.

Adelson filed (on January 30, 2006, Dkt # 126) his translation of Hananel's Affidavit in the 2001 case dated September 9, 2002. Paragraphs 11 and 47 of that Affidavit state Hananel's claim to "options <u>in any venture</u> which [Adelson or IPI] would establish at my initiative" (¶ 11; ¶ 47 says the same)(emphasis added). Adelson filed his responsive affidavit on September 29, 2002 (1st Hananel Aff., Dkt # 12, Exh. 1, copy attached for convenience), on behalf of both parties, announcing (¶ 2) that he was responding to Hananel's contentions, and, at ¶¶ 33-36, Chapter V, entitled "<u>Hananel's contention regarding an option commitment</u>" (emphasis in original) Adelson denied granting Hananel <u>any</u> options. Also, even after Adelson filed the present action, on March 30, 2004, IPI filed an answer to the 2003 Complaint which stated, in paragraph 6, "[T]he question of the undertaking to grant options to the Plaintiff [Hananel] is pending resolution by the Honorable Court within the framework of another lawsuit that the Plaintiff filed against the Defendants [the 2001 action]." On June 29, 2004, IPI submitted its brief on consolidation, stating (in ¶ 20) "[i]ndeed, there is one question common in both lawsuits: the existence of an undertaking to grant options to the Plaintiff [Hananel]." Thus in both 2002 and 2004 Adelson acknowledged, as he has continued to do until last week, that the 2001 and 2003 actions have identical legal theories and factual foundations.[2]

The two Israeli Labor Court judges (including the Chief Judge) heard both parties on this specific question, reviewed the 2001 and 2003 claims, and decided that the identity of claims, causes of

---

[1]      In response to the Court's order to provide a translation of the 2001 Complaint, Adelson has provided a translation not of the Complaint but of a draft, as can be seen from the fax date of 15 Aug. 2001, because the Complaint was not filed until August 19, 2001. While Hananel reserves his rights to examine the differences and the translation critically, even this version shows why the Israeli court ruled as it did.

[2]      The issue is the same in the remaining Count 1 of Adelson's present suit, and no question remains that it is an entirely duplicative proceeding that must be dismissed to avoid conflicting rulings, among other inconveniences.

action, legal theories, and factual issues, led to an unequivocal conclusion that the cases depended on the same factual and legal determinations and ordered consolidation.[3]  The Israeli judges' ruling should be respected because it adjudged the same issue of duplication which is before this Court.  The present action is a complete duplicate, thus raising the most sensitive concerns for disruption of international judicial economy, the greatest danger of conflicting rulings, danger of duplication of judicial and witness effort, and the danger of rewarding unjustified forum shopping.  The Court should conclude, as have many others before it, that Adelson's filing in this Court is entitled to no deference because there was a prior Israeli proceeding between the same parties on the same issues.[4]

Dated: February 1, 2006                          Respectfully submitted,
                                                 MOSHE HANANEL
                                                 /s/ James A. G. Hamilton
                                                 James A. G. Hamilton (MA Bar # 218760)
                                                 BURNS & LEVINSON LLP
                                                 One Beacon Street
                                                 Boston, MA  02108
                                                 617.854.4000

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 1, 2006.

                                                 /s/ James A.G. Hamilton

---

[3]     The first judge to rule that the 2001 and 2003 complaints were an integrated whole was Judge Davidov-Motola, who ruled on May 24, 2004 that the

> two complaints deal with an employment relationship between Plaintiff [Hananel] and Defendants [IPI and Adelson], both require determination of the question of the employer-employee relationship between Plaintiff and Defendant [Sheldon] (as there is no dispute about the employment relationship between Plaintiff and Defendant [IPI]), and both complaints require determination of the employment terms of Plaintiff as summarized orally between him and Defendant [Sheldon] in general, and regarding the projects in which he was involved in particular.  (¶ 19)

> . . . . we believe that it appears there is a place to combine these two complaints, to save judicial time and to prevent inconsistent decisions on the same issues.  (¶ 32)

1st Hananel Aff., Dkt ## 12, 74, Exh. 4 (copy attached for convenience) (emphasis added).  Judge Davidov-Motola referred the consolidation to the chief judge of the court, who ordered the consolidation less than two months later.  2d Hananel Aff., Dkt # 21, Exh. 1 (copy attached for convenience).

[4]     Adelson's belated, ineffectual effort to distinguish the 2003 and 2001 claims runs afoul of the precedent, relied on by Judge Saris in *Linkco*, of *MLC (Bermuda) Inc. v. Credit Suisse First Boston Corp.*, 46 F. Supp. 2d 249 (S.D.N.Y. 1999).  There, the court ordered forum non conveniens dismissal of a suit brought only one month after the commencement by the defendant of a parallel action in London, holding the plaintiff's choice of forum to be entitled to "much less weight when it is made after the filing of a concurrent action arising out of the same series of transactions.  (*id.* at 250-251; holding, *id.* at 254.)  The court rejected the plaintiff's attempt (like Adelson's here) to make distinctions based on insubstantial differences in the claims, and ordered deference to the earlier Israeli action.  *Id.* at 252 (rejecting "differences of form and not of substance").  The court went on to confirm other issues relevant to the present motion, particularly noting the inconvenience and expense of litigating in two forums, judicial economy, and lack of prejudice to the plaintiff.  *Id.* at 253-254

I, the undersigned, Sheldon G. Adelson, U.S. passport No. 101668547, after having been cautioned to tell the truth, failing which I shall be liable for the penalties prescribed by law, do hereby declare as follows:

1. My name is Sheldon G. Adelson. I am making this affidavit on behalf of myself and the first defendant in labor case 6245/01, of which I am the sole controlling shareholder, after having been authorized thereby to do so.

## Chapter I – Introduction

2. The plaintiff's complaint is totally frivolous. Before responding to the unfounded contentions of the plaintiff (hereinafter **"Hananel"**) on their merits, I will briefly describe the background to the relationship between Hananel and the defendants.

3. The first defendant (hereinafter: **"Interface"**) is a private company organized in the United States which has a registered branch in Israel. I am the controlling stockholder of Interface. I am Jewish, a citizen and resident of the United States, and I have several large-scale international businesses.

4. Mr. David Farbstein is the brother of my wife, Dr. Miriam Adelson. My brother-in-law, Mr. Farbstein, worked for Interface in the United States, and upon his return to Israel in 1994 we opened a branch of Interface in Israel. The Israeli branch of Interface was established with the view of capitalizing on Interface's relationship within the Hi-Tech industry and to enable Mr. Farbstein to take advantage of the business experience he acquired in the United States.

5. Hananel and I first met in 1988. Hananel was a manager at HaGalil Tours Ltd. (hereinafter: **"HaGalil Tours"**), an Israeli company which was owned by Hananel's wife's family and himself. HaGalil Tours provided tourism services to a company under my control which was affiliated with Interface. Subsequently, when I visited Israel, Hananel would meet me occasionally, and that is how we became acquainted.

into a personal friendship marked by a relationship of trust.

7.    Toward the end of 1995, existing disputes between myself (and
      Interface) and my brother-in-law, Mr. Farbstein, led to the deterioration
      of our relationship, and it became clear that Interface would need a new
      manager for its Israeli branch. Hananel proposed himself for this
      position. In light of my acquaintance with Hananel and the relationship
      of trust between us, Interface agreed to entrust the responsibility for
      managing its Israeli branch to Hananel.

8.    The agreement between Interface (through myself) and Hananel –
      **which was not reduced to writing** – was that Hananel would act as
      the manager of Interface's Israeli branch. Within this framework,
      Hananel would be responsible – with the assistance of professionals
      whom he would retain with Interface's prior approval – for identifying
      business opportunities in Israel for Interface, mainly in the hi-tech
      market, investigating such opportunities, preparing recommendations
      for Interface, carrying out Interface's decisions with regard to the
      proposed investments and supervising the investments made or to be
      made (hereinafter: the **"Agreement"**). As aforesaid, the Agreement
      between Interface (through myself) and Hananel was an oral
      agreement.

9.    Within this framework, it was agreed that as of January 1, 1996,
      Hananel would work **full time** for Interface, in consideration for which
      he would receive, starting January 1, 1996, an annual salary of US
      $100,000 (US $8,333 per month). Hananel said that he would start a
      "phasing-in" period of sorts shortly before January 1, 1996, but it was
      agreed that Hananel would only be remunerated from January 1, 1996.
      Hananel stated that he would separate himself completely from Hagalil
      Tours, except from an occasional consultation, which in no case would
      compromise his full time employment with Interface. In addition,
      Interface (through myself) undertook to pay Hananel 12% of the net
      profit (profit less losses) which Interface may generate from the
      realization of investments in Israeli companies initiated and caused to
      happen by Hananel while he acted as the manager of Interface's Israeli
      branch. This arrangement will be expanded on below (in Chapter V).

