# BURNS & LEVINSON LLP

JAMES A.G. HAMILTON
(617) 854-4203
JHAMILTON@PSCBOSTON.COM

ONE BEACON STREET · 30th FLOOR
BOSTON, MA 02108
T 617.854.4000  F 617.854.4040
WWW.BURNSLEV.COM

February 3, 2006

**By Hand Delivery**

Maria Simeone, Clerk to
Magistrate Judge Leo J. Sorokin
United States District Court
 for the District of Massachusetts
One Courthouse Way, 5th Floor
Boston, MA 02210

Re:   Sheldon G. Adelson v. Moshe Hananel
      U.S. District Court District of Massachusetts, Docket No. 04CV10357RCL

Dear Ms. Simeone:

In response to Judge Sorokin's Electronic Order of Feb. 2, 2006, and not having heard back from my call to Mr. Zabin, I am enclosing the translation of the draft of the 2001 Complaint which Mr. Zabin supplied me on Monday, Jan. 30, and which was the basis for my two-page filing ordered by the Court.

In light of the Court's order not to file additional briefing on the Motion to Dismiss, I will not file the opposition to Adelson's motion for leave to supplement and motion to strike Hagopian Affidavit which I had been preparing.

Thank you for your attention to this matter.

Very truly yours,

James A. G. Hamilton

JAGH/gc
Enclosures

cc:   Albert P. Zabin, Esq. (by fax, w/o encl.)

31216-1-LtrUSDC

MASSACHUSETTS ::: RHODE ISLAND ::: DISTRICT OF COLUMBIA

2001 Complaint

## IN THE REGIONAL LABOUR COURT OF TEL AVIV-JAFFA

In The Matter Of: **MOSHE HANANEL, ID NO. 52750726**

of 21 Ha'ela Street, Mevasseret Zion
acting by his attorneys, Haim Zadok & Co., Advocates whose address for the service of process is 20 Lincoln Street, Tel Aviv 67134, Tel: 03-6254000; Fax: 03-6254040

the Plaintiff

- AGAINST -

1. **INTERFACE PARTNERS INTERNATIONAL LTD**

   foreign company no. 56-001401-1, of 3A Jabotinsky Street, Ramat Gan

2. **SHELDON G. EDELSON**

   bearer of American passport no. 101668547, of 10 Paamoni Street, Tel Aviv

the Defendants

**Nature Of The Claim:** Pecuniary, declaratory
**Amount Of The Claim:** NIS 1,502,858

## STATEMENT OF CLAIM

1. **The Subject Matter Of The Claim**

   This claim concerns delayed wage, breaches of contract, breaches of obligation and damages that the Defendants have caused the Plaintiff, who served as the First Defendant's general manager for about four and a half years and was dismissed on 10th May 2000. There is another relationship between the parties that does not derive from an employer-employee relationship, in respect of which a separate claim will be brought in the competent court.

2. **The Parties To The Claim**

2.1 The Plaintiff is a private businessman who served as the First Defendant's general manager as aforesaid.

2.2     The First Defendant is a private American company that is registered in Israel and maintains a branch in Israel. The First Defendant is under the control of the Second Defendant.

2.3     The Second Defendant is the American businessman, Sheldon Edelson (hereinafter referred to as "Edelson"), who controls 100% of the First Defendant's shares. The First Defendant's Israeli branch serves as Edelson's Israeli arm in Israel and Edelson manages all his extensive business in Israel through it.

3.      **The Background To The Claim**

3.1     In November 1995 the Plaintiff started working as Edelson's senior representative in Israel, his right-hand man and confidant. In the scope of this position, the Plaintiff was also employed by the First Defendant as general manager and that entity paid his wages.

3.2     It should be noted that the Plaintiff and Edelson had been maintaining close connections even before the Plaintiff started working for the First Defendant. In the scope of those connections Edelson undertook to grant the Plaintiff shares in a venture of a unique type in Israel that was to be set up (hereinafter referred to as "the venture"). The Plaintiff's rights in relation to the venture do not derive from the employer-employee relationship and they will be referred for the decision of the competent court.

3.3     In the first months of working for the First Defendant the Plaintiff did not receive wage slips but was assured that the consideration for his work would be paid to him in due course by cheque and this was indeed partially done. The Plaintiff in due course began to receive his wages in wage slips.

3.4     An employer-employee relationship existed between the Plaintiff and the Defendants from November 1995. As detailed below, although the Plaintiff received his wages from the First Defendant, he was Edelson's senior representative in Israel and his right-hand man both personally and in business affairs. His work also included the provision of services to Edelson. The Plaintiff therefore served both as an employee of Edelson and as an employee of the company.

