# Exhibit 2
## to

# 13th Hananel Affidavit

**Page 143**
**The Labor Courts**

The District Labor court of Tel Aviv-Jaffa           LB 006245/01
In front of: Hon. The Judge Ilan Itach              Jan 17, 2008
      P.R. (A) Mr. Maoz Halevi
      P.R.(M) Mr. Miler Amiram

**Advocate Paul Roberts is warned according to law and testifies in the main interrogation**
I submit two affidavits and everything I said in them is true.

**Page 144**

**Cross examination:**

Q. Can you tell me what your profession is?
A. I am a lawyer. I am employed in Massachusetts. My employer is Interface Group Massachusetts.
Q. Interface Group pays your salary?
A. Yes.
Q. What is your position in Interface Group?
A. Vice president and legal counsel.
Q. I refer you to an affidavit that you gave on the 14th of July 2004 (Marked T/35).
I refer you to paragraph 1. Can you say what is the difference between Interface Group and here where you added the name Massachusetts LLC?
A. Interface Group is the name the company is known by, it is like a brand name. If I say that I am working for General Motors, it is for every one of their departments, so there are a lot of companies and corporations that are a part of what is called Interface Group.
Q. Will it be accurate to say that you, according to your opinion, are the Vice president and legal counsel of all the group?
A. Yes.
Q. Your salary is still paid by Interface Group Massachusetts (hereafter – AG"S)?
A. Yes.
Q. You also said that you are providing legal services to Adelson, I am reading your #3 to T/35. Is it accurate?
A. Yes.
Q. How do you get the salary for these services?
A. I said before that I receive all of my salary from Interface Group Mass' LLC. Before this it was Inc.
Q. You provided services to other companies and your salary was still paid by AG"S?
A. Yes.
Q. You give personal legal services to Mr. Adelson?
A. Yes.
Q. Are you paid for these services?
A. All my salary comes from AG"S.
Q. Is it true to say that you are employed by Adelson and all his other companies?
A. Legally I am employed by Interface Group Massachusetts.
I see myself as employed by Adelson and his partners and all the related companies.

1

145
## The Labor Courts

| | |
|---|---|
| The District Labor court of Tel Aviv-Jaffa | LB 006245/01 |
| In front of: Hon. The Judge Ilan Itach | Jan 17, 2008 |
| P.R. (A) Mr. Maoz Halevi | |
| P.R.(M) Mr. Miler Amiram | |

Q. You said that you are Vice President [.] I refer you to the early testimony of Mr. Adelson in the USA. (Attachment 5A to the supplementary affidavit of Mr. Hananel) I refer you to page 131 line 2. There Adelson is asked if you are a Vice President and he answered that according to his knowledge you are not in this position.
A. I have been a Vice President since 1993 and Adelson is wrong.
Q. What is your involvement in the businesses of Interface Group?
A. Giving [or supplying] legal counsel. Besides that, I don't take business decisions[,] I know the businesses of the companies.
Q. Your job is limited to legal counseling?
A. Most of my job is like this. Sometimes I'm involved in business discussions and in giving advice.
Q. Without offending, Vice President is only a title.
A. In the United States it is very common that the senior legal advisor holds the title of Vice President.
Q. Does Mr. Adelson consult with you before taking business decisions?
A. Only when they have legal implications.
Q. Are you his personal friend?
A. I see myself like that.
Q. Does he share with you personal matters?
A. I was a guest in his house for personal events[;] I participate in birthdays and events during his life cycle with his family.
Q. Have you given him legal advice in a personal matter and not in a business one?
A. Yes.
Q. In what capacity?
A. As his lawyer.
Q. Do you see yourself as the personal lawyer of Adelson?
A. I regard him and his partners and his family members as customers that I give legal services to in all matters.
Q. Do you give these services with or without compensation?
A. I am not getting extra compensation beyond what I already get from AG"S.
Q. Do you hold shares in any one of the company groups?
A. Yes. Las Vegas Sands. I bought the stocks in the free market.
Q. Did you receive options or stocks within your employment conditions?
A. No.
Q. Why?

