1

Affidavit

I, the undersigned, Mr. Moshe Hananel, holder of Israeli I.D.No. 52750726, after having been cautioned that I must state the truth and that I would be duly punished if not, hereby affirm as follows:

This affidavit is given by me in the framework of the case brought by me against Mr. Sheldon Adelson (hereinafter: "**Adelson**") and against Interface Partners International Ltd., (hereinafter: "**Interface Partners**") in the framework of case LB 6245/01 in the District Court in Tel Aviv (hereinafter: "**the action**") with regard to the elements of the action as relates to my rights in the enterprise as detailed hereinafter in Macau area in China (hereinafter: "**the Macau enterprise**").

At the outset of my affidavit, I should like to state that in the past and at present Adelson and I were involved in numerous legal issues during which time extensive documentation and affidavits have been presented by both sides. It was agreed between the parties that the documents disclosed in this file and in the other litigations that are or were between the parties both in Israel and abroad, will be usable in all the proceedings being conducted between the parties.  The documents shown and presented by the parties in the various proceedings, both in Israel and abroad, extend to tens of thousands of pages, and form an integral part of this action, such that after receipt of the affidavits of Adelson and Interface in this case and in accordance with the decision of the honorable courts, if I should so request, I shall present a case of evidence involving photocopies of all documents which I intend to rely upon in this case that I feel are an integral part of this affidavit.

1. **The Defendants**

    1.1 **Adelson**

    The first defendant, Sheldon Adelson, is a Jewish- American business and casino magnate, with extensive business activities around the globe, and one of the richest businessmen in the world.  Lately, it has been reported that Adelson holds the position of third-richest man in the world, immediately after Bill Gates and Wayne Buffett.  As regards this matter, I should at this point like to state that his rise from the 60th place on the list of the richest persons in the world (his place at the time of the submission of the claim) to the present aforementioned position of third, Adelson owes to the Macau enterprise which as detailed hereinafter, I discovered, initiated, and presented before Adelson, and that as per publications, his worth is presently valued at hundreds of millions of dollars.

    Among other things, Adelson is the owner of the hotel and casino, The Venetian, in Las Vegas (hereinafter, "**The Venetian**") designed to resemble the city of Venice, Italy.  Furthermore, Adelson was the initiator and founder of the Comdex Company (hereinafter:  "**Comdex**") which was at the time the world leader in the field of high-tech exhibitions and which was sold by Adelson at the beginning of 1994 for more than 800 million dollars.  Adelson

has also operated companies, through the years, which offer tourist services, including the company GMV, through which I became known to Adelson.

At this point, I should like to state that the Adelson activities are run within the framework of various companies either owned and/or controlled by him, and that all of Adelson's communications in the framework of his activities, are directed by Adelson for execution through the companies under his ownership and/or control (including the establishment of ad hoc companies for various transactions) and this on the basis of various considerations including tax considerations, regulation, etc. (the companies in the Adelson group will hereinafter be referred to as "**Adelson Group**").  The structure of the Adelson Group as presented by Adelson is attached as **Appendix A.**

1.2  **Interface Partners**

Interface Partners is a company in the Adelson Group.  In December 1995, Interface Partners was registered in Israel as a foreign company and since then has an office in Israel which functions for Adelson (as per Adelson's testimony) as his office in Israel.  As hereinafter specified, Interface Partners was the one which paid my salary in the framework of my employment by Adelson, and is therefore considered as my employer and a relevant party to this action.  A photocopy of the documents connected to the registration of Interface Partners abroad and in Israel is attached as **Appendix B.**

-2-

2.  **My connections through employment agreement with Adelson**

2.1  **My warm friendly relations with Adelson prior to my engagement by him**

2.1.1  During the month of August 1995, Adelson turned to me with an offer to join him in an employment agreement.

2.1.2  The basis for Adelson's appeal to me were the friendly connections (close relations) which developed between Adelson and myself ever since 1987 and up to the time of Adelson's appeal.  The warm friendship which existed between Adelson and myself has a significant importance to the understanding of the atmosphere prior to the engagement between Adelson and myself, and I shall therefore refer to this more extensively.

2.1.3  My initial introduction to Adelson was already in 1987.  At that time, I was the Managing Director of the largest tourist company in Israeli at that time - the Galilee Tours Group.  In my capacity [as Managing Director], I was in constant contact with numerous organizations and persons in various fields (including - but not limited to - the tourist industry and fields which service it) throughout the world and including the United States.  I was introduced to Adelson in the framework of my contacts at this time with the American tourist company - GWV - which was a part of the Adelson Group.

2.1.4   After the initial introduction, my wife, Tirza and I joined Adelson during his first-ever visit to Israel (in 1988). Under this framework, my wife and I offered Adelson his first introduction to Israel through its various levels and its most important and principal sites. During this visit, and afterwards, Adelson became a close friend of mine, and, hence, of my wife, Tirza.

2.1.5   It is important to state that during this time and up to the point of Adelson's appeal to me in 1995 (i.e., for a period of approximately 8 full years) for me there was no personal business relationship with Adelson whatsoever, but merely a friendship. (It should be stated that the company in which I served as Managing Director - Galilee Tours Group - offered, from time to time, at the request of Adelson, various services in the field of tourism to Adelson and other organizations and companies under his control). For good measure, I state that in 1994, approximately, I suggested to Adelson to initiate and found a tourist enterprise in Eilat and/or Aqaba, Jordan, and following my suggestion, we executed together (Adelson and I) various activities with regard to this aforementioned enterprise.

2.1.6   In the framework of the friendly relations between Adelson and myself, I accompanied Adelson, very closely, through numerous important milestones in his private life, including his divorce from his first wife, his marriage to Mrs. Miriam Adelson (hereinafter: "**Miri**") and numerous other personal events, which, due to their personal nature, are subject to personal privacy.

Furthermore, through the years, Adelson and I became close friends, and I responded affirmatively when asked by Adelson to deal with personal and private matters of his in Israel.

2.1.7   More importantly, during the years leading up to his appeal to me in 1995, I became Adelson's confidante and secret-keeper.

2.1.8   I should like to reiterate and stress that during the entire period up to my engagement with Adelson in October 1995, our relationship was based purely on friendship. Such, for example, that all activities undertaken by me on Adelson's behalf when asked by him for assistance, were carried out with absolutely no monetary exchange whatsoever!!!

2.2   **Adelson's appeal to me with offer for employment**

2.2.1   As stated, during the month of August 1995, during Adelson's visit to Israel, Adelson approached me with an offer to become connected with him under an employment agreement.

-3-

2.2.2  At this time, I was employed as the Managing Director of the Galilee Tours Group, the largest tourist company in Israel at that time.  My salary and terms of employment at Galilee Tours were quite extensive, as befits an employee of my position.

2.2.3  In the framework of Adelson's appeal to me, Adelson offered that I be employed as his right-hand man in the locating of investment opportunities in various fields through the world (with the exception of the United States) and as Adelson's representative in those companies in which Adelson henceforth chose to invest.  All this in order to reap the fruits of my extensive managerial and other abilities and my numerous contacts in various fields (including - but not limited to - the tourist industry and industries which service it) in Israel and worldwide.  With regard to this, Adelson's claim that my function was limited to finding opportunities for investment in high-tech companies in Israel is not correct.  The field of high-tech was only one of the many fields in which I  was asked by Adelson to intervene and as I shall specify hereinafter, was  only one level in many levels of activities which I dealt with as per Adelson's request.

2.2.4  Adelson clarified to me that his offer comes on the backdrop of notification from his brother-in-law, Mr. David Farbstein (hereinafter: "**Farbstein**") regarding Farbstein's resignation from his position with Adelson.

2.2.5  As presented to me by Adelson at the time in his appeal to me, and in light of Farbstein's resignation, Adelson desired to reap the fruits of my managerial and other abilities and my contact in various fields (which he enjoyed for a period of 8 years on a purely friendly basis) also within a business frame.

2.2.6  Adelson further clarified before me that the position offered to me by him included the position held by Farbstein but was extended to other areas as well, as stated above, which were not in the framework of Farbstein's employment and which were offered to me by Adelson on the basis of his knowledge of my managerial and other abilities and my contacts in Israel and abroad.

2.2.7  In principle, I was not tempted to accept Adelson's offer.  For, among other reasons, my employment and position in Galilee Tours Group was solid, the terms of my employment were good, and also insofar as there was a certain challenge to working for a man like Adelson who was at the time involved in numerous and various affairs, there was not in Adelson's offer and the salary offered (salary offer was $100,000 annually) enough of an incentive for a man of my position at the time).

In this way, I clarified the situation for Adelson.

Furthermore, I made clear to Adelson that some of the fields in which he requested my intervention within the framework of the suggested position (e.g., high-tech), were not my forte.

2.2.8 But Adelson did not give up, and continued for a period of some two months to try and convince me to be employed by him. In the framework of Adelson's attempts to convince me, Adelson arrived in my office at Galilee Tours Group numerous times, and expanded and improved his offer to me in order to convince me to accept it.

