Exhibit A

## Affidavit

I, the undersigned, Dan Tichon, former Speaker of the Israeli Knesset, bearer of I.D. No. 6732481, of 5 Hanamer St., Malcha, Jerusalem, after having been cautioned to tell the truth, failing which I will be liable for the penalties prescribed by law, do hereby declare in writing as follows:

1. I became acquainted with Mr. Sheldon Adelson (hereinafter: "**Mr. Adelson**") more than a dozen years ago and I regard him as a friend.

2. In the context of the acquaintance between us, I met with Mr. Adelson and with the woman who subsequently became his wife, Miriam Oxhorn-Adelson, a great many times at social, public and personal events.

3. I recall, in the context of our close relationship that in the early 1990s Mr. Adelson wanted to hold one of his wedding event at the Knesset building, (the Chagall Hall). I advised him not to hold the said event at the Knesset but he did not heed my advice.

4. I recall that in 1995, after elections were held for the Knesset and for Prime Minister, which former Prime Minister Mr. Benjamin Netanyahu won, a problem arose at the entrance to the Likud's victory event at Binyanei HaUma in Jerusalem. Mr. Adelson, who was invited to the said event, requested my assistance since he not allowed in. Mr. Adelson was unsuccessful in reaching Mr. Benjamin Netanyahu who had invited him and therefore contacted me and requested my assistance. I was aware of Mr. Adelson's substantial and crucial contribution to Mr. Benjamin Netanyahu's election and was happy to help him. I handled Mr. Adelson and his wife's entrance permit for the event and also handled the matter of seats for Mr. Adelson and his wife (next to my wife).

5. Mr. Adelson visited my chambers at the Knesset several times. I was invited to Mr. Adelson's home at 10 Paamoni St. in Tel Aviv a number of times and attended several family events there. Mr. Adelson and his wife were invited to, and were also present at a private party held in my honor at Danny Rejwan's family house in Jerusalem on my being elected as Speaker of the Knesset and on the occasion of my wife's birthday.

6. We dined together a number of times at restaurants in Tel Aviv-Jaffa and in Jerusalem with his wife and my wife. At the majority of the dinners, Mr. Moshe Hananel and his wife also participated.

7. At Mr. Adelson's request, my wife and I participated in a great number of events held at the Knesset and in various locations in Jerusalem, which were held on the occasion of the visit of American members of Congress (mainly Republicans) in Israel. In a number of instances I recall that after being contacted by Mr. Adelson, I helped coordinate events that were held at the Knesset.

8. I recall an event held at Mr. Moshe Hananel's house in Mevasseret Zion at which Mr. Adelson, who spoke with me the entire evening, was present.

9.  Over the years, on his visits to Israel, Mr. Adelson and I met and spoke a great many times on various and varied topics which interested Mr. Adelson such as a casino in Israel, a casino on the Israeli-Jordanian border, the subject of privatization in Israel, the company Africa-Israel, Bank Leumi, professional unions in Israel and in the U.S.A, Mr. Adelson's wife's drug clinic and problems at the Ministry of Health in Israel.

10. Throughout the years, I was happy to be of service to Mr. Adelson when he needed advice or an opinion on matters that occupied him.

11. On August 29, 1999 (at which time I did not hold any public position), I held a press conference at Beit Agron in Jerusalem. I was interested in the press conference being recorded and invited a recording company for this purpose. To my surprise, less than one hour before the press conference began, it transpired that the recording company that I had invited was demanding an undertaking by a "company" for payment of the cost of recording the press conference. The recording company refused to accept an undertaking for payment from a private person and would not even agree to payment in advance in cash or by check or credit card (not even as collateral).

As aforesaid, my attempts to solve the problem by myself were in vain. Due to the shortage of time I was forced to approach an external entity for assistance. I turned to my friend Mr. Moshe Hananel whom I knew worked for Mr. Adelson at Interface and requested his urgent help in solving the problem. I did so, *inter alia*, since I estimated that in view of my relations with Mr. Adelson, helping me in the urgent circumstances that had arisen would not create a problem. Mr. Moshe Hananel expressed his consent to help me by giving an undertaking for payment and I agreed with Mr. Moshe Hananel that upon arrival of the tape and the invoice we would settle the matter and I would arrange to remit to Interface the payment due thereto. I would like to mention that to date, I have not received the tape or the transcript.

12. In the event that I receive a request from any entity for payment, I will not hesitate to remit the sum, which I have been told is NIS 671, immediately.

13. To the best of my understanding and knowledge, in view of my acquaintance and conversations with Mr. Adelson, it was not possible for a situation to have been created in which Mr. Adelson was not aware that Mr. Moshe Hananel continued to be employed by "HaGalil Tours" and involved in the business thereof, in addition to his occupation at Interface, during the period from late 1995 until 1998. In joint meetings that I held with Mr. Adelson and Mr. Moshe Hananel, I made reference, in Mr. Adelson's presence, to the situation at "HaGalil Tours", the situation at Royal Jordanian, the relationship with Jordan, the state of business at "HaGalil Tours" in general and in the field of incoming tourism in particular. Mr. Moshe Hananel, who is considered one of the kingpins of the tourism industry, was absolutely identified in this field with his occupation at "HaGalil Tours", and this fact was commonly known, particularly amongst those entities that engaged in the field of tourism or in the tourism relations with Jordan.

