[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 007704/03**

**Before:**  **The Hon. Justice Ilan Itach**                    **November 13, 2007**
         **Public Representative (Employers) Miller Amiram**
         **Public Representative (Employee) Halevy Maoz**


Q.      How long were you there

A.      I was the first Israeli to visit China and in the aggregate to my estimation I spent 3 months of which one month consecutively the first time.

Q.      This month is the relatively long period of time

A.      I was speaking of the total periods and that's what I meant by the term relatively long. At that time China gave out visas for a week.

Q.      Where did you stay in China in that period?

A.      I was in Beijing, Inner Mongolia, a canton called Guangzhou, and Shanghai. I'm not counting Hong Kong that was British in part of the time of my visits to China.

Q.      Referring to the second brochure in Zhuhai, investment guide – M/2 of the affidavit, on page 18 begins a list entitled businesses which are forbidden for foreign investment in Zhuhai, I'm referring you to page 24, where it says in Section 12 subsection 3, it says casino so what is there to check?

A.      I checked and indeed in Zhuhai to my estimation a casino couldn't have been built. I meant Zhuhai the special area contrary to what Aryeh Lis said that there would be and also in his affidavit he said it. I said that in Macau there could be a casino and that's what's interesting.

Q.      In Section 4.3 of the affidavit, you say that in the first meeting Lis gives you the brochure
        M/2 that describes

A.      He came with a large brochure that describes his project.

Q.      You sent him after you saw the brochure to look into the possibility of building a casino in Zhuhai

A.      Right. I sent him to check whether it was possible to build a casino in Zhuhai and he came back and said that he thought it was but I didn't relate to that. And I said that in my estimation there wouldn't be a casino in Zhuhai but in the adjacent Macau.

Q.      After Lis approached you you started looking into this area independently?

A.      Yes.

Q.      So you learned and studied the subject and presented it to Mr. Adelson?

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 007704/03**

**Before: The Hon. Justice Ilan Itach**                    **November 13, 2007**
**Public Representative (Employers) Miller Amiram**
**Public Representative (Employee) Halevy Maoz**


A.    Right. But there were more milestones in the middle.

Q.    Referring to Section 4.2 of the Complaint, where you wrote that only one casino operates in Macau, I put it to you that that's nonsense because in Macau in 99 plenty of casinos operated. Is that true?

A.    No.

Q.    I put it to you that in Macau, as of 1999, 9 casinos operated, is that true?

A.    All belonging to the same casino. One casino of Stanley Ho's and it operated in 9 locations through a company.

Q.    These were 9 separate casinos?

A.    They're more than 9, only at the Lisboa building 10 casinos operated.

Q.    I put it to you that there were 9 separate sites at which there were casinos?

A.    Only one casino operated in Macau, it has 9 locations and only in one location there's more than one casino.

Q.    Referring to Section 4.7 of your affidavit, paragraph 4, is it true what's written in the paragraph?

A.    It's inaccurate. But in it's essence it's true.

Q.    In fact, it's absolute nonsense because there are casinos in Malaysia – Kuala Lumpur, in Seoul South Korea, in Cheju in South Korea in Manila – in the Philippines, in Nepal and more is that true?

A.    Partially true. In Kuala Lumpur there was no casino at that period but in a remote county in Malaysia that I visited. I visited all of these places in person. In Korea – there was a casino for American soldiers and it closed down. In Cheju – only Japanese were allowed to enter. All of the casinos you mentioned are less than 20% of the tables in a single casino like MGM or The Venetian.

Q.    When you wrote in Section 4.7 that it's a radius of 5 km there's not one casino it's not true?

A.    In the sense of an open and free casino like in Antalya then it's true what I wrote in the affidavit.

[ Emblem of the State of Israel ]

**The Labor Courts**

Tel Aviv Jaffa District Labor Court                           Labor Case 007704/03

Before:  The Hon. Justice Ilan Itach                          November 13, 2007
         Public Representative (Employers) Miller Amiram
         Public Representative (Employee) Halevy Maoz

Q.    In Section 4.2 of the Complaint you write about the Chinese' openness to
      expanding the gambling field in the Macau area only, is this from an inquiry
      that you made at the beginning of 99?

