UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SHELDON G. ADELSON,

                    Plaintiff,

          v.

MOSHE HANANEL,

                    Defendant.

**Civil Action No. 04-cv-10357-RCL
(Sorokin, U.S.M.J.)**

**ECF Case**

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

MAYER BROWN LLP
Andrew H. Schapiro
Christopher J. Houpt
1675 Broadway
New York, New York  10019
(212) 506-2500

*Attorneys for Plaintiff
Sheldon G. Adelson*

# TABLE OF CONTENTS

**Page**

I.    STANDARD OF REVIEW ......................................................................................... 1

II.   THE MASSACHUSETTS STATUTE OF FRAUDS BARS HANANEL'S
      CLAIM. ..................................................................................................................... 2

      A.    Massachusetts Law Governs the Alleged Fee Contract. ................................ 2

            1.    Place of negotiation and contracting ..................................................... 2

            2.    Place of performance ............................................................................ 5

            3.    Location of the parties .......................................................................... 6

            4.    Interests of the forum ............................................................................ 7

      B.    The Massachusetts Statute of Frauds Requires That Contracts for Finder's
            Fees Be in Writing ....................................................................................... 8

III.  HANANEL'S OWN EVIDENCE MAKES PROOF OF CAUSATION
      IMPOSSIBLE. ......................................................................................................... 11

IV.   IN THE ALTERNATIVE, THE COURT SHOULD BIFURCATE THE TRIAL. ........ 14

CONCLUSION ...................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page**

<u>**Cases**</u>

*Alexander v. Berman*,
  560 N.E.2d 1295 (1990)...................................................................................9

*Anderson v. Tyson*,
  1994 WL 630207 (E.D. Pa. 1994) ................................................................ 7-8

*Bay Colony Mktg. Co. v. Fruit Salad, Inc.*,
  672 N.E.2d 987 (Mass. 1996) ....................................................................9, 10

*Bonin v. Chestnut Hill Towers Realty Co.*,
  436 N.E.2d 970 (Mass. Ct. App. 1982) ..........................................................10

*Bonti v. Ford Motor Co.*,
  898 F. Supp. 391 (S.D. Miss. 1995).................................................................1

*Boulder Santa Rosa LLC v. Henry*,
  No. 07-10846-RWZ, 2008 WL 687413 (D. Mass. Mar. 8, 2008) ..................... 2-3

*Brennan v. Fay*,
  353 F.2d 56 (2d Cir. 1965)...............................................................................4

*Bushkin Assocs., Inc. v. Raytheon Co.*,
  473 N.E.2d 662 (Mass. 1985) ..........................................................................8

*Cantell v. Hill Holiday Connors Cosmopulos*,
  772 N.E.2d 1078 (Mass. Ct. App. 2002) ..................................................... 9-10

*Carlson Corp. v. Univ. of Vt.*,
  402 N.E.2d 483 (Mass. 1980) ..........................................................................7

*Chance v. E.I. du Pont De Nemours & Co.*,
  57 F.R.D. 165 (E.D.N.Y. 1972) .......................................................................1

*Chesterton v. Chesterton*,
  1993 WL 618176 (D. Mass. Dec. 30, 1993).......................................................8

*Coltec Indus. Inc. v. Zurich Ins. Co.*,
  2004 WL 413304 (N.D. Ill. 2004) ....................................................................1

*Cucuras v. Dep't of Health & Human Servs.*,
  993 F.2d 1525 (Fed. Cir. 1993).........................................................................4

# TABLE OF AUTHORITIES
(continued)

Page

## Cases (cont'd)

*Emery Corp. v. Century Bancorp., Inc.*,
588 F. Supp. 15 (D. Mass. 1984) ........................................................................8

*English v. Hartford*,
739 F. Supp. 50 (D. Mass. 1990) .......................................................................7

*F.T.C. v. Whole Foods Market, Inc.*,
502 F.Supp.2d 1 (D.D.C. 2007) .........................................................................4

*Gainesville Utils. Dep't v. Fla. Power & Light Co.*,
573 F.2d 292 (5th Cir. 1978) .............................................................................4

*Gallagher v. Med. Research Consultants, LLP*,
2004 WL 2223312 (E.D. Pa. 2004) ...................................................................7

*Gardco Mfg., Inc. v. Herst Lighting Co.*,
820 F.2d 1209 (Fed.Cir.1987)..........................................................................14

*Goebel v. Schmid Bros., Inc.*,
871 F. Supp. 68 (D. Mass. 1994) .......................................................................7

