

115

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


<u>**Re**</u>:            **Moshe Hananel**
                    **Represented by Adv.      Adi Fighel and David Peretz**

                                                    <u>**The Plaintiff**</u>

                        **Versus**

            **1.  Interface Partners International Limited**
            **2.  Sheldon G. Adelson**
            **Represented by Adv.      Klagsbald Dori and Shraga Amir**

                                                    <u>**The Defendants**</u>

<u>**Present**</u>:        **Plaintiff and counsel**
                    **Counsel for the Defendants**

# <u>Transcript</u>


<u>**Ms. Kerner Galit is duly cautioned and testifies in direct examination**</u>

**Everything stated in my affidavit is the truth.**

<u>**Cross Examination**</u>

Q.      You worked at Galilee Tours from May 96 until September 98 as a senior
         secretary?

A.      Right.

Q.      You acted as the Plaintiff's secretary

A.      Right.

Q.      And you also managed the Plaintiff's appointment diary?

A.      Right.

Q.      I'm presenting you with a diary - confirm to me that this is the Plaintiff's
         appointment diary

A.      I confirm.

116

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                      **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                      **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


Q.     Referring you to the following dates: February 12, 1998, March 9, 1998,
       March 10, 1998, March 29, 1998, all of these pages note a meeting with Mr.
       Aryeh Lis, one of them a meeting that was cancelled on March 9, 1998 – is
       that right?

A.     Right. The relevant parts of the diary **are filed and marked Def/58**, after the
       original diary was presented to the Court.

Q.     Referring to Section 3 of your affidavit, you write that Mr. Hananel divided
       his time between Galilee Tours and the Defendant, when you say divided his
       time is that 50-50

A.     It would change according to the period. It's hard to define the division as a
       percentage, also in times when he sat in one of the two offices, there was
       sometimes work that was relevant to the other company.

Q.     How do you know he was employed by the Defendant?

A.     I can't define that he was employed, I know that he dealt with its affairs.

Q.     He told you that he was employed by the Defendant

A.     I can't remember. I know that he dealt with its affairs on a current basis.

**Redirect**

Q.     These pages is this your handwriting?

A.     No. On February 12 that's my handwriting, March 9 that's my handwriting,
       March 10 that's not my handwriting. March 29 that is my handwriting. I think
       the handwriting on March 10 is Hananel's but I'm not sure.

**The Plaintiff's Counsel:**

The Plaintiff will respond to the Court's question whether on March 10 that's his
handwriting within 7 days after the document is magnified via the vision instrument.

**Adv. Avner (Nery) Yarkoni is duly cautioned and testifies in direct examination**

**Everything stated in my opinion is the truth.**

**Cross Examination**

117
[ Emblem of the State of Israel ]
**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


Q.     Referring to the affidavit we filed with the Court at the beginning of the week of John Pim who served in Hong Kong until 2007, I assume you read it – is that right?

A.     I read it but not too closely.

Q.     Referring to Sections 7-9,

A.     In the last two days I spent time in hospital due to the matter of someone close, and I read these opinions while waiting in the operating room. I'm looking where my comments to those sections are.

Q.     From your personal knowledge, is there anything written in those sections which is incorrect?

A.     Yes. In my opinion, in Section 7 there is a lack of distinction between the issue of applicability of Section 3 and the issue of an exemption from Section 3, in my opinion Section 8 gives us an indication that exemptions are indeed given outside the framework of those 4 subsections which ostensibly according to whomever wrote it they are the framework and there is nothing else. If we see at the end of the first line starting… in other words whomever wrote it he himself already presented the breach of the framework when in the third line he speaks of the grounds for breach of the framework referred to as official business[1] - I don't know what is meant legally, what the legal definition is, and in any event according to what I've seen it also doesn't appear in Annex No. 1 which was attached by Kinmoth in his last affidavit as authority for those 4 subsections.

Q.     Is there anything in Sections 7-9 which is incorrect?

A.     The basic rationale underlying the statement in Section 7 is incorrect. And the proof comes in Section 8.

Q.     Do you know of any case of a Chapter 2 narrow-bodied plane which was given approval to land in Hong Kong after 1995 and which is not included in the cases explicitly specified in those sections of Mr. Pim's affidavit?

A.     I don't know.

Q.     Have you ever arranged a landing permit in Hong Kong for a Chapter 2 Gulfstream 3 airplane

---

[1] Translator's note: originally spelt "offishel bisnes".

118

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                        **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                        **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**

A.    No.

Q.    Have you ever arranged any landing permit for any airplane in Hong Kong?

A.    To the best of my recollection no.

Q.    For the purpose of giving your opinion now, did you contact any authorized entity in Hong Kong to verify the actual situation there?

A.    Yes.

Q.    Who is the entity?

A.    I went into the official websites of the Government of Hong Kong and in my opinion, as a jurist specializing in aviation, that was sufficient.

Q.    Going back to the question, did you contact any authorized entity on this matter over and above checking on the Internet?

A.    First, it is possible that I also reviewed official written material which was not on the Internet – it is possible, I have to check. Second, since the question was asked exactly as my colleague said the first time I don't intend to repeat my words again, but only to clarify them that also in the State of Israel when I'm asked a professional question, I'm sure that that's also what the asking person does I open the book of laws and don't pick up the phone to persons in the Ministry of Justice or the Ministry of Transport.

**To the Court's Question**

Did you contact any human entity

A.    No.

Q.    I'm presenting to you Mr. Christopher's affidavit

**The Defendants' Counsel**:

With respect to my colleague's comment about a deletion in Section 6 I will produce the affiant's confirmation about the deletion.

**The Plaintiff's Counsel**:

119

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


It does not constitute a waiver of all of my arguments with respect to the affidavits that were filed on January 14, 2008.


Q.     I understand that you read his affidavit as well?

A.     Indeed.

Q.     Are you familiar with the practice of using companies that specialize in coordinating takeoffs and landings of private planes?

A.     Yes.

Q.     Have you heard of the company Universal?

A.     No.

Q.     Mr. Hurley says in his affidavit in Section 9 that it was Universal which conducted the flight coordination for the flights in question, i.e., August 99 and March 2000. And it was they who instructed the Defendant's aviation personnel that in order to reach Hong Kong they had to land in Macau because of the plane's noise level and that that was – and still is their practice with respect to Chapter 2 Gulfstream 3 flights to Hong Kong, from your personal knowledge can you say that this is not true?

A.     First, what you said in your question as if that's what's written in Section 9 is inconsistent with my understanding of what's written in Section 9 since if we touch directly on the issue they write the word recommendation and not instruction and not prohibition and so forth. Therefore, what's written is written, it can be understood not in contradiction or does not contradict what I determined in the opinion and from the word recommendation that is written here I only learn that also according to their approach it is not an absolute prohibition. A digital prohibition in the sense of yes or no. And therefore I don't think that I can say whether it's true or untrue. If they recommend then they recommend.

Q.     Can you say that Universal's practice is not as described in Mr. Hurley's affidavit.

A.     I don't know.

Q.     Can you say that it's not true?

120

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


A.    I can't say that what's written in Section 9 is not true.

Q.    Referring to Section 16 of your opinion, on p. 6, you quote part of a document that is related to the legal situation in Hong Kong, whose title is as specified in footnote 5, and you didn't attach this document to your opinion?

A.    I didn't attach.

Q.    I am placing this document before you, confirm that this is the document you mean. Is this the document you quoted from?

A.    (The witness opens his laptop) I assume that what appears in Section 16 of my affidavit appears in the filed document, I'm not sure whether I had before me the entire filed document. **Marked Def/59**.

Q.    Referring to Section 7 of your opinion, referring to the end of the section. "Thus, for instance, the maximum weight of the airplane….. A difference of 500 pounds.". I'm presenting to you the two documents that you describe, these are documents that were attached to the first opinion, Annexes 7 and 8 to Kinmoth's first affidavit, are these the documents you referred to?

A.    Yes.

Q.    What in fact did you mean to say in the sentence I read to you?

A.    (The witness peruses) It's written in Section 7.

Q.    Did you mean to say that these are different planes?

A.    No.

Q.    I'm repeating the sentence. What is the airplane in the first document and the airplane in the second document do Annexes 7 and 8 of Kinmoth's affidavit refer to different planes?

A.    Maybe yes and maybe no. If so, there's a problem with Mr. Kinmoth's communication and if not the problem is even worse.

Q.    I'm now placing before you a flight manual (the airplane book),

A.    That's what's written on the document marked **Def/60**

Q.    Turn to the last page – do you see the numbers highlighted in yellow? Do you understand the difference between the numbers mentioned in Section 7 of your affidavit?

121

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


A.     Not necessarily, it needs reading I don't know what it means. I understand the difference but in my opinion I wrote that it was unclear to which weight Mr. Kinmoth was referring. With respect to the difference of the numbers I assume that the issue is the maximum weight allowed on the ramp (parking area) and with respect to the second term it's the maximum weight for takeoff. And what's that got to do with my comment in the opinion that is still unclear to me.

**Redirect**

**None**

**The Plaintiff's Counsel**:

Since insisting upon the motion to have Mr. Michael Koby testify will cause a postponement of the hearings if the motion is granted, we are withdrawing the motion. Under these circumstances, the prosecution rests and these are the Plaintiff's witnesses.

**Comment**:

His testimony is translated by Mr. Gilad Meyerson of Stenogram.

**Mr. Mathew Ma is duly cautioned and testifies in direct examination**

**Everything stated in my affidavit is the truth.**

**Cross Examination**

Q.     Did you write your affidavit or did your lawyers bring it to you to sign

A.     It was written after we spoke and met with the lawyers, it was written by the lawyers after what I described to them. I gave them the details but I didn't write it myself.

Q.     Did you have any comments to the draft affidavit? Were there any inaccuracies or other comments?

A.     It was written in accordance with the details I gave and the lawyers wrote.

Q.     What you're describing is that you spoke about the issues in the affidavit with a lawyer and they wrote and you signed?

A.     Yes. After they wrote I read the facts and after that I signed.

122

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                      **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                      **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


Q.      You didn't have any comments?

A.      I didn't have any comments.

Q.      Before signing the affidavit, were you in touch with any of the following: Mr. Sheldon, Mr. Raviv, Mr. Roberts, or Mr. Bitan or anyone else on Sheldon's behalf?

A.      No. Mr. Adelson in fact I had no contact for 4-5 years. And the other people you mentioned I haven't been in touch with them since I finished working for The Venetian.

Q.      Besides Sheldon's lawyer you weren't in touch with anyone else in connection with your affidavit or testimony?

A.      Right.

Q.      How was contact made with you for you to testify?

A.      I think Adv. Shraga called me… I think it was at my home, and he introduced himself and asked me whether I'd be willing to testify in this claim,

Q.      How did they locate you if you hadn't been in touch with them for a few years?

A.      He located me through one of the colleagues who worked with me Ms. Ivy Yip who worked for me. I was her supervisor.

Q.      Did you or did you not speak with Mr. Adelson in connection with your affidavit or testimony?

A.      As I mentioned I haven't seen him for at least the last 4-5 years.

Q.      Did you speak with Ivy Yip about your testimony or affidavit?

A.      No.

Q.      How do you know that it was she who gave your phone number to Adv. Shraga

A.      She called me from Hong Kong to Las Vegas and told me that Adv. Shraga would be calling me.

Q.      So you did speak with Ms. Yip

123

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**

A.    I didn't say that I didn't speak with her, I was asked whether I'd spoken to her about my testimony and affidavit and that I didn't do. When she spoke with me on the telephone I didn't know what it was all about.

Q.    Can you say where you signed your affidavit?

A.    In Las Vegas at an office inside a [sic] hotel of The Venetian. It's a big office a whole floor

Q.    Was it at the office of a specific manager?

A.    I don't know whose office it was.

Q.    But you worked at The Venetian how can you not know

A.    In my time the office didn't exist. After I left they changed the offices from another building to the place where I signed.

Q.    Did you read affidavits of other witnesses before signing your affidavit?

A.    No.

Q.    How do you explain that in your affidavit, parts of it are identical to the affidavit of Mr. Bitan.

A.    I don't know I haven't seen his affidavit.

Q.    I'm telling you that major parts of your affidavit are identical to the affidavit of Mr. Bitan.

A.    That means it's true.

Q.    I'm talking about the same words

A.    I didn't write the affidavit, I assume it's the lawyers' writing practice.

Q.    You said that you described the facts and then they wrote and you signed, how is such a miracle possible that after you spoke to them in your own words still in the end the affidavits are identical?

A.    As I mentioned I provided the details he didn't write what I said word for word but wrote what I relayed in his words and then I read and signed because it's the truth.

124

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                              **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                              **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**

Q.    After you signed the affidavit until today did you speak or see anyone on behalf of Mr. Adelson with respect to your testimony?

A.    No.

Q.    Referring to Section 2 of your affidavit, what is your training for the job you filled?

A.    I have experience in marketing, before The Venetian I worked for several other casinos and I worked in this field before The Venetian for more than 10 years. I worked at casinos such as the Mirage the Golden Nugget they're all in Vegas Horseshoe casino and at Desert Inn and in all of them I worked in marketing.

Q.    You work for The Venetian – what are your responsibilities?

A.    My responsibility is to lead a marketing group to bring clients from the Far East to visit the hotel.

Q.    Why from the Far East?

A.    The marketing is mainly from Asia. Although I live in Vegas, I was born and grew up in China, I lived in several countries in Asia: Hong Kong, China, Australia, Taiwan, and I traveled around Asia on business and I have intensive and rich experience. I have many connections in Asia.

Q.    Are your connections and experience in Asia or in the Far East connected to the gambling industry.

A.    It wasn't connected to the gambling industry but I knew a lot of people who are potential gambling clients.

Q.    What do you mean by potential clients?

A.    Rich people who can gamble.

Q.    Who can gamble or who you know gamble?

A.    First people who can afford it and people who like to gamble.

Q.    Is it fair to say that The Venetian hired you because of your expertise on heavy gamblers from the Far East.

A.    Right.

125

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


Q.      Explain to the court what you did in your job?

A.      I did marketing, I marketed the hotel to those people. My job was to travel and
        meet them and introduce to them the hotel which was new and which has
        many advantages and to recommend to them to come and visit us. I needed a
        team because I have several regional offices, I couldn't do everything myself,
        and my main responsibility was to lead the group in sales.

Q.      Who paid your salary?

A.      Las Vegas Sands.

Q.      In 2003 you finished working for The Venetian and have since not spoken
        with Mr. Adelson?

A.      I haven't spoken to him at all. Because I retired from the job, I spent a lot of
        time in China after my retirement and I didn't have the chance to meet or talk
        to him. To this day I haven't spoken to him.

Q.      You worked for someone for years, you're an expert on the Far East, you go
        back to China, Mr. Adelson was in China several times, and you still insist
        that you haven't spoken to him?

A.      I worked for him, he wasn't my direct supervisor, I didn't have much contact
        with him, I took him on the travels in question, even though I worked for him
        it doesn't mean I liked him. I didn't like him very much, because I don't think
        he was a good boss to me, that's the reason I decided to retire after my
        contract expired.

Q.      Why wasn't he a good boss?

A.      We didn't get along.

Q.      Can you demonstrate with examples that will illustrate why you didn't like
        him?

A.      I think he is too focused on himself on his role as boss. He wants everything to
        be in his way he didn't listen to me.

Q.      Did you finish with a bad feeling?

A.      When I left it was in good spirits and they threw a party for me.

Q.      You didn't like Mr. Adelson and yet you're here and you came a long way and
        you're a busy person and you came all the way for someone

126

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


A.    I don't hate him and it doesn't mean I have to like him, I worked for him for more than 3 years I don't understand what's the problem with my coming. I didn't come for a particular reason except that I'd never been to Israel.

Q.    Were you forbidden to speak with Mr. Adelson.

A.    I was not forbidden.

Q.    Were you forbidden to do business in Vegas?

A.    No.

Q.    Were you forbidden to engage in the gambling industry?

A.    I retired from the gambling industry.

Q.    So you were not prohibited from doing business in the gambling industry in Vegas.

A.    I had a suspension period of one year.

Q.    What do you mean?

A.    When I announced my retirement a replacement was brought for me by the name of Muk and then during the training period there was a party for the Chinese new year and there was a client who lost a lot of money and then there was a lottery and Mr. Muk arranged for the client to win the lottery, to give him a good feeling, he lost 5 million dollars. And he won the first prize a Mercedes car, Mr. Muk arranged for him to win that car. And Muk asked me if it's O.K. to do so, I didn't give him an absolute answer because I told him that it was his decision, I wasn't in charge of the department any more, he spoke with another supervisor at the hotel and then they decided to do it. This incident was investigated by the Gaming Control Board in Las Vegas, Mr. Muk admitted to the Authority that he had fixed the lottery, and I was punished because I knew about the possibility of it happening and didn't prevent it. And I also didn't report it.

Q.    Did you tell any of the managers about the incident before the investigation?

A.    No. That's why I was punished.

Q.    Was Adelson prohibited from talking to you

A.    I don't know. Why would he be prohibited?

127

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


Q.      I'm referring you to the annex to your affidavit, who did you get it from?

A.      From Adv. Shraga.

Q.      When did you get it? Before your affidavit?

A.      During my meeting with him to prepare the affidavit he showed me the annex.

Q.      Did you see the document in real time?

A.      I had the document in real time.

Q.      From whom did you get the document at the time?

A.      I can't remember exactly whether it was Paul the pilot or Betty Adelson's secretary.

Q.      Does this document accurately reflect what happened in real time.

A.      Not accurately but 90% correct.

Q.      Inaccuracies are possible.

A.      The takeoff and arrival time because Mr. Adelson is not punctual. Rarely arrives on time.

Q.      We arrive at the visits described in your affidavit, I'm asking you why did you travel with Adelson? For what purpose did Adelson need you

A.      He needed me for a marketing tour. He didn't need me I needed him. I needed him to help me market the hotel because he's a known man, and many of my clients had heard about him, and his being the owner in which I marketed [sic] would have great marketing consequences.

Q.      How did they know him at the time?

A.      He was very well known.

Q.      The hotel only opened in 99 and it suffered from several problems at the opening, and only several years later, the hotel started succeeding and Mr. Adelson was known in the gambling industry.

A.      They knew him through me, I advertised and introduced him, I made him a well-known persona among them because Mr. Adelson is a legendary figure. He grew up from a very poor family and made his money with his own two

128

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**

> hands. In Las Vegas most of the casinos are public companies apart from The Venetian, of which he was the only owner (that was at the time) and he didn't have a partner.

Q.    Why did Adelson need you on this tour?

A.    He hadn't been to the Far East before and needed someone who knew the place and would take him.

Q.    Coming to the first tour, was it your first visit with Adelson in Macau?

A.    Yes. The visit wasn't to Macau. We passed through Macau. Our destination was Hong Kong.

Q.    Was it your first time with Adelson in Hong Kong?

A.    Yes.

Q.    And was it your first time with Adelson in Taiwan?

A.    Yes.

Q.    Had you been to Macau before this visit?

A.    Many times. Even before I came to live in the United States.

Q.    What do you think about Macau?

A.    A very small town, the only place you can go to there is the casino

Q.    Did you have connections there

A.    Yes. I knew many people there. The owner of the Lisboa. Mr. Stanley Ho. I knew him in person.

Q.    And who else?

A.    Players, or people who had VIP rooms – a sub-franchise to operate gambling rooms in Stanley's casino.

Q.    Did you know the VIP rooms

A.    I knew some of them

Q.    Do you know managers at the Lisboa casino in Macau?

129

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                           **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                           **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**

A.      I know some of them.

Q.      How did you make contact with Stanley Ho who is one of the richest people in the East?

A.      During my work in the past I was in touch with him several times when I made sales promotion parties and he came to the parties. And also Mr. Ho has several wives (4) and one of his wives is a client of mine.

Q.      Did you know other people in Macau other than in the gambling industry

A.      No. Mainly in the gambling industry.

Q.      Did you know a woman by the name of Kitty Chan in Macau?

A.      I don't think so.

Q.      Did you not meet her?

A.      No. It's the first time I'm hearing the name.

Q.      Let's return to the first tour, you have connections in Macau, you know VIP rooms the owner of Lisboa, Ms. Yip you said she waited for you in Macau at the airport.

A.      Right.

Q.      Why?

A.      Because she worked for me, she went to make transport arrangements, to get tickets for the ferry and arrange cars.

Q.      These are not marketing activities?

A.      She's the manager of the Hong Kong office. It's part of her responsibility.

Q.      You said you went on a tour in Hong Kong and passed through Macau,

A.      Right

Q.      But she works in Hong Kong and you send her to Macau to do simple arrangements for Mr. Adelson as if she's an assistant or a maid

A.      I need someone to do it. From my point of view it's part of the job. Mr. Adelson is the owner he was never in that part of the world. Never has been.

130

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


What's the problem that the regional manager will wait at the airport. For instance if your dad comes from another country don't you go to the airport…

Q.    This woman when you landed in Macau her job was to make transport arrangements

A.    She helped me with that. My job was to give him a smooth tour.

Q.    Surprisingly her nephew worked in a VIP room – how

A.    I know the person he's Ms. Yip's cousin. Mr. Kacheuonj Yip. I knew him as a client

Q.    What do you mean

A.    He gambles I know him from my previous job. He wasn't at The Venetian but he was in other casinos in Vegas.

Q.    Did you talk to him before coming to Macau?

A.    No. I didn't talk to him before this tour.

Q.    Is he the owner of the VIP room

A.    He's a partner. And he's the operator and manager of the room.

Q.    Suddenly Ms. Yip asked Adelson to visit the cousin and suddenly Adelson agreed?

A.    In fact, Ivy suggested to me to visit the cousin. On every tour with Adelson he doesn't decide who to visit he leaves it to me who to visit and who not. I decide who. Because he helps me on the marketing trip.

Q.    You decided that he needed to visit the cousin.

A.    Yes.

Q.    You told Mr. Adelson

A.    Yes. He didn't have any objection.

Q.    Why did you decide to visit him?

131

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


A.     He's a good client and because he asked through Ivy that we visit him then I thought we should visit. At the same time, Mr. Adelson could see the Lisboa hotel and casino.

Q.     The cousin called Ivy and asked her for a visit by Adelson, you thought it was good, and it happened?

A.     Yes.

Q.     Did he call her before you reached Macau?

A.     I don't know when he called, but I assume that since she came from Hong Kong to Macau to meet us I assume she had time to visit him and she mentioned the visit and maybe then he suggested that Adelson visit, because the cousin knows a lot of potential clients in Macau. And it's important for me and for The Venetian to know people like him.