10.   Hananel was the senior (in fact, the only) manager of Interface in
      Israel. Aside from Hananel, Interface employed only a secretary, and
      later (toward mid 1996) Adv. Oded Efrat joined the office.

11.   Only in retrospect did Interface (and I) learn that Hananel abused the
      trust I placed in him as the manager of Interface's Israeli branch.

Hananel did not fulfill the duties he was supposed to. The second half of the 1990s was the most flourishing period of Israeli hi-tech. As aforesaid, Hananel was supposed to identify attractive investments for Interface in the field of hi-tech. However – as Interface (and I) only subsequently learned, Hananel invested most of his time and efforts (in violation of the Agreement between Interface and himself) in the management of HaGalil Tours and in his internal struggles with his partners there. Furthermore, Hananel used the resources which Interface placed at his disposal and his ability to "load" his expenses and the expenses of his private affairs on Interface in order to finance, at its expense, his expenses and the expenses of his private affairs (mainly within the framework of HaGalil Tours), among other things.

12.  The years since Hananel's appointment as the manager of Interface's Israeli branch were very busy years for me, in which I planned, developed and constructed the largest project I had ever undertaken to date – the Venetian Hotel in Las Vegas (a project in the scope of US $1.4 billion). I was unable to dedicate much attention to Interface's branch in Israel. I relied on Hananel and trusted him and he abused the trust I placed in him. Also the geographic distance and time difference between Israel and the United States hampered my ability to monitor the office.

13.  In early 2000 I despaired of Hananel and of his inability or unwillingness to perform his duty to identify hi-tech investments for Interface in Israel. In the more than four years in which Hananel acted as the manager of Interface's Israeli branch – which were the golden years of Israeli hi-tech – Interface invested in only two companies. Hananel would forward to our offices in the United States raw information which he received from companies in Israel, without any analysis or investigation report. Our attempts to convince Hananel to hire the appropriate manpower to identify and evaluate investments – were unfruitful. I therefore decided to terminate Hananel's employment.

14.  Accordingly, in April 2000 Interface (through myself) gave Hananel notice of his termination. Immediately upon receiving the notice, Hananel ceased working for Interface – and Interface did not require his continued services – and Hananel was paid an advance notice payment in the sum of one monthly salary (until May 10, 2000).

15.  At the time of Hananel's termination I was not yet aware (nor was Interface aware) of Hananel's abuse of the trust placed in him. I believed that Hananel was a lazy and unproductive manager. It did not occur to me that throughout those years he actually continued working for HaGalil Tours and misappropriated Interface's funds.

**Chapter II – Hananel's claim for payment in lieu of advance notice**

16.    In Section 26 of Hananel's affidavit he claims that Interface and I and
Hananel agreed that he would be entitled to an advance notice of six
months. There is absolutely no truth in this contention. It is a flagrant
lie. **When Interface (through myself) and Hananel agreed on
Hananel's employment, the issue of the length of the advance
notice which Hananel would receive upon termination was never
discussed.** Nor was this issue discussed at any other time prior to
Hananel's termination. Therefore, no agreement was ever reached
whereby Hananel would be entitled to an advance notice of six months.

17.    The contention regarding **an agreement to a payment in lieu of
advance notice for six months** also stands in utter contrast to my
management principles. For over fifty years I have been managing a
multitude of diverse businesses. Thousands of employees have worked
for me (either directly or through companies under my control). All of
the employees were always considered employees 'at will', which
means that an employee was free to leave my employment at any time
he chose without any severance pay, and I (through the companies
under my control) was free to sever any relationship with any employee
at any time **without any obligation to pay any severance
compensation due to the termination.** Hananel personally was
certainly aware of this policy, which is a well-known managerial
principle I keep. This principle even took written form in Interface's
defense in a complaint by another employee of Interface's Israeli
branch (Mr. Moshe Melnik) against Interface, an action which was
conducted while Hananel acted as the manager of Interface's Israeli
branch, and of which Hananel was aware in great detail.

A copy of my affidavit, filed within the framework of Moshe Melnik's
complaint against Interface, is attached hereto as **Exhibit D/1a.** The Honorable
Court is referred to Sections 23 and 27 of the affidavit.

A copy of the judgment in Moshe Melnik's complaint against Interface is
attached hereto as **Exhibit D/1b.**

18.    In accordance with the aforesaid, upon Hananel's termination, and after
Interface's counsel in Israel explained to me that according to Israeli
law an employee has to be paid an advance notice payment equal to
one monthly salary only, I instructed Interface to treat Hananel as
required by the law.

confronted me with his demand for an advance notice of six months –
he claimed that an advance notice of this duration was the custom in
the State of Israel. The claim whereby this was the agreement between
us from the outset was fabricated by Hananel only toward the filing of
this complaint.

20.    In Section 28 of his affidavit, Hananel based his demand for an
       advance notice of six months also on an alleged custom. According to
       legal advice I received, this claim is unfounded. Interface's Israeli
       branch is a small place of work, where there is in fact not one
       employee who may be said to be comparable to Hananel (and that a
       binding custom was established for employees such as Hananel). I do
       not know the identity of Hananel's secretary who is mentioned in
       Section 28 of Hananel's affidavit, but I most certainly did not approve
       a payment to her of three months in lieu of advance notice, and no
       person besides me was authorized to give her a three-month advance
       notice payment.

21.    In Section 31 of Hananel's affidavit (and in several other instances), he
       claims that Interface and I acknowledged Hananel's right to a six-
       month advance notice, but conditioned it upon his waiver of other
       rights. This claim is entirely without merit. Interface and I never
       acknowledged that Hananel was entitled to a six-month advance notice.
       We were unable to make such an acknowledgment, since it was never
       agreed with Hananel that he would be entitled to a six-month advance
       notice.

22.    Pursuant to legal advice I received, and only alternatively – I will
       respond to the specification of Hananel's salary components in Section
       23 of his affidavit.

23.    As aforesaid, according to the Agreement between Interface (through
       myself) and Hananel, Hananel's salary was fixed at US $100,000 per
       year (US $8,333 per month). In addition, Interface (through myself)
       agreed to pay the expenses of Hananel's cellular telephone and (one)
       telefax line in his home.

24.    As for the car: When we reached our Agreement, Hananel told me that
       he got a car from HaGalil Tours and wants to continue to drive that car,
       and therefore asked – in lieu of automobile expenses – that Interface
       pay for a driver for him, who would also run errands for Interface. I
       agreed to Hananel's said request.

25.   Interface (through myself) never agreed that Hananel would receive both automobile expenses and a full time driver (as may be inferred from the combination of Sections 23.2.1 and 23.2.5 of his affidavit). I personally would never have agreed to it. As stated at the beginning of my affidavit, I carry on several businesses and I have (through companies under my control) a great many employees. There is not one employee - nor has there ever been - of the companies under my control who receives both a car and a full time driver. In fact, not one employee of the companies under my control has a full time driver at the company's expense. The only reason I agreed to this in Hananel's case was in light of Hananel's explanation that the driver's expenses would be in lieu of the automobile expenses.

26.   In any case, specifically with regard to the automobile expenses – according to Section 23.2.1 of Hananel's affidavit, such expenses also included maintenance. I would like to state that not one of my employees (through the companies under my control) is reimbursed for repairs and maintenance to their personal vehicles. Hananel was well aware of this fact, since this fact too was asserted in Interface's defense against Mr. Moshe Melnik's complaint (the Honorable Court is referred to Section 26 of my affidavit, **Exhibit D/1a** hereto).

27.   In contrast to Section 23.2.2 of Hananel's affidavit, Interface never agreed to pay the cost of subscriptions for two daily newspapers for Hananel. In contrast to Section 23.2.3 of Hananel's affidavit, Interface did not agree to pay the cost of two wired telephone lines for Hananel, but only one. I now know that Hananel "loaded" these expenses – in whole or in part – on Interface's cash. This is but a minor example of Hananel's misappropriation of Interface's funds.

28.   Together with this affidavit, my attorneys are filing an affidavit by CPA Dedi Zamir, which addresses Hananel's claims regarding his salary components in further detail.

## Chapter III – Hananel's claim regarding unlawful setoffs

29.   In Sections 34-40 of his affidavit, Hananel claims that two checks were unlawfully offset against what was due to him upon termination. These claims are unfounded.

attorneys are filing, together with this affidavit, an affidavit by Ms. Miri Schory, which addresses, among other things, Hananel's claim regarding this check.