3.5     In addition to a monthly wage and expenses, the Defendants undertook to grant the Plaintiff options for shares in two companies ("the options").

3.6  On 10th May 2000 the Plaintiff was dismissed from the First Defendant.

3.7  After his dismissal the Plaintiff approached the First Defendant and asked to be paid the sums of money due to him in the scope of the employer-employee relationship as detailed in this claim. Edelson admitted to the Plaintiff that his claims for those amounts were justified and he even reaffirmed the Plaintiff's right to the options (a party's admission being involved) but he made the payment conditional upon the Plaintiff's relinquishing the shares that Edelson had undertaken to grant him in the venture mentioned in paragraph 3.1 above. Edelson raised that demand despite the fact that his undertaking to grant shares in the venture to the Plaintiff had been given independently of the Plaintiff's working for the First Defendant. In fact, the undertaking for shares in the venture was given to the Plaintiff even before he started working for the First Defendant and independently of the employee-employer relationship between them.

3.8  There were protracted contacts between the parties, as the Plaintiff was seeking to obtain what was due to him, whilst the First Defendant and Edelson bound it up with the Plaintiff's relinquishing his rights in the venture. Amongst other things, an offer was made to the Plaintiff, whereby he would receive cash in the USA, as his replacement, Mr Raviv, did and as his predecessor, Mr Farbstein, had. This offer found expression in a draft agreement that was produced to the Plaintiff by the First Defendant, a copy of which is annexed hereto as appendix "A".

3.9  In the scope of the contacts, the Plaintiff had talks with Edelson, Edelson's wife and with his attorney in Israel. In the scope of the last offer that was transmitted to the Plaintiff by Edelson's attorney, Adv. Neeman, a proposal was made to the Plaintiff that he content himself with compensation for his pecuniary claims (as viewed by the Defendants), subject to his foregoing not only his rights in the venture but also to the options.

3.10  At this stage the First Defendant and its representatives even threatened the Plaintiff, in a conversation that they had with him, that if he did not agree to surrender the options and the rights in the venture, not only would they not pay him what was due to him as part of his wages but they would also blacken his reputation and initiate various legal proceedings against him with the object of tarnishing his name under the pretext of a legal claim.

4.  **The Terms Of The Plaintiff's Employment**

4.1 The Plaintiff's last wage with the First Defendant was NIS 34,500. The Plaintiff's last wage slip with the First Defendant is annexed hereto as appendix "B".

4.2 In addition to the wage, the First Defendant paid the Plaintiff's expenses. Those expenses were fully grossed up by the First Defendant and did not appear in the Plaintiff's wage slips. The expenses were as follows -

4.2.1 Vehicle expenses (fuel, licensing, insurance, parking and servicing) - approx. NIS 3,000 per month.

4.2.2 Subscriptions to the Ha'aretz and Globes newspapers - approx. NIS 600 per month.

4.2.3 Two telephone lines (for telephone, fax and Internet) - approx. NIS 2,000 per month.

4.2.4 A cellular phone - approx. NIS 1,000 per month.

4.2.5 A chauffeur - approx. NIS 6,500.

The Plaintiff's total expenses that were borne by the First Defendant during the period of his employment were NIS 13,100 per month.

4.3 The First Defendant's bearing the Plaintiff's expenses was part of his terms of employment.

4.4 By combining the basic wage and the expenses, the Plaintiff received a monthly wage of approx. NIS 47,600.

4.5 In view of the unreserved trust that existed between the Plaintiff and Edelson, the Plaintiff's terms of employment were never put in writing and the contract of employment between him and the Defendants was based on oral understandings and accepted practice.

4.6 The trust between the Plaintiff and Edelson was so great that Edelson appointed the Plaintiff as his attorney with rights of signature in respect of about 10 personal bank accounts, from which monies were transferred to members of Edelson's family and in respect of a special bank account (together with Adv. Yaakov Neeman), from which donations were transferred to various *amutot* in Israel. In that context, the Plaintiff was responsible for millions of dollars of Edelson's money and was involved in his most private affairs. It goes without saying that, against the background of this close relationship of trust, neither the Plaintiff nor Edelson thought it necessary to have the other

put his signature to an official contract of employment. In the minds of the parties, the oral understandings that were made between them had the force of a contract engraved in stone.

4.7 One of those understandings was the Defendants' undertaking to give the Plaintiff six months' notice in the event of his dismissal. Such notice meant that the First Defendant would continue paying the Plaintiff his salary (basic wage, plus expenses) for the six months after the notice of dismissal, whether or not he continued working for the First Defendant or Edelson.

4.8 This understanding was also expressed in paragraph 1 of a letter that Edelson sent the Plaintiff on 1st May 2000, a copy of which is annexed hereto as appendix "C".