2

146
The Labor Courts
The District Labor court of Tel Aviv-Jaffa        LB 006245/01
In front of: Hon. The Judge Ilan Itach        Jan 17, 2008
   P.R. (A) Mr. Maoz Halevi
   P.R.(M) Mr. Miler Amiram

A. You should ask Mr. Adelson. Once he offered me and I refused. This was before the I.P.O. There were deals with Mr. Adelson and Las Vegas Sands. And I represented Mr. Adelson in this deal and I thought that it would be a conflict of interests if I get stocks or options.
Q. According to that principle you would never get any?
A. You are right.
Q. You said that you met the plaintiff on the 5th of December 1995?
A. Indeed I met with him.
Q. Did you meet the plaintiff besides in that meeting?
A. Yes.
Q. Describe in what circumstances?
A. I think that I met him the first time when I was in Israel in a discussion with Mr. Adelson with a congressional delegation and the plaintiff made the arrangement for the transportation of the members and that is how we met. We met again when he arrived in Boston in Mr. Adelson's office. That was years before 95.
Q. Describe the nature of your relation between you and the plaintiff before the 5th of December 95.
A. The plaintiff was a manager of Galilee Tours Limited and one of the companies of the group GWV had an arrangement with Galilee Tours. GWV had a network…
Q. I am asking about the nature of the relationship.
A. I didn't have a personal relationship, regarding the nature of the business relations I can say that they were good and limited.
Q. Before the meeting you were aware of the relationship between the plaintiff and Adelson?
A. Yes. They were close friends and decided to move to business relations.
Q. You meant employment?
A. Yes. Previously there were relations between Galilee Tours and GWV Galilee Tours in the USA.
Q. But they didn't have personal businesses relations?
A. They had a personal relationship and business relations within these companies.
Q. When you say business relations you mean relations between companies.
A. One of the companies that the plaintiff had an interest in had relations with a company that Sheldon had an interest in.
Q. How and when did you learn that Adelson and the plaintiff were moving on to employment relations?
A. Mr. Adelson told me that. He told me several weeks before the meeting, in November.
Q. What did he tell you?
**The defendants attorney:** the fact that I am not objecting to a privileged client attorney conversation shouldn't be seen as waiving this privilege.

3

147
## The Labor Courts

| | |
|---|---|
| The District Labor court of Tel Aviv-Jaffa | LB 006245/01 |
| In front of: Hon. The Judge Ilan Itach | Jan 17, 2008 |
| P.R. (A) Mr. Maoz Halevi | |
| P.R.(M) Mr. Miler Amiram | |

A. He said that he meant that Interface LTD in Israel will hire the plaintiff and that he talked with the plaintiff about the employment conditions. But he asked me to finally conclude the details. He said that because they were good friends he didn't feel comfortable handling negotiations on the details.
Q. That was in November?
A. Yes. In the year 95.
Q. I refer you to attachment 5A herein to page 352 line 21. When was it? On November 4th or 5th of December?
A. It was on both occasions.
Q. Why did Adelson, who was confident that you understood the first time, have to say it two times?
A. A few weeks passed since we talked for the first time, I was in Mr. Adelson's house on the evening before the meeting with the plaintiff and he mentioned it again.
Q. Did you know in Nov' 95 what the circumstances were under which the plaintiff was going to be employed?
A. I am not certain that you mean, I knew that the role of the Israeli branch manager was vacant and I was not surprised when Mr. Adelson told me. I was not surprised that he chose the plaintiff.
Q. Why was the position in Israel vacant?
A. Because the previous manager Mr. Farbstein, who is his brother in law, resigned.
Q. Why did he resign?
A. To the best of my recollection, he had disagreements with Mr. Adelson regarding the way that the Israeli branch should be managed.
Q. Is it true that at the end of 1995, from October onwards, the only investment of IPI was on a company by the name of Auto Depot?
A. No.
Q. Where else?
A. There was a company by the name of Pegasus medical system [,] this investment was sold to an American company by the name of HBO and the sale was in 1995, but it was still considered in the group because the payments had not been completed.
Q. There was no other activity beyond collecting the money for Pegasus?
A. Indeed.
Q. The only company that was being dealt with at that time was Auto Depot?
A. In fact the money collection for Pegasus required my involvement and Adelson's in the negotiation. I don't remember if Farbstein was involved, maybe yes but I don't remember.

4

148
**The Labor Courts**
The District Labor court of Tel Aviv-Jaffa        LB 006245/01
In front of: Hon. The Judge Ilan Itach        Jan 17, 2008
P.R. (A) Mr. Maoz Halevi
P.R.(M) Mr. Miler Amiram

Q. I refer you to T/35 – Paragraph 7 line 3 from above. What were according to your memory the limited services?
A. To the best of my memory they were in Israel in taking care of bank accounts, money transfers between accounts and I believe that something that is connected to vehicles in Israel. This is what I remember.