2.2.9 And so, in order to convince me to accept the offer - Adelson specifically stated that within the framework of the position offered to me, expertise in all fields in which I would be involved is not necessary. According to Adelson a good manager is a good manager with no relation to the field which he manages, and that my good managerial abilities and talents were what interested him. Adelson further promised, in an effort to make me feel more comfortable, that in any field in which I am not expert, as in the case of high-tech, he would hire the finest experts in the field to assist me. Adelson explained that in such a manner he manages his activities and that he, too, does not understand all the fields in which he is involved, and he hires experts for just this purpose. Adelson further stated that he himself, although regarded as an expert in high-tech due to his activities in the Comdex company, knows nothing about computers and does not even have a personal computer.

2.2.10 I should like to add here as an aside, that within the framework of my close relations with Adelson, I was aware of the differences of opinion between him and his brother-in-law Farbstin, and that I even attempted, upon Adelson's request, to bridge the gaps

-4-

between them and to bring about a peaceful relationship between them. Adelson's approach to me for a job offer came after my attempts at resolving the issues between Adelson and Farbstein were unsuccessful and Farbstein tendered his resignation to Adelson.

## 2.3 **Mechanism of the Options Offered to Me by Adelson in the Framework of the Job Offer**

2.3.1 As above stated, the terms of my employment as offered to me by Adelson - in principle the salary of 100,000 dollars per year - were not enough of an incentive for me to agree to Adelson's job offer. As stated, my position and salary during this time were that of senior manager, and in addition, I was wary of spoiling a warm friendship with Adelson which at the time was very important to both of us.

As mentioned, I reiterated such to Adelson.

2.3.2  In the framework of his attempts to convince me to agree to his offer of employment, Adelson added the "cherry" to his offer.

Adelson offered me, in addition to my salary, the option to receive 12% of Adelson's share in all investments which shall be executed by Adelson (except in the USA) whose initiation began during the period in which I was employed and in which I had played a role (including as an employee, initiator, assistant, or consultant).  This as against the payment by me of  12% of the amount that Adelson **actually** invested in the framework of that investment.

Adelson stressed that any amount not actually invested (Adelson gave examples of guarantees issued and the granting of owners loans) will not be considered in the calculation of the sums which I must pay in the framework of the realization of the relevant options.

2.3.3  Adelson further stressed that the options are not limited in time and that I would be able to realize them whenever I chose.  Furthermore, Adelson took pains to emphasize - while giving several numerical examples - that the mechanism that he suggested included an advantage for me in that he allows me to choose at any time into which investment I should join, and that in the framework of this mechanism only he (Adelson) is taking a risk, and I would have the right to choose the investments which proved successful and join into them at such time as I should desire.

2.3.4  The only condition which Adelson placed was that after the realization of the options, I would be connected in a voting agreement, in which I would vote during the shareholders meetings of the company in which I had invested in the same manner as Adelson voted, or someone on his behalf.

2.3.5  As stated above, Adelson's transactions were all managed in the framework of various companies either owned and/or under his control and any of Adelson's obligations in the framework of his transactions, were directed by Adelson for execution through one of the companies under his ownership and/or control (including through the establishment of ad hoc companies for purposes of any business), as per various considerations including tax considerations, regulation, etc.

Thus, it is clear that the realization of my part in any of Adelson's investments in the framework of the options offered to me, were in effect the realization of my part from the part in the company within the Adelson group through which the relevant investment was made.

2.3.6  It is important that I add, especially in light of claims raised by Adelson during the litigation between him and myself in the last few years, that in the spectrum of Adelson's inclusive offer to me and his attempts to convince me to join his businesses, the mechanism of the options offered by him was absolutely reasonable.

-5-

As stated, during this time, I was a senior manager in high standing and seniority conditions.  That is to say, I had no need (or desire) to join Adelson's businesses, especially as during the past eight (8) whole years up to this time, I had assisted and advised Adelson in many both private and business matters, with no personal return.  If I had wanted some form of return for my assistance in Adelson's businesses  I had had eight whole years to request such from him and despite such I did not do this.  This further teaches that I had no interest in being employed by Adelson.

Despite this, Adelson, especially in light of the situation created after Farbstein's resignation, desired my affiliation in his business, and on the backdrop of my basic objection to being employed by him, saw fit to offer me an incentive in the form of the above mentioned options mechanism. This at the time when the annual salary offered by Adelson was not especially attractive - only an annual salary of 100,000 Dollars -  a lower salary than that which I was making in the Galilee Tours Group and most certainly a low salary in American terms.

In other words, the only attractive element of Adelson's offer to me was the suggested options mechanism.

I should like to add that to the best of my knowledge the options mechanism as offered to me by Adelson was not abnormal  at the time for senior managers at my level.

2.4.  **My Response to Adelson's Offer**

2.4.1  At this stage, and especially in light of the options mechanism offered to me by Adelson, I decided to respond to Adelson's pleas and accept his offer with the reservation that my salary would be linked as per the Israeli law and that the accompanying conditions of my employment (social conditions, early notice, etc.) would be identical to those which I had at the time in the Galilee Tours Group.

Adelson agreed to my reservations and a binding agreement was made.

2.4.2  In light of the relationship between Adelson and myself and the trust between us at this time, we did not see a need - Adelson and I - to make the agreement in writing.  Together with this, and as shall be specified herein, after Adelson fired me, **Adelson did set in writing** most of the terms of my employment as reflected in the claim and especially the options mechanism which he promised to me.

I should also like to add that the negotiations before the agreement, and the final agreement, were made in Israel, and only in Israel (the negotiation period was at a time when Adelson spent much of his time in Israel).

Furthermore, I , nor anyone on my behalf, did not conduct any negotiations with anyone or any other body with regard to my employment by Adelson nor with any company under his control **except with Adelson himself.** I should herein like to state, that despite Adelson's claims as presented in the later legal proceedings which he began against me, I had not conducted with Mr. Paul Roberts any negotiation and/or conversation of any kind whatsoever with regard to my employment and/or conditions of my employment.

2.4.3 With regard to the formal manner of the realization of the engagement between Adelson and myself, and as per the manner in which Adelson manages his transactions in the framework of the Adelson Group, Adelson requested formally that my salary would be paid by one of the companies in the Adelson group. Adelson offered me several possibilities regarding the company which would pay my salary and as to the place of payment (among others that I would receive my salary in the United States) and presented me with the tax benefits he saw in the possible suggestions.

Such was the procedure with Farbstein as well, who received his salary through one of the companies in the Adelson Group - The Interface Group.

-6-

In the framework of my agreement to the employment offer, I made clear to Adelson that contrary to the manner in which Farbstein's salary was paid (payment in U.S.A), I wished that my salary be paid in Israel insofar as I was a citizen and resident of Israel.

Adelson agreed to this as well, and stated that he would find a solution with the professional factors, as was indeed done, for in fact the Israeli branch of Interface Partners was the body that paid my [each month] salary **in Israel.**

## 2.5. **Adelson was my employer and Interface Partners paid my salary**

I would like to stress that I worked in the service of Adelson and the various companies in the Adelson group.

The Israeli branch of Interface Partners, which was as stated a company in the Adelson Group, actually paid my salary [each month] and as such Interface Partners is also considered my employer.

Adelson, as he himself states, is an extremely centralized person, whose businesses are run by him and under his sole control. The companies in the Adelson Group are a tool in executing Adelson's businesses

As stated, I worked as Adelson's representative and in his service and in the service of his businesses and the companies owned by him and under his control

The man who offered me the position was Adelson, the **only** man to whom I was subordinated was Adelson, the man who instructed me in the execution of my position was Adelson, and the man with whom I traveled to many parts of the world in an attempt to realize investment opportunities which I located was Adelson.

A copy of documents testifying to my employment for Adelson and the various companies in the Adelson Group including a business card which was issued to me by Adelson in which my name is shown as representative of various companies in the Adelson Group is herein attached as **Appendix C.**

2.6. **Adelson's written ratification - after my dismissal - of the options mechanism promised me by him**

2.6.1  As stated, the terms of my employment, including the mechanism of options which Adelson promised to me, were not put in writing at the time of engagement.

2.6.2  In addition, and as permanent proof of the accuracy of my claims with regard to the conditions of my employment and especially in regard to the mechanism of options promised to me as abovementioned, Adelson, as I shall further specify, ratified **in writing** the terms of my employment and the mechanism of options which he promised me.

2.6.3  As shall be specified further in this affidavit, on 10th April 2000 Adelson informed me of my dismissal.  During the time following such notification, **and while still employed by Adelson,** Adelson ratified in a clear manner, which could not be misunderstood, **including in writing,** the mechanism of options as above stated (including most of the other terms of my employment by him).

a.  And so, in the framework of the discussions held between Adelson and myself in connection to the delivery of a notice of termination of employment given by Adelson, Adelson specifically stated before me that it was his intention to fully uphold all obligations which he had taken upon himself in the framework of my employment, including the mechanism of options promised me.  Within this framework, we clarified between the two of us, Adelson and myself, most of the conditions I was entitled to with the termination of my employment.

b.  In addition, the matter of options I was entitled to from initiatives made during the period of my employment arose in the above-mentioned discussions between Adelson and myself.