(-)
Dan Tichon


I, the undersigned, *Ruth Glatt*, Adv. of *74 Menachem Begin Road, T.A.*, do hereby confirm that on *October 25, 2004* appeared before me Mr. Dan Tichon, whom I identified by an I.D. card and who, after I cautioned him to tell the truth, failing which he would be liable for the penalties prescribed by law, confirmed the veracity of his foregoing statement and signed it in my presence.


(-)
Ruth Glatt, Adv.

Exhibit B

## Affidavit

I, the undersigned, **Arye Lis, I.D. No. 008341158**, after having been cautioned to tell the truth, failing which I will be liable for the penalties prescribed by law, hereby declare as follows:

**Following is my affidavit:**

1.  I became acquainted with Moshe Hananel in 1975 or thereabouts, and during my work at Isrotel. In May 1999 or thereabouts, I approached Mr. Moshe Hananel with an offer, which concerned the construction of a 'time-sharing'-type vacation project in the Zhuhai area, near Macau, in China.

2.  I approached Moshe Hananel due to my acquaintance with him as an authority on, and an entrepreneur in various tourism fields, and since I was aware of the fact that he acted as Sheldon Adelson's representative in Israel and was employed by him as part of the Interface group, of which I had heard both from him and from common acquaintances in the tourism industry.

3.  At the first meeting I held with Moshe Hananel, I presented him with a brochure which describes the proposed venture and the geographic location thereof, including the reasons attesting to the advantages inherent to the said location and venture, such as its being a vacation destination for residents of both Hong Kong and Canton, which are located in relative proximity to the said area (2-3 hours by land or sea and approximately half an hour by air).

4.  Moshe Hananel immediately informed me, at that first meeting, that Sheldon Adelson did not seek to invest outside the United States or Israel, unless the project involved a casino. Moshe Hananel asked me about, and asked me to check which foreign investments were made in this region of China, access routes by air, land and sea and who operated them, as well as the possibility of building a casino-related project in this area.

5.  At this stage, I approached my colleagues and asked them for clarifications on the said three issues which Moshe Hananel had raised at our meeting. I met with Moshe Hananel again (to the best of my recollection, in late June 1999 or thereabouts), and gave Moshe Hananel two official brochures, in two copies, aimed at foreign investors in the region, and describing the infrastructure and the possibilities and rules of investment. I also informed Moshe orally that in my colleagues' opinion, the issue of a casino was very realistic. As for his other question, I clarified that there was still no regular aerial tourist traffic to Zhuhai, and that no international airline operated regularly to the new airport built there.

6.  Approximately 2-3 weeks later, Moshe Hananel called me, told me that Sheldon Adelson was in Israel and asked that I meet him and Sheldon Adelson at Interface's offices. Following Moshe Hananel's call, I arrived at Interface's offices for a meeting. At that meeting, Moshe told me that Sheldon Adelson was about to fly to Hong Kong in his private jet, and that he hoped to manage to convince him to go to Macau and meet with locals, who would present the tourist potential of this region to Sheldon Adelson. Moshe told me that he was

unable to join Sheldon Adelson's trip, and that Dan Raviv, who was supposed to accompany Sheldon Adelson, objected to the trip to Macau and regarded it as a waste of time. During the meeting, Moshe Hananel told me that Sheldon Adelson had arrived at the office and was in the next room. At the end of the meeting with Moshe Hananel, he invited me to Sheldon Adelson's room for a short introduction meeting, at which Moshe Hananel introduced me to Sheldon Adelson and Sheldon Adelson to me.

7.    To the best of my recollection, two weeks later contact was made between me and Moshe Hananel, who told me that Sheldon Adelson had visited Macau following his endeavors, that Sheldon Adelson was impressed by what was going on in the region and in Macau, and that Sheldon Adelson had said that if he were 10 or 20 years younger he would not have hesitated even to live in the area due to its huge potential, but that he did not see himself going into investments in the area.

8.    In that period, I approached other bodies in Israel to interest them in entrepreneurship in the Zhuhai area.

9.    I wish to clarify that I have no business relationship with or dependency on either Moshe Hananel or any of his companies or Sheldon Adelson or any of his companies.


(-)

_____

Arye Lis


## Certification

I, the undersigned, Adv. Adi Fighel (License No. 20567), do hereby certify that on December 4, 2006, appeared before me **Mr. Arye Lis, I.D. 008341158**, whom I identified by an identity certificate and who, after I cautioned him to tell the entire truth and nothing but the truth, failing which he would be liable for the penalties prescribed by law, confirmed the veracity of his foregoing statement and signed it in my presence.


(-)

_____

Adi Fighel, Adv.

C:\amir-work\taz-arie-lis-macau.doc