A.    No. I told you that there were milestones.

Q.    You write in Section 4.7 of the affidavit, the inquiry that I conducted was the
      first that the Macau area is about to transfer to Chinese control and from
      experience and from analysis that I conducted, I estimated that the Chinese
      authorities would behave in Macau in a policy similar to the way they acted
      towards Hong Kong – non-intervention and economic autonomy. Today you
      know following the affidavits that we filed that already in the agreement with
      Portugal of 87 and also in the basic law of Macau in 93 it was already
      determined that the Chinese authorities would institute in Macau an autonomy
      like in Hong Kong, in other words when you estimated in 99 or later that the
      Chinese authorities would treat Macau similarly to Hong Kong, it had in fact
      already been determined 12 years earlier, what do you say?

A.    Whoever remembers that also in Hong Kong with respect to which there were
      more specific rules from 12 years earlier, the whole world watched and looked
      whether the Chinese would respect those rules and how. We're talking about
      99. There are still English representatives at a level like of a governor in Hong
      Kong and the Western world especially England and the United States watches
      to see what will happen. In Macau at that time there was no certainty that a
      casino will remain and not stop completely. The citizens of Macau fought to
      be allowed a catholic school despite the agreements that I declare and I didn't
      read them then and I didn't read them before the trial, I mean what you filed.

Q.    You discovered in your research in Section 4.6 of your affidavit that in Macau
      there was casino activity that was operated by Stanley Ho by virtue of a years-
      long franchise that he had from the Macau authorities, is that right?

A.    That's right.

Q.    When you testified in the proceedings in the United States, you were asked
      according to your knowledge in real time when Stanley Ho's monopoly with
      respect to the casino activity in Macau was going to expire and you said that it
      was in 2004 is that true?

A.    I'm asking that you show me what I said.

Q.    I'll show you. Referring you to Exhibits Vol. 2 Exhibit 3 page 26, line 23
      forth,

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                         **Labor Case 007704/03**

**Before:  The Hon. Justice Ilan Itach**                  **November 13, 2007**
            **Public Representative (Employers) Miller Amiram**
            **Public Representative (Employee) Halevy Maoz**


A.    I can't confirm that these are the things I said. There's a document of corrections to this transcript.

Q.    You'll check the correction document and if there's a correction with respect to this paragraph you'll inform the Court?

A.    O.K.

Q.    If so, in your testimony in the United States you said that Stanley's franchise ended in 2004 today you know that it's not true and the franchise was actually going to end and ended in 2001, is that right?

A.    In 99 when I studied the subject I knew that it would end in 2001 and also today I know that it ended in 2001.

Q.    If you already knew that in 99 why didn't you say so in your testimony Exhibit 3?

A.    Because the lawyer – your colleague didn't let me talk.


**The Plaintiff's Counsel**: I am clarifying that Exhibit 3 is testimony taken in the framework of a proceeding concerning the investigation of jurisdiction.


Q.    You say in Section 4.7 of your affidavit, paragraph 2, that the inquiry that I conducted revealed that an airport was built in Macau…and further that also in Zhuhai very close to Macau 10 km away a large modern airport was built and in the following paragraph you explain that one of the basic conditions of a foreign investor in performing investments in developing areas and Macau was an area in development is a developed infrastructure and in the first place a developed airport – I propose to you that in real time, meaning in 99, you didn't even know there was an airport in Macau. What do you say?

A.    The Zhuhai airport whose technical specification is 10 km away from the Lisboa casino…

**To the Court's question**: The question of the Defendants' counsel is focused – he's proposing a fact to you and you'll say if it's true or not, in 99 you didn't know that there was an airport in Macau?

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 007704/03**

**Before:  The Hon. Justice Ilan Itach**                    **November 13, 2007**
**Public Representative (Employers) Miller Amiram**
**Public Representative (Employee) Halevy Maoz**


Answer – it's not true. The large one is in Zhuhai and the small one is in Macau and they're both large.


Q.    I'm placing before you your testimony in the proceedings in the United States, page 206 line 2, reading out the part marked by the letter A – in other words what you explained in the proceedings in the United States is that the Zhuhai airport is in fact the Macau airport and today you know that in Macau itself there was then and there is today a large modern airport, is that right?

A.    Everything that you're attributing to me is a barefaced lie. I have in my possession documents that I filed with the Court that speak as of 99 about Mr. Adelson's theoretical possibility of landing in Macau.
There was an airport in Macau and next to it in Zhuhai an airport 3 times the size maybe 12 km was built, that no one was flying to. I checked with international airlines. It's being built because they're thinking that Macau will be a blast, that was my estimation. This is what drew my attention.

Q.    The continuation of your story in Section 4.8 of your affidavit, you say upon conclusion of the inquiry... Mr. Adelson the gambling and tourism shark tells you the sentence that you say in Section 4.8 that he'd never heard the word Macau before, is that right?