*George E. Westberg Co. v. Quaker Oats Co.*,
311 F.2d 25 (2d Cir. 1962).................................................................................12

*Gramercy Mills, Inc. v. Wolens*,
63 F.3d 569 (7th Cir. 1995) ................................................................................1

*Hodas* v. *Morin*,
814 N.E.2d 320 (Mass. 2004) ............................................................................1

*Julius Tofias & Co., Inc. v. John B. Stetson Co.*,
474 N.E.2d 1162 (Mass. Ct. App. 1985) .....................................................11, 12

*Karelitz v. Damson Oil Corp.*,
820 F.2d 529 (1st Cir. 1987)..............................................................................12

*Lacey v. Cessna Aircraft Co.*,
932 F.2d 170 (3d Cir. 1991)................................................................................7

*Leatherbee Mortgage. Co., Inc. v. Cohen*,
37 Mass. App. Ct. 913 (1994)...........................................................................11

# TABLE OF AUTHORITIES
### (continued)

**Page**

**Cases (cont'd)**

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
   313 U.S. 487 (1941) ..........................................................................................2

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ..........................................................................................2

*McKinney v. Nat. Dairy Council*,
   491 F. Supp. 1108 (D. Mass. 1980) .................................................................6

*Milwaukee Auction Galleries Ltd. v. Chalk*,
   13 F.3d 1107 (7th Cir. 1994) ...........................................................................11

*Reicher v. Berkshire Life Ins. Co. of Am.*,
   360 F.3d 1 (1st Cir. 2004) .................................................................................1

*Rudow v. Fogel*,
   426 N.E.2d 155 (Mass. Ct. App. 1981) ...........................................................7

*United States v. I.B.M.*,
   66 F.R.D. 154 (S.D.N.Y. 1974) .....................................................................4-5

*United States v. United States Gypsum Co.*,
   333 U.S. 364 (1947) ..........................................................................................4

*Veatch v. Standard Oil Co.*,
   49 F. Supp. 45 (S.D.N.Y. 1940) ....................................................................12

*Wallach v. Huang*,
   20 Mass. L. Rep. 15 (Mass. Super. 2005) ......................................................10

**Statutes and Rules**

Fed. R. Civ. P. 42(b) ...............................................................................................14

Fed. R. Civ. P. 56(c) .................................................................................................2

M.G.L. Ch. 259 § 7 ...................................................................................... 1, 8-9, 10

## TABLE OF AUTHORITIES
### (continued)

**Page**

**Other Authorities**

9 CHARLES ALAN WRIGHT & ARTHUR R. MILLER,
   FEDERAL PRACTICE & PROCEDURE § 2388 (2d ed. 2002) ......................................................14

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 ............................................................2, 5

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 196 ...............................................................6

Plaintiff Sheldon G. Adelson moves for summary judgment on the following basis:

(1) Hananel's claim to options or other compensation is barred by the Massachusetts Statute of Frauds, M.G.L. ch. 7 § 259. Prior to applying the Statute of Frauds, the Court must determine which state's law applies to the agreement between Hananel and IPI. Choice-of-law is a threshold issue, determined by the Court under the preponderance-of-evidence standard, not under the summary judgment standard.

(2) Based on Hananel's own account of his alleged efforts relating to the Macau development, no reasonable juror could conclude that Hananel "caused" Adelson's investment, negating as a matter of law Hananel's claim to a finder's fee.

If summary judgment is denied, Adelson moves to bifurcate the trial: in Phase I, the jury would decide what, if any, option agreement existed between the parties, and in Phase II, the jury would decide what, if any, compensation is due to Hananel related to the Macau casino venture. Phase II would, of course, be unnecessary if the jury decides in Phase I that there was no option agreement that would apply to the Macau venture. Courts commonly employ bifurcation when dealing with cases, like this one, that present distinct questions and where resolution of one would obviate the need for the second phase.

## I.     Standard of Review

The issue of which state's law applies is a threshold issue, to be decided by the Court:

> Judges, not juries, decide questions of law, such as choice of law issues. * * * As for the choice of law decision, * * * the jury never gets a crack at deciding the outcome; choice of law merely serves as a predicate for the jury's work.

*Gramercy Mills, Inc. v. Wolens*, 63 F.3d 569, 571 (7th Cir. 1995); see also *Reicher v. Berkshire Life Ins. Co. of Am.*, 360 F.3d 1, 4 (1st Cir. 2004) ("Choice of law determinations are legal questions"); *Boulder Santa Rosa LLC v. Henry*, No. 07-10846-RWZ, 2008 WL 687413 (D.