Q.     Why did he think it was good for Adelson to see the casino?

A.     Because Mr. Adelson is himself a casino operator and everybody wants to see how casinos work.

Q.     Did you tell Mr. Adelson that it was good for him to see the casino?

A.     I don't need to tell him it's natural.

Q.     Was the visit at the Lisboa planned?

A.     It was a last-minute decision.

Q.     Your decision?

A.     Mine after we arrived.

Q.     Did Ms. Yip turn to Adelson or did you turn to Adelson?

A.     I don't remember exactly. I think we said it together.

Q.     When you arrived at the Lisboa, were you received at the entrance

A.     Yes, by the cousin.

Q.     And then he took you to his room?

132

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


A.    He escorted us to the room through the security stand and the casino's main floor. And we went up to the second floor where his room and other VIP rooms are located.

Q.    Is the main floor open space?

A.    Yes. Anyone can come and play.

Q.    Is it necessary to open doors?

A.    You have to go through the security checkpoint. It's an open space.

Q.    Is it a long walk or a short one?

A.    Not very long.

Q.    How was Mr. Adelson impressed by the activity at the casino,

A.    His impression was that business was good because there were a lot of people.

Q.    When you arrived at the cousin's VIP room what did you do?

A.    He escorted us to his office which is a little room. In the room there were two games that were going on outside the office, and inside there was a small office. We sat there and spoke a little. The cousin served us tea

Q.    What did he say to Mr. Adelson?

A.    He looked forward to meeting him, Adelson presented The Venetian hotel how pretty it was and invited him to visit us.

Q.    Did Adelson speak about the Lisboa?

A.    No. Immediately thereafter we hurried to catch the ferry. In any case it was pretty late. I don't remember what time it was but it was in the late afternoon hours.

Q.    Did you stop to eat?

A.    No.

Q.    Is the cousin tall or short?

A.    Very short and thin. About my height.

133

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


Q.      You took off from Taipei in Taiwan and arrived in Hong Kong – at what time?

A.      In the evening. I don't remember. Not in the late hours. Probably around dinner time.

Q.      When did you take off from Taipei?

A.      Maybe a little after what is stated in the annex to my affidavit.

Q.      How long did it take from the takeoff in Taipei until arriving in Hong Kong?

A.      Let's calculate, it says in the annex that takeoff was at 15:00 there may have been a delay I'm not sure. He's usually late and it says that it takes an hour and 22 minutes to reach Macau and it's less than that. I think it's an hour at the most, let's assume we arrived in Macau at around 16:30 we visited the cousin it took maybe half an hour in all and then we went to the ferry it took an hour and then we had to go through customs in Hong Kong and from there we traveled by car to the Kowloon side, I assume we arrived at around 19:00.

Q.      Why did you choose the travel route from Taipei to Hong Kong through Macau instead of taking a commercial flight from Taipei for 45 minutes. Taking Adelson from Taipei, reaching the airport in Macau… coming to the Lisboa… instead of taking the first class flight that takes 45 minutes.

A.      You're wrong, because taking a commercial flight you have to check in before the flight at least 1.5-2 hours before. And what would we do with Adelson's private jet?

Q.      It could have stayed parking in Taipei.

A.      Mr. Adelson considers himself an important person he has bodyguards do you think he would feel comfortable taking a commercial flight when he has a private jet. It doesn't make sense.

Q.      You took him on the ferry from Macau to Hong Kong, that's not so comfortable, it's much less comfortable.

A.      I arranged a private lounge on the ferry for him, for Adelson he'd rather fly in his private jet.

Q.      Do you remember additional visits with Adelson in Macau?

A.      The second time it was the same thing but the destination was Hong Kong.

Q.      After the second trip

134
[ Emblem of the State of Israel ]
**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                         **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                         **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


A.      We were in Macau with Adelson,

Q.      When

A.      I believe that in late 2000 I don't remember exactly. Maybe a few months after the second trip I don't remember exactly. We went to Macau, in fact we stopped there and from there we traveled to China.

Q.      What was on the tour

A.      We tried to market, also The Venetian sponsored a boxing competition in Canton. A city near Macau. We went to Canton by car from Macau. It's about a two-hour drive.

Q.      Why did The Venetian sponsor a boxing competition inside China proper?

A.      It was my initiative. It's in order to advertise The Venetian's name. A year earlier, The Venetian sponsored a similar boxing competition in the United States.

Q.      And after the competition you returned to Macau?

A.      We went from Canton to other cities to visit. We traveled in our car. We stayed for two days in Canton and then we traveled to a city in north China, Delian, and from there we went to Beijing. We took a commercial flight.

Q.      But you said that he didn't like taking commercial flights?

A.      That's in China.

Q.      What does that mean?

A.      If you're flying your private jet you need to ask a long time in advance and there are many problems around. I assume the pilots could give a better explanation, I don't know I'm not an expert.

Q.      Were there other trips to Macau?

A.      I don't remember.

Q.      Do you remember a meeting in Macau with official representatives?

A.      No. We had no business with officials from Macau. I didn't in any case. And not in my presence.

135

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                          **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                          **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


Q.     Do you know whether Mr. Adelson met in Macau or outside of Macau with senior officials of Macau?

A.     During my trip with him I don't recall him having such meetings. I had no contact with such officials.

Q.     Who is Louis Sou?

A.     I don't know him.

Q.     He's an assistant of the Prime Minister of Macau.

A.     I haven't had the pleasure of meeting him.

Q.     Do you know Richard Suan. He's Chinese.

A.     No.

Q.     Do you know Adv. Valente

A.     No.

Q.     Let's go back to the first visit, was Mr. Raviv throughout the trip was he?

A.     Yes he was. Also in the Lisboa casino in everything.

Q.A.   There were Raviv, Mr. Adelson, myself, Ms. Yip and the bodyguards. In the second trip I think Mr. Raviv wasn't there. Ms. Yip was, and there were bodyguards. There are bodyguards in every trip.

**Redirect**

**None**

**Decision**

**The time is now around 12:30. The hearing will be resumed at 13:15.**

**Issued today, January 17, 2008 (Shvat 10, 5768), in the presence of the parties.**


| (-) | (-) | (-) [stamp] |
|---|---|---|
| **P.R. (Employees)** | **P.R. (Employers)** | **Ilan Itach** |

136

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**　　　　　　　　　**Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**　　　　　　　　**January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


**Maoz Halevy**　　　　　　　**Amiram Miller**　　　　　　**Judge**


**Comment**

The time is now 13:25.


**Mr. Bitan Doron is duly cautioned and testifies in direct examination**

**Everything stated in my affidavit is the truth.**

**Cross Examination**

Q.　　In your first affidavit in Section 6 "you were informed… Mr. Hananel" Did they let you read his affidavit?

A.　　To the best of my recollection no.

Q.　　Who told you that in the legal proceedings Hananel claimed so and so?

A.　　Adv. Amir Shraga.

Q.　　With respect to your second affidavit, you say "I have been informed of Mr. Hananel's argument in Section… of May 13, 2007". Were you shown what is stated in the affidavit?

A.　　I was asked by Adv. Shraga whether I had ever said anything like that to Mr. Hananel and I hadn't. It didn't happen.

Q.　　That's all you were asked in this context

A.　　Yes.

Q.　　Referring to your first affidavit, the language of this affidavit did you write it or was it brought to you?

A.　　I didn't write it with my own hands but I said things and they were written down.

Q.　　And this is consistent with what you said?

A.　　Yes.

137

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


Q.    Is it true that you signed this affidavit overseas?

A.    Yes.

Q.    Did you have comments or was what you received acceptable to you?

A.    I dictated it. In principle I don't type in Hebrew. I spoke and things were written on the spot. And then I signed. I read the document after it was printed and I signed.

Q.    You met with Mathew Ma at the same time

A.    No. I saw him in the office but we didn't meet.

Q.    What do you mean we didn't meet.

A.    Our office is in the back part of the offices of all the offices. It's a kind of square and when I came in I saw him passing by, I didn't say hello, at first I didn't recognize him. I haven't seen him in a good few years.

Q.    Who helped you recognize the person who passed you as Mathew Ma.

A.    A guy who worked with me by the name of Zohar Lahav.

Q.    In what context did he tell you?

A.    He asked me if I'd seen Mathew Ma. He hadn't seen him in a long time too.

Q.    Did you speak with any of the witnesses in this case before signing the affidavit.

A.    I didn't speak with any of the witnesses before signing the affidavit.

Q.    Mr. Adelson didn't tell you that he was asking you to make an affidavit.

A.    No. Adv. Shraga contacted me. Only he contacted me.

Q.    After the first affidavit that you gave – did you speak with anyone?

A.    No. Also not with Adelson.

Q.    After the second?

A.    No. I'm sure. I didn't speak with any of the witnesses in the case.

138

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


Q.    Were you informed what were the versions of other witnesses with respect to the things you testified on in the affidavit?

A.    No.

Q.    Did you read the testimony of Eric Koby?

A.    No. I wasn't told what he said. I wasn't in court. They didn't let me read.

Q.    They didn't tell you about a meeting that Eric Koby described between Mr. Zohar Lahav and you and Mr. Micha Koby?

A.    I wasn't told.

Q.    It's a surprise to you?

A.    What's the surprise

Q.    That Eric Koby testified in court about a meeting that took place between Mr. Lahav Zohar and you and Mr. Micha Koby at the Sheraton in Tel Aviv.

A.    I didn't know that he testified on the matter.

Q.    The signature on the first affidavit and the second they're both yours?

A.    Yes. I never manage to make it come out the same.

Q.    Do you have any explanation as to how your affidavit is almost word for word identical to Mathew's affidavit that was signed on the same day? And it refers to events from 8 years ago.

A.    We were both at the same place and at the same time. I have no explanation.

Q.    You mentioned in Section 2 of your affidavit that Mathew Ma worked in the field of marketing and sales for The Venetian Hotel in the Far East?

A.    Yes.

Q.    How do you know Mathew Ma's field of occupation?

A.    From my working and still working for the company.

Q.    Do you know what all the workers do in the company?

139

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**

A.    Almost every worker. I know an entire department and know what it does but not every personal job.

Q.    Also after that visit signing the first affidavit in Vegas until today I [sic] didn't speak with Mathew Ma

A.    About the trial I didn't talk to him.

Q.    When did you talk to him not about the trial.

A.    At the airport in Los Angeles. We happened to be on the same flight.

Q.    Do you know who reserved the airplane tickets for Mathew Ma?

A.    I have no idea. Mine were reserved by my secretary.

Q.    Did you sit together on the plane?

A.    No.

Q.    When did you arrive in Israel?

A.    On Monday at 14:30.

Q.    Take a look at the itinerary that was attached to your first affidavit. Where did you get it from?

A.    From Betty Mr. Adelson's clerk.

Q.    Did you ask for it?

A.    No. We get it before every trip.

Q.    At the time this is the itinerary you would get from Betty.

A.    Yes.

Q.    When did you get it now for the purpose of the affidavit?

A.    When I signed the affidavit I also saw the copy. We have all the copies in the office. We keep in our security department. I didn't physically bring it I made a comparison with what I had and there was no problem. The only thing that I didn't have is the handwriting.

140

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**

Q.     Referring you to the itinerary that was attached to Mathew Ma's affidavit – is this the document you had?

A.     Generally it looks the same, it's just a different printing.

Q.     If what you had is also what was attached to Mathew Ma's affidavit – why didn't you attach the itinerary that you had?

A.     Because it was the same thing.

Q.     You said that the itinerary that you had at the office was without handwriting, and the itinerary that you attached to your affidavit is with handwriting. First from where did you get this specific itinerary that was attached to your affidavit?

A.     This itinerary arrived with Adv. Shraga.

Q.     Is this itinerary accurate?

A.     It's accurate to the best of my recollection but I can say that there are always changes and I know that we left on Monday instead of Tuesday, it doesn't look unreasonable to me that there's handwriting on the itinerary.

Q.     In your affidavit in Section 2 is attached a planned itinerary. In other words it's an itinerary that doesn't necessarily reflect what happened.

A.     It reflects.

Q.     Necessarily?

A.     To the best of my recollection yes.

Q.     Referring to September 3, 1999 – did you take off to Bombay.

A.     We brought it forward to September 2 and flew to Thailand

Q.     You'll agree with me that it's not on September 3 and the flight was not to Bombay but to Thailand

A.     Right. That's what explains the handwriting the changes.

Q.     Show me in the handwriting you said it explains the changes – where are the changes on September 3

141

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


A.    I'm talking about changes in general and not about September 3. The changes make sense you can see the hours.

Q.    I'm telling you that the itinerary including the handwriting does not necessarily reflect what happened I'm referring you for example to September 3, 1999 also after the changes the itinerary doesn't reflect what happened?

A.    That's what I'm saying at the beginning, the itinerary is a given which is not binding, that's why it stays a clean sheet at the office, the way it comes out originally, and in the field it changes with handwriting.

Q.    But you attached it to your affidavit as distinguished from Mathew Ma who refers to the same trip you attached an itinerary with the changes that were made in the field as you say – is that right? Both in the field and in handwriting no changes were made about something that never happened such as a takeoff to Bombay on September 3

A.    It's right that the change does not appear.

Q.    Referring to Section 3 of your first affidavit, you say that the place of accommodation was at a hotel in Hong Kong and you rely on the itinerary.

A.    Not only on the itinerary but on what I know.

Q.    When you say that also Raviv and Mathew Ma joined this trip – are you relying on your memory or on the itinerary?

A.    On my memory.

Q.    From your memory why did Dan Raviv join this tour?

A.    I have no idea.

Q.    Referring to Section 1 of your affidavit, since 1999 I have acted as a security person of Mr. Adelson – is that right?

A.    Yes. Since May 21, 1999

Q.    What did you do before this job?

A.    I lived in New York. I didn't work in security.

Q.    As part of your job is it true that you also worked in securing the Adelson family home?

142

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                                **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                                **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


A.      Yes.

Q.      Is it true that as part of your job you also worked in security for Mr. Adelson's children?

A.      Yes.

Q.      Is it true that you worked in security for the Adelson family also on vacation travel?

A.      Yes.

Q.      Is it true that you guarded Mr. Adelson also on flights that were made not in his private airplane but on commercial flights?

A.      Yes.

Q.      Is it true that the same is correct also with respect to security for other members of Mr. Adelson's family, such as Dr. Adelson?

A.      Yes.

Q.      Is it true that at the beginning of the period of your employment from May 99 you were employed by Adelson through a security company by the name of SOA

A.      No. I was among the first employees of The Venetian. I arrived precisely for the transition.

Q.      If I tell you that the transition was after August 99

A.      I know, when I started working at The Venetian I received an employee card of The Venetian the first pay check I received from The Venetian.

Q.      Who is the employer written on the slip.

A.      Venetian was written then.

Q.      At the time it said The Venetian hotel and now it says Las Vegas Sands.

A.      Yes.

Q.      Is it true that when you stared being employed the head of the security team was Sean Ben Menachem?

143

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**

A.      Yes.

Q.      Referring to Section 2 of your affidavit, is it true that the said additional security person is Mr. Sean Ben Menachem?

A.      Yes.

Q.      Why didn't you state his name?

A.      It's part of the security system. It's a natural thing.

Q.      Is it true that during this trip there was a dinner event in Hong Kong and people with guns burst into the room?

A.      The guns are not true. The burst-in is true.

Q.      In your second affidavit you referred to the description of the event in Section 7.2 of the Plaintiff's supplementary affidavit – were you told that in the same Section 7.2 of the Plaintiff's affidavit, the Plaintiff referred also to the same burst-in event in Hong Kong?

A.      I was asked whether I'd said anything like that about who owned the casino rooms and I said that I didn't. I wasn't asked about the incident.

Q.      Is it true that Mr. Adelson felt threatened in the said burst-in incident?

A.      He didn't feel threatened.

Q.      Is it true that he was angry about the way Sean functioned

A.      It's not a yes or no. I'm explaining, every person who is in a room and a group of 40 people bursts in on him feels intimidated or threatened. He didn't feel threatened personally, but felt threatened the same way as I as a security guard felt threatened.

Q.      Was Mr. Adelson unhappy with Sean's functioning and appreciated your functioning

A.      No. He didn't appreciate the functioning of both of us in the same incident.

Q.      Is it true that after that incident Mr. Ben Menachem's employment was terminated.

A.      Not to the best of my recollection. I think it was afterwards. I don't know when. But we still worked together

144

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


Q.    Is it true that after Mr. Ben Menachem finished working Mr. Zohar Lahav is the head of the security team?

A.    Yes.

Q.    Is it true that from the date of termination of Mr. Ben Menachem's employment you weren't in touch with him.

A.    Not true. I was in touch with him I can't define times. Until 2007 I saw him every so often in events and places. In 2007 I met him at the beach this year, there was the beer festival. I met him with his wife in Israel.

Q.    Did it happen to be in July.

A.    Could be. I was in Israel so many times. Can check according to the date of the beer festival.

Q.    Did you talk to Mr. Sean Ben Menachem about the trial being conducted by the Plaintiff?

A.    No.

Q.    Did you tell anyone that you happened to meet Mr. Ben Menachem?

A.    To the best of my recollection no. And if so then only to Zohar.

Q.    Have you any idea whether Zohar spoke to any of the witnesses in the case?

A.    I have no idea.

Q.    That Sean Ben Menachem signed an affidavit in Israel before the Defendants' lawyers did you know about that?

A.    No. I know about it now.

Q.    And also after July 2007 you didn't speak with Sean about the trial nothing to do with the trial

A.    Since the last time I saw him at the beer festival I didn't hear and didn't talk to him in any context.

Q.A.    I know Micha Koby. I know he's Eric Koby's father.

Q.    Is it true that at the beginning of December or thereabouts you and Zohar Lahav met Micha Koby at the Sheraton hotel in Tel Aviv.

145

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                              **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                              **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


A.      We met with him.

Q.      Who initiated the meeting.

A.      Ronen Rachamim. A childhood friend of mine and a good friend of Eric Koby and Micha Koby was a member of the Board of Directors of the company Kishrei Teufa which was owned by Ronen's father

Q.      Are you familiar with the security background of Mr. Micha Koby?

A.      Certainly that's why we met.

Q.      Do you know that he still works for the security forces in practice?

A.      Yes. That's why we met.

Q.      Is it true that the purpose of the meeting with Mr. Micha Koby was to discuss a business proposal to Mr. Micha Koby?

A.      Not true. The purpose was to get assistance and security information on the security situation in the country for security purposes of ours and around the world in general.

Q.      You schedule a meeting

A.      Not me. Ronen scheduled a meeting. The person who asked was Micha.

Q.      What you're telling me now is that someone who is senior in the security service asks to schedule a meeting on a non-business matter in order to give a private briefing about the state of terrorism in Israel and outside of Israel.

A.      You're distorting. We made a survey here in Israel (a security-related risk survey) Ronen Rachamim knew about this and spoke with Micha Koby and Micha said that he had no problem to meet and explain Ronen asked if this was acceptable to us and we said yes. Naturally he's Eric's father and that's why we didn't approach him.

Q.      Explain. Naturally he… explain.

A.      Ronen asked us if we wanted to meet Micha Koby and we said that we personally had no need Ronen claimed that he was able to provide the information we were seeking security-wise. That was the topic of the conversation.

Q.      Is Ronen a private investigator?

146

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**

A.    Not by profession. By profession he deals with aviation liaisons.

Q.    Do you know whether he ever worked for the investigation firm Weizmann Yaari?

A.    I don't know.

Q.    That Eric Koby testified in the court do you know?

A.    I sat downstairs. I know. I sat in a café downstairs also Mr. Adelson was here I waited downstairs.

Q.    Did you meet Eric Koby that day.

A.    No. I came because there were two secured persons Mr. and Ms. Adelson.

Q.    Did you see Eric?

A.    No.

Q.    Is it true that the meeting with Mr. Micha Koby took place before that day in which you waited downstairs and drank coffee

A.    Yes. It was several months or several weeks before

Q.    Is it true that in that meeting you or Zohar asked Mr. Micha Koby to convince Eric Koby to sign an affidavit for Mr. Adelson?

A.    No.

Q.    Did the issue of Mr. Koby's testimony in this trial come up in the same meeting?

A.    No. The meeting dealt only with security issues and this was clarified in advance to Ronen, and we would not have met if it wouldn't have been clarified that we're not talking about Eric.

Q.    Why is it important to clarify that the meeting with Micha had nothing to do with Eric?

A.    Eric was fired by Zohar Lahav. Eric after he was fired got a job with a guy who was in the unit with me after he asked me to help him and he was fired from there too. Obviously we didn't want to talk about Eric.

147

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**

Q.      Is it true that on that day when you came and drank coffee on December 20 – is it true that you didn't arrive with Mr. Adelson to Israel together to Israel?

A.      I came with his plane from Boston. The whole team together.

Q.      When did you know about that trip on December 20?

A.      A few weeks. And it's never certain. About 3 weeks before and it's subject to change.

Q.      Your affidavit in August you signed in Israel.

A.      Don't remember.

Q.      Does Mr. Adelson involve you in business decisions?

A.      No.

Q.      You started working in 99? You gave affidavits in 2007. After about 8 years. Approximately how many trips did you make in those years?

A.      I have no idea. A lot. I can tell you that this year I traveled for about 170 days.

Q.      Can we say hundreds of trips in eight years?

A.      No. You say hundreds and it sounds a lot to me. It's possible to look in the passport. I gave the passport to the lawyers.

Q.      Do you remember the purpose of every trip you took with Mr. Adelson?

A.      Security.

Q.      What's Adelson's purpose?

A.      He work and I security. Or he took a vacation and I security.

Q.      Apart from that Adelson went on vacation or work what was the purpose of the work?

A.      There are some trips that were to bring gamblers to the casino and it's more hosting and handshakes and there's business where they go into closed rooms and the security personnel are in the corridor.

Q.      Explain to me how you remember that in the trip specified in the itinerary which you attached to your affidavit the purpose was handshaking?

148

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**

A.    Because that's what we did the entire trip. It was one of my first trips as a young security guard and naturally I asked questions and gained an impression from what was going on. I asked the pilots Mathew I spoke with Sean. It was the first time I had visited Macau.

Q.    What sort of plane was used by Mr. Adelson in 99?

A.    Gulfstream 3.

Q.    Are you a pilot?

A.    No but I like planes.

Q.    How much fuel is there on the plane do you know?

A.    No.

Q.    Section 3 of your affidavit you make an identical statement word for word "since… due to matters related to the noise level of the airplane". Do you understand about airport noise regulations?