31.     With regard to the second check (Sections 37-38 of Hananel's affidavit) – my attorneys are filing, together with this affidavit, an affidavit by CPA Dedi Zamir, which addresses, among other things, Hananel's claim regarding this check.

## Chapter IV – Hananel's claim regarding the injury to his reputation and business opportunities

32.     As for Hananel's claim in Sections 41-46 of his affidavit regarding the injury to his reputation and business opportunities – such claims are without any merit. Together with this affidavit, my attorneys are filing affidavits by Mr. Dan Raviv and Ms. Miri Schory which address this claim by Hananel.

## Chapter V – Hananel's contention regarding an option commitment

33.     In Sections 47-52 of his affidavit, Hananel claims that he was granted an option with an indefinite term to receive 12% of the stock of two companies in which Interface invested during his term, against payment of 12% of the sum invested in the said two companies.

34.     Hananel's description of the option that was ostensibly granted to him is untrue. When the Agreement was entered into between Interface (through myself) and Hananel, I told Hananel that he would be entitled to receive 12% of Interface's **net** profit from the realization of investments in Israeli companies initiated and caused to happen by Hananel during his employment, provided that he was still employed with Interface at the time of the realization.

35.     In other words – **Hananel was never granted a stock option.** Hananel was entitled to receive **monetary remuneration only** as a result of the realization of investments he made during his employment, provided that he maintained his position with Interface through the time of realization.

pay fees only for successes, without deducting losses. Such a concept would be totally ludicrous – an employee who injures the company with failing investments should not be remunerated for a single good investment. The principle whereby the good investments made by a certain employee should be offset against the bad investments which such employee made is, to my mind, a basic and self-evident principle.

36.  In any case – Interface has never realized its investment in the two companies mentioned in Section 47 of Hananel's affidavit (Denex Medical Software Systems Ltd. and IMDSoft Ltd.), neither at the time Hananel was employed by Interface nor at any time thereafter. Interface still holds its shares in both of these companies (and one of them, Denex Medical Software Systems Ltd., is subject to a pending merger), so either way – according to legal advice I received – Hananel is not entitled to the remedy sought by him in this respect.

37.

(a)  In Section 49 of his affidavit, Hananel claims that **"An option commitment was given also to my predecessor in Interface, Mr. Farbstein. This indicates that a custom existed of giving options to the General Manager of the Defendant"**. This argument is without merit.

(b)  Furthermore, Hananel's claim regarding the substance of the arrangement between Interface and Farbstein, is incorrect. Before Farbstein started working for Interface in Israel, it was agreed between Farbstein and Interface that Farbstein would be **entitled to join** – against payment of his proportionate share – Interface's investments in Israeli companies at the same time the investment was made (up to 25% of Interface's share in such company). **This was not an option of unlimited duration that Farbstein was given. Farbstein had to decide whether to join Interface's investment concurrently with Interface's decision to enter such investment. Farbstein was not entitled to decide whether to join the investment in retrospect – after he knows whether the investment turned out to be a good one.**

(c)  It should be noted that as an exception to the arrangement described above, it was determined that if Interface invested small amounts of money (less than US $250,000) in Information Technology companies, due to Interface's contribution to such companies of Comdex related marketing

expertise and/or barter, then Farbstein would be entitled to receive 10% of Interface's equity interest (that portion of market value over debt or cost) in such companies **for free**. This exception was fixed in view of Farbstein being my brother-in-law and the know-how and experience which Farbstein had acquired in these fields while working for Interface in the United States, and it is inapplicable to Hananel. This exception did not constitute an option, since Farbstein was in any case entitled to receive the equity interest for free.

A copy of an internal document dated November 29, 1993 which describes the terms of the said arrangement between Farbstein and Interface is attached hereto as **Exhibit D/2**.

(d)    The conclusion is that Hananel's claim whereby he was given an option of unlimited duration for stock in Denex Medical Software Systems Ltd and in IMDSoft Ltd., is not only inconsistent with the arrangement which Interface had with Farbstein, it actually stands **in contrast** to the arrangement with Farbstein. It is inconceivable that I would give Hananel the option to join whenever he pleased an investment in companies in which Interface invested – after he already knows that it was a good investment – and that with regard to my own brother-in-law I would stipulate that he would have to decide whether to join an investment concurrently with Interface's decision to enter such investment. I would like to emphasize that it would never have occurred to me to offer an option arrangement as described by Hananel to **any employee or manager** of a company under my control, for the reason described in Section 35 of my affidavit. An arrangement whereby a manager gets to benefit only from the company's good investments is illogical. Such an arrangement holds no motivation for the manager to choose only good investments for Interface, while avoiding bad ones.

### pter VI – Hananel's claim regarding a bonus commitment

In Sections 53-55 of his affidavit, Hananel claims that at the beginning of his employment with Interface, Auto Depot Ltd. (hereinafter: "**Auto Depot**") – a company in which Interface held shares – was on the verge of insolvency, and that Interface believed that its entire investment therein had been lost. Hananel asserts that he was promised a bonus for

the sum which he claims he "saved" for Interface by selling its share in Auto Depot.

39.   This contention is completely untrue. First, it is not true that when Hananel started working for Interface, Auto Depot was on the verge of insolvency; nor is it true that Interface believed that its entire investment therein had been lost. On the contrary – Until the beginning of 1998 (more than two years after Hananel started working for Interface), and pursuant to Hananel's glowing and very optimistic projections regarding Auto Depot and his strong recommendations, Interface continued to invest millions of NIS in Auto Depot mainly for the expansion of Auto Depot's business by opening new stores. For instance, almost 9 months after Hananel started working for Interface, Hananel notified Interface of an additional cash investment of US $625,000 to be made in Auto Depot due to an opening of a new store in Ramat Gan. According to Hananel's request, Interface transferred US $625,000 to Auto Depot. Of course Interface would not have made those new investments in Auto Depot had it believed - as Hananel contends - that Auto Depot was on the verge of insolvency and that its entire investment therein had been lost. To the best of my knowledge, Auto Depot's financial difficulties started some time after Hananel became involved in the management thereof.

A copy of Hananel's letter dated August 27, 1996, is attached hereto as **Exhibit D/3**.

Second, which is key – Interface (and I) never promised any bonus whatsoever to Hananel due to his involvement in Auto Depot. This contention too is illogical. It would not have occurred to me to promise Hananel a bonus for "saving" an investment in a particular company, since supervising investments was in any case within the framework of Hananel's ordinary duties and responsibilities, for which he was generously paid.

## Chapter VII – Other claims made by Hananel

40.   Hananel's affidavit contains other incorrect factual contentions. According to legal advice I received, these claims are irrelevant to this case. However, for the sake of caution only, I shall briefly refer to some of them.

41.   In Section 6 of his affidavit, Hananel claims that I manage all of my businesses in Israel via the Israeli branch of Interface. This contention is incorrect. There are businesses in Israel which I manage outside of the Israeli branch of Interface, such as investments in real estate and in movie theatres in Israel.

42.   In Section 10 of his affidavit, Hananel claims that he was also employed by me personally. This contention is without merit. Hananel was employed by Interface. Although Hananel also handled several minor and infrequent matters for me personally, he did not provide these services as my employee and in any case, according to legal advice I received, the rights claimed in this action are entirely unrelated to the said services.

43.   In several instances in his affidavit (such as Sections 13 and 17), Hananel refers to correspondence between myself (or my attorneys) and himself (or his attorneys) which was exchanged when we tried to reach a settlement regarding his demands due to his termination by Interface. According to legal advice I received, these documents are inadmissible and the defendants do not agree to the admissibility thereof. Without derogating from the aforesaid, and for the sake of caution only, I shall note that all of the offers made to Hananel were made with the desire to swiftly conclude the relationship between Interface (and myself) and Hananel. These offers were entirely unrelated to either Interface's or my obligations to Hananel. They were made *ex gratia* and before I knew of Hananel's misappropriation of Interface's funds and his continued work for HaGalil Tours at the time when he was supposed to be dedicating his full time and energy to Interface.

44.   In contrast to the contention in Section 20 of Hananel's affidavit – neither I, nor any person on my behalf, ever threatened Hananel to damage his reputation should he refuse to waive his rights.

45.   In Section 23 of his affidavit, Hananel claims that his terms of employment with Interface were based on the terms of employment of his predecessor, Mr. Farbstein. This contention is simply untrue. As I mentioned in my affidavit in Moshe Melnik's complaint (Exhibit D/1 –

46.    I declare that my name is Sheldon G. Adelson, my signature is herein
below and the content of my above affidavit is the truth.