4.9 This understanding was also based on a custom that the First Defendant had during the period when the Plaintiff was employed by it. All the First Defendant's senior employees received several months' notice of dismissal, each in accordance with his seniority with the Defendant. Thus, for example, when the Plaintiff was dismissed from the First Defendant, another more junior employee was dismissed and he actually received payment for three months' notice.

5. **The First Defendant's Debt To The Plaintiff In Respect Of Wages During The Notice Period**

5.1 As aforesaid, on 10th May 2000 the Plaintiff was informed that he was dismissed from the First Defendant.

5.2 In contravention of the Defendants' obligation, the Plaintiff was only paid wages for one month of the notice period.

5.3 The Plaintiff approached the Defendants and asked that he be paid wages for the other five months. However, as set out above, the First Defendant and Edelson - despite not disputing the Plaintiff's rights - sought to bind up the Plaintiff's demands with his waiving his other rights.

5.4 The First Defendant and Edelson therefore remain indebted to the Plaintiff for wages in respect of five months of the prior notice.

5.5 The Defendants' debt to the Plaintiff in respect of the five months is as follows -

5.5.1  The June 2000 salary (which should have been paid on 1st July 2000): NIS 47,600, plus interest and linkage to the date of bringing the claim - NIS 50,743.

5.5.2  The July 2000 salary (which should have been paid on 1st August 2000): NIS 47,600, plus interest and linkage to the date of bringing the claim - NIS 50,387.

5.5.3  The August 2000 salary (which should have been paid on 1st September 2000): NIS 47,600, plus wage delay compensation at one twentieth of the wage (NIS 2,380) for the first week after the date due and one tenth of the wage (NIS 4,760) for 48 weeks from the second week until the date of bringing the claim, being NIS 228,480 - a total of NIS 278,460.

5.5.4  The September 2000 salary (which should have been paid on 1st October 2000): NIS 47,600, plus wage delay compensation at one twentieth of the wage (NIS 2,380) for the first week after the date due and one tenth of the wage (NIS 4,760) for 44 weeks from the second week until the date of bringing the claim, being NIS 209,440 - a total of NIS 259,420.

5.5.5  The October 2000 salary (which should have been paid on 1st November 2000): NIS 47,600, plus wage delay compensation at one twentieth of the wage (NIS 2,380) for the first week after the date due and one tenth of the wage (NIS 4,760) for 40 weeks from the second week until the date of bringing the claim, being NIS 190,400 - a total of NIS 240,380.

5.5.6  The Defendants' total debt to the Plaintiff for wages and wage delay compensation as at the date of bringing the claim is NIS 879,387.

6.  **The Defendants' Debt To The Plaintiff For Unjustified Set-Offs**

6.1  Immediately before the Plaintiff left the First Defendant and a "final account" was prepared, the First Defendant set off two cheques from his wages, it being understood that the matter would be examined afterwards and that if it were found that the set-off was unjustified, the money would be refunded to him. Only after the Plaintiff had checked the nature of the set-offs did he realise that there was no foundation to them.

6.2 Thus, a cheque that had been given to a clerk of the First Defendant, Miri Shachori, was set off from the Plaintiff's wage. The set-off was made on the mistaken assumption that the cheque had been given to the Plaintiff. It was cheque no. 905 dated 30th August 1998 (a copy of which is annexed hereto as appendix "D") for NIS 10,000. The cheque was given to Ms Shachori and redeemed by her.

6.3 After the Plaintiff realised that the amount had been set off without any justification, he asked the First Defendant to pay him the amount. The First Defendant refused and, as aforesaid, made any payment to the Plaintiff conditional upon his surrendering the options. The First Defendant therefore owes the Plaintiff the amount denominated in the cheque, appendix "C", which on being grossed up into his gross wage totals approx. NIS 20,000 (in its value at the date of the set-off - 10th May 2000). With the addition of interest and linkage to the date of bringing the claim, the amount comes to NIS 21,757.

6.4 In addition, the amount denominated in cheque no. 844 (a copy of which is annexed hereto as appendix "E") in the sum of NIS 20,000, that was given to the Plaintiff on 5th July 1998, was set off from the Plaintiff's wage.

6.5 That set-off was made on the assumption that the cheque had been given to the Plaintiff as a loan "on account". However, the cheque was given to the Plaintiff as wages for his work in the months when he worked without wage slips.

6.6 After the Plaintiff realised that the set-off had been made without justification, he asked the First Defendant to refund the amount to him. The First Defendant refused and, as aforesaid, made any payment to the Plaintiff conditional upon his surrendering the options. The First Defendant therefore owes the Plaintiff the amount denominated in the cheque, appendix "C", which on being grossed up into his gross wage totals approx. NIS 40,000 (in its value at the date of the set-off - 10th May 2000). With the addition of interest and linkage to the date of bringing the claim, the amount comes to NIS 43,514.