**Time is 16:00**

**Break of 20 minutes**

Q. Were you aware that the plaintiff was appointed as a director of Auto Depot as early as November 1995?
A. Yes. When I am looking at the protocol that you presented me (protocol from 14th of November 1995 that was attached within attachment I' to the plaintiff's affidavit and was marked exhibit A12) I remember.
Q. After remembering, do you think that director appointment is included within limited services that the plaintiff supplied as you described in you affidavit article 7?
A. Yes. The Plaintiff didn't have general active authority but very specific, that he was requested by Mr. Adelson to do.
Q. Do you remember that Mr. Hananel got signature rights in Auto Depot?
A. I do not remember such a thing. But this agrees with the fact of being chairman of the board in the protocol you showed me (remark: the protocol was not submitted).
Q. I show you the document (from Attachment I to the plaintiff's affidavit – Protocol dated 7th of November 1995 marked B) do you remember in light of this document that the plaintiff had signature rights within Auto Depot?
A. I don't remember but it is written in the protocol. I remember that he was a Director Chairman but not the recipient of signature rights.
Q. Do you still stand on you opinion that we are talking about limited services of the plaintiff before the meeting in December 5th?
A. After I learned that he had signature rights it does not change my opinion that while waiting for his full employment for IPI he was doing limited services at the request of his best and loyal friend Sheldon Adelson.
Q. I present to you an approval of opening an IPI account and this is before the 1st of January 1996 when you said that the plaintiff started working. And in article 3, it is mentioned that the plaintiff has signature rights together with Mr. Adelson and his daughter Yasmin. Do you remember that the plaintiff had such signature rights?
A. Yes. I mentioned bank accounts previously. (**Remark: The document is signed as T/36 and is accepted on condition that it is included within attachment I. Separate notice by the parties will be submitted on the subject matter).**

149

5

**The Labor Courts**

**The District Labor court of Tel Aviv-Jaffa**         LB 006245/01
**In front of: Hon. The Judge Ilan Itach**         Jan 17, 2008
      **P.R. (A) Mr. Maoz Halevi**
      **P.R.(M) Mr. Miler Amiram**

Q. I'm showing you a fax from Mr. Farbstein to the plaintiff that says that he is asking for orders on how to transfer loans to Auto Depot ( **Remark: signed T/37 on condition like T/36).** In light of this document, it seems that Mr. Farbstein stopped working for IPI and the authority moved to Hananel?
A. I don't have a specific recollection in this matter. You can show me many documents and it will not change the truth that I wrote in my affidavit.
His employment in IPI started on the 1st of January 1996. Before this date it was without a manager and the plaintiff did certain things and preparations to become a manager.
Q. In the assumption that what Mr. Farbstein writes is true, is it not enough that the plaintiff will be considered as an employee of Mr. Adelson and/ or IPI before 1st of January 1996?
A. It does not establish working agreement because there was an agreement and an understanding that this is not an established working relation before the 1st of January. This agreement and this understanding was approved by the plaintiff in front of me in the meeting of Dec 5th 1995.
Q. You said that he did not receive salary before the 1st of January 1996?
A. Right.
Q. Were all the activities of the plaintiff before the 1st of January 1996 which included being director, signature rights, and what is written in Mr. Farbstein's letter T/37, -- all this and maybe more were supposed to be done without compensation?
A. All the services that you describe did not take more then a few hours for all of the period until the end of December 1995 and he was not supposed to be paid for it.
Q. All of the hours that the plaintiff did, that according to your opinion were few, these hours were expensive because they were done by a senior person[.] If you had to purchase these services from another person, how much do you think it could cost?
A. I don't know. I don't know how much they were paid outside.
Q. Does it look to you reasonable that a man would accept such responsibility as described previously without compensation?
A. In the circumstances that we had here and the understanding between the plaintiff and the defendant my answer is yes.
Q. Do you say that the plaintiff and Adelson agreed that the plaintiff will not get compensation for these services?
A. Yes. The plaintiff told me so in a meeting in the 5th of December.
Q. I refer you to your affidavit from April 5th, marked T/38 Paragraph 8. Was the meeting on the 5th of December scheduled on the 4th of December? One day before?
A. No. When Mr. Adelson asked me to do the final closure with the plaintiff he asked me to call the plaintiff. I called the plaintiff in Israel and he told me that he would be in the United States soon and we would be able to meet then. I asked him to inform me when he would arrive. I did not talk to him after that. But I learned from the secretary of Mr. Adelson, Betty, regarding the date the plaintiff would be in Boston regarding