-7-

   I should like to state that at this period (April 2000) I knew of
only two investments which were executed  and whose initiation
began during the duration of my employment - one was
Adelson's investment in the IMDSoft Company (hereinafter:
"**IMD"**), and  the second was Adelson's investment in Denex
(hereinafter:  **"Denex"**).  The Macau issue and the Macao
enterprise was not  raised by me at this stage as shall be specified
in furthermore detail later on in  this affidavit.  Prior to this
Adelson presented me with a presentation - which later on proved
to have been false - that he was not interested in investing in
Macau and that the opportunity  which I had found in Macau
would not materialize by him.

c.  Adelson, in what I realized afterwards was  an attempt
    to "put me to sleep" in order to prevent me from receiving my
    rights in the Macau enterprise - suggested that all my reserved
    shares in each of the abovementioned companies (IMD and
    Denex), in the framework of the options of which I was entitled
    (12% of Adelsons part in each of the companies), would be held
     by a  trustee.  In such a way, Adelson clarified, the realization of
    the options to which I was entitled in the companies, would be
    assured.

d.  Insofar and despite that most of the issues connected with the
    termination of my employment were clarified between Adelson
    and myself, a small number of issues remained open, I put in
    writing in a letter to Adelson at the end of April 2000 **and while
    still employed** (attached as Appendix D) that which was
    clarified and my position in regard to the still outstanding
    matters.  In this framework, I wrote to Adelson, among other
    things, the following:

      "3.  Shares in IMD and Denex will be held by a trustee.  12%
           from the holding of interface vesting immediately in IMD
           and in Denex.  On discretion of Moshe Hananel"

e.  In reply to my letter, Adelson wrote back to me on 1 May 2000
    (attached herein as **Appendix E**), and still during the duration of
    my employment (which terminated only on 10 May 2000), among
    other things:

      "…let me tell you how we last left it **and ask that this be
       agreeable to you:**

      …3)  Shares of IMDSoft and Denex will be held by a trustee.  That
      amount will be 12% of Interface shares and your ability to take title
      to these will be predicated upon:  (1) no one exercising their

preemptive rights of their rights of first refusal, and (2) a payment of a 12% proportionate share of my cost. Whether it's the cost up until the time of our agreement or any additional cost - I suppose you could limit any additional cost by choosing not to participate in such increased cost. If that occurred then I suspect that your shares will be subject to dilution…"

In other words, Adelson clearly ratified, **and this time in writing,** the mechanism of options exactly as explained by me above.

In such a way, Adelson ratified that I was due 12% of the part of Interface in the abovementioned companies (as above stated Adelson's investment in Denex and IMD was registered by Adelson in the name of Interface): "That amount will be 12% of Interface shares."

-8-

In such a way, Adelson specifically ratified that the realization of the options by me was conditional on payment of 12% of the sum actually invested by Adelson in said company. As stated by Adelson:

"your ability to take title to these will be predicated upon: …(2) a payment of a 12% proportionate share of my cost"

Note here that Adelson specifically ratified that the payment would be from "my cost", that is to say, the actual cost **to Adelson.**

In such a way, Adelson ratified that there is no time limit to the realization of the options. Adelson explained that with regard to payment for further investment costs (future) of Adelson I would have the option of paying the additional aforementioned costs or not pay them and then remain exposed to dilution. In other words, Adelson was aware that the realization could be at a later time, even after termination of my employment, as his abovementioned letter came after notification of my employment termination.

**Adelson's abovementioned ratification of the conditions of the mechanism of options is significant especially in light of Adelson's later denial of the abovementioned mechanism and especially in light of the later fabricated versions made up by Adelson in an attempt to add content that was never there to the mechanism of options promised me by Adelson.**

Note the affidavit given by Adelson in this case including clauses 33-36 of the abovementioned affidavit. Adelson, who is apparently certain that his letter, **Appendix E** above, will not be presented before the legal courts, did not hesitate to fabricate, including in his affidavit, made-up versions with regard to the

mechanism of options while himself previously having ratified it in writing.

**It should be stressed, Adelson's abovementioned letter was merely a putting into writing of those discussions between Adelson and myself with regard to the subject of options.  It was not an offer by Adelson or a negotiation, simply a written form of the subject (options) which had never been under dispute between Adelson and myself!!!!**

2.6.4.  It is especially important to me to state that also insofar as the abovementioned ratification of Adelson regarding the mechanism of options promised to me by him relates only to the two companies - IMD and Denex - there is a clear legal admission with regard to my rights in general for options in enterprises begun during the time of my employment and including therefore my rights regarding the Macau enterprise.

**The matters gain special importance at a time when the affairs with regard to the two abovementioned companies are similar in essence to matters - as shall be herein detailed - with regard to the Macau enterprise.  As in the Macau enterprise, also as regards the two abovementioned companies, IMD and Denex, I was the one to locate, initiate and present Adelson with the investment opportunity.  Adelson's realization of the opportunity in the abovementioned companies, IMD and Denex, was what granted me the right of options in said companies, just as the realization of the opportunity that I located, initiated and presented before Adelson with regard to the enterprise in Macau,  was what granted me the right of options in the Macau  enterprise.**

2.6.5   On the margins of this issue, I should like to state that during the entire abovementioned period, including during the time that I sent the letter marked as **Appendix D** above, I was not represented in this matter by attorneys.  Naively, I was certain that Adelson's intentions were to stand by all his commitments to me, as he did not deny them (and even ratified them

-9-

in writing ). Unfortunately, this assumption proved incorrect and has therefore brought me to hire the services of attorneys and present this suit.

2.7. **Additional subjects with regard to my engagement with Adelson**

In the margins of things I would like to herein state several other relevant matters with  regard to my employment with Adelson:

2.7.1  As stated, the timing of Adelson's offer to me came when Farbstein submitted his resignation. Farbstein, who is the brother of Adelson's wife, Miri, worked for Adelson in locating investments for Adelson in Israel. As my position included amongst other things replacing Farbstein in his position, therefore my terms of employment were based amongst other things on customs that were rooted in the relationship with Farbstein's.  Such as, for example, with regard to notification of termination, and such also regarding options.  Adelson himself explained to me, during the time that he was trying to convince me to accept his offer of employment, that Farbstein had options as well, and that although the mechanism of options was different from that of Farbsteins, the custom of granting options was customary.

With regard to this issue, I should like to state that many senior managers in the Adelson group enjoyed options of various conditions. A copy of the employment agreements of managers in the Adelson Group (as revealed by Adelson to the American Securities Commission) is attached herein as **Appendix F**.

2.7.2  In the framework of my friendship with Adelson in the years prior to Adelsons' offer of employment, I made the acquaintance of Mr. Dan Raviv ("**Raviv**").  Raviv was well known in the field of communications in Israel, was a close friend of Miri, Adelson's wife, and within this framework became close to Adelson as well.  In the framework of Adelson's offer of employment to me, Adelson further informed me that in light of Farbstein's resignation, and the termination at the same time of another gentleman by the name of Moshe Melnik, Adelson desired to hire Raviv as well.

Adelson informed me that in the event that I accept Adelson's offer of employment, Raviv would be subordinated to me and would assist me in fulfilling my position.  Adelson further informed me that he was considering offering Raviv an options mechanism according to which Raviv would have the right to receive 8% of Adelson's share in the investment.

In the years following this, I was informed numerous times by Raviv that indeed he had an options mechanism for the receipt of 8% as stated above.  Furthermore, both Raviv and his wife came to me through the years and asked my opinion with regard to our options (Raviv's and mine) and their materializing.  Therefore, I know for certain that Raviv knew about my options mechanism.

Recently, I have been informed that Raviv received shares worth millions of dollars in the holding (linked) company of the Macao enterprise!!!  A copy of the documents showing the shares received by Raviv is attached herewith as **Appendix G**.

3.  **My application of my engagement with Adelson**

3.1  Upon the establishment of the agreement between Adelson and myself, I began my work for Adelson as said. In the framework of my work for Adelson, I executed many activities in various fields. For a partial list of the many activities which I did in the framework of the position and in an attempt to shorten the writing sheet, the honorable court is referred to the initial testimony given in the action which was withdrawn. A copy of the affidavit is attached as **Appendix H,** and I should like to draw the attention of the honorable court to clauses 21-25.

Furthermore, and in light of Adelson's denial of the date of the beginning of my employment by him, and his claim that my employment began only in January 1996, attached herein as **Appendix I** are various documents detailing numerous activities executed by myself in my job for Adelson prior to January 1996.

-10-

3.2.  Hereinafter I shall refer to the activities relevant to part of my job which relates to locating opportunities for investment for Adelson in the various fields in Israel and abroad (excluding USA).