A.    It's accurate and Sheldon confirmed it in his examination in the United States.

Q,    I'm placing your examination Annex 3, page 142, from line 11, where you tell of that conversation with Adelson to Adv. Frank Levy's question do you remember when this conversation took place and you answer that he came to the office. I finished a conversation about Macau with the man that I described before and afterwards you write that you presented the plan at the end of the page is that a true description?

A.    The description of this conversation is true. But this isn't the only conversation with Sheldon about Macau.

Q.    This isn't the first conversation

A.    No. To the best of my recollection. I tried to talk to him on the phone and he didn't want to hear. And he was on a visit two weeks earlier. I spoke but he didn't hear. I had the feeling that he didn't understand the magnitude of the opportunity.

Q.    The same gentleman that you describe, meaning Aryeh Lis

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 007704/03**

**Before:  The Hon. Justice Ilan Itach**                    **November 13, 2007**
        **Public Representative (Employers) Miller Amiram**
        **Public Representative (Employee) Halevy Maoz**

A.    Right.

Q.    He was in your office then when Sheldon came?

A.    Right.

Q.    You made the introduction between Mr. Lis and Sheldon?

A.    Right.

Q.    You say in Section 4.10 of your affidavit, that you furnished Adelson with some of the material that you received from Mr. Lis including the Information for the Investor brochure. (Paragraph 1) Was that on the same occasion?

A.    The passage needs to be read out to me.

Q.    When did you give Sheldon Aryeh Lis's brochure?

A.    I showed and I gave one in June and one in July. Either at the end of June or at the beginning of July. I gave either at that meeting that we talked about earlier that Sheldon came to my office and Lis was there or two weeks earlier. In my opinion two weeks earlier is more likely. More than 7 years have passed and I don't really remember in a two-week difference.

Q.    Could it be that you gave in the conversation that Adelson didn't listen to you two weeks earlier could it be that you gave him 2 brochures about Zhuhai with the intention of convincing him to act for the construction of a venture in Macau?

A.    Right. I remember well that I showed him the maps and the pictures and especially the maps and I spoke with him about the airport how much it impressed me meaning the large airport that was added in Zhuhai and I also spoke about sewage.

Q.    In addition to the brochures M, you explain in Section 4.10 of your affidavit that your furnished Adelson with a business plan that was prepared by you with respect to Macau, which as you write was based on another venture and the business plan of the other venture is attached Annex N of the other venture. Is that true?

A.    In the Annex it has 3 business plans that were submitted together.

[ Emblem of the State of Israel ]

## The Labor Courts

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 007704/03**

**Before:  The Hon. Justice Ilan Itach**                    **November 13, 2007**
       **Public Representative (Employers) Miller Amiram**
       **Public Representative (Employee) Halevy Maoz**


Q.    You wrote in Section 4.10 that you were attaching as Annex N the business plan on the basis of which I prepared the business plan that I gave to Adelson the last one of which you didn't keep?

A.    Plans were prepared they're essentially the same and I'm willing to accept that Annex N is the basic plan more or less and it refers to a tourist area in Eilat Aqaba  and it says Red.Sea.Kingdom.

Q.    In your testimony in the United States you explained that you took parts of this plan, printed them and this you gave to Adelson to present to the authorities in Macau is that right?

A.    I printed, I bound in a bookbindery and gave several copies to Adelson.

Q.    You printed a few pages from this brochure, you bound them and gave Adelson?

A.    No. There were pages that I had to leave out pages or passages, and I adapted it so that it could be used for the communist red sea and I left the title Red.Sea.Kingdom. Because it's the communist Red Sea and I liked it as a title and I told that to various people.

Q.    You didn't adapt the plan to Macau, but printed some of the pages in this brochure true or not?

A.    I adapted it to Macau. For example: the parts of the shopping centers when Hong Kong is beyond the fence, were left out. The parts and I had an argument about it with Adelson regarding the conference center, but after Adelson objected they were left in.

Q.    All the stories you left out parts and printed parts?

A.    I adapted. It's not like making a copy and that's it.

Q.    Is the word Macau mentioned in the brochure that you gave Adelson?

A.    In my opinion the subject the word China, is mentioned. But Macau I don't think that I mentioned specifically in the brochure.

Q.    I'm telling you that what you did was you took parts from this brochure (cut and paste) and gave it to Mr. Adelson?