Mass. Mar. 8, 2008), at *1.[1]   The Court determines choice of law by the preponderance of the

evidence.   See *Coltec Indus. Inc. v. Zurich Ins. Co.*, 2004 WL 413304, at *4 (N.D. Ill. 2004);

*Chance v. E.I. du Pont De Nemours & Co.*, 57 F.R.D. 165, 171 (E.D.N.Y. 1972).

Summary judgment is appropriate when "there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  "[I]f the

factual context renders respondents' claim implausible – if the claim is one that simply makes no

economic sense – respondents must come forward with more persuasive evidence to support

their claim than would otherwise be necessary."   *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.     The Massachusetts Statute of Frauds Bars Hananel's Claim.

### A.     Massachusetts Law Governs the Alleged Fee Contract.

A diversity court applies the conflict of laws rules of the state in which it sits.   *See*

*Klaxon Co.* v. *Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  Massachusetts follows the

interest-balancing test set out in Section 188 of the Restatement (Second) of Conflict of Laws.

See *Hodas* v. *Morin*, 814 N.E.2d 320, 324 (Mass. 2004).   Section 188 lists five factors for

determining the applicable law.

#### 1.     Place of negotiation and contracting

The first two factors are the place of negotiation and contracting.  See RESTATEMENT

§ 188(a),  (b).   In this case, the contract was partially negotiated and was finalized in

Massachusetts.  Hananel admits that he came to Needham on December 5, 1995 and met with

Adelson and others in IPI's offices.  Dkt. #106-1, at 106-09 (Hananel Depo.).  Prior to Hananel's

arrival, Adelson told IPI's counsel, Paul Roberts, "the terms he wished to offer to Hananel for

---

[1]       See also *Bonti v. Ford Motor Co.*, 898 F. Supp. 391, 399 (S.D. Miss. 1995) ("Plaintiff contends that the
choice of law question is one that could properly be decided by the jury as a question of fact.  Plaintiff is
unmistakably in error.  The question of choice of law is and always has been one for the Court in the first
instance.").

employment with IPI and directed [Roberts] to discuss and finalize the employment terms with Hananel when he was in the Needham office." Dkt. #16 ¶ 7 (Roberts Aff.); Dkt. #17 ¶ 5 (Adelson Aff.); Dkt. #63 ¶ 6 (Roberts Aff.). Roberts described specific aspects of Hananel's employment that were discussed at the December 5th meeting: that Hananel would leave his employment at Galilee Tours and begin working full-time for IPI on January 1, 1996; that Hananel's future involvement with Galilee Tours would be limited to occasional consulting; and the scope of Hananel's job responsibilities for IPI. Dkt. #16 ¶ 8. The two also discussed Hananel's compensation, including his salary and the specific terms of the profit-sharing arrangement. *Id.* Hananel would receive 12% of the net profits of IPI's investments in Israeli high-tech companies that Hananel had found, conducted due diligence on, negotiated, and recommended. *Id.*; Schapiro Decl., filed herewith, Ex. A (Israeli protocol of Jan. 17, 2008 hearing) at 171; *id.*, Ex. B (Adelson Aff.) ¶ 16; Dkt. #31, Ex. 1 (Adelson Aff.) ¶ 7. Roberts testified that he specifically explained that the profit-share was limited to profits received by IPI during Hananel's employment. *Id.* Finally, Roberts asked Hananel whether he wanted a written contract, which Roberts was prepared to offer; Hananel declined. *Id.* ¶ 9. When Adelson arrived, Roberts repeated the terms of the contract to avoid any misunderstanding, and he, Adelson, and Hananel shook hands, sealing the agreement. *Id.*

The meeting between Hananel and Roberts is confirmed by a contemporaneous diary entry by Roberts. The entry for December 5 reads "pm – Hananel @ TIG [The Interface Group]," and is followed by another entry for 8 p.m. Roberts Decl., filed herewith, Ex. A. Thus, Roberts's account of his meeting with Hananel is confirmed not only by Adelson but by a contemporaneous writing.

Hananel disputes this account.  In his deposition, he stated that he did not recall whether he met with Roberts at a social function on December 4th.  Dkt. #106-1, at 105.  In an affidavit, he testified that he did meet Roberts that evening.  Dkt. #44, App. V (Second Hananel Aff., dated Aug. 4, 2004) ¶ 4.  He does recall meeting almost every other employee in the IPI office on December *5th*, and, though his memory is not clear, he agrees that he may have met each of the rest.  *Id.* at 106-08.  All except one – Hananel claims that he specifically remembers *not* meeting with Roberts.  *Id.* at 105 ("In the afternoon, I have memory that I was not talking to him.  About the evening before I tell you I don't have memory.  Here, I am telling you definitely, clearly, I was not talking to him.").  This self-serving testimony is not credible.  Hananel claims that he went to the Interface offices to meet Interface employees, and the only employee whom he did not encounter just happens to have been the IPI executive who gave detailed testimony, confirmed by Adelson, regarding his meeting with Hananel, and whose diary from that date reflects a scheduled meeting with Hananel.