A.    That's what was explained to me by the pilots with whom I sat in the cockpit. Beyond the fact that I was very excited because the airport is on the water and the landing strip was splendid despite the fog.

Q.    With which of the pilots did you speak?

A.    With Paul Kay and Billy Boyle.

Q.    In this visit in 99, how do you remember that immediately as you landed at the airport you met with Ivy Yip?

A.    When we passed immigration into the passengers' hall we met her.

Q.    How do you remember.

A.    I remember.

Q.    Who else waited for you at the airport?

A.    Ivy and drivers.

Q.    And not only do you remember that she was there you remember that 8 years ago she told Mr. Adelson that she wanted him to visit a relative of hers?

149

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


A.    Yes.

Q.    This you remember from 8 years ago? What's so special about it?

A.    It changed our travel route. We as security people know that we reach a certain point and travel to another point, when the route is changed for us we need to know about it and the reason.

Q.    Explain to me please and I'm referring you to Def/21 – what was the original route and what was the change?

A.    The original route was to let the cars travel to the ferry to Hong Kong. No travel route is defined.

Q.    A travel route is a way you travel through?

A.    A travel route is from one point to another point. The change is that there's a stop on the way and that's a change in the security plan.

Q.    There's no change in the travel route but in the security route?

A.    There's a change in the security plan.

Q.    Did you unload the cargo into the cars at the airport in Macau?

A.    Yes. We traveled with the cars and the cargo.

Q.    Through where?

A.    I don't remember the route.

Q.    Did you arrive at Lisboa?

A.    Yes. They waited for us at the entrance. A relative of Ivy's and others who work with him.

Q.    How many, about?

A.    I don't remember. There are friends and there are non-friends. People who are close to the person who hosts us or meets with us are not a threat and we don't pay attention to them.

Q.    What's the size of the hotel in Lisboa [sic] in Israeli terms?

150

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


A.      In my opinion something like the Tel Aviv Sheraton. Today it's already much larger but that was its size then.

Q.      Describe to me what when you entered the hotel until you arrived in that tiny room you describe?

A.      We entered the casino through a metal detector, we passed through the gaming tables, we stopped. They spoke about the issue of the game, what was the game versus what they have in Las Vegas. Different kinds of games. From there we continued to the office. I sat near Adelson. We sat for about 20 minutes and left.

Q.      How long did it take you to reach the office?

A.      I can't indicate time. No more than 10 minutes.

Q.      Do you remember the relative's name?

A.      No, but I can recognize him. I saw him afterwards at The Venetian.

Q.      You don't remember his name?

A.      Don't remember.

Q.      This room describe to us what that room looked like and what was its size?

A.      A room the size of about a quarter of the courtroom. A table on the left hand side with a passage, we sat against the wall with two chairs. Mr. Adelson on the right and I on the left. Mathew was inside and also Ms. Yip and there were all sorts of other workers who came in and out.

Q.      How many other workers?

A.      Sean was outside the door, there was the girl who gave water.

Q.      Mathew was inside?

A.      To the best of my recollection yes. With respect to Raviv to the best of my recollection he was outside.

Q.      This relative was he particularly short?

A.      Maybe 1.55. I'm 1.85.

151

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


Q.     Is it true that Mr. Ben Menachem claimed that Mr. Adelson mustn't meet with this relative because he was a dubious character?

A.     That's not true.

Q.     How long did it take from the time of landing in Macau until arriving at the hotel in Hong Kong?

A.     A little more than two hours. One hour is the ferry. From the landing – half an hour until you come out to passport control. About 10 minutes travel to the hotel. You have another 10 minutes. 20 minutes meeting. That's already more than an hour. We got to one hour and ten minutes. Then we went out a walk in the casino. We went outside another 5 minutes travel to the ferry. We waited for the ferry I don't remember how long. Until now about one and a half hours. And another hour the ferry and from there I don't remember the exact time but something like half an hour to the hotel.

Q.     Where did you sit on the ferry?

A.     It's called first class if I'm not mistaken.

Q.     Instead of making this entire round and taking the ferry, how many people take this ferry?

A.     About 100 people.

Q.     Why didn't you take a commercial flight from Taiwan to Hong Kong?

A.     That's a question you need to direct to someone else. Not to me.

Q.     What other visits did you have to Macau after this visit and until 2002?

A.     In June 2001, and after that there were a few more trips. Since then there have been many trips.

Q.     Did you visit with government officials in Macau?

A.     When I was in June yes.

Q.     Was there an event in that visit in which Mr. Adelson slept at the Governor's house?

A.     No.

Q.     Are you aware of a visit in which Adelson slept at the Governor's house?

152

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


A.      No.

Q.      Do you know Louis Sou?

A.      I think he's a worker of the Governor. I know him from when we came there. From the first time in which I was at the Governor's house in June 2001. Then we met him.

Q.      Do you know Yechiel Sabag?

A.      No.

Q.      Do you know Hagai Leibovitz?

A.      No.

Q.      Do you know Avi Nitzan?

A.      No.

Q.      When did you become acquainted with the Plaintiff?

A.      Some time in 99 when we came to Israel. It was in August. Before this trip.

Q.      Do you know what the Plaintiff's job was?

A.      No.

Q.      Can you describe the relationship between the Plaintiff and Mr. Adelson?

A.      No.

Q.      Do you have an employment agreement in writing?

A.      No. There's no contract in the United States for things. When you come to work in the United States you get a document from Human Resources that tells you your rights and duties. I got that. I signed it.

Q.      Have you signed a confidentiality agreement?

A.      Yes.

Q.      For how many years from the date of termination of your employment?

A.      I have no idea.

153

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


Q.     Are you allowed to tell anyone about anything you witnessed in your work with Adelson?

A.     That's a very general question. What was explained to us that with respect to anything related to the personal relationship between the guarded persons to family matters we're committed to strict confidentiality. With respect to the other things there is no commitment.

Q.     I understand what you wanted to say about the personal matters. I'm asking you about Mr. Adelson's business matters. About the meetings. About the hotels. You're not committed to secrecy?

A.     If you were a journalist I wouldn't answer but I'm in court and that's why I'm answering.

Q.     Outside of court?

A.     Any journalist who would ask me what happened here or elsewhere it's none of his business.

Q.     Is it true that over the coming days Mr. Adelson is supposed to decide about replacing Zohar Lahav with you?

A.     No. Define what's replacing Zohar Lahav with you.

Q.     Upgrading your position in Mr. Adelson's security system?

A.     No. Mr. Zohar Lahav is vice president and we both take care of the security system. We've been together for 9 years. No change is supposed to take place.


**Redirect**:

None.


**Paul Roberts, Esq., is duly cautioned and testifies in direct examination**:

I filed two affidavits and everything stated in them is true.


**Cross examination:**

154

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                                      **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                                        **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**

Q.      Can you tell me your profession?

A.      I am a lawyer. I am employed in Massachusetts. My employer is Interface
        Group Massachusetts.

Q.      Interface Group pays your salary?

A.      Yes.

Q.      What's your position in Interface Group?

A.      Vice president and legal counsel.

Q.      I'm referring you to an affidavit you made on July 14, 2004 (marked P/35).
        Referring you to Section 1. Can you say what is the difference between
        Interface Group and here you added the name Massachusetts LLC?

A.      Interface Group is a name by which the company is known it's like a brand
        name. If I say that I work for General Motors, all sorts of departments of
        theirs, then there are a lot of companies and corporations which are part of
        what is known as Interface Group.

Q.      Would it be accurate to say that you, in your opinion, are VP and general
        counsel of the entire group?

A.      Yes.

Q.      Still your salary is paid by Interface Group Mass. (hereinafter – IGM)?

A.      Yes.

Q.      You also said that you provide legal services to Adelson, I'm reading to you
        from Section 3 of P/35. Is that accurate?

A.      Yes.

Q.      The salary for these services how do you get it?

A.      I said earlier that I get my entire salary from Interface Group Mass. LLC.
        Beforehand it was inc.

Q.      You provided services to other companies and still your salary was paid by
        IGM?

A.      Yes.

155
[ Emblem of the State of Israel ]
**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**

Q.    Do you provide personal legal services to Mr. Adelson?

A.    Yes.

Q.    Are you paid a fee for those services?

A.    All of my salary arrives from IGM.

Q.    Is it true to say that you're employed by Adelson and all the rest of his companies?

A.    Legally speaking, I'm employed by IGM. I see myself as employed by Adelson and his partners and all of the affiliated companies.

Q.    You said that you were vice president, I'm referring you to Mr. Adelson's earlier testimony in the United States (Annex 5A of Mr. Hananel's supplementary affidavit). Referring you to p. 131, line 2. There Adelson answered the question of whether you were vice president and responded that to the best of his knowledge you didn't hold that position.

A.    I have been vice president since 1993 and Adelson is wrong.

Q.    What is your involvement in Interface Group's business.

A.    I provide legal counsel. Apart from that, I don't make business decisions. I'm familiar with the companies' business.

Q.    Your job is limited to legal counsel?

A.    The majority of my job is such. Sometimes I'm involved in business conversations and give advice.

Q.    No offense, but VP is only a title.

A.    In the United States it is widely accepted that the senior legal advisor holds the title of VP.

Q.    Does Mr. Adelson consult with you before making business decisions.

A.    Only when they have legal implications.

Q.    Are you a personal friend of his?

A.    I see myself as such.

156

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                         **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                         **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**

Q.    Does he share personal things with you?

A.    I was a guest at his home in personal events I participate in birthdays and events in the course of life with his family? [sic]

Q.    Did you provide him with legal advice on personal and non-business matters?

A.    Yes.

Q.    In what capacity of yours?

A.    As his lawyer.

Q.    Do you see yourself as a personal lawyer of Adelson's?

A.    I deem him and his partners and the members of the family as clients to whom I provide legal services on all matters.

Q.    Do you provide these services for or without consideration?

A.    I don't receive consideration in addition to that I receive from IGM.

Q.    Do you hold shares in any of the companies in the group?

A.    Yes, Las Vegas Sands. I bought the shares on the free market.

Q.    Did you receive options or shares as part of your employment conditions?

A.    No.

Q.    Why?

A.    You need to ask Mr. Adelson. Once he offered me and I refused. It was before the IPO. There were deals between Mr. Adelson and Las Vegas Sands. And I represented Mr. Adelson in the deal and I thought it would be a conflict of interests if I received shares or options.

Q.    According to this principle you'll never get?

A.    You're right.

Q.    You said that you met the Plaintiff on December 5, 1995.

A.    I did indeed meet him.

157

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


Q.      Did you meet the Plaintiff apart from that meeting?

A.      Yes.

Q.      Describe in what circumstances?

A.      I think that I met him for the first time when I was in Israel in a discussion with Mr. Adelson on the congressmen's delegation and the Plaintiff made the arrangements for the members' transport and that's how we met. We met again when he came to Boston at Adelson's office. It was years before 95.

Q.      Describe the nature of the relationship between you and the Plaintiff before December 5, 1995.

A.      The Plaintiff was a manager of Galilee Tours Ltd. and one of the group members GWV had an arrangement with Galilee Tours. GWV had a system…

Q.      I'm asking about the nature of the relationship?

A.      I didn't have a personal relationship, about the nature of the business relationship I can say that it was good and limited.

Q.      Before the meeting were you aware of the relationship between the Plaintiff and Adelson?

A.      Yes. They were close friends and decided to move over to the track of a business relationship.

Q.      Did you mean employment?

A.      Yes. First there was a relationship between Galilee Tours and GWV group Galilee Tours in the United States.

Q.      But they didn't have a personal business relationship?

A.      They had a personal relationship and also a business relationship in the context of the said companies.

Q.      When you say a business relationship you mean a relationship between companies.

A.      One of the companies in which the Plaintiff had interests had a relationship with a company in which Sheldon had interests.

158

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**

Q.    How and when did you learn that Adelson and the Plaintiff were moving over to an employment relationship?

A.    Mr. Adelson told me so. He told me a few weeks before the meeting, in November.

Q.    What did he tell you?

**The Defendants' Counsel:**

The fact that I am not objecting to matters of attorney-client privilege should not be construed as a waiver of such privilege.

A.    He said that he meant for Interface Ltd. in Israel to hire the Plaintiff and that he spoke with the Plaintiff about the employment conditions, but he asked me to finalize the details. He said that because they were good friends he didn't feel comfortable conducting the negotiations about the details.

Q.    This was in November?

A.    Yes. In 95.

Q.    Referring you to the said Annex 5A, p. 352, line 21, when was it in November on the 4th or on the 5th of December?

A.    It was on both dates.

Q.    Why Adelson who is sure you understand the first time had to say it twice?

A.    A few weeks had passed since we had spoken for the first time, I was at Mr. Adelson's house on the evening before the meeting with the Plaintiff and he mentioned it again.

Q.    In November 95 did you know the circumstances due to which the Plaintiff was going to be employed?

A.    I'm not sure if this is what you mean, I knew that the position of manager of the Israeli branch was vacant and I wasn't surprised when Mr. Adelson told me. I wasn't surprised that he chose the Plaintiff.

Q.    Why was the job in Israel vacant?

A.    Because the previous manager Mr. Farbstein who is his brother-in-law had resigned.

159

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


Q.    Why did he resign?

A.    To the best of my recollection, he had disagreements with Mr. Adelson about the manner in which the Israeli branch was to be managed.

Q.    Is it true that at the end of 1995, from October forth, IPI's only investment was in a company by the name of Auto Depot?

A.    No.

Q.    Where else?

A.    There was a company by the name of Pegasus Medical System this investment was sold to a U.S. company by the name of HBO and the sale was in 1995, but it's still considered in the group because the payments had not finished.

Q.    There was no other activity beyond the receipt of the money for Pegasus?

A.    Right.

Q.    The only company that was dealt with was Auto Depot at that time?

A.    In fact the collection due to Pegasus required involvement by myself and Adelson in negotiations. I don't remember whether Farbstein was involved, he may have been, but I don't remember.

Q.    Referring to P/35 – Section 7 third line from the top what to the best of your recollection were the limited services?

A.    They were in Israel to the best of my recollection handling bank accounts, transferring money between accounts and I believe something to do with cars in Israel. That's what I remember.


**The time is 16:00.**

**20 minute recess.**


Q.    Were you aware that the Plaintiff had been appointed as director in Auto Depot at the earliest in November 1995?

160

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


A.    Yes. When I look at the minutes you presented to me (minutes dated November 14, 1995 which were attached in the framework of Annex I to the Plaintiff's affidavit and marked Exhibit 12A) I remember.

Q.    After you remember do you think that an appointment as director falls within the framework of limited services that were provided by the Plaintiff as you describe in your affidavit in Section 7?

A.    Yes. The Plaintiff didn't have general powers of action but a very specific action that he was asked by Mr. Sheldon to perform.

Q.    Do you remember that Mr. Hananel received signatory rights in Auto Depot?

A.    I don't recall such a thing. But it's consistent with his being Chairman of the Board of Directors in the minutes you showed me. (Comment: The minutes were not filed).

Q.    I'm showing you a document (from Annex I to the Plaintiff's affidavit – minutes dated November 7, 1995 marked B). Do you recall in view of the document that the Plaintiff received signatory rights in Auto Depot?

A.    I don't remember but it's written in the minutes. I recall that he was a director, chairman, but not the granting of signatory rights.

Q.    Do you still insist that these were limited services of the Plaintiff before the meeting in December 05 [sic]?

A.    After I learned that he had signatory rights, it doesn't change my opinion that in anticipation for his full employment with IPI he performed limited actions at the request of his good and loyal friend Sheldon Adelson.

Q.    I'm presenting to you an approval for the opening of an account for IPI, and this was before January 1, 1996 when you said that the Plaintiff started working and in Section 3, it's stated that the Plaintiff has a signatory right together with his daughter Yasmin [sic] and Mr. Adelson. Do you remember that the Plaintiff received such a signatory right?

A.    Yes. I mentioned bank accounts earlier (**comment: The document is marked P/36 and is received on condition that it is included in the framework of Annex I. A separate notice by the parties shall be filed on the matter**).

Q.    I'm showing you a fax from Mr. Farbstein to the Plaintiff that says that he's asking for instructions for the transfer of a loan to Auto Depot (**comment: marked P/37 on condition as P/36**). In view of these documents, it appears

161

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**

that Mr. Farbstein stopped operating for IPI and the powers were transferred to Hananel?

A.    I have no specific recollection on this matter. You can show me many documents and it won't change the truth that I wrote in my affidavit. His employment with IPI began on January 1, 1996 before that date it had no manager and the Plaintiff did a few things and preparations to become manager.

Q.    Assuming that what Mr. Farbstein writes is true, is that not sufficient for the Plaintiff to be deemed as an employee of Mr. Adelson and/or IPI before January 1, 1996?

A.    It doesn't establish an employment relationship because there was an agreement and an understanding that it didn't establish an employment relationship before January 1, 1996. This understanding and agreement was confirmed to me by the Plaintiff at the meeting of December 5, 1995.

Q.    You said that he didn't receive a salary before January 1, 1996?

A.    Right.

Q.    Were all of the Plaintiff's activities before January 1, 1996 which included the office of director and a signatory right and what's written in Mr. Farbstein's letter P/37, all that and maybe more, supposed to be performed without consideration?

A.    All of the services you described took no longer than several hours for the entire period until the end of December 1995 and he wasn't supposed to be paid for it.

Q.    All of the hours which the Plaintiff performed which in your opinion were few, such hours were expensive because they were performed by a senior person. Had you purchased those services from another person, how much do you think it would have cost?

A.    I don't know. I don't know how much would have been paid outside.

Q.    Does it seem reasonable to you that a person assumes such responsibility as described before without compensation?

A.    Under the circumstances that we have here and the understandings between the Plaintiff and the Defendant my answer is yes.

162

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**

Q.    Are you saying that the Plaintiff and Adelson agreed that the Plaintiff would not receive a salary for those services?

A.    Yes. The Plaintiff said so to me in the meeting of December 5.

Q.    I'm referring you to your affidavit of April 05 **marked P/38** in Section 8 was the meeting of December 5 scheduled on December 4 one day earlier?

A.    No. When Mr. Adelson asked me to finalize with the Plaintiff, he asked me to call the Plaintiff. I called the Plaintiff in Israel and he told me that he would be in the United States shortly and that we could meet then. I asked him to let me know when he arrived. I hadn't spoken to him since. But I found out from Mr. Adelson's secretary Betty of the day on which the Plaintiff would be in Boston on a medical matter and that he would come to our offices later. Since the phone call to Israel and I met him on the 4th. And I wanted to make sure that he was indeed coming on December 5th.

Q.    Did Mr. Adelson tell you that the Plaintiff was coming to Boston?

A.    Mr. Adelson didn't tell me that the Plaintiff was coming to Boston but it was the Plaintiff who told me so in my phone call to him in Israel.

Q.    Why didn't you write the whole story that you just told in the affidavit of April 05?

A.    The important thing in the story was the agreement we made at the meeting, how the meeting was scheduled is not important.

Q.    Referring to P/38 of April 05 in Section 3, this is a supplementary affidavit to P/35 and in Section 3 you say that the Plaintiff remembers that he was present but does not remember what we discussed and in Section 4 you say that you do remember the meeting?

A.    The context the affidavit of P/38 and the preceding affidavit P/35, is a claim in Boston and the issue was jurisdiction. And the Plaintiff's attorneys denied that there was a sufficient link to the State of Massachusetts and we had to confirm that he came to this state for a meeting and he claimed that it was a social meeting and not business-related. The only thing that was relevant to these affidavits is what our attorney in our claim thought was relevant for the jurisdiction. I had no intention of telling the whole story but the facts that were important for establishing jurisdiction.

Q.    You said that you called the Plaintiff and he updated you that he was coming to Boston, in P/38 in Section 5 you said… I'm still asking why you didn't

163

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                              **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                              **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**

write here that you spoke with the Plaintiff and he updated you and to show you that it's relevant I'm showing you another affidavit that you made in August 2005, **P/39** and in this third affidavit you finally tell the whole story you said in Section 6 fifth line in the middle you said… I'm asking why did you need three affidavits to tell a simple story is it because you made such a story up?

A.      Everything that I said today I told our lawyer in Boston. He chose what he needed for the affidavits and I signed that it was true. He chose what he needed for his needs.

Q.      But you're not an ordinary witness, you yourself are a lawyer was it not necessary to tell the whole story in full in the first affidavit?

A.      I'm not a representing attorney. I'm a business, commercial lawyer. I don't represent in court, I don't draft pleadings. I rely on attorneys who specialize in this.

Q.      You said that you found out about the Plaintiff's visit also from Betty the secretary?

A.      Betty Yurcich.

Q.      In P/39 in Section 7 you speak of a letter in which the Plaintiff says that he would try to be in the first week of December in Boston, how do you conclude from this that he will indeed be there on December 5?

A.      As I testified before. I learned from the Plaintiff on the phone that he planned to come to Boston in the near future. All that I learned from the phone. I learned from Betty the specific date on which he was supposed to arrive, and that's how I knew that he was coming on December 5, I wrote down for myself a meeting with the Plaintiff in the diary on December 5 and kept the time free for this purpose. And the previous evening on December 4 I confirmed in the meeting his coming to my office in the afternoon of the following day to conclude the terms of his employment.

Q.      Of all people, why did Mr. Adelson ask that you finalize the terms of his employment?

A.      I was the most sensible choice because I was the group's lawyer. I had been with Mr. Adelson since 1980 and it was of the type of things that he trusted me to do.

164

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


Q.    Did you see a problem as an attorney in speaking with the Plaintiff who is not a professional to finalize details?

A.    I saw no problem. We spoke about terms of employment. During the conversation I asked him if he wanted to receive a written document that he could have had reviewed by any attorney that he wanted.

Q.    Were you not concerned about misleading the Plaintiff when speaking of legal matters such as net profit?

A.    Net profit is not a legal term. I know the Plaintiff who is sophisticated and brilliant in business and I wasn't concerned about having an advantage over him in this field.

Q.    Did you propose to him that he seek legal advice?

A.    I don't remember doing so. But the Plaintiff used lawyers of his own. And he knew how to find them if he needed them.

Q.    Do you usually talk to people who are not lawyers in deals?

A.    In the United States it's considered unethical for a lawyer to speak with a person who is represented by another lawyer. There's no problem when he's not represented.

Q.    I'm referring you to Annex 5A p. 352 – lines 13-16, Adelson says that to the best of his knowledge the Plaintiff wasn't paid for his trip to Boston in December and I wouldn't allow it, in your affidavit P/39 at the end of Section 7, you said that Hananel came for a business meeting with me and now I ask you does it seem logical to you that the Plaintiff would bear the expenses of a trip in which he had to meet with you on business matters?