Sheldon G. Adelson

**Certification**

In accordance with Section 15 of the Evidence Ordinance [New Version], 5731-1971, I, the
undersigned, Amir Shraga, Adv., of 28 Bezalel St., Ramat Gan, certify that on September 29, 2002
appeared before me Mr. Sheldon G. Adelson, who is known to me personally, and who, after having
cautioned him to declare the truth, failing which he would be liable for the penalties prescribed by
law, signed this affidavit in my presence.

Amir Shraga, Adv.
License #23944



**Decision: Tel Aviv District Labor Court, May 24, 2004, Honorable Judge Davidov Motolla Segal, In re: Moshe Hananel ("Moshe") v. Sheldon Adelson ("Sheldon"),**

SELECTED PARAGRAPHS

[Moshe may be referred to as Plaintiff. Interface will be referred to as IPI. IPI and Sheldon will be referred to as "Defendants"]

1. Before us is a request to issue a judgment against Defendant 2 – Mr. Sheldon Adelson-for failure to timely submit a Statement of Defense. In order to decide we need to initially determine the legality of the service of the complaint – not by hand to Mr. Sheldon personally (since he is not an Israeli citizen or resident), but through "alternative service methods" as will be further detailed herein.

3. Plaintiff claims under an agreement between him and Defendants, according to which he will be entitled to 12% of the stock held by IPI, or Sheldon, or another company controlled by Sheldon, in any project originated by Plaintiff, and that against a payment of 12% of the amount invested by Defendants or either of them and/or another company owned by Sheldon in the same project. During the separate complaint [Case No. 6245/01- the 2001 suit], Plaintiff moved (among other things) to receive rights, which he is entitled to receive based on this alleged agreement in two projects, while this lawsuit deals with a third project – Plaintiff argues that he originated the establishment of the casino in the area of Macau in China (the "Macau Project"), and even began to take necessary actions to make this initiative a reality. Only after he was fired and after submitting an independent claim [the 2001 suit], did he find out that his idea about [the Macau project] had crystallized and that Sheldon – through a company under his control and with some involvement of IPI – indeed received the right to build said Casino.    .

4. Thus, the current lawsuit is to obtain a Declaratory Judgment of the right of Plaintiff to 12% of the stock in the Macau Project against payment of 12% of the Defendants' investment in it. The complaint was submitted on December 17, 2003 and as of this date. Sheldon has not submitted a Statement of Defense. A Statement of Defense by IPI was submitted only after the rejection of its motion to dismiss the claim ab initio.

19. [Following a discussion in which the Judge accepts the limited power of attorney submitted by Sheldon's legal counsel:] Nevertheless, we determine to accept Plaintiff's claim that <u>substantively the complaint before us deals with the same matter as the other independent complaint [the 2001 suit], to which there is no dispute that the attorneys represent the Defendant [Sheldon] and are authorized to receive pleadings on his behalf</u> [emphasis in original]. Thus, the two complaints deal with an employment relationship between Plaintiff and the Defendants, both require determination of the question of the employer-employee relationship between Plaintiff and Defendant [Sheldon] (as there is no dispute about the employment relationship between Plaintiff and Defendant [IPI]), and both complaints require determination of the employment terms of Plaintiff as summarized orally between him and Defendant [Sheldon] in general, and regarding the

projects in which he was involved in particular. Considering that, we believe that we can determine that the representation of Defendant [Sheldon] regarding his employment relationship with Plaintiff is handled by the attorneys, in a manner that allows proper service on their office of a new complaint which is in essence another layer of the complaint they are handling.

22. To summarize this point – where there is no dispute that the lawyers are authorized to represent Defendant [Sheldon] in matters related to the employment agreement of Plaintiff (in the separate lawsuit [the 2001 suit]), and where the current complaint evolves from the same claimed agreement and deals with the same issues - we think that the Defendant [Sheldon] has an "attorney" in Israel for the subject matter of the complaint, and that the limitation of the power of attorney was done for tendentious reasons per se, consequently, the service on the law offices was a valid service.

28. [Dealing with the issue of whether there was proper service via IPI] In our case, there is no dispute that the first two conditions exist [1- the complaint deals with issue of "business " or "work", 2- against a person that "does not live in the jurisdiction"]. As to the third condition [3 – the person manages his businesses in Israel], it is proper to quote in this context the statements of Defendant [Sheldon] in connection with his affidavit in case No. 6245/01 [the first case]: "In section 6 of his affidavit Hananel claims that I manage all my business in Israel via the Israeli branch of Interface. This contention is incorrect. There are businesses in Israel which I manage outside of the Israeli branch of Interface, such as investments in real estate and in movie theaters in Israel" (Section 41 to his affidavit - exhibit [the Hebrew letter Daled] to the response of Plaintiff).

Defendant [Sheldon] further confirmed in his affidavit (for example in section 8) that he retained the services of Plaintiff (even if the company [IPI] was the formal employer) and he concluded with him the terms of his employment, through personal and direct involvement in the management of the Israeli company, which is in essence his long arm.

It seems that it is possible to see in this affidavit clear admission on behalf of defendant [Sheldon] of the management of business in Israel by him (and not just by Defendant [IPI] as an independent entity) [emphasis in original] as there is no dispute that there is no need under the ordinance that a person will manage all his business only in Israel, but it is enough that part [emphasis in original] of his business will be in Israel [citation to Israeli precedent – Peri case]. It appears that this is a clear distinction between the matter of Defendant [Sheldon] and a matter of a Chairman of another international company who does not personally manage his business in Israel, and that distinguishes Defendant [Sheldon] according to his own affidavit.

30. Considering the decisions above, and where there is no real dispute about the intensive relationship between Defendant [Sheldon] to Defendant [IPI] through which he manages his businesses in Israel (and the attorneys even did not argue against this) we hold that the fourth condition was proved [the fourth condition is that the complaint was served to a "manager or representative" that manages on behalf of the person those businesses in Israel that are the subject of the complaint] in a way that allows the service

through Defendant [IPI] to be seen as a valid service. The fact itself, that was emphasized by the attorneys, that Ordinance 482 was not used in this manner before is not relevant; the opposite - if confirmed via this ordinance, in appropriate cases service of pleadings on partners or agents, let alone the service in our case on "the long arm" of Defendant [Sheldon} in Israel that is close to him in a tight relationship, namely the Defendant [IPI].

32. In conclusion, we decide to accept the service of the complaint – both on the offices of the attorneys and on Defendant [IPI] - as a legal and valid service on Defendant [Sheldon] which conforms to the requirements of the ordinances. Notwithstanding our decision, we do not agree to accept [Plaintiff's] request for a judgment without defense, in order not to prevent Defendant [Sheldon] from having his day in court. An extension of 30 days to Defendant [Sheldon] is hereby granted to, from the date of receipt of this decision in the law offices, for the purpose of submitting a Statement of Defense on his behalf.

In addition, and considering that this complaint, in our opinion, is another layer of the separate complaint [the 2001 suit], and requires determination on the same issues, we believe that it appears that there is a place to combine the two complaints, to save judicial time and to prevent inconsistent decisions on the same issues. The parties are requested to submit their positions on this matter (in addition to the preliminary positions provided during the hearing) within 30 days from today and the matter will come before the head judge to determine the issue of the consolidation of the cases.

33. The Defendant [Sheldon] will pay to Plaintiff his expenses in this motion of 3,500NIS plus VAT.

בתי הדין לעבודה

| בשא 003111/04 | בית הדין האזורי לעבודה בתל-אביב-יפו | |
|---|---|---|
| בתיק עיקרי: עב 007704/03 | | |
| תאריך: 24.5.2004 | כב' השופטת דוידוב-מוטולה'סיגל | בפני: |

| בעניין: | חנ נאל משה | | |
|---|---|---|---|
| | עו"י ב"כ עו"י/ד | איזי הולדשטיין | המבקש |

נ ג ד

שלדון ג' אדלסון

המשיב

החלטה

פתיח

1.    בפנינו בקשה למתן פסק דין כנגד הנתבע 2 – מר שלדון אדלסון – בשל שטר הגיש כתב
      הגנה על אף חלוף המועד חוקונו לצורך כך. על מנת להכריע בכך עלינו לחברע תחיה
      בשאלת חוקיות המצאתו של כתב התביעה – שלא לידיו של מר אדלסון באופן אישי (שכן
      אינו אזרח ישראל או תושבה) אלא באמצעות "חליפי המצאה" שיפורטו להלן.