6.7 As at the date of bringing the claim, the Defendants' debts in respect of unjustified set-offs total NIS 65,271.

7. **Damages For Harm To The Plaintiff's Business And Goodwill**

7.1 In the period after the Plaintiff left the First Defendant, the First Defendant refused to forward to the Plaintiff mail and personal faxes that were sent to his address at the First Defendant's offices.

7.2 In a conversation that the Plaintiff had with the First Defendant's attorney, Adv. Chinn, the latter said that the mail arriving for the Plaintiff at the company's address was being opened by his replacement, Mr Raviv. According to Adv. Chinn, there were about three boxes full of letters and faxes.

7.3 Only about half a year later was the Plaintiff given a minor portion of the letters and faxes that had been addressed to him personally. The majority of the material remains in the First Defendant's possession.

7.4 Due to the First Defendant's refusal to forward the letters and faxes to the Plaintiff, the Plaintiff has not received communications that are very important in respect of his private affairs. Thus, amongst other things, the Plaintiff lost the opportunity to participate in an important international conference, to which he had been personally invited, because of the fact that the invitation was sent to the offices of the First Defendant and because Mr Raviv failed to forward it to him. As a result, the Plaintiff lost business opportunities.

7.5 Moreover, the Plaintiff has received communications from acquaintances and persons with whom he had business connections complaining that he was not replying to faxes and mail sent to him.

7.6 The Plaintiff quantifies his damages under this head at NIS 50,000.

8. **The Options**

8.1 In the scope of the employer-employee relationship between the Plaintiff and the Defendants, the First Defendant granted the Plaintiff, through Edelson, options of unlimited duration for shares in two companies - Dankes Medical Software Systems Ltd ("Dankes") and IMD Soft Ltd ("IMD").

8.2 The undertaking for the options was given orally, in the scope of the close relationship of trust detailed above.

8.3 The undertaking for the options was also given to the Plaintiff's predecessor in the First Defendant, Mr Farbstein. This indicates the existence of a practice to give options to the First Defendant's general manager.

8.4 In accordance with the First Defendant's undertaking, the Plaintiff is entitled to 12% of the shares of Dankes and IMD, which are held by the First Defendant or by Edelson or by another company under the control of Edelson, less 12% of the amount invested in Dankes and IMD by the First Defendant or by Edelson.

8.5   These conditions were expressed in Edelson's letter to the Plaintiff, appendix "B" above.

8.6   The Honourable Court is moved to award a declaratory order that the Plaintiff is entitled to exercise the options according to the aforegoing conditions.

9.   **Debt In Respect Of A Bonus That The Plaintiff Was Promised**

9.1   At the beginning of his period of employment with the First Defendant the Plaintiff served, on its behalf, as chairman of Auto Depot Ltd (hereinafter referred to as "Auto Depot"), in which the First Defendant held approximately half the share capital and controlling interest. At that time Auto Depot was on the verge of insolvency and the First Defendant estimated that its whole investment in it would go to waste.

9.2   The way in which the Plaintiff conducted the contacts with the First Defendant's partner in Auto Depot led to the First Defendant's receiving $ 2 million.

9.3   In consideration for the way in which the Plaintiff conducted and steered the affair, Edelson and the First Defendant promised him a bonus of 6% of the amount that he had "salvaged" for them, namely $ 120,000. The bonus should have been paid to the Plaintiff when the First Defendant received the payment. The First Defendant therefore owes the Plaintiff the sum of $ 120,000, which is the equivalent of NIS 508,200 as at the date of bringing the claim.

10.   **Conclusion**

10.1   The Defendants' total debts to the Plaintiff, as set out above, are NIS 1,502,858 as at the date of bringing the claim.

10.2   The Honourable Court has local and subject matter jurisdiction to try the claim.

10.3   The Honourable Court is therefore moved to summon the Defendants to trial and condemn them in payment to the Plaintiff of the amount of the claim, jointly and severally, plus wage delay compensation until the time of actual payment.

10.4   The Honourable Court is further moved to award an order declaring that the Plaintiff is entitled to receive 12% of the shares of Dankes and IMD, that are held by the First Defendant or Edelson or a company

under the control of Edelson, against 12% of the initial investment of the First Defendant or Edelson.

10.5 The Honourable Court is further moved to condemn the Defendants in the Plaintiff's costs, including advocates' professional fees and VAT.

_____    _____
Eyal Rosovsky, Adv.          Dan Sella, Adv.
The Plaintiff's Attorney     The Plaintiff's Attorney

Tel Aviv, this ____ day of August 2001