6

Page 150
The Labor Courts
The District Labor court of Tel Aviv-Jaffa        LB 006245/01
In front of: Hon. The Judge Ilan Itach        Jan 17, 2008
     P.R. (A) Mr. Maoz Halevi
     P.R.(M) Mr. Miler Amiram

a medical matter and that he would come later to our offices. After the telephone call to Israel [and] I met him on the 4th. And I wanted to confirm that he would indeed come on the 5th of December.
Q. Mr. Adelson told you that the plaintiff would arrive in Boston?
A. Mr. Adelson didn't tell me but the plaintiff is the one who told me in my telephone conversation to him to Israel.
Q. Why didn't you write in the affidavit of April 5th the entire story that you just described?
A. The important thing in the story was the agreement that we made in the meeting, how the meeting was scheduled is not important.
Q. I refer you to T/38 from April 5th paragraph 3, it is a supplementary affidavit to T/35 and in paragraph 3 you said that the plaintiff remembered that he was present but does not remember what was discussed and in paragraph 4 you say you do remember the meeting?
A. The connection of affidavit T/38 and the previous affidavit T/35, is a law suit in Boston where the issue is jurisdiction. And the lawyers of the plaintiff denied that there was enough connection to the state of Mass'[Massachussets] and we needed to prove that he came to this state for a meeting and he claimed that is was a social meeting and not business. The only relevancy of these affidavits is what our lawyer in our claim thought was relevant to jurisdiction. It was not my intent to tell the whole story but the important facts to establish jurisdiction.
Q. You said that you phoned the plaintiff and he updated you that he is coming to Boston, in T/38 paragraph 5 you said…I am still asking why you didn't write here that you talked to the plaintiff and that he updated you and in order to show you that it is relevant I show you another affidavit that you gave in August 2005 **T/39** and in this affidavit, the 3rd one at the end, you tell the entire story that you said in paragraph 6 line 5 in the middle …I am asking why you needed 3 affidavits to tell a simple story, is it because you invented such a story?
A. Everything that I said today I told to our lawyer in Boston. He chose what was needed for the affidavit and I signed that it was true. He chose what he needed for his needs.
Q. But you are not an ordinary witness, you are yourself a lawyer, wasn't it necessary to tell the entire story in full in the first affidavit?
A. I'm not the representing counsel. I am a business lawyer, commercial. I do not represent in courts, I do not write [Courts] arguments. I rely on specialized lawyers for this.
Q. You said that you learned about the plaintiff's visit also from Betty the secretary?
A. Betty Yurcich.
Q. In T/39 Paragraph 7 you are talking about a letter that the plaintiff says that he will try to be in the 1st week of December in Boston, How do you conclude from this that he will really be there on the 5th of December?

7

151

**The Labor Courts**
**The District Labor court of Tel Aviv-Jaffa**      LB 006245/01
**In front of: Hon. The Judge Ilan Itach**      Jan 17, 2008
**P.R. (A) Mr. Maoz Halevi**
**P.R.(M) Mr. Miler Amiram**

A. As I testified previously. I learned from the plaintiff on the telephone that he plans to come to Boston soon. All of this I learned from the telephone. I learned the specific date from Betty in which he is supposed to come, and that is how I knew he is coming on the 5th of December, I noted in my diary a meeting with the plaintiff on the 5th of December and I kept the time vacant for this. In the evening before the 4th of December I confirmed in a meeting his arrival at my office the next afternoon to summarize the terms of his employment.
Q. Why among everyone did Mr. Adelson ask you to conclude his employments terms?
A. I was the most logical person to choose because I was the group counsel. I had been with Mr. Adelson since 1980 and this is the kind of thing he relies on me to do.
Q. Did you see any problem as a lawyer in talking to the plaintiff who is not a professional person [lawyer] to summarize details?
A. I didn't see a problem. We spoke about terms of employment. At the time of the conversation I asked him if he wanted to receive a written document that could be examined by any lawyer that he had wanted.
Q. Didn't you fear that you might mislead the plaintiff when you were talking about legal matters like net profit?
A. Net Profit is not a legal term. I know the plaintiff, he is brilliant and sophisticated in business and I was not worried that I had an advantage on him in this subject.
Q. Did you suggest to him to obtain legal counseling?
A. I don't remember that I did such a thing. But the plaintiff had used lawyers of his own. And he knew how to find them if he needed them.
Q. Do you generally talk with persons who are not lawyers on deals?
A. In the United States it is considered unethical for a lawyer to talk to somebody represented by other lawyers. There is no problem when he is not represented.
Q. I refer you to attachment 5A page 352 – lines 13-16, Adelson says that to the best of his knowledge the plaintiff was not paid for his trip to Boston in December and I would not allow it, in your affidavit T/37 at the end of paragraph 7, you said, Hananel came to a business meeting with me and now I ask you does it look reasonable to you that the plaintiff would bear travel expenses in which he needs to meet with you on a business matters?
A. It's logical. And even if Mr. Adelson would suggest paying it would look logical. Many times we bring people from out of town for business and sometimes we pay their expenses and sometimes we don't.
Q. At the same affidavit T/39 paragraph 6 at the end of page 2, is it true what is written?
A. Yes.
Q. You handled negotiations as Adelson asked?