Amidst my activities in locating investment opportunities for Adelson in various fields, in Israel and abroad the following can be enumerated (only main examples):

3.2.1  **Activities for the pursuit of investment opportunities in the field of casinos**

One of the central areas in which my abilities, experience, expertise and contacts were significant and required by Adelson, was the field of casinos. Within this framework, I was familiar with the field for many years, including expertise in marketing casinos in the framework of tourist activities and acquaintances in many parts of the world with the central factors involved in the field of casinos everywhere as mentioned.

Through the years in which I was employed by Adelson, I worked diligently in an effort to locate investment opportunities for Adelson in the casino field throughout the world.

I would like to stress that at the outset of my employment, Adelson was not acquainted with the field of casinos in the world. His acquaintance with the field was limited to the casino which was in his control at the time in Las Vegas (Casino "Sands"). During the time of my employment, I initiated for Sheldon several visits and acquaintances in the field of casinos in many countries including those in which Adelson had never been before.

So, in addition to others, my activities in the field of casinos included the following:

a.  My initiation of a tourist enterprise in Jordan, including hotel, conference centers and casino and the execution by me of many activities to pursue this enterprise, including the initiation and activation of Adelson and my participation in the Economic Council for the Middle East which was held in October 1995 in Amman, Jordan; initiation and activation of joint meetings for Adelson and myself for cooperation with the worldwide hotel chain "Accor" with regard to the abovementioned enterprise; initiation and activation of meetings for Adelson and myself with Abdullah, king of Jordan, together with the Jordanian Minister of Water in charge of affairs with Israel, with Abu Rahab, a potential partner for the establishment of a casino in Jordan and with Omar Salah with regard to the abovementioned enterprise; initiation and activation of a visit to Jordan for a delegation of 54 American Congressmen, etc.;

b.  My initiation of a tourist enterprise in Eilat including, among other things, a congress center and casino and many activities for the advancement of the abovementioned enterprise, including the initiation and activation of the participation of both Adelson and myself in the meetings with the Israel Land Authority including a meeting which took place in November 1995 with the participation of Adelson and myself with regard to the establishment of a congress center in the city of Eilat. I would like to state that within this framework, and as a result of my efforts, the Director of the Israel Land Authority (through the Company for the Development of the Eilat Shore) offered Adelson some 30 dunams on the Eilat shore (east of the Herod's Hotel).  A copy of the documents relating to the abovementioned allocation is attached herein as **Appendix J;**

c.  Treatment and advancement by me of the possibilities of purchase of a casino on the Rose Island in Rhodes;

d.  Treatment and advancement by me of the possibilities of purchase and/or the establishment of a casino in Karlovy Vary in The Czech Republic

e.  Treatment and advancement by me of the possibilities of the establishment of a congress center and casino in Dublin, Ireland, including the initiation and activation of a joint visit for Adelson and myself in Ireland and meetings with important officials of the country including a gentleman by the name of Dermod Dwyer;

-11-

f.  A joint visit for Adelson and myself of five casinos in Antalya, Turkey in order to illustrate for Adelson the idea of  casinos in the Mediterranean Basin;

   g.  Treatment and advancement by me with regard to a casino in
       Hungary;

   h.  Treatment and advancement by me with regard to a casino in
       Bulgaria, including the initiation and activation of a joint visit
       for Adelson and myself in Bulgaria (myself being a proud
       member of the Bulgarian emigrant community) including the
       initiation and activation of meetings for Adelson and myself
       with the Vice-President and the Finance Minister of Bulgaria.

   i.  Treatment and advancement by me of matters connected to
       Adelson's Venetian hotel in Las Vegas, including joint visits
       for Adelson and myself at the Moreno exhibition in Italy,
       Venetian workshops, visits with architects and interior decorators, the
       photographing of sites, and a visit to the Carrerra quarries;  the initiation
       and execution of a joint visit  for Adelson and myself to Hungary to see
       the iron foundries for the production of the lamp posts and decorations
       in the abovementioned hotel; initiation and execution  of a joint visit
       for Adelson and myself in France with regard to restaurants and
       fashion houses for the casino for the commercial center in the
       abovementioned hotel and the initiation and execution of a
       joint visit for Adelson and myself in glass factories in The Czech
       Republic for the abovementioned hotel.

   j.  Treatment and advancement by me of the possibilities for the
       establishment of a casino and congress center in Cyprus;

   k.  Treatment and advancement by me of the possibilities for the
       establishment of a casino in Morocco;

3.2.2  Treatment and advancement by me for the possibilities of purchase by
      Adelson of a marble cutting and polishing factory and a bicycle factory in
      Beer Sheva (Dunhill Company); treatment and advancement by me for
      possible purchase of Africa-Israel Company by Adelson; treatment and
      advancement by me for the possibility for a purchase by Adelson of Bank
      Leumi Le'Israel  Ltd.; treatment and advancement by me for the possibility
      of purchasing of El Al Company after privatization; treatment and
      advancement by me for the possibility of purchasing the basketball team,
      HaPoel Jerusalem; treatment and advancement by me for the possibility of
      purchasing clothing stores and receipt of franchises for name brand clothing
      shops (Naf Naf chain, Waikiki and Boom, Ltd.); treatment and
      advancement by me for the possibility of establishing a shop and purchasing
      the franchise to "Warner Brothers"; treatment and advancement by me for
      the possibility of purchasing the franchise for the "Starbucks" chain.

3.2.3.  Treatment and advancement by me for the possibility of purchasing (within
      the framework of privatization) the congress center in the Exhibition
      Grounds in Tel Aviv, including the initiation and activation of contacts with
      the Tel Aviv Municipality and the Ministry of Tourism in this matter;

treatment and advancement by me for the possibility of constructing a center in the South Tel Aviv Park including the initiation and activation of contacts with the Tel Aviv Municipality and the Ministry of Tourism in this matter.

3.2.4.   Treatment and advancement by me for the possibility of purchasing the convention center in Jerusalem; treatment and advancement by me for the possibility of establishing a chain of  movie theaters which would compete with the Globus chain; treatment and advancement by me for the possibility of establishing a movie theater complex in Gelilot (Cinema City) including a trip to Brussels; treatment and advancement  by me  for the possibility of making Adelson a partner in the Globus Studios and the \ purchase of the real estate upon which the studios lie in Neve Ilan; treatment and advancement by me for the possibility of purchasing the franchise for the IMAX movie theaters (3-dimensional) in Masada and/or Eilat; treatment and advancement by me for the possibility of cooperation in the tender for satellite television broadcasts; treatment and advancement by me for the possibility of establishing hotels abroad; treatment and advancement by me for the possibility of purchasing the "Mega Sport" chain which had merged with the "Sportmart" chain, including a meeting together with Adelson and the owners of the Sportmart chain in the United States; treatment and advancement by me of the possibility of establishing a store and the acquisition of a franchise for the "Sharper Image".

-12-

3.2.5.   <u>Activities in the Field of High-Tech (Examples Only):</u>

Treatment and advancement by me for the possibility of having Adelson invest in Geo Interactive (Internet animation) - in the framework of which I was successful in reaching a draft agreement in which all the commercial conditions were agreed upon.  Adelson wished to check the subject over and over and when he finally reached his decision the offer was no longer relevant; treatment and advancement by me of the possibility of having Adelson invest in Exact (examination of internet traffic) - in the framework of this I reached an understanding about investment in the company.  At the end, the offer was refused by Exact as they preferred not to enter into contract with Adelson; treatment and advancement by me for the possibility of having Adelson invest in Centronix (the establishment of a Pan-Arab Internet site) - Adelson cancelled the transaction at the time of signing of the investment agreement. As said, these are only examples.  A copy of the documents with regard to part of my abovementioned activities is herein attached as **Appendix K.**

3.3   **Locating of Investment Opportunites for Adelson in IMD and Denex**

3.3.1   **Locating of Investment Opportunities for Adelson in IMD**

In addition to my abovementioned duties, and in the framework of my task in locating investment opportunities for Adelson, I located the IMD Company, which dealt in medical hardware.  In October 1995 or thereabouts, I presented to Adelson the abovementioned investment opportunity, including an analysis of all the relevant parameters, and I advised Adelson to invest.  In early 1996 Adelson invested in the company.  In the beginning, the investment was handled from Adelson's private money and afterwards the ownership of shares was registered in the name of Interface Partners.

With the implementation of Adelson's investment in IMD and in the framework of my role as representative for Adelson in those companies in which investments have been implemented, Adelson appointed me as his representative in the company Board of Directors and as active chairman of the Board of Directors.  Within this framework I functioned as Company director for many years, recruiting investors, consolidating recovery programs for the company when needed, and more.  I especially recall my involvement in the handling of a severe financial crisis that occurred in the abovementioned company at the outset of 2000.  In the framework of my involvement here, I recruited investors from Japan and solidified an agreement with them according to which they would undertake to purchase products from the abovementioned company for a long term period.

I also recall that during the years Raviv turned to me for consultation on whether it would be worthwhile for us (Raviv and I) to realize our options mechanism which was due Raviv and I with regard to Adelson's investment in IMD.  During this time I was of the opinion that the time was not yet ripe to realize the options in IMD and informed Raviv of my position.  To the best of my knowledge, in light of my position, Raviv also decided not to realize[at that time] his options with regard to investment in the abovementioned company.