A.    No.

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 007704/03**

**Before:   The Hon. Justice Ilan Itach**                    **November 13, 2007**
           **Public Representative (Employers) Miller Amiram**
           **Public Representative (Employee) Halevy Maoz**

Q.   I'm referring you to Annex 3 page 178 line 3 – the entire part marked by the letter A – is that what it was?

A.   What it was is what's in the Hebrew I expressed myself articulately and it's not inconsistent with the passage you read out.

Q.   Referring to page 180 line 14 – 23 **marked A** you were asked whether Macau appears in the document and you said no, what do you have to say?

A.   Completely identical to what I said in Hebrew.

Q.   You also explained in the proceedings in the United States that you left the title Red.Sea, because China is red and Macau is near the sea as you explained earlier that it's the communist sea?

A.   Originally it was called the Red Sea because of Eilat and Aqaba, and as I showed on the maps that there's a river and the whole area is called Pearl River Delta, and the sea is called the Chinese Sea which is larger, I thought it could be sold as the Red Sea.

Q.   This is what you say Mr. Adelson gave the Chinese authorities in Macau on his trip of August 1999?

A.   What I saw, I gave he took it, the security people saw that he took it and I know from hearsay that he gave it on several trips.

Q.   In Section 4.10 of your affidavit, you say that you offered Mr. Adelson you offered him [sic] meetings with relevant persons and especially with Stanley's daughter Ms. Panty Ho, with whom you had a prior acquaintance?

A.   I didn't have a prior acquaintance and I didn't claim so. My acquaintance was with Gray Line Hong Kong. I was the president of the international Gray Line organization and I knew the franchisee in Hong Kong who brought the regular gamblers to Macau at that time. I called Gray Line Hong Kong and they suggested that the meeting be with Panty Ho and I suggested that to Sheldon and he said that there was no need because he had a Chinese worker who would take care of it.

Q.   When were you president of Gray Line?

A.   At the end of the 80s and the beginning of the 90s.

Q.   Moving on to Adelson's visit to the Far East in August 1999, I'm presenting to you his travel itinerary as attached to his affidavit in Annex 4, he started his

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                                   **Labor Case 007704/03**

**Before:  The Hon. Justice Ilan Itach**                              **November 13, 2007**
**          Public Representative (Employers) Miller Amiram**
**          Public Representative (Employee) Halevy Maoz**

|       |                                                                                         |
|-------|-----------------------------------------------------------------------------------------|
|       | journey on August 29 he landed in Macau, and even though he landed in Macau he slept in Hong Kong? |
| Q.    | That's what I understood and was described to me by Sheldon and be Sean Ben Menachem.     |
| A.    | We explained in our affidavits that Adelson landed in Macau only because his private jet wasn't authorized to land in Hong Kong due to the noise level, you denied this and declared in your complementary affidavit in Section 2.4… "August…could have landed in Hong Kong", in other words, you're saying that since there were no noise restrictions that prevented Mr. Adelson's landing in Hong Kong, his landing in Macau wasn't a necessity but a choice right? |
| A.    | Yes. But I don't agree with the assumptions in the question. But I deny the noise issue. |
| Q.    | I'm now re-reading you a passage from your testimony in the proceedings in Annex 3 page 189 line 6, where you describe a conversation with Adelson's pilots, before he left for the Far East and so you say…**Passage A** You knew in real time that Adelson's jet couldn't land in Hong Kong is that right? |
| A.    | It's a lie. The jet could have landed in Hong Kong but it couldn't park for a long time in Hong Kong because the airport was narrow. No noise problems and everything is tales and a barefaced lie. What is true, leaving a jet on the ground for 4 days like parking, is impossible. I talked to the pilots beforehand because the pilots planned to return empty to Taiwan empty [sic] and would come to pick him up 4 days later and I said: that there's Macau because I wanted him to visit. |
| Q.    | In other words because you knew that according to you there was no permission to park in Hong Kong for 4 days you told the pilots "that they can't get landing privileges in Hong Kong". How is that consistent with the parking version? |
| A.    | It's the same version and the facts will prove. |

**The parties ask for a half-hour recess.**

**Decision**

The time is now 14:35 hearing will continue at 15:05.

**Issued today, Kislev 3, 5768 (November 13, 2007), in the presence of the parties.**

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 007704/03**

**Before:  The Hon. Justice Ilan Itach**                    **November 13, 2007**
**Public Representative (Employers) Miller Amiram**
**Public Representative (Employee) Halevy Maoz**


**(-)**

_____

**Justice Ilan Itach**


**Comment**: The time is now 15:05.


**Continued examination**:

Q.    Referring to the affidavit in the Macau claim, reminding you your version with respect to the trip in August 99, you describe in Section 5.1 of your affidavit, paragraph 2 – reading the paragraph. Is the entire second paragraph true?