The contemporaneous documentary evidence in Roberts's diary is entitled to greater weight than mere testimony.  See *Cucuras v. Dep't of Health & Human Servs.*, 993 F.2d 1525 (Fed. Cir. 1993) ("the Supreme Court counsels that oral testimony in conflict with contemporaneous documentary evidence deserves little weight") (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947)).[2]  That principle applies with special force where the testimony is by a party and prepared for the purpose of litigation.  See *F.T.C. v. Whole Foods Market, Inc.*, 502 F.Supp.2d 1, 4 n.4 (D.D.C. 2007); *United States v. I.B.M.*, 66 F.R.D. 154, 166 (S.D.N.Y. 1974) ("In reaching this conclusion the court has accorded greater weight to the

---

[2]      See also *Brennan v. Fay*, 353 F.2d 56, 59 (2d Cir. 1965) ("Common sense tells us that when the state's pan is filled with probative documentary evidence, only the strongest contrary oral testimony could prevail, especially when proffered by an interested party as to occurrences of long ago."); *Gainesville Utils. Dep't v. Fla. Power & Light Co.*, 573 F.2d 292, 301 n.14 (5th Cir. 1978).

documents and deposition excerpts submitted by plaintiff than to the testimony and affidavits tendered by defendant.  The affidavits, unlike the documents, were prepared in contemplation of the special masters' proceeding and must be weighed accordingly.").

Based on these facts, this Court previously found, albeit under a *prima facie* standard, that

> the December 5th meeting occurred; the meeting resulted in a formal albeit oral, agreement or execution of the terms of the employment and that thereafter defendant began his transition into the job of IPI's general manager in Israel, as distinct from filling in for or helping plaintiff out as he had in the past.

Dkt. #78 at 9 (Report and Recommendation).

2.    Place of performance

The third choice-of-law factor is the place of performance.  See RESTATEMENT § 188(c). Hananel contends that he was authorized to do business for Adelson worldwide.  See Dkt. #12 ¶¶ 16, 19 (Hananel Aff.) (alleging performance through work in "Israel, Jordan, Italy, Rhodes (Greece), Bulgaria, Ireland, and elsewhere"); see also Dkt. #135, at 8 (Report and Recommendation) ("The scope of the agreement, as described by Hananel, is international."). Specifically, he claims to have conducted research for the Macau casino project, the focus of the disputed claim, not in Israel but during trips to Macau and Hong Kong.  Dkt. #106-1, at 22-37. In Macau, Hananel says that he

> [t]alked to people, I talked to people in the casino, I talked to suppliers of tourism service, tried to understand the dynamic of the place, who is coming and who is going.

*Id.* at 25.  Hananel also claims to have conducted IPI business in "New York, Boston, and Chicago.  Contrary to the statements made in [IPI's Israeli] Complaint, these were not meetings on personal matters."  Dkt. #128, part 3 (Hananel Aff.) ¶ 65 ("I traveled to . . . United States – to

5

meet with various investors in the high-tech field in New York, with Data Scope people in New Jersey and for the HIMS convention in Orlando.").

When performance occurs in multiple jurisdictions, the significance of the place-of-performance factor is diminished:

> The importance in the choice-of-law process of the place where the services, or a major portion of the services, are to be rendered depends somewhat upon the nature of the services involved. This place enjoys greatest significance when the work is to be more or less stationary and is to extend over a considerable period of time. * * * By way of contrast, the place where the services are to be rendered is of lesser importance * * * when the employee's duties will require him to travel with fair frequency between two or more states.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 196 (cmt. b) (quoted in *McKinney v. Nat. Dairy Council*, 491 F. Supp. 1108, 1112 n.3 (D. Mass. 1980)). And if Hananel is wrong – that is, if (as Adelson contends) the contract pertained to Israeli ventures only – then Hananel loses on the merits, and choice-of-law is irrelevant.