P.    It's logical. And also if Mr. Adelson had proposed to pay it would have seemed logical. Many times we bring people from out of town for business and sometimes we pay their expenses and sometimes not.

Q.    In the same affidavit P/39, in Section 6 at the end of p. 2, is it true what's written?

A.    Yes.

Q.    Did you conduct negotiations as Adelson asked?

A.    Yes.

165

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


Q.     You spoke in your first affidavit P/35 in Section 8, that you conducted negotiations and afterwards agreed is that right?

A.     It's a fair description of what happened.

Q.     As I understand the term negotiations, there were disagreements that were later settled. Is that what happened here?

A.     I don't describe everything we spoke about as something in dispute but things that had to be clarified.

Q.     So why did you write negotiations?

A.     I think negotiations is an appropriate word for a process of discussion and clarification of details.

Q.     I'm referring to Annex P/5 p. 353 line 9-11, Adelson said that there are no disagreements. I'm referring you to another affidavit of Mr. Adelson's **Marked P/40**, in his answer to question 2 p. 4 second paragraph, fourth line from the end Mr. Adelson says… Adelson and the Plaintiff already agreed in November and he says there are no disagreements. You yourself say that you spoke about clarifications, in this light why was there a need for a meeting with you, everything had been agreed, in this case it's an oral agreement, there are no disagreements, why was it necessary for him to make a special trip from Israel?

A.     I think you're reading what's not written in Mr. Adelson's answer. He just said that we reached an understanding, and as he described it to me it was a general understanding and he wanted me to verity that we had sufficiently specific details. I didn't understand my role as creating the employment conditions but as clarifying, specifying and confirming the details. For instance: When we met on December 5 the Plaintiff told me that he would move from Galilee Tours to IPI. And he said that he wanted to clarify that he would still have to deal with Galilee Tours matters after he was employed by IPI and I said but your employment with us will be full time and he said yes that's true but I'll still have to advise Galilee Tours from time to time. He said that there were things that he did for Galilee Tours some connections that nobody could replace him. He said that the time he would have to dedicate to advice would be very limited. So I felt that it was a very important clarification.

Q.     You're a lawyer and even this negligible example, so professional advice should have defined the number of hours?

166

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**


A.    I wasn't present in the conversations between Adelson and the Plaintiff which lasted over some time. I had to concentrate everything into one set of conditions and I didn't know until the end of my meeting with the Plaintiff whether he wanted it in writing or not. Mr. Adelson authorized me to make an agreement in writing if the Plaintiff was interested.

Q.    Why didn't you insist on a written agreement?

A.    It's not customary in our company to make agreements in writing with anyone. In fact the whole time I worked with the company, I don't think anyone had a written agreement until we brought the management group to the hotel in Vegas. These are 3 people who worked together in a hotel in Atlantic City and we brought them together to Vegas and they wanted a written agreement. Before that, there were no written agreements and the company has hundreds of workers on all levels and it was never in writing but Mr. Adelson recognized that maybe the prevailing practice in Israel was different and he told me that if the Plaintiff said that in Israel the practice was to have a written agreement then do so, and even if it's not the practice and he wants it then make a contract.

Q.    Why was Adelson concerned about the practice in Israel?

A.    In our business when we managed Comdex (a computer exhibition) we had people in a few countries, France, Mexico and around the world, and we had terrible problems work-wise and we had difficulties firing them. And in those countries we discovered that there was a difference if you had a written or oral contract. And an agreement in writing would have helped us.

Q.    So you thought that if there was an agreement in writing in Israel it could help you?

A.    In the Plaintiff's case Adelson didn't need an agreement because he was concerned about the Plaintiff but raised it in order to calm the Plaintiff. He wanted to offer the Plaintiff the possibility to protect himself with a written agreement. He was supposed to be employed in Israel according to the Israeli law. The purpose of the conversation was also if I would have to draw up an agreement.

Q.    You were not authorized to change any of the Plaintiff's conditions?

A.    I understood that the final agreement was supposed to be approved by Mr. Adelson. I wasn't authorized to change anything in his employment conditions.

167

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                          **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                          **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**

Q.      Let's talk about the conditions. You said in P/35, in Section 8D that you
        agreed on 12%... as described there and I ask you what do you mean by "as a
        result of the Plaintiff's efforts" – how is that measured?

A.      The Plaintiff's role as I understood was to deal with the stream of transactions
        in Israel. He had to make contacts maybe hire consultants… if he performed
        his duties in respect of any investment and if a profit was generated from the
        investment then it would be deemed as a result of his efforts. I don't think it's
        unclear. I agree that it's not a sharp and clear mathematical term and can be
        subject to disputes.

Q.      In the 12% you described, is this customary with Adelson?

A.      No.

Q.      Why did he offer it to the Plaintiff?

A.      I have no idea. He didn't share his thoughts with me.

Q.      The summary of the employment conditions with the Plaintiff was it based on
        information that was provided to you by Adelson?

A.      In principle yes and on the exchange of information between me and the
        Plaintiff at the meeting.

Q.      But in which you agreed earlier that you couldn't change details?

A.      I gave you an example. What we discussed was beyond what the Plaintiff had
        agreed with Mr. Adelson on certain matters. I'm not authorized to change
        what was agreed. To discuss further and to change conditions are different
        things. In reaching the summary I knew that it had to be approved by Mr.
        Adelson and if he had said no to me about something specific, then he would
        have changed it.

Q.      Is it true that the Plaintiff's right to 12% exists only while he's employed by
        IPI, does it expire when he ceases to be employed?

A.      Yes. This is what I discussed with him specifically.

Q.      Is it customary with Adelson that agreements of this type expire at the end of
        the employment period that [sic]?

A.      I already testified that this entire agreement is not customary.

Q.      Does a similar mechanism usually end after the termination of employment?

168

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**

A.      There were no such mechanisms. There was no such arrangement with anybody else.

Q.      Were there any close arrangements of which you are aware or similar?

A.      Yes. At the same time Mr. Adelson made such an agreement with Dan Raviv.

Q.      I repeat the question. Is it customary that such an arrangement expires at the end of the employment relationship?

A.      Since the only additional arrangement is with Dan Raviv, and since also with Dan Raviv it's identical (after the witness is asked whether identical or similar he corrects – identical to the best of my knowledge). I understand that this is the situation – with respect to the expiration of the right – also with Dan Raviv but I never spoke with Dan Raviv on this matter. Mr. Adelson didn't ask me with Dan Raviv.

Q.      Why did Mr. Adelson ask you to finalize with the Plaintiff but not with Dan Raviv?

A.      To the best of my knowledge he didn't ask anyone else to speak with Dan Raviv. And why he didn't ask me or anyone else to speak with Dan Raviv I don't know.

Q.      Did you make a memo of that meeting?

A.      I don't remember.

Q.      Do you usually draw up memos of meetings?

A.      Not always.

Q.      I'm referring you to Annex D in P/39 – this is a memo of a meeting and you attached it to prove its existence?

A.      Right. This is a memo I prepared. This memo was in preparation for a complex deal of the merger of HP and IMD.

Q.      I'm referring to Adelson's affidavit **P/41 Section 8**, this is the earliest affidavit from September 2002, and in Section 8 Adelson said that the agreement – in view of what's written here do you want to retract your testimony as if you yourself agreed with Hananel?

A.      I believe that I described in my affidavit that at the end of the meeting at which we agreed on the conditions, Adelson came and said that he agreed to

169

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**

the conditions and the Plaintiff agreed and everybody shook hands. This is the summary of the agreement and I assume this is what he meant in Section 8.

Q.     Were you aware in real time of this affidavit in P/41?

A.     I saw this affidavit before and I can't say when it was.

Q.     You said in your affidavit that you supervise the proceedings in Israel so you were supposed to see the affidavit?

A.     Supervising the proceedings didn't include reading every document.

Q.     This isn't every document, it's an affidavit of Mr. Adelson and it's something rare?

A.     I agree that it's a material document. But I don't remember if I did or didn't see it in real time. I remember the meeting of December 5 in detail. I don't remember when I saw this affidavit. I wouldn't have remembered the date on which I met with the Plaintiff if it hadn't been written in my diary.

Q.     Why didn't you present your diary?

A.     It's a small diary like the one I'm showing (the witness takes out from his pocket a small diary for 2008) and I wasn't asked to attach.

Q.     Referring you to Adelson's affidavit P/40 p. 3 question no .2 that asks for all the documents in connection with the contacts, were you asked to present this document or not?

A.     Nobody asked me specifically to present my diary and I didn't think my diary was a document in the field addressed by the question.

Q.     Showing you documents of Mr. Adelson to the Plaintiff of May 1, 2000 – **received and marked P/42** showing 12% which according to Adelson's version (in subsection 3) this is a document which Adelson sent to the Plaintiff it says exactly what the Plaintiff says about the entitlement to a percentage. What do you have to say?

**The Defendants' Counsel:** Receipt of the document does not constitute consent to the admissibility of the document. But over and above this, also the assumption that was presented to the witness as if subsection 3 is entirely consistent with the Plaintiff's version in the claim, also that's not entirely true.

170

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**

Q.    In P/42 Adelson proposes a mechanism that is different to the mechanism which you claim was agreed with the Plaintiff, do you agree that this is a different mechanism to the mechanism you claim was agreed upon at the meeting of December 5?

A.    It is indeed a different mechanism.

Q.    Do you have an explanation why it's a different mechanism?

A.    At the time of termination of the Plaintiff's employment in 2000 there was no rivalry between them. Mr. Adelson believed that the Plaintiff didn't do his job and they were still friends. Shortly after the termination there were several conversations on the telephone and the Plaintiff asked Adelson for a few things to do with the termination of the engagement. He wanted to negotiate the conditions of the termination. This letter that I've been shown reflects the conversations between the Plaintiff and Mr. Adelson and it has nothing to do with the original employment summary. And you can see at the end of the letter that it says without prejudice and only for negotiation purposes. I think these lines were copied from a letter of the Plaintiff's. It reflects what the Plaintiff asked of Adelson and doesn't reflect the employment conditions.

Q.    According to you this is an offer by Adelson?

A.    Yes.

Q.    This is an offer that was made after the termination of the employment of the Plaintiff who had failed in his job – so it was alleged and this offer proposes that you in your affidavit say that it's an inconceivable mechanism and you can't believe that it's something that was agreed upon so Adelson offered it to a failing manager, why would he offer an inconceivable mechanism?

A.    In view of their friendship he offered him something to which the Plaintiff was entirely unentitled. All of his rights to participation in profits expired upon the termination of his employment and yet he asked to receive something. And Mr. Adelson was prepared of his own will to give as a present.

Q.    Adelson still offered him something dozens of times better than what he had as an employee?

A.    Yes. I know that at the time Mr. Adelson didn't feel comfortable about having terminated the Plaintiff and they were friends and he proposed it. Before concluding that it's ten times what he had it should be noted that the percentage were reduced with respect to another investment in Section 4.

171

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                               **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                               **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**

Q.    I'm presenting to you a document, one of whose titles is agreement… are you familiar with this paper?

A.    I've seen it before **received and marked P/43**.

Q.    This was given to the Plaintiff by Adelson's lawyers in 2001?

A.    Right.

Q.    Is it an agreement whereby Adelson would pay an unspecified amount for final settlement?

A.    I need to read the document.

Q.    I'm referring to the paragraph that the Plaintiff says… **marked A** do you know why at the end of the paragraph it says casino… or other countries?

A.    I don't know. You need to ask the person who drafted the document.

Q.    I'm presenting to you a document **that you wrote P/44 to the lawyer** of the Plaintiff after a letter that was sent from the Plaintiff's attorneys to the Defendant in which the Plaintiff specified his demands with respect to the casino in Macau, and I'm referring you to the second paragraph **marked A** in view of the facts that are now known to you do you want to correct what is written in this paragraph?

A.    No. It's correct today as it was then.

Q.    What you're saying is that Mr. Adelson was not given a concession for a casino in Macau until July 30, 2002, what's the reason?

A.    Mr. Adelson didn't receive a concession for a casino in Macau.

Q.    Did any company controlled or owned by Adelson receive such a concession?

A.    Las Vegas Sands Corporation which is controlled by Adelson (a public company). I understand that it has a sub-concession.

Q.    Does Las Vegas Sands operate a casino in Macau?

A.    Yes.

Q.    Is it controlled by Adelson?

172

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**

A.     It's controlled by the Board of Directors. Mr. Adelson, by virtue of his being a shareholder, has the ability to change the Board of Directors, but he cannot control the daily activity.

Q.     Why didn't you deem fit to give this explanation in your letter to your colleague P/44?

A.     I had no legal or ethical obligation to explain to Adv. Rosovsky. He raised a claim which I denied in a correct and appropriate manner.

Q.     Why in paragraph B did you deem fit to mention affiliates and employees, which you didn't do in paragraph A

A.     I don't have Rosovsky's letter in front of me. But my letter P/44 is a response to his letter. I chose to include certain and not other possible statements and what's written here was true then and is true now.

Q.     I'm showing you an affidavit by Weidner which was filed with the Court which says in Section 10 thereof…. in light of what's written here do you want to correct paragraph A in P/44?

A.     The statement is correct. It's still true. It pertains to the date of termination of the Plaintiff's employment. I don't have any information today that it's untrue.

Q.     Why did you choose to go into detail about the state of affairs on the date of termination of his employment?

A.     Because it seemed clear to me that it was a significant date. Anything that arose thereafter couldn't be something with respect to which he had rights or a claim.

Q.     You thought that the date of termination was a significant date because his rights expired?

A.     Right.

Q.     But the Plaintiff's rights are not even connected to Macau so the date of termination is not relevant at all on the other hand the Plaintiff is claiming rights in Macau irrespective of the date of termination of his employment? I'm reading to you Adv. Rosovsky's letter (Exhibit H to the Macau claim)?

A.     (The letter in Exhibit H is translated into English for the witness). He claimed that he took some steps to develop the venture. My letter says that there was

173

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**

no opportunity in Macau as of the date of termination of his employment. Anything he developed after the termination of his employment is irrelevant.

Q.    He didn't refer to when he developed but claimed that he initiated the venture and claimed a percentage?

A.    As I understand the claim that was translated for me he claimed that he had taken some steps in connection with the venture before the termination of this employment and I said in my letter that there was no opportunity in Macau at that time and therefore the date of termination of employment is relevant.

Q.    Describe to me in detail all of the meetings that you know about of Sheldon or another on his behalf in connection with the casino in Macau from August 1999 until October 2001?

A.    I was never present at any meeting with respect to Macau. The information included in my letter P/44 was provided to me by other people particularly Adelson Weidner and others. I cannot testify from my personal knowledge about any meeting to do with Macau.

Q.    You don't know of any meeting even that you didn't participate in?

A.    No.

**Redirect: None.**

**The parties' counsel:** An equipment test was performed yesterday with respect to the video conference with the Macau witnesses. And the test was successful.

# Decision

**Scheduled for continuation of trial for January 21, 2008 at the Tel Aviv District Court for the hearing of the video witnesses. Time limit approximately one and a half hours.**

**The Defendants' counsel will announce at the next session whether they intend to ask for more witnesses to testify.**

174

[ Emblem of the State of Israel ]

**The Labor Courts**

**Tel Aviv Jaffa District Labor Court**                    **Labor Case 006245/01**

**Before the Hon. Justice Ilan Itach**                    **January 17, 2008**
**Public Representative (Employees) Mr. Maoz Halevy**
**Public Representative (Employers) Mr. Miller Amiram**

**Issued today, Shvat 10, 5768 (January 17, 2008), in the presence of the parties.**

|                       |                        |                        |
|-----------------------|------------------------|------------------------|
| (-)                   | (-)                    | (-) [stamp]            |
| _____     | _____      | _____      |
| **P.R. (Employees)**  | **P.R. (Employers)**   | **Ilan Itach**         |
| **Maoz Halevy**       | **Amiram Miller**      | **Judge**              |

**Nava Yannay + Yossef Shulamit**

Exhibit B

# AFFIDAVIT

I, the undersigned, Sheldon G. Adelson, bearer of US passport No. 017371448, after having been cautioned to tell the truth, failing which I shall be liable for the penalties prescribed by law, do hereby declare as follows:

**Table of contents**:

| | | |
|---|---|---|
| Chapter A – | Introduction | 2 |
| Chapter B – | The Opening of the Venetian Resort Hotel Casino in Las Vegas, Nevada | 2 |
| Chapter C – | The Acquaintance Between Myself and Mr. Moshe Hananel; the Opening of the IPI Office in Israel; the Employment of Hananel by IPI | 4 |
| Chapter D – | the Contract of Employment Between Hananel and IPI; the Alleged Option Mechanism | 5 |
| Chapter E – | Hananel's Employment: By IPI Only | 12 |
| Chapter F – | Hananel's Employment by IPI: For The Purpose of Locating Hi-Tech Investments in Israel | 14 |
| Chapter G – | The Termination of Hananel's Employment | 17 |
| Chapter H – | The Tender for the Granting of Gaming Concessions in Macau | 20 |
| Chapter I - | Hananel's Claims With Regard to Macau | 23 |
| | My Trip to the Far East at the End of August 1999 | 23 |
| | My Trip to the Far East in the second half of March 2000 | 30 |
| | The (Alleged) Conversation – Before my Trip to the Far East in August 1999 – in which Hananel Allegedly Updated me regarding the Business Opportunity for Building a Casino in Macau | 32 |
| | Hananel's (baseless) attempt to make a connection between his dismissal in April 2000 and the casino venture in Macau | 36 |
| | Hananel's (baseless) claim that since our alleged conversation before my trip to the Far East in August 1999 I have continuously acted to execute the business opportunity he allegedly gave me | 38 |
| Chapter J – | Reply to additional claims in Hananel's affidavit and additional comments | 38 |
| Chapter K - | Conclusion | 40 |

## Chapter A – Introduction

1.   My name is Sheldon G. Adelson.  I am making this affidavit on behalf of myself and as chairman of the board and president of Interface Partners International, Ltd. ("IPI"), the defendants in Labor Case 7704/03.

2.   I was born in 1933 and am 73 years old. I grew up in Boston, Massachusetts in a very poor family. I started my first business at the age of 12, selling newspapers on street corners. From that time, except when I served in the United States Army, I never stopped being a businessman and entrepreneur, and I have enjoyed much success in my business activities. I have started and developed dozens of businesses, one of which was a successful tour and travel business. One of my greatest business achievements is creating **COMDEX** (an acronym for Computer Dealer Expo), which was, at the time it was sold in 1995 for US$860 Million, **the world's leading trade show in the computer and communications industry.** COMDEX is said to have revolutionized the trade show and exhibition industry. Besides my business activities, I am an enthusiastic Zionist and a major supporter of Israel. I donate a great deal of my time and energy, as well as significant amounts of money, to Israel-related and Jewish causes worldwide.

3.   This claim filed in December 2003 by Mr. Moshe Hananel ("**Hananel**") against IPI and myself and all the supporting allegations relating to it are complete fabrications. Hananel and I **never** discussed any issue concerning Macau, and thus defending against this claim is similar to fighting a ghost. Hananel's claim is a story which never happened, invented by Hananel in order to extract a settlement payoff (which will never happen). Due to the many falsehoods in Hananel's claim and the fact that I need to address the invented details of events which never happened my affidavit is lengthy, but Hananel's lies are exposed easily and unequivocally.

## Chapter B – The Opening of the Venetian Resort Hotel Casino in Las Vegas, Nevada

4.   I am the majority shareholder, chairman of the Board and Chief Executive Officer of **Las Vegas Sands Corp.**, a publicly-held, New York Stock Exchange-listed corporation and the successor in interest to **Las Vegas Sands Inc.** (which are collectively referred to below, for the sake of convenience, as "**LVS**"). LVS owns the **Venetian Resort Hotel Casino** and the adjacent **Sands Expo and Convention Center** on the Las Vegas Strip on Las Vegas, Nevada.

5.   Until 1996, the land on which the Venetian Resort Hotel Casino now stands was occupied by the Sands Hotel & Casino. LVS bought the Sands Hotel & Casino from its previous owner (MGM Sands, Inc.) in 1989. The Sands Hotel & Casino was a rather old hotel, small by Las Vegas standards and mostly unprofitable. In 1996, the Sands Hotel & Casino was demolished and construction of the Venetian Resort Hotel Casino began the following year. My vision behind the Venetian project was to create, for the first time in Las Vegas, a convention-based marketing strategy, **combining a mega casino hotel resort with a conference and exhibition center**. The traditional business model in Las

Vegas was based, mainly, on "tour and travel" traffic (3 and 4 day all-inclusive tour packages). My concept was that the Sands Expo and Convention Center would act as a magnet for the gaming and hotel complex, thus basing the Venetian's future success on a convention and exhibition based marketing strategy. I had much experience and success in the convention and exhibition industry beginning as early as 1972. As mentioned above, in 1979 I created and founded COMDEX and in April 1995 companies, of which I was the majority shareholder, sold COMDEX and other trade show properties for approximately US$860 Million, in a transaction which was the largest sale in the history of the trade show industry. Shortly afterwards, LVS decided to demolish the Sands Hotel & Casino and to build the Venetian, **combining a mega hotel-casino resort complex with the than existing conference and exhibition center**. As mentioned above, it was my belief that the conference and exhibition center would attract massive crowds to the hotel-casino complex, particularly in mid-week days (the traditionally "weak" days in Las Vegas), which would mostly be composed of the more affluent and higher expense budget convention delegates, exhibitors, businessmen and corporate workers.

6.   Between the years 1995 and 1999, we - LVS's management team including myself - worked on the planning and the construction of the Venetian complex. In those years, many people were skeptical of my vision of a convention-based marketing strategy, whereby approximately 50% of the resort's customers would come from the convention and exhibition traffic. Many industry so-called experts believed that my vision was unfounded. They said that the Venetian project – which was one of the largest hotel projects in the world at that time, with an anticipated construction budget of US$1.4 Billion – was a grandiose project which was doomed to fail and would cause me to lose my money. Also, the minority shareholders in the travel and trade show companies, who had been my business associates for many years, did not participate with me in the Venetian project. I attach, merely as an example, an article from the *Las Vegas Review-Journal* dated January 27, 1998 which, after describing my vision to **"use conventiongoers as an engine to fill rooms"**, has unflatteringly quoted others as terming LVS's management team as **"strip neophytes who lack an in depth knowledge of the desert city's gaming market"**.