2.    לפי כתב התביעה, התובע שימש כנציגו של מר אדלסון (להלן – "הנתבע") בישראב,
      וכמנכ"ל הנתבעת 1 ("אינטרקיס פרטנרס אינטרנישונל לימיטד") שהנה חברה פרטית
      אמרקינית, חמקיימת סנף בישראל ומצויה בשליטת הנתבע (להלן – "הנתבעהדני). במסגרת
      תביעה נפרדת שהגיש התובע לבית דין זה    כנגד הנתבע והתובעת גם יחד (6245/01),
      תבע זכויות שונות חמגיעות לו, לטענתו, עקב עבודתו והפסקת עבודתו, כאשר בין היתר טען
      כי התקיימו יחסי עובד ומעביד גם בינו לבין הנתבע באופן אישי     (להלן – "התביעה
      הנפרדת" או "יתיק עב/6245/01").

3.    התובע טוען לסיכום בינו לבין הנתבעים, לפיו יהא זכאי ל – 12% מהמניותה המוחזקות
      בידי הנתבעת, או בידי הנתבע, או בידי חברה אחרת בשליטת הנתבע, בכל מיזם שלידתו
      ביוזמת של התובע, וזאת כנגד תשלום בגובה 12% מחמכום שהשקיעו הנתבעים או מי
      מחם ו/או חברה אחרת בבעלות הנתבע באותו מיזם, במסגרת התביעה הנפרדת עתיר
      התובע (בין היתו) לקבלת זכויות המגיעות לו כתוצאה מסיכום נטעון זה בשני פרוייקטים,
      בעדר שהתביעה חנוכחית עוסקת בפרוייקט שלישי - חתובע טוען כי יזם את הקמתו של בית
      קזינו באזור מקאו אשר ברפובליקה חעממת של סין (להלן – "מיזם מקאו"), ואף החל
      בפעלות הדרישות לצורך הוצאת היוזמה אל הפועל. רק בדי-עבד, לאחר פיטוריו ולאחר
      הגשת התביעה הנפרדת, התברר לו כי רעיונו בקשר לכך קרם עור וגידים וכי הנתבע –
      באמצעות חברה בשליטו ובמעורבות מסוימת של הנתבעת – אכן קיבל זכיון לחקמתה
      הקזינו האמור.

4.    התביעה חנוכחית חנה כפיכך לקבלת סעד הצהרתי, בדבר זכאותו של חתובע ל- 12%

מהמניות ב"מיום מקאו", כנגד תשלום סך 12% מהמשקעת הנתבעים בו. התביעה הוגשה ביום 17.12.03 כאשר עד היום טרם הוגש כתב הגנה ע"י הנתבע. כתב הגנה הוגש ע"י הנתבעת חוגש רק לאחר דחיית בקשתם למחיקת התביעה כנגד על הסף.

5.    לטענת התובע, כתב התביעה הומצא לנתבע כדין, וזאת בכל הדרכים הבאות וכל אחת מהן בפני עצמה :

(א)   המצאת כתב התביעה, באותו יום בן הוגש, לבאי כוחה של הנתבעת, שהנם גם באי כוחו של הנתבע בתביעה הנפרדת המתנהלת בין הצדדים בבית דין זה - משרד עורכי הדין דנציגר, קלוגסבלד, רוזן ושות' (להלן – "עורכי הדין"). יצוין בהקשר זה כי כבר למחרת התמצאות הודיעו ע"י קלוגסבלד לב"כ התובע כי אינו מוסמך לקבל את כתב התביעה בשמו של מר אדלסון, וביום 3.2.04 הגישו עורכי הדין "המודעה" לבית הדין, בה הבהירו כי אינם מוסמכים לקבל כתבי בי דין בשם הנתבע וכי ייפוי הכוח שניתן להם חנו לצורך תיק עב' 6245/01 בלבד. ל"המודעה" זו אכן צורף עותק מייפוי כוח מוגבל, אשר מדגיש כי ניתן אך ורק ביחס לתיק עב' 6245/01 מבלי שלעורכי הדין סמכות לפעול בשמו של הנתבע בכל עניין אחר (להלן – ייפוי הכוח המוגבל").

(ב)   המצאת כתב התביעה בדואר רשום לכתובת מגוריו של הנתבע בישראל. מבלי שהמסמך נדרש. הצדדים כמעט ולא התייחסו לטענה זו, ואף לא הובאה בפנינו כל ראיה לכך שהכתובת אליה נשלח כתב התביעה הנה אכן כתובתו של הנתבע.

(ג)   המצאת כתב התביעה למשרדיו של הנתבע בישראל, היינו למשרדי הנתבעת, כאשר אין חולק כי המסמך התקבל באופן פיזי וקבלתו אושרה בחתימתם עובדת הנתבעת.

6.    לאחר הגשת הבקשה למתן פסק דין בהעדר הגנה ביקש בית הדין מעורכי הדין להתייחס לטענות העולות מהבקשה – בתחילה בכתב, בהתייחס לסוגיית ההמצאה למשרדים, ובהמשך גם נדונו במעמד הצדדים. בהתייחס לסוגיית ההמצאה לנתבע, בית הדין הבהיר כי עצם התייחסות עורכי הדין לסוגיות אלו לבקשתנו אכן תיחשב כייצוגו של הנתבע.

לחלן נציג לפיכך את טענות הצדדים ביחס לכל אחת מהדרכים דלעיל (למעט דרך (ב) שלמעשה נזנחה ע"י התובע) ובהמשך את הכרעתנו.

חוקיות ההמצאה לעורכי הדין

טענות הצדדים

7.    התובע טוען כי ייפוי הכוח המוגבל לא מעשה כדין ואינו מחווה ייפוי כוח תקף – מהטעם שנערך בחו"ל אך לא אומת באחת הדרכים המפורטות בסעיף 30 לפקודת הראיות (נוסח חדש), תשל"א - 1971. עוד מעלה התובע ספקים שונים לגבי אמיתות ייפוי הכוח. לאור זאת, ובהעדר ייפוי כוח תקף המכביל את סמכותם של עורכי הדין, התובע סבור כי יש לתיניינ למסקנת כי עורכי הדין חנם עורכי דינו של הנתבע בישראל, וזקהה הם בסמכותם לקבל כתבי בי דין עבורו בכל דבר ועניין. התובע מוסיף וטוען כי טענת החסמכה המוגבלת הועלתה בדיעבד ולאחר מעשה, כאשר עורכי הדין חלחו לפעול בשם הנתבע כבר ביום 7.11.01 וייפוי הכוח המוגבל נושא תאריך 1.3.02.

8.    עורכי הדין הטבינו בהקשר זה כי סעיף 30 לפקודת הראיות (נוסח חדש), התשל"א – 1971 כלל לא חל בבית הדין לעבודה (סעיף 32 לחוק בית הדין לעבודה, תשכ"ט – 1969), וממילא אין להסתמך עליו בנוסף, הוראת סעיף 30 לא נועדה להתקשות על אופן הוכחת

מסמך שנערך בחו"ל אלא להקל, כאשר במקרה זה – כאשר עורכי הדין "מעידים" כי קיבלו את
ייפוי הכוח מהנתבע, אין צורך בהוכחה קפדנית מעבר לכך כי המסמך אכן אותנטי. עוד
טוענים עורכי הדין כי אם ייפוי הכוח המוגבל אכן אינו תקף – הרי שאין בידיהם ייפוי כוח
כלל, תוצאה שממילא לא תסייע לתובע.

9.    התובע טוען עוד, גם אם בשפה רפה (ראו למשל סעיפים 3.6 ו–3.9 לבקשתו), כי אין חולק
כי עורכי הדין מייצגים את הנתבע בתביעה חנפרדת המתנהלת בבית דין זה מול התובע
בנשוא מקביל, כך שוודאי כי חנם מוסמכים לייצגו גם בתביעה זו (במאמר מוסגר יצוין כי
גם בתביעה חנפרדת טען הנתבע לאי המצאת החתביעה אליו באופן חוקי – טענה שנדחתה).
עוד הוסיף כי לא יכול להיות ספק בכך שהנתבע מודע היטב להגשת כתב התביעה נגדו – הן
מעצם היותו ויו"ר הדירקטוריון של הנתבעת, אשר קיבלה כדין את כתב התביעה וכבר
הגיבה לו, והן מכיטובים שונים בעתונות האמריקאית, בהם נמסר ע"י עזרו המשפטיים של
הנתבע כי חוגשה נגדו תביעה וכי חנם מטופלת (נספחים י"ג וי"ד לבקשה). בהתחמקות בכך
הרי שהתשובה התכלתית של הבאת התביעה לידיעת הנתבע, ואין כל הצדקה לאפשר לנתבע,
על בסיס "תרגילים טקטיים" ומחוסרי תום לב, שלא להגיש כתב הגנה – תוך התחמקות
פסולה מבירורו התיק לגופו, השתת התובע בהתחשב בפער הכלכלי בפער בינו לבין הנתבע, וסרבול
ההליכים.