8

152

**The Labor Courts**
**The District Labor court of Tel Aviv-Jaffa**            LB 006245/01
**In front of: Hon. The Judge Ilan Itach**        Jan 17, 2008
        **P.R. (A) Mr. Maoz Halevi**
        **P.R.(M) Mr. Miler Amiram**

A. Yes
Q. You said in your first affidavit t/35 paragraph 8, that you handled negotiations and then you concluded is this true?
A. It's a fair description of the events.
Q. According to how I understand the term negotiations, there were disputes that were later on settled. Did this happen here?
A. I'm not describing everything we talked about as something in dispute, but things that needed to be clarified.
Q. So why did you write negotiations?
A. I think that negotiation is the right word, for a process of discussion and clarification of details.
Q. I'm referring you to t/5 page 353 line 9-11, Adelson is saying that there is no dispute. I am referring you to another affidavit of Mr. Adelson **marked as t/40,** in his answer to question 2, page 4 second paragraph, line 4 from the end Mr. Adelson said…Adelson and the plaintiff had already summarized in November and he said that there was no dispute. You yourself said that you talked about clarification. In light of this, why was the meeting with you necessery, everything was summarized, in any event it is an oral agreement, no dispute, and why was it necessary that he [Hananel] come especially from Israel?
A. I'm thinking that you are reading what is not written in the answer of Mr. Adelson. He just said that we came to an understanding and as he described it to me, it was a general understanding and he wanted me to make sure that we have enough certain details. I did not understand my job as being to create the working conditions, but to clarify, to detail and to confirm the details. For example : When we met on the 5th of December the plaintiff told me that he would move from Galilee Tours to IPI. And he told me that he wanted to clarify that he would still need to deal with Galilee Tours matters after he was employed by IPI and I told him but that your employment with us will be a full time job and he said yes this is right but I still would have to consult from time to time for Galilee Tours. He said that there are certain things that he has done for Galilee Tours, certain connections for which no one could substitute for him. He said the time he would have to devote to consulting would be very limited. So I felt that this was a very important clarification.
Q. You are a lawyer, and even this neglected example(,)then Professional consultation had to define the number of hours?
A. I was not present in the conversations between Adelson and the plaintiff that continued over time. I needed to summarize everything into one set of conditions, and I did not know until the end of my meeting with the plaintiff if he wanted them in writing or not. Mr. Adelson authorized me to do a written agreement if the plaintiff was interested
Q. Why didn't you insist on a written agreement?

9

153
## The Labor Courts

| | |
|---|---|
| The District Labor court of Tel Aviv-Jaffa | LB 006245/01 |
| In front of: Hon. The Judge Ilan Itach | Jan 17, 2008 |
| P.R. (A) Mr. Maoz Halevi | |
| P.R.(M) Mr. Miler Amiram | |

A. It's not customary in our company to make written agreements with anyone. In fact, all the time (that I had) worked in the company, I don't think anyone had a written agreement until we bought a management team for the hotel in [Las] Vegas. It concerned 3 people who had worked together in a hotel in Atlantic City and we brought them to [Las] Vegas together and they wanted a written agreement. Before this, there were no written agreements and the company had hundreds of employees in all levels and never in writing, but Mr. Adelson recognized that maybe the common practice in Israel is different and he told me that if the plaintiff will say that in Israel the practice is that there is a written agreement, do so, and even if it's not the practice and he wants this, do a contract.