3.3.2   **Locating of Investment Opportunities for Adelson in Denex**

In addition to my abovementioned activities, and within the framework of my duties in locating investment opportunities for Adelson, in 1997, I located the Denex company which dealt in educational and treatment programs related to dentistry.  I presented Adelson the abovementioned investment opportunity which I had located, including an analysis of all the relevant parameters and suggested to Adelson to invest in this company as well.  Indeed, Adelson invested in the company.
With the implementation of Adelson's investment in Denex and within the framework of my duties for Adelson as his representative in the implementation of the investment, Adelson appointed me as his representative in the Denex Board of Directors.  Within this framework

functioned through the years in management of the abovementioned company, recruited investors, consolidated activity plans when needed and more.

-13-

    3.3.3  I would like to state that I delivered to Adelson notifications of materialization - which were turned down - regarding my options with regard to the abovementioned companies - IMD and Denex.

4.  **My application of the engagement with Adelson regarding the Macau enterprise**

  4.1.  In the framework of my abovementioned function in locating investment opportunities for Adelson in Israel and abroad, I initiated and located for Adelson the Macau enterprise during the year 1999.

    And in what context does this apply.

  4.2.  Firstly, I shall state several details with regard to Macau.  This applies to the area composed of several small islands which for many years were a colonial settlement under the control of  Portugal.  In accordance with agreements between Portugal and China, similar to agreements which China had with Britain regarding Hong Kong, Macau (similar to Hong Kong which would revert to Chinese control in 1997) would revert to the control of China at the end of 1999.

    Geographically, Macau is situated near Hong Kong (a distance of 40 minutes travel by sea) and very near to Mainland Zhuhai in China which borders it and is surrounded by China.  For the convenience of the honorable court a map of the area is attached herein as **Appendix L.**

  4.3.  During the month of May 1999 or thereabouts, Mr. Arieh Lees, whom I had known in the field of tourism (from among other things Mr. Lees'  work in Isrotel) appealed to me.  Among other reasons he knew of my employment with Adelson, and wished to present before me a "time-sharing" project in the Zhuhai area, near Macau.

    During my first meeting with Mr. Lees, Mr. Lees presented a brochure describing the suggested enterprise in Zhuhai, adjacent to Macau and its geographical position, including arguments on the benefits inherent in the location and the enterprise, including it being a resort location for both residents of Hong Kong and Canton, a relatively nearby location.

    During the meeting I made clear to Mr. Lees that Adelson did not desire to invest outside of the United States or Israel, unless it was a project connected to a casino.  In accordance with this, I requested that Mr. Lees investigate what foreign investments were made in this area in China, air, land and sea access routes, and who was operating them and the possibility of establishing a project connected to a casino in Zhuhai .

4.4   In a follow up meeting with Mr. Lees at the end of June 1999, or thereabouts, Mr. Lees gave me two official pamphlets in duplicate intended for foreign investors in the area describing the foundation, possibilities and rules of investment.  During that same follow up meeting, Mr. Lees informed me that in his opinion, and in the opinion of his colleagues in the prospective project, the subject of a casino in Zhuhai was a very realistic one.  Mr. Lees further clarified that there was as yet no flow of tourists by air to Zhuhai and that as of yet no international airline was flying regular flights to the new airport constructed there.  A copy of the material transferred to me by Mr. Lees with regard to Zhuhai in particular and to China in general is attached herein as **Appendix M.**

4.5   Immediately after my first meeting with Mr. Lees, I began an investigation of my own with regard to the subjects raised by Mr. Lees.  Within the framework of this investigation I checked various aspects of the area, including the "Pearl River Delta" which includes Hong Kong, Macau and Zhuhai , as well as geographical, economic, and political aspects, and aspects relating to the field of gambling in the area.  This, as I had told Mr. Lees, because I knew that Adelson was interested only in projects in which his relative advantages in the fields of casinos and congresses would be expressed.

4.6   From the examination which I conducted, the initial conclusion was that precisely Macau, adjacent to Zhuhai , could be a potential for Adelson's investment.  During this time, Macau was, as abovementioned, a Portuguese settlement, known in the area as ridden with crime and having a low socio-economic level.  Casino activity existed at this time in Macau

-14-

and was operated by Mr. Stanley Ho  through a monopoly franchise which he held for many years and was given by the Macau authorities during this time. The problematic characteristics of Macau (crime, etc.) and Mr. Ho's monopoly on casino activity which did not allow foreign groups a foothold in the casino activity in the area, served, as I learned, as a deterrent to foreign investors from approaching Macau.

4.7.   From the examination which I conducted, I found that that the Macau area was due to revert to Chinese control in 1999.  From my experience, and from the analysis made, I estimated the Chinese authorities would handle Macau in a similar fashion to how they handled Hong Kong upon its return to China.  In other words, a policy of non-intervention and a kind of economic autonomy with an open approach towards the West (One country, two systems).  I further estimated that in the framework of this openness and commitment to the West, the Chinese authorities would lead a policy of liberalization in the field of casinos and my estimation was that the days of the Stanley Ho monopoly on  casino activity in Macau were numbered, in the manner in which they would allow Mr. Ho to continue to activate a casino while granting licenses to new foreign agents.  I further assessed, with regard to this matter, that together with the openness that would be accorded to the West, the

Chinese authorities would, upon receipt of control in Macau, also adopt a policy of "barnyard cleaning" with regard to the rampant crime in Macau. From a close acquaintance with China (among other things, I was there for a relatively long period), I knew that the Chinese authorities would bring back law and order to the streets of Macau and "remove" the fear that dominated the streets of Macau with regard to crime.

This and more. The examination which I conducted further showed that a large and modern airport had been recently constructed in Macau which could serve a great deal of travelers, and also that in Zhuhai in the vicinity of Macau (a distance of only 10 km) a large and modern airport had been established which could also serve a large number of travelers.  From my experience in the tourist industry, I estimated that whosoever established airports of this scope in an area which did not have a lot of passenger traffic (it was at the time extremely light), showed an intention of significant changes with regard to their attitude about foreign investments in general and in particular foreign investments in the tourist field (including casinos) .

 It is known that one of the basic conditions of foreign investors in executing investments in developing areas (and Macau was a developing area) is a developed infrastructure, headed by a developed airport allowing high access to the area.  I found that an enormous bridge was planned which would link Hong Kong, Zhuhai and Macau.

Furthermore, my examination showed that in a radius of a 5 hour flight from Macau, there was no other casino.  Insofar as we are discussing an area with a population of **over 1.5 billion** people, this fact had immense importance.

All the above brought me to the conclusion that Macau had immense inherent potential in the tourist and casino field and that Macau was an extraordinary investment opportunity for Adelson.

4.8   Upon conclusion of my examinations, I turned to Adelson and asked to present the subject to him.  Adelson claimed that he was not familiar with the Macau area and had never heard of it.  Adelson even claimed that he was not interested in doing business with the Chinese.  Despite this, I spread before Adelson the opportunity which I had uncovered in Macau and my estimations, as above said, that I saw Macau as a potential investment enterprise for Adelson.  As you will recall, this was the essence of my position with Adelson, and in this manner I acted.  The singularity of the Macau issue was Adelson's total lack of knowledge of the Macau area.  In essence, all the material and examinations which I presented to Adelson with regard to Macau was utterly new information for him.

 Adelson listened carefully, but claimed that he was not interested in investing in the area.

 Despite this, I did not give up.  I continued to explain to Adelson the uniqueness of Macau's location, my estimations regarding the geo-economic

and political developments in Macau and the conclusion which I had reached regarding the attractiveness of an investment by Adelson in the Macau area.

-15-

The structure of the investment which I suggested to Adelson was to offer the Macau authorities the establishment of a broad scope enterprise incorporating a congress center together with entertainment and casino centers, while relying on Adelson's excellent reputation in those areas.  The strategy which I presented was similar to that which I had presented to Adelson on several enterprises, including the contacts made with the Jordanian authorities for the establishment of a tourist enterprise in Jordan, the contacts made with the Israeli authorities for the establishment of a tourist enterprise in Eilat, and the contacts made with the Cypriot authorities for the establishment of a tourist enterprise in Cyprus. The basis of the strategy lay in the combination of a congress and casino center [Typo mistake, originally tender]
as a stimulus for tourist development and to draw visitors and tourists, while the above combination worked to offer a volume of honorability and to soften the opposition which generally existed in the authorities when discussing enterprises with only casinos (from fear of crime, etc).

From my intimate relationship with Adelson I knew that Adelson was due to travel in August 1999 in his private jet from Israel to the Far East (including Hong Kong and Taiwan), on an expedition to locate and guard heavy gamblers (high rollers) for the casino under Adelson's control in Las Vegas (the Venetian).