A.    Both of the quotations that Sheldon told me with respect to the 45 minutes and the second that he's going to Macau – are true. As for the rest, I know both from him and from the security people who described. I can't respond whether it's true.

Q.    Sheldon landed in Macau, slept in Hong Kong, spoke with you one day that he'll travel the next day to Macau and return on the same day to Hong Kong. Is that true?

A.    I can't say that it's true.

Q.    Landed in Macau, slept in Hong Kong stayed in Hong Kong, traveled to Macau for a visit and returned to Hong Kong on the same day, is that true according to what you know?

A.    I know what I remember what I was told over the phone. I wasn't there.

Q.    What I described now is what you write in the affidavit, is that true?

A.    I answered that.

Q.    In the testimony in the United States you added that Adelson left Hong Kong for Macau at 11:00-12:00 in the morning and returned to Hong Kong after 17:00, is that true?

A.    The same reservation appears in this examination in English two or three times.

Q.    Referring to page 184 lines 8-15 are these statements that were made by you?

[ Emblem of the State of Israel ]

**The Labor Courts**

Tel Aviv Jaffa District Labor Court                    Labor Case 007704/03

**Before:  The Hon. Justice Ilan Itach**                    **November 13, 2007**
**          Public Representative (Employers) Miller Amiram**
**          Public Representative (Employee) Halevy Maoz**


A.      The statements were made by me, with the same reservations that I mentioned earlier and also in the original the reservations appear.

Q.      In the affidavit that you gave in this Court in the Section that I read out before, 5.1 paragraph 2, did you include any reservation?

A.      I've already answered this question.

Q.      You didn't answer this question

A.      The affidavit should be read.

Q.      You when you wrote the affidavit and all the fairytales, you forgot to take into account that a trip from Hong Kong to Macau is an entry and an exit requiring a passport stamping and we filed a photocopy of Adelson's passport Annex 5, we specified the stamps in his affidavit and explained that if your story as if during his stay in Hong Kong Mr. Adelson traveled to Macau during the day and returned on the same day to Hong Kong, there should have been another 4 stamps in the passport which aren't there, namely, an exit from Hong Kong an entry to Macau an exit from Macau and an entry to Hong Kong. After we presented the passport to you do you agree that the story that you told in the affidavit is groundless?

A.      The passport was presented to me after more than two years of requests on my part. I don't accept it as a fact because this passport wasn't filed in real time in advance. We estimate that it's missing 4 pages that aren't in it. It will come up in his examination. The original passport can't be examined by my counsel and my wife because there was a request and they refused. And I can't confirm either way. Sean Ben Menachem specifically said otherwise. It doesn't change the fact that there was a tour in Macau irrespective of where it started and where it ended. A tour of a few hours.

Q.      After we filed Adelson's passport with the affidavit, you understood the meaning of this and you filed a motion with the Court in which you asked to inspect all of the original documents that were filed by the Defendants and especially the passport marked **Def/23**, this is the same motion that you mentioned earlier. You told the Court that we objected to the motion and I'm presenting to you our response **Def/24** to the motion in which it was stated that the respondents of course do not object to the inspection at any time and I further say on the next page that the thought that the second respondent and his counsel will attach…the passport is available for inspection. Would you like to withdraw what you said before in Court that we objected to your motion to show you the passport?

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 007704/03**

**Before:  The Hon. Justice Ilan Itach**                    **November 13, 2007**
          **Public Representative (Employers) Miller Amiram**
          **Public Representative (Employee) Halevy Maoz**


A.      I'm not withdrawing. They threw my wife and counsel who came to Adv. Shraga's office and weren't prepared to allow them to inspect the material.

Q.      What you said now is not true.

A.      Let my wife testify.

Q.      You never neither you nor your lawyers asked to see Mr. Adelson's passport following our position in the discovery motion, what do you say?

A.      I think a game is being played here with the dates.


**To the Court's question**: Do you know that after the Defendants' position Def/24 of May 31, 2007 your counsel or your wife or you yourself or another on behalf of those mentioned approached the Defendants' counsel and asked to inspect the passport and this request was refused?


**I respond**: After this date I don't know whether my counsel approached. I didn't approach. My wife didn't approach either. Before this date what I described – happened.

Q.      Was it regarding the passport?

A.      I wasn't there.

Q.      You tell in your story, in Section 5.1 of your affidavit, before Adelson leaves for a visit in Macau from the Peninsula you recommend to him to travel in a vehicle that is called a hovercraft of sorts, my question is a few days earlier Mr. Adelson came from Macau to Hong Kong. Why does he need you to explain to him how to travel from Hong Kong to Macau?