            3.      Location of the parties

The final factor[3] is the "domicil, residence, nationality, place of incorporation and place of business of the parties." Section 188(e). One of the parties to the contract, IPI, is a Delaware citizen with a principal place of business in Massachusetts. Furthermore, this suit addresses the personal liability of Sheldon Adelson, a U.S. citizen and Boston native who owns a residence and maintains an office in Massachusetts. As this Court previously ruled,

> [s]everal factors heighten Massachusetts' interest: two or three of IPI's executive officers work in Massachusetts; IPI's corporate funds are held in Massachusetts, at least until disbursed to Israel; and IPI's corporate funds are managed or monitored from Massachusetts.

> * * *

---

[3]     One other factor, the "location of the subject matter of the contract," § 188(d), comes into play only when the contract "deals with a specific physical thing * * * or affords protection against a localized risk." See *id.* at cmt. b.

And finally, with respect to substantive social policies, Massachusetts has an interest in redressing harms inflicted on businesses operating here.

Dkt. #78 at 22-23 (Report and Recommendation).

      4.      Interests of the forum

The state's interest in applying its own contract law, and in particular its Statute of Frauds, is also relevant to the interest balancing analysis. "Massachusetts has an interest not only in providing a forum for its residents, but also in enforcing business transactions consummated within its boundaries." See *Carlson Corp. v. Univ. of Vt.*, 402 N.E.2d 483, 486 (Mass. 1980) (internal quotation and alteration omitted) (holding that this state interest supports finding of jurisdiction).

In particular, Massachusetts courts have noted the state's "interest in upholding its Statute of Frauds." *Rudow v. Fogel*, 426 N.E.2d 155, 159 (Mass. Ct. App. 1981). "A state has a legitimate interest not only in protecting alleged promisors, but also in protecting the integrity of its legal process by limiting the possibilities of perjury and avoiding unseemly disputes as to what sort of assurances or promises may have been made." *Goebel v. Schmid Bros., Inc.*, 871 F. Supp. 68, 77 (D. Mass. 1994) (internal quotation omitted) (finding that "even after giving New York the benefit of this evaluation, I conclude that New York's interest falls short of matching Massachusetts' interest in applying its Statute of Frauds"); *Gallagher v. Med. Research Consultants, LLP*, 2004 WL 2223312, at *5 (E.D. Pa. 2004) (noting that "the governmental interests of *both* [Pennsylvania and Texas] would be impaired if their [Statute of Frauds] were not applied.") (emphasis in original) (quoting *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187 n. 15 (3d Cir. 1991); *Anderson v. Tyson*, 1994 WL 630207, at *2 (E.D. Pa. 1994) ("By adopting a strict Statute of Frauds, New York clearly has manifested an interest in protecting New York defendants from the need to contest agreements not reduced to writing. Since defendants are

New York residents, the New York Statute of Frauds should be applied in this case."); *cf. Emery Corp. v. Century Bancorp., Inc.*, 588 F. Supp. 15, 18 (D. Mass. 1984) (citing case finding that Missouri consumer protection law was "intended to protect Missouri defendants in Missouri courts from the claims of out-of-state plaintiffs" and predicting that Massachusetts courts would come to same conclusion about similar Massachusetts law); *Bushkin Assocs., Inc. v. Raytheon Co.*, 473 N.E.2d 662 (Mass. 1985) (noting "that New York claims a paramount 'interest' in applying its Statute of Frauds, even when defendants (like Raytheon) do not 'come into New York'").

Courts applying these factors have held that there is at least a presumption that the employment contract of a foreign employee of a Massachusetts company is governed by Massachusetts law.  See *Chesterton v. Chesterton*, 1993 WL 618176, at *1 n.3 (D. Mass. Dec. 30, 1993) ("The record fails to contain factual evidence that plaintiff's implied contract of employment is governed by Dutch or Irish law.  Absent evidence or argument to the contrary, Massachusetts has the most significant relationship to the contract at issue. Massachusetts law therefore applies to plaintiff's alleged contract with International.").  Thus, the court applied Massachusetts law to an oral employment contract with a Massachusetts employer, even though the contract was formed in New Hampshire and the claim arose out of an accident in New Hampshire.  *English v. Hartford*, 739 F. Supp. 50, 51 (D. Mass. 1990).  The same result should apply here.

### B.    The Massachusetts Statute of Frauds Requires That Contracts for Finder's Fees Be in Writing

Massachusetts law is clear that contracts for a finder's fee must be in writing.  Section 7 of Chapter 259 of the Massachusetts General Laws, reads, in relevant part:

> Any agreement to pay compensation for service as a broker or finder or for service rendered * * * in negotiating the purchase, sale or exchange of a business,

its good will, inventory, fixtures, or an interest therein, * * * shall be void and unenforceable unless such agreement is in writing, signed by the party to be charged therewith, or by some other person authorized.  For the purpose of this section, the term 'negotiating' shall include identifying prospective parties, providing information concerning prospective parties, procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction.