A copy of the January 27, 1998 *Las Vegas Review-Journal* article mentioned above is attached hereto as **Exhibit 1**.

7.   The Venetian Resort Hotel Casino opened in May 1999. Within a short time, and after overcoming initial, anticipated, problems (primarily construction problems), it turned out to be a meteoric success. Soon, the hotel had one of the highest occupancy rates on the Las Vegas Strip and in the entire hotel industry, mainly – as I envisioned – relying upon a high percentage of convention and exhibition customers. Maybe more importantly, the Venetian had the highest rate of return on net invested capital as compared to the other hotels on the Las Vegas Strip. Within a few short years the Venetian became the most successful hotel in the world, measured both by occupancy rate as well as by gross income standards.

- 4 -

## Chapter C – The Acquaintance Between Myself and Hananel; the Opening of the Office in Israel; the Employment of Hananel by IPI

8.    I first met with Moshe Hananel in 1988. Hananel was a manager at Galilee Tours Ltd. ("Galilee Tours"), an Israeli company which was owned by Hananel's wife's family and him. Galilee Tours provided inbound tourism services to a company acquired by a travel company of which I was a shareholder. In my first visit to Israel, in 1988, Hananel arranged a car and a guide for me. Subsequently, when I visited Israel, Hananel would meet me occasionally, and that is how we became acquainted.

9.    Over the years, the acquaintance between me and Hananel turned into a personal friendship marked by a relationship of trust.

10.   Since the beginning of 1994, at first a related company to IPI (Interface Group Massachusetts, Inc. ("IGM")) and since 1996 IPI itself, has maintained a branch office in Israel **with the specific aim of locating hi-tech investment opportunities in Israel**. The reason for the opening of the office in Israel was, first and foremost, the return of my brother-in-law, Mr. David Farbstein ("Farbstein"), from the United States – where he had worked closely with me – to his home in Israel. The Israel office was established for the specific purpose of capitalizing on the many COMDEX connections within the hi-tech industry and to enable Farbstein to take advantage of the business experience he had acquired while working in the United States. As is explained in Chapter A above, I consider myself to be a very enthusiastic Zionist. As part of the 1993 COMDEX convention I arranged a special pavilion for Israeli hi-tech companies and over 2,500 meetings for these companies with prospective business partners or affiliates, which I called "the National Forum". I regarded the Israel operation as a way in which I could contribute to the hi-tech industry in Israel, using the many COMDEX related connections in the fields of computers and technology. I thought that using COMDEX connections can serve as a bridge between the Israeli hi-tech industry and the US markets.

11.   In the summer and fall of 1995, disagreements with my brother-in-law, Farbstein, concerning operational matters led to the deterioration of our relationship, and it became clear that Farbstein would not continue to run the Israeli office. Because of that I was undecided whether or not to keep the office open. During that period, Hananel, who was aware of the situation, approached me and told me that he was tired of working at Galilee Tours, and proposed that he transition out of Galilee Tours by January 1, 1996 and replace Farbstein. In light of my acquaintance with Hananel and the relationship of trust between us, IPI agreed to entrust the responsibility for managing its Israel branch to Hananel.

12.   I have read Hananel's claim in his affidavit that I courted him and pleaded with him in order to persuade him to agree to act as IPI's branch manager in Israel. This description is the opposite of the truth, because – as I have stated above – it was Hananel who offered himself as Farbstein's replacement, after he learned of the anticipated vacancy that would exist upon Farbstein's departure.

~ 5 ~

13.    Hananel was the only "manager" in the IPI office in Israel. Aside from Hananel, IPI employed only a secretary, and later (toward mid 1996) Adv. Oded Efrat joined the office. I would like to mention that the word "manager", which I use in my affidavit, in the context of IPI's branch office in Israel might be misconstrued. There was in fact nothing much to manage. Hananel's role was to have IPI enter the "deal flow" in the Israeli hi-tech market, i.e. locate investments, conduct due diligence with the aid of experts in the hi-tech field (which he was supposed to hire), monitor and oversee the investments made, etc. It was not a real managerial post.

## Chapter D – the Contract of Employment Between Hananel and IPI; the Alleged Option Mechanism

14.    The agreement between IPI and Hananel – **which was not reduced to writing** – was that Hananel would become the manager of IPI's Israel branch. In this position, Hananel would be responsible – with the assistance of professionals whom he would recruit with IPI's prior approval – for identifying business opportunities for IPI in the hi-tech field in Israel; screening and investigating such opportunities; preparing recommendations for IPI; carrying out IPI's decisions with regard to the proposed investments and monitoring and overseeing the investments, if made.

15.    Since Hananel said he needed a short time to transition out of Galilee Tours, the agreement was to begin on January 1, 1996, at which time Hananel would become a **full-time** employee of IPI, in consideration for which he would receive, starting January 1, 1996, an annual salary of US$100,000 (US$8,333 per month). Hananel said that he would be available to do whatever needed to be done even before January 1, 1996, but it was agreed that Hananel's formal employment would start on January 1, 1996 and he would only be paid beginning on that date. Hananel stated that as of January 1, 1996 he would separate himself completely from Galilee Tours, except for occasional consultation, which in no case would compromise his full-time employment with IPI.

16.    In addition to his salary, IPI undertook to pay Hananel **12% of the net profit (profits net of losses)** which IPI may generate from the realization of investments in Israeli companies - the Israeli hi-tech investment opportunities that Hananel was supposed to find for IPI - that were initiated and caused to happen by Hananel while he acted as the manager of IPI's Israel branch. Hananel's entitlement to such profits was conditioned upon him being employed with IPI, from the beginning till the end, meaning he had to find the investment, conduct (with the assistance of professionals) the due diligence and monitor and oversee the investment (after it was made) **until the realization of the investment.**

17.    In other words – contrary to what Hananel claims in his lawsuit and affidavit - **Hananel was never granted a stock option.** Hananel was entitled, pursuant to the conditions stated above, to **participation in profits only.**

18.  I would like to emphasize that Hananel's potential entitlement was, as mentioned above, for 12% of the **net** profit (i.e., profits net of losses) of realized investments. It would never have occurred to me (or any other reasonable investor) to have a company I was affiliated with pay a manager for successful investments, without deducting the losses from unsuccessful investments. Such a concept would be totally ludicrous – an employee who injures the company with failing investments should not be remunerated for a single good investment. The principle whereby the good investments made by a certain employee should be offset against the bad investments which such employee made is, to my mind, a basic and self-evident principle.

19.  Several conversations took place between myself and Hananel late in 1995 with regard to terms of Hananel's employment by IPI. The final agreement regarding Hananel's terms and conditions of employment was made at a meeting which took place in December 1995 at IPI's office in Massachusetts between Hananel and IPI's legal counsel, Paul G. Roberts ("**Roberts**"), which I joined at the end. When I joined the meeting, upon my return from a trip to New York, Roberts reported, in the presence of Hananel, the results of the meeting and, at my request, repeated the terms he had agreed upon with Hananel (as detailed above in my affidavit) so there would be no misunderstanding.  Hananel said he agreed.  On behalf of IPI, I said that I agreed.  Then Roberts and I each shook hands with Hananel.

20.  In Section 2.4.1 of his affidavit Hananel claims that he agreed to be employed by IPI "**under the caveat that my salary conditions would be linked according to Israeli law, and that the related employment terms (social benefits, advance notice, etc.) would be identical to those I had had at that time at Galilee Tours group**". Hananel claims that I had agreed to these conditions. This claim is absolutely untrue. I was not aware of Hananel's terms of employment at Galilee Tours, and would not have used them as a reference point for any offer I was making to Hananel (on behalf of IPI). **Galilee Tours was a private company owned by Hananel and his family, and obviously the terms of employment which, in fact, Hananel set for himself, could not logically serve as a basis for the terms of Hananel's employment with IPI.**

21.  I read in Hananel's affidavit (Section 2.3) the story which Hananel tells with regard to "the option mechanism" which he claims I offered him so that he would agree to work for IPI – an option arrangement whereby he would be entitled to receive 12% of my share in any investment I made any place in the world (excluding the United States) and in which Hananel was involved, against payment of 12% of the sum actually invested by me in such an investment; according to Hananel, **the alleged option is not restricted in time and Hananel could execute the option whenever he wanted, after he knows which investments had turned out to be successful.** As Hananel declares, in Section 2.3.3 of his affidavit, "**(Adelson) was taking the risk, whilst [Hananel] reserved the right to choose only those investments which had turned out to be good, and join only them, at any time [Hananel] like[d]**".

22. This is a false story; a fabrication on the part of Hananel. This "option story" is illustrative of Hananel's lack of hesitation in changing his version of the events to fit facts disclosed as the litigation proceeds, as will be demonstrated below, and his inclination to fabricate stories.

23. In order to grant credibility to his "option arrangement" version, Hananel referred, in his affidavit in the **first claim** which he filed against me and IPI (Labor Case 6245/01: **"the First Claim"**), to the conditions of employment of his predecessor, my brother-in-law, Farbstein, and declared – in Section 23 of his affidavit – as follows:

> "The terms of my employment with Interface <u>were based on the terms of employment of my predecessor, Mr. Farbstein,</u> into whose "shoes" Adelson and I agreed that I would in fact "step", with slight modifications"

Specifically with regard to the alleged "option arrangement" Hananel declared (in Section 49 of his affidavit in the First Claim) that:

> "<u>The undertaking for options was also granted to my predecessor at Interface, Mr. Farbstein</u>. This indicates the existence of a <u>custom</u> to grant options to the Defendant's CEO".

24. In other words – as long as Hananel thought that there was **no written documentation** of the employment agreement with Farbstein, Hananel testified – in order to grant credibility to his "option version" – that his conditions of employment were **based** on Farbstein's conditions of employment and specifically that the option undertaking which was granted to him **replicated** Farbstein's option arrangement.

25. However, once I had filed my affidavit in reply to the First Claim – in November 2002 – the false nature of Hananel's assertion had been proven conclusively **to Hananel himself**. I attached Farbstein's conditions of employment document to my affidavit in the First Claim (which I am also attaching to this affidavit). As can be seen from the document, before Farbstein's employment commenced, it was agreed that Farbstein would be **entitled to join** – against payment of his proportionate share – IGM's investments in Israeli companies **at the same time the investment was made** (up to 25% of IGM's share in such company). **This was <u>not</u> an option of unlimited duration that Farbstein was given. Farbstein had to decide whether to join IGM's investment <u>concurrently with IGM's decision to enter such investment</u>. Farbstein was not entitled to decide whether to join the investment <u>in retrospect</u> – after he knew whether the investment turned out to be a good one.**

A copy of the document dated November 29, 1993 which describes the terms of the employment arrangement with Farbstein is attached hereto as **Exhibit 2**.

– 8 –

26.   It should be noted that as an exception to the arrangement described above, it was determined that if IGM invested small amounts of money (less than US$250,000) in Information Technology companies, due to IGM's contribution to such companies of COMDEX related marketing expertise and/or barter, then Farbstein would be entitled to receive 10% of IGM's equity interest (that portion of market value over debt or cost) in such companies **for free**. This exception was fixed in view of Farbstein being my brother-in-law and the know-how and experience which Farbstein had acquired in these fields while working in the United States, and it is inapplicable to Hananel. This exception did not constitute an option, since Farbstein was in any case entitled to receive the equity interest **for free**.

27.   The conclusion arising from Farbstein's terms of employment is that Hananel's claim, whereby his "option arrangement" was similar to Farbstein's, **was proven false**. Hananel's alleged arrangement is not only **inconsistent** with the arrangement which Farbstein had, it actually stands **in contrast** to the arrangement with Farbstein.

28.   Now, in his affidavit in **this** case, Hananel's version **changes**. Having learned that Farbstein's terms of employment **did not** include an option arrangement like the one he claims was granted to him, Hananel **changed** his story and now claims that "**my option mechanism was different to Farbstein's**" (Section 2.7.1 of Hananel's affidavit in this claim). Hananel tells a very long story, which I shall address below, to explain why I offered him, on behalf of IPI, a "**different**" option mechanism than Farbstein's.

29.   Besides the changing nature of Hananel's so-called "option arrangement", I would like to emphasize to the Honorable Court that it is inconceivable that I would allow IPI to give Hananel the option to join whenever he pleased an investment in companies in which IPI invested, **after he already knew that it was a good investment**. It goes against my fundamental business principles. It is especially inconceivable that I (on behalf of IPI) would have such an agreement with Hananel, while with regard to **my own brother-in-law**, serving **in the same position**, IGM stipulated that he would have to decide whether to join an investment **concurrently** at the time IGM decided to invest. It is plainly unbelievable.

30.   Another plainly unbelievable element of Hananel's "option story" is that, according to him, I "**emphasized that any amount not actually invested (Adelson gave examples of the provision of collateral and the granting of shareholders' loans), would not be taken into account for the calculation of the sum I would have to pay in the context of exercising the relevant option**". That is very strange. An investment by way of shareholder loans (for shares or convertible to shares) is a **very common** way of investment since it gives the investor a status of creditor (regarding his investment amount) as opposed to a shareholder. Investments are also frequently made by the investor putting up a personal guarantee or collateral for a cash infusion by a financial institution, such as a bank, to the company. It is totally unreasonable that I, on behalf of IPI, would agree that shareholder loans or collateral support, both common forms of investment, "**would not be taken into account**". It actually

- 9 -

means that if the investment was, for instance, registered as a shareholder loan Hananel would receive, according to the "option arrangement" alleged by him, his 12% for free. This just goes to show that Hananel's testimony is not worthy of belief.

31.    In a failed attempt to add a touch of credibility to his "option story" Hananel explains that the annual salary I offered him (on behalf of IPI), US$100,000 per year, was **"lower than what I was earning at Galilee Tours"**, and accordingly **"the only attractive element in Adelson's offer to me was the proposed option mechanism"** (Section 2.3.6 of Hananel's affidavit).  As described by Hananel in Sections 2.3.1 – 2.3.2 of his affidavit:

> **"The terms of employment Adelson had offered me – primarily a salary of $100,000 a year – were not a sufficient incentive for me to accept Adelson's employment offer. As aforesaid, my position and salary at that time were of a senior manager ... However, as part of his attempts to convince me to accept his employment offer, Adelson <u>added</u> "icing" to his offer [i.e. the alleged option arrangement]".**

32.    In other words – the considerations which Hananel wants the Honorable Court to believe that he weighed when he had to decide whether to take the job at IPI is that, on the one hand, the salary offered (by IPI) was lower than at his then present place of employment (Galilee Tours) but, on the other hand, there was a very attractive option mechanism, which I allegedly added as "icing" to IPI's original offer.

33.    However, this portrayal of Hananel's deliberations is **absolutely false**. What Hananel **fails** to mention in his affidavit is that in practice (and without IPI's knowledge) Hananel had taken the salary paid to him by IPI **in addition to** the salary paid to him by Galilee Tours.  In other words – there was no significance whatsoever, from Hananel's point of view, to the question whether Hananel's salary at IPI was higher or lower than his salary at Galilee Tours, because Hananel had no intention of giving up his salary at Galilee Tours.

34.    In any event, I would like to note that an annual salary of US$100,000, plus the accompanying terms which Hananel received, was, according to what I knew at the time, a very high salary in Israeli terms. Certainly taking into account the fact that Hananel was the manager of a relatively small business. I specifically remember a survey of certain Israeli public companies published in Israel at the time that showed that the highest paid executive was making about US$250,000 per year and that US$100,000 was a high salary for executives.

– *10* –

35.   In Section 2.7.1 of his affidavit Hananel claims that "**many senior managers in the Adelson Group enjoy options with various terms and conditions**" and attaches to his affidavit LVS's Securities and Exchange Commission ("SEC") filings of the contracts with LVS's top executives, William P. Weidner ("**Weidner**"), Robert G. Goldstein ("**Goldstein**") Bradley H. Stone and David Friedman. Besides the fact that there is no such thing as "**the Adelson Group**", this reference to LVS actually illustrates the unbelievable nature of Hananel's version regarding his "option arrangement". Contrary to Hananel's claim, at the relevant time (when the employment contract with Hananel was concluded) up until shortly before LVS's IPO in December 2004 (when LVS adopted, as common by publicly held companies, an Employee Stock Option Plan), only a **very limited** number of **executives** received options and later shares in LVS, each receiving, on the average, **approximately <u>only 1%</u> of LVS shares**. LVS was a company fulfilling a mega-project with an anticipated budget of US$1.4 Billion, employing thousands of employees. IPI's branch in Israel, on the other hand, was a very small operation, with Hananel managing a secretary and one other employee only. **The comparison which Hananel attempts to make between himself and senior managers of LVS is totally baseless and only illustrates just how <u>conservative</u> I am in having companies of which I am a shareholder grant equity to executives.** The possibility that I would grant Hananel the option mechanism described by him, which would apply as Hananel claims also to casino deals worldwide, would be regarded by me as <u>**an act of complete unfairness**</u> towards my senior executive staff. **There is no way in the world that I would have been able to face Weidner or Goldstein, for instance, persons with whom I worked every day, and explain to them that while they, who really operated and managed LVS's casino business, received a <u>minimal</u> equity stake, Hananel received such an extraordinary option mechanism**. I would never have done it.

36.   And another point to consider - what did Hananel have to do in order to receive his rights under this fantastic option mechanism he claims I offered him? According to Hananel's deposition, taken in the US proceedings, it was enough for him to talk to me about how developing a casino (for instance) in some place in the world would be a great idea. **That's all ! I (or any other reasonable businessman) would never have made such an agreement** (whether on behalf of IPI, or any other company). It would have been **totally irresponsible** on my part. In my line of business, I always talk to people I work with regarding business possibilities. To have a deal with an employee of a company of mine by which it is enough for him to be entitled to equity by telling me that making an investment in this or that part of the world would be a good idea, is totally ludicrous and highly irresponsible.

37.   Finally, if I had made an "option deal" with Hananel which extended to casino investments, as Hananel claims, I would have been obliged, as required by Nevada gaming laws and regulations, to report such an agreement to the Nevada Gaming Control Board for prior notice and approval. Failing to do so would have been a violation of applicable Nevada gaming laws and regulations and consequently endangered my and LVS's casino licenses. The fact that no

mention of Hananel's "option agreement", as claimed by Hananel, was ever made to the Nevada Gaming Control Board proves that Hananel's agreement did not extend to casino investments (but only to Israeli hi-tech investments). **I am extremely conscientious about strictly observing Nevada gaming laws and regulations since LVS's business is absolutely dependent on its Nevada gaming license. I would never have placed LVS's Nevada license at risk by not disclosing Hananel's "option agreement", had such an agreement ever existed.**

38. To sum up regarding Hananel's alleged option mechanism – it is an unrealistic mechanism, lacking any economic logic, unworthy of belief, the details of which changed to suit Hananel's litigation needs. It is something which I would never have offered (on behalf of IPI) to Hananel. Such an offer is contrary to all my experience as a business man. **I am not in the habit of liberally giving away equity to managers in companies which I am a shareholder of** and I would certainly not have done it (on behalf of IPI) in the case of Hananel after the arrangement with my brother-in-law, Farbstein, who had to decide whether he was joining the investment **at the time of the investment**. Hananel never had an "option arrangement" of any sort. All he was entitled to was **participation in profits** pursuant to the conditions detailed above in my affidavit.

## Hananel's claims regarding Mr. Dan Raviv

39. Hananel claims in Section 2.7.2 of his affidavit that when the employment agreement was reached, I told him that Mr. Dan Raviv (hereinafter: "**Raviv**") would be subordinate to him. This is not true. Raviv was for many years the political correspondent of the Israeli Broadcasting Authority and had many years of experience in the media and mass communication industry. Raviv was (and is) a very close personal friend of my wife and myself for many years. At the time Hananel refers to (the time when his employment agreement was made, late 1995) I was under the impression that Raviv was on a sort of "leave of absence" from the broadcasting authority. Raviv did not have any defined post at IPI, but he had an office at IPI's offices (then IGM's offices) long before Hananel's employment at IPI began. Raviv was well aware of IPI's business and assisted in various matters. From 1998 Raviv's involvement in the Venetian project in Las Vegas, including public relations and positioning of the project from an international media standpoint, expanded.

40. I did not have any intention of making Raviv subordinate to Hananel, as Hananel claims, nor did this ever happen. However I did envision them working together. I told Raviv – just like Hananel – that if and insofar as they (Hananel or Raviv) would produce investment deals for IPI in Israeli hi-tech companies, then – after IPI's realization of the investment – whomever of them remained with IPI until the realization (including both of them, if that was the case), would receive from IPI a percentage (Hananel 12% and Raviv 8%) of the profit realized. I also explained to Raviv – just like I did to Hananel – that these were net profits reduced by any losses (from failed investments). These conversations were held, at times, with the joint participation of Hananel and Raviv. I (on

behalf of IPI) decided that Hananel and Raviv would receive **together 20%** of the profit because this was the typical compensation, as I knew at the time, to a management company of a Venture Capital investments fund, upon realization of investments (which seemed comparable to IPI's Israel branch's contemplated business operation). The reason for the 12/8 split between Hananel and Raviv was due to Hananel's business experience (which Raviv did not have).

41.  Subsequently in Section 2.7.2 of his affidavit Hananel declares that "**Raviv did indeed receive shares, worth millions of dollars!!! in a company of Adelson's which holds (indirectly) the Macau Venture**". This statement is incorrect. Raviv did not receive shares in LVS. In 2004 Raviv was granted an option to **buy** shares in LVS, which amounted to **less than half of one percent of LVS shares**. This of course had nothing to do with the participation in profits mechanism which existed in favor of Raviv (and Hananel) upon the realization of IPI's investments in hi-tech companies in Israel.

## Chapter E – Hananel's Employment:  By IPI Only

42.  In his affidavit Hananel claims that he was employed by me personally and by other companies in what Hananel refers to as "**the Adelson Group**". The whole object of this claim is to make me a defendant personally in his claim and to justify Hananel's demand for options in a venture with which IPI does not have – and never had – any connection.

43.  Hananel's claim that I was his employer is baseless. Hananel was employed by IPI. Although Hananel also infrequently handled minor personal matters for me, he did not do that as my employee (which he never was) but as a friend. Hananel's claim that he was employed by other companies in which I have an interest is also totally baseless.

44.  In order to blur the significance of the fact that the company that employed Hananel – IPI – does not have, and never had, any connection with a casino venture in Macau, Hananel uses a phrase - "**the Adelson Group**" - which does not have any corporate meaning or existence, that includes, according to Hananel, every corporation I own or control. However, this artificial accumulation of separate corporations is baseless. For operational, legal and tax reasons, I have always kept my personal business matters separate from the business of the companies in which I own any interest, and have kept the business of each of these companies separate from the others. Hananel was employed **solely by IPI and he does not have – and has never had – any rights in connection with any business of of LVS**.