10.   עורכי חדין השיבו בחקשר זה כי בכתב התביעה עצמו הדגיש התובע כי מדובר בתביעה
"שונה בתכלית" מהתביעה חנפרדת, כך שאין זו יכול כיום לטעון טענה חפוכה. בנוסף,
השאלה המשפטית הרלוונטית אינה אם הנתבע יודע בפועל על התביעה אם לאו, אלא האם
מתקיימים התנאים לביצועה של המצאת כדין לפי תקנות סדרי הדין והפסיקה העוסקת
בכך, כאשר התשובה לכך (לגרסתם) חנה שלילית.

11.   התובע טוען עוד כי עצם הגשת ה"מודעה"י בשמו של הנתבע לבית הדין כמוה כהודאה מצד
עו"ד קלגוסבלד בדבר ייצוג הנתבע. עורכי הדין השיבו על כך כי משקיבלו כתב תביעה,
ודרישה להגשת כתב הגנה, עבור אדם שאינו מיוצג ע"י חם – חובה היתה עליהם לחודיע
זאת לבית הדין, וכך עשו; אין בכך כדי להפוך את ההמצאה לחוקית ככל שלא חיתה כזו
כבר קודם לכן.

12.   בתגובה נוספת מטעם התובע ביקש חוא לחסב את תשומת לבנו לתביעה שהוגשה ע"י
הנתבע, ביום 23.2.04, באותו נושא ממש בו עוסקת התביעה שבפנינו, בבית המשפט
המחוזי בבוסטון. התובע מתייחס לכך כאל נסיון מחוסר תום לב לעקוף את סמכות בית
הדין ולהתיש את התובע, עורכי הדין השיבו כי התביעה בבוסטון הוגשה ללא כל מעורבות
מצידם, וכי חוגשה מטעם יחיד של הפסקת הדיון שמוציא התובע (כך נטען) כלפי הנתבע
ברחבי ארצות הברית.

<u>הכרעה</u>

13.   תקנה 477 לתקנות סדר הדין האזרחי, התשמ"ד – 1984 (<u>לחלן – "התקנות"</u>), חמילולת
בבית דין זה מכוח תקנה 129 לתקנות בית הדין לעבודה (סדרי דין), התשנ"ב – 1991,
קובעת כדלקמן:

"ההמצאה תהא ככל האפשר מבחינה מעשית לנמען גופו, אולם אם יש לו מורשה
לקבלת כתבי בי דין לשם המצאה לפי תקנות אלה – דיה החמצאותה למורשה, ואם יש
לו עורך דין, דיה ההמצאה לעורך הדין או למתמחה שלו, או בהנחה במשרדו, וכל
אם לא חורה בית המשפט אחרת".

14. תחילכה בנוגע לסיפת תקנה 477 קובעת כי אין הכרח בקיומה של הסמכה מפורשת לעורך
דין על מנת לקבל כתבי בי דין בשם לקוחו, כל עוד ברור כי קיימים כי קיימים יחסי שליחות וכי עורך
דין הוסמך לפעול בשם לקוחו – בין בכלל ובין בעסקה נשוא התביעה (ע"א 23/83 <u>יחימם
נ. קדם</u>, פ"ד ל"ח (4), 309). כלשונו של ד"ר זוסמן :

"בעל דין שמינה עורך דין לייצגו, די במסירת המסמך לידי עורך הדין, או למתמחה
שלו, ואפילו בהתנת חשמת במשרד עורך הדין : תקנה 477. תקנה זו דנה במי שיש כן
"עורך דין", : לעניין זה אין צורך שבעל הדין יחתום על יפוי כוח פורמלי לעורך הדין
וגם אין צורך שערוך הדין יהא מוסמך לייצג את לקוחו בבית המשפט. די בכך שיהיא
רשאי לייצג את בעל הדין בנשוא העסקה המשמשת עילה לתביעה"
(ד"ר י' זוסמן, <u>סדרי הדין האזרחי</u>, מהדורה שביעית, 233).

15. עם זאת, ההלכה ממשיכה וקובעת כי כאשר קיימת הגבלה מפורשת בייפוי הכוח שניתן
לעורך הדין, לא ניתן להמציא אליו כתבי בי דין החורגים מייפוי הכוח המוגבל (בש"א
33/87 <u>אוסטפלד נ. בחירי</u>, פ"ד מ"ד (3)221).

16. בעניינו, בייפוי הכוח המוגבל נקבע :

It is hereby expressly clarified that the Attorneys neither are not ever were authorized to perform any"
other act in my name or to receive any other document in my name, in connection with any other
"complaint or cause or matter, either present or future

חיינו, ברור מחנוסח כי חנוצבע עשה ככל יכולתו על מנת להבהיר כי אינו מעוניין לקבל כתבי
בי דין דרך עורכי הדין, וכי הוא ממונה אותם לצורך טיפול בתביעה אחת ויחידה בלבד.
להכין נבחן אם די בכך, שהרי אין חולק כי שאלת רצונו של הצד חנתבע לקבל עליו את מרות
בית הדין – אינה שאלה רלוונטית.

17. אינט מקבלים את טענות התובע בנוגע לאי חוכחתו של ייפוי הכוח המוגבל באופן המאפשר
לו לחתעלם ממנו. צודקים עורכי הדין בהפנייתם לצורך כך לסעיף 32 לחוק בית הדין
לעבודה, תשכ"ט – 1969, הקובע כי בית דין זה לא יהא כפוף לדיני ראיות. כיוון שאין
ספק בלבנו כי ייפוי הכוח המוגבל הנו אותנטי ומשקף את רצונ של חנתבע – אינה מקבלים
את טענות התובע בקשר לכך, שהן פורמליסטיות בעיקרן.

18. עוד אין בפרשרותנו לקבל את טענת התובע המסתמכת על ה"מודעה" שהגישו עורכי הדין
ומעדכנת את בית חדין בכך. שאינם מוסמכים לקבל כתבי בי דין בשמו של חנתבע. אנו
סבורים כי הייתה זו חובתם של עורכי הדין לעדכן את בית חדין בכך שקיבלו לידיהם כתב
תביעה שאינם מוסמכים (לגישתם) לקבל), מבלי שניתן לראות בכך משום יצוג של חנתבע,
זאת, גם אם הדבר נעשה בתיאום עם חנתבע – דבר שסביר להניח שאכן נעשה.

19. עם זאת, אנו מחליטים לקבל את טענת התובע כי מבחינת מהותית התביעה שבפנינו
**עוסקת באותו עניינו בו עוסקת התביעה הקודמת, לגביה אין חולק כי עורכי הדין מייצגים**
**את חנתבע ומורשים לקבל מטעמו כתבי בי דין.** זאת, שכן שתי התביעות עוסקות במערכת
יחסי העבודה שבין התובע לנתבעים, שתיהן מחייבתם הכרעה בשאלת קיומם של יחסי עובד
ומעביד בין התובע לבין חנתבע (כאשר אין מחלוקת בדבר יחסי העבודה בין התובע לבין
חנתבעת), ושתיתן מחייבות הכרעה בדבר תנאי עבודתו של התובע כפי שסוכמו בעל פה בינו
לבין חנתבע – בכלל ובהתייחס למזומנים בחם היה מעורב בפרט. בהתחשב בכך, אנו
סבורים כי ניתן לקבוע כי יצוגנו של חנתבע בנוגע למערכת יחסי העבודה בינו לבין התובע
מצוי בטיפולם של עורכי הדין, באופן המאפשר לבצע למשרדם המצאה כדין של כתב

תביעה חדש המהווה למעשה מדבך נוסף של כתב התביעה המצוי בטיפולם.

20. קבלת טענת התובע בהקשר זה מושפעת גם מגישתנו לפיה המבחן בנושא ההמצאה אינו
יכול להיות טכני, אלא אמור להיבחן באופן מהותי ובהתאם לתכלית התקנה. כבר נקבע
כי:

"תכליתה העיקרית של ההמצאה היא להביא לידיעתו של הנתבע כתבי בי
דין שהוגשו נגדו. תכלית נוספת היא להחיל על הנתבע, באמצעות האקט
הפורמלי של ההמצאה, את שיפוטו הפרסונאלי של בית המשפט" (ע"א
1004/97

SAMSOUNIMAILLE   FOUNDATION ג. פרי ואח', תק-מח 98 (1) 16010
( להלן – "עניין פרי").