Q. Why was Adelson concerned with the practice in Israel?

A. In our business, when we ran Comdex (computer show), we had people in a number of countries, France, Mexico and around the world, and we had a terrible problem from a labor [point of view] and we had difficulties in firing them. And in those states we found out that there was a difference if you have a written contract or a verbal one. And a written agreement could help us.

Q. So you thought that if there would be a written agreement in Israel it could help you?

A. In the case of the plaintiff, Adelson did not need an agreement because he was [not] worried by the plaintiff, but he raised this in order to calm the plaintiff. He wanted to suggest to the plaintiff the possibility of protecting himself in a written agreement. He was supposed to be employed in Israel according to the Israeli law. The purpose of the conversation was also if I was needed to edit an agreement.

Q. You were not authorized to change any of the terms of the plaintiff?

A. I understood that the final conclusion should be approved by Mr. Adelson. I was not authorized to change anything in the terms of his employment.

Q. Lets talk about the terms. You said in T/35 paragraph D8 that you had agreed upon 12%... as described there, and I ask you what is the meaning "as a result of the plaintiffs efforts"- how is it measured?

A. As I understood the plaintiffs job was to deal with the " deal flow " in Israel. He had to establish contacts, maybe hire consultants... If he did his job regarding a certain investment and if there was profit from the investment then it would be considered a result of his efforts. I don't think that this is unclear. I agree that it is not a mathematical term, sharp and clear, and that it can be a subject of disputes.

Q. The 12% that you described, is it common with Adelson?

A. No.

Q. Why did he propose it to the plaintiff?

A. I have no idea, he did not share his thoughts with me.

Q. The conclusion of the employment terms of the plaintiff - is it based on information given to you by Adelson?

10

154
## The Labor Courts
The District Labor court of Tel Aviv-Jaffa     LB 006245/01
In front of: Hon. The Judge Ilan Itach       Jan 17, 2008
P.R. (A) Mr. Maoz Halevi
P.R.(M) Mr. Miler Amiram

A. In principle yes, and on exchange of information between me and the plaintiff in the meeting.
Q. But earlier you agreed that you couldn't change the details in it?
A. I gave you an example. What we spoke about was beyond what the plaintiff summarized with Mr. Adelson in certain matters. I'm not authorized to change what was summarized. To talk beyond and to change conditions are different matters. In getting the agreement I knew that it should be approved by Mr. Adelson and if he had said to me no on a specific thing then he would've changed it.
Q. Is it true that the right of the plaintiff to 12% existed only when he was employed by IPI, Does it expire when he stopped being employed?
A. Yes. This is a thing that I talked to him about specifically.
Q. Is it common with Adelson that agreements of this sort end at the employment termination (q)?
A. I already testified that all of this agreement was uncommon.
Q. Does a similar structure normally end after termination of work?
A. There were no such structures. There were no such arrangements with anybody.
Q. Were there similar arrangements that you are aware of?
A. At the same time Mr. Adelson made such an arrangement with Dan Raviv.
Q. I am repeating the question. Is it common that such arrangements expire at the end of the working relationship?
A. Since the similar additional arrangement is with Dan Raviv and since the one with Dan Raviv is identical (after the witness was asked if identical or similar he corrected -identical to the best of my knowledge). I understood that this is the situation- regarding the expiration of rights- also with Dan Raviv but I never spoke to Dan Raviv about this. Mr. Adelson did not ask me in the case of Dan Raviv.
Q. Why did Mr. Adelson ask you to summarize with the plaintiff but not with Dan Raviv?
A. To the best of my knowledge he did not ask anybody else to talk with Dan Raviv. And why he didn't ask me or anyone else to talk with Dan Raviv I don't know.
Q. Did you make a transcript of that meeting?
A. I don't remember.
Q. Do you usually make transcripts of meetings?
A. Not always.
Q. I refer you to attachment D in T/39- this is a transcript of a meeting that you attached to prove its existence?
A. That's right. It's a transcript that I made. This transcript was as a preparation to a complicated deal of a merger of companies HP and IMD.