Therefore, I pressured Adelson to incorporate Macau into his abovementioned visit and to devote a full day to the matter during his stay in nearby Hong Kong, amongst others things because the trip from Hong Kong to nearby Macau takes only forty minutes.  In such a way Adelson would be able to visit Macau, to make his own unmediated impressions of Macau and its infrastructures and to meet with the relevant authorities.  I suggested this to Adelson and he agreed.

4.10. Before Adelson's trip to the Far East in August 1999, I equipped Adelson with some of the material which I had received from Mr. Lees, including a brochure of information to the investor (to show Adelson the importance that the Chinese were exhibiting regarding development in the area and their desire to draw in foreign investors).  I also equipped Adelson with a business plan prepared by myself (although based on a business plan for another enterprise, it was based on the same mentioned suggested strategy).  I should like to state that I did not keep a  copy of the material which I gave to Adelson, but in light of Adelson's denial during the legal proceedings between us, I was successful in locating the brochures given me by Mr. Lees which I had given to Adelson (**Appendix M** above).

Furthermore, I attach as **Appendix N** the business plan on whose basis I prepared the plan which was given to Adelson (of which I do not have a copy).

Adelson received all the material and promised me that during his forthcoming visit to the Far East, he would make a special trip to Macau, in order to see the casino there and the potential in the area.

I even suggested to Adelson to arrange meetings for him in Macau with the relevant authorities.  Among others, I suggested to arrange a meeting for him with Ms. Panti [Pansi] Ho, Mr. Stanley Ho's daughter and the strongest woman  in Mr. Ho's organization.  This, in light of my position at the time as president of worldwide GrayLine, in which Ms. Ho was connected to as a result of the visits arranged by GrayLine, from Hong Kong to the Ho family casino in Macau.  Adelson thanked me for my initiative in arranging the meeting but explained that insofar as his Far East representative, Mr. Mathew Ma, would be accompanying him on his journey, he (Mathew Ma) would arrange the meetings.

4.11  I would like to state that at the time I also told Raviv about the potential new investment which I had located in Macau.  Raviv expressed his opposition to the possibility of investing in Macau and expressed this opposition to Adelson as well, even stating that the visits there would be a waste of time.

4.12.  In the margin of matters, I would like to state at this time that, although at this stage, the project which Mr. Lees had presented to me had not seemed relevant in my eyes (in light of the fact that I thought that precisely Macau would be considered a great tourist and casino potential in the area), I invited Mr. Lees to my office while Adelson was in Israel.  Mr. Lees indeed arrived to the meeting in my office,  and upon Adelson's arrival in the office shortly afterward, I presented Mr. Lees to Adelson while explaining to Adelson, in Mr. Lees' presence, that Mr. Lees was connected with the Macau issue which I had presented to Adelson.

-16-

4.13  **Thus, from all the above**mentioned **it is clear that the entire matter of Adelson's  investment in the Macau enterprise was located by myself, initially presented to Adelson by myself, and only by myself, including the outline and the strategy for investment, all of this during the year 1999, at which time I was employed by Adelson.**

Adelson clearly admitted to me that this was the first time anyone had ever raised before him the matter of Macau in general and the inherent potential for investment inherent there.  As Adelson said:

"Never heard the word Macau before."

Furthermore,  I would like to state in all humility that my initiative and vision with regard to Macau and the analysis and examinations carried out by myself with regard to the anticipated developments in Macau - which all came to materialization - which brought Adelson to begin a high-power

course to materialize the Macau enterprise while drastically preceding all of his competitors, as his head start granted him a dramatic advantage over his competitors.  As proof, the Macau enterprise is the new flagship of Adelson's transactions that has recently brought him to the third place in the list of the world's richest people!!!

5.  **Adelson's execution of the opportunities located by me and presented to him for investment in the Macau Enterprise**

As stated, I located the investment opportunity in Macau, initiated the tourist enterprise in Macau and presented it to Adelson.  At the time that I presented Macau and the Macau enterprise to him, Adelson was reserved, as was Raviv about Macau and about the enterprise and it was only with great effort that I was successful in convincing Adelson to visit Macau and examine Macau and the enterprise which I had presented to him.

From here on in, Adelson began a series of significant actions to realize the opportunities which I had located and presented to him for the Macau enterprise up to the completion of the construction and actual operation of a huge and luxurious center with a casino in Macau while raking in enormous profits for Adelson, and all as a result my presentation and initiation of the enterprise before Adelson.

Henceforth I shall describe in short some of the actions taken by Adelson and his men for the realization of the idea which I had raised regarding Macau.  As could be seen, a significant succession on the time axis of consistent actions on the part of Adelson and his men to materialize the opportunity I located, initiated and presented in front of Adelson [regarding] Macau, as of the date which I presented Macau to Adelson and up to the operation of the casino by Adelson in Macau and raking in of enormous profits by him.

I would like to state that most of the information herein specified has been gathered by me through great efforts while Adelson tried to prevent or hide the very existence of Adelson's investment in Macau and the actions he took to bring it about.

As I shall specify herein, Adelson fired me in order to remove me from a claim for my rights in the Macau enterprise because he clearly knew that as per the options mechanism which he promised me, I was due 12% of Adelson's share in the enterprise.  Therefore, I was withheld from and unable to take any further part whatsoever in the Macau enterprise.  Because of this, and in the nature of things, I do not have at my disposal all the information regarding Adelson's activities with regard to the execution of the Macau enterprise.  My efforts to receive the said information from Adelson in the framework of a request to make visible details and documents presented to the honorable court was resolutely denied by Adelson, and I would request that the honorable court take this fact into consideration.

5.1. **Adelson's visit to Macau in August 1999**

As stated, after presenting Adelson with Macau and the Macau enterprise, I succeeded in convincing him to visit Macau during his visit to the Far East in August 1999. All this so that he may get an impression of the area and meet with the relevant parties. I even equipped Adelson with the relevant materials which I had prepared in order that he may prepare for the visit and present them to the parties with whom he shall meet.

On 29th August 1999, Adelson landed in Macau in the framework of his visit to the Far East. During his visit Adelson traveled - as he had promised me - to Macau. The evening before his trip, as was his custom, Adelson phoned me from Hong Kong

-17-

and during the conversation I once again pleaded with him to devote time to examine the subject of Macau. Adelson told me that since he had free time the following day, he would go to Macau from the "Peninsula" hotel in Hong Kong. I once again recommended that he travel via a vehicle known as a hydro-jet (a sort of funicular). On the morning of his visit to Macau and shortly before departing, Adelson phoned me as he did immediately upon arriving in Macau. I clearly recall this as I recall that Adelson "complained" to me that despite my promise that the journey on the funicular would take 40 minutes, it actually took 45 minutes (this was Adelson's way of thanking me). In this framework Adelson told me that he had gone around Macau and visited the Lisboa casino, which at the time was the central casino in Macao (under the ownership of Stanley Ho).

**Upon Adelson's return to Israel from his abovementioned visit in the Far East, Adelson told me that he had found Macau interesting but that he is not interested in investing there and this, because of his advanced age and his desire to invest in areas in which, as he said, "only the American or Israeli flag flies".**

5.2. **Adelson's additional visit to Macau at end March 2000**

At the end of March 2000, Adelson conducted an additional visit to the Far East, during which it is known to me that he visited Macau.

5.3. It is known to me that during his stay in Macau Adelson met with local real estate parties, with parties involved in gambling and even visited Macau to locate real estate sites which would be appropriate for the establishment of a congress center [Typo, Originally tender] and casino. I should like to state that among other parties with whom Adelson met in Macau was one Ms. Kittie Chan who was at the time a real estate agent from Hong Kong who dealt in real estate in Macau. Ms. Chan herself assured me of such during my conversations with her in the framework of preparations for this case.

A copy of documents including travel journals, documents relating to the trip, etc., with regard to Adelson's abovementioned trips are attached herein as **Appendix O**

5.4.  **Adelson's activities for the materialization of the Macau enterprise following my notice of termination of employment**

As shall be further expanded upon hereinafter, immediately concurrent to Adelson's return from Macau in the beginning of April 2000 and after waiting - not in good faith - several days in order to allow for a meeting which I had initiated for him with Mr. Shimon Peres, Adelson informed me on 10th April on the termination of my employment.

5.4.1  Immediately afterwards, during the month of July 2000 or thereabouts, Adelson made contact with a man by the name of Richard Suen (hereinafter: "**Suen**") who was a friend of Adelson's brother, Mr. Lenny Adelson.  Suen offered Adelson his services in aiding the materialization of a casino in Macau.  Adelson told Suen - almost certainly on the basis of the information and ideas which I had presented to him  regarding Macau - that he was very interested in Macau and in the materialization of the opportunity there and even traveled with Suen and Raviv during the month of July 2000 from Hong Kong to Macau for a visit and meetings with Suen's people in Macau.