A.      The explanation how to travel from Hong Kong to Macau was still in Israel. If you look at the map that you filed, you'll see that Macau airport is in the sea. The shortest service between Macau and Hong Kong is a helicopter and that's the first thing I presented. The second option is a hydrojet or turbojet that doesn't exist today and existed in 99 which leaves directly from the airport. In the first conversation that was before the first trip between Hong Kong and Macau in this or the other direction, I understood that he would be on the turbojet and not the hydrojet and then we talked about it again. We talked

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 007704/03**

**Before:  The Hon. Justice Ilan Itach**                    **November 13, 2007**
**Public Representative (Employers) Miller Amiram**
**Public Representative (Employee) Halevy Maoz**

about it still in Israel because he told me no about the helicopter because Miri his wife wouldn't agree.

Q.    In Section 5.1 of your affidavit you also declare that in the morning of his visit to Macau a little before he went there again Adelson called you and so he did upon arriving in Macau, and you were in Israel then?

A.    Right.

Q.    Where?

A.    One conversation I remember for certain in the office. A second conversation I don't remember where.

Q.    In the first one you were at the office?

A.    I don't remember.

Q.    According to my calculation, the first conversation was at 4:00 Israel time and the second according to you was a little before 5:00 a.m., and I ask you when were you at the office at 4:00 or at 5:00 a.m.?

A.    I think you're misleading the Court.

Q.    What's the time difference?

A.    The time difference then was 5 or 6 hours whilst there it's more. In other words, it's now 15:30 Israel time and there it's 21:30 Hong Kong time. The first conversation that he's telling me that tomorrow I'll go there is…

Q.    I asked you about the conversation in the morning before and after the trip in the morning of the visit to Macau?

A.    The landing of the airplane we know in Hong Kong was between 15:00 and 16:00 in the afternoon according to their claim, less 6 hours it's 10 a.m. Israel time. Assuming that he wasn't 20 minutes but a few of hours, then let's say till 18:00 or 19:00. If it's 17:00 then the conversation was 13:00 Israel time.

**To the Court's question**: The Court reads from Section 5.1 second paragraph "in the morning of his visit…after his arrival in Macau". Up to this point Sir is describing two phone calls that were made in the morning of the visit to Macau?

A.    Right.

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                     **Labor Case 007704/03**

**Before:  The Hon. Justice Ilan Itach**                     **November 13, 2007**
          **Public Representative (Employers) Miller Amiram**
          **Public Representative (Employee) Halevy Maoz**

**The Court's question**. According to the time difference, phone calls that are made in the morning of the visit to Macau, were made according to Israel time during the night before is that true or not?

A.      Early in the morning the day before, Mr. Sheldon didn't get up at 6:00 a.m. His morning there in Macau was at 11:00 minus 5 hours or 6 hours this is according to Israel time. One conversation I remember that was at the office, a second conversation I don't remember where it was. On a regular basis for 6 years, I got calls at every hour of the day. Even in the middle of the night. It wasn't unusual.

Q.      You claim that Adelson was angry with you about the wrong time estimate of the hydrojet journey but I'm telling you that the hovercraft between Hong Kong and Macau takes an hour and never 40 minutes or 45 minutes, what do you say to that?

A.      I say that you're lying. Because you can check the existing time tables that I checked after you raised this argument in writing, and there it says 55 minutes. With respect to that time I was convinced while I'm in Israel that Sheldon was taking a private hovercraft. But either way, an hour isn't an hour. There are documents that speak of 55 minutes.

Q.      After Mr. Adelson's trip to the Far East in August 99 you didn't have any connection to the Macau project true?

A.      Not true.

Q.      I'm reading to you from Section 4.10 of the Complaint, why did you answer earlier in the negative to my previous question in view of what I read to you in Section 4.10?

A.      Because Eric Kobi who was in the second trip mentioned, that I arranged to give him brochures also for the second trip in March 2000 and when I wrote the Complaint it slipped my mind, and he told me that he remembers this fact well.

Q.      When did Eric Kobi tell you this?

A.      Before you called him and before the subpoena in Israel.

Q.      Pinpoint on the timeline?

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 007704/03**

**Before:  The Hon. Justice Ilan Itach**                    **November 13, 2007**
**Public Representative (Employers) Miller Amiram**
**Public Representative (Employee) Halevy Maoz**

A.    The subpoenas was [sic] given on June 28, 2007 (stated by the Plaintiff's counsel). In view of my counsel's statement, a few weeks before that.