MASS. GEN. LAWS. Ch. 259 § 7 (2008).[4]  There is no doubt that Hananel's agreement falls within

Section 7.  Accordingly this Court must grant summary judgment for Adelson.

"The modern trend is to give statutes of frauds liberal interpretations."  *Cantell v. Hill Holiday Connors Cosmopulos*, 772 N.E.2d 1078, 1081 (Mass. Ct. App. 2002).  Massachusetts courts "have followed this trend previously in concluding that the precise section at issue, G.L. c. 259, § 7, should be interpreted broadly to further its policy determination that agreements for compensation for certain services be in writing."  *Id.*; see also *Bay Colony Mktg. Co. v. Fruit Salad, Inc.*, 672 N.E.2d 987 (Mass. 1996).  Indeed, they have described the purpose of the statute in words relevant to this case:  "to discourage claims for commission based on conversation which persons heard differently or remembered differently."  *Alexander v. Berman*, 560 N.E.2d 1295 (1990).

Massachusetts courts have explained that

A broker is "[a]n agent who acts as an intermediary or negotiator, esp[ecially] between prospective buyers and sellers; a person employed to make bargains and contracts between other persons in matters of trade, commerce, and navigation." Black's Law Dictionary 187 (7th ed. 1999).  A finder is "[a]n intermediary who brings together parties for a business opportunity.... A finder differs from a broker-dealer because the finder merely brings two parties together to make their own contract, while a broker-dealer usu[ally] participates in the negotiations." *Id.* at 646.  A finder locates, introduces, and brings parties to a transaction together, while a broker does more, attempting to bring the parties to an agreement.  See *Shinberg v. Bruk*, 875 F.2d 973, 978 (1st Cir. 1989).

---

[4]        There are two exceptions in Section 7, neither of which applies here:  contracts "to pay compensation for professional services of an attorney-at-law or a real estate salesman acting in their professional capacity."

*Cantell*, 772 N.E.2d at 1082 (finding recruiter to be either broker or finder because it "identified business opportunities for HHCC by recommending prospective employees"); see also *Bonin v. Chestnut Hill Towers Realty Co.*, 436 N.E.2d 970, 977 (Mass. Ct. App. 1982) (defining finder as one who "merely identif[ies] a business opportunity"); *Wallach v. Huang*, 20 Mass. L. Rep. 15 (Mass. Super. 2005) ("A finder under Massachusetts Law is merely one who finds an opportunity for another."). In addition, the Statute of Frauds applies to "negotiating the purchase, sale or exchange of a business." MASS. GEN. LAWS. Ch. 259 § 7 (2008). "For the purpose of this section, the term 'negotiating' shall include identifying prospective parties, providing information concerning prospective parties, procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction." *Id.*[5]

There is no dispute that the contract with Hananel was oral. Thus, if it falls within the Statute of Frauds, the alleged option agreement is unenforceable. Hananel's own description of the work he would need to perform to satisfy the alleged option term falls easily within the legal definitions of both broker's or finder's services and negotiating for the purchase of a business. For example,

> Q: So when you say initiate, was it enough for you to just mention something to him or describe an idea that you had and then you automatically locked in your rights, for example?
>
> Mr. Hananel: I believe yes.

Dkt. #106-1, at 86 (objection omitted).

> Q: O.K. and if you had said to Sheldon, Sheldon, I've been reading the newspaper and there's a company that's trading on the Israel Stock Exchange and it's trading at $1 a share and in my opinion that's going to be a tremendous company some day, I think you should buy it and Sheldon buys it for $1 a share

---

[5]     The broker/finder's fee provision and the provision regarding negotiating for the purchase of a business are disjunctive; that is, "the statute [requires] written agreements where there is to be compensation 'for service as a broker or finder', *or* 'for service rendered in negotiating a loan or in negotiating the purchase, sale or exchange of a business [or component elements thereof]." *Bay Colony Mktg.*, 672 N.E.2d at 989-90 (emphasis and alteration in original).

and a year later it goes to $100, are you entitled to buy 12 % of his ownership for $12?

A:  If he bought it because I told him that he should buy it, I think I am entitled.

*Id.* at 90-91.

The Statute of Frauds exists precisely to bar this sort of testimonial dispute regarding a broker's or finder's fee, where the alleged fee agreement is totally unsupported by documentary evidence.  On the undisputed facts before the Court, Adelson is entitled to summary judgment under the Statute of Frauds.