45.  In his affidavit Hananel attempts to create the impression that it was me personally who concluded business deals and than decided, according to various considerations, to which company I wished to channel them. Thus, for example, it is claimed in Section 1.1 of Hananel's affidavit that "**any engagement made by Adelson in the context of his business is routed by Adelson to be performed via one of the companies owned and/or controlled by him (including by the organization of new, ad hoc companies for the purpose of a certain transaction), for various considerations**". This description is false,

and if it were true – would be illegal.   While it may be true that any businessman may form new companies to exploit new business opportunities that come to his attention, if such an opportunity relates to the business of a company of which one is a director or officer, it would be unlawful to place that opportunity in any other company.   This principle is called the "corporate opportunity" doctrine and is well known to most American businessmen, including myself, who perceive it not only as a legal requirement but also a requirement of proper business ethics and morality.

46.   In Section 2.4.3 of his affidavit Hananel claims that "**Adelson proposed to me several possibilities with regard to the company which would pay my salary and the place of payment (including that I receive my salary in the United States), and presented to me the tax advantages which he claimed were entailed by the possibilities he proposed**". This claim is not true either. I am not – and never was – Hananel's tax advisor, I am no expert in tax law, and certainly not Israeli tax law. In 1995, after the sale of COMDEX, my business associates and I re-organized our joint businesses, and agreed that IPI would become a company wholly owned by me and would assume full ownership of the operation in Israel (which as of that date was operated by IGM, a company of which I was the majority shareholder). Therefore – in late 1995 – IPI was registered as a foreign company operating in Israel (see paragraph 4 to Roberts affidavit), and the Israeli operation was thereafter transferred to IPI. Hananel was not presented with alternative possibilities with respect to the company which would be his employer. **Why would we complicate such a simple matter? Hananel received his salary from IPI, and from no one else, because he was employed by IPI and no one else**, just as my brother-in-law, Farbstein, who managed the Israel office when it was owned by IGM, received his salary from that company. No other company in which I owned any interest ever paid Hananel any salary whatsoever since Hananel was never employed by any company in which I owned any interest other than IPI.

47.   I have read the claim made in Section 2.5 of Hananel's affidavit whereby I issued Hananel a business card in which his name appears as representative of various companies in what Hananel calls "**the Adelson Group**".   I absolutely deny this claim. I do not issue business cards to managers employed in the companies in which I have an interest. They do so for themselves. I have thousands of employees and countless managers in the companies of which I am a shareholder. I do not issue their business cards or monitor which business card they use. If I had gone into things as minuscule as that I would not have had any time to conduct business. If Hananel had business cards in which various companies in which I have an interest are mentioned, other than IPI, it was without my knowledge or consent, and **he arranged** for the preparation of these business cards, in an apparent effort to promote himself and to exaggerate his position.

~14~

## Chapter F – Hananel's Employment by IPI: For The Purpose of Locating Hi-Tech Investments in Israel

48.   Hananel claims in Sections 2.2.3, 2.2.6 and elsewhere of his affidavit, that **"In the context of Adelson's offer, Adelson proposed that I be employed by him as his right-hand man, *inter alia* for the identification of investment opportunities in various fields <u>around the world (except the United States)</u> ... Adelson clarified to me that the position he was offering me included also Farbstein's former position, but <u>also other fields as aforesaid, which had not been included in Farbstein's responsibilities, and were being offered to me by Adelson based on his familiarity with my managerial and other capabilities and my connections in Israel and around the world."**

49.   This claim is a complete fabrication. Throughout his affidavit Hananel attempts to create the impression that he was my right-hand man with the most important position in my organizational structure. This was not the case. The Israel branch of IPI – which Hananel was supposed to manage – was a very small part of my business activities. As has already been mentioned above, the Israel office was established for reasons that went beyond purely business considerations, namely: Zionist considerations; in order to allow my brother-in-law, Farbstein, to take advantage of the knowledge he had acquired when he had worked together with me in the United States; and in order to enable me to have a place to work during my visits to Israel. The Israel office was never meant to be a business which would take up anything more than a very minor part of my attention, and it never occurred to me to make Hananel, who was supposed to manage that business, a worldwide locator of investments for me.

50.   As aforesaid, Hananel only replaced my brother-in-law, Farbstein. I never offered Hananel any employment beyond Farbstein's position as manager of the Israel office. Hananel claims, in Section 3.2.1 of his affidavit, that **"One of the main fields in which my capabilities, experience, expertise and connections were meaningful to <u>and required by Adelson,</u> was the casino field."** This claim is completely false and baseless. I owned LVS, which was the owner of the Sands Hotel & Casino in Las Vegas, **for seven years before the commencement of Hananel's employment.** I as well as the managerial team of the Sands Hotel & Casino had many years of comprehensive acquaintance with the gaming industry, in the United States and elsewhere, even before Hananel's employment with IPI began. Moreover, only a short time before Hananel's employment had been agreed upon (at the end of 1995), LVS recruited a team of executives, experts with many years' experience in the gaming industry (Weidner, Goldstein, Bradley H. Stone and David Freedman). Each one of these people had worked for many years in the gaming industry and had **vast international experience** in the gaming industry. **The idea that precisely at such a time I would require Hananel's assistance in particular in the casino field, to locate casino business opportunities outside Israel, as Hananel claims, is utterly baseless.**

51.   On the contrary, the time we did attempt to advance a project including a casino (the congress center and casino project in Israel or in the Israeli-Jordanian border area) and we needed work done in Israel which involved expertise in the

gaming field, **we brought over a company from the United States with expertise in the gaming field (Urban Systems)** in order to conduct the necessary studies, **because it was clear to me (as well as to Hananel himself) that Hananel <u>did not</u> have any necessary experience or knowledge regarding the gaming industry.**

52.   Hananel claims time and again that I made him a manager with unlimited authority all over the world **since I was so impressed by his managerial ability.** This is also untrue. I knew that Hananel was CEO of Galilee Tours **which was a private company <u>owned by Hananel and his family</u>.** I understood from this that he had business experience - nothing more. Hananel was a friend of mine, we had a relationship of trust and he had business experience -- therefore I thought that he could expand and run the operation of IPI in Israel. Hananel was employed solely by IPI. He was not a partner in any other way in my business activities.

53.   Due to my business in Las Vegas (the Sands Hotel & Casino and later the Venetian Resort Hotel Casino), I would frequently, when visiting various countries around the world, visit the local casinos, as a matter of professional interest, without any plan or intention of buying such casinos (which I never did). Hananel made every effort to join me on my trips in my private jet around the world, usually (or maybe always) when these trips originated from Israel. Since Hananel was my friend -- I sometimes agreed to take him along on these trips. Thus, for example, I took Hananel with me to Venice or for a vacation in Rhodes. For another example, one of the times I was in Israel, I made a day trip to visit the local casinos in nearby Turkey, Hananel asked to join me, and I agreed. Another example is a three day trip we made in 1997 to the cities of Sofia, Budapest, Prague and Milan after Hananel convinced me that he knew people in some Eastern European cities that could duplicate Murano Venetian glass that LVS needed for the Venetian at a dramatically lower price, a story which turned out to be without any truth whatsoever. In such cases when we traveled overseas together, Hananel would also accompany me on some of my outings at such places, including casino visits (if there was a casino around and I had decided to have a look at it). All of this had, of course, nothing to do with any desire on my part to buy such casinos (which I have never done) or with Hananel's work for IPI.

54.   Now, in Section 3.2.1 of his affidavit, Hananel turns all sorts of casinos which I (allegedly) visited into casinos which I wanted to acquire (with his assistance as part of his employment). The fact of the matter is that in not one of the places outside Israel which are mentioned in Section 3.2.1 of Hananel's affidavit -- such as Rhodes, the Czech Republic, Dublin, Turkey, Hungary, Bulgaria etc. -- in some of which I never even visited a casino, did any company in which I was involved acquire a casino **or even conduct any negotiations whatsoever or conduct due diligence for the acquisition of a casino.** This is all a product of Hananel's imagination.

As for the Israeli - Jordanian tourism venture: the idea to build a tourism project, with a conference center and a casino, in Israel or in the Israeli-Jordanian border region was conceived long before Hananel joined IPI and, of

– 16 –

course, without any connection to Hananel, his employment with IPI or his job description at IPI. Later, Hananel claimed that he could help promote the idea due to connections he allegedly had in Jordan, and he did try to do so, but Hananel's alleged connections and potential assistance turned out to be of limited value. Now, in Section 3.2.1(a) of his affidavit, Hananel repeats his boastful but unsubstantiated assertion about his alleged "contribution" to the casino venture in Jordan. Especially ridiculous is Hananel's claim that he initiated and arranged my meetings with the King of Jordan and the visit of a delegation of 54 American members of Congress to Jordan. These claims only demonstrate Hananel's delusions with regard to his status and position. Does Hananel really believe that **he** brought 54 American members of Congress to Jordan or that I required his assistance in order to meet with the King of Jordan? This is simply an inconceivable invention. First of all, there was never a visit which included 54 congressmen. Second, and more importantly, it was I - not Hananel - who was utilizing my position and contacts as a member of the executive committee of AIPAC (the American Israeli Public Affairs Committee) to arrange visits to Israel, sponsored by AIPAC, for members of the US Congress and had been doing this for many years before Hananel's employment with IPI. I considered these visits to be of great importance. In these visits we would demonstrate to the members of the US Congress the many facets of Israel and, more importantly, its "narrow waist" and security problems. These visits helped "convert" many members of Congress to the support of Israel, which I consider a very important asset to Israel. Now Hananel says that he initiated and executed a visit to Jordan of a delegation of the US members of Congress? This assertion is the product of a very vivid imagination. AIPAC was behind the visits of the members of Congress and I did not need Hananel's help to set up a meeting for the US Congressmen with the King of Jordan or, for that matter, with any political figure in the region.

55.  In section 3.2.1(I) of his affidavit Hananel mentions certain places in Europe (besides Sofia, Budapest, Prague and Milan, which I have addressed above) that I went to for meetings regarding the Venetian. As I mentioned above, Hananel made every effort to join me on my trips around the world in my private jet, and, since he was my friend, I sometimes agreed. Although Hananel may have accompanied me to some of the places mentioned in section 3.2.1(I) of his affidavit, it had nothing to do with his work. It is totally ludicrous to think that I would need Hananel to set up meetings in Paris, for instance, regarding restaurants and apparel shops for the Venetian mall when the Venetian employed a full time representative in Europe just for these matters.

56.  In Sections 3.2.2 - 3.2.4 of his affidavit, Hananel lists a series of activities – either imaginary or genuine – in an attempt to convince the Court that his role was not limited to identifying investments in Israeli hi-tech companies. I would like to emphasize two points regarding these activities.

57.  First, I have been, for many years now, a rather high profile businessman. Because of that, and because of my frequent travels to Israel, a significant part of the business and political community in Israel are my friends or acquaintances. When I visit Israel, many people want to meet with me in order

~ 17 ~

to, among other things, propose business investments or present me with ideas for business alliances. For reasons of courtesy, due to my Zionist wish to assist Israel and since I had plenty of spare time when I was in Israel, I did not usually refuse to meet with people. Most of the business proposals that were presented to me did not interest me and I did nothing about them. According to Hananel's affidavit almost every idea or person with whom I met is an issue which he handled as part of his work for IPI. This is simply not true.

58.  Second, as mentioned above, Hananel's job was to identify investments for IPI in the hi-tech industry in Israel. Hananel did not do his job and tried, time and again and while using my name, to get me involved in deals in which I had no interest. It is my impression that Hananel used his association with me and the fact that I was a rather high profile and very wealthy businessman, in order to introduce himself to as many people as possible as my representative for all intents and purposes, which was not true. The bottom line is more suggestive than anything else – other than the investment in Auto Depot, which was made before Hananel started working for IPI, and to which I shall refer in more detail below, **IPI did not invest in anything but hi-tech companies in Israel**. This fact speaks for itself as for the job Hananel was hired to do.

59.  As for Auto Depot, the involvement in Auto Depot was started when the Israel office was under the management of my brother-in-law, Farbstein. When I heard of it, I was upset, since, as aforesaid, the Israel office's job was to find investments in the hi-tech market in Israel. But since a commitment had already been made (without my approval), we went forward with it. Later on, when Hananel started his employment I told Hananel (on behalf of IPI) that overseeing Auto Depot was part of the job for which he was being paid.

60.  In summary, **the fact is that in the more than four years of Hananel's employment by IPI, neither IPI not any other company I own bought anything or made any investments in Israel other than the small handful of hi-tech investments**. This - hi-tech investments in Israel - was the thing Hananel was hired to do. Indeed, some other things were interesting to me, such as buying Bank Leumi or buying the real estate company Africa Israel, to address things in the long term in the event I spent the majority of my time in Israel, but eventually I was simply too busy developing my property in Las Vegas, and I was never at a shortage for investment opportunities in the United States, and made no such investments

## Chapter G – The Termination of Hananel's Employment

61.  The years since Hananel's appointment as the manager of IPI's Israeli branch were very busy years for me, in which LVS planned, developed and constructed the largest project I had ever been involved with to date – the Venetian Resort Hotel Casino in Las Vegas. I was unable to devote much attention to IPI's branch in Israel. I trusted Hananel and relied on him. Also the geographic distance and time difference between Israel and the United States hampered my ability to monitor the office.

62. The second half of the 1990s was the most flourishing period of Israeli hi-tech. As aforesaid, Hananel was supposed to identify attractive investments for IPI in the field of hi-tech. However, Hananel did not perform his job satisfactorily. In the more than four years in which Hananel acted as the manager of IPI's Israel branch – which were the golden years of Israeli hi-tech – IPI invested in only two companies. Hananel would forward to our offices in the United States raw information which he received from companies in Israel, without any analysis or investigation report and frequently without even opening the envelopes sent to IPI by these companies. Our attempts to convince Hananel to hire the appropriate manpower to identify and evaluate investments – were unfruitful. In early 2000 IPI despaired of Hananel's inability or unwillingness to perform his duty to identify hi-tech investments for IPI in Israel. I, acting on behalf of IPI, therefore decided to terminate Hananel's employment.

63. Accordingly, in April 2000 IPI gave Hananel notice of his termination. Immediately upon receiving the notice, Hananel ceased working for IPI – and IPI did not require his continued services – and Hananel was paid an advance notice payment in the sum of one month's salary (until May 10, 2000).

64. After Hananel's termination, IPI's Israel branch was left with no substantial activity (unfortunately this was very much the situation also during Hananel's employment). IPI continues to lease office space in Israel, but it is inactive, conducting little or no business operations.

65. At the time of Hananel's termination I was not yet aware (nor was IPI aware) of Hananel's abuse of the trust placed in him. I believed that Hananel was a lazy and unproductive manager. It did not occur to me that throughout most of those years he actually worked for, and got full salary and benefits from, another employer, Galilee Tours, in addition to the full salary and benefits he received from IPI, as well as misappropriated IPI's funds.

66. After Hananel's termination – and before IPI became aware of his conduct during the course of his employment – Hananel made claim against IPI for additional compensation. IPI conducted negotiations with Hananel with regard to the settlement of the terms of his termination. My intention was to bring about a speedy and amicable settlement of Hananel's employment with IPI. I understand that within the proceedings in Israel Hananel is using documents (whose admissibility I object to) which were exchanged when Hananel and IPI tried to reach a settlement, especially my letter to him dated May 1, 2000, in order to claim that the contents of our **negotiation** letters reflect what **was agreed** when **his employment started**. Hananel declares, at the end of Section 2.6.3 of his affidavit, that:

> "Adelson's said letter [of May 1, 2000] **merely reduced to writing the conversations between Adelson and me about the options, and the statements made therein. It was neither an offer by Adelson, nor a negotiation,** but simply a reduction to writing of the subject (the options), which had never been in dispute between Adelson and me".

- 19 -

67.     This testimony of Hananel is just another one of Hananel's lies. The truth is
        simply the opposite. My letter of May 1, 2000 - Exhibit "E" of Hananel's
        affidavit – was made in reply to Hananel's letter - Exhibit "D" of Hananel's
        affidavit. In my letter of May 1, 2000 I called Hananel's letter a "**counter-
        proposal**", and my letter concludes with the words:

> "1) <u>**Without Prejudice**</u>, 2) <u>**Not binding**</u> and 3) <u>**For
> negotiations purpose only**</u>".

        What could be more clear than that? Hananel's testimony that my letter of May
        1, 2000 was <u>**not**</u> an "**offer**" or a "**negotiation**" is <u>**false**</u> testimony, which is
        expressly contradicted by the contents of my letter.

68.     What Hananel has in fact done is to take the proposals contained in my letter
        dated May 1, 2000 – which were proposed by IPI as part of the settlement
        negotiations – and <u>**turn**</u> them into his own Statement of Claim (already in the
        First Claim). According to legal advice I received, it is precisely in order to
        avoid such conduct that the rule, which establishes the inadmissibility of
        settlement negotiation evidence (documents or testimony), comes into play.

69.     Without waiving the claim of inadmissibility, and in view of Hananel's
        reference to the matter and the decisions of the Labor Courts on the matter, I
        would like to set the record straight: in the context of the settlement
        negotiations, and in order to swiftly and amicably terminate the business
        relationship with Hananel, who was a long-time friend of mine (even at the time
        of his termination), I suggested to Hananel (on behalf of IPI) terms of
        termination **which went <u>beyond</u> what Hananel was entitled to under his
        agreement with IPI**. As I wrote to Hananel in my letter of May 1, 2000, I
        attempted "**the furthest stretch to be as accommodating as possible**". There
        was nothing more to it than that.

70.     In Sections 8.1.3 – 8.1.4 of his affidavit Hananel claims that "**At first, matters
        [with regard to the settlement negotiations] proceeded quickly, ...
        Suddenly, however, <u>in late July 2000</u>, a <u>surprising change</u> occurred in
        Adelson's position, and he now denied any of my rights with regard to
        options. In addition, the matter was suddenly referred to Adelson's
        attorneys in Israel – Herzog, Fox, Neeman ... the contacts <u>suddenly</u> began
        to drag out and protract without any progress**". There is no basis for this
        claim. Even though I wanted to conclude the negotiations with Hananel swiftly,
        this was not always at the top of my list of priorities. Hananel's claim, at the
        beginning of Section 8.1.3 of his affidavit, that at the **end of July 2000** some
        sort of **turning point** had occurred in my attitude towards the negotiations is an
        unfounded claim, the whole purpose of which is to justify the groundless
        speculation raised subsequently in Section 8.1.3 of Hananel's affidavit. At the
        end of April 2000, on May 1, 2000 and on May 2, 2000 Hananel and I (on
        behalf of IPI) exchanged **three letters within a time span of about a week**
        (Exhibits "D" and "E" of Hananel's affidavit, Exhibit P/3 of Hananel's affidavit
        in the First Claim). Thereafter – **from the beginning of May 2000, and not
        beginning at the end of July 2000 as Hananel claims** – the pace of the

- *20* -

negotiations **slowed down**, after I learned certain disturbing facts regarding Hananel's conduct during and at the end of his employment by IPI, including that he did not work full time for IPI but rather continued his employment for Galilee Tours. I was initially surprised by this disclosure, and appalled when I later learned the full extent of Hananel's continued involvement with Galilee Tours, which apparently was largely responsible for his failure to succeed in locating hi-tech investments as required by the terms of his employment with IPI. Eventually, Hananel and IPI did not succeed in reaching an agreement with regard to the terms of the termination of Hananel's employment. I absolutely deny the unfounded claim that there was any intention to deliberately slow down the negotiations with Hananel or to conceal from him any involvement whatsoever of me, or of any company connected to me, in a casino venture in Macau (or in any other matter connected to Macau). There was, in fact, nothing to conceal.

71.    In Section 8.1.5 of his affidavit Hananel makes allegations with regard to the wording of the draft Settlement and Release Agreement (to the admissibility of which I object), which was attached as Appendix "Z" to his affidavit. I understand that Hananel's claim relates to the paragraph in the draft which mentions licenses for the operation of casinos in Israel, Jordan or in any other country. I was not involved in the wording of the draft Settlement and Release Agreement with Hananel. However, it appears to me perfectly reasonable and absolutely essential that an attorney drafting a settlement agreement, such as Hananel's, would draft the provisions of the agreement, which concern Hananel's waiver of claims and demands, in the broadest possible fashion in order to prevent Hananel, **after having received the monetary consideration pursuant to the settlement agreement,** from raising any claims whatsoever against me or against any company connected to me, with regard to any matter whatsoever, in Israel or abroad. On the contrary, if after the signing of the agreement – and the receipt of the consideration – Hananel would have been able to come to me with demands for parts of my business interests, in Israel or abroad, I would have regarded this result as a serious error in the wording of the settlement agreement. Anyway, as mentioned above I was not involved in the wording of the draft Settlement and Release Agreement with Hananel and never instructed anyone to conceal any information from Hananel.

## Chapter H – The Tender for the Granting of Gaming Concessions in Macau

72.    As one can infer from the previous chapters, LVS, the company of which I am chairman of the board, CEO and majority shareholder, is one of the world's leading companies in the hotel and gaming industry. Because of that, LVS's management team are often (even before the Venetian was opened) approached by people or companies with suggestions and proposals for business opportunities in the hotel and gaming industry, both within and outside of the United States. I, and the other managers of the LVS team, also make sure to keep up-to-date on the news in the gaming industry by, among other things, reading the many journals and periodicals in this field.

- 21 -

73. The fact that Macau has been – for many decades – a large gaming center in the Far East, was known to everyone in the gaming industry. Macau was nick-named the "Monte Carlo of the east" and sometimes the "Las Vegas of the east". I did not personally go to Macau until 1999 but I had visited more than once its neighbor, Hong Kong, and, usually when I was there, had discussed gaming in Macau (which is the main gaming destination for Hong Kong residents). I specifically remember that in 1985 I traveled, with my business associates and others, to Hong Kong and Japan for COMDEX related business reasons. While we were in Hong Kong my business associates and others went for a day trip to Macau and later that evening over dinner they provided a rather vivid description of what the casinos in Macau looked like. I also remember that, when the "triad" wars (Chinese organized crime) broke out in Macau in 1997 (or thereabouts) in relation to the control of the gaming business there, in which many people were shot and killed, Weidner and I discussed Macau in general and specifically the situation in the gaming business there. However, I was not aware of any gaming business possibility in Macau and did not take any particular interest in Macau. It was more like general industry knowledge.