משאין מחלוקת אמיתית כי הנתבע מודע (או לפחות אמור להיות מודע) להגשת התביעה
נגדו, ומצוי בקשר הדוק עם עורכי דינו הן לצורך ניהול הגנתו בתביעה הנפרדת (בה נתן
תצהיר מטעמו ומטעם הנתבעת) והן לצורך ניהול הגנתה של התביעה בתיק זה – אנו
סבורים כי תכלית התקנה מתקיימים, וכי אין לאפשר לנתבע לנצל טענות פרוצדורליות על
מנת להתחמק מבירורו של עניין זה לגופו (על חובת תום לב בהקשר של טענות דיוניות
ראו למשל ע"א 1206/01 ויקטוריה גליקמן – חווה שטיינפלד, עבודה ארצי כרך לג (13) 32,
וכן בר"ע 305/80 שילה ואח' נ. רצ'קובסקי ואח', פ"ד לה (3) 449).

21. במאמר מוסגר יצוין כי החלטנו לקבל טענה זו על אף שהטענה מנוגדת להצהרות התובע
בראשית כתב התביעה לפיהן מדובר בתביעה "שונה ונפרדת", ובהתחשב בין היתר בהצהרות
בא כוחו החובתי כי הנן סבור אחרת.

22. בסיכום נקודה זו – כאשר אין חולק כי עורכי דין מוסמכים לייצג את הנתבע בעניינים
הקשורים להסכם העבודה של התובע (במסגרת התביעה הנפרדת), וכאשר התביעה
הנוכחית נוגעת מאוד להסכם נטען ועוסקת באותם נושאים – אנו סבורים כי לנתבע יש
"עורך דין" בישראל בעניין נשוא התביעה, וכי הגבלת ייפוי הכוח נעשתה מטעמים מגמתיים
גרידא. לאור זאת, המצאת כתב התביעה למשרד עורכי הדין היתה היתה המצאה כדין.

**חוקיות ההמצאה לנתבעת כ"מורשית"**

**טענות הצדדים**

23. התובע טען במסגרת בקשתו כי יש לראות בעורכי הדין גם כ"מורשה בניהול עסקים" של
הנתבע במסגרת תקנה 482(א) לתקנות, באשר הקשר הסיני בינם לבין התובע הנו אינטנסיבי
הדוק ויומיומי, כפי העולה מכתבות ותכתובות רבות שכתבו לאחרונה, לרבות לאחרונה (כולל
בהתייחס לתיק עב' 6245/01 – ס.ד). עורכי הדין השיבו לכך כי ודאי שאינם עסקיים
בהנהלת עסקיו של הנתבע בישראל, וממילא תקנה 482(א) אינה רלוונטית לגביהם. אנו
מקבלים את עמדתם זו, ואין צורך להרחיב בכך.

24. במסגרת תגובתו לעמדות עורכי הדין ביקש התובע, כנטען, לראות בהמצאת כתב התביעה
**לנתבעת** כאל המצאה ל"מורשה" במסגרת תקנה 482(א) לתקנות, בהתחשב בכך שהנתבעת
מנהלת את עסקיו בישראל דרך קבע באמצעות הנתבעת, כאשר יש לו משרדים משל עצמו
בתוך משרדי הנתבעת, וכאשר הנו הבעלים הבלעדי של החברה (עובדה זו הוכחה באמצעות
התצהיר שהגיש הנתבע במסגרת תיק עב' 6245/01) ויו"ר מועצת המנהלים שלה. עוד הגיש
הנתבע מכתב שנשלח לנתבע בשנת 1998 מהבנק הבינלאומי בישראל, כאשר הכותבת

למשלוח המכתב לנתבע היתה "ע"י" הנתבעת, בכרוזבתה של הנתבעת.

25. עורכי חדין השיבו כי חשבון הבנק נסגר כבר לפני שנים. באשר לתקנה 482(א) – השיבוו כי זו רלוונטית רק במקרה בן האדם הנתבע מנהל עסק בישראל, כאשר במקרה שלפנינו הנתבע אינו מנהל עסק כי אם הנו רק בעל חמניות בחברה אמרקניגת אשר יש לה סניף ישראלי, והיא זו שממהלת את העסקים בישראל. עורכי הדין צירפו מספר רב של פסקי דין ועורסקים בתקנה זו, כאשר בכולם הממצאה חנה לחברה באמצעות מורשה מטעמה היושב בארץ, ולא להיפך. עוד ציינו כי לפי טענת התובע – ניתן לתבוע כל ז״ר דירקטוריון של חברה בינלאומית גדולה בבית משפט ישראלי, תוך המצאת כתב התביעה לסניף הישראלי של החברה. בכך ניסו להדגים את האבסודר שהנם רואים בחפעלת התקנה בעניין שלפנינו.

<u>הכרעה</u>

26. תקנה 482(א) לתקנות קובעת:

"חיותה חתובענה בעניין עסק או עבודה נגד אדם שאינו גר באזור השיפוטו של בית המשפט המוצא כתב בי דין, די בחמצאת הכתב למנהל או למורשה, וחעוסק אותה שעה בעצמו מטעם האדם בהנהלת העסק או העבודה באותו אזור שיפוטי.

27. עולה מלשון תקנה ומחפסיקה העוסקת בה כי על מנת לחכשיר המצאת כתב תביעה ל"מורשה" יש צורך בהתקיימות ארבעה תנאים:

(א)    התובענה חנה בעניין "עסק או עבודה";
(ב)    נגד אדם "שאינו גר באזור השיפוטי";
(ג)    האדם מנהל עסקים בישראל;
(ד)    התביעה הומצאה ל"ימנהל או מורשה" אשר מנהל מטעם האדם את אותם עסקים בישראל אשר הנם נשוא התובענה.

28. בעניינונו, אין מחלוקת כי שני התנאים הראשונים מתקיימים. באשר לתנאי השלישי, ראוי לצטט בקשר זה את דבריו של הנתבע במסגרת תצהירו בתיק עבי 6245/01:

"In section 6 of his affidavit Hananel claims that I manage all my businesses in Israel via the Israeli branch of Interface. This contention is incorrect. There are businesses in Israel which I manage outside of the Israeli branch of Interface; such as investments in real estate and in movie theatres in Israel."
(סעיף 41 לתצחירו – נספח ד' לתשובת המבקש).

עוד איש ר הנתבע בתצחירו (למשל בסעיף 8) כי הוא ששכר את שירותיו של התובע (גם אם חתבצה לטעונתו היתה החמסיק החפורמלי) וסיכם מולו את תנאי עבודתו, תוד מעורבות אישית ישירה בניהול החברה בישראל, המחווה למעשה את ידו הארוכה.

נראה כי ניתן לראות בתצהיר זה הודאה ברורה מצד הנתבע בדבר ניהול עסקים בישראל על ידו (ולא רק ע"י הנתבעת כגוף עצמאי), כאשר אין חולק כי אין צורך לפי הותקנה כי האדם ינהל עסקים אך ורק בישראל, אלא די בכך שחלק מעסקיו יהיו בישראל (עניין פרי). נראה כי זו גם חתמנתנה חבורנה בין עניינו של הנתבע לבין עניינו של ז"ר חברה בינלאומית אתרת, אשר אינו מנהל באופן אישי עסקים בישראל וזאת לחבדיל מהנתבע לפי הצחרתו שלו.

29. השאלה שנותרת חנה האם ניתן לראות בגתבעת, שהנה החברה דרכה מנהל הנתבע את רוב

עסקיו בישראל (כפי שלמדנו מסעיף 41 להצהיר הנתבע שצוטט לעיל), משום "מורשיתו" העומדת בתנאי חסעיף. בפסק דינו המנחה של בית המשפט העליון בהקשר זה (רע"א 39/89 <u>ג'נרל אלקטריק נ. מג'ד לחברה לבטוח בע"מ ואח'</u>, פ"ד מ"ז(4)(762), נפסקו העקרונות הבאים:

(א)  לבתי משפט בישראל סמכות בינלאומית על נתבע ח"נמצא" בישראל, בין בעצמו ובין באמצעות ידו הארוכה. לפיכך אם מוגש כתב תביעה לי"ד ארוכה" העומדת בדרישות התקנות – ההמצאה תיחשב כת פועל ללא צורך בהגשה בקשה להמצאה אל מחוץ לתחום. אין בכך כדי לשלול את זכות הנתבע, לאחר קבלת כתב התביעה, לטעון לי"פורים לא נאות" או כל טענה אחרת.

(ב)  הי"מורשה" לפי תקנה 482 אינו "שליח" במשמעותו הטכנית של מונח זה, אלא מי שדרגת האינטנסיביות של הקשר בינו לבין הנתבע הגיעה לרמה כזו, שמניח להניח שיעביר לידיעתו את הנתבע את דבר התהליכים שהוגשו נגדו. הוא אינו חייב להיות מוסמך גם ליצג את הנתבע בדין. שאלת מידת האינטנסיביות הנדרשת כדי לעשות את ההמצאה בת פועל היא שאלה שבדרגה.