11

155
## The Labor Courts

| | |
|---|---|
| The District Labor court of Tel Aviv-Jaffa | LB 006245/01 |
| In front of: Hon. The Judge Ilan Itach | Jan 17, 2008 |
| P.R. (A) Mr. Maoz Halevi | |
| P.R.(M) Mr. Miler Amiram | |

Q. I refer to Adelson's affidavit **T/41 paragraph 8**, this is the earliest affidavit from September 2002, and in paragraph 8 said Adelson that the agreement – in light of what is written here do you want to change your testimony that you yourself summarized with Hananel?
A. I believed that I described in my affidavit that at the end of the meeting, we summarized the conditions, Adelson arrived and said that he agreed to the conditions and the plaintiff agreed and everybody shook hands. This is the summary of the agreement and I assume that this is what he meant in paragraph 8.
Q. Were you aware of this affidavit in T/41 at the time [it was written]?
A. I saw this affidavit previously and I cannot say when it happened.
Q. You said in your affidavit that you supervised the procedures in Israel so you were supposed to see the affidavit?
A. The supervision of procedures did not include reading every document.
Q. This is not every document, this is the affidavit of Mr. Adelson and this is something rare?
A. I agree that this is a substantial document. But I don't remember if I saw it or not in real time. I remembered the meeting from 5th of December to its details. I don't remember when I saw this affidavit. I wouldn't remember the date I met with the plaintiff if this was not written in my diary.
Q. Why did you not present your diary?
A. It's a small diary like I'm presenting (the witness takes out from his pocket a small diary of 2008). And it was not asked from me to attach.
Q. [I] refer you to Mr. Adelson's affidavit T/40 page 3 and question #2 that he is asking all the documents regarding the contacts, were you asked to present this document or not?
A. Nobody asked me specifically present my diary and I didn't think that my diary is a document in the spectrum that the question deals in.
Q. Showing you documents of Mr. Adelson to the plaintiff from the 1st of May 2000.
- **Receive and sign T/42**, this shows the 12% that according to Adelson (small paragraph 3) it's a document that Adelson sent to the plaintiff, and it states exactly what the plaintiff says regarding his right to percentages. What do you have to say?

**The defendant lawyer:** by accepting this document there is no acceptance of the admissibility of the document. But beyond that, also the assumption that was presented to the witness like small paragraph 3 is completely identical to the plaintiff's version in this suit, also this is not completely true.
Q. In- T/42 Adelson proposed a structure that is different from the structure that you claim was summarized with the plaintiff, do you agree that this is a different structure than what you claim that was agreed to in the meeting of the 5th of December?
A. This is really a different structure.

12

156
## The Labor Courts
**The District Labor court of Tel Aviv-Jaffa**                                      **LB**
**006245/01**
**In front of: Hon. The Judge Ilan Itach          Jan 17, 2008**
  **P.R. (A) Mr. Maoz Halevi**
  **P.R.(M) Mr. Miler Amiram**

Q. Do you have an explanation why it is different?
A. During the termination of employment of the plaintiff in 2000 there was no rivalry between them. Mr. Adelson believed that the plaintiff was not doing his job and they were still friends. Soon after the end there were several telephone conversations and the plaintiff asked Adelson certain things regarding the end of the connection. He wanted to negotiate the final terms. This letter that was shown to me reflects the conversation between the plaintiff and Mr. Adelson and has no connection to the original finalization of the employment agreement. And you can see at the end of the letter that is says without prejudice and for negotiation purposes only. I think that these lines were copied from the plaintiff's letter. It reflects what the plaintiff asked Adelson and not the employment terms.
Q. According to your version is this a proposition by Adelson?
A. Yes.
Q. This was an offer that was done after the termination of the employment of the plaintiff who has failed in his job – this is what was claimed and this offer suggests what you in your affidavit say is an unbelievable structure and you can't believe that this is something that was summarized so Adelson proposed it to a failed manager, why would he propose an unbelievable structure?
A. In light of their friendship he suggested to him something that the plaintiff was totally not entitled to. All his rights to participation in the profits expired with the termination of his employment and in spite of this he asked to get something. And Mr. Adelson was willing to give him this as a gift.
Q. Yet Mr. Adelson offered him [something] tens of times better than what he had as an employee?
A. Yes. I know that at the same time Mr. Adelson felt bad when he fired the plaintiff and they were friends and he suggested it. Before concluding that it was 10 times what he had you need to notice that the percentage was reduced regarding another investment in paragraph 4.
Q. I am presenting to you a document of which one of its titles is Agreement. Do you know this agreement?
A. I saw it before **Accepted and marked T/43**
Q. It was given to the plaintiff by the lawyer of Adelson in 2001?
A. Right.
Q. Is it an agreement that Adelson will pay a sum that is not clear in a final settlement?
A. I need to read the document.
Q. I refer you to paragraph that is saying the plaintiff …**Marked A** Do you know why at the end of this paragraph it is written "Casino… or other countries?"
A. I don't know. You need to ask the author of the document.