5.4.2.  In the period after this towards the year 2001 and during all of 2001, Adelson and other parties on his behalf, led by Mr. William (Bill) Weidner (hereinafter: "**Weidner**") from the Adelson Group, president of the public company Las Vegas Sands, Inc. (hereinafter: "**LVSI**") were active in the materialization of the Macau enterprise.  In this framework, Adelson and his people met with very high officials in Macau and China  In this matter Adelson and his people met in July 2001 in Beijing, China,  with the Chinese Vice Prime Minister - Mr. Chen Chi Sen - who was also responsible for supervision of Macau on behalf of the Chinese government.  In this meeting, as well as others, Adelson presented the  Adelson group as holders of a singular advantage in their being experienced and having a reputation with regard to congress centers (for example Comdex which was under Adelson's ownership) combined with entertainment and casino centers. **Exactly the strategy resented by Adelson by me already in 1999.**

**-18-**

Adelson and his people continued to meet during this period with Mr. Edmond Ho, the Governor of Macau on behalf of the Chinese government, and with numerous other parties, and all the while Adelson wove contacts and presented and transferred to these parties with which he met those very same plans based on the enterprise which I had presented to him and on the strategy which I had initiated and suggested to him.

5.4.3. On 16th October 2001, Adelson presented to the Macau authorities an Expression of Intent with regard to his participation in the tender for the granting of licenses of the operation of a casino in Macau which the authorities intended to manage.  A copy of this document is herein attached as **Appendix P.**

Perusal of this document shows that the strategy taken by Adelson was a combination of a complex combining a congress center with casino - exactly as per the outline which I had suggested to Adelson in 1999.

5.4.4 After this time, during the month of November 2001, and as per the request of the Macau authorities, Adelson presented an offer on his behalf for the tender in the granting of licenses for casino operation in Macau.  All this in partnership with additional parties, such as the Taiwan Bank CDIB and under the name Asian American Corporation. A copy of this party's offer is herein attached as **Appendix Q).**

5.4.5 Due to the last minute addition of a new party - the British casino operators by the name of Espinel - to the party in whose framework Adelson participated in the tender (Asian American Corporation) and on the background of the dissatisfaction of the Chinese authorities by the involvement of a Taiwanese factor in the tender, Adelson abandoned - in a further exhibit of his conduct in a manner lacking good faith - the group in whose framework he had competed, and transferred to the framework of the group known as Galaxy Casino.  A copy of the  notification by Mr. David Friedman, on behalf of Adelson, to the Macau authorities in February 2002 of his abandonment of the previous group and his inclusion in the Galaxy Casino Group is attached here in as **Appendix R**.  A copy of a revised offer from the Galaxy Casino following Adelson's inclusion is herein attached as **Appendix** S.

5.4.6 Closely thereafter, the Galaxy Casino Group won the license to operate a casino in Macau, but due to the refusal of the members of the abovementioned Galaxy Group to meet with the demands of discovery put before Adelson by supervisory authorities for gambling in the United States, an agreement was finally reached with the Macau authorities wherein Galaxy Casino would grant Adelson a sub-concession for operating  a casino which would allow Adelson to operate a casino with no partners and not as part of the Galaxy Casino Group.

5.4.7 In an aside, I should like to state that Adelson promised Suen a success fee of 5 million dollars and 2% of net profits from the Macau enterprise.  However, in a conduct much like Adelson's conduct with me, Adelson denied his promises to Suen and the latter was forced to bring suit against, among others, Adelson, Weidner and LVSI for the materialization of his rights.

A copy of the documents relating to Suen's case against, among others, Adelson and Weidner, from which we can learn about the conduct and actions taken by Adelson and others on his behalf regarding Macau immediately after my dismissal, is herein attached as **Appendix T**.

6. **Adelson's Ownership of the Macau Enterprise**

As stated above, the Adelson activities are run in the framework of numerous companies under his ownership and/or his control and all Adelson's connections in the framework of his activities, are directed by Adelson for execution via one of the companies under his ownership and/or under his control (including by the establishment of new ad hoc companies for the purpose of a particular transaction), and as per various considerations including tax considerations, regulation, etc. Such was the case with the Macau enterprise. Adelson directed the investment to the company known as Venetian Macau S.A., which was a company established for the purpose of control in the Macau enterprise,

-19-

and which is operated under a public company, LVSI, under the control of Adelson. copy of the structure of control in the Adelson companies of which the abovementioned companies are a part, is attached herein as Appendix A above.

7. **My Rights to 12% of the Macau Enterprise as it was finally realized**

7.1 **The Factual Background**

On February 10, 2002, while perusing the financial section of the "Ha'aretz" newspaper, I read that the Macau project which I had located, initiated and presented to Adelson was coming to life, as Adelson had won the concession to establish a casino in Macau. A copy of this article is attached as **Appendix U.**

Through an intermediary, I immediately turned to Adelson and Interface, in a demand for materialization of my rights in the enterprise on the basis of the options mechanism described above. A copy of this is attached herein as **Appendix V.** I shall state that in reply, Adelson and Interface denied their right to the concession for the casino in Macau and my rights to the said enterprise. A copy of the replies is attached herein as **Appendix W.**

Together with this, and in addition to the abovementioned, it seems to me that there is no argument that Adelson - through the auspices of companies under his control - is establishing and operating a large casino enterprise in Macau.

7.2. **Components of my rights to the options**

As I proved above, the options mechanism described above grants me the right to receive 12% of Adelson's share in each investment whose initiative was born during the time of my employment. I would like to reiterate that the above options mechanism was distinctly ratified by Adelson in writing (see **Appendix E** above).

As I proved above, the Macau enterprise was born during the time of my employment, whereas I located the opportunity, initiated the plan, presented it to Adelson and convinced him to take measures to realize it.

As I proved above, I informed Adelson of my desire to realize my right to receive the abovementioned 12% in the Macau enterprise.

Therefore, it is clear that my rights to receive of 12% of Adelson's share in the Macau enterprise as against 12% of the sum invested by Adelson, must be stated.

## 8. <u>Additional Matters Relating to the Macau enterprise and my rights</u>

Although the abovementioned is sufficient proof of my right to 12% of Adelson's share in the abovementioned Macau enterprise, I would like to refer to several additional related matters, which strengthen my claims and shed more light on Adelson's lack of good faith in his conduct.

### 8.1 <u>Adelson fired me in an attempt to prevent me from receiving my rights in the Macau enterprise</u>

8.1.1. As stated, Adelson informed me of the termination of my employment on 20th April 2000.  This notification was a surprise to me especially since it came immediately after the enormous feat which I achieved for Adelson, hereby saving Adelson's investment in IMD at a time when I succeeded, at the end of March 2000, (including during a trip to Japan) to locate and find a Japanese party prepared to invest a fortune in IMD and who undertook to purchase products from IMD for a long period, thereby insuring the company a cash flow.

8.1.2 Furthermore, immediately upon my return - at the end of March 2000 - from my abovementioned trip to Japan, I noticed a coldness on the part of Adelson.  Suddenly, Adelson was discrete with me and subjects which were always part of our conversations were suddenly concealed.  Hence, and significantly, Adelson did not share with me his reflections on his trip to the Far East from where he had just returned, and in which Macau had been one of his destinations.

-20-

Together with this, and despite my concealed fears, I continued to behave as always, and even worked to realize a meeting which I had arranged for Adelson with Mr. Shimon Peres.  As abovementioned, immediately after this meeting, Adelson informed me of the termination of my employment.

I did not imagine that the notification of termination of employment was related to Macau since Adelson had clearly told me that he had no

intention of realizing the opportunity which I had initiated and presented to him regarding the Macau enterprise, due to his advanced age, and due to his desire to invest solely in the United States and Israel. Today, I understand that Adelson's words had been lies in a malicious attempt to hide his Macau enterprise from me, and prevent me from materialization of my rights and getting rich on my own account.

8.1.3   Immediately thereafter, I began my attempts to reach a full agreement with Adelson regarding the conditions of the termination of my employment. In the beginning, matters were conducted quickly and in an orderly fashion on the part of Adelson, as was exhibited in a letter sent to me (see **Appendix E** above), in which Adelson clearly ratified, among other things, my rights to receive options with no time limit (also after the termination of my employment).

However, suddenly, at the end of July 2000, a surprising change appeared in Adelson's position, and he suddenly denied any of my rights with regard to options. Furthermore, the matter was suddenly referred to the care of Adelson's attorneys in Israel - Herzog, Fox, and Neeman and they even sent me a letter on 26 July 2000 in which they requested that I present my position with regard to my rights - in their language, "if any" - to options. A copy of the letter which was sent to me by Mr. Daniel Chin from the Herzog, Fox and Neeman office is attached herein as **Appendix X.**

At this point, and in light of the information which I received recently, I understand that the reason for the surprising change was Suen's referral to Adelson in the middle of July 2000 regarding the Macau enterprise. As will be recalled, Adelson expressed an immediate preparedness to invest in Macau. Adelson did not request that Suen examine the subject of Macau, but rather gave Suen an immediate positive reply. This, in light of the fact that Suen's words matched and verified one to one the Macau enterprise as I had presented it to Adelson, and my estimates and forecasts presented to Adelson in this regard.