Q.    Didn't you move since then to amend the statements in the Complaint?

A.    I remembered it being so stated.

Q.    You know that in November 2001, two years and a quarter after your alleged conversation with Mr. Adelson and after Mr. Adelson's alleged visit to Macau, a tender was published in Macau for the distribution of 3 concessions for the operation of casinos is that true?

A.    Not a tender but an invitation to make offers. I don't remember the exact date. It was published in the official gazette.

Q.    I'm placing before you the tender Annex 9 of the affidavit Exhibit Volume 1 and there the document published by the Macau government is called a tender[1], what's a tender?

A.    It's a tender[2]. But I'm not sure this was the first approach. To the best of my recollection the first approach by the Macau government was an invitation to make offers.

Q.    This tender was a public tender?

A.    Right.

Q.    Public announcements about the publication of the tender were made in the press and on the internet true?

A.    True.

Q.    Whoever wanted to participate in the tender participated?

A.    True.

Q.    Indeed companies owning huge hotels, on the Las Vegas Strip participated in it?

A.    Absolutely.

---

[1] Translator's note: טנדר, tender transliterated.
[2] Translator's note: מכרז [*mikhraz*], tender in Hebrew.

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    Labor Case 007704/03

**Before:  The Hon. Justice Ilan Itach**                    **November 13, 2007**
         **Public Representative (Employers) Miller Amiram**
         **Public Representative (Employee) Halevy Maoz**

Q.     Let's say that you talked with Adelson in August 1999 about Macau, let's say that following this he visited Macau, but two years and a quarter later an open, public, equal tender was published that was known to everyone and especially to companies which own hotels in Vegas and whoever won a concession won the tender, what's the connection between you and the outcome of the public tender that was held a year and a half after you were fired?

A.     A. One of the mega-hotel owners who entered "the tender" Mr. Donald Trump announced that he failed the tender even though I gave a presentation that cost me 20 million dollars because I found out about the tender late. B. During my work Adelson was in Macau at least twice, two months after the termination of my employment he asks for a visa for China because Macau belongs to China, and he makes a combined Macau-China trip. In July of the same year, he flies and in a succession of flights he visits Macau twice, he discusses Macau with several people and thus the continuum goes on such that ultimately, when you look at it and I was fired and they tried to hide the continuum, in this period before the tender Mr. Adelson slept at the Governor's house and met with people and I'll prove it later.

Q.     After all the facts at the end there was a tender. What's the connection between you and the winning of the tender?

A.     The lobbying work that Sheldon started immediately with the visit and afterwards by a committee that traveled to Las Vegas and a series of visits, influenced first of all the definition of the tender. Such that the terms of the tender are important also as we saw Sheldon at the end didn't win. Because of all sorts of matters that came up in the beginning of the strategy to approach Macau then they waited for Sheldon.

Q.     I'm moving on with you to Mr. Adelson's second trip at the end of March 2000, presenting to you Annex 6 (volume 2), and again you'll agree with me that also according to this time table Macau is only a transit station, and Mr. Adelson landed there in the afternoon. On March 28 and landed at 3 o'clock in the afternoon and the accommodation was in the same evening in Hong Kong. Is that true?

A.     It's a future plan. When you have a private jet you can tell the pilot to wait or you'll leave later.

Q.     Do you know that what's written here is not true?

A.     I can't confirm or deny. I know what the security people and Adelson told me.

Q.     What security people?

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 007704/03**

**Before:  The Hon. Justice Ilan Itach**                    **November 13, 2007**
          **Public Representative (Employers) Miller Amiram**
          **Public Representative (Employee) Halevy Maoz**


A.    Eric Kobi.

Q.    Why security people in the plural?

A.    Because it's a general statement.

A.    This is a visit that you didn't know about in real time but you found out about it in retrospect?

Q.    I didn't say that. I filed with the Court a document similar to Annex 6 that is issued every week when meetings are planned, which hotels, flight hours, I filed and only after I filed they filed. So I did know about it in real time and everything you're saying is groundless speculation.

Q.    Referring you to Section 4.10 of the Complaint, where you claim that in retrospect the additional visit transpired, my question to you why did you answer in the negative to my previous question in view of the provisions of Section 4.10 of the Complaint?

A.    The document I'm talking about, is a document of a landing in Macau, only in retrospect later when I tried to understand what was there and I found in my papers more documents and I spoke with Eric who didn't specify too much he said that they made an actual visit, he didn't specify too much. So I knew in real time about the landing but not about the visit and I was fired immediately after that. After I connected between the things I went to the papers and searched.