### III.    Hananel's Own Evidence Makes Proof of Causation Impossible.

The Court should also grant summary judgment because Hananel cannot prove that his alleged efforts related to Macau caused Adelson's investment.  As a matter of law, a finder is not entitled to any fee unless his services are the "efficient cause" of the principal's entry into a transaction.  See *Leatherbee Mortgage. Co., Inc. v. Cohen*, 37 Mass. App. Ct. 913, 940-41 (1994); *Julius Tofias & Co., Inc. v. John B. Stetson Co.*, 474 N.E.2d 1162, 1165 (Mass. Ct. App. 1985) ("in the absence of express words or plain indication to the contrary, a broker is not entitled to a commission if his efforts are only a contributing cause to a sale.  He must be the 'efficient' or 'predominating' cause.") (citation omitted); *Milwaukee Auction Galleries Ltd. v. Chalk*, 13 F.3d 1107, 1110 (7th Cir. 1994) ("the requirement of 'procurement' is not satisfied merely by the broker's having happened to disclose to the person who ended up being the purchaser that the property in question was for sale.  The broker's role in the transaction must be more active than this.") (citations omitted).  Thus, the finder must establish a "continuing connection" between his original idea or introduction and the ultimate transaction.  As discussed below, by Hananel's own account, his services could not have been the cause of Adelson's entry into Macau.

First, the passage of time between Hananel's purported services and Adelson's investment bar any reasonable jury from finding that Hananel is entitled to a fee. Hananel alleges that he introduced Adelson to Macau sometime in or before August of *1999*, and it is undisputed that Hananel was terminated by IPI in April 2000. Dkt. #106-1, at 143-45. It is also not disputed that Macau did not establish a tender commission for the award of new gambling concessions until October 31, 2001, a year and a half later, and that the concessions were not awarded until 2002. As a matter of law, "[a]s time passes, the ever greater likelihood of new relevant events makes it ever more reasonable to relegate the original introduction to the status of 'background fact' and ever less reasonable to give that introduction the more elevated status of 'cause.'" *Karelitz v. Damson Oil Corp.*, 820 F.2d 529, 532 (1st Cir. 1987) (Breyer, J.); see also *George E. Westberg Co. v. Quaker Oats Co.*, 311 F.2d 25 (2d Cir. 1962) (gap of two-and-a-half years between suggestion of purchase and conclusion of deal barred finder's recovery); *Veatch v. Standard Oil Co.*, 49 F. Supp. 45, 51-52 (S.D.N.Y. 1940) (same, gap of ten months).

Second, no reasonable juror could conclude that the minimal efforts Hananel claims to have made were the efficient cause of Las Vegas Sands's more than ten billion dollar investment in Macau. See *Julius Tofias & Co.*, 474 N.E.2d at 1165 ("The question still remains whether the sale of Stetson's property was made 'on information or introduction furnished by' the plaintiff.") Hananel described his efforts as follows:

> I told Sheldon I want to speak with you about Macau. He told me what it is Macau? It could be for him object, it mean a name of place, it could be address, it could be a brand name. I told him Sheldon, I need your concentration and I almost begged because I was already convinced at that time that Macau it's presenting a huge opportunity. As a mercy to my begging he tell me o.k., we kicked everybody from the office and I brought the business plan that I had with a map * * *
>
> 50-meter booklet which fold in the middle to 25-25 with pictures, like its common with different business plan but what I was referring was not the business of the timeshare or so but the map of the place. And I told him look

Sheldon, it's not here high rollers to come to Vegas and so on and so forth, I think this place got tremendous opportunity and he told me why you think so?  Why you think I'll deal with this yellowish people?  And I told him because this is an unbelievable opportunity and I explain him the opportunity because in '99 when we were talking, Hong Kong was return already to China.  Macau was not yet returned to China and in order to calm the world, United States, Britain, all the Western world, the Chinese government declared that they will respect a system which will be one country-two systems, and that was valid for Hong Kong but it was clear that it will be valid also for Macau.  It means that what was going on with the Macau tradition, it means religious Catholicism, it means the type of religious schools which not existing Christian school which not exist in China, really be continue to exist in Macau and that includes casino which was existing in Macau and not existing anywhere else including Hong Kong and China and then I told him, it presents a tremendous opportunity and Sheldon, I believe, that a time will come that the new regime, it means the communist which will take over Macau, they will want to have the benefits of the casino as well.  So the way its in now, they will not just kick the old regime and connection because their cake needs to be shared.