74. At the end of 1999 Macau was to return to Chinese sovereignty (commonly referred to as "the handover"). As the 1999 handover drew near – and after the handover – there were many rumors and speculations about the future of the gaming industry in Macau, one of the possibilities being that the Macau government would liberalize the gaming industry. However, until 2001, there was no certain information regarding this matter and no announcement from the Macau government.

75. We, LVS and its management team, including myself, were aware of the rumors and the speculations regarding the future of the gaming industry in Macau. We were approached by people (NOT Hananel), who met with us and claimed that they would be able to help us – if and when the gaming market in Macau opened – to receive a license to operate casinos in Macau. These approaches were not unique; as aforesaid, we were often approached by people saying that they could help us receive a gaming license in this or that part of the world. However, as regards Macau, these approaches turned out to be of no real substance, **primarily since, as will be detailed below and is discussed in greater detail in Weidner's affidavit, the Macau government conducted a public and transparent process, a public tender open to all, for the granting of concessions to operate casinos in Macau.**

76. In October 2001 the public process leading to the granting of concessions to operate casinos in Macau began. My personal involvement in the process was quite limited. From early July 2001, when Weidner and I returned from a visit to Beijing, my health deteriorated badly. On the night of the day we landed in the United States, I started suffering terrible pains. These pains lasted for a period of many months – approximately six months – and afterwards, gradually and slowly, began to decrease. In this period, I was partially bedridden and was prescribed and took many painkillers and steroids (sometimes even more than 20 a day). My involvement in business activities was sparse, and - as I was told - when I was involved, my contributions were very often incoherent. On many

- *22* -

occasions I would not remember things that were said to me, I would fall asleep in the middle of meetings, etc. Therefore, the entire process of LVS's bid for the Macau gaming concession was led to a great extent by Weidner, with the assistance of David Friedman, Esq., the Venetian's Legal Counsel.

77. Nevertheless, I kept up to date regarding the main events concerning the process of the granting of concessions to operate casinos in Macau. It was clear to me all along that this was **a public process, fully accessible to everyone in the industry**. It was a very long and tedious process, which lasted many months, in which the senior staff at LVS, headed by Weidner, was engaged intensively in matters pertaining to the Venetian's participation in the process of the granting of concessions to operate casinos in Macau. It was a complicated process, which required coordination between many bodies and many people, such as law firms, accounting firms, engineers, marketing firms, etc. LVS's team conducted more than a dozen lengthy business visits to Macau, Hong Kong and Taiwan (one of our partners at the beginning of the process was a Taiwanese bank by the name of China Development Industrial Bank).

78. My main concern – which I repeatedly told Weidner about – was to avoid taking any action which could endanger LVS's gaming license in Nevada. If it was possible to win the bid in Macau without endangering our Nevada license – that would be good. But, under no circumstances, were we to risk our license in Nevada.

79. I recall clearly – unfortunately – my trip to Macau in December 2001 or January 2002 (or thereabouts), for a meeting with the Tender Commission, in which we presented the entity which we were involved with at that stage of the tender, Asian American Entertainment Corporation Limited ("**Asian American**"). I was in bed throughout the flight, almost without being able to move, and suffering terrible pains. I arrived at the meeting and participated in it, while experiencing excruciating pains, because the Macau Government asked to see me, the person in the company with the most experience in the convention and exhibition industry, and I understood that my personal participation was essential at this stage in order to persuade the Macau government that it should choose the entity with which the Venetian was then affiliated with, Asian American.

80. At the beginning of February 2002 I was in Hong Kong in the days leading up to the declaration of the winners in the tender. This was concurrently or immediately after the Venetian notified the Tender Committee of the termination of its relationship with Asian American and its intention to co-operate in the tender with another participant, Galaxy Casino Company Limited ("**Galaxy**"). As set forth in detail in Weidner's affidavit, on February 8, 2002 (or thereabouts) the names of the winners in the tender were announced, and Galaxy was among them.

81. After the declaration of the winners in the tender, intensive negotiations began between Galaxy and the Venetian in order to reach formal agreements regarding the form and structure of the cooperation between the Venetian and Galaxy. These negotiations were led by Weidner and, as I recall, were long and

exhausting, and included many meetings and long draft agreements which were exchanged between the parties. **These negotiations were unsuccessful.** Despite all of our efforts, we were unable to reach an agreement with Galaxy regarding the format of the cooperation between the Venetian and Galaxy.

82. **At this stage, the situation was that the Venetian, on the one hand, had not won any of the concessions in the tender (nor was it a shareholder in any one of the winners) and, on the other hand, was unable to reach agreement with the winner with which it was supposed to cooperate.**

83. This state of affairs was explained to the Macau government. Because of the Venetian's experience and proven success in the gaming, tourism, convention and exhibition areas, the Macau government was interested in having the Venetian as a significant factor in the shaping of Macau's gaming, convention and tourism industries, however that opportunity would have been lost as a result of the disagreements that broke out between Galaxy and the Venetian. Under the circumstances, in the second half of 2002 the Macau government agreed that the Venetian would receive a sub-concession to operate casinos in Macau issued off of Galaxy's concession, while Galaxy will remain the concession holder and act independently from the Venetian. This structure has been in effect ever since.

84. To sum up - the public process for determining the winners of the Macau gaming concessions, which started more than a year and a half after Hananel was terminated, was a long and tedious process **that Hananel had nothing whatsoever to do with.** Hananel's claim that he made **a contribution** to the Venetian's winning a concession to operate casinos in Macau (which it didn't) is totally without merit. Hananel's name was never mentioned in that regard. I have never spoken about Hananel with anyone at LVS or elsewhere regarding the Macau gaming concession (prior to learning of his baseless claims). To say that Hananel had a contribution to the Venetian's position in Macau is totally inconsistent with the facts.

### Chapter I - Hananel's Claims With Regard to Macau

85. Hananel **claims** that in 1999, more than a year before Macau was returned to Chinese sovereignty and more than two years before the Macau gaming tender began, he presented me with the business opportunity to build a casino in Macau and persuaded me to visit Macau (which, according to him, I did in August 1999), as a result of which I took steps to realize the business opportunity in Macau which he had presented to me. As will be proved in the following paragraphs, this claim is a total fabrication with no basis in reality whatsoever.

### My Trip to the Far East at the End of August 1999

86. In 1999 the Venetian Resort Hotel Casino in Las Vegas opened. At that time I made numerous trips to the Far East in order to meet potential players ("high-rollers") from the Far East and invite them to come to the Venetian (these trips are called "handshaking tours"). This is a standard marketing method employed

-24-

by the major hotels on the Las Vegas Strip. The revenue from the high-rollers (a considerable part of whom come from the Far East) is a most substantial element in any casino's profitability, and all the mega hotels on the Las Vegas Strip compete for the high-rollers business and dedicate much time and expense to bring them to their hotels.

87. As part of these trips to the Far East I would also visit Hong Kong, where many of these players reside. Since my private plane at that time (a Gulfstream III) was not permitted to land at Hong Kong Airport due to more stringent noise level requirements applying to the engines of my airplane, I would land at the nearby Macau airport, and from there I would reach Hong Kong by the ferry which sailed between Macau and Hong Kong (the ferry trip takes only an hour).

88. I shall start my reference to Hananel's claims regarding Macau with the first lie. Hananel describes, in Section 4.8 of his affidavit, the conversation which he alleges took place between us in August 1999 in which he purportedly talked to me about operating a casino in Macau. In Section 4.9 of his affidavit Hananel relates how – when the alleged conversation took place – he knew that **"Adelson was scheduled to travel in August 1999 in his private jet from Israel to the Far East (including Hong Kong and Taiwan) for a tour to locate and keep high rollers for Adelson's Las Vegas casino (the Venetian). Consequently, I pressured Adelson to include Macau in his said visit, and to dedicate an entire day to the matter during his stay in the adjacent Hong Kong ... I proposed this to Adelson and he agreed ... [Adelson] promised to make a special trip to Macau during his upcoming trip to the Far East,** *inter alia* **in order to see the casino there and the potential posed by the place."**

89. I would like to emphasize the following: **this conversation with Hananel (which never took place), as a result of which it is alleged that I made a visit to Macau in August 1999, constitutes the entire alleged contribution made by Hananel to the Venetian winning two and a half years later the Macau gaming tender (which it didn't). Hananel's affidavit does not contain any claim concerning any conversation or other act whatsoever of Hananel which contributed to the Venetian winning the possibility of operating casinos in Macau.** On the contrary – in the Statement of Claim which Hananel filed, it is mentioned, in Paragraph 4.10, that **"since that trip [my alleged trip to Macau in August 1999], the Plaintiff had no connection to the project"**.

90. In Section 5.1 of his affidavit Hananel explains to the Court, in a very detailed fashion, what he alleges transpired regarding my visit to Macau in August 1999, which took place after our alleged conversation regarding Macau:

> **"Adelson's trip to Macau in August 1999**
>
> **As aforesaid, after I had presented Macau and the Macau Venture to Adelson, I managed to convince him to visit Macau during his trip to the Far East in August**

-25-

1999, in order to gain an impression from the place and meet with relevant persons. I also equipped Adelson with relevant materials which I had prepared, so that he could prepare for the visit and present the same to the persons with whom he would meet.

On August 29, 1999, Adelson landed in Macau as part of his visit to the Far East. **During his visit Adelson traveled – as he had promised me – to Macau. On the evening before his trip, as was his custom, Adelson called me from Hong Kong, and during the conversation I implored him again to dedicate time to looking into the Macau issue. Adelson informed me that since he had some spare time the following day, he would travel to Macau from the "Peninsula" hotel in Hong Kong. I recommended to him again to take the means of transport known as hydro-jet (a type of hovercraft). On the morning of his visit to Macau and shortly before he left for Macau, Adelson called me again, as he did also immediately after arriving in Macau. I explicitly remember this since I recall Adelson "complaining" to me that even though I had assured him that the hovercraft trip would last 40 minutes, it actually took 45 minutes (this was Adelson's way of thanking me). In this context, Adelson told me that he had taken a tour of Macau and had visited the Lisboa casino which was, at that time, the main casino in Macau (owned by Stanley Ho)**".

91.   The same version – and even with additional (false) details – was made by Hananel in his deposition in February 2005 in the US proceedings.

A copy of Hananel's testimony in his deposition in the US proceedings is attached hereto as **Exhibit 3** of my affidavit.

Thus, Hananel described my departure from Hong Kong to Macau and my return to Macau on the same evening (page 184 of his testimony):

"**I know that he left Hong Kong between 11-12 which for him was morning. And I know that he was very keen and very nervous that he will be able to come back to Hong Kong by 5 o'clock because he had to prepare for the dinner which he was the host**. And he was coming later than 5 o'clock which upset him".

Hananel testified that during this day trip to Macau I met with people from the gaming industry in Macau (page 183 of his testimony):

-26-

> "Mr. Levi, Esq.:    Did you receive information that in
> the first trip to Macau Mr. Adelson met with people
> concerning the development of the casino in Macau?
> A:    The answer is yes.
> ...
> Q:    With whom did he meet?
> A:    He met with people from Mr. Hoe organization".

Hananel also testified about **an additional meeting** I held during the same visit
to Macau, whose subject was the gaming industry in Macau (page 187 of his
testimony):

> "Q:    Do you have any idea what that other meeting
> had anything to do with?
> A:    Regarding the casino style in Macau.
> Q:    And in that other meeting, did he also meet with
> Stanley Hoe's people?
> A:    I don't have recollection on this but I know the
> subject of the meeting was to understand the way the
> casino operates in Macau and how they are operating in
> Macau".

Hananel testified that at those meetings I handed out the documents which
Hananel had allegedly prepared and gave me prior to my leaving for the Far East
(page 182 of his testimony):

> "Mr. Levi, Esq.: What did, did Sheldon Adelson ever
> tell you what he did with the business plan?
> A:    I know that he hand over the business plan to
> people he met in Macau ... Sheldon told me that he hand
> over but he told me in the sense that he's too old. He
> told me if I was young I was, I'm telling you the future
> is there. I would invest in China".

And Hananel even testified how – after my return to Israel – I (and the others
who were with me on that trip to the Far East) told him about what happened
during this day trip to Macau (page 187 of his testimony):

> "they told me that they spend more than half a day in
> Macau moving around and discussing what Chinese
> prefer in the way of gaming".

- 27 -

92. So this is Hananel's version: due to the fact that Hananel presented me with his business initiative regarding Macau, I, during my visit to Hong Kong in August 1999, set off one day for a visit to Macau, where I visited the "Lisboa" casino, there I held certain meetings regarding the gaming industry in Macau. I wish to note that Hananel's version **is not** that during the course of my passing through Macau (on the way to or from Hong Kong) I made such a day trip to Macau. **Hananel's version is that during the course of my stay in Hong Kong I left Hong Kong for a day trip to Macau and came back to Hong Kong.**

93. <u>**Well, everything asserted by Hananel and quoted in paragraphs 90 and 91 above is an utter lie. Hananel describes - with many details - an event which never occurred in real life and which Hananel fabricated as part of his perjured testimony.**</u>

94. I am attaching to my affidavit two documents which relate to my trip in August 1999 to the Far East:

94.1.   **Exhibit 4** – a copy of the **itinerary** of my trip to the Far East in August 1999. The itinerary, as its name suggests, is a **planned schedule** of the trip. The itinerary is prepared by my secretary in Las Vegas, who updates it in accordance with the data known to her (which can, of course, change even during the course of the trip).

94.2.   **Exhibit 5** – a copy of my **passport** from the relevant period.

95. As is apparent from the **itinerary**, the planned schedule of my trip to the Far East in August 1999 was as follows:

95.1.   **Tuesday, August 24, 1999 (in the evening)** – departure from Israel and arrival at Taiwan the following day, August 25, 1999.

95.2.   **Sunday, August 29, 1999 (in the afternoon)** - departure from Taiwan, landing at Macau and transfer to Hong Kong. As may be seen from the itinerary, even though the landing was at the Macau airport (during the afternoon), the accommodation was at the Peninsula Hotel in Hong Kong.

95.3.   **Friday, September 3, 1999 (in the morning)** – departure from the airport in Macau back to Israel.

~28~

96.   As may be seen from my passport, the visit was made exactly as planned, apart from one change – a one day visit to Thailand was added, on September 2, 1999, following which we returned to Israel. The list below details **all** the stamps in my passport in the period between August 24, 1999 thru September 3, 1999:

August 24, 1999 - depart Israel (second page K)
August 25, 1999 - enter Taipei (page 24)
August 29, 1999 - depart Taipei (page 20)
August 29, 1999 - enter Macau (second page R)
August 29, 1999 - depart Macau (second page R)
August 29, 1999 - enter HK (second page P)
September 2, 1999 - depart HK (second page P)
September 2, 1999 - enter Macau (second page Q)
September 2, 1999 - depart Macau (second page Q)
September 2, 1999 - enter Thailand (second page S)
September 3, 1999 - depart Thailand (second page S)
September 3, 1999 - enter Israel (second page Q)

97.   My passport proves **unequivocally** that Hananel **lied** in his affidavit and in his testimony.  As may be seen from the stamps in my passport, on August 29, 1999 I left Taiwan, arrived in Macau, left Macau **and entered Hong Kong**. These stamps are consistent with the description set forth above with regard to the manner in which I arrived in Hong Kong: landing at Macau airport (**entry stamp to Macau**) and transfer by ferry from Macau (**departure stamp from Macau**) to Hong Kong (**entry stamp to Hong Kong**), **all of which are on the same day, <u>August 29, 1999</u>. About four days later, on September 2, 1999, I left Hong Kong (by ferry), entered Macau (by ferry), left Macau (via the airport) and arrived in Thailand.**

98.   **If Hananel's testimony were true, and during the course of my visit to Hong Kong I had made a day trip to Macau, there would have to be <u>four additional stamps</u> in my passport (<u>which do not exist</u>): departure from Hong Kong, arrival in Macau, departure from Macau and arrival in Hong Kong.  <u>There is no other way of making Hananel's version consistent with reality</u>.**

99.   I wish to emphasize the following: this is not a matter of Hananel making an accidental "**slip**" in his deposition and in his affidavit.  This is the **core** of Hananel's claim: he told me about the Macau gaming opportunity and I went there to check it out. Hananel declared and testified – both by testimony and by affidavit - **accompanied by perjured anecdotes and trivia** - about my day trip **from Hong Kong to Macau and back**. Thus, Hananel testified:

99.1.      That we spoke on the telephone the evening before my departure from Hong Kong to Macau.

- 29 -

99.2.  That I told him during that conversation that the following day I had a free morning and therefore I would fulfill "my promise" to him and travel from the Peninsula hotel in Hong Kong to Macau for a few hours.

99.3.  That he recommended to me in our conversation to take the ferry in order to travel from Hong Kong to Macau.

99.4.  That I told him that I was worried that I would not manage to return from Macau to Hong Kong in time for an event which was scheduled to take place at five o'clock in the afternoon in Hong Kong.

99.5.  That we spoke on the telephone the following day in the morning when I was in Hong Kong **before** I left for Macau.

99.6.  That we spoke on the telephone the following day **after** I arrived from Hong Kong by ferry to Macau.

99.7.  That I complained to him during this conversation about the time of the ferry journey from Hong Kong to Macau (which he alleges I said was 45 minutes rather than 40 minutes).

99.8.  That I was upset after I returned from Macau to Hong Kong after five o'clock in the afternoon.

99.9.  That – after we returned to Israel – we told him about what had happened during that half-day visit to Macau.

100.  **And all of these details and anecdotes are just <u>lies upon lies</u>. It appears that Hananel has no problem (or shame) in fabricating a tall story, with all the little details which would make it seem plausible, <u>but which have no basis in reality</u>.**

101.  As aforesaid, the purpose of my trip to the Far East in August 1999 was a "handshaking tour". On August 24, 1999 we departed – I, Dan Raviv, my two security men (Doron Bettan and Sean Ben-Menachem), and Mr. Dershowitz (who was a friend of Hananel's) – from Israel to Taiwan. Mr. Dershowitz was added to the flight because he was a friend of Hananel, and Hananel asked me to give him a "ride" to Taiwan on my plane. In Taiwan we met with Mr. Matthew Ma. Mr. Ma was, at that time, an employee of the Venetian in Far East sales and marketing. After a few days' visit in Taiwan, on the afternoon of August 29, 1999 we departed from Taiwan and landed in Macau on our way to Hong Kong. As has already been explained above, the <u>sole</u> reason for the landing in Macau was that my plane, at that time, was not permitted to land at Hong Kong Airport. Consequently, we landed at the airport of the neighboring Macau. Except for a **single** stop, which I will describe below, we went straight from the Macau airport to the ferry terminal, **where we departed to Hong Kong.**

102. Immediately upon landing at the airport in Macau, we met with Ms. Ivy Yip, who worked, subordinate to Mr. Matthew Ma, for the Venetian's Far East marketing. Upon landing, Ms. Yip told me that a cousin of hers is a prospective client of the Venetian and that he would appreciate it very much if I would meet him for a few minutes. So on the way to the ferry terminal we stopped at the Lisboa Hotel in Macau, where Ms. Yip's cousin worked as a manager of one of the VIP gaming rooms. We entered the Lisboa, we passed through the casino observing the gaming activity there, and came to a very small office where we met with Ms. Yip's cousin for a short meeting which lasted approximately 20 minutes. Since Ms. Yip's cousin knew no English there was very little communication during the meeting. The only subject of conversation was me telling Ms. Yip's cousin about the Venetian Resort Hotel Casino in Las Vegas and inviting him to come and play there. Thereafter, we all left the meeting, passed through the casino again, and left the Lisboa Hotel, returning to the car and proceeding **directly to the ferry terminal**. Upon arriving at the ferry terminal, we boarded the ferry, which brought us to Hong Kong within one hour.

103. As described above, and as can be seen from the itinerary and my passport, I did not go back to Macau during my visit to Hong Kong. A few days after our arrival in Hong Kong, I concluded my visit in Hong Kong, and we went, via the ferry, to the Macau airport, where we departed to Thailand. **There were no stops on the way.**

104. Together with my affidavit, I also file the affidavits of **Mr. Doron Bettan** (my security guard), **Mr. Matthew Ma** (of the Venetian's Far East sales and marketing), **Ms. Ivy Yip** (also of the Venetian's Far East sales and marketing) and **Raviv** (who accompanied me on my journey to the Far East). Doron Bettan by the very nature of his position as my security guard, was together with me 24 hours a day. Matthew Ma and Ivy Yip were with me on the said trip from morning till night. Raviv was also with me all the time. Doron Bettan, Matthew Ma, Ivy Yip and Raviv confirm in their affidavits that Hananel's claims regarding the visit to Macau and the meetings which I allegedly had there during my August 1999 trip to the Far East are totally false.

## My Trip to the Far East in the second half of March 2000

105. In Section 5.2 of his affidavit Hananel declares that "**In late March 2000, Adelson took another trip to the Far East, in which too I know that he visited Macau**". Hananel does not give any details of the meetings which I had in Macau during that trip to the Far East (unless the contents of Section 5.3 of his affidavit relate to the aforementioned trip); however, in his deposition in the US proceedings Hananel claimed that during my trip to the Far East in March 2000 I held meetings in Macau with a government official and with a real estate agent, both in connection with gaming in Macau.

106. These claims are also untrue. Just like my previous trip to the Far East, this trip was also a "handshaking tour" to meet potential casino players. As may be seen from the itinerary, the planned schedule for my trip to the Far East in March 2000 was as follows:

- *31* -

106.1.    **Sunday, March 19, 2000 (in the evening)** – departure from Israel and arrival at Singapore the following day, March 20, 2000.

106.2.    **Wednesday, March 22, 2000 (in the afternoon)** – departure from Singapore and arrival at the Philippines.

106.3.    **Friday, March 24, 2000 (in the afternoon)** – departure from the Philippines and arrival at Taiwan.

106.4.    **Tuesday, March 28, 2000 (in the afternoon)** – departure from Taiwan, landing at Macau and transfer to Hong Kong.

106.5.    **Saturday, April 1, 2000 (in the morning)** – departure from Macau Airport and back to Israel.

A copy of the itinerary of my said trip to the Far East is attached hereto as **Exhibit 6** to my affidavit.