(ג)  שאלת בירור תוקפה של ההמצאה אינה יכולה להיותנה על יסוד ראיות בדיעבד-על ידיעת הקונקרטית של הנתבע על התהליך, אלא יש צורך בהוכחה על קיומם של נתונים אוביקטיבים, העושים את ההמצאה בת פועל לפי התקנות.

ברע"א 2652/94 <u>טנדלר נ. לה קלוב מדיטרנאה (ישראל) בע"מ</u>, לא פורסם, שב וקבע בית המשפט העליון כי אין לפרש את תקנה 482 (א) באופן מצמצם, בפרט כאשר לוקחים בחשבון את התתשתוית המגוזרית, המאפשרת קשרים הדוקים עם חו"ל והעברת מידע מהירה וזולה. עוד הודגש באותו עניין כי:

"מטרת התקנה היא בעיקר להבטיח הבאת דבר התהליכים לידי הנתבע באמצעות מי שעומד עמו בקשרי מסחר באופן שוטף ובמהלך העסקים הרגיל" (ולפי עניין פרי שצוטט לעיל – גם לחתיל על הנתבע, באמצעות האקט הפורמלי של ההמצאה, את שיפוטו הפרסונאלי של בית המשפט).

וכפי שקבע בית המשפט המחוזי:

"<u>תכליתה של הורואת זו ליתן אפשרות המצאת כתבי בי דין נוחה</u> דהיינו, המצאה באמצעות מורשה י"מקומי" – לגוף המצוי בחו"ל המנהל עסקו או המבצע עסקים בישראל... תקנה 482(א) מבוססת על התחנת שיהודת בשכל הישר, כי אם שמעורב דין בניהול עסקי גוף פלוני או מבצע עבודה בעבור אותו גוף נמצא בקשר די הדוק עימו, כך שכתבי בי דין שומצאו למורשה, קרוב לודאי שיגיעו לגוף המצוי מחוץ לתחום השיפוט... עולה מהמקובץ כי <u>המבחן להיותו של פלוני מורשה לעניין תקנה</u> <u>482(א) הוא מבחן רחב</u>. היינו, כל מקום שפלוני הוא מנהל או מורשה, העוסק אותה שעה בעצמו מטעם האדם או הגוף או בהנהלת עסקו או העבודה באזור השיפוט – ומחית האינטנסיביות של הקשר מובילה למסקנה שבמידת מסקנה של ראיות ההמצאה למורשה תוביל לכך שכתבי בי דין יגיעו לאדם או לגוף – הרי שהדין מאפשר להמציא כתבי בי דין למורשה" (<u>עניין פרי, התדגשות אינן במקור</u>).

30.  בהתחשב בפסיקה לעיל, וכאשר אין מחולוקת אמיתית בדבר הקשר האינטנטיביי הקיים בין הנתבע לבין הנתבעת דרכה הוא מנהל את עסקיו בישראל (ועורכי הדין אף לא טענו כנגד כך), אנו סבורים כי הוכח גם תתבאי חרבועי, באופן המאפשר לראות את ההמצאה לנתבעת כאל המצאה חוקית. עצם העובדה, שהודגשה ע"י עורכי הדין, כי טרם השתמשה בתקנה

482 בדרך זו עד היום אינה רלוונטית; נהפוך הוא – אם אישרו בעזרת תקנה יו, במקרים
המתאימים, מסירות כתבי בי דין לשותפים או סוכנים, מכוח קל וחומר כי ניתן לבצע
מסירה בעניינינו ל"ידו הארוכה" של הנתבע בישראל שקרובה אליו בקרבה הדוקה, היינו
הנתבעת.

31. במאמר מוסגר יצוין כי החלטתנו לעיל ניתנה על בסיס עובדות שאינן במחלוקת ו/או עולות
מתארי הנתבע עצמו, כך שאיננו צריכים להתייחס להערתו של עו"ד קלנסבלד בסיום
דבריו לפיהם אינו מוותר בשם הנתבע על זכותו לחקור חקירה נגדית את התובע על
תצהיריו. בנוסף אנו רשאים להסתפק בטענות עורכי הדין במסגרת בקשה זו, גם אם נטיעונו
פורמלית שלא בשם הנתבע.

**סיכום**

32. <u>סוף דבר</u> – החלטנו לקבל את המצאת כתב התביעה – הן למשרד עורכי הדין והן לנתבעת –
כאל המצאה חוקית לנתבע שעומדת בדרישות התקנות. למרות החלטתנו זו, לא מצאנו
לנכון לקבל את הבקשה למתן פסק דין בהעדר הגנה, וזאת על מנת שלא למנוע מהנתבע את
יומו בבית הדין. ניתנת בזאת לפיכך ארכה בת 30 יום לנתבע, ממועד קבלת החלטה זו
במשרד עורכי הדין, לצורך חגשת כתב הגנה מטעמו.

בנוסף, ובהתחשב בכך שתביעה זו מהווה לטעמנו כאמור לעיל נדבך נוסף של התביעה
הפדרלית, הדורשת הכרעה באותם עניינים, אנו סבורים כי לבאורח יש מקום לאיחוד הדיון
בשתי התביעות, על מנת לחסוך זמן שיפוטי ולמנוע הכרעות סותרות באותם נושאים.
הצדדים מתבקשים למסור את עמדתם בקשר לכך (מעבר לעמדות הראשוניות שנמסרו
בדיון) בתוך 30 יום מהיום וההתיק יובא בפני השופטת הראשית לצורך מתן החלטה
בסוגיית האיחוד.

33. הנתבע ישלם לתובע את הוצאות בקשה זו בסך 3,500 ₪ בצירוף מע"מ.

34. לעיון ביום 1.7.04.

**ניתנה היום ד' בסיון, תשס"ד (24 במאי 2004) בהעדר הצדדים.**

<u>דיידה מוטולה סיגל, שופטת</u>

קלדנית: שירלי אימרמן.

*Docket 21 (hand) Filed Aug 2004*

*Exh. 1*

בתי המשפט

21/07/2004

ביה"ד האזורי לעבודה בת"א/יפו
עב 6245/01

תובע: משה חנגאל

ע"י ב"כ: שלו חגי

נגד

נתבע: אינטרפייס פרטנרס אינטרנשיונל לימיטד
ע"י ב"כ: דנציגר יורם

## החלטה:

‏**טענ**‏ הנתבעת לתגובת התובע בקשר לשאלת איחוד הדיון **מיום:** 18/07/2004
[טקסט מטושטש] דיון ... שולחין עדיין מבעות מאותה מערכת
יחסי עבודה, בין אותם צדדים, ובשתיהן יוצגא בי"ד להכריע בסוגיות דומות - קרן, באופן שהתמייבינת שקיבל התובע, לשעתו, מהנתבעים, בגובא לתמני העשוקם.
אמנם שני התיקים מצויים בשלבים דיונים שונים; אולם לאחר איזון של כל השיקולים; לכאן ולכאן; ותוך שאיפה להימנע ממצב בו שני שופטים יכריעו הכרעות שונות בסוגיות דומות, שוכנעתי כי מן הראוי לאחד את הדיון בתיקים.
המנ"ת יקבע את התיק המאוחד לשופט קדם, שיקים דיון ויקבע בו את המשך סדר הדיון.

פוגל עליה שופטת ראשית



נת הדין האזורי לעבודה בתל-אביב
שהעתק זה נכון ומתאים למקור

התאריך 26.7.04 (חתימה)
מזכיר ראשי

הופק ע"י רחל רוזה

**Decision: Tel Aviv District Labor Court, July 21, 2004, Honorable Judge Fogel Alia, In re: Moshe Hananel ("Plaintiff") v. Interface Partners International Ltd. ("IPI"), Case No. 6245/01**

<u>DECISION</u>

[IPI and Sheldon Adelson are referred to as "Defendants"]

In the matter of the response by IPI to the response of Plaintiff as to the question of the consolidation of the proceeding from July 18, 2004.

Even though the two claims, of which consolidation is discussed here, do not deal in completely identical facts, both arise from the same set of employment relationships, between the same parties, and in both the court will be asked to decide similar issues, namely, the type of commitments that Plaintiff received, as he alleges, from the Defendants, as to the terms of his employment.

Indeed the two cases are in different stages of proceedings, but after balancing all considerations, for each side, and with the aim of avoiding a situation in which two judges will reach different rulings on similar issues, I was convinced that it is appropriate to consolidate the proceedings of the cases.

The [court office of file assignment] will submit the consolidated case to the initial judge, who will hold a hearing and determine the continuation of the proceedings.