13

157
**The Labor Courts**
The District Labor court of Tel Aviv-Jaffa     LB 006245/01
In front of: Hon. The Judge Ilan Itach     Jan 17, 2008
P.R. (A) Mr. Maoz Halevi
P.R.(M) Mr. Miler Amiram

Q. I present to you a document that **you wrote T/44 to the plaintiff's lawyer** following a letter sent by the plaintiff's lawyers to the defendant where the plaintiff detailed his demands regarding the casino in Macau, and I refer you to the second paragraph **marked A** In light of the facts known to you today would you want to correct what is written in this paragraph?
A. No. It's right today as it was then.
Q. What you are saying is that Mr. Adelson was not given a casino franchise in Macau until the 30th of July 2002, and what is the reason?
A. Mr. Adelson did not receive a casino in Macau.
Q. Did any company controlled or owned by Adelson receive such a franchise?
A. Las Vegas Sands corporation which is controlled by Adelson (public company). I understand that it got a sub-concession.
Q. Does Las Vegas Sands operate a casino in Macau?
A. Yes.
Q. Is it controlled by Adelson?
A. It is controlled by the board of directors. Mr. Adelson from his power as a share holder has the ability to change the board of directors but he cannot control the daily activity.
Q. Why didn't you think it right to make this explanation in your letter to your colleague t/44 ?
A. I was not obliged either legally or ethically to explain to advocate Rozovsky. He raised a claim that I denied correctly and adequately.
Q. Why in paragraph B did you find it right to mention connected companies and employees, [something] that you didn't do in Paragraph A.
A. I don't have the letter of Rozovsky in front of me. But my letter T/44 is an answer to his letter. I chose to include certain statements and not other possibilities and what is written there was right then and today.
Q. I'm showing you an Affidavit of Weidner that was submitted to the court that says in its paragraph 10... In light of what is written here do you want to correct paragraph A in T/44?
A. The statement is right. It is still true. It referred to the termination of the plaintiff's employment. Today I don't have information that it is not true.
Q. Why did you choose to be meticulous regarding the situation at the termination of his employment?
A. Because it was obvious to me that this is a substantial date. Anything that's raised afterwards couldn't be something that he has rights in or a claim about it.
Q. You thought that the termination date was a substantial date because his rights were expired?
A. Yes

14

158
## The Labor Courts
The District Labor court of Tel Aviv-Jaffa        LB 006245/01
In front of: Hon. The Judge Ilan Itach        Jan 17, 2008
   P.R. (A) Mr. Maoz Halevi
   P.R.(M) Mr. Miler Amiram

Q. But the rights of the plaintiff are not even connected to Macau so the date of termination is totally irrelevant[.] On the other side the plaintiff claim to rights in Macau without any connection to the date of the termination of his employment? I'm reading to you the letter of advocate Rosovsky (attachment H to Macau claim)?
A. (The letter of attachment H is translated into English for the witness). He claims that he took some steps to develop the initiative. My letter says that there was no opportunity in Macau up until the date of his termination of employment. Anything that he developed after his termination is irrelevant.
Q. He did not refer to when he developed [something] but claimed that he initiated the project and claims percentages?
A. As I understand the claim that was translated to me [,] he claims that he made several steps in connection to the project before his termination and I said in my letter that there was no opportunity in Macau at this date and that is why the date of the end of employment is relevant.
Q. Tell me in detail all of the meetings that you know of, of Sheldon or anyone on his behalf in connection with the casino in Macau from the months of August 1999 until October 2001?
A. I was never present in any meeting regarding Macau. The information that is included in my letter T/44 was given to me by other people especially Adelson, Widener and others. I cannot testify from my personal knowledge about any meeting regarding Macau.
Q. You don't know about any meeting even if you didn't participate in it?
A. No.

**Repeated Examination: None**
**Attorneys of both sides:** Yesterday we made an operational test regarding the video conference with the Macau witnesses. And the test was successful.

## Decision
**Dated for continuation of evidentiary hearing to the 21st of January 2008 in the Regional Court of Tel Aviv for hearing the video witnesses. Limit of time of hour and a half.**
**The representative of the defendants will notify in the upcoming meeting if they have intention to request testimonies of additional witnesses.**

Given today 17th of January 2008 in the presence of the parties.

_____    _____    _____
P.R Maoz Halevi        P.R Amiram Miller     Ilan Itach-Judge
Nava Yanai + Yousef Shulamit

15