Adelson, who had just received further encouragement for the potential in Macau and who had just decided to work all the more strongly to realize this, suddenly understood that his ratification of my option conditions as promised, would give me the unequivocal right to options in the Macau enterprise which he intended to establish following my initiative. Therefore, his stand toughened, and he instructed his attorneys to clearly deny any prior ratification on his part, and all in an attempt to prevent me from receiving my rights in the Macau enterprise.

Therefore, I suddenly found in Daniel Chin's letter (**Appendix X** above) a precise (false) clarification which was nothing but an attempt

to correct the previous ratification given by Adelson of the rights of options to which I was entitled:

> "As you have discussed in the past with Sheldon, it is understood by both parties that any offer made in the past or in the future by rather of the parties was and will be for negotiation purposes only and will not be deemed to be acceptance by any party of any issue other that as part of a comprehensive settlement signed by both parties."

8.1.4.  Furthermore, matters suddenly began to drag along slowly with no progress.  Such that at the end of October, 2000, four months after Mr. Chin's letter and seven months after notice of my dismissal, I was forced to turn to Mr. Chin in a reminder.  A copy of the letter from my intermediary dated 29 November 2000 to Mr. Chin is attached herein as **Appendix Y.**

-21-

Despite my appeals, Adelson continued to drag matters.  This probably due to Suen's expected visit to Las Vegas in November 2000 for meetings with Adelson regarding the Macau enterprise.  Once again, Adelson, who was beginning to see that the Macau enterprise was coming to life, tried in all his power not to confirm anything in order to prevent me from realizing my rights in the Macau enterprise.

8.1.5   In April 2001, one year following my notice of dismissal, and after taking numerous and significant steps to proceed with the Macau enterprise which brought him to the understanding that the enterprise is highly viable, Adelson sent me a document via his attorney Yaacov Neeman a document.  Surprisingly, in this document, all the separate agreements  with Adelson including the options trust mechanism due me in IMD and Denex were interchanged with a clause offering one financial sum (not specified) for the termination of my employment.  A copy of this document is herein attached as **Appendix Z.**

Even more drastic than this, an additional clause was added wherein I raised claims related to the rights due me with regard to casino licensing which Adelson or anyone on his behalf, had achieved in Israel, Jordan, and, in the language of the letter, "in any other country".

The addition of this clause raised fears and suspicions in me with regard to the hidden intent of the drafter, especially insofar as I did not raise any claims with regard to a casino anywhere else but Jordan and Israel (due to the simple fact that I was not aware of any materialization by Adelson of the Macau enterprise).  This can also be seen from the documents which I took out at that time (amongst others Appendix E above).  Today, I understand that the clause was added in light of the

development of the Macau enterprise and in an attempt to prevent me from raising the claim regarding lack of any knowledge of a casino enterprise in the world (and specifically in Macau). What was the fear, that in the event that the above sentence "in any other country" had not been written, I would have been able to claim that I waived claims in the framework of the arrangement, only with regard to those subjects of which I had knowledge. The addition of the clause was intended to prevent a situation wherein I would raise the abovementioned claim, and upon its incision, I am aware of a casino enterprise in any other country, including Macau.

8.1.6     Indeed, today it is clear to me that what Adelson told me when giving me the notification of my dismissal, according to which he wished to terminate his investments in Israel and the rest of the world and concentrate on his transactions in the United States, were a total lie. Adelson fired me in order to prevent me my rights which he knew I was due in the Macau enterprise. Immediately after, Adelson continued to try, through any manner of cunning, to bring me to waive my rights in Macau without uncovering to me that he materialized the enterprise which I had offered him. Adelson simply tried to hide from me any information regarding Macau, and to mislead me in any way possible in order to bring about the situation that I waive all rights including in regard to Macau. He clearly knew that in the event that I would know about the Macau enterprise, with my knowledge of the enormous potential inherent in it, I would not agree to any outline of arrangement in light of the large amounts involved.

8.2  In the framework of the legal litigations between Adelson and myself, Adelson denied numerous times any involvement and knowledge of the Macau issue. All this when it was clear that he had materialized the Macau enterprise. During the legal procedures between Adelson and myself, Adelson presented various versions contradicting themselves, but with one common denominator – denial of the Macau enterprise and my involvement therein.

Adelson especially denied any knowledge and/or involvement in the Macau enterprise before the time of my dismissal. In the framework of the Suen claim's documents (Weidner's affidavit in the Suen case 1:25-20:9) Weidner admitted on Adelson's behalf, that in 1999 – the year in which I presented the Macau enterprise to Adelson, the subject of the potential of a casino and tourist enterprise in Macau was known to Adelson and his people. To the best of my knowledge, this is a legal admission on behalf of Adelson on the presentation of the Macau enterprise by me to Adelson.

8.3  Liability of Interface Partners – As stated, I presented the case against Adelson, my employer, and against Interface which paid my salary, and therefore they are also considered as my employer. Hence, the liability of Interface as well with regard to my rights in the Macau enterprise. It is the responsibility of Interface Partners as a subject who paid my salary and are therefore

-22-

considered my employer, to deal with the materialization of my rights in the
Macau enterprise. Declarative welfare against Interface Partners as requested
in my claim, will cause them to do such.

**8.4   Campaign of fear and pounding which Adelson unloosened due to my
       daring to sue him**

During the contacts between Adelson and myself with regard to the terms of
the termination of my employment, Adelson and his representatives threatened
me that if I should dare to sue Adelson for my rights, they would blacken my
name and take legal measures against me.

After I "dared" to sue Adelson in this case, Adelson began an unprecedented
campaign against me – which has continued up to today – whose only aim is to
cause me to lose this case.

In this framework, Adelson brought against me, one and a half years after my
dismissal, a counterclaim in the Labor Courts in the sum of more than NIS
2,660,000 LB 9015/02 (hereinafter: "withdrawn case"). In the framework of
this case, Adelson raised a set of false claims whose only aim was to blacken
my face and slander me. Adelson conducted the case against me for four
years, while taking advantage of every possible legal tactic in the rulebook in
order to drag the case and retain it as a black cloud over my head. Finally,
after four years, Adelson instructed Interface Partners to withdraw the case and
the honorable court decided on unprecedented expenses in the sum of NIS
90,000 plus V.A.T. (which has not, to date, been paid in full by him).

But Adelson did not stop here, and recently brought the same withdrawn claim
as abovementioned, this time in an American court!!!

Once again, in an attempt to exhaust me and cause me enormous financial
expenses in order that I may abandon this case.

Finally, Adelson, in the beginning of 2004, brought a claim against me in the
United States in the sum of 10,000,000 dollars on groundless claims. Even
after the said case was withdrawn due to an inadequate forum, Adelson
continues to appeal the decision.

Finally, Adelson began an unprecedented smear campaign and harassment
against me and my family. In this framework, Adelson does not hesistate to
take any means. Adelson (or someone on his behalf) has leased the services of
a private investigating firm in order to follow me day and night, including
harassment day in and day out, and including teams who follow me wherever I
go. Adelson (or someone on his behalf) has taken actions which harass my
wife and my minor son, e.g., opening of documents to my wife and my minor
son in the late evening hours, and has done this numerous times despite my
complaints regarding this to the police. Adelson (or someone on his behalf) has
harassed witnesses on my behalf. Adelson (or someone on his behalf) has acted

- including by way of impersonation – in order to get information about me and about my financial and health situation.  For example, Adelson brought in the framework of the proceedings which he is conducting against me in the United States, details of 64 trips which I took abroad which was illegally extracted from  the country's data base.  Furthermore, and as I have been informed, Adelson (or someone on his behalf) has turned to many parties who have been my business  colleagues and/or friends and acquaintances in Israel and abroad and threatened  them that in the event that they continue to be in contact with me, he will cut off  any contact with them.

Therefore, this smear campaign, harassment and pounding which Adelson is conducting against me, while utilizing his endless resources in conpared to my meager ones, has caused me great damages.

Such, I am dragged into lengthy and unnecessary legal proceedings in Israel and the United States, which have cost me great sums of hundreds of thousands of dollars.  Many of my colleagues, friends and acquaintances in Israel and abroad have cut off or limited their contact with me for fear that they would be hurt by Adelson and some even talk to me in private, this too for fear that they would be hurt by Adelson. My health and mental status has deteriorated due to Adelson's endless  harassment including through private investigators and detectives who follow me and my family constantly.  My family's situation has also deteriorated and my family members are angry at me that I dragged them into this unbearable situation which is all the result of a campaign of vengeance by Adelson.

-23-

Sadly, Adelson may  achieve his aims and "break" me.

The only hope left to me, is to receive relief from the honorable court which will put an end to Adelson's unfit  behavior and force him to give me what is legally mine from him.

_____

Signature of the declarator

I, the undersigned, David Peretz, Adv., herein confirm that on 17 December 2006 Mr. Moshe Hananel, holder of I.D. No. 52750726, who is known to me personally, appeared before me, and after cautioning him that he must tell the truth, and only the truth, and that he would be liable to punishment as

determined by law in the event that he not do such, has confirmed the accuracy of his affidavit above and signed before me.


_____

David Peretz, Advocate

J:\Docs\31216\00001\01244284.DOC