Q.    So you're saying that after this trip, Mr. Adelson fired you as you say, "in a vicious attempt" to hide from you the "realization" of the Macau venture right?

A.    Yes.

Q.    The proceedings in the United States you testified that after Mr. Adelson came back from the visit on April 1, 2000 and before your dismissal on April 10, 2000 you received business cards of 2 people from Macau that Mr. Adelson met with is that true?

A.    Your quotation is inaccurate from the United States. But in essence what I said in the United States, I said that I don't remember who gave me these photos. The security man or Adelson.

Q.    Referring to Annex 3 page 208 forth line 26 until page 209 line 9 – I asked you before the following question: In the proceedings in the United States you

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 007704/03**

**Before:  The Hon. Justice Ilan Itach**                    **November 13, 2007**
**Public Representative (Employers) Miller Amiram**
**Public Representative (Employee) Halevy Maoz**

testified that after Mr. Adelson came back from the visit to the Far East on April 1, 2000 and before your dismissal on April 10, 2000 you received business cards of two people from Macau with whom you claim that Mr. Adelson met, in view of the quotation that I've just read to you, do you agree with me that this is what you said in the proceedings in the testimony in the United States?

**The Plaintiff's Counsel**: The objection is to questions that try to verify accurate things statements that were said by the Plaintiff, in the framework of a testimony in the United States that are being told partially.

I withdraw the objection.

A.    It's part of my testimony in the United States. Everything needs to be referred to and I don't withdraw what I said before.

Q.    When you were asked to show the business cards in the examination in the United States, you refused and said that you'll disclose them shortly in the framework of the proceedings in Israel is that true?

A.    Yes. I objected because the hearing there was about jurisdiction.

Q.    And then indeed several weeks after the examination in the United States you signed a discovery in this file that I'm presenting to you **received and marked Def/25**. And in it in Sections 14 and 15 you refer to the business cards of people in Macau. Several days later an inspection proceeding took place and I'm presenting to you what we received in the framework of the inspection **received and marked Def/26**.

**The Plaintiff's Counsel**: There is no dispute that Def/26 was handed over in the inspection.

Continuing question: After that we asked your lawyers for a long period of time to inspect the original business cards and on June 29 the Court decided that you'll make the original documents available to the Defendants and even then we didn't receive the cards, the answer that you finally filed you declared on page 5 at the end of Section 3.3 that you don't have the original business cards **received and marked Def/27, is that true?**

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 007704/03**

**Before:  The Hon. Justice Ilan Itach**                    **November 13, 2007**
          **Public Representative (Employers) Miller Amiram**
          **Public Representative (Employee) Halevy Maoz**


A.    Yes.

Q.    One business card is a business card of Louis Sou whom you refer to in Section 14 of the discovery affidavit Def/25, as a senior official in the Macau administration, true?

A.    I guess that's true.

Q.    In the meantime you saw the affidavit of Mr. Louis Sou that we filed that explained that this business card didn't even exist until November 2000. Explain to me how Mr. Adelson or anyone else, gave you in March 2000 or April 2000 a business card that didn't even exist?

A.    The explanation should be given by Mr. Sou. Among the papers that I took after my dismissal photos of these business cards were found in the phonebook. Not original, and the person who needs to explain how it got to my papers is Mr. Sou who claims that it didn't exist.

Q.    The second business card is of a lady by the name of Kitty Chan?

A.    Yes.

Q.    In Section 15 of the discovery affidavit Def/25, you refer to her as a real-estate agent[3] in Hong Kong and Macau, namely on the date of this discovery affidavit you didn't know that Kitty Chan was a woman right?

A.    When I found out that she's a woman, I don't remember. I spoke with her boss[4] in Hong Kong a real-estate agency who told me that she's her employee.

Q.    To conclude, Mr. Adelson according to your claim returned from Macau in early April 2000, concealed from you the visit to Macau and everything that happened there and at the same time gave you two blurred photos of business cards that were given to him for you to keep them?

A.    That's not what I said. That's not my position. My position is like this. At a much later stage after my dismissal we went through the papers and in the phonebook someone remembered that there were business cards and then we referred to those business cards. As I said in the United States I don't remember whether Sheldon or a security man gave me. But it's obvious that I had it before May 10 which was my last day at the office.

_____

[3] Translator's note: 'agent' is stated in the masculine.
[4] Translator's note: 'boss' is stated in the feminine.