His eyes were glimpsing and he tell me but, show me how you get there and so on and we spoke about this.  He told me why you take the communist you know, the communist was stressed by him, the communists will agree to this.  I told him look, and sorry for what I'm saying but this is what I said now, I told him the communists are like clergy people, they are good in preaching but not always they are keeping the preaching for their own behavior.  The fact that they are saying that they are against casino if there will be a certain benefit for them, for the region, I believe that they will be for it because they will want to share it.

Dkt. #106-1, at 143-45 (paragraph break inserted).  Hananel also claims to have provided a

lesson in Macanese history:

Because when I told him Macau as I told you a few minutes ago, he told me what is Macau?  What is Macau?  I told you I want to speak with you about Macau, he told me what is Macau, what is this Macau?  He was not understanding it was a name of state or a name of a region, of a name.  I had to go one by one to tell him the Portuguese ruled there, it's like Hong Kong.  Hong Kong of course he knew, but Macau for him I had to explain it about Macau, I had to explain about release of Macau from the Chinese, that it will come because as I told you, it was in between after Hong Kong was given back by the British.  I explained about the two system, I explained him about the religious situation in Macau which is unique in China.

*Id.* at 149-50.

By Hananel's account, out of this incoherent ramble was born what is now the world's largest casino (by number of tables).  In fact, however, even setting aside the question of whether Adelson, the controlling shareholder of one of the largest casino enterprises in the world, had never heard of Macau, the largest gambling center in the Far East since 1962 and now the largest in the world, the undisputed evidence shows that the Macau government approached all of the major Las Vegas hotel owners about bidding for gambling concessions, not the other way around.  In October 2001, more than a year and half after Hananel's termination, the Macau government released a Request for Expression of Interest in gaming concessions.  Schapiro Decl., Ex. D (Oliveira Aff.) ¶ 8.  The government announced the Request in international media, including the *Financial Times*, the *Asian Wall Street Journal*, and the *South China Morning Post*, Hong Kong's leading English newspaper, and posted it on the Macau government's website.  *Id.* ¶¶ 10, 11.  Ultimately, twenty-one companies, including several from Nevada, submitted bids.  *Id.* ¶ 12.  The idea that, without Hananel's help, Las Vegas Sands would not have been among them does not pass the straight-face test.

## IV.     In the Alternative, the Court Should Bifurcate the Trial.

Federal Rule of Civil Procedure 42(b) permits a court to order separate trials on particular issues "when separate trials will be conducive to expedition and economy."  Under Rule 42(b), "a district court has broad discretion in separating issues and claims for trial as part of its wide discretion in trial management."  *Gardco Mfg., Inc. v. Herst Lighting Co.*, 820 F.2d 1209, 1212 (Fed.Cir.1987); see also 9 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2388 (2d ed. 2002) ("Ultimately the question of separate trials under Rule 42(b) should be, and is, a matter left to the discretion of the trial court.").

If this Court declines to grant summary judgment as requested above, the Court should issue an order bifurcating the trial, taking whatever evidence it deems necessary to determine

choice-of-law at the outset, since the answer to that question could dispose of the entire case. After the pre-trial determination of choice-of-law, Phase I should cover the terms of the parties' contract. The dispute over the scope and terms of the contract formation is, as this Court has previously found, "essentially a swearing match" (Report and Recommendation (Dkt. #135) at 5), between Adelson and Roberts, on the one side, and Hananel on the other. If necessary, the jury could then determine in Phase II the more fact-intensive questions of whether Hananel's alleged work related to the Macau casino venture satisfied the terms of any option agreement, as established in Phase I. Of course, if the Phase I jury determines that there was no option agreement, that the agreement was limited to investments made by IPI and located in Israel, or that the agreement only applied to profits realized by IPI during Hananel's employment, then Phase II would not be necessary. Any reasonable probability that the second phase could be mooted, thereby saving judicial and party resources, is a strong basis for bifurcating the trial.

## <u>CONCLUSION</u>

The Court should grant summary judgment in plaintiff's favor on the Statute of Frauds and based on Hananel's inability to prove the existence of his version of the option agreement, or, in the alternative, should bifurcate the trial as described above.

July 30, 2008

Respectfully submitted,

/s/ Andrew H. Schapiro
MAYER BROWN LLP
Andrew H. Schapiro
Christopher J. Houpt
1675 Broadway
New York, New York 10019
(212) 506-2500

*Attorneys for Plaintiff
Sheldon G. Adelson*

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Andrew H. Schapiro