107.    As can be seen from my passport, the visit was made as planned without any change:

March 19, 2000 - depart Israel (second page A)
March 20, 2000 - enter Singapore (second page F)
March 22, 2000 - depart Singapore (second page F)
March 22, 2000 - enter Philippines (second page D)
March 24, 2000 - depart Philippines (second page D)
March 24, 2000 - enter Taipei (page H)
March 28, 2000 - depart Taipei (second page F)
March 28, 2000 - enter Macau (second page H)
March 28, 2000 - depart Macau (second page H)
March 28, 2000 - enter HK (second page D)
**\*March 28, 2000 - depart HK (second page D)**
**\*March 29, 2000 - enter HK (second page E)**
April 1, 2000 - depart HK (second page E)
April 1, 2000 - enter Macau (second page H)
April 1, 2000 - depart Macau (second page H)
April 1, 2000 - enter Israel (second page C)

\*On our first night in Hong Kong the Venetian sponsored a party for potential clients of the Venetian on a gaming ship which left Hong Kong for International waters (since gaming was not allowed in Hong Kong), and returned to Hong Kong the following morning. Hence, the stamps on my passport, highlighted in bold, for exiting Hong Kong on March 28 and returning back to Hong Kong the following day, March 29 (without entering any other country).

-32-

108. As can be readily seen, I did not make any visit to Macau during the said trip; Macau was only a transit stop on the way to or from Hong Kong. I entered Macau and left it the same day, both coming (on March 28) and leaving (on April 1) Hong Kong. Again, since my private jet was not permitted to land at Hong Kong airport, we landed at the Macau airport (from Taiwan). That's the **only** reason we landed in Macau. As can be seen from my itinerary, the place of accommodation, on the day of landing at the Macau airport, was the Peninsula hotel in Hong Kong. Again, we were met at the airport by Ms. Yip. From the airport we went **straight** to the ferry terminal, **and departed** to Hong Kong. When I concluded my visit in Hong Kong (on Saturday, April 1, 2000), I left Hong Kong – via the ferry – to the Macau airport, where I departed to Israel. **There were no stops on the way.**

109. On this trip I was again accompanied by **Matthew Ma** and **Ivy Yip**, who were with me from morning till night. Matthew Ma and Ivy Yip confirm in their affidavits that Hananel's claim regarding visits to or meetings which I held in Macau are false claims.

**The (Alleged) Conversation – Before my Trip to the Far East in August 1999 – in which Hananel Allegedly Updated me regarding the Business Opportunity for Building a Casino in Macau**

110. Based upon the background facts set forth above, I would like to return to the alleged conversation between Hananel and myself prior to my trip to the Far East in August 1999. In Sections 4.8 – 4.10 of his affidavit Hananel testifies about the conversation which allegedly took place between us in which he told me about the business opportunity in Macau, and about the documents which he allegedly delivered to me in connection with such a business opportunity. **As I have already stated, no such conversation ever took place and no such documents were delivered to me.**

111. Hananel claims that during that alleged conversation I demonstrated "**total unawareness ... with respect to the Macau region**". Hananel testifies that I told him that I "**[am] not familiar with the Macau region and have never [heard] of it**". Hananel said similar things in his testimony in the US proceedings (**Exhibit 3**, page 142):

> "I told Sheldon I want to speak with you about Macau.
> He told me what it is Macau? It could be for him object,
> it could mean a name of place, it could be address, it
> could be a brand name".

112. I totally reject Hananel's false and presumptuous testimony. In 1999 I was a 66 year old man and a very experienced business man, with many years of experience in the tourism industry, the convention industry and the gaming industry (as well as in other industries). COMDEX, which was the world's leading exhibition in the computer and communications industry, was also produced in the Far East. Even before 1999, I had visited the Far East many

-33-

times, including Hong Kong, which is next to Macau. As I mentioned above in my affidavit, while I was in Hong Kong, the subject of Macau would frequently come up in conversations with the people whom I would meet. I also described above two specific occasions on which I spoke about Macau with others (before 1999). Macau – as a central gaming destination of the Far East – was mentioned many times in the professional publications of the gaming industry, and also in the general press, which I am in the habit of reading.

A copy of several publications – exemplifying many more - describing Macau and its gaming industry are attached hereto as **Exhibits 7 - 13**.

One of the publications mentioned above (**Exhibit 8**) is from a periodical in which I (and Weidner) appear on the front page. I have no doubt that I paid special attention to this publication and read it thoroughly. Although I don't have any pretensions of being an expert regarding Macau (as of 1999), **Hananel's testimony whereby I told him that I had never in my life heard of Macau, and I did not know whether it was a place, address or brand name – is testimony which cannot be granted any credibility.** It attributes to me exceptional ignorance – not only as an adult, but in particular as a person with a great deal of experience in the tourism and gaming industries. **This is incredible testimony which undermines the credibility of all of Hananel's testimony concerning this matter.**

113.    I have also read the claims made in Sections 4.6 – 4.7 of Hananel's affidavit with regard to **"the inquiry"** and the **"analysis"** which he allegedly performed regarding Macau, and about the results of which he allegedly told me during the same conversation (which did not take place). As explained in greater detail in Weidner's affidavit (Paragraphs 43-44), Hananel's assertions are a collection of matters which are common knowledge (for example, that Macau was due to be returned to China's control or that the gaming in Macau was under a monopolistic regime) or common assessments (for example, the assumption that the Chinese authorities would install law and order in Macau), combined with incorrect facts and arrogant self serving statements.

114.    A good illustration of the above is Hananel's claim, in Section 4.7 of his affidavit, that **"from my experience and from an analysis I performed, I estimated"** that the Chinese authorities would exercise in Macau – as they had in Hong Kong – a policy of non-intervention and economic autonomy (the One Country, Two Systems method). It is unclear what **experience** or **analysis** Hananel used or performed in order to reach this so-called **"estimate"**. As detailed in Mr. Weidner's affidavit (paragraph 44.4), the fact that the Chinese authorities would exercise autonomy in Macau on the basis of the One Country, Two Systems principle was fixed in the basic law establishing the Macau Special Administrative Region **which was enacted already in 1993** and in the agreement between Portugal and China with respect to Macau **of 1987**. Obviously, Hananel's assertion that this was his **"estimate"**, based on his **"experience"** and **"analysis"**, just proves that Hananel's story is made up.

- 34 -

115.    Another example may be found at the end of Section 4.7 of Hananel's affidavit, according to which:

> "<u>My inquiry further revealed that there was no other casino within a 5-hour flight radius around Macau.</u> Since the area's population is more than 1.5 billion people, <u>this fact was of the utmost importance</u>."

Indeed, a "fact" of "**the utmost importance**", except that it is without any basis in the real world (for details see Weidner's affidavit, paragraph 44.5). **Accordingly, even if Hananel's testimony about our "Macau conversation" was true, he gave me false information with no value (or even worse).**

116.    Another example - in Section 4.2 of his statement of claim Hananel announces that:

> "**The Plaintiff took an interest in the venture and in the field of gambling in the Far East, <u>and learned that there is only one casino house operating in the Macau district.</u>**"

This too is of course an important "fact" but unfortunately has no basis in the real world. There were **nine** casinos operating in Macau at the time (see Mr. Oliveira's affidavit, paragraph 3). **Again - false information of no value**, which just proves Hananel's story is made up.

117.    Another false fact which Hananel claims, several times in his affidavit, that he told me about, is that the ferry trip between Macau and Hong Kong **takes 40 minutes** (Sections 4.2, 4.9 and 5.1 of Hananel's affidavit). This claim demonstrates, yet again, Hananel's ignorance with regard to Macau and the fact that the conversation about Macau which he claims took place between us **never took place.** The ferry trip between Hong Kong and Macau most usually **takes one hour** (never less than 55 minutes). I have taken this ferry dozens of times. The trip never takes 40 or 45 minutes. I am attaching to my affidavit a print-out from the official website of the Macau Government Tourist Office, which explains how to get to Macau via sea, and states that **"journeys will take one hour from Hong Kong to Macau and vice versa".** Thus, Hananel's claim, in Section 5.1 of his affidavit, whereby **"Adelson 'complained' to me that even though I had assured him that the hovercraft trip would last 40 minutes, it actually took 45 minutes"** <u>cannot be a true claim</u>. This is another one of the Hananel's lies which undermines the veracity of his entire story.

A copy of the print-out from the official website of the Macau Government Tourist Office is attached hereto as **Exhibit 14** to my affidavit.

- *35* -

118.    Hananel claims – in Section 4.10 of his affidavit – that, while we were speaking about Macau before my trip to the Far East in August 1999, he gave me brochures which he had received from a person by the name of Arie Lis, which – according to Section 4.3 of Hananel's affidavit – concern investment **in the city of Zhuhai in China.** I would like to clarify the following: **Zhuhai is not Macau and Macau is not Zhuhai.** In August 1999 Zhuhai and Macau belonged to two separate countries. Zhuhai was part of China. Macau was a Portuguese sovereign colony. In December 1999, upon the handover, Macau was returned to Chinese sovereignty, but was, and has remained until this day, a Special Administrative Region in which, for example, the Communist system is not practiced. In order to travel from Macau to Zhuhai one must be equipped with a passport and **a visa permitting entry to China** (no visa is required in order to enter Macau, except for Chinese citizens of certain cities). The idea that brochures about <u>Zhuhai</u> could be of any assistance in coming to a decision regarding an investment in <u>Macau</u> is absolutely unfounded, since these are two different places which also operate under two different governments.

119.    In Section 4.12 of his affidavit Hananel describes an introductory meeting which allegedly took place between myself and Mr. Arie Lis, during which Hananel allegedly pointed out to me **"that Mr. Lis was associated with the Macau issue"** which he had talked to me about before. I have no recollection whether in 1999 (as alleged by Hananel) Hananel introduced me to a person by the name of Arie Lis. In any event, Hananel did not tell me that Mr. Lis was associated with the Macau issue he had discussed with me before, because the conversation about Macau which Hananel alleges he had with me never occurred.

120.    In Section 4.8 of Hananel's affidavit he is claiming that **he gave me the idea** of combining a conference center with a casino in my application for a Macau gaming concession. In Section 5.4.2 of his affidavit Hananel reveals – after he was served with a copy of the Expression of Interest document which the Venetian had filed (<u>**Exhibit 2**</u> of Weidner's affidavit) - that "**An inspection of the document also reveals that the strategy that was used by Adelson was a combination of a complex combining a conference center with a casino – <u>precisely according to the outline which I had proposed to Adelson in as early as 1999</u>**".

~ 36 ~

121.   The absurdity of this claim must be made clear. I had been in the convention and exhibition industry since 1972. I had been in the gaming and hotel industry since 1989. I was the first one to recognize the extraordinary synergistic advantages of combining conventions and exhibitions with hotels and gaming when a company in which I was the majority shareholder started building in 1989, next to the Sands Hotel & Casino, the first privately owned conference and exhibition center in the United States and, to the best of my knowledge, in the world (the Sands Expo and Convention Center). I am the creative force behind the strategy of convention and exhibition-based marketing for the Venetian Resort Hotel Casino. **This is the essence of the Venetian: the combining of** conventions **and** conferences **with a** casino. Hananel's claim that he brought **value** by telling me that I should **combine a conference center with a casino**, is similar to a claim that I would be bringing value to the owner of McDonald's by telling him that he should add cheese to his hamburgers and sell them as cheeseburgers. It's plainly absurd. I certainly did not need Hananel to tell me to combine a convention and exhibition center with a casino hotel. After all that's what I had been doing since 1989.

122.   Another point which I would like to re-emphasize is that in August 1999, when Hananel claims we had the alleged conversation regarding Macau, Macau was under Portuguese sovereignty. No discussion of gaming was possible with any government official since the issue was to be decided by the future and totally different government after the handover to China.

123.   To sum up this chapter: the conversation about the casino venture in Macau which Hananel claims took place between us before my trip to the Far East in August 1999 **did not take place.** However, I would like to point out that even if such a conversation had taken place, then I did not do anything as a result of that conversation.  The gaming tender in Macau opened **more than two years** after the conversation which Hananel claims took place between us.  The Venetian did not win the tender, **and Hananel certainly did not make any contribution – not even a minor one – to the involvement of the Venetian (in a certain form) in Galaxy, which did win the tender.**

**Hananel's (baseless) attempt to make a connection between his dismissal in April 2000 and the casino venture in Macau**

124.   In April 2000 IPI terminated Hananel's employment. Hananel claims, in a clear and unequivocal manner, that **"Adelson fired me in order to deny me the rights he knew I was entitled to in the Macau Venture"** (see, for example, Section 8.1.6 of his affidavit).  Hananel declares (in Section 8.1.2 of his affidavit) that – after I had returned to Israel from my trip to the Far East in March 2000:

- 37 -

> "Suddenly, Adelson was discrete with me, and issues which had always been part of the conversations between us, were suddenly hushed. Thus, and in particular, <u>Adelson did not share with me his impressions from the Far East trip from which he had just returned [the March 2000 trip], and which had included Macau as one of its destinations</u>".

Hananel describes his dismissal as "**a malicious attempt** <u>to hide</u> **from me his execution of the Macau Venture**" (Section 8.1.2 of his affidavit), and adds (in Section 8.1.6 of his affidavit) that I tried "**through any deceitful means ... to deny [Hananel]** <u>any information regarding Macau</u>".

125.    These are indeed harsh words, but they are contradicted by Hananel's own testimony. In his deposition in the US proceedings Hananel described **in a very detailed fashion** the meetings which I supposedly had in Macau during my trip to the Far East in March 2000. Thus, Hananel testified about the meeting which I allegedly had with a senior official in the Macau government (**Exhibit 3**, pages 221-222) and when Hananel was asked who told him about that meeting and what happened there – his reply was .... <u>Sheldon Adelson</u> (**Exhibit 3**, pages 222-223). However, not only did I allegedly report to Hananel about the meetings which I had in Macau, Hananel also testified that I (or someone on my behalf) had given him **business cards** of the two people with whom I had allegedly met in Macau during the course of my trip to the Far East in March 2000 (**Exhibit 3**, pages 209-210).

126.    These business cards, which I (or someone on my behalf) allegedly gave Hananel after my trip to the Far East in March 2000, constitute another proof of Hananel's perjury. One of these business cards, produced by Hananel in the pre-trial discovery proceedings, belongs to a Macau official by the name of Louis Sou. **As stated by Mr. Sou in his affidavit which is being filed concurrently with this affidavit, <u>that business card, which Hananel claims to have received in March 2000, "did not exist before November 2000",</u> thus revealing Hananel's testimony to be an intentional fraud.**

127.    To summarize this chapter, Hananel's testimony in the proceedings in the United States regarding how I allegedly informed him of my meeting in Macau in my March 2000 trip to the Far East **contradicts** Hananel's version in his affidavit before the Honorable Court. Perhaps of even more importance, the malice which Hananel attributes to me collapses. If I had really intended to dismiss Hananel, as he declares, "**in order to deny me the rights he knew I was entitled to in the Macau Venture**", why would I report to Hananel about my alleged meetings in Macau with a government official and a real estate person? Why would I give Hananel those people's business cards? This is an absolutely illogical version. The truth of the matter is that there were, of course, no such meetings (or business cards given) and Hananel's version regarding these events is just another perjury committed by him.

-38-

**Hananel's (baseless) claim that since our alleged conversation before my trip to the Far East in August 1999 I have continuously acted to execute the business opportunity he allegedly gave me**

128. In Section 5 of his affidavit Hananel claims that since his conversation with me before my trip to the Far East in August 1999 "Adelson launched a continuous and material series of acts to execute the opportunity which I had identified and presented to him for the venture in Macau, to the completion and actual operation of a huge and grand casino center in Macau ... there is a material continuum in time of consistent acts taken by Adelson and his people to execute the opportunity which I had identified".

129. This assertion is baseless. As set forth in detail above, Hananel's claims regarding my visits and meetings in Macau, during my trips to the Far East **in August 1999 and March 2000**, are entirely unsubstantiated and without merit. Subsequently, in Section 5.4.1 of his affidavit, Hananel declares that "**in July 2000 or thereabouts**, Adelson was contacted by a person by the name of Richard Suen ("Suen"), who was a friend of Adelson's brother, Mr. Lenny Adelson. Suen offered Adelson his services in assistance with the consummation of an opportunity for a casino in Macau". This is a conversation which, according to Hananel's affidavit, occurred **one year** after Hananel's alleged conversation with me about Macau, **and which I did not initiate**. Moreover, Hananel himself testified (**Exhibit 3**, pages 43 – 45), that he does not have any connection to Richard Suen or to Suen's approach to me. Subsequently Hananel goes on to describe events (some of them genuine and some of them baseless) which occurred in 2001, **two years after the alleged conversation with him**, just before the public process began, **while not raising any claim that he had any connection with any of them**.

130. Thus, the claim that ever since Hananel's conversation with me before my trip to the Far East in August 1999 – "Adelson launched a continuous and material series of acts to execute the opportunity which I had identified and presented to him for the venture in Macau" – is an unfounded claim.

**Chapter J – Reply to additional claims in Hananel's affidavit and additional comments**

131. In section 3.2.1(h) of his affidavit Hananel mentions a meeting I had with the finance minister and vice president of Bulgaria. When Hananel and I were in Bulgaria (for the trip mentioned in paragraph 53 above) Hananel told me I should meet a person he introduced to me as the finance minister of Bulgaria, since he could help us regarding the Murano Venetian Glass which Hananel said the Venetian could purchase in Bulgaria. That meeting had nothing to do with developing or buying a casino in Bulgaria, which I never did, and – like the rest of Hananel's idea of LVS buying Murano Venetian glass in Eastern Europe – had absolutely no value.

-39-

132. In Sections 3.3.1 – 3.3.2 of Hananel's affidavit, Hananel describes the investments made in IMDSoft and Denex. The descriptions contained in these sections include inaccuracies, such as the assertion that the investments in these companies were made by me personally, whereas they were in fact made by IPI. In addition, the description of the date of the investment in IMDSoft is not correct.

133. In Section 5.4 of his affidavit Hananel claims that – after I returned from my trip to the Far East in March 2000 – I waited several days before dismissing Hananel **"to enable the holding of a meeting which I [Hananel] had initiated for him with Mr. Shimon Peres"**. This is not true. I did not need Hananel to set up a meeting for me with Mr. Shimon Peres and I did not delay telling Hananel of the termination of his employment by IPI because of that meeting.

134. In section 8.1.1 of his affidavit Hananel claims the he made "**a huge achievement**" by securing a certain business deal for IMDSoft. Hananel's description of his role in that business deal is totally incorrect and exaggerated.

135. In contrast to the contention in Section 8.4 of Hananel's affidavit, neither I, nor any person acting on my behalf, ever threatened Hananel with damage to his reputation should he refuse to waive his rights. The claim which IPI filed against Hananel in the Labor Court (Labor Case 9015/02), which is mentioned in Section 8.4 of Hananel's affidavit, was transferred by IPI for hearing in a court in the United States after Hananel had used the filing by IPI in Israel to claim that I personally had subjected myself to the jurisdiction of the courts in Israel for all intents and purposes. Section 8.4 of Hananel's affidavit contains many further accusations against me -- accusations regarding harassment of Hananel, regarding ceaseless surveillance of Hananel and of his family, regarding impersonation etc. – all of which are incorrect, and which may be attributed to Hananel's attempt to turn the tables, after having been caught **trying to deceive the US court with false claims that he was blind**.

136. As stated in the Statement of Defense on my behalf, I deny the jurisdiction of this Honorable Court, both its subject matter jurisdiction (due to the absence of any employee-employer relationship between myself and Hananel) and its international jurisdiction over me (as a citizen and resident of the United States). In addition, as stated in the Statement of Defense on my behalf, Hananel failed to join in the claim the company to whose shares the claim relates. According to legal advice I have received, this omission is more than a mere technical matter and must lead to the dismissal of the claim.

-40-

137.  Hananel's affidavit contains several additional claims which, according to legal advice I have received, are not relevant to this lawsuit. Moreover, together with his affidavit, Hananel filed - in this lawsuit - photocopies of the affidavits which he filed in 2004 within the framework of IPI's lawsuit against him. According to legal advice I have received, the claims contained in these affidavits, to the extent not addressed above, are not relevant to this lawsuit, and for the sake of caution I want to make it clear that I (and IPI) deny everything claimed in those affidavits.

138.  As has already been stated above, in several instances in his affidavit, Hananel refers to correspondence which was exchanged when we tried to reach a settlement regarding his demands following his termination by IPI. According to legal advice I received, these documents are inadmissible and the defendants do not agree to the admissibility thereof. Notwithstanding the aforesaid, according to legal advice I have received, in view of the decisions of the Labor Courts in this matter, I have replied in my affidavit to some of Hananel's claims regarding this matter without derogating from my claim that they are inadmissible. Furthermore, according to legal advice I have received, Hananel's affidavit contains additional documents which he is not entitled to file and additional claims which he is not entitled to raise, for example due to "extension of the scope of the dispute", and I object to these documents and claims being filed and raised.

## Chapter K - Conclusion

139.  Hananel's claim pending in this court is a total fabrication. Hananel did not work for me personally or for any other company I have ever had any interest in other than IPI. Hananel's alleged "option agreement" never existed and Hananel's entitlement to participation in profits was limited, subject to the terms mentioned above in my affidavit, to Israeli hi-tech companies in which IPI invested. Hananel's scope of employment did not include world-wide casino investments and he does not have any claim to any part of LVS's business activities. Regarding Macau - frankly, it is bewildering to me how Hananel can claim that it was because of him the Venetian won a gaming concession in Macau (which it didn't), when the process for the granting of the concessions was a **public tender, open to all**, and Hananel had been terminated **more than a year and a half before the tender even began**. From the mere fact that the process for the granting of the concessions was **public and fully accessible to everyone in the industry**, Hananel – who had been terminated more than a year and a half before the tender began – could clearly not have made any contribution to the Venetian being, ultimately, a sub-concessionaire of one of the winners in the tender.

140.  I request the Honorable Court to dismiss Hananel's claim, and to order him to pay the costs of my defense and IPI's defense.

-41-

I declare that my name is Sheldon G. Adelson, my signature is herein below and the content of my above affidavit is the truth.

Sheldon G. Adelson

**Certification**
In accordance with Section 15 of the Evidence Ordinance [New Version], 5731-1971, I, the undersigned, Amir Shraga, Adv., of 7 Menachem Begin St., Ramat Gan, certify that on April 21, 2007 appeared before me Mr. Sheldon G. Adelson, who is known to me personally, and who, after having cautioned him to declare the truth, failing which he would be liable for the penalties prescribed by law, signed this affidavit in my presence.

Amir Shraga, Adv.
License #23944

E:\10070-001\taz-sheldon-adelson-macau-ver09-trans-clean.doc